BROWNE GEORGE ROSS LLP
Peter Obstler (State Bar No. 171623)
  pobstler@bgrfirm.com
101 California Street, Suite 1225
San Francisco, California 94111
Telephone: (415) 391-7100
Facsimile: (415) 391-7198

BROWNE GEORGE ROSS LLP
Eric M. George (State Bar No. 166403)
  egeorge@bgrfirm.com
Debi A. Ramos (State Bar No. 135373)
  dramos@bgrfirm.com
2121 Avenue of the Stars, Suite 2800
Los Angeles, California  90067
Telephone: (310) 274-7100
Facsimile: (310) 275-5697

Attorneys for LGBTQ+ Plaintiffs Divino Group
LLC, Chris Knight, Celso Dulay, Cameron Stiehl,
BriaAndChrissy LLC, Bria Kam, Chrissy
Chambers, Chase Ross, Brett Somers, and
Lindsay Amer

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION

| | |
|---|---|
| DIVINO GROUP LLC, a California limited liability company, CHRIS KNIGHT, an individual, CELSO DULAY, an individual, CAMERON STIEHL, an individual, BRIAANDCHRISSY LLC, a Georgia limited liability company, BRIA KAM, an individual, CHRISSY CHAMBERS, an individual, CHASE ROSS, an individual, BRETT SOMERS, an individual, and LINDSAY AMER, and individual,<br><br>             Plaintiffs,<br><br>     vs.<br><br>GOOGLE LLC, a Delaware limited liability company, YOUTUBE, LLC, a Delaware limited liability company, and DOES 1-25,<br><br>             Defendants. | Case No.<br><br>**CLASS ACTION COMPLAINT FOR DAMAGES, INJUNCTIVE RELIEF, RESTITUTION, AND DECLARATORY JUDGMENT**<br><br><br>**<u>JURY TRIAL DEMANDED</u>**<br><br><br>Action Filed:<br>Trial Date:  None Set |

# TABLE OF CONTENTS

Page

I. INTRODUCTION AND STATEMENT OF THE CASE ...................................................1

II. PARTIES...................................................................................................................10

III. JURISDICTION AND VENUE...................................................................................12

IV. FACTS COMMON TO ALL CLAIMS........................................................................13

    A. The YouTube Platform.......................................................................................13

    B. YouTube Holds Itself Out As A Quintessential Forum for Freedom of Expression ...........................................................................................................14

    C. Defendants Flout The Fundamental "Free Expression" Bargain They Made With YouTubers ................................................................................................16

    D. Defendants Begin To Compete With YouTubers In The Proposed Class .............18

    E. Defendants' Tool Kit Of Unlawful Speech Suppression .........................................20

        1. Restricted Mode .....................................................................................20

        2. Advertising Restrictions ...........................................................................23

        3. AI Filtering Under Restricted Mode And Advertising Restrictions ...........25

        4. Deletion Of LGBTQ+ Content Thumbnail Images.....................................27

        5. Cancelling And Stopping New Video Notifications ...................................27

        6. Excluding LGBTQ+ Related Content From The "Up Next" Recommended Application ..................................................................28

        7. Recommending Anti-LGBTQ+ Hate Speech In The "Up Next" Application Alongside The LGBTQ+ Plaintiffs' Videos ...........................28

        8. Playing Anti-LGBTQ+ Related Advertisements Immediately Before The LGBTQ+ Plaintiffs' Videos................................................................29

        9. Including Anti-LGBTQ+ Hate Speech In The Comments Section Appearing On The Same Screen As The LGBTQ+ Plaintiffs' Videos........30

        10. Other Unlawful Speech-Restricting Tools .................................................33

    F. Defendants Were Caught Censoring LGBTQ+ Users In 2017 ...............................34

    G. YouTube's Promises To the LGBTQ+ YouTubers Were "Lip Service".................35

    H. Defendants Have And Continue To Violate The Rights Of The LGBTQ+ Plaintiffs And The LGBTQ+ Community .............................................................37

CLASS ACTION COMPLAINT FOR DAMAGES, INJUNCTIVE RELIEF, RESTITUTION, AND DECLARATORY JUDGMENT

1. Divino (GlitterBombTV.com's GNews!) ....................................................37

2. BriaAndChrissy LLC (BriaAndChrissy).......................................43

3. Chase Ross ........................................................................50

4. Brett Somers a/k/a AMP (Watts The Safeword) ..........................58

5. Lindsay Amer (Queer Kid Stuff) ................................................62

V.   CLASS ACTION ALLEGATIONS........................................................66

FIRST CAUSE OF ACTION (California Constitution Article I, section 2) ...................................71

SECOND CAUSE OF ACTION (California Unruh Civil Rights Act—Civil Code §§ 51, et seq.) ......................................................................................74

THIRD CAUSE OF ACTION (California Business and Professions Code §§ 17200, et seq.) ......................................................................................75

FOURTH CAUSE OF ACTION (Breach of Implied Covenant of Good Faith and Fair Dealing) ..............................................................................76

FIFTH CAUSE OF ACTION (Lanham Act—15 U.S.C. § 1125 et seq.)......................................78

PRAYER FOR RELIEF.............................................................................79

JURY DEMAND .........................................................................................80

Plaintiffs Divino Group LLC d/b/a GlitterBombTV.com, which produces the online show "GNews!;" Chris Knight, Celso Dulay, Cameron Stiehl, BriaAndChrissy LLC d/b/a "BriaAndChrissy," which owns the channel youtube.com/BriaAndChrissy; Bria Kam, Chrissy Chambers, Chase Ross, sole proprietor of youtube.com/uppercaseCHASE1; Brett Somers, sole proprietor of youtube.com/Watts The Safeword; and Lindsey Amer, sole proprietor of queerkidstuff.com, (collectively the "LGBTQ+ Plaintiffs") bring this Complaint for damages, and equitable and declaratory relief, individually, and on behalf of all persons similarly situated, against Defendant YouTube, LLC ("YouTube") and its parent company, Google LLC ("Google") (collectively referred to as "Google/YouTube" or "Defendants," unless otherwise specified).

## I.     INTRODUCTION AND STATEMENT OF THE CASE

1.     The LGBTQ+ Plaintiffs are Lesbian, Gay, Bisexual, Transgender, Transsexual or Queer content creators, viewers, users, and/or online consumers of YouTube who bring this lawsuit to redress Defendants Google/YouTube's discrimination, fraud, unfair and deceptive business practices, unlawful restraint of speech, and breach of consumer contract rights on behalf of themselves and other Lesbian, Gay, Bisexual, Transgender, Transsexual, or Queer persons (collectively referred to as the "LGBTQ+ Community") who use the global social media site known as "YouTube."

2.     Google/YouTube control and regulate more than 95% of the public video-based content and communications in the world.  By controlling and regulating virtually all of the public video content in the United States and the rest of the world, Google/YouTube operate YouTube as the largest for-profit forum dedicated to free speech and expression in the history of the world.  It is estimated that Defendants reap more than $25 billion in annual revenues and profits solely by regulating, distributing, and monetizing the free speech and expression of the estimated 2.3 billion people who use YouTube.

3.     The business model is simple enough: solicit and induce the public to post, view, and communicate through video content on the YouTube platform by inviting the public to use YouTube as a place to engage in "**Freedom of Expression**," "**Freedom of Information**,"

CLASS ACTION COMPLAINT FOR DAMAGES, INJUNCTIVE RELIEF, RESTITUTION, AND
DECLARATORY JUDGMENT

"**Freedom of Opportunity**," and "**Freedom to Belong**."[1]  Defendants further represent that all persons who use the site are accorded the status of "members" of a public "YouTube Community" who are subject to viewpoint-neutral, content-based regulations that Defendants designate as "Community Guidelines."  Google/YouTube represent and warrant that these freedoms apply to all Community Members and shall be exercised by and protected for each and every user.  Indeed, in sworn testimony to the U.S. Congress, Google/YouTube warrant that "everyone's voice" will be heard, subject only to viewpoint-neutral, content-based rules and filtering under rules that "apply equally," to all members of the YouTube Community, regardless of the individual user's particular viewpoint or identity.

4.      In return, Defendants monetize the video content of YouTube's users through a variety of means, including, but not limited to, selling online advertising space to third-party advertisers; selling consumers video reach and distribution products; collecting, mining, and selling the personal information or "data" of anyone who uses the site, entering into lucrative deals with third-party fact checkers and content curators who are authorized to flag and proscribe content that they and Defendants dislike; and, more recently, creating, producing, marketing, distributing and monetizing Defendants' own video content, or monetizing content creation, marketing, and distribution through deals with large media conglomerates like FOX News, the NFL, HBO, and PBS (to name but a few).

5.      When it comes to the LGBTQ+ members of the YouTube Community, Defendants have not kept their end of the bargain.  Internal documents suggest that YouTube was never a truly free and open platform in accordance with the free speech and viewpoint-neutral promises given to consumers.  Indeed, Defendants now describe themselves as a "Good Censor."[2]  Rather than being free and open to all, Defendants have abandoned YouTube's mission as a viewpoint-neutral video hosting platform and are increasingly engaged in a discriminatory and fraudulent profit scheme in

---

[1] See https://www.youtube.com/yt/about/ .

[2] See "Google, Facebook, Twitter Shifted to Censorship From Free Speech, According to Leaked Google Document," The Epoch Times, October 10, 2018 (https://www.theepochtimes.com/google-facebook-twitter-shifted-from-free-speech-to-censorship-according-to-leaked-google-document_2686124.html).

which Community Members are now subjected to discriminatory, animus-based and content-based regulations and restrictions, designed to maximize Defendants' financial and political interests. As such, the fundamental bargain upon which YouTube was built has now been broken. LGBTQ+ users, like the LGBTQ+ Plaintiffs who built the YouTube platform, are now being subjected to unlawful content regulation, distribution, and monetization practices that stigmatize, restrict, block, demonetize, and financially harm the LGBTQ+ Plaintiffs and the greater LGBTQ+ Community.

6. Since 2016, Defendants have exercised unfettered and absolute discretion to control, regulate, restrict, and manipulate the public video content and viewership of consumers on YouTube, based not on the content of the video, but Defendants' subjective animus, dislike, or commercial bias with respect to the viewpoint and/or the identity of the content creator and/or the intended audience, including content that Defendants identify as being posted by or expressing a viewpoint of an LGBTQ+ user. In the exercise of that discretion, Defendants brand LGBTQ+ content as "shocking," "offensive," and/or "sexually explicit" not because of the video's content, but either because the viewpoints expressed involve what a senior Google/YouTube content curator dubbed the "gay thing," or because the content was posted by or viewed by YouTube Community members who identify as "gay." At the same time, in direct violation of their Community Guidelines and monetization rules, Defendants use their absolute power and discretion over content regulation and monetization to promote, sponsor, and profit from violent, obscene, and threatening hate speech and online bullying directed at and against the LGBTQ+ Community, including the LGBTQ+ Plaintiffs.

7. Defendants effectuate their unlawful discriminatory, fraudulent, anticompetitive, and unlawful attack on the rights of the LGBTQ+ Plaintiffs and the LGBTQ+ Community by utilizing a complex and clandestine web of broad, overlapping, vague, discriminatory, and unlawful content-based speech regulations, filtering practices, data and information collection and surveillance, video monetization, and third-party advertising and content production schemes. Defendants use this speech regulation scheme as a pretext to engage in unlawful practices that restrain and harm the LGBTQ+ Plaintiffs and the greater LGBTQ+ Community, by insisting that

animus-based speech regulation and discrimination against the LGBTQ+ Community and/or what Defendants refer to as the "gay thing," is necessary for "keeping [their] popular online video service safe and enjoyable for users."

8.      Google/YouTube is engaged in discriminatory, anticompetitive, and unlawful conduct that harms a protected class of persons under California law.  And Defendants' animus-based content regulations and discriminatory filtering practices certainly have not made YouTube any safer.  Defendants' control and regulation of speech on YouTube has resulted in a chaotic cesspool where popular, compliant, top quality, and protected LGBTQ+ content is restricted, stigmatized, and demonetized as "shocking," "inappropriate," "offensive," and "sexually explicit," while homophobic and racist hatemongers run wild and are free to post vile and obscene content on the pages and channels of the LGBTQ+ Plaintiffs and other LGBTQ+ content creators.  That should not come as a surprise because, as the record developed to date in this case and other legal proceedings, Congressional testimony, and news reports show, Defendants are engaged in a discriminatory and fraudulent scheme to profit from the unlawful and fraudulent regulation of speech on the platform in which compliant and quality LGBTQ+ content is restrained and demonetized, while vile and dangerous homophobic hate speech is monetized and promoted to further Google/YouTube's corporate profits and market power.

9.      Each LGBTQ+ Plaintiff in this case is a victim of one or more of Defendants' systemic and pervasive discriminatory, anticompetitive, and unlawful practices that have caused substantial reputational and financial harm to each of them.

10.     Defendants continue to threaten and harm the entire LGBTQ+ YouTube Community by using their unprecedented power over free speech and expression as a pretext to systematically target, suppress, stigmatize, terrorize, steal, and financially harm the video content created or viewed by the LGBTQ+ Community, including, but not limited to:

a.      Failing to apply content-based regulations and filtering "equally to all," as provided for in Defendants' form consumer contract and promises to the LGBTQ+ Plaintiffs and the LGBTQ+ Community;

b.      Arbitrarily, capriciously, and unfairly censoring, removing, suspending,

restraining, suppressing and/or demonetizing the speech, video content or channels of LGBTQ+ YouTubers solely because they are "lesbian," "gay," "bisexual," "transgender," or "queer," because they identify as such, because they address issues of interest to the LGBTQ+ Community or because they use tag words related to the LGBTQ+ Community in association with their content to make it easier for viewers to locate their content;

     c.    Exercising unfettered and absolute discretion to selectively apply and enforce content-based regulations, content filtering tools, and monetization schemes in a manner that promotes Defendants' own content or content in which Defendants have a direct financial interest, including obscene, violent, and/or homophobic bullying and hate speech that Defendants not only fail to regulate or restrict, but which they monetize and profit from;

     d.    Enforcing what Defendants stated was a "company policy" of prohibiting "gay" users from advertising their content on YouTube because of the "gay thing" and using that "policy" to stigmatize LGBTQ+ YouTubers and their content as "shocking" and "sexually explicit" solely because the users identify as "gay" or LGBTQ+;

     e.    Demonetizing the content of the LGBTQ+ Plaintiffs and the LGBTQ+ Class, including LGBTQ+ YouTubers who operate and publish content on some of the most popular channels on the YouTube platform;

     f.    Promoting, monetizing, profiting, and distributing online hate speech, including homophobic slurs, threats of violence and death; theft and destruction of LGBTQ+ content; homophobic, obscene and threatening video comments that appear in connection with the channels' video content (as recommended videos and as advertisements), all of which violate Defendants' regulations, policies, and contracts with their consumers, and none of which are protected by the California or federal law, or even by Defendants' own published guidelines;

     g.    Promoting individuals and groups with anti-LGBTQ+ messages by selling advertisements which undermine, criticize, disparage, or belittle members of the LGBTQ+ Community, and running those advertisements that violate the law and Defendants' regulations and contracts with consumers, immediately before the videos of the LGBTQ+ Plaintiffs, thereby discouraging viewers from going forward with the viewing of the LGBTQ+ Plaintiffs' videos ;

CLASS ACTION COMPLAINT FOR DAMAGES, INJUNCTIVE RELIEF, RESTITUTION, AND DECLARATORY JUDGMENT

h.      Promoting YouTubers with anti-LGBTQ+ messages or with hate speech videos by recommending such videos to the LGBTQ+ Plaintiffs' viewers in YouTube's "Up Next" list of recommended videos which appears on the screen when the LGBTQ+ Plaintiffs' videos are played;

i.      Replacing the LGBTQ+ Plaintiffs' customized "thumbnail" graphic images of individual videos, which serve as mini-advertisements that appear in YouTube search results, with Defendants' own generic thumbnails, consisting of a screenshot taken at random from the individual video;

j.      Arbitrarily, capriciously, and unfairly removing individual subscribers from the list of those viewers who have intentionally applied to be affiliated with the respective YouTube channels of LGBTQ+ YouTubers, without notice to the LGBTQ+ creators or to the individual subscribers;

k.      Unilaterally changing the procedure for new video notifications to be sent to individual subscribers of the LGBTQ+ creators' channels, without giving notice to the subscribers or to the LGBTQ+ creators, resulting in hundreds of thousands of subscribers not receiving notices as new content is uploaded by LGBTQ+ creators;

l.      Stealing, copying, altering, and or violating the property rights appurtenant to the content of the LGBTQ+ Plaintiffs, and then using the content of the LGBTQ+ Plaintiffs to produce and promote content that Google/YouTube own, or in which they have a financial interest, and that directly competes with the original content stolen from the LGBTQ+ Plaintiffs;

m.      Arbitrarily, capriciously, and unfairly excluding LGBTQ+ creators' original videos from Google/YouTube's "Up Next" video recommendations, which appear on the screen whenever videos are played; while at the same time recommending hate speech or disparaging reaction videos which steal, copy, or alter the very same original videos upon which they are based;

n.      Fraudulently and deceptively inducing LGBTQ+ YouTubers and the public to use YouTube by promising the LGBTQ+ Plaintiffs and the public that YouTube is (i) a "Public Forum" (ii) dedicated to Four Freedoms - Expression, Information, Opportunity, and Belonging,

and (iii) a "Community" where "everyone's voice" may be heard subject only to (iv) viewpoint- and identity-neutral, content-based regulations that apply equally to everyone, and then breaching those obligations in a way that financially injures and causes other reputational harms to LGBTQ+ YouTubers and consumers.

11.     This is not the first time that Defendants have been accused of, and admitted to LGBTQ+ discrimination and malfeasance, by improperly manipulating content and user regulations to suppress the content and rights of LGBTQ+ members of the "YouTube Community." As early as 2016, Defendants admitted that their restraints unfairly discriminated against LGBTQ+ users like Plaintiffs, hiding from view videos that reference same-sex relationships, and other videos focusing on "pop culture from a feminist and queer perspective." When these restraints were exposed, YouTubers like Tyler Oakley, Gigi Gorgeous and others "blasted the platform for bias."

12.     Google/YouTube publicly admitted that using their Restricted Mode filtering, they improperly censored videos that were posted or produced by members of the LGBTQ+ Community based upon the identity and orientation of the speaker, rather than upon the content of the video. In response to complaints from the LGBTQ+ Community and other civil rights critics, Google/YouTube promised to remove all restricted filtering on videos posted or produced by LGBTQ+ members and groups, and to change their policy, filtering algorithm, and manual review policies to ensure that videos posted by LGBTQ+ vloggers were not being censored solely because of the identity of the speaker. Google/YouTube admitted that they wrongly censored videos posted by members of the LGBTQ+ Community, blaming a purported engineering problem with filtering tools that targeted video content from LGBTQ+ users, or targeted users who discussed topics and perspectives regarding LGBTQ+ issues. Google/YouTube agreed to investigate the claims of LGBTQ+ users and dispatch a team of senior managers, including YouTube's CEO Susan Wojcicki, to meet with LGBTQ+ representatives to consider revising their policies and review protocols, correcting the filtering tools, and rewriting guidelines that "clarify its position by specifically allowing personal accounts from victims of discrimination or violent hate crimes, as long as they don't contain graphic language or content."

13.     On April 27, 2017, Johanna Wright, Vice President of Product Management for Google/YouTube, promised LGBTQ+ YouTubers that Defendants would ensure that "Restricted Mode" should not filter out content belonging to individuals or groups based on certain attributes like gender, gender identity, political viewpoints, race, religion or sexual orientation."  And while Defendants admitted that "Restricted Mode will never be perfect, [Google/YouTube] hope to build on [their] progress so far to continue making [their] systems more accurate and the overall Restricted Mode experience better over time."

14.     But the LGBTQ+ YouTubers who met with Defendants, all of whom were forced to execute non-disclosure agreements regarding the substance of their discussions with Defendants, now believe that Defendants' promises were nothing more than "lip service" made solely for public relations purposes and now believe that Ms. Wojcicki and Defendants had no intention of keeping their promises.

15.     Instead of taking LGBTQ+ reports of viewpoint discrimination and selective restrictions on LGBTQ+ content seriously, Ms. Wojcicki spent some of her "personal vacation" time doing carefully scripted PR or "selfie" interviews with selected YouTubers, and other media outlets, in which she boasts that all is well at YouTube, especially with the LGBTQ+ members of the YouTube Community.[3]  In one interview, posted only days before the filing of this Complaint, YouTube's CEO Susan Wojcicki confirmed the importance of and Defendants' adherence to the "Four Freedoms" of expression, describing those promises to consumers as the "Pillars" of the YouTube platform and global Community it serves.  When the interviewer is prompted to ask her scripted questions about reports and concerns of viewpoint- or animus-based censorship and the use of content-based restrictions, Wojcicki pleads executive ignorance of systemic complaints and harms caused by viewpoint bias or animus-based content regulation, filtering tools, monetization restrictions, and promotion of LGBTQ+ harassment and hate speech for profit.

16.     While YouTube's CEO and other senior executives of the global video communication monopoly continue to double down on their promises of free speech, viewpoint

---

[3] See https://www.youtube.com/watch?v=gMINAiDWI6g.

neutrality, and equal application of rules, the allegations of these LGBTQ+ Community members show in specific and painstaking detail that systemic speaker, topic, or viewpoint-biased and animus-based regulation, restraint, and disparate treatment of LGBTQ+ videos, LGBTQ+ creators and LGBTQ+ audiences is rampant on the platform. As the experience of these Plaintiffs shows, Defendants use machines to flag, identify, and restrict LGBTQ+ content that human or "customer service" reviewers pretend to justify after the fact, under the pretext of "a company policy" of absolute discretion to take users down for discussing any topic, viewpoint, or identifying as LGBTQ+ which Google/YouTube consider to be "Offensive," "Inappropriate," or "Otherwise Objectionable," for "any reason, no reason," whether for "altruism or profit," or, as in the case of these Plaintiffs simply because they identify as "gay," or their content mentions or discusses any topic or viewpoint that is "about the gay thing."

17. The LGBTQ+ Plaintiffs do not seek to interfere with YouTube's Mission of providing a forum for global YouTube Community to engage in and experience "Four Freedoms of Expression" or Pillars when creating, posting, distributing, viewing, and engaging with other Community members through video content and communications. LGBTQ+ Plaintiffs understand and support effective, but lawful viewpoint-neutral content-based regulations on the platform. But that is not how these Defendants have been operating YouTube during the relevant time period of this lawsuit. Defendants have brazenly abandoned YouTube's Four Freedoms and hijacked the YouTube Community and the Mission that defines that Community, by continuing to engage in and defend identity, viewpoint, discriminatory, and illegal content-based regulation, distribution and monetization policies that harm YouTube's LGBTQ+ Community and other YouTube Community members. Requests by the LGBTQ+ Plaintiffs to address these allegations and concerns have been made to Defendants, but not only have these requests fallen on deaf ears, but in the past several weeks, they have been the subject of outright false denials by YouTube's CEO.

18. Enough is enough. The LGBTQ+ Plaintiffs in this case have summoned the courage to challenge the world's largest corporate conglomerate and regulator of free speech by invoking their right to petition the courts to enforce the antidiscrimination, free speech, and consumer fraud laws, to require Defendants to honor their promises and their legal obligations to

LGBTQ+ YouTubers and YouTube consumers. Specifically, the LGBTQ+ Plaintiffs, in their individual and representative capacities, bring this lawsuit to force Google/YouTube to comply with their legal obligations under federal and California law, including: (i) Article One, Section 2 of the California Constitution (the "Liberty of Speech Clause"); (ii) the Unruh Civil Rights Act, Section 51, et seq. of the California Civil Code (the "Unruh Act"); (iii) the Unfair Competition Laws, Section 17200, et seq. of the California Business and Professions Code (the "UCL); (iv) the Lanham Act, 15 U.S.C. sections 1125, et seq.; and (v) Defendants' Terms of Service, "Community Guidelines," and other purportedly content-neutral filtering representations (the "Contract Claim"). The LGBTQ+ Plaintiffs seek damages for financial, reputational, and other cognizable harms and injuries to themselves and to other LGBTQ+ members of the YouTube Community who compose the putative class or subclasses in this case. The LGBTQ+ Plaintiffs also seek individual and class-wide relief for restitution and disgorgement of Defendants' ill-gotten or unlawfully obtained profits, injunctive relief, and a declaratory judgment that Google and YouTube violate the legal and equitable rights of LGBTQ+ members of the YouTube Community.

## II. PARTIES

19. Plaintiff Divino Group LLC ("Divino") is a limited liability company formed and doing business in the state of California. Divino is co-owned, managed and operated by a married gay couple, Celso Dulay and Chris Knight, both of whom reside in San Francisco, California. Divino owns a news-based media company, "GlitterBombTV.com" the producer of GNews! Its principal place of business is located in San Francisco, California. Divino produces and distributes on-line, video-based news programs that report on and discuss current events and issues, involving or affecting the LGBTQ+ Community. Divino's news programs are written, produced, promoted, and distributed by Messrs. Knight and Dulay. Since February 6, 2014, Divino has used YouTube as a hosting platform to advertise, distribute, and reach the viewing public in connection with 132 episodes of GNews!.

20. Plaintiff Cameron Stiehl is an individual who resides in San Francisco, California. Ms. Stiehl regularly appears on GNews! as a co-host, and contributes to the content.

21. Plaintiff BriaAndChrissy LLC, is a Georgia Limited Liability Company.

BriaAndChrissy LLC is owned and managed by Bria Kam and Chrissy Chambers, who reside in the state of Washington. Because of harassment they have received, these Plaintiffs should be contacted through their attorneys of record. BriaAndChrissy LLC does business as "BriaAndChrissy;" it produces and distributes a variety of original videos that feature music, skits, day-in-the-life presentations, and discussions of mental health issues, healthy lifestyles recommendations and LGBTQ+-related issues. Since 2012, BriaAndChrissy LLC has uploaded more than 1000 videos to its two YouTube channels, BriaAndChrissy, which has 849,000 subscribers, and WonderWarriors, which has 195,000 subscribers.

22. Plaintiff Chase Ross is an individual who resides in Montreal, Quebec, Canada. Mr. Ross produces and distributes a series of original educational and day-in-the-life videos about the transgender experience and products, as well as discussions of LGBTQ+ issues. Since 2010, Mr. Ross has uploaded 723 videos to his "uppercaseCHASE1" YouTube channel, which has more than 163,000 subscribers.

23. Plaintiff Brett Somers is an individual who resides in San Francisco, California. Mr. Somers produces and distributes original sexual education and product review videos, with a focus on non-traditional sexual activities. Since 2014, he has uploaded 227 videos to his "Watts The Safeword" YouTube channel, which has more than 193,000 subscribers.

24. Lindsay Amer is an individual who resides in Maine. Because of harassment and threats they have received, Mx. Amer should be contacted through their attorneys of record. Mx. Amer produces and distributes original educational videos for children aged 3-17, parents and educators regarding LGBTQ+ issues. Since 2016 Mx. Amer has uploaded 94 videos to their YouTube channel "Queer Kid Stuff," which has more than 15,000 subscribers.

25. Defendant Google LLC is a for-profit, limited liability company organized under the laws of the State of Delaware, with its principal place of business in Mountain View, California; it regularly conducts business throughout California, including Santa Clara County. The LGBTQ+ Plaintiffs are informed and believe, and thereon allege that, at all relevant times, Defendant Google LLC has acted as an agent of Defendant YouTube, LLC, and controls or participates in censoring and restricting speech on the YouTube service or platform.

26. Defendant YouTube, LLC is a for-profit limited liability corporation, wholly owned by Google LLC, and organized under the laws of the State of Delaware. YouTube's principal place of business is Mountain View, California and it regularly conducts business throughout California, including Santa Clara County, California. Defendant YouTube, LLC operates the largest and most popular Internet video viewer site, platform, and service in California, the United States, and the world and holds itself out as one of the most important and largest public forums for the expression of ideas and exchange of speech available to the public. The LGBTQ+ Plaintiffs are informed and believe that at all relevant times Defendant YouTube, LLC acts as an agent of Defendant Google LLC and uses, relies on, and participates with Defendant Google LLC in restricting speech on the YouTube site, platform, or service.

27. The true names and capacities, whether individual, corporate, associate, or otherwise, of Defendants Does 1 through 100, inclusive, are presently unknown to the LGBTQ+ Plaintiffs, and for that reason these defendants are sued by such fictitious names. The LGBTQ+ Plaintiffs are informed and believe and thereon allege that each of the Doe defendants is in some way legally responsible for the violations of law, injuries, and harm caused, as alleged herein. If, and when appropriate, the LGBTQ+ Plaintiffs will seek leave of the Court to amend this Complaint when the true names and capacities of said defendants are known.

## III.    JURISDICTION AND VENUE

28. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, and 1337(a), because the Complaint includes Federal questions, and the amount in controversy arising from the claims asserted on behalf of the LGBTQ+ Plaintiffs exceeds $5 million, exclusive of interest and costs.

29. Venue is proper in the Northern District of California (San Jose Division) under 28 U.S.C. § 1391. Defendants reside and/or transact business in the County of Santa Clara, and are within the jurisdiction of this Court for purposes of service of process. Defendants' Terms of Service expressly provide that the LGBTQ+ Plaintiff's lawsuit be filed in a court of competent jurisdiction located within Santa Clara County.

## IV.  FACTS COMMON TO ALL CLAIMS

### A.  The YouTube Platform

30.     YouTube is the largest video-sharing platform in the world, accessible via computer browsers and mobile telephone applications.  YouTube was founded in 2005 in San Bruno, California.

31.     In 2006, Defendant Google bought YouTube for $1.65 billion and operates YouTube as a Google subsidiary.  The current value of Google's YouTube subsidiary has been estimated to exceed $160 billion.

32.     The YouTube platform functions by allowing users to upload, view, rate, share, add to favorites, report, comment on videos, and subscribe to the channels of other users.  Available content includes video clips, TV show clips, music videos, short and documentary films, audio recordings, movie trailers, live streams, and other content such as video blogging, short original videos, and educational videos.

33.     It is the content and audiences of YouTubers like the LGBTQ+ Plaintiffs and other members of the Proposed LGBTQ+ Community Class that have made the platform one of the top four most visited Internet websites in the world.  It is estimated that more than *one-third* of the world's Internet users use YouTube, to post, view, and communicate through videos.  Eighty-five percent of the U.S. Internet audience watches videos online, including on YouTube.  A billion hours of videos are watched on YouTube each day.  More video content has been uploaded to YouTube by public users than that created by the major U.S. television networks in 30 years.  The average number of mobile YouTube views is estimated to be about 1 billion per day.  YouTube videos can be navigated in at least 80 different languages, and the platform has launched in more than 91 countries around the globe.

34.     Most of the video content on YouTube is created and uploaded by YouTubers like the members of the Proposed Class, but larger media corporations including CBS, the BBC, Vevo, and Hulu also offer some of their content via YouTube as part of the Google/YouTube partnership program.

35.     Defendants monetize speakers' intellectual property and viewers' interests by

selling advertisements; some of those advertisements come from the speakers themselves, who pay for their videos or channels to be "featured" or publicized. In addition, Defendants offer subscriptions through which people pay ongoing fees to view videos on YouTube without advertisements.

36. In total, Google's subsidiary YouTube earned $9 billion in revenue in 2015 – primarily by selling advertisements; and will earn $27 billion annually by 2020.

**B.** **YouTube Holds Itself Out As A Quintessential Forum for Freedom of Expression**

37. Much of YouTube's success can be attributed to Defendants' representations that YouTube is, has been and will remain the premier space for freedom of expression in video content on the Internet – representations that were made with the intent of inducing more consumers like LBGTQ+ Plaintiffs to become YouTubers.

38. More specifically, Defendants expressly solicit and invite the general public to use YouTube as a hosting platform to engage in "freedom of expression" by posting, viewing, promoting, and interacting with third-party video content, subject only to viewpoint-"neutral" content-based regulations that apply equally to everyone.

39. Consistent with their express "mission [] to organize the world's information and make it universally accessible and useful," Google/YouTube invite the public, including original content creators like the LGBTQ+ Plaintiffs, viewers, and advertisers large and small, to connect with, inform, and inspire others across the globe by using YouTube as a distribution platform for freedom of expression through videos. Google/YouTube claim to be the largest public forum for video-based speech in California, the United States, and the world, where, based on the number of views, likes, and subscriptions to uploaded video content, new celebrities emerge and new ideas are popularized. In so doing, Google/YouTube emphatically declare that their "mission" is to "give people a voice" in a "place to express yourself" and in a "community where everyone's voice can be heard." Defendants further brag that YouTube is "one of the largest and most diverse collections of self-expression in history," giving "people opportunities to share their voice and talent no matter where they are from or what their age or point of view." *See*, *e.g.*,

https://youtube.googleblog.com/ (YouTube Official Blog: Broadcast Yourself). Each of these disclosures, including the Community Guidelines and promises of "neutral" content filtering "***are also incorporated . . . by reference***" into YouTube's Terms of Service.

40. Defendants expressly represent to consumers that YouTube is designated as a public place for free speech "define[d]" by "four essential freedoms" that govern the public consumer's use of the platform: "**Freedom of Expression**," "**Freedom of Information**," "**Freedom of Opportunity**," and "**Freedom to Belong**."[4] Defendants further induce the public to provide, view, and communicate with video content on the YouTube hosting platform by promising users that "everyone's voice" will be heard subject only to neutral, content-based rules and filtering which "apply equally to all," regardless of the viewpoint, identity, or source of the speaker.

41. These lofty representations have been repeated in sworn testimony to Congress. On January 17, 2018, Defendants, through YouTube's Assistant General Counsel, Juniper Downs, confirmed to Congress that YouTube's mission remains unchanged and the platform is designated and operates as a "public forum" for free speech and expression subject only to viewpoint-neutral, content-based regulations:

> **Senator Cruz**: Thank you Mr. Chairman. Welcome to each of the witnesses. I'd like to start by asking each of the company representatives a simple question, which is: do you consider your companies to be neutral public fora?
>
> *     *     *     *
>
> **Senator Cruz**: I'm just looking for a yes or no whether you consider yourself to be a neutral public forum.
>
> **Senator Cruz**: Ms. Downs?
>
> **Ms. Downs**: Yes, our goal is to design products for everyone, subject to our policies and the limitations they impose on the types of content that people may share on our products.
>
> **Senator Cruz**: So, you're saying you do consider YouTube to be a neutral public forum?
>
> **Ms. Downs**: *Correct.* We enforce our policies in a politically neutral way. Certain things are prohibited by our Community Guidelines,

---

[4] See https://www.youtube.com/yt/about/ .

which are spelled out and provided publicly to all of our users.

[02:28:30 – 02:29:36 of the full hearing recording.]

\* \* \* \*

**Senator Cruz**: What is YouTube's policy with respect to Prager University and the allegations that the content Prager University is putting out are being restricted and censored by YouTube?

**Ms. Downs**: *As I mentioned, we enforce our policies in a politically neutral way.* In terms of the specifics of Prager University, it's a subject of ongoing litigation so I'm not free to comment on the specifics of that case.[5]

**C.**   **Defendants Flout The Fundamental "Free Expression" Bargain They Made With YouTubers**

42.     It is now clear that the lofty "Freedom of Expression" promises and representations made to consumers like the LGBTQ+ Plaintiffs and other members of the Proposed LGBTQ+ Class are nothing but outright falsehoods.

43.     In or about March 2018, Defendants distributed an internal memo and presentation entitled "The Good Censor: How can Google reassure the world that it protects users from harmful content while supporting free speech." The Memo sets forth in detail the bait-and-switch fraud which Defendants seek to perpetrate against the more than 2.3 billion consumers who built YouTube into the global speech giant and profit machine that it is today.

44.     In the Memo, which is purportedly based on "layers of research" and in reliance on "some leading thinkers in this space" Defendants, concede that since the 2016 U. S. presidential elections, Defendants' have sought to secretly and deceptively "migrate" away from a hosting platform that solicits the public and consumers to provide YouTube with content based on the express promise that YouTube operates as a viewpoint-neutral and politically neutral place for free speech and "an open market place of ideas," where the public is invited to engage in freedom of expression speech. Rather, Defendants now seek to use the site to curate and restrict content in

---

[5] See https://www.c-span.org/video/?439849-1/facebook-twitter-youtube-officials-testify-combating-extremism and https://www.c-span.org/video/?448566-1/house-judiciary-committee-examines-social-media-filtering-practices at 02:34:28 – 02:35:29 of the full hearing recording (emphasis added).

CLASS ACTION COMPLAINT FOR DAMAGES, INJUNCTIVE RELIEF, RESTITUTION, AND DECLARATORY JUDGMENT

order to further profit and monetize its 2.3 billion users, by promoting Defendants' own, or their preferred content through the exercise of unfettered discretion to censor and curate otherwise public content. In other words, Defendants admit that they are now acting as "censors," who regulate and curate online speech and content for their own gain, after promising consumers that YouTube exists and is designated for open, viewpoint-neutral, third-party communications and free speech.

45. This is a classic bait-and-switch fraud perpetrated by Defendants on the 2.3 billion users who built YouTube into what it is today. According to Defendants "[t]his free speech ideal was instilled in the DNA of the Silicon Valley startups [including YouTube] that now control the online conversations." In the case of YouTube, that ideal provided Defendants with a marketing and business model which monetized the public speech of its consumers by inviting them to use YouTube as a forum for free speech, where the public is invited to post video content, regardless of identity and viewpoint, subject to "content-neutral" rules that apply equally to everyone.

46. Now that YouTube is globally saturated, with 2.3 billion users and their content, Defendants seek to exploit their control over more than 90% of the world's video-based communications, by secretly seizing control over the platform's content, so that they, not the users, control and decide who gets to speak, what is said, and who is listening. As Defendants admit, they do so by discriminating and censoring compliant third-party content in favor of Defendants' own content, or that of preferred users, for financial gain and enhanced political power at the expense of, and to the detriment of third-party users like the LGBTQ+ Plaintiffs.

47. Defendants admit that platform "migration" creates "an unresolved tension" on social media sites like YouTube because "**[t]he platforms have to deny that they're media companies** in order to retain their immunity from liability" and "**at the same time, they're exercising more influence as media companies**… than CBS News did in its heyday, and therefore, in order for democratic values to flourish **they need to embrace free speech standards**." *See* "The Good Censor" Memo, at page 10 of 85 (quoting Jeffrey Rosen, Professor of Law at The George Washington University and legal affairs editor of The New Republic)

(internal quotes omitted, bold in original).[6] Defendants have continued to use animus-based censorship and content regulation to perpetrate religious, political, sexual orientation and gender, and ethnic discrimination for profit and financial gain to the harm of the public and consumers.

48.     Putting these "Good Censor" principles into practice, Defendants have unlawfully employed a series of content-based distribution and monetization policies and procedures that form a single, interrelated, uniform, and comprehensive content-based regulation and control scheme that empowers Defendants unilaterally to control and restrain all consumer speech and content that appears on YouTube.

**D.     Defendants Begin To Compete With YouTubers In The Proposed Class**

49.     Defendants have a strong financial motive to disregard the principles of free expression upon which YouTube was founded.  Specifically, beginning around 2016, Defendants began to use, operate, and profit from YouTube -- not as a hosting platform for the video content of its public users and consumers, but as a means for producing, distributing, and profiting from its own video content, or that of its financial partners.

50.     Following the trend of other hosting networks, Defendants sought to use the worldwide consumer audience of YouTube users as a means for monetizing their own content, not merely as a hosting platform for the Public.  Recognizing that they now controlled more than 90 percent of all video communications, Defendants sought to secure for themselves a market share of the production- and distribution-based revenues that previously had been reserved for YouTube's users and consumers.

51.     Having induced consumers to create video content and an audience in excess of two billion people by promising to neutrally host and regulate the video content of others, Defendants commenced a plan to recapture revenues from third-party producers and distributors by using their unlawful content regulation system to promote and monetize their own content by

---

[6] See https://www.google.com/search?client=firefox-b-1-d&ei=9u_iXNjkEYi6_wTgj5m4Dg&q=the+good+censor+google+rosen&oq=the+good+censor+google+rosen&gs_l=psy-ab.3..33i160l3.1304.2502..3431...0.0..0.100.472.5j1......0....1..gws-wiz.......0i71j0i22i30j33i22i29i30.rvL00PLfyos .

CLASS ACTION COMPLAINT FOR DAMAGES, INJUNCTIVE RELIEF, RESTITUTION, AND DECLARATORY JUDGMENT

unlawfully restricting third-party content and reach. Because Defendants obtained control over nearly all of the world's public video content by falsely inducing consumers to use YouTube, Defendants used their monopoly power over content regulation to selectively apply their rules and restrictions in a manner that allowed them to gain an unfair advantage over YouTubers, to profit from their own content to the detriment of its consumers. Consequently, the public, third-party content of YouTube's loyal consumers and users was not only being subjected to animus-based, discriminatory content regulations and restrictions, but Defendants exempted their own content from those regulations to gain an anticompetitive edge and to create unlawful distribution scheme in which its loyal consumers unwittingly became the largest captive video communications audience, or cash cow in the history of the world.

52. Among other things, Defendants announced that "[t]he company has partnered with its top content creators who wanted to charge a subscription rental or purchase fees for their content and made their uploaded content as paid content which requires users to pay for a subscription or purchase fees to access the content of the channel." Furthermore, Google/YouTube partners with "affiliates" whose "related product" advertisements are placed with some videos on YouTube. These products link to the affiliate partners, which pays a commission to Google/YouTube if their products are purchased.[7]

53. In recent years, Defendants have expanded their business from operating YouTube only as a hosting platform for third-party users, to become a production and media company that produces its own content or partners with other large video, TV, and film producers, including Bill Maher, major sports teams, and large entertainment networks and companies, including HBO, Fox, PBS, NBA, ABC, and CBS, to name a few.

54. Just like other large global social media platforms, including Facebook, Defendants understand that the YouTube platform has reached its saturation point in the monetization of third-party users' content. Consequently, Defendants have decided to compete directly with third-party content providers like the LGBTQ+ Plaintiffs. In addition to their own

---

[7] See https://www.feedough.com/youtube-business-model-how-does-youtube-make-money/ .

video channels on YouTube, Defendants have entered the digital TV market, and are trying to induce consumers to purchase their TV and entertainment services from Defendants directly, by advertising and offering a product called YouTube TV.

55.     Defendants compete for that public audience or viewership unfairly and unlawfully, in a manner which gives their "preferred content" a competitive advantage, by among other things, using their filtering tools and criteria to restrict the access and reach of the smaller third-party users it hosts on YouTube.  Thus, under the pretext of making the site safe for their users, Defendants arbitrarily, capriciously, and deceptively restrict access and reach to speech and content of their competitors on the platform, like the LGBTQ+ Plaintiffs, while at the same time allowing their own content to avoid those same restrictions and restraints -- even when that content violates their own guidelines.  In so doing, Defendants effectively clear space on the platform for content which they, or their preferred users supply, to better reach the sites' 2.3 billion users by censoring the content of their competitors.

## E.     Defendants' Tool Kit Of Unlawful Speech Suppression

56.     Defendants employ a number of tools to unlawfully restrict the expression of their users in violation of principles of law and contrary to their agreements with users, all of which are an interrelated part of Defendants' unlawful scheme.

### 1.     Restricted Mode

57.     One of the Defendants' primary tools is "Restricted Mode."  According to Defendants, Restricted Mode is a viewpoint- and identity-neutral, content-based restriction intended to limit viewer access by younger, sensitive audiences to video content that discusses "mature" topics.

58.     "Restricted Mode" is intended "to help institutions like schools as well as people who wanted to better control the content they see on YouTube with an option to choose an intentionally limited YouTube experience."

59.     Viewers can choose to turn on Restricted Mode for their personal accounts, but it may also be activated by system administrators to restrict all access on computer networks to all users and machines, including viewers who seek to access video content in public libraries,

schools, and other institutions or work places.

60.     When a network administrator or an individual viewer activates "Restricted Mode," for each video that Defendants deem to have violated their guidelines, the name, creator or subject of the video, as well as its content, comments about the video, or any other information related to the video are blocked, as if the video did not exist on the YouTube platform.

61.     According to Alice Wu, a Senior Manager of Trust & Safety at YouTube, LLC, Defendants estimate that about 1.5 percent of YouTube's daily views (or approximately 75 million of the nearly 5 billion views every single day) come from people who have activated Defendants' Restricted Mode.  Defendants assert, however, that Restricted Mode is not "about numbers," but "about the principle of anyone having access to important content and different points of view."

62.     Defendants claim to restrict content in Restricted Mode based upon certain "Restricted Mode Guidelines."  The Guidelines ensure that videos containing potentially mature content will not be shown to viewers who have Restricted Mode turned on.  Defendants purport to use six criteria for determining whether such content warrants exclusion from Restricted Mode: (1) Talking about drug use or abuse, or drinking alcohol in videos; (2) Overly detailed conversations about or depictions of sex or sexual activity; (3) Graphic descriptions of violence, violent acts, natural disasters and tragedies, or even violence in the news; (4) Videos that cover specific details about events related to terrorism, war, crime, and political conflicts that resulted in death or serious injury, even if no graphic imagery is shown; (5) Inappropriate language, including profanity; and (6) Video content that is gratuitously incendiary, inflammatory, or demeaning towards an individual or group.

63.     When the Restricted Mode is applied by Defendants to a specific video, any viewer who has activated the Restricted Mode filter on their device and who searches for video content on YouTube will see a message on their screen stating: "Some results are hidden because Restricted Mode is turned on."

64.     According to Defendants, Restricted Mode can be applied to videos in two ways.

        a.     First, Defendants examine certain "signals" like the video's metadata, title, and the language used in the video.  These certain "signals" are used by Defendants to find bogus

rules violations that serve as a pretext for Defendants to segregate disfavored content using Restricted Mode, regardless of whether the content is protected speech or is otherwise compliant with Defendants' regulations.

                b.      Second, Defendants use Restricted Mode to passively restrict a video if it is "flagged" as "inappropriate" by anyone, or by what Defendants refer to as the YouTube "community." So-called "flagged" videos are reviewed by a "team" of human reviewers for "violations" of Community Guidelines."

65. Restricted Mode operates in tandem with separate, more stringent "Age Based Restriction" filtering criteria, intended to block all mature content to viewers under the age of 18. Age Based Restrictions provide Defendants with the ability to protect younger, sensitive audiences from mature content without any need to employ Restricted Mode. When evaluating whether content is appropriate for all ages, Defendants restrict: (1) "Vulgar language" involving sexually explicit language or excessive profanity in the video or associated metadata; (2) Violence and disturbing imagery whether real, dramatized or fake violence that may not be suitable for all ages; (3) Nudity and sexually suggestive content containing nudity or dramatized sexual conduct may be age-restricted when the context is appropriately educational, documentary, scientific or artistic, and content featuring individuals in minimal or revealing clothing may also be age-restricted if intended to be sexually provocative, but are not explicit in content; and (4) Portrayal of harmful or dangerous activities involving content that intends to incite violence or encourage dangerous or illegal activities that have an inherent risk of serious physical harm or death.

66. As Defendants admit, Restricted Mode is entirely duplicative of Age Based Restrictions with one important exception. Age Based Restrictions block access to any viewer under the age of 18, while **Restricted Mode blocks access to *all* viewers**, regardless of the age or purported sensitivity of the viewer. Thus, Restricted Mode can be, and is utilized by Defendants to block access to content by all viewers, regardless of age or sensitivity, even where the content fully complies with YouTube's Community Guidelines or its Age Based Restriction Criteria.

67. This is precisely how Defendants have utilized Restricted Mode as a pretext to unlawfully block all viewer access to vast numbers of the LGBTQ+ Plaintiffs' videos and those of

other members of the Proposed LGBTQ+ Class, despite the fact that the videos are in full compliance with Defendants' Age Based Restriction criteria and Community Guidelines. Indeed, Defendants use Restricted Mode to censor content even though that video content has never been found to violate Defendants' Age Restrictions or Community Guidelines.

68.     The truth is that Defendants utilize Restricted Mode not to further any legitimate interest in protecting younger or sensitive audiences from inappropriate content, but as a pretext to unlawfully restrict and restrain the LGBTQ+ Plaintiffs' speech through the use of broad, circular, vague, self-serving, subjective, and/or meaningless criteria and procedures which give Defendants unfettered discretion to censor or restrain speech as they see fit (for any reason or no reason -- whether lawful, irrational, or not). Defendants have even restricted the LGBTQ+ Plaintiffs' videos recommending tea drinking or other self-care practices, each of which is entirely inoffensive and complies with all of Defendants' Community Guidelines.

69.     Defendants themselves admit that they repeatedly make "mistakes in understanding context and nuances when it assesses which videos to make available in Restricted Mode." On May 19, 2017, Defendants admitted that the Restricted Mode "feature isn't working the way it should and we're going to fix it." For instance, Defendants admit that they got "it wrong" when they censored videos like Ash Hardell's "Her Vows," Calum McSwiggan's "Coming Out To Grandma," Jono and Ben's "Woman interrupted during BBC interview," and Tegan and Sara's "BWU [OFFICIAL MUSIC VIDEO]."

### 2.    Advertising Restrictions

70.     Arbitrary and capricious advertising restrictions are another example of the vague, ambiguous, and arbitrary criteria and anticompetitive filtering schemes Defendants utilize to suppress speech and to capriciously and discriminatorily restrict users like the LGBTQ+ Plaintiffs from monetizing or boosting the reach or viewer distribution of their videos.

71.     Defendants impose these restrictions to justify anticompetitive and unlawful actions intended to gain a competitive advantage for their own video content and/or to ensure that their sponsored creators, content partners, and advertisers have an unfair competitive advantage in the YouTube video market. By placing no restrictions on the monetization of their own videos or

those of Defendants' sponsored creators, content partners and preferred advertisers, Defendants gain a competitive advantage by restricting the financial reach of the LGBTQ+ Plaintiffs and other disfavored users, while simultaneously ensuring that their own video content (and those of their sponsored creators, content partners and preferred advertisers) are not subjected to the same (or any) Advertising Restrictions.

72. Defendants have sold advertisements to the LGBTQ+ Plaintiffs in connection with videos which were posted on YouTube for months, without restriction and were fully monetized. Having sold the ads, after receiving partial payment for the ads, Defendants then applied the Restricted Mode classification to the videos, pulled the advertisements stating that videos subject to the Restricted Mode classification cannot be advertised, and thereafter Defendants retained the money they had charged the LGBTQ+ Plaintiffs for the advertisements of the now restricted videos.

73. The sole basis for this restraint is the identity or viewpoint of the consumer seeking to boost the reach and distribution of the video, and has nothing to do with the actual content of the video.

74. This, however, is not what Defendants publicly state. According to Google, "[t]he purpose" of these restrictions "is to keep Google's content and search networks safe and clean for our advertisers, users, and publishers. We hope that all publishers participating in AdSense have a long and successful partnership with Google. To understand why we need policies and the role they play in the ads eco-system you can watch this video. For that to happen, it's important that you familiarize yourself with the AdSense program policies. It's important to make sure visitors to your pages are not misled and avoid any deceptive implementation that may bring accidental clicks. For more details, please check out our ad implementation policies."[8]

75. Defendants' actual practices tell a very different story, and are yet another example of Defendants saying one thing to members of the Proposed LGBTQ+ Class, and doing something very different. Not only is the "safe and clean" determination not based upon the actual content of

---

[8] See https://support.google.com/adsense/answer/3394713?hl=en&ref_topic=1250104.

CLASS ACTION COMPLAINT FOR DAMAGES, INJUNCTIVE RELIEF, RESTITUTION, AND DECLARATORY JUDGMENT

users' videos, but the Defendants' "inappropriate" designation precludes the LGBTQ+ Plaintiffs and other members of the Proposed LGBTQ+ Class from receiving any revenue from advertisements that would otherwise accompany content not designated as "inappropriate." Moreover, such practices unlawfully provide Defendants with monopoly power over the video posting and viewership market, and the ability to manipulate, bully, and falsely denigrate legitimate political and educational speakers by subjectively designating their speech as "inappropriate," solely because Defendants do not like or agree with the speakers' political identity or point of view.

### 3. AI Filtering Under Restricted Mode And Advertising Restrictions

76.     Another tool in Defendants' speech-censoring "kit" is electronic artificial intelligence or "A.I." algorithms that review and regulate video content.  Defendants *claim* that these algorithms are viewpoint- and identity-neutral, and that they ensure that the "same standards apply equally to all" when it comes to the content regulation of speech on YouTube.  Defendants claim that their employees conduct "manual reviews" to supplement the electronic filtering and regulation of video content.

77.     But the evidence, including statements by Defendants' employees familiar with both electronic and manual filtering and regulation of speech that takes place on the YouTube platform, suggests that Defendants' representations of neutral viewpoint and identity-based content regulation are *also* false.  The A.I. and algorithmic filtering tools are embedded with code that regulates content based on purely subjective, viewpoint, topic, and identity animus, and other unlawful criteria.  Even before October 2016, Defendants' engineers began making changes to the code and operations of the algorithms and filtering tools in order to ensure that Defendants could filter videos and regulate access to video content based upon overt discrimination of sexual or gender orientation, ethnic, political or religious animus, as well for financial and/or anticompetitive purposes.

78.     Similarly, Defendants' viewpoint bias, animus, and discrimination towards the user's identity or viewpoint is institutionally and culturally rampant in Defendants' work place and employment practices.  Among other things, Defendants operate and administer Restricted Mode

through employees, including engineers and content reviewers, who work in what has been widely reported and acknowledged as a dysfunctional work environment.

79.     Internal emails by and between Defendants' employees show that many employees are routinely subjected to harassment, threats, blacklisting, discipline, and hazing based on their political or religious viewpoints and identity.  The dysfunction and viewpoint bias emanates from, and is enforced at, the highest ranks of Defendants' upper management, and drives the actions of employee supervisors, co-workers, third-party affiliates, and advertisers.

80.     Consequently, even when manual employee reviews of video content are used to check and audit restrictions on content based upon the electronic filtering algorithms, Defendants use Restricted Mode and other discretionary and vague content-based restriction criteria to restrict access to the LGBTQ+ Plaintiffs' videos under vague and undefined terms such as "mature" or "sensitive" for certain audiences, solely because the video discusses a topic involving "LGBTQ+," "lesbian," "gay," "bisexual," "transgender," or "queer" issues, or the video merely mentions these trigger words.  The result is censorship, restraint of speech, and discrimination based, not upon content which might violate a narrow, neutral, objective, and specifically verifiable criteria that furthers a compelling and legitimate public interest, but upon Defendants' animus or dislike for the identity or viewpoint of the speaker.

81.     Defendants also admit that decisions to restrict access to videos are routinely made or influenced by third-party NGO affiliates and advertisers who dislike the political or religious identity or viewpoint of the user.  According to Defendants, "YouTube receives significant pressure from governments and social interest groups around the world to remove or restrict access to content that those groups find harmful, dangerous, or offensive. For example, Germany's Netzwerkdurchsetzungsgesetz (network enforcement law or NetzDG) requires any Internet platform with more than 2 million users to implement more efficient ways to report and delete potentially illegal content, such as slander and hate speech.  Platforms which fail to remove such content within 24 hours (or within 7 days for more legally complex content), will be subject to fines of up to 50 million euros."  These groups constantly pressure Defendants to apply access restriction criteria to users whose political or religious viewpoint does not comport with that of an

1321766.1                                                                                                          Case No.

CLASS ACTION COMPLAINT FOR DAMAGES, INJUNCTIVE RELIEF, RESTITUTION, AND DECLARATORY JUDGMENT

advertiser or third-party NGO.

### 4. Deletion Of LGBTQ+ Content Thumbnail Images

82. Thumbnails are small square images or tiles which appear in the lists of YouTube search results ("Thumbnails"). For channels with fewer than 15,000 subscribers, Thumbnails consist of a single still photo which Defendants generate from the uploaded video, or which Defendants capture with a digital camera. For those channels with 15,000 subscribers or more, Defendants allow the creators to craft unique Thumbnails with titles using customized lettering and graphics. The LGBTQ+ Plaintiffs and other YouTubers who are part of the LGBTQ+ Community who generate the minimum subscriber numbers required by Defendants are authorized to upload such customized Thumbnails to attract viewers. Using custom Thumbnails is a visual way of signaling to new viewers that the related content is professionally prepared and superior in quality to most of the content from less popular, amateur creators which populate most of YouTube's channels. Custom Thumbnails are so effective at attracting new viewers that these creators actually plan new videos around specific Thumbnail concepts, generating the Thumbnail in advance of the video.

83. Without any notice or explanation, Defendants have and continue to delete the custom Thumbnails of the LGBTQ+ Plaintiffs and Community, and replace those custom Thumbnails with Defendants' own generic Thumbnails, which typically results in reduced numbers of click-throughs and views. The unlawful and anticompetitive practice of replacing the LGBTQ+ Plaintiffs' custom Thumbnails allows Defendants to further denigrate, stigmatize, and harm the LGBTQ+ Plaintiffs' respective brand, reputation, goodwill, and ability reach intended audiences.

### 5. Cancelling And Stopping New Video Notifications

84. Another unlawful practice used by Defendants to harm the LGBTQ+ Plaintiffs and LGBTQ+ Community involves the cancelling or cessation of electronic notifications that are sent automatically to subscribing viewers to apprise them that the LGBTQ+ Plaintiffs have uploaded a new video to their channels or to the YouTube platform. Defendants cancelled the existing subscribers' notifications of new video content without providing any notice to the LGBTQ+

Plaintiffs or YouTube consumers. As a result, existing subscribers and followers of the LGBTQ+ Plaintiffs' channels must now re-subscribe and click on a bell icon in order to receive electronic notifications when the channels post any new videos. Consequently, not only do the LGBTQ+ Plaintiffs' subscribers not get notifications that new material has posted, the LGBTQ+ Plaintiffs' existing subscribers and audience have no way of knowing that a new video from any LGBTQ+ Plaintiff even exists, or is available for viewing. By utilizing this bait-and-switch notification practice, Defendants ensure that the LGBTQ+ Plaintiffs' ability to generate interest among and to reach existing and new viewers is retarded, and declines to a degree that makes it impossible to generate sufficient views to meet Defendants' monetization requirements, causing the LGBTQ+ Plaintiffs to lose substantial revenue to Defendants.

### 6. Excluding LGBTQ+ Related Content From The "Up Next" Recommended Application

85. Defendants generally exclude LGBTQ+ related content from the YouTube recommended content on the "Up Next," application for the channels, which appears on the screen whenever viewers play the LGBTQ+ Plaintiffs' videos. As a practical matter, Defendants refuse to recommend to viewers or advertisers video content which includes tag words like "LGBTQ+," "lesbian" "gay," bisexual," "transgender," or "queer." Google/YouTube does so, despite the fact that it recommends reaction videos that are based upon the very same non-recommended videos uploaded by LGBTQ+ Plaintiffs. As a result, creators like BriaAndChrissy and Chase Ross must self-censor and refrain from using such tag words for their videos to avoid Defendants' censorship practices, if they are to generate any advertising revenues from their posted videos. Such self-censorship makes it harder for members of the LGBTQ+ Community (the intended audience for the two channels) to find content which is designed to support, educate and entertain them.

### 7. Recommending Anti-LGBTQ+ Hate Speech In The "Up Next" Application Alongside The LGBTQ+ Plaintiffs' Videos

86. While Defendants exclude LGBTQ+-related content from the YouTube recommended content on the "Up Next," application, Defendants recommend and include on the "Up Next" application both reaction videos which copy, pirate or parody the LGBTQ+ Plaintiffs' original content, and original videos which include obscene, homophobic, violent, threatening or

disparaging anti-LGBTQ+ content.  These "Up Next" videos which Defendants are recommending to the LGBTQ+ Plaintiffs' subscribers and viewers appear on the same screen, alongside the LGBTQ+ Plaintiffs' videos.  Defendants also monetize many anti-LGBTQ+ hate speech videos, ensuring that both Defendants and their preferred creators are making money from the LGBTQ+ Plaintiffs' original content, all the while discouraging, offending, and even frightening the intended audience for the LGBTQ+ Plaintiffs' videos.

87.  Defendants' practice of recommending hate speech videos in conjunction with the displaying of LGBTQ+ related videos discourages and even prevents members of the LGBTQ+ Community from accessing video content which is designed to support, educate and entertain them.  While the LGBTQ+ Plaintiffs in this case support the right of all persons to express their viewpoints, Defendants may not restrain, censor, or prevent the LGBTQ+ Community from expressing their viewpoints, especially where Defendants promise everyone a level playing field where the rules apply equally to all.

**8.  Playing Anti-LGBTQ+ Related Advertisements Immediately Before The LGBTQ+ Plaintiffs' Videos**

88.  Defendants have sold YouTube advertisements to users who have strong anti-LGBTQ+ messages, and play those advertisements so that they directly precede the LBGTQ+ Plaintiffs' videos .  Accordingly, viewers who played video content by BriaAndChrissy, and WonderWarriors were forced to view advertisements with anti-LGBTQ+ messages before viewing the videos which they desired to watch.  Defendants' practice of running anti-LGBTQ+ advertisements before playing videos by the LGBTQ+ Plaintiffs offends their intended audience, and discourages viewers from watching the LGBTQ+ Plaintiffs' videos, by forcing them to first listen to doctrinal advertisements that criticize, belittle, or disparage the viewers' beliefs and lifestyles, resulting in fewer views per video, lower subscriber numbers and less income to the LGBTQ+ Plaintiffs.  While the LGBTQ+ Plaintiffs in this case support the right of all persons to express their viewpoints, Defendants may not restrain, censor, or prevent the LGBTQ+ Community from expressing their viewpoints, especially where Defendants promise everyone a level playing field where the rules apply equally to all.

**9.** **Including Anti-LGBTQ+ Hate Speech In The Comments Section Appearing On The Same Screen As The LGBTQ+ Plaintiffs' Videos**

89.    YouTube has come a long way from days when it was credited as providing the resources to disenfranchised persons in the Middle East that fueled the Arab Spring.  Instead of treating everyone equally Google/YouTube, now finds it politically and financially expeditious to restrain and disenfranchise LGBTQ+ users, while promoting institutional racism, ethnic violence, and homophobia around the world.  In a recent investigative report sponsored by the New York Times and the FX network entitled "What Is YouTube Pushing You To Watch Next,"[9] several well respected investigative journalists report that YouTube assists, and is the weapon of choice for anti-LGBTQ+, gay bashing dictators, politicians and advocates around the world, including the current President of Brazil, Jair Bosanaro.  The report describes YouTube as the single most powerful catalyst in the world for disrupting societies and does so by reaching more people than any private or government controlled TV communication network in history.  The report concludes that YouTube exercises "extraordinary influence" over hate-based, ethnic violence, and totalitarian ethnic cleansing, including the horrific events in Myanmar, Sri Lanka, Germany, the Philippines, and Brazil.

90.    One of the principal ways of gaining new viewers and subscribers on the YouTube platform is to generate favorable comments and/or healthy discussion in the "Comments Section," which appears when videos are played.  Favorable comments can generate thousands of additional views for a video.  Comments regarding video content can generate even more views where the viewers have differing opinions and perspectives.  Defendants allow, and refuse to filter out from the LGBTQ+ Plaintiffs' channels and video comments sections those comments with obscene, homophobic, violent, threatening hate speech.  Accordingly, viewers who play educational video content by QueerKidStuff designed for young viewers, supportive video content by BriaAndChrissy, and WonderWarriors designed for adolescents to young adults, and educational and supportive video content designed for adults by GNews! and uppercaseChase1, are exposed to vile hate speech when they view the videos uploaded by these LGBTQ+ Plaintiffs:

---

[9] See https://www.nytimes.com/2019/08/09/the-weekly/youtube-brazil-far-right.html .



Huurduur Excuse • 2 months ago

Go to hell, whore. Jesus washed away your sin with his blood by being pierced through his heart by a spear after his crucification on the cross accomplished by Roman soldiers and yet you rejected him and offended him. So fuck you.



kennybros Hernandez • 2 weeks ago

I wish gay people died



ChiefRighteousFilms • 1 year ago

Yeah pride...one of the 7 sins! What a bunch of assholes! I just want to see someone getting run over while the government give a reward to the person that runover these assholes!



1

VIEW REPLY

CLASS ACTION COMPLAINT FOR DAMAGES, INJUNCTIVE RELIEF, RESTITUTION, AND DECLARATORY JUDGMENT



91.     LGBTQ+ Plaintiffs generally must spend substantial time and energy attempting to use Defendants' word filters for the Comments Section application to remove the hate speech comments.  LGBTQ+ creators often are unable to capture all of the different misspellings used in the hate speech to avoid Defendants' word filters.  GNews! devotes significant resources to filtering and deleting hate speech which appears in its comments sections.  For new videos, hate speech trolls flood the Comments Section of the LGBTQ+ Plaintiffs' channels so that each positive comment is pushed down in the queue of comments and is not visible unless the viewers scroll through dozens of hate filled comments.  QueerKidStuff has been forced to disable the Comments Section to protect its young viewers and their parents from such hate speech comments.  In doing so, QueerKidStuff generates less buzz for new content, fewer views per video uploaded, fewer subscribers, and barely any revenue from its videos.

92.     The LGBTQ+ Plaintiffs strongly support the right of free Speech and expression for all Community Members.  That right does not extend to Defendants' promotion of anti-LGBTQ+ hate speech, speech which also violates Defendants' own purportedly neutral content-based rules -- especially when Defendants unlawfully use those rules as pretext to censor, restrain, demonetize, silence, and squelch the engagement and distribution of LGBTQ+ video content or viewership.  Such, actions unlawfully interfere with the express rights of LGBTQ+ Community

Members to protect themselves by speaking out against hate and homophobia on a level playing field, as provided by Defendants' representations and warranties that the rules apply equally to all on YouTube.

### 10. Other Unlawful Speech-Restricting Tools

93. Defendants have even more tools in their toolkit to unlawfully restrict the expression of YouTubers like the LGBTQ+ Plaintiffs in the Proposed Class. These tools include, but are not limited to:

a. Removing the comments section entirely for videos, without a request by the LGBTQ+ creator, and without giving the creator notice as to why the action was taken or an opportunity to respond, thereby depriving creators of the opportunity to generate buzz by having viewers post favorable comments and recommend content to others;

b. Content production, "fact checking," and political partnerships with large third-party media conglomerates, advertisers, or non-Governmental organizations (NGO's) who work with Defendants as a pretext to restrain users and viewpoints that Defendants and their partners dislike;

c. A global network of content review and call center locations and teams who interact with consumers to flag and restrict disfavored producers or viewpoints; and

d. Terms of Service contracts with consumers that contain a catchall provision that Defendants contend grants them unfettered and absolute discretion to restrain speech for "any reason or no reason."

94. Despite the number, complexity, and interrelation of each of these (and other) content regulation policies and practices, each serves as part of a uniform, single, simplistic, and unlawful content-based scheme to control, regulate, restrain, and harm protected speech. The common thread or core aspect of this scheme is simple: use and apply vague, subjective, and meaningless content-based criteria with unfettered and absolute discretion to restrict the viewership, reach, and monetization of videos on YouTube, based not on content, but upon the

sexual identity, political affinity, religious affiliation, ethnic identity, or commercial affiliation of the speaker or the listener, or upon other animus or bias.

**F.      Defendants Were Caught Censoring LGBTQ+ Users In 2017**

95.      On March 19, 2017, Defendants publicly admitted that they improperly censored videos using their Restricted Mode filtering that were posted or produced by members of the LGBTQ+ Community, based upon the identity and orientation of the speaker, rather than upon the content of the video.  In response to complaints from the LGBTQ+ Community and other civil rights critics, Defendants removed all restricted filtering on videos posted or produced by LGBTQ+ members and groups, and changed their policy, filtering algorithm, and manual review policies purportedly to ensure that videos posted by LGBTQ+ vloggers were not being censored solely because of the identity of the speaker.

96.      Defendants also admitted that they wrongly censored videos posted by members of the LGBTQ+ Community blaming a purported engineering problem with filtering tools that targeted video content from LGBTQ+ users, or targeted users who discussed topics and perspectives on LGBTQ+ issues.  Subsequent to that admission, Defendants agreed to investigate the claims of LGBTQ+ users.  Defendants dispatched a team of senior managers, including YouTube's CEO Susan Wojcicki, to meet with LGBTQ+ representatives to consider revising their policies and review protocols, correcting the filtering tools, and rewriting guidelines that "clarify its position by specifically allowing personal accounts from victims of discrimination or violent hate crimes, as long as they don't contain graphic language or content."

97.      On April 27, 2017, Johanna Wright, Vice President of Product Management for YouTube, stated that Defendants wanted to "clarify that Restricted Mode should not filter out content belonging to individuals or groups based on certain attributes like gender, gender identity, political viewpoints, race, religion or sexual orientation."  Wright further promised users that while "Restricted Mode will never be perfect, [Defendants] hope to build on [their] progress so far to continue making [their] systems more accurate and the overall Restricted Mode experience better over time."

98.      This was another false promise by Defendants.  On at least five occasions, after

1 | promising to stop discriminating against LGBTQ+ users, Defendants denied an LGBTQ+ news
2 | organization the right to advertise and boost viewership on YouTube.  In one instance, Defendants
3 | denied Divino an ad seeking to promote a Christmas Holiday video solely because the speakers
4 | and organization producing and promoting the video were identified and expressed viewpoints
5 | which Defendants stigmatized as "shocking" and "sexually explicit," solely because the user
6 | identified and expressed viewpoints that were "gay."  After the LGBTQ+ user repeatedly
7 | complained and sought an explanation, the LGBTQ+ user got a customer service person to
8 | escalate the complaint.  Whereupon, two different employees at two different locations were
9 | unable to provide an explanation of the denial to this user other than to say that the video had been
10 | flagged as "shocking content."  When the LGBTQ+ consumer further escalated the complaint, a
11 | person identified as an "expert" and senior supervisor, expressly informed the consumer that the
12 | ad was being denied because the video it was promoting contained "shocking" and "sexually
13 | explicit" content solely because the consumer was "gay" and that "company policy" deemed
14 | LGBTQ+ content as shocking and "sexually explicit," solely because of the video involved "the
15 | gay thing."

99.     Defendants subsequently apologized to the LGBTQ+ client for what they contend was a misunderstanding and eventually agreed to run the ad.  But they did so **more than three weeks** *after* **the Christmas holiday had passed**.  Subsequent to their apology, Defendants declined at least four additional ad requests from the same video channel with little, or no, explanation.

### G.     <u>YouTube's Promises To the LGBTQ+ YouTubers Were "Lip Service"</u>

100.     Whatever promises, apologies, and misunderstanding explanations Google/YouTube has given to the LGBTQ+, they were and continue to be "lip service" as described by one LGBTQ+ YouTuber following his meeting with YouTube's management in 2017.  Instead of fixing the problems, Defendants Google/YouTube have doubled down on their anti-LGBTQ+ animus and discrimination that now pervades the platform.

CLASS ACTION COMPLAINT FOR DAMAGES, INJUNCTIVE RELIEF, RESTITUTION, AND
DECLARATORY JUDGMENT

101. In an article headlined "How YouTube Radicalized Brazil,"[10]an investigative report written by journalists Max Fisher and Amanda Taub, released by the New York Times on August 11, 2019, YouTube's animus-based content regulation and distribution system was dubbed the political "Party" behind Jair Bolsonaro, who, courtesy of YouTube content filtering and distribution control, is now the President of Brazil. Bolsonaro is arguably the most powerful anti-LGBTQ+, homophobic bigot and hatemonger in the world. According to the article, "YouTube had recently installed a powerful new artificial intelligence system that learned from user behavior and paired videos with recommendations for others." This system, embedded in YouTube's content regulation schemes and practices, made "Jair Bolsonaro, then a marginal figure in national politics," a "star in YouTube's far-right community in Brazil, where the platform has become more widely watched than all but one TV channel."

102. The "investigation in Brazil found that, time and again, videos promoted by the site have upended central elements of daily life," including those of children, who YouTube hypocritically exploits to impose content-based restrictions for its own financial and political gain. According to the New York Times, "[t]eachers describe classrooms made unruly by students who quote from YouTube conspiracy videos or who, encouraged by right-wing YouTube stars, secretly record their instructors."

103. Thus, contrary to Defendants repeated promises that the "system" is viewpoint-neutral and does "not favor any political ideology," the Times' report found that YouTube "directs users to extreme content," while, as alleged here, restricting compliant and quality LGBTQ+ content intended for younger audiences. According to Defendants, this system "now drives 70 percent of total time on the platform." While that is good news for YouTube "as viewership skyrockets globally," and YouTube brings "in over $1 billion a month," it is bad news for the LGBTQ+ Plaintiffs and the members of the YouTube Community: as Zeynep Tufekci, a social media scholar, has stated, YouTube is "one of the most powerful radicalizing instruments of the 21st century."

---

[10] See https://www.nytimes.com/2019/08/11/world/americas/youtube-brazil.html .

**H.** **Defendants Have And Continue To Violate The Rights Of The LGBTQ+ Plaintiffs And The LGBTQ+ Community**

104. Defendants' 2017 promises and claims that the bias "problems" identified by members of the LGBTQ+ Community are now resolved, is simply not true. Indeed, as the allegations and claims of the LGBTQ+ Plaintiffs demonstrate, things are getting worse, not better. What Defendants previously characterized as incidental or unintentional "problems" in properly regulating and protecting LGBTQ+ expression have become part of an unlawful scheme by defendants to restrain, deceive, discriminate, and violate the legal rights of the LGBTQ+ Plaintiffs and the putative class members of the LGBTQ+ Community that the LGBTQ+ seek to represent in this lawsuit.

**1.** **Divino (GlitterBombTV.com's GNews!)**

105. Divino Group LLC is owned and managed by Chris Knight and Celso Dulay. Mr. Knight and Mr. Dulay are members of the LGTBQ+ Community who write, produce and upload to the YouTube platform video content intended for the LGTBQ+ Community under the GlitterBombTV.com name as GNews!. Cameron Stiehl is a regular co-host and contributor to GNews! and Glitter Bomb TV.

106. Plaintiffs Divino, Chris Knight and Celso Dulay are informed and believe and thereon allege that sometime in late 2013 or early 2014, Divino entered an agreement with Defendants to become YouTube partners by joining the YouTube Partnership Program. As part of the YouTube Partnership Program, Defendants gave Divino a number of special benefits, such as the opportunity to prepare custom Thumbnail images for each video it uploaded to YouTube, and to monetize its videos. YouTube promised additional benefits to Divino if it succeeded in obtaining 1,000 or more subscribers to its YouTube channel.

107. Commencing in March of 2014, in reliance on its YouTube Partnership Program agreement with Defendants, in order to secure additional partner benefits, Divino undertook efforts to increase its number of views per video, and its number of subscribers, by purchasing from Defendants a series of advertisements. Between March 9, 2014 and October 1, 2018, Divino paid to Defendants $14,542.94 for advertisements relating to its GNews! videos.

108.    However, Defendants refused to sell Divino all of the advertisements it applied to purchase: on at least eight separate occasions, after November 2016, Google/YouTube barred Divino from purchasing ads or monetizing its news and event show, GNews!, because Defendants had determined in their discretion that the content of a show violated Defendants' policy against promoting "shocking" "offensive," and "sexually explicit" content.

109.    Around April 2017, after Divino had purchased numerous advertisements in an effort to secure the minimum 1,000 subscribers to qualify for the next level of Defendants' enhanced video creator benefits, Defendants unilaterally changed the YouTube Partnership Program requirements so that only video creators with "10,000 lifetime views" would qualify to be partners.  In unilaterally changing the terms of the YouTube Partnership Program, Defendants repudiated the agreement with Divino.

110.    On December 24, 2017, Plaintiff Divino was prohibited from advertising a holiday special news and events show created for LGBTQ+ persons in the San Francisco Bay Area and beyond, because Defendants labeled the GNews! video as "shocking content."  When Plaintiff Divino inquired as to what portion, if any, of the video content on a holiday event show was inappropriate for advertising, an employee of Google AdWords stated that video content that discusses or expresses the "gay thing" or is created by a YouTuber who identifies as "LGBTQ+" or "gay" violates "company policy" against the advertising or monetizing of "shocking" and "sexually explicit" content.

111.    On or about January 17, 2018, Defendants again unilaterally changed the YouTube Partnership Program requirements so that only creators with channels that "have accumulated 4,000 hours of watchtime within the past 12 months, and have at least 1,000 subscribers" would qualify for the program.  By that time, Defendants had spent thousands of dollars in an effort to boost their subscriber numbers, and had been refused opportunities to purchase other advertisements.  Because Divino had not reached the new 1,000 minimum number of subscribers, Defendants removed Divino from the YouTube Partnership Program, and stripped Divino of the ability to monetize its videos.  In doing so, Defendants further repudiated the agreement with Divino.

112. Since February 6, 2014, Divino has produced 132 episodes of GNews!, an online LGBTQ+ news show co-produced by Divino's principals, Celso Dulay and Chris Knight. In reliance on Defendants' assurances of viewpoint-neutrality and free expression discussed above, Divino decided to produce and distribute each such episode through the YouTube platform.

113. GNews! is and has always been intended to be a positive and affirming news source for members of the LGBTQ+ Community. Labeled "Where You Get All Your Gay in a Day," Dulay and his revolving line-up of co-hosts cover a variety of topics of interest to the global LGBTQ+ Community – from Hollywood, the music charts, pop culture, celebrities, politics, news of top interest to the community, local and international events, their "Crush of the Week" and more.

114. A representative screenshot from an episode of GNews! is below:



Glitter Loud & Prosper! - GNews! Episode 114
14,358 views

115. Inasmuch as GNews! is subject to the same criteria that governs all YouTubers (and there is nothing in any GNews! episode that violates any provision of law or any legitimate provision of YouTube's or Google's terms of service), GNews! is typical of YouTube content produced and uploaded by other YouTuber members of the Proposed Class.

116. Relying on the truth of Defendants' representations that YouTube is, had been, and would remain a viewpoint-neutral forum for free expression, Divino and other members of the Proposed LGBTQ+ Class were further induced to purchase ad products from Defendants.

117. YouTubers like Divino, who initially attempted to rely on social media and word of

mouth to increase viewership for their video content, often find that the only effective way to increase views of GNews! and to grow subscribers is to purchase ad products from Defendants to increase their reach.  This appears to be the result of a deliberate and fraudulent effort by Defendants to increase their profits through the sale of advertisements.

118.    Specifically, when videos like Divino's GNews! episodes are uploaded to the "YouTube Creator's Studio," there appears a direct link via pull-down menu to promote the episodes via Google Ads (formerly called Google AdWords).  YouTubers who select the "promote" option via pull-down menu are immediately directed to a Google Ads landing page that states - as of May 5th, 2019:

> You'll promote your video using Google Ads. Like millions of other creators and businesses, you'll use the Google Ads platform to run and manage your video as an ad on YouTube. With video ads, you can expand your audience and pay only for views that count. You'll now be redirected to sign in to or create a Google Ads account.

119.    Neither Divino, nor any other member of the Proposed Class would have spent money on such products, if they had been aware of the true facts underlying Defendants' representations.

120.    For example, between August 2015 and May 2018, GNews! ads purchased by Divino on the strength of the above-referenced representations were "disapproved" (YouTube-speak for "blocked") no fewer than ***eleven times*** based on increasingly vague and nonsensical reasons.

121.    And between September 2015 and March 2018, two GNews! episodes were subject to "Restricted Mode," thus restricting significant portions of GNews! potential audience from viewing the content.

122.    GNews! Episode 60 included an image of Bryan Hawn's bare buttocks. Defendants applied "Restricted Mode" to the video ***solely because of the image of Mr. Hawn's bare buttocks***.  However, Defendants routinely allow their favored creators to post similar images on his videos which are not posted in Restricted Mode, age-gated or demonetized.  In spring of 2019, Google/YouTube's sponsored creator, James Charles, uploaded a video depicting his dress at the Coachella Music Festival which include lengthy video segments depicting Mr. Charles's

bare buttocks. Mr. Charles' video which is not age restricted, appears when viewers apply Restricted Mode, and appears to be fully monetized by Defendants.

123. Consistent with what has happened to members of the Proposed Class who have dared to question Defendants' blacklisting, when Divino's representatives sought clarification as to what content in the news show constituted "shocking content," Defendants were initially unable to point to anything. When Divino escalated the inquiry, their call was transferred to a person working for Defendants in South Asia identified as a senior content regulator and Defendants' "call center" head. After taking some time to view the GNews! content in question, the employee informed Divino that the content of the show violated the company's prohibition against "shocking" and "sexually explicit" content ***because*** of what he stated was Defendants' "***company policy***" of banning content that related to the "***gay thing***" and because Divino's representatives identified as LGBTQ+ and are "***gay***."

124. The call thus confirms what the LGBTQ+ Plaintiffs and other YouTubers in the Proposed LGBTQ+ Class have long known to be true: the soaring rhetoric of Defendants' professed commitments to values of freedom of expression is nothing more than a smokescreen covering a rotting corporate culture that uses overseas call center workers in a scheme to suppress speech and violate established antidiscrimination protections.

125. Defendants' discretionary, discriminatory, viewpoint-based, and unlawful content-based speech regulation system was, is, and continues to be used to discriminate against and financially harm YouTube consumers. Indeed, every YouTube consumer or user is an unwitting victim of Defendants' discriminatory and fraudulent scheme to use unlawful and discriminatory content-based speech regulations, policies, and practices to obtain illegal financial and political gain at the expense, and to the detriment of the users' free speech and consumer rights.

126. Instead of correcting their behavior and bringing their filters and regulations of speech into compliance with California's free speech, antidiscrimination, consumer fraud, and contract laws, Defendants continue to maintain and apply arbitrary, capricious, discriminatory and deceptive regulations to restrict speech on YouTube.

127. In short, Defendants are engaged in a global fraud on YouTube's users and

consumers.  YouTube consumers, like the LGBTQ+ Plaintiffs, are promised a video hosting platform that operates without regard to a user's identity or viewpoints subject only to neutral, narrowly tailored, non-discretionary content-based rules and restrictions that serve to further a legitimate public interest, such as public safety or national security.  In reality, however, Defendants deliver a platform where YouTube consumers are subject to, vague, discretionary, and meaningless rules, regulations, and practices to discriminate against and financially harm disfavored third-party speakers and viewers, as a pretext to further Defendants' purely selfish, corporate interests of maximizing financial gain, political power, and consolidating control over the public speech and content of its consumers and the public.

128.     Not only is Defendants' censorship not based upon the express content of the LGBTQ+ Plaintiffs' videos and those of others in the Proposed LGBTQ+ Class, but Defendants' "inappropriate" designation, falsely and unfairly stigmatizes the LGBTQ+ Plaintiffs.  The designation renders prospective viewers ineligible to watch the LGBTQ+ Plaintiffs' programming from many public, as well as private workplace or home computer stations.  It prevents access to educational content by students whose computer use may be subject to parental controls, intended to shield the student from truly inappropriate material, not to exclude political or educational discourse of current or historical events.  It precludes the LGBTQ+ Plaintiffs from receiving any revenue from advertisements that would otherwise accompany content not designated as "inappropriate."  Moreover, it gives Defendants a virtual monopoly over the video posting and viewership market, and authority to manipulate, bully, and falsely denigrate legitimate political and educational speakers by subjectively designating their speech as "inappropriate," solely because Defendants do not like or agree with the users' political identity or point of view.

129.     Such a censorship regime cannot pass muster under California law.  Among other things, it provides Google/YouTube with unfettered and unbridled discretion to impose their own political views and values upon speakers, without any objective criteria for evaluating what is and is not appropriate, and thereby censors speech, based on animus towards the speaker's political viewpoint, rather than on the appropriateness of the video content.  It also constitutes intentional discrimination by Defendants based upon the religious beliefs, political identity, or sexual

orientation of the speaker.  Moreover, it allows Defendants unfettered authority to regulate, restrain, and censor speech as an unfair, unlawful and deceptive business practice designed to inflict harm upon their competitors and to promote their own video content at the expense of the smaller third-party users, on whose backs the YouTube platform was built.  Furthermore, it violates the warranty of good faith and fair dealing implied in the Defendants' Terms of Service, and the video posting guidelines and policies to which the LGBTQ+ Plaintiffs were required to agree, in order to use the YouTube platform.  Defendants do all of this as part of their control and management of what is arguably the largest public forum for expression and the exchange of ideas that has ever been available to the public in California, the United States, and ultimately the world—one to which Google/YouTube invite the public to express themselves in all manner of speech, and to engage with such speech through viewing and commenting.

130.    Until recently, all of Divino's subscribers had been receiving electronic notifications from YouTube whenever Divino uploaded new video content.  In the past year, Divino's subscribers have been complaining that they no longer receive YouTube notifications for new Divino video content.  YouTube did not announce or notify Divino of any change to the existing notification system.  In discontinuing their practice of notifying existing Divino subscribers regarding new posted content, Defendants have effectively nullified the benefits of the $14,000 worth of advertisements Divino had purchased to boost subscriber numbers:  existing subscribers will not continue to watch Divino's videos when they believe Divino has stopped posting new materials, and Divino cannot possibly generate the minimum 4,000 annual hours of viewer watchtime required to requalify for the YouTube Partner Program if existing subscribers were not watching new videos.

### 2.    BriaAndChrissy LLC (BriaAndChrissy)

131.    Plaintiff BriaAndChrissy LLC a limited liability company created under the laws of the state of Georgia, and is wholly owned by Bria Kam and Chrissy Chambers, a married lesbian couple and the creators of BriaAndChrissy, and WonderWarriors (formerly known as "OurLesbianLove"), two popular LGBTQ+ video content channels on the YouTube platform. Bria is a professional musician, and Chrissy is an actress.  They use their creative talents to

support and entertain young adult members of the LGBTQ+ Community.

132. On the BriaAndChrissy and WonderWarriors channels, BriaAndChrissy LLC uploads videos that document and describe the experiences of the same sex couple, including the struggles, and mental and physical health issues which affect same sex couples who are constantly confronted with homophobic hate speech, bigotry, attacks, and institutional bias against LGBTQ+ persons. Since 2012, BriaAndChrissy LLC has been uploading videos featuring the original material and covers of the work of the couple, and of other artists, as well as skits, interviews, and editorial commentary on issues of the day, such as homophobic celebrities.

133. On the WonderWarriors channel, BriaAndChrissy LLC created a popular "Day-in-the-Life" video-log that chronicles the couple's lives, and encourages LGBTQ+ persons to live a healthy lifestyle through fitness, creativity, responsible ethical conduct and supportive relationships.

134. In 2017, the BriaAndChrissy channel had 850,000 subscribers with 380 million views. WonderWarriors had 200,000 additional subscribers with 60 million views. The two channels averaged 15,000 new subscribers per month, 10 million views per month for each new video uploaded, and generated on average $3,500 per month. And as any objective or reasonable viewer can see, the video content that appears on BriaAndChrissy and WonderWarriors complies with YouTube's Community Guidelines and other content-based regulations used by Defendants to regulate free expression and speech on the YouTube platform.

135. On or about June of 2013, the BriaAndChrissy channel was so popular with viewers that Defendants invited the couple to create and post a video titled "Proud to Love" on the channel. No sooner had these Plaintiffs agreed to Defendants' invitation to create and post "Proud to Love," than Defendants demonetized the "Proud to Love" video and refused to re-monetize it. Defendants only re-monetized the video after Bria Kam appealed to BriaAndChrissy fans on Twitter, where the video received significant additional attention. As a result of Defendants' monetization treatment of the "Proud to Love" video, " BriaAndChrissy LLC lost substantial revenue and earnings from this popular video.

136. In February 2016, Defendants then invited BriaAndChrissy LLC to pitch and

produce an LGBTQ+ documentary program featuring the couple travelling throughout the United States and interviewing members of the LGBTQ+ Community about their personal experiences. The concept was to document LGBTQ+-related issues of local importance, and broader LGBTQ+ issues of national importance which affect LGBTQ+ persons, their families and friends in different communities around the United States. To Plaintiff's surprise, Defendants subsequently turned down the project under the pretext that they were no longer interested in the concept. Unbeknownst to the Plaintiff, and without it permission or any legal rights to the unique content, Defendants sponsored an identical show hosted by a former Google/YouTube employee. In brazen disregard and violation of BriaAndChrissy LLC's intellectual property rights, Defendants stole and plagiarized Plaintiff's concept and content, and profited from that theft by promoting and posting a show on YouTube which was a complete rip off of BriaAndChrissy LLC's concept and content, keeping all of the monetary and distribution value for themselves, to the financial detriment of BriaAndChrissy LLC, Defendants' direct competitor.

137.    In furtherance of their anticompetitive and discriminatory attack on this LGBTQ+ Plaintiff, Defendants also engaged in "unsubscribing" viewers who had existing subscriptions to the BriaAndChrissy and Wonder Warrior channels. Specifically, Defendants began deleting longstanding subscriptions of viewers who watch Plaintiff's content, making those subscriptions disappear without warning. Because many of its subscribers and audience were deterred by having to constantly re-subscribe to BriaAndChrissy LLC's channels over and over again, this Plaintiff's viewership and subscription rates were fraudulently and unfairly reduced to levels well below the level which had existed prior to Defendants' unlawfully unsubscribing of viewers to BriaAndChrissy and/or WonderWarriors. As a result of this unlawful conduct, Defendants caused this Plaintiff to lose its substantial viewer base and revenues derived from an audience that BriaAndChrissy LLC alone, had built up over the past seven years.

138.    Defendants also unilaterally cancelled or stopped sending electronic notifications of new videos that Plaintiff BriaAndChrissy LLC had uploaded to its channels, without providing any notice to Plaintiff, its subscribers, or YouTube consumers. As a result of this practice, not only do BriaAndChrissy LLC's LGBTQ+ subscribers and loyal viewers not get notifications that

CLASS ACTION COMPLAINT FOR DAMAGES, INJUNCTIVE RELIEF, RESTITUTION, AND DECLARATORY JUDGMENT

new material has posted, but neither this Plaintiff, its subscribers nor its audience have any way of knowing whether a new video from BriaAndChrissy LLC exists and is now available for viewing. By utilizing this bait-and-switch notification practice, Defendants harmed BriaAndChrissy LLC's ability to generate interest among its subscribers, and to reach existing and new viewers, which caused BriaAndChrissy LLC's numbers of subscribers and views to decline to a degree that made it impossible for BriaAndChrissy LLC to generate sufficient views to meet Defendants' monetization requirements and, consequently, caused this Plaintiff to lose substantial revenue to Defendants.

139. Beginning on or around 2017, without any notice or explanation, Defendants deleted many of Plaintiff's customized Thumbnails identifying BriaAndChrissy LLC's channels and content, and replaced them with Defendants' own generic Thumbnails that harm and stigmatize Plaintiff's brand and content by giving viewers the impression that the video uploaded was of poor quality and/or posted by someone who does not have the following, goodwill, and quality associated with BriaAndChrissy LLC's reputation and content quality.

140. In 2017, Defendants also demonetized individual videos posted by BriaAndChrissy LLC, such as http://youtube.com/watch?v=yIDaCdjDodM, a video about being comfortable in your own skin. In 2018, Defendants demonetized the entire WonderWarriors channel without any notice, explanation or an opportunity to respond and fix the monetization issues, if any. In so doing, Defendants harmed the ability of BriaAndChrissy LLC and other LGBTQ+ creators to generate a financial return on their videos and unlawfully restrained, if not eliminate entirely, the ability of BriaAndChrissy LLC to earn revenue on content associated with its channels.

141. Defendants' monetization treatment of BriaAndChrissy's videos is haphazard at best. Most recently, when BriaAndChrissy's video "Ten Ways To Know You're In Love," was uploaded, Defendants immediately demonetized the video.

| | Video | Visibility | Monetization | Date | Views | Comments | Likes (vs. dislikes) |
|---|---|---|---|---|---|---|---|
| ☐ | 10 Ways To Know You're In LOVE! (Do you ... DO YOU WANT A BABY? Huge thank you to XYTEX for sponsoring this, and YOU can have ... | ⊙ Public | $ Limited Not suitable for m... Under review | Aug 8, 2019 Published | 1,297 | 17 | 97.0% 164 likes |

Just hours later on the same day, the video appeared fully monetized.

142.     Defendants also exclude LGBTQ+ related content from the "Up Next," application that appears on the BriaAndChrissy and WonderWarriors channels.  Defendants refuse to recommend or to promote video content that is associated with tag words like "LGBTQ+," "lesbian," "gay," "bisexual," "transgender," or "queer," or content that is associated with titles or descriptions using such terms.  **Defendants engage in this discriminatory, anticompetitive, and unlawful practice, while simultaneously promoting and recommending reaction videos by other creators which are based upon videos uploaded by BriaAndChrissy or WonderWarriors which Defendants restrict or demonetize.**  As a result, LGBTQ+ creators like BriaAndChrissy LLC must self-censor and refrain from using such words for videos to avoid running afoul of Defendants' subjective and unlawful censorship practices.  Such self-censorship forced upon BriaAndChrissy LLC is yet another unfair and unlawful tactic that discriminates against, and makes it harder for members of the LGBTQ+ Community to find LGBTQ+-related content intended to support, educate and entertain LGBTQ+ consumers on YouTube.

143.     And as they do to many of their competitors, Defendants indiscriminately and unlawfully apply the "Restricted Mode" limitations for "sensitive viewers," to BriaAndChrissy LLC's videos, as well as to videos of many other LGBTQ+ members of the YouTube Community, solely because LGBTQ+ content creators discuss viewpoints or topics that Defendants' filtering tools and practices "flag" as "LGBTQ+," "lesbian," "gay," "bisexual," "transgender," or "queer." As is Defendants' continuing custom, practice, and policy, Google/YouTube "flag" LGBTQ+ content as "inappropriate," even though the actual content does not violate YouTube's Community Guidelines, Restricted Mode criteria, or any other content-based regulations.  Thus, Defendants stigmatize many of BriaAndChrissy LLC's videos, including content which addresses suicide prevention, addiction treatment, bullying, or healthy lifestyles, as "inappropriate" for what Defendants call "sensitive audiences," merely because BriaAndChrissy LLC's owners identify as a legally married lesbian couple.

144.     Defendants also misapply age restrictions to this LGBTQ+ Plaintiff, limiting BriaAndChrissy LLC's videos to viewers 18 years of age or older, regardless of the actual content of the video.  As they do in applying their Restricted Mode, Defendants use A.I. and other

machine-based filtering tools to flag tags, titles, descriptions, or content that Defendants deem to be "LGBTQ+," "lesbian," "gay," "bisexual," "transgender," or "queer." As a result, many of the videos created by BriaAndChrissy LLC to support younger members of the LGBTQ+ Community who are experiencing bullying, persecution and/or abuse, many of whom reside in rural areas where mental health and social services are hard to access, cannot view the very materials designed to provide them with support and educate them about resources where help may be obtained.

145.    Defendants also engage in advertising practices which are designed to discourage more sensitive members of the LGBTQ+ Community from viewing the videos posted on BriaAndChrissy or WonderWarriors. Among other practices, Defendants sell and profit from ads sponsored by extremist groups who viciously and violently target gay marriage and the LGBTQ+ Community in general. Defendants permit these hate mongers to display these obscene ads before content of LGBTQ+ creators like BriaAndChrissy LLC is played in order to scare and threaten LGBTQ+ viewers and intended audiences from watching BriaAndChrissy LLC's videos. Such gay bashing ads effectively negate any positive message embodied in the video by turning away the LGBTQ+ audience before they view the video. When BriaAndChrissy posted a video addressing the anti-LGBTQ+ agenda of Chick-fil-A, Defendants began loading anti-LGBTQ+ Chick-fil-A ads which played before BriaAndChrissy videos.

146.    Defendants also engage in outright censorship of LGBTQ+ content, including that of BriaAndChrissy LLC. On June 21, 2015, Defendants censored one a video on the BriaAndChrissy channel which discussed the actions and statements of celebrities who expressed homophobic views or slurs, without providing any notice, explanation or opportunity to address any concern that Defendants might have. And like the other LGBTQ+ Plaintiffs, BriaAndChrissy LLC support the right of free speech and expression for all Community Members, as long as that right is not co-extensive with the promotion of anti-LGBTQ+ hate speech for profit in violation of Community Guidelines or other rules on YouTube, nor is it a basis for using those same rules to censor, restrain, demonetize, and/or squelch LGBTQ+ content or engagement on the platform.

147.    Finally, in August 2019, Defendants commenced disabling the comments sections

for a number of BriaAndChrissy videos. Plaintiffs BriaAndChrissy LLC, Bria Kam and Chrissy

Chambers have been informed by Defendants and believe and thereon allege that Defendants have

disabled comments sections because they believe that they are "protecting minors."



It is unclear from Defendants' message whether the comments sections are being disabled because

third parties have posted hate speech and anti-gay comments, or to prevent minors themselves

from posting comments and generating hate speech and anti-gay comments, or to prevent minors

from encouraging other minors from viewing the video content. The affected videos do not depict

children or minors in the video content, and have not generated the kind of inappropriate

comments about small children which prompted Google/YouTube to remove the comments

sections from creators' channels posting videos of young children engaged in gymnastics or

swimming practice and/or competitions. The disabling of the comments sections for the new

videos prevents the new content from generating favorable comments which amplify the reach of

the video beyond BriaAndChrissy's subscribers, and cause videos to go viral, thereby substantially

reducing the potential for generating revenue for the affected videos.

     148.    Defendants' unlawful and anticompetitive attack on LGBTQ+ Plaintiff

BriaAndChrissy LLC has achieved its intended result of reducing monthly revenues that had

previously been available in the amount of $ 3,500 to less than $400-500 per month, to this

popular LGBTQ+ content creator who directly competes with Defendants for LGBTQ+ audiences

and viewers in the YouTube Community. Additionally, for two years, this Plaintiff was

generating up to $8,000 for each of its sponsored videos, but now receives on average only $800

per sponsored video. BriaAndChrissy LLC is offered less for each performance and appearance,

CLASS ACTION COMPLAINT FOR DAMAGES, INJUNCTIVE RELIEF, RESTITUTION, AND
DECLARATORY JUDGMENT

and has been offered fewer travel opportunities.  Defendants' conduct has not only deprived this LGBTQ+ Plaintiff of being able to monetize its content at levels that permit continued reinvestment in new content production but ensures that Defendants can increase their own share of corporate revenues and profits from the LGBTQ+ Plaintiffs' content, or from content which Defendants sponsor in direct competition with the LGBTQ+ Plaintiffs.

### 3. Chase Ross

149.    Plaintiff Chase Ross is the creator and owner of UppercaseCHASE1, a YouTube channel created to support members of the LGBTQ+ Community in general and transgender people specifically by uploading sexual education, transgender education, and transgender product review videos, as well as allies, who are supporting members of the non-LGBTQ+ Community who have relatives and family dealing with transgender issues.  Mr. Ross has a degree in sociology and a minor in interdisciplinary studies of sexuality; he also received a master's degree in sociology in 2018.  Starting in 2006, Mr. Ross created video content that was posted on YouTube in various names, including "ellendegeneres26," "ChaseRoss73," "FTMTranstastic," "MightTMenFTM," "MightierMenFTM," and "itsTtime2010."  Commencing in 2010, Mr. Ross started uploading video content on the UppercaseCHASE1 YouTube channel, with new content posting each month, and over the years increasing to weekly or bi-weekly depending on his available time and the subject matter of the video content.  In 2017, Mr. Ross created the "Trans 101" series of videos designed to educate the public, including transgender individuals, about issues confronting transgender individuals.  UppercaseCHASE1 has uploaded 753 videos in all, generating 20.2 million total views with 163,000 subscribers.  By 2019, UppercaseCHASE1 was generating between 20 and 50,000 views for each new video uploaded to the channel, and generating $10,800 Canadian dollars annually in revenue.  Earnings for this year are projected to be $400-$1,000 range.

150.    Commencing within the past two years, Defendants have harmed UppercaseCHASE1 by employing many of the same strategies applied to BriaAndChrissy, and WonderWarriors:

151.    Mr. Ross is a victim of "unsubscribing" existing subscriptions to

UppercaseCHASE1.  Subscribers have informed Mr. Ross via Twitter and email that their existing subscriptions have disappeared without notification or explanation, forcing fans to re-subscribe.

152.     Defendants also deleted and/or failed to provide content notifications for Mr. Ross' subscribers of his channel and intended audiences.  Specifically, Defendants imposed these restrictions on UppercaseCHASE1 by requiring existing subscribers to specifically click on a bell icon in order to receive electronic notifications when UppercaseCHASE1 posts new videos which has adversely affected the channel's view numbers.  And, UppercaseCHASE1 has received complaints via Twitter and email from former subscribers who no longer receive Defendants' notifications for new content uploaded to the UppercaseCHASE1 channel.  The new practice has substantially reduced the views per new posted video on the UppercaseCHASE1 channel, resulting in reduced revenues.

153.     Defendants also engage in stripping UppercaseCHASE1's custom Thumbnails from search results for many of the channel's subscribers and for new viewers.  Some viewers report as few as 20% of the videos for the UppercaseCHASE1 channel have visible custom Thumbnails.

154.     Defendants have also "Demonetized " many UppercaseCHASE1's videos under the discriminatory, fraudulent, and unlawful pretext that the content violates YouTube's Community Guidelines or other vague, overly broad, subjective, or meaningless content-based regulations. And despite Mr. Ross' appeals and repeated requests for more guidance regarding the bases of its decisions to demonetize specific videos, Defendants have provided no reasonable response or basis for their decisions.

155.     Defendants also exclude UppercaseCHASE1's content from the Defendants' recommended content on the "Up Next," application for the channel for no viable reason, while allowing the content of other creators, as well as that created or financially preferred by Defendants to appear, including homophobic and anti-LGBTQ+ content.

156.     And, as it does to other members of the LGBTQ+ YouTube Community, Defendants indiscriminately apply the "Restricted Mode" limitations for "sensitive viewers," to many of UppercaseCHASE1's videos, regardless of whether the actual content includes graphic

sexual images or content, or discussions regarding transgender issues.  For example, videos

consisting of Mr. Ross engaging in editorial comment in front of a blank wall discussing events,

festivals or conventions have been restricted and do not appear in searches performed in

"Restricted Mode," despite the fact that there is no sexual content and no discussion of transgender

issues.

        a.      Viewers enabling the "Restricted Mode," conducting searches for

UppercaseCHASE1 videos see this :



Only 2 of the UppercaseCHASE1 videos posted in the past year appear in searches where

"Restricted Mode," is enabled.

        b.      Viewers who do not enable the "Restricted Mode," when searching for

UppercaseCHASE1 videos see this:

CLASS ACTION COMPLAINT FOR DAMAGES, INJUNCTIVE RELIEF, RESTITUTION, AND
DECLARATORY JUDGMENT



Nineteen (19) of the UppercaseCHASE1 videos posted in the past year appear in searches where "Restricted Mode," is not enabled.

157.    Many videos are restricted regardless of content merely because of Mr. Ross' identity as a transgender individual.  The Defendants' "Restricted Mode" filters generally appear the first weekday after a new video is uploaded to the UppercaseCHASE1 channel.  By employing "Restricted Mode," Defendants have successfully limited viewer access to the general public to each of the new videos which UppercaseCHASE1 has posted in 2019.  Defendants have even applied the "Restricted Mode," to a video which features Mr. Ross doing nothing more than drinking tea and endorsing tea for self-care and stress reduction.

   a.    In the first video, (which can be viewed by using the link: https://youtu.be/rccjNF3dEpA) Mr. Ross appears seated on the screen with a black mug and a white cat in the foreground, and a kitchen scene in the background.  In the video Mr. Ross extolls the virtues of drinking tea for LGBT "self-care," and explains that LGBT includes "lesbian," "gay," "bisexual," "transgender," and "queer."  There is no sexual, political or obscene or vulgar content in the video at all.  When he uploaded the video, Mr. Ross did so "unlisted," so that it does not appear on UppercaseCHASE1 channel.  Mr. Ross tagged the video with the terms "LGBT," "lesbian," "gay," "bisexual," "transgender," and "queer."  He used these terms in the description and used "LGBT" in the title.

CLASS ACTION COMPLAINT FOR DAMAGES, INJUNCTIVE RELIEF, RESTITUTION, AND DECLARATORY JUDGMENT

b.  In the second video, (which can be viewed by using the link:

https://youtu.be/qfFIl_ECxnI) the identical video content appears.  When the second video

is uploaded, it is loaded as "unlisted," and does not appear on the UppercaseCHASE1

channel.  Mr. Ross tagged this video only with the terms "product review," and "tea."  The

description is "tea product review."  Only the title includes "LGBT."

Though the videos consists solely of a monologue about tea by Mr. Ross, he says the terms

"LGBT," "lesbian," "gay," "bisexual," "transgender," and "queer."  The use of these words in the

video content appear to be sufficient to prevent the videos from being viewed when "Restricted

Mode" is engaged.  If viewers engage "Restricted Mode" and attempt to access the videos using

the links, YouTube will display this message:



158.  Mr. Ross produces videos consisting of product reviews intended for a transgender

audience featuring products which are especially relevant to his audience.  Mr. Ross has reviewed

a number of prosthetic devices created for individuals suffering from gender dysphoria, which

resemble male genitalia, along with "pouches" used to hold the prosthetics in place against the

body.  These pouches range from simple fabric pockets with strings to tie them into place, to more

elaborate underwear styled models with pockets for the prosthetic devices.

a.  Defendants routinely censor UppercaseCHASE1's product reviews of

CLASS ACTION COMPLAINT FOR DAMAGES, INJUNCTIVE RELIEF, RESTITUTION, AND
DECLARATORY JUDGMENT

"pouches" whether they are simple fabric pouches or more elaborate modified undergarments so that they do not appear in "Restricted Mode." Viewers searching for "UppercaseCHASE1 pouches" with Restricted Mode engaged will see only:



b.     Viewers searching for UppercaseCHASE1 pouches" without enabling "Restricted Mode" will see product reviews which include the entire range of products reviewed by Mr. Ross.



CLASS ACTION COMPLAINT FOR DAMAGES, INJUNCTIVE RELIEF, RESTITUTION, AND
DECLARATORY JUDGMENT

1

2          c.          Defendants do not censor other transgender pouch product reviews posted

3  by other video creators in the same way.  Viewers searching for "Pouch Packers," with Restricted

4  Mode enabled will see:



16  Viewers searching for "Pouch Packers" will see the Thumbnail for a DYI pouch packer (which

17  can be viewed using the link https://www.youtube.com/watch?v=kid7Ull6DgE), and a Thumbnail

18  for a Joey Pouch Packer (which can be viewed using the link

19  https://www.youtube.com/watch?v=QtLBCHoBqTs) each of which includes images of prosthetics

20  and the use of fabric pouches that are similar to those appearing in Mr. Ross' videos which

21  Defendants routinely censor when Restricted Mode is enabled.

22          159.   Defendants also misapplied YouTube's age restrictions policy to

23  UppercaseCHASE1's videos, limiting videos to viewers 18 years of age or over, regardless of the

24  content.  While many videos on the channel dealing with product reviews for prosthetics, or

25  frankly discussing sexual issues experienced by transgender individuals, are not suitable for

26  younger audiences, Defendants have applied age restrictions to videos which do nothing more than

27  illustrate a piece of fabric, without context or reference to the function or prospective use.

28          160.   Defendants also censored UppercaseCHASE1's LGBTQ+-related content by

CLASS ACTION COMPLAINT FOR DAMAGES, INJUNCTIVE RELIEF, RESTITUTION, AND
DECLARATORY JUDGMENT

removing videos from its platform without explanation and imposing use restrictions on the channel.  In one instance, Defendants removed a video which had been uploaded for six years without issue, for which no age restriction had been imposed, and which was fully monetized.  Mr. Ross was unable to post new content, livestream or use the account for a month before Defendants addressed his complaints.  It was only after Mr. Ross took to Twitter complaining about the removal of the video that Defendants addressed his complaints.  Within two weeks of posting his complaints on Twitter, YouTube reinstated the account, released the video, and admitted that it had taken the adverse action in error.  However, in mid-July of 2019, Defendants again suspended the account merely for posting a link to "Gendercat.com" in violation of YouTube's community guidelines.  Again, in response to Mr. Ross' complaints, Defendants admitted they had acted in error and assured Mr. Ross that it would not happen again.

161.    Like other LGBTQ+ Plaintiffs and members of the LGBTQ+ Community, UppercaseCHASE1 has been the victim of numerous disparaging and hate speech-filled reaction videos which appear when viewers search for "UppcercaseCHASE1," videos.  These hate speech reaction videos also appear in the Defendants' recommended videos in the "Up Next" application for the UppercaseCHASE1 channel.  Some of the reaction videos appear to be monetized, despite the fact that UppercaseCHASE1's video has been demonetized by Defendants, resulting in hate speech which copies the original video of UppercaseCHASE1 generating money, while at the same time, Defendants refuse to allow the creator himself from realizing any financial gain from his own work.

162.    As averred above, Mr. Ross and the LGBTQ+ Plaintiffs support the right of free Speech and expression for all YouTube Community Members, but that right does not  mean that Defendants get to promote anti-LGBTQ+ hate speech by exempting it from the same content-based restrictions and distribution restraints that are used to suppress the right of the LGBTQ+ Community to speak back and distribute LGBTQ+ content on a level and equal playing field.  And it certainly does not give Defendants carte blanche discretion to censor, restrain, demonetize, or otherwise squelch LGBTQ+ Community content and engagement that is compliant with Defendants' content-based regulations and practices.

### 4. Brett Somers a/k/a AMP (Watts The Safeword)

163. Plaintiff Brett Somers, also known as AMP, is the creator and owner of Watts The Safeword, a YouTube channel dedicated to developing and posting sexual education materials which include both LGBTQ+ and non-traditional practices, as well as discussing events, conventions, and issues relevant to the LGBTQ+ Community. Mr. Somers has a degree in art design, and is trained to use video and photographic software applications, as well as to create computer code for gaming, which he did professionally for a number of years.

164. On May 25, 2014, Mr. Somers started the Watts The Safeword channel on YouTube. A week or two later, he uploaded the first video. Thereafter, on average, Mr. Somers uploaded a new video on a bi-weekly basis. As of last year, Mr. Somers had uploaded 227 videos to the Watts The Safeword channel on YouTube; had generated 1.3 million views, and had 193,000 subscribers. Watts The Safeword generated $5,751.00 in just one month, November 2018. However, since that highpoint, as a result of Defendants' strategies, Watts The Safeword generates only $200-$300 monthly from YouTube. This Plaintiff's channel no longer is able to generate 30,000 – 40,000 new subscriptions on a regular basis, as it did in 2018. Watts The Safeword's views have become sporadic, inconsistent, and unpredictable.

165. Commencing within the past two years, Defendants harmed and continue to harm Watts The Safeword by employing many of the same strategies it has applied to other LGBTQ+ Plaintiffs and putative members of the LGBTQ+ Community Class.

166. Defendants have been and continue to strip Watts The Safeword's custom Thumbnails from search results for most of its videos. This strategy is not applied based upon the content of the videos, because Mr. Somers often collaborates with other LGBTQ+ creators and has seen collaborative videos posted to the collaborator's channel bearing the custom Thumbnails, while the identical video posted to Watts The Safeword's channel have had the custom Thumbnails stripped by Defendants.

167. Defendants have and continue to "Demonetize" many of Watts The Safeword's videos on grounds that they purportedly fail to comply with community standards, and have refused to reverse their decisions despite Mr. Somers's appeals and repeated requests for more

guidance regarding the bases of their decisions to demonetize specific videos.

168.     Defendants indiscriminately use their "Restricted Mode" filters and limitations and place to nearly all of Watts The Safeword's videos into that viewer restraint.  Defendants do this for arbitrary, capricious, discriminatory anticompetitive, and other unlawful reasons by restricting Mr. Somers' videos regardless of whether the actual content violates Defendants' Community Guidelines or other content-based regulations or standards.  For example, videos consisting of Mr. Somers discussing his experience traveling to events, festivals or conventions have been restricted and do not appear in searches performed in "Restricted Mode," despite the absence of any content involving sexually explicit, practices, or activities.  Like the other LGBTQ+ Plaintiffs, Mr. Somers Watts The Safeword's videos are restricted regardless of content merely because Mr. Somers' expresses viewpoints, discusses topics, or affiliates with the members of the LGBTQ+ Community.  In August 2019, Defendants restricted videos of Mr. Somers doing nothing more than drinking tea and recommending tea for self-care, while leaving unrestricted countless videos posted by other YouTube creators doing the very same thing.

169.     Defendants also misapplied age restrictions to Watts The Safeword's videos, limiting videos to viewers 18 years of age or over, regardless of the actual content of the video. While many videos on the channel dealing with sex and include graphic sexual images are not suitable for younger audiences, Defendants have applied age restrictions as a one-size-fits-all, eschewing their contractual and legal obligations to review the content of each and every video so that travel videos about LGBTQ+ events and issues, festivals and conventions are not stigmatized and restricted as inappropriate merely because they discuss or mention LGBTQ+ persons or topics.

170.     Defendants have also engaged in outright censorship of Watts The Safeword's LGBTQ+-related content by removing videos from its platform without explanation and imposing age restrictions on the channel without regard to the content of the video uploaded.  In one instance, Defendants imposed age restrictions on Watts The Safeword's video featuring Mr. Somers talking about traveling to a convention while seated in a car.  The video contains no sexual graphics or content at all.  But Defendants did not restrict videos of the actual convention,

featuring sex toys and other sexual content when posted by other creators, that were fully monetized for profit by Defendants.

171.    Even when Defendants allow Watts The Safeword's videos to remain on the platform, Google/YouTube prevent those videos from appearing in response to searches performed by both subscribers and the public at large.  And like other LGBTQ+ Plaintiffs, Mr. Somers has received comments and tweets on the Twitter platform from viewers who have been unable to find content uploaded by Watts The Safeword using the Defendants' search application.

172.    Defendants continue to restrain the innocuous travel videos of Watts The Safeword under its Restricted Mode, age restrictions, and demonetization rules and practices, while allowing objectively and sexually explicit content that Google/YouTube sponsor and/or profit from to run unrestricted on the YouTube platform.  For example, Defendants apply the Restricted Mode filter to Watts The Safeword's video depicting rubber garments, where no bare buttocks are exposed at all.



Nonetheless, Defendants sponsor and monetize explicit and sexualized video content depicting bare buttocks, without any restrictions on a YouTube channel known as the James Charles Channel.  The James Charles content depicts a sexually ambiguous young man who creates and uploads videos demonstrating female-styled make-up techniques, nail care demonstrations, and

recommendations for make-up and personal care products.  One recent video even features Mr. Charles at the Coachella Music Festival, acting as a "make-up guru."  Mr. Charles is wearing a white G-string and chaps which cover his genitals but expose his bare buttocks.



The video also depicts Mr. Charles spanking the bare buttocks of another other festival attendee, who is wearing a similar G-string and chaps in black.



A second video from the Coachella Music Festival depicts Mr. Charles wearing a black G-string

CLASS ACTION COMPLAINT FOR DAMAGES, INJUNCTIVE RELIEF, RESTITUTION, AND DECLARATORY JUDGMENT

with pubic hairs visible.



While the LGBTQ+ Plaintiffs take no issue and offer no view as to whether Defendants should or can regulate Mr. Charles' content, what Defendants cannot do is use their unfettered and absolute discretion to apply purportedly neutral viewpoint regulations that apply equally all users of YouTube as a discriminatory, fraudulent, anticompetitive, and unlawful pretext to promote content that Google/YouTube sponsors and restrict and harm that of its competitor, Mr. Somers.

### 5. Lindsay Amer (Queer Kid Stuff)

173. Plaintiff Lindsay Amer is the creator and owner of Queer Kid Stuff, a YouTube educational channel created to serve as a support for LGBTQ+ parents, LGBTQ+ children between the ages of 3 and 17, who have questions or face bullying for perceived LGBTQ+ status, and librarians and educators seeking assistance with respect to how to field questions about LGBTQ+ issues and support children affected by LGBTQ+ issues. Mx. Amer has an undergraduate degree in gender studies and theater; and a graduate degree in performance studies.

174. In 2015, they created the Queer Kid Stuff channel as a vehicle to upload their original video content. On May10, 2016, Mx. Amer uploaded the first Queer Kid Stuff education video. Initially, the video was shared and received roughly 2,000 views without negative

1  comments or reaction videos.  Within months of the uploading of the first video, the Huffington

2  Post published a favorable article discussing the video.

3       175.    On June 23, 2016, The Daily Stormer, a Neo Nazi website on that appears on

4  Defendant Google's search engine site published a commentary by Andrew Anglin entitled, "Sick

5  Dyke Creates Educational Program to Brainwash Children Into the Homosexual Lifestyle," which

6  quotes from the Huffington Post article, and bashes both Queer Kid Stuff and Ms. Amer:

7            "Lindsey Amer is a twisted lesbo who is obsessed with
             psychologically abusing children, and has created an entire
8            'educational' program to teach children to become homosexual
             perverts. . . .  [Homos] are always pushing for the ability to recruit
9            younger and younger victims into their sex-cult, and now, our
             jewed-out society has reached the point where we are ready to show
10           their recruitment propaganda to pre-schoolers – in order to prove
             we're not haters, of course. . . .  Please visit this creature on Twitter
11           and let her know what you think of her plot. . . . Oh, and ask her if
             she's Jewish."  A Anglin, Daily Stormer, June 23, 2016.
12
   The article included a link to the Queer Kid Stuff Twitter account and Mx. Amer's personal
13
   profile.
14
          176.    The Daily Stormer commentary generated an avalanche of hate speech directed at
15
   Mx. Amer and the Queer Kid Stuff channel.  The hate speech involved vicious and obscene anti-
16
   Semitic, misogynist, and homophobic content, as well as other obscene material, and culminated
17
   in a death threat against Mx. Amer.  Defendants permitted all of that hate speech to appear directly
18
   in the comment section of Mx. Amer's Queer Kid Stuff channel.  And although Defendant Google
19
   finally removed The Daily Stormer from their platform in the fall of 2017, the hate speech directed
20
   at Mx. Amer continued unabated on the channel.
21
          177.    As with the other the LGBTQ+ Plaintiffs in this case, Mx. Amer supports the right
22
   of all to express their viewpoints in a civil and protected manner.  But Mx. Amer, and the other
23
   LGBTQ+ Plaintiffs take serious issue with Defendants systematic efforts to restrain or financially
24
   harm Mx. Amer's content and their ability to defend and protect themselves on a platform that
25
   promises to treat everyone equally.  That is not the case here, because Defendants selectively
26
   apply their content-based regulations and filtering to promote and profit from homophobic
27
   hatemongers who are allowed to inundate Mx. Amer and other LGBTQ+ channels when their
28

CLASS ACTION COMPLAINT FOR DAMAGES, INJUNCTIVE RELIEF, RESTITUTION, AND
DECLARATORY JUDGMENT

content directly and objectively violates Defendants content-based rules that they claim exist only to "keep the platform safe" for all of the YouTube Community, including Mx. Amer and the other LGBTQ+ members of that Community.

178.    On September 14, 2016, four months after Mx. Amer uploaded the first video to the Queer Kid Stuff channel, they uploaded the second video.  The four month delay between the first and second video was the direct result of the fear and chilling affect that the hate speech allowed and/or promoted by Defendants had on Mx. Amer.  Mx. Amer was and continues to be unable to remove that hate speech using Defendants' available filter tool.  Repeated attempts to handle the tidal waves of hate speech that Defendants continue to allow to be directed at the Queer Kid Stuff channel has also interfered with Mx. Amer's ability to reach and engage with their intended audience.

179.    In total, Queer Kid Stuff published 12 new videos between September 14, 2016 and January 27, 2017.  With the uploading of each new video, a new wave of hate speech filled the comments section of the channel.  For every positive comment that appeared, dozens of hate-filled comments appeared and pushed the positive comment down the queue so that viewers would only see hate-filled comments when they watched Queer Kid Stuff content.

180.    Despite repeated complaints to Defendants about the hate speech comments, and after devoting considerable efforts to reconfigure the Defendants' filters to screen them, a number of members of Queer Kid Stuff's intended audience, including parents, wrote to Mx. Amer complaining about the obscene hateful comments posted on the Queer Kid Stuff channel and informing Mx. Amer, that despite their approval of the intended content on the channel, these parents could not share the quality videos with their children, because it would expose the children to content which they deemed harmful and injurious.  One parent wrote:

> "I'm really glad that I ran into your channel today, as I found the videos to be easy enough for my 5 year old to enjoy and understand the content.  This really is a godsend for me, a trans demi girl who has major problems with panic attacks just trying to address the subject with them.
>
> The only thing that I wish would get addressed with your channel would be doing something with the comments section.  While it's great that there are some positive encouragement from some

viewers, others turn it into a dumpster fire dipped in cancer. I'm glad that my child can't read well enough to understand the comments, but I think other children will inherently get exposed to transphobic, ablest, and queerphobic nonsense that may undermine the positive message of the videos."

Another parent wrote:

"My 7 year old son (who self-identifies as queer) is home from school today. . . We love your channel . . . I wanted to reach out because even though we watch your videos, I have a strict policy against reading YouTube comments. YouTube suggested a bunch of hateful anti-queer videos in response to our watching yours, and as I went through the list to tell YouTube I am not interested in any of these, I ended up reading some of the comments. How disheartening. Talk about homophobia. I am literally crying right now at some of these and am quite glad my son is in the other room, since I'm not sure I'm emotionally up to explain it to him right now. . . ."

181.    Because Defendants failed to regulate or filter the hate speech directed to the Queer Kid Stuff channel between 2016 and 2018, Mx. Amer was forced to disable the comments section to the channel in the fall of 2018 and to forego the ability to fully engage with and reach Queer Kid Stuff's intended audience with its content.   In the process, however, Mx. Amer noticed the hatemongers had started to upload and copy portions of or entire Queer Kid Stuff videos that they then displayed on the platform with disparaging, obscene, and hateful content, including fake voiceovers, or with the commentator inserted into a frame in the corner of the Queer Kid Stuff videos.  Most of the reaction videos include links to the Queer Kid Stuff channel which acted as an amplifier for generating hate speech comments.

182.    The obscene, hate speech filled reaction videos, many of which were spawned by The Daily Stormer article, also appear in searches for Queer Kid Stuff on YouTube, and appear in "Up Next," recommendations on the screen whenever viewers watched Queer Kid Stuff videos, thereby exposing LGBTQ+ parents and children to inappropriate hurtful material.  Mx. Amer repeatedly complained to Google/YouTube about the hate speech reaction videos which appear in the recommended "Up Next" material, and in the search results for "Queer Kid Stuff," but Defendants refused to subject that content to their Community Guidelines and other speech regulations, or to prevent reaction video creators from posting links to the Queer Kid Stuff channel on the reaction videos.

183. In all, Queer Kid Stuff has uploaded more than 100 videos, of which Defendants have only allowed 94 to remain accessible to viewers; the channel has more than 2 million views and more than 15,000 subscribers. Queer Kid Stuff's growth has been substantially stymied by Defendants' selected, discriminatory, anticompetitive and unlawful use of its content regulation and monetization policies and practices, and has generated less than $500 per year. Defendants should be ashamed of themselves for promising LGBTQ+ consumers that the same rules apply equally to everyone and then singling out the LGBTQ+ Plaintiffs, like Mx. Amer, and the greater LGBTQ+ Community for content and monetization violations while promoting and profiting from homophobic hate speech that threatens violence and goes unregulated on the YouTube platform.

## V.   CLASS ACTION ALLEGATIONS

184. The LGBTQ+ Plaintiffs bring this action on behalf of themselves and a putative YouTube Community Class and an LGBTQ+ Community Subclass of YouTube users and consumers who are similarly situated under Rules 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure. The YouTube Community Class and LGBTQ+ Community Class seeking monetary damages and injunctive relief on behalf of the following class of YouTube consumers and users:

**The YouTube Community Class Is Defined As**:

> All persons or entities in the United States who are or were members, users and or consumers of YouTube who uploaded, posted, or viewed video content on YouTube subject to Google/YouTube's Terms of Service, Mission Statement, Community Guidelines, and/or any other content-based filtering, monetization, distribution , personal data use policies, advertising or regulation and practices any other regulations or practices that are related to the YouTube Platform on or after January 1, 2015 and continuing through to December 31, 2019 (the "Class Period").

> Excluded from the YouTube Community Class are Defendants and their employees, affiliates, parents, subsidiaries, and co-conspirators, whether or not named in this Complaint, and the United States government.

**The LGBTQ+ Community Subclass Is Defined As:**

> All persons or entities in the United States who (a) are or were members, users and or consumers of YouTube who uploaded, posted, or viewed video content on YouTube subject to Google/YouTube's Terms of Service, Mission Statement,

Community Guidelines, and/or any other content-based filtering, monetization, distribution , personal data use policies, advertising or regulation and practices any other regulations or practices that are related to the YouTube Platform and (b) are part of protected class of persons under the California or Federal law because of sexual orientation, gender identity, or gender or (c) create, post, distribute, monetize, or advertise video content on the YouTube Platform that discusses or relates to topics, issues or viewpoints that advocate for, are of interest to, or are intended for LGBTQ+ audiences, on or after January 1, 2015 and continuing through to December 31, 2019 (the "LGBTQ+ Subclass Period").

Excluded from the LGBTQ+ Community Subclass are Defendants and their employees, affiliates, parents, subsidiaries, and co-conspirators, and any YouTube users who create, post, distribute, promote or engage in video or communications on the YouTube Platform that is directed against the LGBTQ+ Plaintiffs or LGBTQ+ Community and is objectively violent, obscene, threatening, or homophobic as alleged in the Complaint.

185.    The LGBTQ+ Plaintiffs believe that there are over 200 million members of the YouTube Community Class and hundreds of thousands of members of LGBTQ+ Community Subclass as defined and described above in the Complaint.  The exact number and identities of the YouTube Community Class and LGBTQ+ Community Subclass are known by Defendants, and the number of persons who fall within the definitions of the Class and/or Subclass are so numerous and geographically dispersed so as to make joinder of all members of the Class or Subclass in their individual capacities impracticable, inefficient, and unmanageable so as to effectively deny each putative Class or Subclass member his, her, or their rights to prosecute and obtain legal and equitable relief based on the claims and allegations averred in this Complaint.

186.    There are questions of law and fact common to the YouTube Community Class and the LGBTQ+ Community Subclass that relate to and/or are dispositive of the nature and allegations of unlawful conduct alleged in the Complaint, and the nature, type and common pattern of injury and harm caused by that unlawful conduct and sustained by the putative members of the Class and Subclass including, but not limited to:

a.    Whether Defendants' regulations and content-based restrictions violate the free speech, antidiscrimination, consumer fraud and unfair competition, and contractual rights of the members of the YouTube Community Class and/or the LGBTQ+ Community Subclass;

b. Whether Defendants concealed, misrepresented or omitted to disclose material policies and practices regarding the unlawful regulation of video content, advertising, distribution, monetization, contractual obligations, and characteristics of the YouTube platform to the members of the YouTube Community Class and/or LGBTQ+ Community Subclass;

c. Whether Defendants use unlawful, discriminatory, anticompetitive and fraudulent, deceptive, unfair, and/or bad faith filtering tools and practices, in the code and operation of their machine based, algorithmic, or A.I. filtering tools, and/or other practices and procedures to review, regulate, and restrict content, and/or regulate and restrict the advertising, monetization, distribution, and property rights of the YouTube Community Class and LGBTQ+ Community Subclass;

d. Whether Defendants are engaged in discriminatory practices against the members of the LGBTQ+ Community Subclass based on protected characteristics;

e. Whether Defendants' breached their form consumer contracts and obligations to the YouTube Community Class and LGBTQ+ Community Subclass;

f. Whether Defendants are engaged in unlawful, deceptive, unfair, or anticompetitive practices that violate federal or California law, and harmed and injured the YouTube Community Class and/or the LGBTQ+ Community Subclass;

g. Whether the conduct of Defendants, as alleged in this Complaint, caused injury to the business and property of the LGBTQ+ Plaintiffs and the members of the YouTube Community Class and LGBTQ+ Community Subclass;

h. Whether Defendants' alleged regulations, practices, and conduct has caused or threatens to cause harm to the speech of the YouTube Community Class

or the LGBTQ+ Community Subclass to warrant the ordering of temporary, preliminary and/or final injunctive relief and corresponding declaratory relief with respect to the legal rights of the LGBTQ+ Plaintiffs and the YouTube Community Class and LGBTQ+ Community Subclass;

i. The scope, nature, substance, and enforcement of injunctive and equitable relief sought by the YouTube Community Class and LGBTQ+ Community Subclass;

j. Whether Defendants were unjustly enriched or obtained profits or ill-gotten financial gains as a result of the unlawful, discriminatory, deceptive, unfair, or anticompetitive practices perpetrated against the LGBTQ+ Plaintiffs, the YouTube Community Class, and the LGBTQ+ Community Subclass;

k. Whether Defendants breached their contractual obligations and/or implied duty of good faith and fair dealing under the consumer form contracts entered into during the Class Period between Google/YouTube and the LGBTQ+ Plaintiffs, the YouTube Community Class, and the LGBTQ+ Community Subclass;

l. Whether Defendants' content-based regulations and filtering practices, on their face and/or as applied, violate the free speech rights of the LGBTQ+ Plaintiffs and the YouTube Community Class and the LGBTQ+ Community Subclass; and

m. whether Defendants' assertion of immunity from liability under the Community Decency Act 15 U.S.C. § 230 (c) (the "CDA") with respect to any of the claims or allegations asserted by the LGBTQ+ Plaintiffs, the YouTube Community Class, and/or the LGBTQ+ Community Subclass operates as an unlawful prior restraint of speech in violation of the First Amendment of U.S. Constitution.

187. During the Class Period, the LGBTQ+ Plaintiffs uploaded one or more videos to YouTube and Plaintiffs Divino and Brett Somers each purchased Google Ads products in reliance

CLASS ACTION COMPLAINT FOR DAMAGES, INJUNCTIVE RELIEF, RESTITUTION, AND DECLARATORY JUDGMENT

on the representations and failures to disclose alleged above.  At least some of that video content uploaded by LGBTQ+ Plaintiffs was subjected to one or more human or algorithmic restriction tools.  The interests of the LGBTQ+ Plaintiffs are coincident with, and not antagonistic to those of the other members of the YouTube Community Class and the LGBTQ+ Community Subclass.

188.    Each of the LGBTQ+ Plaintiffs is a member of the YouTube Community Class and LGBTQ+ Community Subclass class.

189.    The claims of the LGBTQ+ Plaintiffs are typical of the claims of YouTube Community Class and LGBTQ+ Community Subclass members, and the LGBTQ+ Plaintiffs will fairly and adequately protect the interests of the members of the LGBTQ+ Class.  The LGBTQ+ Plaintiffs are represented by counsel who are competent and experienced in the prosecution and defense of similar claims and litigation, including class actions filed, prosecuted, defended, or litigated in under California and federal law, in California and federal courts, in connection with claims and certification of consumer and civil rights classes composed of members who reside in California and/or the United States.

190.    The prosecution of separate actions by individual members of the YouTube Community Class and LGBTQ+ Community Subclass would create a risk of inconsistent or varying adjudications.

191.    The questions of law and fact common to the members of the YouTube Community Class and the LGBTQ+ Community Subclass predominate over any questions of law or fact affecting only individual members of the Class or Subclass, including legal and factual issues relating to liability and the nature of the harm caused by Defendants' unlawful actions.

192.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Treatment as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently and without the duplication of effort and expense that numerous individual actions would engender.

193.    The YouTube Community Class and the LGBTQ+ Community Subclass are readily definable and are categories for which records should exist in the files of Defendants, and

prosecution as a class action will eliminate the possibility of repetitious litigation. Class treatment will also permit the adjudication of relatively small claims by many members of the LGBTQ+ Community Subclass who otherwise could not afford to litigate claims such as those asserted in this Complaint.

## **FIRST CAUSE OF ACTION**

### **(California Constitution Article I, section 2)**

### **(On Behalf Of The LGBTQ+ Plaintiffs Individually And The YouTube Community Class)**

194. The LGBTQ+ Plaintiffs re-allege and incorporate herein by reference, as though set forth in full, each of the allegations set forth in paragraphs 1 through 193 above.

195. Article I, section 2 of the California Constitution protects the liberty of speech and association, especially in public, quasi-public, and limited public spaces.

196. In YouTube, Defendants created and maintain a public forum, or its functional equivalent. First, Defendants solicit the general public to use YouTube by representing that its purpose, and primary use, is a place dedicated to free speech. Second, Defendants expressly invite the public to visit YouTube to engage in freedom of expression. Third, the size and reach of YouTube's dominance over the expression and exchange of video-based speech is unparalleled. Fourth, the relationship between the ideas sought to be presented and the function or purpose of the property are those of a "public forum," the cyber-equivalent of a town square where citizens exchange ideas on matters of public interest or concern. Given these factors, Defendants' regulation of speech is supposed to be viewpoint-neutral, and the same rules should apply equally to all.

197. Defendants describe YouTube as a "service that enables more than a billion users around the world to upload" videos, where users are urged to "Broadcast Yourself," "promote yourself" or "do the broadcasting yourself." Furthermore, in YouTube's Terms of Service, Defendants state that YouTube is not legally or otherwise responsible for any third-party content: YouTube is not "responsible for the accuracy, usefulness, safety, or intellectual property rights of or relating to such Content"; responsibility for the "FOREGOING RESTS ENTIRELY WITH YOU [THE USER]." These are not the statements of a publisher who tells the public they only

print news "fit to print." Defendants do not merely sell edited news content to users; they monetize third-party public speech inviting "everyone" to "express themselves" on a "nearly limitless range of topics."

198. Under California law, Defendants' regulation of speech on YouTube is state action because Defendants perform an exclusively and traditionally public function: the regulation of speech within a designated public forum. Accordingly, speech cannot be arbitrarily, unreasonably, or discriminatorily excluded, regulated, or restricted on the basis of viewpoint or the identity of the speaker and any such regulations must fully comply with protections afforded free speech and expression under the Liberty of Speech Clause and the long established jurisprudence governing the Clause's application.

199. Videos of the Proposed Class constitute expressive speech and activity protected by Article I, section 2 of the California Constitution.

200. Defendants have restricted the speech and expressive conduct of the Proposed Class based upon subjective, vague, and overbroad criteria that give Defendants unfettered and unbridled discretion to censor speech for any reason, or no reason at all, no matter how arbitrary or capricious. Those criteria further fail to convey a sufficiently definite warning to the LGBTQ+ Plaintiffs or to the public as to what is prohibited or restricted. Defendants' adoption and application of those criteria on its face violates the Proposed LGBTQ+ Class' right to free speech as guaranteed by Article I, section 2 of the California Constitution. Further, that invidious potential has been borne out and evidenced by Defendants' application of those policies and procedures to censor the LGBTQ+ Plaintiffs.

201. Defendants also apply their censorship criteria, including the Terms of Service and Community Guidelines, as a pretext to censor and restrict the LGBTQ+ Plaintiffs' speech, based not upon the content of the speech, but rather, upon the identity and political viewpoints of the LGBTQ+ Plaintiffs. Defendants' application of criteria and corresponding restraints on the LGBTQ+ Plaintiffs' speech is arbitrary and capricious and/or is based upon political, religious, or other animus towards the identity and viewpoints of the speaker, not the actual content of the speech.

202. Further, because the LGBTQ+ Plaintiffs are so restrained and punished because of the speakers featured in its videos, as well as those speakers' opinions, Defendants' actions impinge on and violate LGBTQ+ Plaintiff's right to free association and assembly. Defendants' actions also violate LGBTQ+ Plaintiff's right to free association and assembly, by blocking viewers' access to videos and comments.

203. No compelling, significant, or legitimate reason justifies Defendants' actions. Even if such interests did exist to justify Defendants' restriction and demonetization rules generally, the restrictions imposed on the LGBTQ+ Plaintiffs' speech, are not narrowly or reasonably tailored to further such interests, because they sweep within their ambit inoffensive and non-graphic discussions intended and designed for educational purposes. Given Defendants' monopolistic control over search results, including video search results, as well as online video streaming, the LGBTQ+ Plaintiffs have no alternative affording it a reasonable opportunity to reach their full intended audience.

204. Defendants' discriminatory policies and application of those policies are not viewpoint-neutral, are unreasonable in time, place, and manner, and are unreasonable in relation to the nature, purpose, and use of the forum. They impose an unreasonable prior restraint on the LGBTQ+ Plaintiffs' protected political speech, motivated by impermissible discrimination against Plaintiffs' identity and viewpoint.

205. Defendants' wrongful actions were taken with oppression, fraud, malice and/or are arbitrary and capricious, and as part of Defendants' normal course of business, effectuated through both algorithms, as well as through human agents. And Defendants' actions were done with the intent to deprive the LGBTQ+ Plaintiffs and their viewers of their rights under the California Constitution.

206. As a direct and proximate result of Defendants' violations of clearly established law regarding public fora, LGBTQ+ Plaintiffs have suffered, and continue to suffer, immediate and irreparable injury in fact, including lost income, reduced viewership, and damage to brand, reputation, and goodwill, for which there exists no adequate remedy at law.

**SECOND CAUSE OF ACTION**

**(California Unruh Civil Rights Act—Civil Code §§ 51, et seq.)**

**(On Behalf Of The LGBTQ+ Plaintiffs And The YouTube Community Class)**

207. The LGBTQ+ Plaintiffs re-allege and incorporate herein by reference, as though set forth in full, each of the allegations set forth in paragraphs 1 through 206 above.

208. Defendants Google and YouTube host business establishments under the Unruh Civil Rights Act, California Civil Code § 51 et seq. Defendants grant the public unrestricted access to YouTube for commercial reasons that are at the core of their business model and the source of virtually all of their revenue.

209. Despite their promises of neutrality and a diversity of viewpoints, Defendants engage in a pattern and practice of intentional discrimination in the provision of their services, including discriminating against and censoring of the LGBTQ+ Plaintiffs' speech, based not upon the content of speech, but on its sexual orientation and political identity and viewpoint. Through the acts complained of herein, Defendants intentionally denied, and aided or incited in denying, the LGBTQ+ Plaintiffs full and equal accommodations, advantages, privileges, and services, by discriminating against it in demonetizing the LGBTQ+ Plaintiffs' content, and by placing its videos in Restricted Mode.

210. A substantial motivating reason for Defendants' conduct is Defendants' subjective perception of the LGBTQ+ Plaintiffs' political identity, viewpoints, and religious and sexual orientation, as well as those of others with whom the LGBTQ+ Plaintiffs are associated. Defendants' restrictions on the LGBTQ+ Plaintiffs' video content is the result of arbitrary, capricious, invidious, and pretext-based discrimination against the LGBTQ+ Plaintiffs' political and religious identity and sexual orientation and viewpoints. It is also wholly without any legitimate, reasonable business interest, as the content of the restricted and demonetized the LGBTQ+ Plaintiffs' videos are completely compliant with the letter and spirit of Defendants' Terms of Service and Community Guidelines, including satisfying and complying with all of Defendants' criteria and rules for reaching younger and "sensitive" audiences. In sum, Defendants are censoring and treating the LGBTQ+ Plaintiffs and their videos differently from Defendants'

own or preferred content, solely because of discriminatory animus towards the LGBTQ+

Plaintiffs' identities and views.

211.    Defendants' wrongful actions were taken with oppression, fraud and/or malice,

effectuated through both the Google/YouTube algorithms, as well as manual human review of the

LGBTQ+ Plaintiffs' videos and appeals.

212.    As a direct and proximate result of Defendants' unlawful discriminatory actions,

the LGBTQ+ Plaintiffs suffered, and continue to suffer, irreparable injury in fact, including, but

not limited to: lower viewership, lost advertising opportunities otherwise available to other

nonprofits, decreased ad revenue, and reputational damage, for which there exists no adequate

remedy at law.

213.    Defendants' violations of the Unruh Act further entitle the LGBTQ+ Plaintiffs to

recover statutory damages of up to three times the amount of actual damages in an amount to be

proven at trial, or a minimum of $4,000 per violation.

### THIRD CAUSE OF ACTION

**(California Business and Professions Code §§ 17200, et seq.)**

**(On Behalf Of The LGBTQ+ Plaintiffs And The YouTube Community Class)**

214.    The LGBTQ+ Plaintiffs re-allege and incorporate herein by reference, as though set

forth in full, each of the allegations set forth in paragraphs 1 through 213 above.

215.    Defendants have committed acts of unfair competition, as defined by California

Business and Professions Code § 17200, by engaging in the practices described above.

216.    Defendants' policies and practices, and their application of the same to the

LGBTQ+ Plaintiffs, constitute unlawful, unfair or fraudulent business acts or practices within the

meaning of California Business and Professions Code § 17200.  Defendants' policies, as well as

their application, violate the policy and spirit of the Unruh Act, the Lanham Act, the California

Constitution, and prior court decisions.  In addition, Defendants compete with third-party content

providers like the LGBTQ+ Plaintiffs, and Defendants' arbitrary and capricious restrictions on

their competitors' speech and content significantly threatens or harms competition.  Those actions

are likely to mislead the public, and do mislead the public, about YouTube, Defendants' videos,

the LGBTQ+ Plaintiffs, and the LGBTQ+ Plaintiffs' videos. Content creators, advertisers, and viewers trust and rely on Defendants for an open marketplace of ideas and expression, and further that when videos are restricted or demonetized, that those videos are truly, and in good faith, deemed inappropriate for viewing by minors or sensitive viewers.

217. There is no utility to the public for Defendants' actions, where those restrictions treat the LGBTQ+ Plaintiffs and others similarly situated differently, simply because of their perceived politics and the identity of their speaker. To the extent that Defendants' arbitrarily and discriminatorily-applied policies have any utility whatsoever, that utility is significantly outweighed by the harm which they impose on consumers and the public. Defendants have alternatives to this conduct that would be less harmful to consumers, but do not adopt or apply them because of their bias against the LGBTQ+ Plaintiffs and others similarly situated.

218. As a direct and proximate result of the aforementioned acts, the LGBTQ+ Plaintiffs have suffered, and continue to suffer, immediate and irreparable injury in fact, including lost income, reduced viewership, and damage to brand, reputation, and goodwill, for which there exists no adequate remedy at law.

219. Defendants' wrongful actions were taken with oppression, fraud and/or malice.

### FOURTH CAUSE OF ACTION

**(Breach of Implied Covenant of Good Faith and Fair Dealing)**

**(On Behalf Of The LGBTQ+ Plaintiffs And The YouTube Community Class)**

220. The LGBTQ+ Plaintiffs re-allege and incorporate herein by reference, as though set forth in full, each of the allegations set forth in paragraphs 1 through 219 above.

221. The LGBTQ+ Plaintiffs and Defendants entered into written contracts in which Defendants agreed to provide YouTube access, hosting, streaming, and advertising services to the LGBTQ+ Plaintiffs. Those contracts give Google/YouTube vague, unfettered, and unilateral discretion to remove, restrict, demonetize, or de-emphasize content as Defendants see fit.

222. Implied in those contracts is the implied covenant of good faith and fair dealing. This is particularly true because, in those contracts, Defendants assumed for themselves unilateral and unfettered discretionary control over virtually every aspect of their relationship with the

LGBTQ+ Plaintiffs—control that Defendants have exercised at their whim, repeatedly and without notice to the LGBTQ+ Plaintiffs, and without an opportunity for meaningful discussion or appeal.  To the extent that those discretionary powers are valid, Defendants are obligated to exercise them fairly and in good faith.

223.    The LGBTQ+ Plaintiffs did all or substantially all of the significant things required of them under their agreements with Defendants, or were excused from having to do those things.

224.    Defendants are bound by the implied covenant of good faith and fair dealing in their agreements, terms, and policies, not to engage in any acts, conduct, or omissions, which would impair or diminish the LGBTQ+ Plaintiffs' rights and benefits under the parties' agreements.  Pursuant to the terms of those agreements, the LGBTQ+ Plaintiffs were supposed to have equal access to a wide audience to promote its messages, and it was in reliance on Defendants' representations they chose YouTube as the host of their videos.  Also pursuant to those agreements, the LGBTQ+ Plaintiffs are entitled to some portion of the profits that Defendants were making from the LGBTQ+ Plaintiffs' video content.  Instead, Defendants have, by the acts and omissions complained of herein, intentionally and tortiously breached the implied covenant of good faith and fair dealing by unfairly interfering with Plaintiffs' rights to receive the benefits of those contracts.

225.    The foregoing acts and omissions were engaged in by Defendants with the knowledge that they were bound to act consistently with the covenant of good faith and fair dealing.  Those acts and omissions were not only failures to act fairly and in good faith, but they were acts of oppression, fraud, and malice.

226.    As a direct and proximate result of the aforementioned conduct of Defendants, the LGBTQ+ Plaintiffs have suffered, and continue to suffer, immediate and irreparable injury in fact, including lost income, reduced viewership, and damage to brand, reputation, and goodwill, for which there exists no adequate remedy at law.

**FIFTH CAUSE OF ACTION**

**(Lanham Act—15 U.S.C. § 1125 et seq.)**

**(On Behalf Of The LGBTQ+ Plaintiffs And The YouTube Community Class)**

227.    The LGBTQ+ Plaintiffs re-allege and incorporate herein by reference, as though set forth in full, each of the allegations set forth in paragraphs 1 through 226 above.

228.    Google/YouTube are engaged in interstate commerce and competition through hosting, creating, advertising, and soliciting and receiving revenue for advertising, and video streaming services on YouTube.com.  In addition, Google/YouTube compete with content creators such as the LGBTQ+ Plaintiffs in the market of online video streaming by creating, hosting, and promoting their own video content, and the video content of a hand-picked cadre of creators with whom they partner or whom they sponsor.

229.    Defendants engage in a pattern and practice of knowingly misleading and deceptive advertisement, and unfair competition.  Defendants advertise YouTube, as a word, term, name, symbol, device, and/or product or service as place for freedom of expression where the rules apply equally to everyone who uses the site.  Defendants unfairly and deceptively misrepresent the nature, characteristics, and qualities of YouTube's services and commercial activities as viewpoint-neutral public forum where content-based regulations, rules, and monetization policies and practices apply equally to all users.

230.    In direct violation of these regulations and promises, as well as by deception, fraud, and other anticompetitive practices, Defendants unlawfully enhance the image and goodwill of their own content, and that of their partners and/or sponsored creators, while falsely degrading and stigmatizing the LGBTQ+ Plaintiffs and their videos, including labeling their content as "shocking," "inappropriate," "offensive," "sexually explicit,' "obscene," unfit for minors, or the "gay thing" under the pretext of keeping the platform safe for users.

231.    Defendants' false representations and unfair competition both deceived, and had a tendency to deceive, substantial segments of Defendants' audiences, including content creators like the LGBTQ+ Plaintiffs, subscribers, viewers, and advertisers, who are induced to traffic and do business with YouTube, and to view (or not view) particular videos.  As a direct and proximate

result of Defendants' actions complained of herein, the LGBTQ+ Plaintiffs have suffered, and continue to suffer, immediate and irreparable injuries in fact, including injuries in the form of fewer subscribers to their respective YouTube channels, fewer viewers of their videos, particularly by isolated and vulnerable LGBTQ+ viewers who would benefit from the video content, fewer notifications to subscribers regarding their posting of new video content, fewer or no recommendations of their videos to viewers from Defendants, decreased ad revenue, a reduction in advertisers willing to purchase advertisements shown on the LGBTQ+ Plaintiffs' videos, diverted viewership, and damage to their respective brands, reputations and goodwill.

232. Defendants' wrongful actions were taken with oppression, fraud and/or malice. The LGBTQ+ Plaintiffs have repeatedly attempted to remedy the situation, and Defendants have repeatedly refused to un-restrict or re-monetize the LGBTQ+ Plaintiffs' videos. Defendants have attempted to justify their differential treatment of the LGBTQ+ Plaintiffs and their respective videos as necessary to protect sensitive viewers throughout the world, or as a response to an report that video content was offensive received from someone located somewhere in the world. Defendants' treatment of LGBTQ+ creator videos like those of the LGBTQ+ Plaintiffs is part of their normal course of business, effectuated through both the Google/YouTube algorithms, as well as through their agents manually reviewing Plaintiffs' videos and conducting appeals.

## **PRAYER FOR RELIEF**

1. For a declaratory judgment that Defendants have violated and continue to violate the LGBTQ+ Plaintiffs' free speech rights, both facially and as applied, under Article I, section 2 of the California Constitution, the Unruh Civil Rights Act, the UCL Law, the express terms and implied convent of good faith and fair dealing in the contract or contracts between Defendants and the LGBTQ+ Plaintiffs, and the Lanham Act. An actual controversy exists between the LGBTQ+ Plaintiffs and Defendants as to whether Defendants' policies, practices, and procedures, and their application thereof, violate the California Constitution, the Unruh Civil Rights Act, the UCL, the express terms and implied convent of good faith and fair dealing in the contract or contracts between Defendants and the LGBTQ+ Plaintiffs, and the Lanham Act. The correct interpretation is that Defendants' policies and procedures violate both on their face and as applied, these

CLASS ACTION COMPLAINT FOR DAMAGES, INJUNCTIVE RELIEF, RESTITUTION, AND DECLARATORY JUDGMENT

constitutional protections and laws, and that a declaration of the parties' respective legal rights and obligations by the Court will clarify the extent to which Defendants' policies and procedures, and Defendants' application of their policies and procedures, violate California and federal law; and will resolve most of the disputes and controversy that now exist because of the policies, practices, and procedures of Defendants and their application to the LGBTQ+ Plaintiffs and other members of the YouTube Community as alleged in this Complaint;

2. For an injunction requiring Defendants to:

 a. Cease and desist from capriciously restricting, demonetizing, or otherwise censoring any content of videos uploaded to the YouTube site in violation of federal and California law; and

 b. Cease and desist from censoring, restricting, restraining, or regulating speech based on the discretionary use or application of discriminatory, animus-based, arbitrary, capricious, vague, unspecified, or subjective criteria, rules, guidelines, and/or practices;

3. For compensatory, special, and statutory damages in an amount to be proven at trial, including statutory damages pursuant to, *inter alia*, Civil Code § 51, 51.5, 52, Civil Procedure Code § 1021.5, 15 U.S.C. § 1117, 42 U.S.C. §§ 1981, 1983;

4. A civil penalty of $2,500 for each violation pursuant to Business and Professions Code §§ 17200, 17206, and 17536;

5. For punitive damages and exemplary damages in an amount to be proven at trial;

6. For restitution of financial losses or harm caused by Defendants' conduct and ill-gotten gains, and disgorgement of profit obtained from all unlawful conduct in an amount to be proven at trial;

7. Attorney's fees and costs of suit;

8. For prejudgment and post-judgment interest; and

9. For any and all other relief that the Court deems just and proper.

## **JURY DEMAND**

The LGBTQ+ Plaintiffs demand trial by jury on all issues of law so triable.

CLASS ACTION COMPLAINT FOR DAMAGES, INJUNCTIVE RELIEF, RESTITUTION, AND DECLARATORY JUDGMENT

DATED: August 13, 2019                    Respectfully submitted,

                                          BROWNE GEORGE ROSS LLP
                                              Peter Obstler
                                              Debi A. Ramos


                                          By:        /s/ Peter Obstler
                                                      Peter Obstler
                                          Attorneys for LGBTQ+ Plaintiffs Divino LLC, Chris
                                          Knight, Celso Dulay, Cameron Stiehl, BriaAndChrissy
                                          LLC, Bria Kam, Chrissy Chambers, Chase Ross, Brett
                                          Somers, and Lindsay Amer