BROWNE GEORGE ROSS LLP
Peter Obstler (State Bar No. 171623)
  pobstler@bgrfirm.com
44 Montgomery Street, Suite 1280
San Francisco, California 94104
Telephone: (415) 391-7100; Facsimile: (415) 391-7198

BROWNE GEORGE ROSS LLP
Eric M. George (State Bar No. 166403)
  egeorge@bgrfirm.com
Debi A. Ramos (State Bar No. 135373)
  dramos@bgrfirm.com
2121 Avenue of the Stars, Suite 2800
Los Angeles, California  90067
Telephone: (310) 274-7100; Facsimile: (310) 275-5697

Attorneys for LGBTQ+ Plaintiffs Divino Group
LLC, Chris Knight, Celso Dulay, Cameron Stiehl,
BriaAndChrissy LLC, Bria Kam, Chrissy
Chambers, Chase Ross, Brett Somers, and
Lindsay Amer, Stephanie Frosch, Sal
Cinequemani, Tamara Johnson and Greg Scarnici

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION

| | |
|---|---|
| DIVINO GROUP LLC, a California limited liability company, CHRIS KNIGHT, an individual, CELSO DULAY, an individual, CAMERON STIEHL, an individual, BRIAANDCHRISSY LLC, a Georgia limited liability company, BRIA KAM, an individual, CHRISSY CHAMBERS, an individual, CHASE ROSS, an individual, BRETT SOMERS, an individual, and LINDSAY AMER, an individual, STEPHANIE FROSCH, an individual, SAL CINEQUEMANI, an individual, TAMARA JOHNSON, an individual, and GREG SCARNICI, an individual,<br><br>          Plaintiffs,<br><br>     vs.<br><br>GOOGLE LLC, a Delaware limited liability company, YOUTUBE, LLC, a Delaware limited liability company, and DOES 1-25,<br><br>          Defendants. | Case No. 5:19-cv-004749-VKD<br><br>**FIRST AMENDED CLASS ACTION COMPLAINT FOR DAMAGES, INJUNCTIVE RELIEF, RESTITUTION, AND DECLARATORY JUDGMENT**<br><br><br>**<u>JURY TRIAL DEMANDED</u>**<br><br><br><br>Action Filed: August 13, 2019<br>Trial Date:  None Set |

1371398.1

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION AND STATEMENT OF THE CASE ....................................................1

II.   PARTIES...............................................................................................................................15

III.  JURISDICTION AND VENUE...........................................................................................18

IV.  FACTS COMMON TO ALL CLAIMS ..............................................................................18

      A.    The YouTube Platform.............................................................................................18

      B.    Youtube Holds Itself Out As A Quintessential Forum For Freedom Of
Expression ...............................................................................................................19

      C.    Defendants Flout The Fundamental "Free Expression" Bargain They Made
With Youtubers ........................................................................................................22

      D.    Defendants Begin To Compete With Youtubers In The Proposed Class.................24

      E.    Defendants' Tool Kit Of Unlawful Speech Suppression ........................................25

            1.    Restricted Mode ........................................................................26

            2.    Advertising Restrictions...........................................................29

            3.    AI Filtering Under Restricted Mode And Advertising Restrictions ...........31

            4.    Demonetizing Channels Wholesale ..........................................32

             5.    Shadow Banning .......................................................................33

             6.    Deleting LGBTQ+ Thumbnail Images .....................................33

            7.    Cancelling And Stopping Subscribers' New Video Notifications ..............34

             8.    Excluding LGBTQ+ Content From The "Up Next" Recommended
Application ...............................................................................36

            9.    Recommending Anti-LGBTQ+ Hate Speech In The "Up Next"
Application Alongside LGBTQ+ Videos...................................36

            10.   Playing Anti-LGBTQ+ Advertisements Immediately Before
LGBTQ+ Videos ......................................................................37

             11.   Including Anti-LGBTQ+ Hate Speech In Comments Appearing
With LGBTQ+ Videos ..............................................................38

            12.   Other Unlawful Speech-Restricting Tools ................................40

      F.    Defendants Were Caught Censoring LGBTQ+ Users In 2017 ...............................41

      G.    YouTube's Promises To the LGBTQ+ YouTubers Were "Lip Service".................43

1371398.1

## TABLE OF CONTENTS
### (Continued)

Page

H.  Defendants Have And Continue To Violate The Rights Of The LGBTQ+ Plaintiffs And The LGBTQ+ Community ...................................44

  1.  Divino (GlitterBombTV.com's GNews!) .....................................44

  2.  BriaAndChrissy LLC (BriaAndChrissy).....................................51

  3.  Chase Ross .....................................................................62

  4.  Brett Somers a/k/a AMP (Watts The Safeword)..........................69

  5.  Lindsay Amer (Queer Kid Stuff) ............................................74

  6.  Stephanie Frosch (ElloSteph, ElloStephExtras and StephFrosch) ..............78

  7.  Sal Cinquemani (SalBardo)..................................................82

  8.  Tamara Johnson (SVTV Network) ...........................................86

  9.  Greg Scarnici (GregScarnici and UndercoverMusic) ................................90

V.  CLASS ACTION ALLEGATIONS...............................................93

FIRST CAUSE OF ACTION........................................................98

SECOND CAUSE OF ACTION (California Constitution Article I, Section 2) .........................104

(On Behalf Of The LGBTQ+ Plaintiffs Individually And The YouTube Community Class) ......104

THIRD CAUSE OF ACTION (California Unruh Civil Rights Act—Civil Code §§ 51, *Et Seq*.)........................................................................107

(On Behalf Of The LGBTQ+ Plaintiffs And The YouTube Community Class)...........................107

FOURTH CAUSE OF ACTION (California Business And Professions Code §§ 17200, *Et Seq*.)........................................................................108

(On Behalf Of The LGBTQ+ Plaintiffs And The YouTube Community Class)...........................108

FIFTH CAUSE OF ACTION (Breach Of Implied Covenant Of Good Faith And Fair Dealing)........................................................................109

(On Behalf Of The LGBTQ+ Plaintiffs And The YouTube Community Class)...........................109

SIXTH CAUSE OF ACTION (Lanham Act—15 U.S.C. § 1125 *Et Seq*.) ....................................111

SEVENTH CAUSE OF ACTION (Declaratory Relief) .................................................114

PRAYER FOR RELIEF........................................................115

JURY DEMAND ...........................................................117

1    Plaintiffs Divino Group LLC d/b/a GlitterBombTV.com, which produces the online show

2  "GNews!;" Chris Knight, Celso Dulay, Cameron Stiehl, BriaAndChrissy LLC d/b/a

3  "BriaAndChrissy," which owns the channel youtube.com/BriaAndChrissy; Bria Kam, Chrissy

4  Chambers, Chase Ross, sole proprietor of youtube.com/uppercaseCHASE1; Brett Somers, sole

5  proprietor of youtube.com/Watts The Safeword; Lindsey Amer, sole proprietor of

6  queerkidstuff.com, Stephanie Frosch, sole proprietor of youtube.com/ellosteph and

7  youtube.com/ellostephextras; Sal Cinequemani (a.k.a Sal Bardo), sole proprietor of

8  youtube.com/SalBardo; Tamara (Sheri) Johnson, sole proprietor of the channel

9  youtube.com/SVTVNetwork and owner of SVTVNetwork.com;and Greg Scarnici, an individual,

10  sole proprietor of youtube.com/GregScarnici (collectively the "LGBTQ+ Plaintiffs") bring this

11  First Amended Complaint for damages, and equitable and declaratory relief (the "FAC"),

12  individually, and on behalf of all persons similarly situated, against Defendant YouTube, LLC

13  ("YouTube") and its parent company, Google LLC ("Google") (collectively referred to as

14  "Google/YouTube" or "Defendants," unless otherwise specified).

15  **I.**    **INTRODUCTION AND STATEMENT OF THE CASE**

16    1.    The LGBTQ+ Plaintiffs are Lesbian, Gay, Bisexual, Transgender, Transsexual or

17  Queer content creators, viewers, users, and consumers of the on line global video and social media

18  platform known as "YouTube."  Plaintiffs bring this lawsuit to redress Defendants

19  Google/YouTube's past, present, and continuing unlawful restraint of speech, discrimination,

20  consumer fraud, unfair and deceptive business practices, and breach of consumer contract rights

21  on the YouTube Platform, and related services and products offered to consumers in connection

22  with the use of the platform (collectively the YouTube Platform).

23    2.    Each Plaintiff brings this lawsuit, on behalf of himself, herself, or itself

24  individually, and as a representative of a class and/or subclasses of other similarly situated persons

25  whose use the YouTube Platform, whose legal rights have been violated by Defendants' use of the

26  data regarding users' gender, sexual orientation, religious, ethnic, racial, political, and/or

27  commercial and data driven identities and viewpoints, to restrain, discriminate against,

28  economically crush, and cleanse disfavored users from the YouTube Platform in direct violation of

1  the users' civil and consumer rights.

2      3.      Google/YouTube's scheme to restrain, interfere with, bar or cleanse consumers

3  from the YouTube Platform was not undertaken for purposes of furthering any legitimate or

4  lawful interest, such as the filtering, regulation, restriction, or need to curate harmful or unlawful

5  video content[1] on the YouTube Platform.  Rather, the actions and conduct which form the basis of

6  this lawsuit have little, if anything, to do with filtering the actual content of the videos uploaded to

7  the YouTube Platform.

8      4.      Defendants' unlawful actions, conduct, and practices that give rise to and form the

9  core basis and premise of this lawsuit all involve and are based upon Google/YouTube's unlawful

10  use of data regarding the video creators,' subscribers,' or viewers' gender, sexual, orientation,

11  race, ethnicity, commercial, or political identities or viewpoints.  Specifically, Google/YouTube

12  filter, regulate, restrict, and censor videos and user access to the YouTube Platform, based not on

13  video content (the images a video depicts, or the dialogue presented) --  but on the personal,

14  sexual, ethnic, religious, commercial or political identities or viewpoints of the user[2] as a pretext to

15  "cleanse" the YouTube Platform of LGBTQ+ third party content creators who upload videos for

16  the LGBTQ+ Community, and their followers who, based on Defendants absolute and unfettered

17  discretion and power, compete with or do not further Google/YouTube's corporate profits,

18  political interests, or business plans.

19      5.      Furthermore, Google/YouTube's cleansing of independent LGBTQ+ video content

20  creators is not limited to discriminating against those creators and users who identify as, or

21  express LGBTQ+ viewpoints.  Documented evidence exists and lawsuits are pending or are being

22  _____

23  [1] "Video content," here refers to the actual video material which a creator uploads to the YouTube
    Platform, which can be viewed by subscribers to a creator's or random viewers on the platform.  It

24  is distinguished from metadata regarding the video, such as tags, descriptions and titles; data
    regarding the identity of or information about the person posting the video; or data regarding the

25  identity of or information about the person viewing the video.

26  [2] The "user" refers to both the creators who upload videos, and the people who access those videos
    on the YouTube Platform, and includes subscribers to channels, subscribers who pay for ad free

27  video services, and viewers who are simply accessing the YouTube Platform using either
    individual accounts created online, or using accounts held by institutions such as libraries, schools,

28  and private companies.

FIRST AMENDED CLASS ACTION COMPLAINT FOR DAMAGES, INJUNCTIVE RELIEF, RESTITUTION,
AND DECLARATORY JUDGMENT

threatened by independent third party video creators and loyal users of the YouTube Platform who have been victimized by Defendants' practices because of the users' race, religion, political affiliations, or commercial status.  Google/YouTube is using identity based censorship to determine who can and cannot continue to use the YouTube Platform.

6.      Defendants' exercise, control, and regulation and absolute dominion over the filtering, regulation, restriction, censorship, distribution, monetization, advertising, data collection, viewer reach and access to content on the YouTube Platform, the world's largest forum for video content, expression, and communication -- is discriminatory, unlawful and violates the civil and consumer rights of more than 2.3 billion YouTube users.

7.      YouTube was founded, built, and operated as an "open" internet platform for profit.  Based on YouTube's Mission Statement, Terms Of Service, marketing, advertising, solicitations, and representations to consumers, Defendants solicit and induce the public to post, view, and communicate through video content on the YouTube platform by inviting the public to use YouTube as a place to engage in "**Freedom of Expression**," "**Freedom of Information**," "**Freedom of Opportunity**," and "**Freedom to Belong**."[3]  Everyone who use the YouTube Platform is accorded the status of "members" of a public "YouTube Community," whose use and access of the platform are governed by viewpoint-neutral, content-based rules and regulations which Defendants refer to as "Community Guidelines."  Google/YouTube represent and warrant that these freedoms apply to all Community Members and shall be exercised by and protected for each and every user.  According to Defendants, the public is entitled to post, view, communicate, and share information and ideas through video content, subject only to "viewpoint neutral" content based filtering rules and restraints that "apply equally to everyone" based only on the content of the video NOT the personal identity or viewpoint of the video's creator or viewer.

8.      In return for granting the public access to a global, non-discriminatory, viewpoint neutral forum for creating, posting, marketing, distributing and sharing video content, YouTube's users give Google/YouTube certain rights that permit Defendants to monetize the user's video and

---

[3] See https://www.youtube.com/yt/about/ .

FIRST AMENDED CLASS ACTION COMPLAINT FOR DAMAGES, INJUNCTIVE RELIEF, RESTITUTION, AND DECLARATORY JUDGMENT

the viewership or audience for that video.  This includes the right of Defendants to use any of the video content of its users to sell advertising and obtain revenue from advertisers, as well as to solicit, market, and sell to users, Defendants' own advertising, promotional, distribution, or reach expansion products that YouTube users are enticed to use as a means for enhancing the reach of their videos, and competing for advertising revenues and viewership on an "open" platform.

9.      Under this open platform business model, users must also give Google/YouTube the exclusive property rights to each user's personal and financial data, the value of which provides Defendants with billions of dollars in annual revenues.  Google/YouTube not only collect, store, analyze, and organize the personal, financial, political, and other data for each of the YouTube Platform users, but Defendants also use and sell that data to third parties on the open market.  The average revenue value to Defendants for the property right to the data for *each* individual Plaintiff (and *each* individual putative class member's) is estimated to exceed $1 million in revenue per year for each such user.

10.     Google/YouTube also monetizes the YouTube Platform by creating, posting, distributing, and marketing Defendants' own video content which competes for viewership and revenues directly with YouTube creators and viewers like Plaintiffs, on a "viewpoint neutral" open internet platform.  In so doing, Google/YouTube have content production and distribution deals with large, mainstream media conglomerates including FOX News, PBS, NBC, MLB, the NFL, and HBO (to name but a few) whose content also competes with Plaintiffs on the YouTube Platform subject to viewpoint neutral content based rules that apply equally to all.

11.     To effectuate, govern, and enforce access and use by consumers as well as Google/YouTube and its business partners, all creators and viewers enter into a Terms of Service contract with Defendants.  In so doing, Defendants admitted, clarified and expressly warranted to the public and U.S. Congress that under its Terms of Service, YouTube is a designated "public forum" that is open to "everyone" subject only to "viewpoint-neutral," content-based filtering rules and restrictions that "apply equally to all" who use YouTube.  Among other things, Defendants have admitted under oath, that YouTube's Terms of Service and other public representations prohibit them from considering, utilizing, or taking into account a user's personal,

1   gender, sexual orientation, racial, ethnic, religious, political, or commercial identity or viewpoint

2   when filtering or regulating content on YouTube.  These obligations expressly prohibit Defendants

3   or their agents from using the personal identity or viewpoint of the creators or viewers as a basis to

4   restrict or interfere with the users' ability to reach, distribute, or market content to the users

5   intended audience or viewers on the YouTube Platform.  The Terms of Service also prohibits

6   Defendants from using the user's personal identity or viewpoint to prohibit or interfere with a

7   user's purchase of Defendant's advertising and/or reach products to promote or distribute

8   otherwise compliant content.

9           12.    Using this business model and in direct reliance, Google/YouTube solicited the

10  public users to provide the YouTube Platform with video content that now amounts to roughly

11  95% of the public video-based content and communications in the world.  By controlling and

12  regulating virtually all of the public video content in the United States and the rest of the world,

13  Google/YouTube operate YouTube as the largest for-profit forum dedicated to free speech and

14  expression in the history of the world.  Based on its promises to provide the public and its

15  consumers with an open internet platform for freedom of expression subject only to lawful,

16  viewpoint neutral content based filtering, regulations, and rules that apply equally to all,

17  Defendants have reaped more than $50 billion in annual revenues by regulating, distributing, and

18  monetizing the free speech and expression of what is now estimated to be 95% of all public video

19  content provided by the 2.3 billion people who now use the YouTube Platform.

20          13.    Defendants built and operate the YouTube Platform based on a lie that pervades

21  every aspect of the platform and render its operation one of the largest and most dangerous

22  consumer frauds in history:  that YouTube is an open, viewpoint neutral platform where lawful

23  content based rules apply equally to all persons regardless of personal identity or viewpoint.

24  Instead Google/YouTube are engaged in a bait and switch designed to purge the Platform of

25  content creators and their followers whom Defendants dislike or view as unprofitable in the long

26  term.  In direct violation of the law and the fundamental promises upon which YouTube was

27  founded, built, and operated, Google/YouTube now filter and regulate all aspects of user access on

28  the YouTube Platform based on the personal identity and viewpoint of the creator or their intended

1    audience.  That is discrimination pure and simple.

2         14.    Furthermore, as part of its campaign to cleanse the LGBTQ+ and other content

3    creators from the YouTube Platform, Google/YouTube also use discriminatory, identity based

4    filtering tools, practices, and machines to stigmatize and restrict access to LGBTQ+ content

5    creators in order to crush them economically and destroy their livelihoods.  Among other things,

6    Google/YouTube have entered into lucrative anticompetitive tying arrangements with purported

7    independent, third-party fact checkers and content curators to who flag, curate, and restrict third

8    party creator content who promote Google/YouTube's own content by falsely and capriciously

9    branding third party users and/or their content as purveyors of "hate speech," "disinformation,"

10   "fake news," shocking, offensive, or simply "otherwise objectionable."  These practices not only

11   violate the express and implied contractual obligations and promises that Defendants have made to

12   Plaintiffs and the billions of other YouTube users who depend on the platform to communicate

13   and to earn their livelihoods; but they violate the constitutional and legal rights of public YouTube

14   users to express, communicate, interact, and market ideas through video content under viewpoint

15   neutral rules and regulations.

16        15.    Defendants' conduct is not only unlawful, but constitutes an existential threat to the

17   fundamental freedoms on which our society is based.  Plaintiffs, as well as other independent

18   content creators and users supplied YouTube with the content and viewers that are directly

19   responsible for creating YouTube's global reach, popularity, and financial and political success.

20   They in reliance upon Defendants' repeated promises that YouTube was a forum for freedom of

21   expression, access to which was subject only to lawful, viewpoint based content filtering and rules

22   that apply equally to all users.  Consequently Defendants' denial of Plaintiffs' access to the

23   YouTube Platform based on Plaintiffs' sexual orientation or gender identity constitutes unlawful

24   systemic discrimination that is unconstitutional, unlawful, and repugnant to everything YouTube

25   purports to represent.

26        16.    The evidence and facts alleged herein leave no doubt that Google/YouTube are

27   using filtering and regulation to directly target and crush the reach LGBTQ+ content creators,

28   solely because of the sexual orientation, gender, or political identities or viewpoints of LGBTQ+

1    content creators and their intended audiences.

2           17.    During a phone call between the Plaintiffs in this case and a Google representative,

3    a person who was described as a "senior" Google employee, the senior representative

4    unequivocally stated that Defendants have a "company policy" of not selling ads to "gay" content

5    creators because the "gay thing" rendered the video "shocking" and sexually explicit regardless of

6    the actual content of the video.[4]

7           18.    Internal documents confirm that in direct violation of YouTube's Terms of Service,

8    Defendants have used their absolute power over filtering on and regulation of the YouTube

9    Platform to undermine the core promises and principles to employ viewpoint neutral content based

10   filters and regulations.  Defendants now describe themselves as a "[c]ensor,"[5] and exercise their

11   censorship power to silence and crush Plaintiffs because they identify LGBTQ+ and express

12   LGBTQ+ viewpoints.  As the evidence set forth below establishes, Defendants now operate

13   YouTube in open defiance and direct violation of the "neutral" content based filtering practices

14   and regulations which form the core of YouTube's legal and contractual obligations to its users.

15          19.    Defendants' discriminatory conduct has created an unlawful global social media

16   cartel which controls 95% of all video communications in the world and engages in overt and

17   open discrimination against the sexual orientation, gender identity, and viewpoints of its LGBTQ+

18   creators and Community Members.  Such discrimination is not limited to Defendants' use of

19   affirmative content and monetization restrictions, or and restraints imposed on LGBTQ+ creators,

20   viewers, and audiences, but extends to Defendants' promotion, monetization of, and profit from

21   obscene and shocking anti-LGBTQ+ and homophobic hate speech, bullying, and threatening

22   content and comments that pervade popular LGBTQ+ channels.

23          20.    Google/YouTube is engaged in discriminatory, anticompetitive, and unlawful

24   conduct that targets and harms the LGBTQ+ Community, a protected class of persons under

25

26   [4] A transcript of this call is set forth as Exhibit 1.
     [5] See "Google, Facebook, Twitter Shifted to Censorship From Free Speech, According to Leaked
27   Google Document," The Epoch Times, October 10, 2018
     (https://www.theepochtimes.com/google-facebook-twitter-shifted-from-free-speech-to-censorship-
28   according-to-leaked-google-document_2686124.html).

FIRST AMENDED CLASS ACTION COMPLAINT FOR DAMAGES, INJUNCTIVE RELIEF, RESTITUTION,
AND DECLARATORY JUDGMENT

California law.  And Defendants' animus-based regulations and discriminatory filtering practices have not made YouTube safer for members of this protected class.  Defendants' control and regulation of speech on the YouTube Platform has created a chaotic cesspool where popular, compliant, top quality, and protected LGBTQ+ content is restricted, stigmatized, and demonetized as "shocking," "inappropriate," "offensive," and "sexually explicit," while homophobic and racist hatemongers run wild and are free to post vile and obscene content on the pages and channels of the LGBTQ+ Plaintiffs and other LGBTQ+ creators.  That should not come as a surprise because, as the record shows, Defendants are engaged in a discriminatory and fraudulent scheme to profit from censoring speech on the YouTube Platform which complies with Defendants' written Terms of Service -- while Google/YouTube rakes in profits from the vile, graphically violent, dangerous homophobic hate speech posted on the platform.

21.     Google/YouTube uses a complex and clandestine web of broad, overlapping, vague, discriminatory, and unlawful regulations, artificial intelligence filtering practices, data and information collection and surveillance, video monetization, and third-party advertising and content production schemes – none of which actually relate to what videos posted on the YouTube Platform contain.  Defendants use this platform wide regulation scheme as a pretext to engage in unlawful practices to restrain and harm the LGBTQ+ Plaintiffs and the greater LGBTQ+ Community, by insisting that animus-based speech regulation and discrimination against the LGBTQ+ Community and/or what Defendants refer to as the "gay thing," is necessary for "keeping [their] popular online video service safe and enjoyable for users."

22.     Each LGBTQ+ Plaintiff in this case is a victim of one or more of Defendants' systemic and pervasive discriminatory, anticompetitive, and unlawful practices that have caused substantial reputational and financial harm to each of them.

23.     Defendants continue to threaten and harm the entire LGBTQ+ YouTube Community by using their unprecedented power over free speech and expression as a pretext to systematically target, suppress, stigmatize, terrorize, steal, and financially harm the video content created or viewed by the LGBTQ+ Community, including, but not limited to:

                  a.       Failing to apply content-based regulations and filtering "equally to all," as

FIRST AMENDED CLASS ACTION COMPLAINT FOR DAMAGES, INJUNCTIVE RELIEF, RESTITUTION,
AND DECLARATORY JUDGMENT

provided for in Defendants' form consumer contract and promises to the LGBTQ+ Plaintiffs and the LGBTQ+ Community;

        b.      Falsely representing to the viewing public and potential advertisers that video content created and posted to YouTube by the LGBTQ+ Plaintiffs contains discussions about drug use or abuse or drinking alcohol, overly detailed conversations about or depictions of sexual activity, graphic depictions of violence, violent acts, natural disasters or tragedies or violence in the news, specific details about events related to terrorism, war, crime and political conflicts that resulted in death or serious injury even if no graphic imagery is shown, inappropriate language, including profanity, and/or content that is gratuitously incendiary, inflammatory, or demeaning toward an individual or group;

        c.      Arbitrarily, capriciously, and unfairly censoring, removing, suspending, restraining, suppressing and/or demonetizing the speech, video content or channels of LGBTQ+ YouTubers solely because they are "lesbian," "gay," "bisexual," "transgender," or "queer," because they identify as such, because they address issues of interest to the LGBTQ+ Community or because they use tag words related to the LGBTQ+ Community in association with their content to make it easier for viewers to locate their content;

        d.      Exercising unfettered and absolute discretion to selectively apply and enforce content-based regulations, content filtering tools, and monetization schemes in a manner that promotes Defendants' own content or content in which Defendants have a direct financial interest, including obscene, violent, and/or homophobic bullying and hate speech that Defendants not only fail to regulate or restrict, but which they monetize and profit from;

        e.      Enforcing what Defendants stated was a "company policy" of prohibiting "gay" users from advertising their content on YouTube because of the "gay thing" and using that "policy" to stigmatize LGBTQ+ YouTubers and their content as "shocking" and "sexually explicit" solely because the users identify as "gay" or LGBTQ+;

        f.      Demonetizing the content of the LGBTQ+ Plaintiffs and the LGBTQ+ Class, including LGBTQ+ YouTubers who operate and publish content on some of the most popular channels on the YouTube platform;

FIRST AMENDED CLASS ACTION COMPLAINT FOR DAMAGES, INJUNCTIVE RELIEF, RESTITUTION, AND DECLARATORY JUDGMENT

g. Promoting, monetizing, profiting, and distributing online hate speech, including homophobic slurs, threats of violence and death; theft and destruction of LGBTQ+ content; homophobic, obscene and threatening video comments that appear in connection with the channels' video content (as recommended videos and as advertisements), all of which violate Defendants' regulations, policies, and contracts with their consumers, and none of which are protected by the California or federal law, or even by Defendants' own published guidelines;

h. Promoting individuals and groups with anti-LGBTQ+ messages by selling advertisements which undermine, criticize, disparage, or belittle members of the LGBTQ+ Community, and running those advertisements that violate the law and Defendants' regulations and contracts with consumers, immediately before the videos of the LGBTQ+ Plaintiffs, thereby discouraging viewers from going forward with the viewing of the LGBTQ+ Plaintiffs' videos ;

i. Promoting YouTubers with anti-LGBTQ+ messages or with hate speech videos by recommending such videos to the LGBTQ+ Plaintiffs' viewers in YouTube's "Up Next" list of recommended videos which appears on the screen when the LGBTQ+ Plaintiffs' videos are played;

j. Replacing the LGBTQ+ Plaintiffs' customized "thumbnail" graphic images of individual videos, which serve as mini-advertisements that appear in YouTube search results, with Defendants' own generic thumbnails, consisting of a screenshot taken at random from the individual video;

k. Arbitrarily, capriciously, and unfairly removing individual subscribers from the list of those viewers who have intentionally applied to be affiliated with the respective YouTube channels of LGBTQ+ YouTubers, without notice to the LGBTQ+ creators or to the individual subscribers;

l. Unilaterally changing the procedure for new video notifications to be sent to individual subscribers of the LGBTQ+ creators' channels, without giving notice to the subscribers or to the LGBTQ+ creators, resulting in hundreds of thousands of subscribers not receiving notices as new content is uploaded by LGBTQ+ creators;

m. Stealing, copying, altering, and or violating the property rights appurtenant

to the content of the LGBTQ+ Plaintiffs, and then using the content of the LGBTQ+ Plaintiffs to produce and promote content that Google/YouTube own, or in which they have a financial interest, and that directly competes with the original content stolen from the LGBTQ+ Plaintiffs;

n.   Arbitrarily, capriciously, and unfairly excluding LGBTQ+ creators' original videos from Google/YouTube's "Up Next" video recommendations, which appear on the screen whenever videos are played; while at the same time recommending hate speech or disparaging reaction videos which steal, copy, or alter the very same original videos upon which they are based;

o.   Fraudulently and deceptively inducing LGBTQ+ YouTubers and the public to use YouTube by promising the LGBTQ+ Plaintiffs and the public that YouTube is (i) a "Public Forum" (ii) dedicated to Four Freedoms - Expression, Information, Opportunity, and Belonging, and (iii) a "Community" where "everyone's voice" may be heard subject only to (iv) viewpoint- and identity-neutral, content-based regulations that apply equally to everyone, and then breaching those obligations in a way that financially injures and causes other reputational harms to LGBTQ+ YouTubers and consumers.

24.   This is not the first time that Defendants have been accused of, and admitted to LGBTQ+ discrimination and malfeasance, by improperly manipulating content and user regulations to suppress the content and rights of LGBTQ+ members of the "YouTube Community."  As early as 2016, Defendants admitted that their restraints unfairly discriminated against LGBTQ+ users like Plaintiffs, hiding from view videos that reference same-sex relationships, and other videos focusing on "pop culture from a feminist and queer perspective." When these restraints were exposed, YouTubers like Tyler Oakley, Gigi Gorgeous and others "blasted the platform for bias."

25.   Google/YouTube publicly admitted that using their Restricted Mode filtering, they improperly censored videos that were posted or produced by members of the LGBTQ+ Community based upon the identity and orientation of the speaker, rather than upon the content of the video.  In response to complaints from the LGBTQ+ Community and other civil rights critics, Google/YouTube promised to remove all restricted filtering on videos posted or produced by

1    LGBTQ+ members and groups, and to change their policy, filtering algorithm, and manual review

2    policies to ensure that videos posted by LGBTQ+ vloggers were not being censored solely

3    because of the identity of the speaker.  Google/YouTube admitted that they wrongly censored

4    videos posted by members of the LGBTQ+ Community, blaming a purported engineering problem

5    with filtering tools that targeted video content from LGBTQ+ users, or targeted users who

6    discussed topics and perspectives regarding LGBTQ+ issues.  Google/YouTube agreed to

7    investigate the claims of LGBTQ+ users and dispatch a team of senior managers, including

8    YouTube's CEO Susan Wojcicki, to meet with LGBTQ+ representatives to consider revising their

9    policies and review protocols, correcting the filtering tools, and rewriting guidelines that "clarify

10   its position by specifically allowing personal accounts from victims of discrimination or violent

11   hate crimes, as long as they don't contain graphic language or content."

12          26.    On April 27, 2017, Johanna Wright, Vice President of Product Management for

13   Google/YouTube, promised LGBTQ+ YouTubers that Defendants would ensure that "Restricted

14   Mode" should not filter out content belonging to individuals or groups based on certain attributes

15   like gender, gender identity, political viewpoints, race, religion or sexual orientation."  And while

16   Defendants admitted that "Restricted Mode will never be perfect, [Google/YouTube] hope to build

17   on [their] progress so far to continue making [their] systems more accurate and the overall

18   Restricted Mode experience better over time."

19          27.    But the LGBTQ+ YouTubers who met with Defendants, all of whom were forced

20   to execute non-disclosure agreements regarding the substance of their discussions with

21   Defendants, now believe that Defendants' promises were nothing more than "lip service" made

22   solely for public relations purposes and now believe that Ms. Wojcicki and Defendants had no

23   intention of keeping their promises.

24          28.    Instead of taking LGBTQ+ reports of viewpoint discrimination and selective

25   restrictions on LGBTQ+ content seriously, Ms. Wojcicki spent some of her "personal vacation"

26   time doing carefully scripted PR or "selfie" interviews with selected YouTubers, and other media

27   outlets, in which she boasts that all is well at YouTube, especially with the LGBTQ+ members of

28

FIRST AMENDED CLASS ACTION COMPLAINT FOR DAMAGES, INJUNCTIVE RELIEF, RESTITUTION,
AND DECLARATORY JUDGMENT

the YouTube Community.[6]  In one interview, posted only days before the filing of this Complaint, YouTube's CEO Susan Wojcicki confirmed the importance of and Defendants' adherence to the "Four Freedoms" of expression, describing those promises to consumers as the "Pillars" of the YouTube Platform and global Community it serves.  When the interviewer is prompted to ask her scripted questions about reports and concerns of viewpoint- or animus-based censorship and the use of content-based restrictions, Wojcicki pleads executive ignorance of systemic complaints and harms caused by viewpoint bias or animus-based content regulation, filtering tools, monetization restrictions, and promotion of LGBTQ+ harassment and hate speech for profit.

29.     While YouTube's CEO and other senior executives of the global video communication monopoly continue to double down on their promises of free speech, viewpoint neutrality, and equal application of rules, the allegations of these LGBTQ+ Community members show in specific and painstaking detail that systemic speaker, topic, or viewpoint-biased and animus-based regulation, restraint, and disparate treatment of LGBTQ+ videos, LGBTQ+ creators and LGBTQ+ audiences is rampant on the platform.  As the experience of these Plaintiffs shows, Defendants use machines to flag, identify, and restrict LGBTQ+ content that human or "customer service" reviewers pretend to justify after the fact, under the pretext of "a company policy" of absolute discretion to take users down for discussing any topic, viewpoint, or identifying as LGBTQ+ which Google/YouTube consider to be "Offensive," "Inappropriate," or "Otherwise Objectionable," for "any reason, no reason," whether for "altruism or profit," or, as in the case of these Plaintiffs simply because they identify as "gay," or their content mentions or discusses any topic or viewpoint that is "about the gay thing."

30.     Enough is enough.  This needs to stop here and now.  The LGBTQ+ Plaintiffs do not seek to interfere with YouTube's Mission of providing a forum for global YouTube Community to engage in and experience "Four Freedoms of Expression" or Pillars when creating, posting, distributing, viewing, and engaging with other Community members through video content and communications.  LGBTQ+ Plaintiffs understand and support effective, but lawful

---

[6] See https://www.youtube.com/watch?v=gMINAiDWI6g.

viewpoint-neutral content-based regulations on the platform.  But that is not how these Defendants have been operating YouTube during the relevant time period of this lawsuit.  Defendants have brazenly abandoned YouTube's Four Freedoms and hijacked the YouTube Community and the Mission that defines that Community, by continuing to engage in and defend identity, viewpoint, discriminatory, and illegal content-based regulation, distribution and monetization policies that harm YouTube's LGBTQ+ Community and other YouTube Community members.  Requests by the LGBTQ+ Plaintiffs to address these allegations and concerns have been made to Defendants, but not only have these requests fallen on deaf ears, but in the past several weeks, they have been the subject of outright false denials by YouTube's CEO.

31.     Enough is enough.  The LGBTQ+ Plaintiffs in this case have summoned the courage to challenge the world's largest corporate conglomerate and regulator of free speech by invoking their right to petition the courts to enforce the antidiscrimination, free speech, and consumer fraud laws, to require Defendants to honor their promises and their legal obligations to LGBTQ+ YouTubers and YouTube consumers.  Specifically, the LGBTQ+ Plaintiffs, in their individual and representative capacities, bring this lawsuit to force Google/YouTube to comply with their legal obligations under federal and California law, including: (i) Article One, Section 2 of the California Constitution (the "Liberty of Speech Clause"); (ii) the Unruh Civil Rights Act, Section 51, et seq. of the California Civil Code (the "Unruh Act"); (iii) the Unfair Competition Laws, Section 17200, et seq. of the California Business and Professions Code (the "UCL); (iv) the Lanham Act, 15 U.S.C. sections 1125, et seq.; and (v) Defendants' Terms of Service, "Community Guidelines," and other purportedly content-neutral filtering representations (the "Contract Claim").  The LGBTQ+ Plaintiffs seek damages for financial, reputational, and other cognizable harms and injuries to themselves and to other LGBTQ+ members of the YouTube Community who compose the putative class or subclasses in this case.  The LGBTQ+ Plaintiffs also seek individual and class-wide relief for restitution and disgorgement of Defendants' ill-gotten or unlawfully obtained profits, injunctive relief, and a declaratory judgment that Google and YouTube violate the legal and equitable rights of LGBTQ+ members of the YouTube Community.

## II.    **PARTIES**

32.    Plaintiff Divino Group LLC ("Divino") is a limited liability company formed and doing business in the state of California.  Divino is co-owned, managed and operated by a married gay couple, Celso Dulay and Chris Knight, both of whom reside in San Francisco, California. Divino owns a news-based media company,"GlitterBombTV.com" the producer of GNews!  Its principal place of business is located in San Francisco, California.  Divino produces and distributes on-line, video-based news programs that report on and discuss current events and issues, involving or affecting the LGBTQ+ Community.  Divino's news programs are written, produced, promoted, and distributed by Messrs. Knight and Dulay.  Since February 6, 2014, Divino has used YouTube as a hosting platform to advertise, distribute, and reach the viewing public in connection with 132 episodes of GNews!.

33.    Plaintiff Cameron Stiehl is an individual who resides in San Francisco, California. Ms. Stiehl regularly appears on GNews! as a co-host, and contributes to the content.

34.    Plaintiff BriaAndChrissy LLC, is a Georgia Limited Liability Company. BriaAndChrissy LLC is owned and managed by Bria Kam and Chrissy Chambers, who reside in the state of Washington.  Because of harassment they have received, these Plaintiffs should be contacted through their attorneys of record.  BriaAndChrissy LLC does business as "BriaAndChrissy;" it produces and distributes a variety of original videos that feature music, skits, day-in-the-life presentations, and discussions of mental health issues, healthy lifestyles recommendations and LGBTQ+-related issues.  Since 2012, BriaAndChrissy LLC has uploaded more than 1000 videos to its two YouTube channels, BriaAndChrissy, which has 849,000 subscribers, and WonderWarriors, which has 195,000 subscribers.

35.    Plaintiff Chase Ross is an individual who resides in Montreal, Quebec, Canada. Mr. Ross produces and distributes a series of original educational and day-in-the-life videos about the transgender experience and products, as well discussions of LGBTQ+ issues.  Since 2010, Mr. Ross has uploaded 723 videos to his "uppercaseCHASE1" YouTube channel, which has more than 163,000 subscribers.

36.    Plaintiff Brett Somers is an individual who resides in San Francisco, California.

FIRST AMENDED CLASS ACTION COMPLAINT FOR DAMAGES, INJUNCTIVE RELIEF, RESTITUTION, AND DECLARATORY JUDGMENT

Mr. Somers produces and distributes original sexual education and product review videos, with a focus on non-traditional sexual activities.  Since 2014, he has uploaded 227 videos to his "Watts The Safeword" YouTube channel, which has more than 193,000 subscribers.

37.     Lindsay Amer is an individual who resides in Maine.  Because of harassment and threats they have received, Mx. Amer should be contacted through their attorneys of record.  Mx. Amer produces and distributes original educational videos for children aged 3-17, parents and educators regarding LGBTQ+ issues.  Since 2016 Mx. Amer has uploaded 94 videos to their YouTube channel "Queer Kid Stuff," which has more than 15,000 subscribers.

38.     Plaintiff Stephanie Frosch is an individual who resides in New York, New York.  Since October 5, 2009, Ms. Frosch has produced and distributed 189 of original videos focused on lifestyle topics:, advice, interview and/or mini documentaries which present her  experiences as a Lesbian, or present and discuss issues which affect members of the LGBTQ+ community.  The videos are intended for a target audience 13 years and older.  She operates two YouTube channels: Youtube.com/ElloSteph and Youtube.com/StephFrosch.  The ElloSteph channel has 376,000 subscribers and 36.5 million views.  She also operates a merchandise store at www.districtlines.com/ellosteph.  Stephanie Frosch has been an LGBTQ internet activist who has appeared as a speaker at conventions, and she has been interviewed on MTV and the main stream media regarding her YouTube experience and treatment at the hands of YouTube.

39.     Plaintiff Sal Cinquemani is an individual who resides in Los Angeles, California.  Mr. Cinquemani owns and operates salbardo.com.  He is an independent film maker who directs and produces films for LGBTQ+ audiences under the name "Sal Bardo."  Since March 27, 2011, Mr. Cinquemani has operated the YouTube channel youtube.com/user/salbardo, uploading videos consisting of original short films, film trailers, interviews of actors, and out-takes from films for purposes of promoting his independent films.  The Sal Bardo YouTube channel has approximately 38,000 subscribers and 24.1 million views.

40.     Plaintiff Tamara (Sheri) Johnson is an individual who lives in Columbus, Georgia and does business in Atlanta, Georgia.  Ms. Johnson owns and is the CEO of SVTVNetwork.com.  Since May 30, 2012, she has operated the YouTube channel SVTV Network, writing, developing,

FIRST AMENDED CLASS ACTION COMPLAINT FOR DAMAGES, INJUNCTIVE RELIEF, RESTITUTION, AND DECLARATORY JUDGMENT

taping and producing short videos, original web series, animated series and feature length films for the LGBTQ+ audience.  SVTV Network has 114,000 subscribers and generated 5 million views. In the fall of 2016, she launched an internet on-demand network dedicated to content specifically designed for LGBTQ+ audiences.  For the past three years, Ms. Johnson has been uploading her own independently produced original video webseries, and licensing the original independently produced videos of others on the internet in direct competition with Google/YouTube.

41.     Plaintiff Greg Scarnici is an individual who resides in Brooklyn, New York.  Mr. Scarnici owns and operates gregscarnici.com.  He is a comedic writer, director, producer and performer who currently works as an Associate Producer for "Saturday Night Live," with more than 25 years of experience working in television and comedy.  He has appeared in films, on television  and in numerous internet uploads and posts.  Since September 14, 2007, Mr. Scarnici has operated the YouTube channels youtube.com/user/Greg Scarnici and youtube.com/user/Undercover Music, uploading videos consisting of short films, comedic sketches, parodies, and music videos for the LGBTQ+ audience.  The Greg Scarnici YouTube channel has approximately 9,600 subscribers and 8.9 million views.  Mr. Scarnici also owns and operates gregscarnici.com.

42.     Defendant Google LLC is a for-profit, limited liability company organized under the laws of the State of Delaware, with its principal place of business in Mountain View, California; it regularly conducts business throughout California, including Santa Clara County. The LGBTQ+ Plaintiffs are informed and believe, and thereon allege that, at all relevant times, Defendant Google LLC has acted as an agent of Defendant YouTube, LLC, and controls or participates in censoring and restricting speech on the YouTube service or platform.

43.     Defendant YouTube, LLC is a for-profit limited liability corporation, wholly owned by Google LLC, and organized under the laws of the State of Delaware.  YouTube's principal place of business is Mountain View, California and it regularly conducts business throughout California, including Santa Clara County, California.  Defendant YouTube, LLC operates the largest and most popular Internet video viewer site, platform, and service in California, the United States, and the world and holds itself out as one of the most important and

largest public forums for the expression of ideas and exchange of speech available to the public. The LGBTQ+ Plaintiffs are informed and believe that at all relevant times Defendant YouTube, LLC acts as an agent of Defendant Google LLC and uses, relies on, and participates with Defendant Google LLC in restricting speech on the YouTube site, platform, or service.

44.     The true names and capacities, whether individual, corporate, associate, or otherwise, of Defendants Does 1 through 100, inclusive, are presently unknown to the LGBTQ+ Plaintiffs, and for that reason these defendants are sued by such fictitious names.  The LGBTQ+ Plaintiffs are informed and believe and thereon allege that each of the Doe defendants is in some way legally responsible for the violations of law, injuries, and harm caused, as alleged herein.  If, and when appropriate, the LGBTQ+ Plaintiffs will seek leave of the Court to amend this Complaint when the true names and capacities of said defendants are known.

## III.     JURISDICTION AND VENUE

45.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, and 1337(a), because the Complaint includes Federal questions, and the amount in controversy arising from the claims asserted on behalf of the LGBTQ+ Plaintiffs exceeds $5 million, exclusive of interest and costs.

46.     Venue is proper in the Northern District of California (San Jose Division) under 28 U.S.C. § 1391.  Defendants reside and/or transact business in the County of Santa Clara, and are within the jurisdiction of this Court for purposes of service of process.  Defendants' Terms of Service expressly provide that the LGBTQ+ Plaintiff's lawsuit be filed in a court of competent jurisdiction located within Santa Clara County.

## IV.     FACTS COMMON TO ALL CLAIMS

### A.     The YouTube Platform

47.     YouTube is the largest video-sharing platform in the world, accessible via computer browsers and mobile telephone applications.  YouTube was founded in 2005 in San Bruno, California.

48.     In 2006, Defendant Google bought YouTube for $1.65 billion and operates YouTube as a Google subsidiary.  The current value of Google's YouTube subsidiary has been

1    estimated to exceed $160 billion.

2    49.    The YouTube Platform functions by allowing users to upload, view, rate, share,

3    add to favorites, report, comment on videos, and subscribe to the channels of other users.

4    Available content includes video clips, TV show clips, music videos, short and documentary films,

5    audio recordings, movie trailers, live streams, and other content such as video blogging, short

6    original videos, and educational videos.

7    50.    It is the content and audiences of YouTubers like the LGBTQ+ Plaintiffs and other

8    members of the Proposed LGBTQ+ Community Class that have made the platform one of the top

9    four most visited Internet websites in the world.  It is estimated that more than **one-third** of the

10   world's Internet users use YouTube, to post, view, and communicate through videos.  Eighty-five

11   percent of the U.S. Internet audience watches videos online, including on YouTube.  A billion

12   hours of videos are watched on YouTube each day.  More video content has been uploaded to

13   YouTube by public users than that created by the major U.S. television networks in 30 years.  The

14   average number of mobile YouTube views is estimated to be about 1 billion per day.  YouTube

15   videos can be navigated in at least 80 different languages, and the platform has launched in more

16   than 91 countries around the globe.

17   51.    Most of the video content on YouTube is created and uploaded by YouTubers like

18   the members of the Proposed Class, but larger media corporations including CBS, the BBC, Vevo,

19   and Hulu also offer some of their content via YouTube as part of the Google/YouTube partnership

20   program.

21   52.    Defendants monetize speakers' intellectual property and viewers' interests by

22   selling advertisements; some of those advertisements come from the speakers themselves, who

23   pay for their videos or channels to be "featured" or publicized.  In addition, Defendants offer

24   subscriptions through which people pay ongoing fees to view videos on YouTube without

25   advertisements.

26   53.    In total, Google's subsidiary YouTube earned $9 billion in revenue in 2015 –

27   primarily by selling advertisements; and will earn $27 billion annually by 2020.

28   **B.    Youtube Holds Itself Out As A Quintessential Forum For Freedom Of**

**Expression**

54.     Much of YouTube's success can be attributed to Defendants' representations that YouTube is, has been and will remain the premier space for freedom of expression in video content on the Internet – representations that were made with the intent of inducing more consumers like LGBTQ+ Plaintiffs to become YouTubers.

55.     More specifically, Defendants expressly solicit and invite the general public to use YouTube as a hosting platform to engage in "freedom of expression" by posting, viewing, promoting, and interacting with third-party video content, subject only to viewpoint-"neutral" content-based regulations that apply equally to everyone.

56.     Consistent with their express "mission [] to organize the world's information and make it universally accessible and useful," Google/YouTube invite the public, including original content creators like the LGBTQ+ Plaintiffs, viewers, and advertisers large and small, to connect with, inform, and inspire others across the globe by using YouTube as a distribution platform for freedom of expression through videos.  Google/YouTube claim to be the largest public forum for video-based speech in California, the United States, and the world, where, based on the number of views, likes, and subscriptions to uploaded video content, new celebrities emerge and new ideas are popularized.  In so doing, Google/YouTube emphatically declare that their "mission" is to "give people a voice" in a "place to express yourself" and in a "community where everyone's voice can be heard."  Defendants further brag that YouTube is "one of the largest and most diverse collections of self-expression in history," giving "people opportunities to share their voice and talent no matter where they are from or what their age or point of view."  *See*, *e.g.*, https://youtube.googleblog.com/ (YouTube Official Blog: Broadcast Yourself).  Each of these disclosures, including the Community Guidelines and promises of "neutral" content filtering "***are also incorporated . . . by reference***" into YouTube's Terms of Service.

57.     Defendants expressly represent to consumers that YouTube is designated as a public place for free speech "define[d]" by "four essential freedoms" that govern the public consumer's use of the platform: "**Freedom of Expression**," "**Freedom of Information**,"

FIRST AMENDED CLASS ACTION COMPLAINT FOR DAMAGES, INJUNCTIVE RELIEF, RESTITUTION, AND DECLARATORY JUDGMENT

"**Freedom of Opportunity**," and "**Freedom to Belong**."[7]  Defendants further induce the public to provide, view, and communicate with video content on the YouTube hosting platform by promising users that "everyone's voice" will be heard subject only to neutral, content-based rules and filtering which "apply equally to all," regardless of the viewpoint, identity, or source of the speaker.

58.     These lofty representations have been repeated in sworn testimony to Congress. On January 17, 2018, Defendants, through YouTube's Assistant General Counsel, Juniper Downs, confirmed to Congress that YouTube's mission remains unchanged and the platform is designated and operates as a "public forum" for free speech and expression subject only to viewpoint-neutral, content-based regulations:

> **Senator Cruz**: Thank you Mr. Chairman. Welcome to each of the witnesses. I'd like to start by asking each of the company representatives a simple question, which is: do you consider your companies to be neutral public fora?
>
> *      *      *      *
>
> **Senator Cruz**: I'm just looking for a yes or no whether you consider yourself to be a neutral public forum.
>
> **Senator Cruz**: Ms. Downs?
>
> **Ms. Downs**: Yes, our goal is to design products for everyone, subject to our policies and the limitations they impose on the types of content that people may share on our products.
>
> **Senator Cruz**: So, you're saying you do consider YouTube to be a neutral public forum?
>
> **Ms. Downs**: *Correct.* We enforce our policies in a politically neutral way. Certain things are prohibited by our Community Guidelines, which are spelled out and provided publicly to all of our users.
>
> [02:28:30 – 02:29:36 of the full hearing recording.]
>
> *     *     *     *
>
> **Senator Cruz**: What is YouTube's policy with respect to Prager University and the allegations that the content Prager University is putting out are being restricted and censored by YouTube?
>
> **Ms. Downs**: *As I mentioned, we enforce our policies in a*

---

[7] See https://www.youtube.com/yt/about/ .

FIRST AMENDED CLASS ACTION COMPLAINT FOR DAMAGES, INJUNCTIVE RELIEF, RESTITUTION, AND DECLARATORY JUDGMENT

*politically neutral way.* In terms of the specifics of Prager University, it's a subject of ongoing litigation so I'm not free to comment on the specifics of that case.[8]

**C.**      **Defendants Flout The Fundamental "Free Expression" Bargain They Made With Youtubers**

59.      It is now clear that the lofty "Freedom of Expression" promises and representations made to consumers like the LGBTQ+ Plaintiffs and other members of the Proposed LGBTQ+ Class are nothing but outright falsehoods.

60.      In or about March 2018, Defendants distributed an internal memo and presentation calling Google "The Good Censor." The Memo sets forth in detail the bait-and-switch fraud which Defendants seek to perpetrate against the more than 2.3 billion consumers who built YouTube into the global speech giant and profit machine that it is today.

61.      In the Memo, which is purportedly based on "layers of research" and in reliance on "some leading thinkers in this space," Defendant, concede that since the 2016 U. S. presidential elections, Defendants have sought to secretly and deceptively "migrate" away from a hosting platform that solicits the public and consumers to provide YouTube with content based on the express promise that YouTube operates as a viewpoint-neutral and politically neutral place for free speech and "an open marketplace of ideas," where the public is invited to engage in freedom of expression and speech. Rather, Defendants now seek to use the site to curate and restrict content in order to further profit and monetize its 2.3 billion users, by promoting Defendants' own, or their preferred content through the exercise of unfettered discretion to censor and curate otherwise public content. In other words, Defendants admit that they are now acting as "censors," who regulate and curate online speech and content for their own gain, after promising consumers that YouTube exists and is designated for open, viewpoint-neutral, third-party communications and free speech.

62.      This is a classic bait-and-switch fraud perpetrated by Defendants on the 2.3 billion

---

[8] See https://www.c-span.org/video/?439849-1/facebook-twitter-youtube-officials-testify-combating-extremism and https://www.c-span.org/video/?448566-1/house-judiciary-committee-examines-social-media-filtering-practices at 02:34:28 – 02:35:29 of the full hearing recording (emphasis added).

users who built YouTube into what it is today.  According to Defendants "[t]his free speech ideal was instilled in the DNA of the Silicon Valley startups [including YouTube] that now control the online conversations."  In the case of YouTube, that ideal provided Defendants with a marketing and business model which monetized the public speech of its consumers by inviting them to use YouTube as a forum for free speech, where the public is invited to post video content, regardless of identity and viewpoint, subject to "content-neutral" rules that apply equally to everyone.

63.     Now that YouTube is globally saturated, with 2.3 billion users and their content, Defendants seek to exploit their control over more than 90% of the world's video-based communications, by secretly seizing control over the platform's content, so that they, not the users, control and decide who gets to speak, what is said, and who is listening.  As Defendants admit, they do so by discriminating and censoring compliant third-party content in favor of Defendants' own content, or that of preferred users, for financial gain and enhanced political power at the expense of, and to the detriment of third-party users like the LGBTQ+ Plaintiffs.

64.     Defendants admit that platform "migration" creates "an unresolved tension" on social media sites like YouTube because "**[t]he platforms have to deny that they're media companies** in order to retain their immunity from liability" and "**at the same time, they're exercising more influence as media companies**… than CBS News did in its heyday, and therefore, in order for democratic values to flourish, **they need to embrace free speech standards**."  *See* "The Good Censor" Memo, at page 10 of 85 (quoting Jeffrey Rosen, Professor of Law at The George Washington University and legal affairs editor of The New Republic) (internal quotes omitted, bold in original).[9]  Defendants have continued to use animus-based censorship and content regulation to perpetrate religious, political, sexual orientation and gender, and ethnic discrimination for profit and financial gain to the harm of the public and consumers.

65.     Putting these "Good Censor" principles into practice, Defendants have unlawfully

---

[9] See https://www.google.com/search?client=firefox-b-1-d&ei=9u_iXNjkEYi6_wTgj5m4Dg&q=the+good+censor+google+rosen&oq=the+good+censor+google+rosen&gs_l=psy-ab.3..33i160l3.1304.2502..3431...0.0..0.100.472.5j1......0....1..gws-wiz.......0i71j0i22i30j33i22i29i30.rvL00PLfyos.

employed a series of content-based distribution and monetization policies and procedures that form a single, interrelated, uniform, and comprehensive content-based regulation and control scheme that empowers Defendants unilaterally to control and restrain all consumer speech and content that appears on YouTube.

### D.   Defendants Begin To Compete With Youtubers In The Proposed Class

66.     Defendants have a strong financial motive to disregard the principles of free expression upon which YouTube was founded.  Specifically, beginning around 2016, Defendants began to use, operate, and profit from YouTube -- not as a hosting platform for the video content of its public users and consumers, but as a means for producing, distributing, and profiting from its own video content, or that of its financial partners.

67.     Following the trend of other hosting networks, Defendants sought to use the worldwide consumer audience of YouTube users as a means for monetizing their own content, not merely as a hosting platform for the Public.  Recognizing that they now controlled more than 90 percent of all video communications, Defendants sought to secure for themselves a market share of the production- and distribution-based revenues that previously had been reserved for YouTube's users and consumers.

68.     Having induced consumers to create video content and an audience in excess of two billion people by promising to neutrally host and regulate the video content of others, Defendants commenced a plan to recapture revenues from third-party producers and distributors by using their unlawful content regulation system to promote and monetize their own content by unlawfully restricting third-party content and reach.

69.     Among other things, Defendants announced that "[t]he company has partnered with its top content creators who wanted to charge a subscription rental or purchase fees for their content and made their uploaded content as paid content which requires users to pay for a subscription or purchase fees to access the content of the channel."  Furthermore, Google/YouTube decided to partner with "affiliates" whose "related product" advertisements are placed with some videos on YouTube.  These products link to the affiliate partners, which pays a

1   commission to Google/YouTube if their products are purchased.[10]

2          70.     In recent years, Defendants have expanded their business from operating YouTube

3   only as a hosting platform for third-party users, to become a production and media company that

4   produces its own content or partners with other large video, TV, and film producers..

5          71.     Just like other large global social media platforms, including Facebook,

6   Defendants understand that the YouTube Platform has reached its saturation point in the

7   monetization of  third-party users' content.  Consequently, Defendants have decided to compete

8   directly with third-party content providers like the LGBTQ+ Plaintiffs.  In addition to their own

9   video channels on YouTube, Defendants have entered the digital TV market, and are trying to

10  induce consumers to purchase their TV and entertainment services from Defendants directly, by

11  advertising and offering a product called YouTube TV.

12         72.     Defendants compete for that public audience or viewership unfairly and unlawfully,

13  in a manner which gives their "preferred content" a competitive advantage, by among other things,

14  using their filtering tools and criteria to restrict the access and reach of the smaller third-party

15  users it hosts on YouTube.  Thus, under the pretext of making the site safe for their users,

16  Defendants arbitrarily, capriciously, and deceptively restrict access and reach to speech and

17  content of their competitors on the platform, like the LGBTQ+ Plaintiffs, while at the same time

18  allowing their own content to avoid those same restrictions and restraints -- even when that

19  content violates their own guidelines.  In so doing, Defendants effectively clear space on the

20  platform for content which they, or their preferred users supply, to better reach the sites' 2.3

21  billion users by censoring the content of their competitors.

22         **E.     Defendants' Tool Kit Of Unlawful Speech Suppression**

23         73.     Defendants employ a number of tools to unlawfully restrict the expression of their

24  users in violation of principles of law and contrary to their agreements with users, all of which are

25  an interrelated part of Defendants' unlawful scheme.

26

27

28
_____
[10] See https://www.feedough.com/youtube-business-model-how-does-youtube-make-money/ .

1

### 1.    Restricted Mode

2    74.    One of the Defendants' primary tools is "Restricted Mode."  According to

3  Defendants, "Restricted Mode" is supposed to function much like a curtain that blocks access to

4  the hardcore pornography section at the corner video rental shop, limiting viewer access by

5  younger, sensitive audiences to video content that contains certain specifically enumerated

6  "mature" aspects.

7    75.    Accordingly, "Restricted Mode" is touted by Defendants as a tool "to help

8  institutions like schools as well as people who wanted to better control the content they see on

9  YouTube with an option to choose an intentionally limited YouTube experience."

10    76.    Viewers can choose to turn on "Restricted Mode" for their personal accounts, but it

11  may also be activated by system administrators to restrict all access on computer networks to all

12  users and machines, including viewers who seek to access video content in public libraries,

13  schools, and other institutions or work places.

14    77.     "Restricted Mode" affects tens of millions of YouTube users every single day.

15  Indeed, according to Alice Wu, a Senior Manager of Trust & Safety at YouTube, LLC,

16  Defendants estimate that about 1.5 percent of YouTube's daily views (or approximately 75 million

17  of the nearly 5 billion views every single day) come from people who have activated Defendants'

18  Restricted Mode.

19    78.    According to Defendants, Restricted Mode can be applied to videos in two ways.

20        a.    First, Defendants examine certain "signals" like the video's metadata, title,

21  and the language used in the video.  These certain "signals" are used by Defendants to find bogus

22  rules violations that serve as a pretext for Defendants to segregate disfavored content using

23  Restricted Mode, regardless of whether the content is protected speech or is otherwise compliant

24  with Defendants' regulations.

25        b.    Second, Defendants use Restricted Mode to passively restrict a video if it is

26  "flagged" as "inappropriate" by anyone, or by what Defendants refer to as the YouTube

27  "community."  So-called "flagged" videos are reviewed by a "team" of human reviewers for

28  "violations" of  Community Guidelines."

79.     Restricted Mode operates in tandem with separate, more stringent "Age Based Restriction" filtering criteria, intended to block all mature content to viewers under the age of 18. Age Based Restrictions provide Defendants with the ability to protect younger, sensitive audiences from mature content without any need to employ Restricted Mode.  When evaluating whether content is appropriate for all ages, Defendants restrict: (1) "Vulgar language" involving sexually explicit language or excessive profanity in the video or associated metadata; (2) Violence and disturbing imagery whether real, dramatized or fake violence that may not be suitable for all ages; (3) Nudity and sexually suggestive content containing nudity or dramatized sexual conduct may be age-restricted when the context is appropriately educational, documentary, scientific or artistic, and content featuring individuals in minimal or revealing clothing may also be age-restricted if intended to be sexually provocative, but are not explicit in content; and (4) Portrayal of harmful or dangerous activities involving content that intends to incite violence or encourage dangerous or illegal activities that have an inherent risk of serious physical harm or death.

80.     As shown below, when a network administrator or an individual viewer activates "Restricted Mode," each video subject to "Restricted Mode" appears with a Defendant-created stamp of disapproval, including a red face including a red square bearing a foreboding facial expression, together with text showing "This video is unavailable with Restricted Mode enabled. To view this video, you will need to disable Restricted Mode.",



81.     Where the LGBTQ+ plaintiffs are concerned, Defendants' stamp of disapproval thus makes a specific and falsifiable misrepresentation to consumers of the LGBTQ+ plaintiffs

FIRST AMENDED CLASS ACTION COMPLAINT FOR DAMAGES, INJUNCTIVE RELIEF, RESTITUTION, AND DECLARATORY JUDGMENT

and the viewing public that the video that they have attempted to access contains content that is so

inappropriate, shocking and outrageous for the viewer who has chosen to enable "Restricted

Mode" that the viewer must be protected from that content and that the YouTuber who has created

and posted that content is responsible for having created and uploaded such inappropriate,

shocking and outrageous content.

82.     These specific and falsifiable factual representations are by no means limited to

Defendants' foreboding red "Restricted Mode" stamp of disapproval.  Indeed, as shown below,

viewers who attempt to ascertain why a particular video is subject to "Restricted Mode" are told

by Defendants that videos are eliminated from "Restricted Mode" when they include specific

pieces of content, including content (1) Talking about drug use or abuse, or drinking alcohol in

videos; (2) Overly detailed conversations about or depictions of sex or sexual activity; (3) Graphic

descriptions of violence, violent acts, natural disasters and tragedies, or even violence in the news;

(4) Videos that cover specific details about events related to terrorism, war, crime, and political

conflicts that resulted in death or serious injury, even if no graphic imagery is shown; (5)

Inappropriate language, including profanity; and (6) Video content that is gratuitously incendiary,

inflammatory, or demeaning towards an individual or group.

- **Drugs and alcohol:** Talking about drug use or abuse, or drinking alcohol in videos.
- **Sexual situations:** Overly detailed conversations about or depictions of sex or sexual activity. Some educational, straightforward content about sexual education, affection, or identity may be included in Restricted Mode, as well as kissing or affection that's not overly sexualized or the focal point of the video.
- **Violence:** Graphic descriptions of violence, violent acts, natural disasters and tragedies, or even violence in the news.
- **Mature subjects:** Videos that cover specific details about events related to terrorism, war, crime, and political conflicts that resulted in death or serious injury, even if no graphic imagery is shown.
- **Profane and mature language:** Inappropriate language, including profanity.
- **Incendiary and demeaning content:** Video content that is gratuitously incendiary, inflammatory, or demeaning towards an individual or group.

83.     Far from ensuring that the videos behind YouTube's version of the pornography

curtain contain the content Defendants claim to exclude, the reality is that "Restricted Mode" is

significantly over- and under-inclusive, which has caused significant damage to the LGBTQ+

plaintiffs.  Even the most simple examination of the LGBTQ+ plaintiffs' videos subject to "Restricted Mode" shows that Defendants are not only dead wrong in their representations to the public related to the content of LGBTQ+ videos that they subject to the "Restricted Mode" stamp of disapproval, but that they are hiding from the public valuable materials and are doing so in bad faith.

84.     Even worse, Defendants brazenly admit that they **know** they are doing this. Defendants themselves admit that they repeatedly make "mistakes" in their operation of "Restricted Mode."  For example, on May 19, 2017, Defendants admitted that the Restricted Mode "feature isn't working the way it should and we're going to fix it."  For instance, Defendants admit that they got "it wrong" when they censored videos like Ash Hardell's "Her Vows," Calum McSwiggan's "Coming Out To Grandma," Jono and Ben's "Woman interrupted during BBC interview," and Tegan and Sara's "BWU [OFFICIAL MUSIC VIDEO]."

## 2.     Advertising Restrictions

85.     Arbitrary and capricious advertising restrictions are another example of the vague, ambiguous, and arbitrary criteria and anticompetitive filtering schemes Defendants utilize to suppress speech and to capriciously and discriminatorily restrict users like the LGBTQ+ Plaintiffs from monetizing or boosting the reach or viewer distribution of their videos.

86.     Defendants have sold advertisements to the LGBTQ+ Plaintiffs in connection with videos which were posted on YouTube for months, without restriction and were fully monetized. Having sold the ads, after receiving partial payment for the ads, Defendants then applied the Restricted Mode classification to the videos, pulled the advertisements stating that videos subject to the Restricted Mode classification cannot be advertised, and thereafter Defendants retained the money they had charged the LGBTQ+ Plaintiffs for the advertisements of the now restricted videos.

87.     According to Google, "[t]he purpose" of these restrictions "is to keep Google's content and search networks safe and clean for our advertisers, users, and publishers.  We hope that all publishers participating in AdSense have a long and successful partnership with Google. To understand why we need policies and the role they play in the ads eco-system you can <u>watch</u>

FIRST AMENDED CLASS ACTION COMPLAINT FOR DAMAGES, INJUNCTIVE RELIEF, RESTITUTION, AND DECLARATORY JUDGMENT

this video.  For that to happen, it's important that you familiarize yourself with the AdSense program policies.  It's important to make sure visitors to your pages are not misled and avoid any deceptive implementation that may bring accidental clicks.  For more details, please check out our ad implementation policies."[11]

88.     The reality is quite different: The sole basis for this restraint is the identity or viewpoint of the consumer seeking to boost the reach and distribution of the video, and has nothing to do with the actual content of the video.

89.     Defendants impose these restrictions to justify anticompetitive and unlawful actions intended to gain a competitive advantage for their own video content and/or to ensure that their sponsored creators, content partners, and advertisers have an unfair competitive advantage in the YouTube video market.  By placing no restrictions on the monetization of their own videos or those of Defendants' sponsored creators, content partners and preferred advertisers, Defendants gain a competitive advantage by restricting the financial reach of the LGBTQ+ Plaintiffs and other disfavored users, while simultaneously ensuring that their own video content (and those of their sponsored creators, content partners and preferred advertisers) are not subjected to the same (or any) Advertising Restrictions.

90.     Defendants' actual practices present yet another example of Defendants saying one thing to members of the Proposed LGBTQ+ Class, and doing something very different.  Not only is the "safe and clean" determination not based upon the actual content of  users' videos, but the Defendants' "inappropriate" designation precludes the LGBTQ+ Plaintiffs and other members of the Proposed LGBTQ+ Class from receiving any revenue from advertisements that would otherwise accompany content not designated as "inappropriate."  Moreover, such practices unlawfully provide Defendants with monopoly power over the video posting and viewership market, and the ability to manipulate, bully, and falsely denigrate legitimate political and educational speakers by subjectively designating their speech as "inappropriate," solely because Defendants do not like or agree with the speakers' political identity or point of view.

---

[11] See https://support.google.com/adsense/answer/3394713?hl=en&ref_topic=1250104.

### 3.    AI Filtering Under Restricted Mode And Advertising Restrictions

91.    Another tool in Defendants' speech-censoring "kit" is electronic artificial intelligence or "A.I." algorithms that review and regulate video content.  Defendants **claim** that these algorithms are viewpoint- and identity-neutral, and that they ensure that the "same standards apply equally to all" when it comes to the content regulation of speech on YouTube.  Defendants claim that their employees conduct "manual reviews" to supplement the electronic filtering and regulation of video content.

92.    But the evidence, including statements by Defendants' employees familiar with both electronic and manual filtering and regulation of speech that takes place on the YouTube Platform, suggests that Defendants' representations of neutral viewpoint and identity-based content regulation are **also** false.  The A.I. and algorithmic filtering tools are embedded with code that regulates content based on purely subjective, viewpoint, topic, and identity animus, and other unlawful criteria.  Even before October 2016, Defendants' engineers began making changes to the code and operations of the algorithms and filtering tools in order to ensure that Defendants could filter videos and regulate access to video content based upon overt discrimination of sexual or gender orientation, ethnic, political or religious animus, as well for financial and/or anticompetitive purposes.

93.    Similarly, Defendants' viewpoint bias, animus, and discrimination towards the user's identity or viewpoint is institutionally and culturally rampant in Defendants' work place and employment practices.  Among other things, Defendants operate and administer Restricted Mode through employees, including engineers and content reviewers, who work in what has been widely reported and acknowledged as a dysfunctional work environment.

94.    Internal emails by and between Defendants' employees show that many employees are routinely subjected to harassment, threats, blacklisting, discipline, and hazing based on their political or religious viewpoints and identity.  The dysfunction and viewpoint bias emanates from, and is enforced at, the highest ranks of Defendants' upper management, and drives the actions of employee supervisors, co-workers, third-party affiliates, and advertisers.

95.    Consequently, even when manual employee reviews of video content are used to

check and audit restrictions on content based upon the electronic filtering algorithms, Defendants use Restricted Mode and other discretionary and vague content-based restriction criteria to restrict access to the LGBTQ+ Plaintiffs' videos under vague and undefined terms such as "mature" or "sensitive" for certain audiences, solely because the video discusses a topic involving "LGBTQ+," "lesbian," "gay," "bisexual," "transgender," or "queer" issues, or the video merely mentions these trigger words.  The result is censorship, restraint of speech, and discrimination based, not upon content which might violate a narrow, neutral, objective, and specifically verifiable criteria that furthers a compelling and legitimate public interest, but upon Defendants' animus or dislike for the identity or viewpoint of the speaker.

96.     Defendants also admit that decisions to restrict access to videos are routinely made or influenced by third-party NGO affiliates and advertisers who dislike the political or religious identity or viewpoint of the user.  According to Defendants, "YouTube receives significant pressure from governments and social interest groups around the world to remove or restrict access to content that those groups find harmful, dangerous, or offensive. For example, Germany's Netzwerkdurchsetzungsgesetz (network enforcement law or NetzDG) requires any Internet platform with more than 2 million users to implement more efficient ways to report and delete potentially illegal content, such as slander and hate speech.  Platforms which fail to remove such content within 24 hours (or within 7 days for more legally complex content), will be subject to fines of up to 50 million euros."  These groups constantly pressure Defendants to apply access restriction criteria to users whose political or religious viewpoint does not comport with that of an advertiser or third-party NGO.

**4.     Demonetizing Channels Wholesale**

97.     Google/YouTube continue to censor and demonetize the work of LGBTQ+ creators by they are demonetizing entire channels of LGBTQ+ creators:

a.     The YouTube channel SalBardo was demonetized for a period of 30 days, despite the popularity of his short film "Sam," a short film which presents the story of a transgender child who has been beaten for dressing as a boy.  "Sam" https://www.youtube.com/watch?v=YQiN2MYEzSg was posted in 2013 and has generated 7.4

1  million views.

2      b.      The YouTube channel NateTrinrud also was demonetized for a period of

3  time, despite the fact that the three videos uploaded to the channel, ("Goodbye, Charley,"

4  https://www.youtube.com/watch?v=RNXC1rkrONU; "Pop Rox,"

5  https://www.youtube.com/watch?v=E-VpD4_sgNw; and the "Pop Rox Trailer,"

6  https://www.youtube.com/watch?v=QWBc92tTzPA), are award winning films which do not

7  include graphic scenes of violence or sexuality.

8          **5.      Shadow Banning**

9      98.      Google/YouTube treats serious videos that present themes and issues important to

10  the LGBTQ+ Community as "not family friendly," or as if they were inappropriate for all

11  audiences simply because they are uploaded by members of the LGBTQ+ Community or are

12  created for the LGBTQ+ Community to watch.  Defendants are not merely censoring and

13  demonetizing individual videos by LGBTQ+ creators – Defendants are making those videos

14  invisible on the YouTube Platform; despite the fact that the videos comply with all of Defendants'

15  published Terms of Service.  For example:

16      a.      Various videos posted by the YouTube channel Watts The Safeword,

17  including "Mermaid Tie," which demonstrates traditional knot work and includes no nudity, have

18  been sporadically shadow banned on YouTube and could not be located on the YouTube Platform

19  by conducting searches for various periods since the videos were uploaded..

20      b.      The "Dare" short film, written by David Brind, depicts the beginning of a

21  gay relationship between two high school seniors.  "Dare" was posted to YouTube in 2013,

22  https://www.youtube.com/watch?v=HtCxdsvlO0s and has generated more than 12.6 million

23  views.  Defendants demonetized and applied Restricted Mode filters to the short film.  Plaintiffs

24  are informed and believe and thereon allege that for various periods of a time over the past two

25  years, "Dare" also was shadow banned on the YouTube Platform and could not be found  except

26  by searching using the director's name.

27          **6.      Deleting LGBTQ+ Thumbnail Images**

28      99.      Thumbnails are small square images or tiles which appear in the lists of YouTube

search results ("Thumbnails").  For channels with fewer than 15,000 subscribers, Thumbnails consist of a single still photo which Defendants generate from the uploaded video, or which Defendants capture with a digital camera.  For those channels with 15,000 subscribers or more, Defendants allow the creators to craft unique Thumbnails with titles using customized lettering and graphics.  The LGBTQ+ Plaintiffs and other YouTubers who are part of the LGBTQ+ Community who generate the minimum subscriber numbers required by Defendants are authorized to upload such customized Thumbnails to attract viewers.  Using custom Thumbnails is a visual way of signaling to new viewers that the related content is professionally prepared and superior in quality to most of the content from less popular, amateur creators which populate most of YouTube's channels.  Custom Thumbnails are so effective at attracting new viewers that these creators actually plan new videos around specific Thumbnail concepts, generating the Thumbnail in advance of the video.

100.    Without any notice or explanation, Defendants have and continue to delete the custom Thumbnails of the LGBTQ+ Plaintiffs and Community, and replace those custom Thumbnails with Defendants' own generic Thumbnails, which typically results in reduced numbers of click-throughs and views.  The unlawful and anticompetitive practice of replacing the LGBTQ+ Plaintiffs' custom Thumbnails allows Defendants to further denigrate, stigmatize, and harm the LGBTQ+ Plaintiffs' respective brand, reputation, goodwill, and ability reach intended audiences.

### 7.    Cancelling And Stopping Subscribers' New Video Notifications

101.    Since the early days of YouTube, creators grew their channel's view numbers by encouraging viewers to "subscribe," to their channels.  Some Plaintiffs have more than one million "subscribers" for their combined two channels.  One major perk of being a "subscriber," used to be that "subscribers," automatically received notification from the YouTube Platform whenever the subscribed channel uploaded new video material.  By cancelling subscriptions, and/or new video notifications, Defendants can prevent LGBTQ+ Plaintiffs from continuing to attract new subscribers by preventing videos from going viral with large numbers of viewers.  Over time, as existing subscribers fail to see channels are posting new videos, views and subscriber numbers

1    shrink.

2    102.    For the past 18-24 months, when established LGBTQ+ creators post a new video,

3    fewer and fewer existing subscribers have been getting new video notifications for LGBTQ+

4    channels like BriaAndChrissy and ElloSteph.  Newly posted videos are languishing with few

5    views during the critical first few days when "buzz" can be generated and a video can go viral.

6    Over time, with Defendants cancelling more and more longtime subscribers, fewer viewers are

7    receiving new video notifications, and successful longtime LGBTQ+ creators' channels post fewer

8    and fewer views per new video.  Defendants also ceased providing new video notifications to

9    longtime subscribers, without providing any notice to the LGBTQ+ creators, their subscribers or

10   other YouTube users.

11   103.    Google/YouTube changed the procedure for requesting "notifications of new

12   videos," sometime in the past several years.  Instead of including automatic new video

13   notifications whenever subscribers double click on the "subscribe," box for a channel,

14   Google/YouTube changed the process so that a subscriber who wanted to receive new video

15   notifications both had to double click the "subscribe," box, and to double click on a grey bell icon

16   located to the right of the "subscribe," box.  Existing subscribers automatically stopped receiving

17   new video notifications when Defendants implemented the new procedure.  Google/YouTube

18   implemented the new procedure without any announcement, and did not inform existing

19   subscribers that new video notifications would cease.

20   104.    Even when existing subscribers figured out that Google/YouTube had a new

21   procedure for getting new video notifications, many subscribers tried to double click on the grey

22   bell icon, many subscribers were unable to successfully complete the process.  Those existing

23   subscribers who successfully managed to complete the process, did not necessarily receive new

24   video notifications on a regular basis.

25   105.    Defendants further compounded the problems sometime between July and

26   November of 2019, when Google/YouTube again changed the requirements for subscribers to

27   receive new video notifications:  Now, it is no longer sufficient to double click on the grey bell

28   icon, but subscribers must take the additional step of choosing from a new drop down menu one of

FIRST AMENDED CLASS ACTION COMPLAINT FOR DAMAGES, INJUNCTIVE RELIEF, RESTITUTION,
AND DECLARATORY JUDGMENT

three options:  "All Notifications," "Personalized Notifications," and "No Notifications."  Again, before implementing this change regarding new video notifications, Defendants gave no advanced notice to the creators, subscribers or YouTube users of this change, resulting in weeks passing during which LGBTQ+ creators posted new material without subscribers to their channels receiving any notification at all.  For those subscribers who had taken the trouble to double click on the grey bell icon to the right of the "subscribe" box before the second change, instead of receiving notifications for all new videos, Google/YouTube converted the existing notification request to only require "Personalized Notifications."  This sleight of hand resulted in subscribers not getting any new video notifications, as Plaintiffs' channels are not set up to provide "Personalized Notifications" to subscribers.

**8.      Excluding LGBTQ+ Content From The "Up Next" Recommended Application**

106.     Defendants generally exclude LGBTQ+ related content from the YouTube recommended content on the "Up Next," application for the channels, which appears on the screen whenever viewers play the LGBTQ+ Plaintiffs' videos.  As a practical matter, Defendants refuse to recommend to viewers or advertisers video content which includes tag words like "LGBTQ+," "lesbian" "gay," bisexual," "transgender," or "queer."  Google/YouTube does so, despite the fact that it recommends reaction videos that are based upon the very same non-recommended videos uploaded by LGBTQ+ Plaintiffs.  As a result, creators like BriaAndChrissy and Chase Ross must self-censor and refrain from using such tag words for their videos to avoid Defendants' censorship practices, if they are to generate any advertising revenues from their posted videos.  Such self-censorship makes it harder for members of the LGBTQ+ Community (the intended audience for the two channels) to find content which is designed to support, educate and entertain them.  Recently, LGBTQ+ creators have been forced to remove paid products placed in their videos because Google/YouTube has deemed certain product brands, such as "Adam and Eve" as inappropriate for the YouTube Platform.

**9.      Recommending Anti-LGBTQ+ Hate Speech In The "Up Next" Application Alongside LGBTQ+ Videos**

107.     While Defendants exclude LGBTQ+-related content from the YouTube

recommended content on the "Up Next," application, Defendants recommend and include on the "Up Next" application both reaction videos which copy, pirate or parody the LGBTQ+ Plaintiffs' original content, and original videos which include obscene, homophobic, violent, threatening or disparaging anti-LGBTQ+ content.  These "Up Next" videos which Defendants are recommending to the LGBTQ+ Plaintiffs' subscribers and viewers appear on the same screen, alongside the LGBTQ+ Plaintiffs' videos.  Defendants also monetize many anti-LGBTQ+ hate speech videos, ensuring that both Defendants and their preferred creators are making money from the LGBTQ+ Plaintiffs' original content, all the while discouraging, offending, and even frightening the intended audience for the LGBTQ+ Plaintiffs' videos.

108.    Defendants' practice of recommending hate speech videos in conjunction with the displaying of LGBTQ+ related videos discourages and even prevents members of the LGBTQ+ Community from accessing video content which is designed to support, educate and entertain them.  While the LGBTQ+ Plaintiffs in this case support the right of all persons to express their viewpoints, Defendants may not restrain, censor, or prevent the LGBTQ+ Community from expressing their viewpoints, especially where Defendants promise everyone a level playing field where the rules apply equally to all.

### 10.    Playing Anti-LGBTQ+ Advertisements Immediately Before LGBTQ+ Videos

109.    Defendants have sold YouTube advertisements to users who have strong anti-LGBTQ+ messages, and play those advertisements so that they directly precede the LBGTQ+ Plaintiffs' videos .  Accordingly, viewers who played video content by BriaAndChrissy, and WonderWarriors were forced to view advertisements with anti-LGBTQ+ messages before viewing the videos which they desired to watch.  Defendants' practice of running anti-LGBTQ+ advertisements before playing videos by the LGBTQ+ Plaintiffs offends their intended audience, and discourages viewers from watching the LGBTQ+ Plaintiffs' videos, by forcing them to first listen to doctrinal advertisements that criticize, belittle, or disparage the viewers' beliefs and lifestyles, resulting in fewer views per video, lower subscriber numbers and less income to the LGBTQ+ Plaintiffs.  While the LGBTQ+ Plaintiffs in this case support the right of all persons to

express their viewpoints, Defendants may not restrain, censor, or prevent the LGBTQ+ Community from expressing their viewpoints, especially where Defendants promise everyone a level playing field where the rules apply equally to all.

**11.    Including Anti-LGBTQ+ Hate Speech In Comments Appearing With LGBTQ+ Videos**

110.    YouTube has come a long way from days when it was credited as providing the resources to disenfranchised persons in the Middle East that fueled the Arab Spring.  Instead of treating everyone equally Google/YouTube, now finds it politically and financially expeditious to restrain and disenfranchise LGBTQ+ users, while promoting institutional racism, ethnic violence, and homophobia around the world.  In a recent investigative report sponsored by the New York Times and the FX network entitled "What Is YouTube Pushing You To Watch Next,"[12] several well respected investigative journalists report that YouTube assists, and is the weapon of choice for anti-LGBTQ+, gay bashing dictators, politicians and advocates around the world, including the current President of Brazil, Jair Bosanaro.  The report describes YouTube as the single most powerful catalyst in the world for disrupting societies and does so by reaching more people than any private or government controlled TV communication network in history.  The report concludes that YouTube exercises "extraordinary influence" over hate-based, ethnic violence, and totalitarian ethnic cleansing, including the horrific events in Myanmar, Sri Lanka, Germany, the Philippines, and Brazil.

111.    One of the principal ways of gaining new viewers and subscribers on the YouTube Platform is to generate favorable comments and/or healthy discussion in the "Comments Section," which appears when videos are played.  Favorable comments can generate thousands of additional views for a video.  Comments regarding video content can generate even more views where the viewers have differing opinions and perspectives.  Defendants allow, and refuse to filter out from the LGBTQ+ Plaintiffs' channels and video comments sections those comments with obscene, homophobic, violent, threatening hate speech.  Accordingly, viewers who play educational video content by QueerKidStuff designed for young viewers, supportive video content by

---

[12] See https://www.nytimes.com/2019/08/09/the-weekly/youtube-brazil-far-right.html .

**FIRST AMENDED CLASS ACTION COMPLAINT FOR DAMAGES, INJUNCTIVE RELIEF, RESTITUTION, AND DECLARATORY JUDGMENT**

1  BriaAndChrissy, and WonderWarriors designed for adolescents to young adults, and educational

2  and supportive video content designed for adults by GNews! and uppercaseChase1, are exposed to

3  vile hate speech when they view the videos uploaded by these LGBTQ+ Plaintiffs:







112.     The LGBTQ+ Plaintiffs generally must spend substantial time and energy attempting to use Defendants' word filters for the Comments Section application to remove the hate speech comments.  LGBTQ+ creators often are unable to capture all of the different misspellings used in the hate speech to avoid Defendants' word filters.  GNews! devotes significant resources to filtering and deleting hate speech which appears in its comments sections.  For new videos, hate speech trolls flood the Comments Section of the LGBTQ+ Plaintiffs' channels so that each positive comment is pushed down in the queue of comments and is not visible unless the viewers scroll through dozens of hate filled comments.  QueerKidStuff has been forced to disable the Comments Section to protect its young viewers and their parents from such hate speech comments.  In doing so, QueerKidStuff generates less buzz for new content, fewer views per video uploaded, fewer subscribers, and barely any revenue from its videos.

113.     The LGBTQ+ Plaintiffs strongly support the right of free Speech and expression for all Community Members.  That right does not extend to Defendants' promotion of anti-LGBTQ+ hate speech, speech which also violates Defendants' own purportedly neutral content-based rules -- especially when Defendants unlawfully use those rules as pretext to censor, restrain, demonetize, silence, and squelch the engagement and distribution of LGBTQ+ video content or viewership.  Such, actions unlawfully interfere with the express rights of LGBTQ+ Community Members to protect themselves by speaking out against hate and homophobia on a level playing field, as provided by Defendants' representations and warranties that the rules apply equally to all on YouTube.

### 12.     Other Unlawful Speech-Restricting Tools

114.     Defendants have  even more tools in their toolkit to unlawfully restrict the expression of YouTubers like the LGBTQ+ Plaintiffs in the Proposed Class.  These tools include, but are not limited to:

a.      Removing the comments section entirely for videos, without a request by the LGBTQ+ creator, and without giving the creator notice as to why the action was taken or an opportunity to respond, thereby depriving creators of the opportunity to generate buzz by having viewers post favorable

comments and recommend content to others;

    b.    Content production, "fact checking," and political partnerships with large third-party media conglomerates, advertisers, or non-Governmental organizations (NGO's) who work with Defendants as a pretext to restrain users and viewpoints that Defendants and their partners dislike;

    c.    A global network of content review and call center locations and teams who interact with consumers to flag and restrict disfavored producers or viewpoints; and

    d.    Terms of Service contracts with consumers that contain a catchall provision that Defendants contend grants them unfettered and absolute discretion to restrain speech for "any reason or no reason."

115.    Despite the number, complexity, and interrelation of each of these (and other) content regulation policies and practices, each serves as part of a uniform, single, simplistic, and unlawful content-based scheme to control, regulate, restrain, and harm protected speech. The common thread or core aspect of this scheme is simple: use and apply vague, subjective, and meaningless content-based criteria with unfettered and absolute discretion to restrict the viewership, reach, and monetization of videos on YouTube, based not on content, but upon the sexual identity, political affinity, religious affiliation, ethnic identity, or commercial affiliation of the speaker or the listener, or upon other animus or bias.

    **F.**    **Defendants Were Caught Censoring LGBTQ+ Users In 2017**

116.    On March 19, 2017, Defendants publicly admitted that they improperly censored videos using their Restricted Mode filtering that were posted or produced by members of the LGBTQ+ Community, based upon the identity and orientation of the speaker, rather than upon the content of the video. In response to complaints from the LGBTQ+ Community and other civil rights critics, Defendants removed all restricted filtering on videos posted or produced by LGBTQ+ members and groups, and changed their policy, filtering algorithm, and manual review policies purportedly to ensure that videos posted by LGBTQ+ vloggers were not being censored solely because of the identity of the speaker.

117.     Defendants also admitted that they wrongly censored videos posted by members of the LGBTQ+ Community blaming a purported engineering problem with filtering tools that targeted video content from LGBTQ+ users, or targeted users who discussed topics and perspectives on LGBTQ+ issues.  Subsequent to that admission, Defendants agreed to investigate the claims of LGBTQ+ users.  Defendants dispatched a team of senior managers, including YouTube's CEO Susan Wojcicki, to meet with LGBTQ+ representatives to consider revising their policies and review protocols, correcting the filtering tools, and rewriting guidelines that "clarify its position by specifically allowing personal accounts from victims of discrimination or violent hate crimes, as long as they don't contain graphic language or content."

118.     On April 27, 2017, Johanna Wright, Vice President of Product Management for YouTube, stated that Defendants wanted to "clarify that Restricted Mode should not filter out content belonging to individuals or groups based on certain attributes like gender, gender identity, political viewpoints, race, religion or sexual orientation."  Wright further promised users that while "Restricted Mode will never be perfect, [Defendants] hope to build on [their] progress so far to continue making [their] systems more accurate and the overall Restricted Mode experience better over time."

119.     This was another false promise by Defendants.  On at least five occasions, after promising to stop discriminating against LGBTQ+ users, Defendants denied an LGBTQ+ news organization the right to advertise and boost viewership on YouTube.  In one instance, Defendants denied Divino an ad seeking to promote a Christmas Holiday video solely because the speakers and organization producing and promoting the video were identified and expressed viewpoints which Defendants stigmatized as "shocking" and "sexually explicit," solely because the user identified and expressed viewpoints that were "gay."  After the LGBTQ+ user repeatedly complained and sought an explanation, the LGBTQ+ user got a customer service person to escalate the complaint.  Whereupon, two different employees at two different locations were unable to provide an explanation of the denial to this user other than to say that the video had been flagged as "shocking content."  When the LGBTQ+ consumer further escalated the complaint, a person identified as an "expert" and senior supervisor, expressly informed the consumer that the

ad was being denied because the video it was promoting contained "shocking" and "sexually explicit" content solely because the consumer was "gay" and that "company policy" deemed LGBTQ+ content as shocking and "sexually explicit," solely because of the video involved "the gay thing."

120.    Defendants subsequently apologized to the LGBTQ+ client for what they contend was a misunderstanding and eventually agreed to run the ad.  But they did so **more than three weeks *after* the Christmas holiday had passed**.  Subsequent to their apology, Defendants declined at least four additional ad requests from the same video channel with little, or no, explanation.

### G.    YouTube's Promises To the LGBTQ+ YouTubers Were "Lip Service"

121.    Whatever promises, apologies, and misunderstanding explanations Google/YouTube has given to the LGBTQ+, they were and continue to be "lip service" as described by one LGBTQ+ YouTuber following his meeting with YouTube's management in 2017.  Instead of fixing the problems, Defendants Google/YouTube have doubled down on their anti-LGBTQ+ animus and discrimination that now pervades the platform.

122.    In an article headlined "How YouTube Radicalized Brazil,"[13]an investigative report written by journalists Max Fisher and Amanda Taub, released by the New York Times on August 11, 2019,  YouTube's animus-based content regulation and distribution system was dubbed the political "Party" behind Jair Bolsonaro, who, courtesy of YouTube content filtering and distribution control, is now the President of Brazil.  Bolsonaro is arguably the most powerful anti-LGBTQ+, homophobic bigot and hatemonger in the world.  According to the article, "YouTube had recently installed a powerful new artificial intelligence system that learned from user behavior and paired videos with recommendations for others."  This system, embedded in YouTube's content regulation schemes and practices, made "Jair Bolsonaro, then a marginal figure in national politics," a "star in YouTube's far-right community in Brazil, where the platform has become more widely watched than all but one TV channel."

---

[13] See https://www.nytimes.com/2019/08/11/world/americas/youtube-brazil.html .

123.    The "investigation in Brazil found that, time and again, videos promoted by the site have upended central elements of daily life," including those of children, who YouTube hypocritically exploits to impose content-based restrictions for its own financial and political gain. According to the New York Times, "[t]eachers describe classrooms made unruly by students who quote from YouTube conspiracy videos or who, encouraged by right-wing YouTube stars, secretly record their instructors."

124.    Thus, contrary to Defendants repeated promises that the "system" is viewpoint-neutral and does "not  favor any political ideology," the Times' report found that YouTube "directs users to extreme content," while, as alleged here, restricting compliant and quality LGBTQ+ content intended for younger audiences.  According to Defendants, this system "now drives 70 percent of total time on the platform."  While that is good news for YouTube "as viewership skyrockets globally," and YouTube brings "in over $1 billion a month," it is bad news for the LGBTQ+ Plaintiffs and the members of the YouTube Community: as Zeynep Tufekci, a social media scholar, has stated, YouTube is "one of the most powerful radicalizing instruments of the 21st century."

**H.    Defendants Have And Continue To Violate The Rights Of The LGBTQ+ Plaintiffs And The LGBTQ+ Community**

125.    Defendants' 2017 promises and claims that the bias "problems" identified by members of the LGBTQ+ Community are now resolved, is simply not true.  Indeed, as the allegations and claims of the LGBTQ+ Plaintiffs demonstrate, things are getting worse, not better. What Defendants previously characterized as incidental or unintentional "problems" in properly regulating and protecting LGBTQ+ expression have become part of an unlawful scheme by defendants to restrain, deceive, discriminate, and violate the legal rights of the LGBTQ+ Plaintiffs and the putative class members of the LGBTQ+ Community that the LGBTQ+ seek to represent in this lawsuit.

**1.    Divino (GlitterBombTV.com's GNews!)**

126.    Divino Group LLC is owned and managed by Chris Knight and Celso Dulay.  Mr. Knight and Mr. Dulay are members of the LGTBQ+ Community who write, produce and upload

FIRST AMENDED CLASS ACTION COMPLAINT FOR DAMAGES, INJUNCTIVE RELIEF, RESTITUTION, AND DECLARATORY JUDGMENT

to the YouTube Platform video content intended for the LGTBQ+ Community under the GlitterBombTV.com name as GNews!.  Cameron Stiehl is a regular co-host and contributor to GNews! and Glitter Bomb TV.

127.     Plaintiffs Divino, Chris Knight and Celso Dulay are informed and believe and thereon allege that sometime in late 2013 or early 2014, Divino entered an agreement with Defendants to become YouTube partners by joining the YouTube Partnership Program.  As part of the YouTube Partnership Program, Defendants gave Divino a number of special benefits, such as the opportunity to prepare custom Thumbnail images for each video it uploaded to YouTube, and to monetize its videos.  YouTube promised additional benefits to Divino if it succeeded in obtaining 1,000 or more subscribers to its YouTube channel.

128.     Commencing in March of 2014, in reliance on its YouTube Partnership Program agreement with Defendants, in order to secure additional partner benefits, Divino undertook efforts to increase its number of views per video, and its number of subscribers, by purchasing from Defendants a series of advertisements.  Between March 9, 2014 and October 1, 2018, Divino paid to Defendants $14,542.94 for advertisements relating to its GNews! videos.

129.     However, Defendants refused to sell Divino all of the advertisements it applied to purchase: on at least eight separate occasions, after November 2016, Google/YouTube barred Divino from purchasing ads or monetizing its news and event show, GNews!, because Defendants had determined in their discretion that the content of a show violated Defendants' policy against promoting "shocking" "offensive," and "sexually explicit" content.

130.     Around April 2017, after Divino had purchased numerous advertisements in an effort to secure the minimum 1,000 subscribers to qualify for the next level of Defendants' enhanced video creator benefits, Defendants unilaterally changed the YouTube Partnership Program requirements so that only video creators with "10,000 lifetime views" would qualify to be partners.  In unilaterally changing the terms of the YouTube Partnership Program, Defendants repudiated the agreement with Divino.

131.     On December 24, 2017, Plaintiff Divino was prohibited from advertising a holiday special news and events show created for LGTBQ+ persons in the San Francisco Bay Area and

beyond, because Defendants labeled the GNews! video as "shocking content."  When Plaintiff Divino inquired as to what portion, if any, of the video content on a holiday event show was inappropriate for advertising, an employee of Google AdWords stated that video content that discusses or expresses the "gay thing" or is created by a YouTuber who identifies as "LGBTQ+" or "gay" violates "company policy" against the advertising or monetizing of "shocking" and "sexually explicit" content.

132.    On or about January 17, 2018, Defendants again unilaterally changed the YouTube Partnership Program requirements so that only creators with channels that "have accumulated 4,000 hours of watchtime within the past 12 months, and have at least 1,000 subscribers" would qualify for the program.  By that time, Defendants had spent thousands of dollars in an effort to boost their subscriber numbers, and had been refused opportunities to purchase other advertisements.  Because Divino had not reached the new 1,000 minimum number of subscribers, Defendants removed Divino from the YouTube Partnership Program, and stripped Divino of the ability to monetize its videos.  In doing so, Defendants further repudiated the agreement with Divino.

133.    Since February 6, 2014, Divino has produced 132 episodes of GNews!, an online LGBTQ+ news show co-produced by Divino's principals, Celso Dulay and Chris Knight.  In reliance on Defendants' assurances of viewpoint-neutrality and free expression discussed above, Divino decided to produce and distribute each such episode through the YouTube Platform.

134.     GNews! is and has always been intended to be a positive and affirming news source for members of the LGBTQ+ Community.  Labeled "Where You Get All Your Gay in a Day," Dulay and his revolving line-up of co-hosts cover a variety of topics of interest to the global LGBTQ+ Community – from Hollywood, the music charts, pop culture, celebrities, politics, news of top interest to the community, local and international events, their "Crush of the Week" and more.

135.    A representative screenshot from an episode of GNews! is below:



1

2

3

4

5

6      136.    Inasmuch as GNews! is subject to the same criteria that governs all YouTubers

7   (and there is nothing in any GNews! episode that violates any provision of law or any legitimate

8   provision of YouTube's or Google's terms of service), GNews! is typical of YouTube content

9   produced and uploaded by other YouTuber members of the Proposed Class.

10      137.    Relying on the truth of Defendants' representations that YouTube is, had been, and

11   would remain a viewpoint-neutral forum for free expression, Divino and other members of the

12   Proposed LGBTQ+ Class were further induced to purchase ad products from Defendants.

13      138.    YouTubers like Divino, who initially attempted to rely on social media and word of

14   mouth to increase viewership for their video content, often find that the only effective way to

15   increase views of GNews! and to grow subscribers is to purchase ad products from Defendants to

16   increase their reach.  This appears to be the result of a deliberate and fraudulent effort by

17   Defendants to increase their profits through the sale of advertisements.

18      139.    Specifically, when videos like Divino's GNews! episodes are uploaded to the

19   "YouTube Creator's Studio," there appears a direct link via pull-down menu to promote the

20   episodes via Google Ads (formerly called Google AdWords).  YouTubers who select the

21   "promote" option via pull-down menu are immediately directed to a Google Ads landing page that

22   states - as of May 5th, 2019:

23           You'll promote your video using Google Ads. Like millions of other
             creators and businesses, you'll use the Google Ads platform to run
24           and manage your video as an ad on YouTube. With video ads, you
             can expand your audience and pay only for views that count. You'll
25           now be redirected to sign in to or create a Google Ads account.

26      140.    Neither Divino, nor any other member of the Proposed Class would have spent

27   money on such products, if they had been aware of the true facts underlying Defendants'

28   representations.

FIRST AMENDED CLASS ACTION COMPLAINT FOR DAMAGES, INJUNCTIVE RELIEF, RESTITUTION,
AND DECLARATORY JUDGMENT

141.     For example, between August 2015 and May 2018, GNews! ads purchased by Divino on the strength of the above-referenced representations were "disapproved" (YouTube-speak for "blocked") no fewer than **eleven times** based on increasingly vague and nonsensical reasons.

142.     And between September 2015 and March 2018, two GNews! episodes were subject to "Restricted Mode," thus restricting significant portions of GNews! potential audience from viewing the content.

143.     Consistent with what has happened to members of the Proposed Class who have dared to question Defendants' blacklisting, when Divino's representatives sought clarification as to what content in the news show constituted "shocking content," Defendants were initially unable to point to anything.  When Divino escalated the inquiry, their call was transferred to a person working for Defendants in South Asia identified as a senior content regulator and Defendants' "call center" head.  After taking some time to view the GNews! content in question, the employee informed Divino that the content of the show violated the company's prohibition against "shocking" and "sexually explicit" content **because** of what he stated was Defendants' "**company policy**" of banning content that related to the "**gay thing**" and because Divino's representatives identified as LGBTQ+ and are "**gay**."

144.     The call thus confirms what the LGBTQ+ Plaintiffs and other YouTubers in the Proposed LGBTQ+ Class have long known to be true: the soaring rhetoric of Defendants' professed commitments to values of freedom of expression is nothing more than a smokescreen covering a rotting corporate culture that uses overseas call center workers in a scheme to suppress speech and violate established antidiscrimination protections.

145.     Defendants' discretionary, discriminatory, viewpoint-based, and unlawful content-based speech regulation system was, is, and continues to be used to discriminate against and financially harm YouTube consumers.  Indeed, every YouTube consumer or user is an unwitting victim of Defendants' discriminatory and fraudulent scheme to use unlawful and discriminatory content-based speech regulations, policies, and practices to obtain illegal financial and political gain at the expense, and to the detriment of the users' free speech and consumer rights.

146.     Instead of correcting their behavior and bringing their filters and regulations of speech into compliance with California's free speech, antidiscrimination, consumer fraud, and contract laws, Defendants continue to maintain and apply arbitrary, capricious, discriminatory and deceptive regulations to restrict speech on YouTube.

147.     In short, Defendants are engaged in a global fraud on YouTube's users and consumers.  YouTube consumers, like the LGBTQ+ Plaintiffs, are promised a video hosting platform that operates without regard to a user's identity or viewpoints subject only to neutral, narrowly tailored, non-discretionary content-based rules and restrictions that serve to further a legitimate public interest, such as public safety or national security.  In reality, however, Defendants deliver a platform where YouTube consumers are subject to, vague, discretionary, and meaningless rules, regulations, and practices to discriminate against and financially harm disfavored third-party speakers and viewers, as a pretext to further Defendants' purely selfish, corporate interests of maximizing financial gain, political power, and consolidating control over the public speech and content of its consumers and the public.

148.     Not only is Defendants' censorship not based upon the express content of the LGBTQ+ Plaintiffs' videos and those of others in the Proposed LGBTQ+ Class, but Defendants' "inappropriate" designation, falsely and unfairly stigmatizes the LGBTQ+ Plaintiffs.  The designation renders prospective viewers ineligible to watch the LGBTQ+ Plaintiffs' programming from many public, as well as private workplace or home computer stations.  It prevents access to educational content by students whose computer use may be subject to parental controls, intended to shield the student from truly inappropriate material, not to exclude political or educational discourse of current or historical events.  It precludes the LGBTQ+ Plaintiffs from receiving any revenue from advertisements that would otherwise accompany content not designated as "inappropriate."  Moreover, it gives Defendants a virtual monopoly over the video posting and viewership market, and authority to manipulate, bully, and falsely denigrate legitimate political and educational speakers by subjectively designating their speech as "inappropriate," solely because Defendants do not like or agree with the users' political identity or point of view.

149.     Such a censorship regime cannot pass muster under California law.  Among other

FIRST AMENDED CLASS ACTION COMPLAINT FOR DAMAGES, INJUNCTIVE RELIEF, RESTITUTION, AND DECLARATORY JUDGMENT

things, it provides Google/YouTube with unfettered and unbridled discretion to impose their own

political views and values upon speakers, without any objective criteria for evaluating what is and

is not appropriate, and thereby censors speech, based on animus towards the speaker's political

viewpoint, rather than on the appropriateness of the video content.  It also constitutes intentional

discrimination by Defendants based upon the religious beliefs, political identity, or sexual

orientation of the speaker.  Moreover, it allows Defendants unfettered authority to regulate,

restrain, and censor speech as an unfair, unlawful and deceptive business practice designed to

inflict harm upon their competitors and to promote their own video content at the expense of the

smaller third-party users, on whose backs the YouTube Platform was built.  Furthermore, it

violates the warranty of good faith and fair dealing implied in the Defendants' Terms of Service,

and the video posting guidelines and policies to which the LGBTQ+ Plaintiffs were required to

agree, in order to use the YouTube Platform.  Defendants do all of this as part of their control and

management of what is arguably the largest public forum for expression and the exchange of ideas

that has ever been available to the public in California, the United States, and ultimately the

world—one to which Google/YouTube invite the public to express themselves in all manner of

speech, and to engage with such speech through viewing and commenting.

150.    Until recently, all of Divino's subscribers had been receiving electronic

notifications from YouTube whenever Divino uploaded new video content.  In the past year,

Divino's subscribers have been complaining that they no longer receive YouTube notifications for

new Divino video content.  YouTube did not announce or notify Divino of any change to the

existing notification system.  In discontinuing their practice of notifying existing Divino

subscribers regarding new posted content, Defendants have effectively nullified the benefits of the

$14,000 worth of advertisements Divino had purchased to boost subscriber numbers:  existing

subscribers will not continue to watch Divino's videos when they believe Divino has stopped

posting new materials, and Divino cannot possibly generate the minimum 4,000 annual hours of

viewer watchtime required to requalify for the YouTube Partner Program if existing subscribers

were not watching new videos.

FIRST AMENDED CLASS ACTION COMPLAINT FOR DAMAGES, INJUNCTIVE RELIEF, RESTITUTION,
AND DECLARATORY JUDGMENT

## 2.    BriaAndChrissy LLC (BriaAndChrissy)

151.    Plaintiff BriaAndChrissy LLC a limited liability company created under the laws of the state of Georgia, and is wholly owned by Bria Kam and Chrissy Chambers, a married lesbian couple and the creators of BriaAndChrissy, and WonderWarriors (formerly known as "OurLesbianLove"), two popular LGBTQ+ video content channels on the YouTube Platform. Bria is a professional musician, and Chrissy is an actress.  They use their creative talents to support and entertain young adult members of the LGBTQ+ Community.

152.    On the BriaAndChrissy and WonderWarriors channels, BriaAndChrissy LLC uploads videos that document and describe the experiences of the same sex couple, including the struggles, and mental and physical health issues which affect same sex couples who are constantly confronted with homophobic hate speech, bigotry, attacks, and institutional bias against LGBTQ+ persons.  Since 2012, BriaAndChrissy LLC has been uploading videos featuring the original material and covers of the work of the couple, and of other artists, as well as skits, interviews, and editorial commentary on issues of the day, such as homophobic celebrities.

153.    On the WonderWarriors channel, BriaAndChrissy LLC created a popular "Day-in-the-Life" video-log that chronicles the couple's lives, and encourages LGBTQ+ persons to live a healthy lifestyle through fitness, creativity, responsible ethical conduct and supportive relationships.

154.    In 2017, the BriaAndChrissy channel had 850,000 subscribers with 380 million views.  WonderWarriors had 200,000 additional subscribers with 60 million views.  The two channels averaged 15,000 new subscribers per month, 10 million views per month for each new video uploaded, and generated on average $3,500 per month.  And as any objective or reasonable viewer can see, the video content that appears on BriaAndChrissy and WonderWarriors complies with YouTube's Community Guidelines and other content-based regulations used by Defendants to regulate free expression and speech on the YouTube Platform.

155.    On or about June of 2013, the BriaAndChrissy channel was so popular with viewers that Defendants invited the couple to create and post a video titled "Proud to Love" on the channel.  No sooner had these Plaintiffs agreed to Defendants' invitation to create and post "Proud

FIRST AMENDED CLASS ACTION COMPLAINT FOR DAMAGES, INJUNCTIVE RELIEF, RESTITUTION, AND DECLARATORY JUDGMENT

1  to Love," than Defendants demonetized the "Proud to Love" video and refused to re-monetize it.

2  Defendants only re-monetized the video after Bria Kam appealed to BriaAndChrissy fans on

3  Twitter, where the video received significant additional attention.  As a result of Defendants'

4  monetization treatment of the "Proud to Love" video, " BriaAndChrissy LLC lost substantial

5  revenue and earnings from this popular video.

6       156.   In February 2016, Defendants then invited BriaAndChrissy LLC to pitch and

7  produce an LGBTQ+ documentary program featuring the couple travelling throughout the United

8  States and interviewing members of the LGBTQ+ Community about their personal experiences.

9  The concept was to document LGBTQ+-related issues of local importance, and broader LGBTQ+

10 issues of national importance which affect LGBTQ+ persons, their families and friends in

11 different communities around the United States.  To Plaintiff's surprise, Defendants subsequently

12 turned down the project under the pretext that they were no longer interested in the concept.

13 Unbeknownst to the Plaintiff, and without it permission or any legal rights to the unique content,

14 Defendants sponsored an identical show hosted by a former Google/YouTube employee.  In

15 brazen disregard and violation of BriaAndChrissy LLC's intellectual property rights, Defendants

16 stole and plagiarized Plaintiff's concept and content, and profited from that theft by promoting and

17 posting a show on YouTube which was a complete rip off of BriaAndChrissy LLC's concept and

18 content, keeping all of the monetary and distribution value for themselves, to the financial

19 detriment of BriaAndChrissy LLC, Defendants' direct competitor.

20      157.   In furtherance of their anticompetitive and discriminatory attack on this LGBTQ+

21 Plaintiff, Defendants also engaged in "unsubscribing" viewers who had existing subscriptions to

22 the BriaAndChrissy and Wonder Warrior channels. Specifically, Defendants began deleting

23 longstanding subscriptions of viewers who watch Plaintiff's content, making those subscriptions

24 disappear without warning.  Because many of its subscribers and audience were deterred by

25 having to constantly re-subscribe to BriaAndChrissy LLC's channels over and over again, this

26 Plaintiff's viewership and subscription rates were fraudulently and unfairly reduced to levels well

27 below the level which had existed prior to Defendants' unlawfully unsubscribing of viewers to

28 BriaAndChrissy and/or WonderWarriors.  Many subscribers have continued to complain

throughout September and October that Google/YouTube are deleting their subscriptions to the channel and not allowing them to re-subscribe.  Other subscribers are complaining that when they visit the BriaandChrissy channel, they cannot find new videos which were uploaded, and even when they learn through other social media platforms that new BriaAndChrissy videos have been posted to the channel, the videos do not appear on the channel or in YouTube searches.  As a result of this unlawful conduct, Defendants caused this Plaintiff to lose its substantial viewer base and revenues derived from an audience that BriaAndChrissy LLC alone, had built up over the past seven years.

158.     Defendants also unilaterally cancelled or stopped sending electronic notifications of new videos that Plaintiff BriaAndChrissy LLC had uploaded to its channels, without providing any notice to Plaintiff, its subscribers, or YouTube consumers.

159.     As a result of Google/YouTube's ever changing new video notification practices, BriaAndChrissy LLC's LGBTQ+ existing subscribers and loyal viewers not get new video notifications no matter how many times that they succeed in learning about Google/YouTube's secret new procedures and comply:  Defendants just change the process again.  Defendants' bait-and-switch notification practices, harmed BriaAndChrissy LLC's ability to generate continued interest among its existing subscribers, prevented them from reaching new viewers who would be attracted by video comments posted by subscribers.  Defendants' conduct has caused BriaAndChrissy LLC's numbers of subscribers and views to decline to a marked degree.  Defendants' practices are making it is impossible for BriaAndChrissy LLC to consistently generate sufficient views per video to meet Defendants' monetization requirements and, consequently, caused this Plaintiff to lose substantial revenue to Defendants.

160.     Beginning on or around 2017, without any notice or explanation, Defendants deleted many of Plaintiff's customized Thumbnails identifying BriaAndChrissy LLC's channels and content, and replaced them with Defendants' own generic Thumbnails that harm and stigmatize Plaintiff's brand and content by giving viewers the impression that the video uploaded was of poor quality and/or posted by someone who does not have the following, goodwill, and quality associated with BriaAndChrissy LLC's reputation and content quality.

161.     In 2017, Defendants also demonetized individual videos posted by BriaAndChrissy LLC, such as http://youtube.com/watch?v=yIDaCdjDodM, a video about being comfortable in your own skin.  In 2018, Defendants demonetized the entire WonderWarriors channel without any notice, explanation or an opportunity to respond and fix the monetization issues, if any.  In so doing, Defendants harmed the ability of BriaAndChrissy LLC and other LGBTQ+ creators to generate a financial return on their videos and unlawfully restrained, if not eliminate entirely, the ability of BriaAndChrissy LLC to earn revenue on content associated with its channels.

162.     Defendants also exclude LGBTQ+ related content from the "Up Next," application that appears on the BriaAndChrissy and WonderWarriors channels.  Defendants refuse to recommend or to promote video content that is associated with tag words like "LGBTQ+," "lesbian," "gay," "bisexual," "transgender," or "queer," or content that is associated with titles or descriptions using such terms. **Defendants engage in this discriminatory, anticompetitive, and unlawful practice, while simultaneously promoting and recommending reaction videos by other creators which are based upon or copy videos uploaded by BriaAndChrissy or WonderWarriors which Defendants have restricted or demonetized.**  As a result, LGBTQ+ creators like BriaAndChrissy LLC must self-censor and refrain from using such words for videos to avoid running afoul of Defendants' subjective and unlawful censorship practices.  Such self-censorship forced upon BriaAndChrissy LLC is yet another unfair and unlawful tactic that discriminates against, and makes it harder for members of the LGBTQ+ Community to find LGBTQ+-related content intended to support, educate and entertain LGBTQ+ consumers on YouTube.

163.     And as they do to many of their competitors, Defendants indiscriminately and unlawfully apply the "Restricted Mode" limitations for "sensitive viewers," to BriaAndChrissy LLC's videos, as well as to videos of many other LGBTQ+ members of the YouTube Community, solely because LGBTQ+ content creators discuss viewpoints or topics that Defendants' filtering tools and practices "flag" as "LGBTQ+," "lesbian," "gay," "bisexual," "transgender," or "queer." As is Defendants' continuing custom, practice, and policy, Google/YouTube "flag" LGBTQ+ content as "inappropriate," even though the actual content does not violate YouTube's Community

Guidelines, Restricted Mode criteria, or any other content-based regulations. Thus, Defendants stigmatize many of BriaAndChrissy LLC's videos, including content which addresses suicide prevention, addiction treatment, bullying, or healthy lifestyles, as "inappropriate" for what Defendants call "sensitive audiences," merely because BriaAndChrissy LLC's owners identify as a legally married lesbian couple.

164.    Defendants also misapply age restrictions to this LGBTQ+ Plaintiff, limiting BriaAndChrissy LLC's videos to viewers 18 years of age or older, regardless of the actual content of the video. As they do in applying their Restricted Mode, Defendants use A.I. and other machine-based filtering tools to flag tags, titles, descriptions, or content that Defendants deem to be "LGBTQ+," "lesbian," "gay," "bisexual," "transgender," or "queer." As a result, many of the videos created by BriaAndChrissy LLC to support younger members of the LGBTQ+ Community who are experiencing bullying, persecution and/or abuse, many of whom reside in rural areas where mental health and social services are hard to access, cannot view the very materials designed to provide them with support and educate them about resources where help may be obtained.

165.    Defendants also engage in advertising practices which are designed to discourage more sensitive members of the LGBTQ+ Community from viewing the videos posted on BriaAndChrissy or WonderWarriors. Among other practices, Defendants sell and profit from ads sponsored by extremist groups who viciously and violently target gay marriage and the LGBTQ+ Community in general. Defendants permit these hate mongers to display these obscene ads before content of LGBTQ+ creators like BriaAndChrissy LLC is played in order to scare and threaten LGBTQ+ viewers and intended audiences from watching BriaAndChrissy LLC's videos. Such gay bashing ads effectively negate any positive message embodied in the video by turning away the LGBTQ+ audience before they view the video. When BriaAndChrissy posted a video addressing the anti-LGBTQ+ agenda of Chick-fil-A, Defendants began loading anti-LGBTQ+ Chick-fil-A ads which played before BriaAndChrissy videos.

166.    Defendants' monetization treatment of BriaAndChrissy's videos is haphazard at best. Most recently, when BriaAndChrissy's video "Ten Ways To Know You're In Love," was

FIRST AMENDED CLASS ACTION COMPLAINT FOR DAMAGES, INJUNCTIVE RELIEF, RESTITUTION, AND DECLARATORY JUDGMENT

uploaded, Defendants immediately demonetized the video.

Just hours later on the same day, the video appeared fully monetized.

167.    As demonstrated below, Google/YouTube subject many of BriaAndChrissy videos to censorship resulting in reduced advertising revenue being produced by each video, compared with similar videos uploaded by creators who are do not identify as part of LGBTQ+ Community, despite the fact that the videos do not include scenes of graphic violence, graphic sexual content, nudity, or descriptions of sexual acts.

| Plaintiff's Videos | YouTube Status | Comparable Videos By Others | YouTube Status |
|---|---|---|---|
| "Lesbian Condom Challenge," posted May 2017; generated 90,000 views; https://www.youtube.com/watch?v=kUiEL FvLPyM | Age Restricted; Limited Monetization | "The Ultimate Condom Test," posted August 2016, generated 7.5 million views; https://www.youtube.com/watch?v=ZULIT2YDu_E | No Restrictions; Full Monetization |
| "Sexy Athletes," posted June 2014; generated 157,000 views; https://www.youtube.com/watch?v=yTCaO 3dmOjU | Age Restricted; Limited Monetization | "The Hottest Female Athletes 2019," posted April 2019, generated 318,000 views; https://www.youtube.com/watch?v=ppf6qp3bVb8 | No Restrictions; Full Monetization |
| "Confronting My Bully," posted March 2019, generated 27,000 views; https://www.youtube.com/watch?v=Xq-P64GAXY8 | Limited Monetization | "Confronting Online Bullies Face To Face," posted September 2019, generated 193,000 views; https://www.youtube.com/watch?v=t4bNGLE5De4 | Full Monetization |
| "Revenge Porn And Lawsuit Impact Statement," posted February 2019, generated 9 views; https://www.youtube.com/watch?v=1Fv9Bu wLijo | Limited Monetization | "'Revenge porn' site founder defends site, posted April 2012, generated 22,000 views; https://www.youtube.com/watch?v=mO_o1FBK8qI | Full Monetization |

FIRST AMENDED CLASS ACTION COMPLAINT FOR DAMAGES, INJUNCTIVE RELIEF, RESTITUTION, AND DECLARATORY JUDGMENT

| Plaintiff's Videos | YouTube Status | Comparable Videos By Others | YouTube Status |
|---|---|---|---|
| "The Gross Tongue Challenge," posted December 2018, generated 102,000 views; https://www.youtube.com/watch?v=Hsdz1Gy22bQ | Restricted Mode; Limited Monetization | "Tongue Kissing Make Out Challenge w/ Jordyn Jones & Josh Killacky," posted October 2018, generated 580,000 views; https://www.youtube.com/watch?v=BVGO3kHgvTU | Full Monetization |
| "I Almost Died My Side of the Story," posted August 2018, 165,000 views; https://www.youtube.com/watch?v=05dvHnDhLz0 | Limited Monetization | "I almost Died Last Night," posted June 2019, generated 2.1 million views; https://www.youtube.com/watch?v=lFiqD9coEDU | Full Monetization |
| "10 Worst Kisses," posted June 2018, generated 1.7 million views; https://www.youtube.com/watch?v=QbLMHb_CQAA | Limited Monetization | "Couples Try Kissing With Their Eyes Open," posted 2017, generated 2.9 million views; https://www.youtube.com/watch?v=fFHAB82u-nQ | Full Monetization |
| "I got My First tattoo," posted September 2017, generated 132,000 views; https://www.youtube.com/watch?v=WsSIBIEiQRo | Limited Monetization | "Pewdiepie Butt Tattoo Reaction," posted January 2016, generated 11.5 million views; https://www.youtube.com/watch?v=r-bd7iDnE6M | Full Monetization |
| "We don't Like To Kiss," posted March 2017, generated 25,000 views; https://www.youtube.com/watch?v=_hESANEM-Sk | Limited Monetization | "Guys Kiss Guys for the First Time," posted December 2014, generated 9.7 million views; https://www.youtube.com/watch?v=d5ci_VlRcig&t=1s | Full Monetization |
| "10 Lesbian Nightmares," posted January 2017, generated 87,000 views; https://www.youtube.com/watch?v=lEgEDasPips | Limited Monetization | "My First Time Putting on a Condom," posted September 2019, generated 267,000 views; https://www.youtube.com/watch?v=nYIuufoClO8 | Full Monetization |
| "Touch My Body Challenge," posted January 2017, generated 743,000 views; https://www.youtube.com/watch?v=skf33gjLef0 | Limited Monetization | "Wild Touch My Body Challenge With Girlfriend," posted June 2019, generated 152,000 views; https://www.youtube.com/watch?v=PN0oYzD8_zg | Full Monetization |

FIRST AMENDED CLASS ACTION COMPLAINT FOR DAMAGES, INJUNCTIVE RELIEF, RESTITUTION, AND DECLARATORY JUDGMENT

| Plaintiff's Videos | YouTube Status | Comparable Videos By Others | YouTube Status |
|---|---|---|---|
| "I have PTSD," posted July 31, 2016, generated 189,000 views; https://www.youtube.com/watch?v=fokQraI-HTU | Limited Monetization | "COMPLEX PTSD - Post-Traumatic Stress Disorder," posted April 2015, generated 237,000 views; https://www.youtube.com/watch?v=_qIAZcOryl4 | Full Monetization |
| "Men French Kiss Men For First Time," posted September 6, 2016, generated 4.6 million views; https://www.youtube.com/watch?v=ETwZ74337Kg | Limited Monetization | "Guys Kiss Guys for the First Time," posted December 2014, generated 9.7 million views; https://www.youtube.com/watch?v=d5ci_VlRcig&t=1s | Full Monetization |
| "Most Homophobic Celebrities," posted June 2015, generated 204,000 views; https://www.youtube.com/watch?v=O6wGBnY9gTA | Limited Monetization | "Alec Baldwin -- Homophobic Rant #73," posted June 30, 2013, generated 35,000 views; https://www.youtube.com/watch?v=faqPP1X5kzc | Full Monetization |
| "Buzzfeeds already done it," posted March 2015, generated 179,000 views; https://www.youtube.com/watch?v=rPO0ekLHvOs | Limited Monetization | "10 Creators Who Had Their Content Stolen By Buzzfeed," posted June 2019, generated 64,000 views; https://www.youtube.com/watch?v=2aekPAwUhzo | Full Monetization |
| "Shocking Super Bowl Commercial 2015 (GAY KISS)," posted January 2015, generated 6.8 million views; https://www.youtube.com/watch?v=--aMixRk1ZY | Limited Monetization | "Banned Carl's Jr Superbowl Commercial (Parody)," posted February 2014, generated 166,000 views; https://www.youtube.com/watch?v=8_ux5T-3GpI | Full Monetization |
| "I hate Fags," posted June 2014, generated 249,000 views; https://www.youtube.com/watch?v=5XJM2eFxAgg | Demonetized | "God Hates a Fag Music Video HD," posted August 2009, generated 225,000 views; https://www.youtube.com/watch?v=BREvUu4wI-4 | Full Monetization |
| "Couples Therapy," posted November 2014, generated 119,000 views; https://www.youtube.com/watch?v=CwPmtcd9KL4 | Demonetized | "When couples therapy Gets REAL," posted December 2018, generated 2.6 million views; https://www.youtube.com/watch?v=Ycjtow-lNA4 | Full Monetization |

-58-                                    Case No. 5:19-cv-004749-VKD

FIRST AMENDED CLASS ACTION COMPLAINT FOR DAMAGES, INJUNCTIVE RELIEF, RESTITUTION, AND DECLARATORY JUDGMENT

| Plaintiff's Videos | YouTube Status | Comparable Videos By Others | YouTube Status |
|---|---|---|---|
| "How Couples really Act," posted June 2014, generated 2.6 million views; https://www.youtube.com/watch?v=rUamtkf4ixg | Demonetized | "Weird Things All Couples Do," posted August 2014, generated 6 million views; https://www.youtube.com/watch?v=HFQBIK__X14 | Full Monetization |
| "10 Worst Kisses," posted April 2014, generated 25.5 million views; https://www.youtube.com/watch?v=bwMQlpvLsO4 | Demonetized | "The 10 Worst Kisses in the Universe," posted April 2013, generated 9.9 million views; https://www.youtube.com/watch?v=tKvHQ5l8iXw | Full Monetization |
| "10 worst Hugs," posted May 2014, generated 10.5 million views; https://www.youtube.com/watch?v=eS-XtPeJQTc | Demonetized | "Worst Hug Ever," posted June 2019, generated 385,000 views; https://www.youtube.com/watch?v=xeNz0uaxia8 | Full Monetization |
| "I hate Gays Dear FireFox," posted April 2014, generated 108,000 views; https://www.youtube.com/watch?v=0eV_ddXgg38 | Demonetized | "Eddie Murphy:  Fag and HIV jokes," posted March 2009, generated 45,285 views; https://www.youtube.com/watch?v=c1x0MBLKlrk | Full Monetization |
| "50 Facts (100th video)," posted March 2014, generated 196,678 views; https://www.youtube.com/watch?v=pYQEaz1td0U | Demonetized | "50 Facts About Us: Cody & Lexy," posted February 2018, generated 178,000 views; https://www.youtube.com/watch?v=RrT9l1ulMvI | Full Monetization |
| "Cotton Ball Challenge," posted September 2013, generated 71,000 views; https://www.youtube.com/watch?v=yTQN7l5vf_o | Demonetized | "Family Cotton Ball Challenge," posted November 2016, generated 780,000 views; https://www.youtube.com/watch?v=Ab_220M5EVo | Full Monetization |
| "10 Things Lesbians are Afraid of," posted August 2013, generated 7.6 million views; https://www.youtube.com/watch?v=V9VABvh7kRw | Demonetized | "Condom Challenge," posted January 2016, generated 1.4 million views; https://www.youtube.com/watch?v=vy6Vak6OPlI | Not Restricted; Full Monetization |

FIRST AMENDED CLASS ACTION COMPLAINT FOR DAMAGES, INJUNCTIVE RELIEF, RESTITUTION, AND DECLARATORY JUDGMENT

| Plaintiff's Videos | YouTube Status | Comparable Videos By Others | YouTube Status |
|---|---|---|---|
| "Picking up a Stranger Prank," posted July 2013, generated 147,000 views; https://www.youtube.com/watch?v=5p2KZUoC7FI | Demonetized | "Picking Up Strangers Girlfriends in Front of Their Boyfriends," posted April 2019, generated 37,000 views; https://www.youtube.com/watch?v=zWHMZZkZ1bk | Full Monetization |
| "Lesbian Q&A Part 3," posted May 2013, generated 195,000 views; https://www.youtube.com/watch?v=FcCQ2cocF0w | Demonetized | "Q&A with my Boyfriend," posted July 2019, generated 161,000 views; https://www.youtube.com/watch?v=h2-u7S2khTY | Full Monetization |
| "11 Crazy Youtube Challenges," posted May 2013, generated 398,000 views; https://www.youtube.com/watch?v=Nntzx3GpuQk | Limited Monetization | "I tried 10 Crazy Challenges for 10 Million Subscribers," posted September 2019, generated 3.6 million views; https://www.youtube.com/watch?v=qnqknRJ3WPs | Full Monetization |
| "My Suicide Story," posted May 2013, generated 1 million views; https://www.youtube.com/watch?v=s_DIT-gmBaU | Limited Monetization | "My story with Suicide," posted August 2018, generated 802,000 views; https://www.youtube.com/watch?v=B4H2veOd9SA | Full Monetization |
| "The Girlfriend Tag," posted April 2013, generated 224,000 views; https://www.youtube.com/watch?v=1DaTezPKwm0 | Limited Monetization | "Boyfriend vs. Girlfriend Tag," posted April 2017, generated 3.5 million views; https://www.youtube.com/watch?v=8jinyoofAeM | Full Monetization |
| "Our Bullying Story," posted January 2013, generated 105,000 views; https://www.youtube.com/watch?v=Zv0mZ43wtxs | Limited Monetization | "Confronting Internet Bully Cody Ko," posted May 2019, generated 4.3 million views; https://www.youtube.com/watch?v=xf7vX3D8_ME | Full Monetization |
| "Stop Birthing Gays Song," posted January 2013, generated 164,000 views: https://www.youtube.com/watch?v=PvIAd0Rkiyk | Limited Monetization | "Christian vs. Westboro Baptist 'God Hates Fags,'" posted May 2012, generated 300,000 views; https://www.youtube.com/watch?v=ehjWWgdrY_Q | Full Monetization |

FIRST AMENDED CLASS ACTION COMPLAINT FOR DAMAGES, INJUNCTIVE RELIEF, RESTITUTION, AND DECLARATORY JUDGMENT

168.    Defendants also engage in outright censorship of LGBTQ+ content, including that of BriaAndChrissy LLC.  On June 21, 2015, Defendants censored one a video on the BriaAndChrissy channel which discussed the actions and statements of celebrities who expressed homophobic views or slurs, without providing any notice, explanation or opportunity to address any concern that Defendants might have.  And like the other LGBTQ+ Plaintiffs, BriaAndChrissy LLC support the right of free speech and expression for all Community Members, as long as that right is not co-extensive with the promotion of anti-LGBTQ+ hate speech for profit in violation of Community Guidelines or other rules on YouTube, nor is it a basis for using those same rules to censor, restrain, demonetize, and/or squelch LGBTQ+ content or engagement on the platform.

169.    Finally, in August 2019, Defendants commenced disabling the comments sections for a number of BriaAndChrissy videos.  Plaintiffs BriaAndChrissy LLC, Bria Kam and Chrissy Chambers have been informed by Defendants and believe and thereon allege that Defendants have disabled comments sections because they believe that they are "protecting minors."



It is unclear from Defendants' message whether the comments sections are being disabled because third parties have posted hate speech and anti-gay comments, or to prevent minors themselves from posting comments and generating hate speech and anti-gay comments, or to prevent minors from encouraging other minors from viewing the video content.  The affected videos do not depict children or minors in the video content, and have not generated the kind of inappropriate comments about small children which prompted Google/YouTube to remove the comments sections from creators' channels posting videos of young children engaged in gymnastics or swimming practice and/or competitions.  The disabling of the comments sections for the new

videos prevents the new content from generating favorable comments which amplify the reach of the video beyond BriaAndChrissy's subscribers, and cause videos to go viral, thereby substantially reducing the potential for generating revenue for the affected videos.

170.    Defendants' unlawful and anticompetitive attack on LGBTQ+ Plaintiff BriaAndChrissy LLC has achieved its intended result of reducing monthly revenues of $3,500 that had generated in 2016, to $809 in July, $694 in August, $462 in September and $423 in October of 2019 for this popular LGBTQ+ content creator who directly competes with Defendants for LGBTQ+ subscribers and viewers on the YouTube Platform.

171.    Additionally, for two years, this Plaintiff was generating up to $8,000 for each of its sponsored videos, but now receives on average only $800 per sponsored video. BriaAndChrissy LLC is offered less for each performance and appearance, and has been offered fewer travel opportunities.  Not only are the revenues generated by sponsored videos reduced, but fewer and fewer companies are offering sponsorships and brand deals due to depressed viewer numbers.  Defendants' conduct has not only deprived this LGBTQ+ Plaintiff of being able to monetize its content at levels that permit continued reinvestment in new content production but ensures that Defendants can increase their own share of corporate revenues and profits from the LGBTQ+ Plaintiffs' content, or from content which Defendants sponsor in direct competition with the LGBTQ+ Plaintiffs.

### 3.    Chase Ross

172.    Plaintiff Chase Ross is the creator and owner of UppercaseCHASE1, a YouTube channel created to support members of the LGBTQ+ Community in general and transgender people specifically by uploading sexual education, transgender education, and transgender product review videos, as well as allies, who are supporting members of the non-LGBTQ+ Community who have relatives and family dealing with transgender issues.  Mr. Ross has a degree in sociology and a minor in interdisciplinary studies of sexuality; he also received a master's degree in sociology in 2018.  Starting in 2006, Mr. Ross created video content that was posted on YouTube in various names, including "ellendegeneres26," "ChaseRoss73," "FTMTranstastic," "MightTMenFTM," "MightierMenFTM," and "itsTtime2010."  Commencing in 2010, Mr. Ross

started uploading video content on the UppercaseCHASE1 YouTube channel, with new content posting each month, and over the years increasing to weekly or bi-weekly depending on his available time and the subject matter of the video content.  In 2017, Mr. Ross created the "Trans 101" series of videos designed to educate the public, including transgender individuals, about issues confronting transgender individuals.  UppercaseCHASE1 has uploaded 753 videos in all, generating 20.2 million total views with 163,000 subscribers.  By 2019, UppercaseCHASE1 was generating between 20 and 50,000 views for each new video uploaded to the channel, and generating $10,800 Canadian dollars annually in revenue.  Earnings for this year are projected to be $400-$1,000 range.

173.    Commencing within the past two years, Defendants have harmed UppercaseCHASE1 by employing many of the same strategies applied to BriaAndChrissy, and WonderWarriors:

174.    Mr. Ross is a victim of "unsubscribing" existing subscriptions to UppercaseCHASE1.  Subscribers have informed Mr. Ross via Twitter and email that their existing subscriptions have disappeared without notification or explanation, forcing fans to re-subscribe.

175.    Defendants also deleted and/or failed to provide content notifications for Mr. Ross' subscribers of his channel and intended audiences.  Specifically, Defendants imposed these restrictions on UppercaseCHASE1 by requiring existing subscribers to specifically click on a bell icon in order to receive electronic notifications when UppercaseCHASE1 posts new videos which has adversely affected the channel's view numbers.  And, UppercaseCHASE1 has received complaints via Twitter and email from former subscribers who no longer receive Defendants' notifications for new content uploaded to the UppercaseCHASE1 channel.  The new practice has substantially reduced the views per new posted video on the UppercaseCHASE1 channel, resulting in reduced revenues.

176.    Defendants also engage in stripping UppercaseCHASE1's custom Thumbnails from search results for many of the channel's subscribers and for new viewers.  Some viewers report as few as 20% of the videos for the UppercaseCHASE1 channel have visible custom Thumbnails.

177.   Defendants have also "Demonetized " many UppercaseCHASE1's videos under the discriminatory, fraudulent, and unlawful pretext that the content violates YouTube's Community Guidelines or other vague, overly broad, subjective, or meaningless content-based regulations. And despite Mr. Ross' appeals and repeated requests for more guidance regarding the bases of its decisions to demonetize specific videos, Defendants have provided no reasonable response or basis for their decisions.

178.   Defendants also exclude UppercaseCHASE1's content from the Defendants' recommended content on the "Up Next," application for the channel for no viable reason, while allowing the content of other creators, as well as that created or financially preferred by Defendants to appear, including homophobic and anti-LGBTQ+ content.

179.   And, as it does to other members of the LGBTQ+ YouTube Community, Defendants indiscriminately apply the "Restricted Mode" limitations for "sensitive viewers," to many of UppercaseCHASE1's videos, regardless of whether the actual content includes graphic sexual images or content, or discussions regarding transgender issues.  For example, videos consisting of Mr. Ross engaging in editorial comment in front of a blank wall discussing events, festivals or conventions have been restricted and do not appear in searches performed in "Restricted Mode," despite the fact that there is no sexual content and no discussion of transgender issues.

a.   Viewers enabling the "Restricted Mode," conducting searches for UppercaseCHASE1 videos see this :



1    Only 2 of the UppercaseCHASE1 videos posted in the past year appear in searches where

2    "Restricted Mode," is enabled.

3               b.       Viewers who do not enable the "Restricted Mode," when searching for

4    UppercaseCHASE1 videos see this:



14   "Restricted Mode," Defendants have successfully limited viewer access to the general public to

15   each of the new videos which UppercaseCHASE1 has posted in 2019.  Defendants have even

16   applied the "Restricted Mode," to a video which features Mr. Ross doing nothing more than

17   drinking tea and endorsing tea for self-care and stress reduction.

18              a.       In the first video, (which can be viewed by using the link:

19          https://youtu.be/rccjNF3dEpA) Mr. Ross appears seated on the screen with a black mug

20          and a white cat in the foreground, and a kitchen scene in the background.  In the video Mr.

21          Ross extolls the virtues of drinking tea for LGBT "self-care," and explains that LGBT

22          includes "lesbian," "gay," "bisexual," "transgender," and "queer."  There is no sexual,

23          political or obscene or vulgar content in the video at all.  When he uploaded the video, Mr.

24          Ross did so "unlisted," so that it does not appear on UppercaseCHASE1 channel.  Mr.

25          Ross tagged the video with the terms "LGBT," "lesbian," "gay," "bisexual," "transgender,"

26          and "queer."  He used these terms in the description and used "LGBT" in the title.

27

28

b.      In the second video, (which can be viewed by using the link: https://youtu.be/qfFIl_ECxnI) the identical video content appears.  When the second video is uploaded, it is loaded as "unlisted," and does not appear on the UppercaseCHASE1 channel.  Mr. Ross tagged this video only with the terms "product review," and "tea."  The description is "tea product review."  Only the title includes "LGBT."

Though the videos consists solely of a monologue about tea by Mr. Ross, he says the terms "LGBT," "lesbian," "gay," "bisexual," "transgender," and "queer."  The use of these words in the video content appear to be sufficient to prevent the videos from being viewed when "Restricted Mode" is engaged.

181.    Mr. Ross produces videos consisting of product reviews intended for a transgender audience featuring products which are especially relevant to his audience.  Mr. Ross has reviewed a number of prosthetic devices created for individuals suffering from gender dysphoria, which resemble male genitalia, along with "pouches" used to hold the prosthetics in place against the body.  These pouches range from simple fabric pockets with strings to tie them into place, to more elaborate underwear styled models with pockets for the prosthetic devices.

a.      Defendants routinely censor UppercaseCHASE1's product reviews of "pouches" whether they are simple fabric pouches or more elaborate modified undergarments so that they do not appear in "Restricted Mode."  Viewers searching for "UppcercaseCHASE1 pouches" with Restricted Mode engaged will see only:



1

2

3

4          b.      Viewers searching for UppercaseCHASE1 pouches" without enabling

5    "Restricted Mode" will see product reviews which include the entire range of products reviewed

6    by Mr. Ross.

7



8

9

10

11

12

13

14

15          c.      Defendants do not censor other transgender pouch product reviews posted

16   by other video creators in the same way.  Viewers searching for "Pouch Packers," with Restricted

17   Mode enabled will see:



18

19

20

21

22

23

24

25   Viewers searching for "Pouch Packers" will see the Thumbnail for a DYI pouch packer (which

26   can be viewed using the link https://www.youtube.com/watch?v=kid7Ull6DgE), and a Thumbnail

27   for a Joey Pouch Packer (which can be viewed using the link

28   https://www.youtube.com/watch?v=QtLBCHoBqTs) each of which includes images of prosthetics

FIRST AMENDED CLASS ACTION COMPLAINT FOR DAMAGES, INJUNCTIVE RELIEF, RESTITUTION,
AND DECLARATORY JUDGMENT

1   and the use of fabric pouches that are similar to those appearing in Mr. Ross' videos which

2   Defendants routinely censor when Restricted Mode is enabled.

3        182.    Defendants also misapplied YouTube's age restrictions policy to

4   UppercaseCHASE1's videos, limiting videos to viewers 18 years of age or over, regardless of the

5   content.  While many videos on the channel dealing with product reviews for prosthetics, or

6   frankly discussing sexual issues experienced by transgender individuals, are not suitable for

7   younger audiences, Defendants have applied age restrictions to videos which do nothing more than

8   illustrate a piece of fabric, without context or reference to the function or prospective use.

9        183.    Defendants also censored UppercaseCHASE1's LGBTQ+-related content by

10  removing videos from its platform without explanation and imposing use restrictions on the

11  channel.  In one instance, Defendants removed a video which had been uploaded for six years

12  without issue, for which no age restriction had been imposed, and which was fully monetized.  Mr.

13  Ross was unable to post new content, livestream or use the account for a month before Defendants

14  addressed his complaints.  It was only after Mr. Ross took to Twitter complaining about the

15  removal of the video that Defendants addressed his complaints.  Within two weeks of posting his

16  complaints on Twitter, YouTube reinstated the account, released the video, and admitted that it

17  had taken the adverse action in error.  However, in mid-July of 2019, Defendants again suspended

18  the account merely for posting a link to "Gendercat.com" in violation of YouTube's community

19  guidelines.  Again, in response to Mr. Ross' complaints, Defendants admitted they had acted in

20  error and assured Mr. Ross that it would not happen again.

21       184.    Like other LGBTQ+ Plaintiffs and members of the LGBTQ+ Community,

22  UppercaseCHASE1 has been the victim of numerous disparaging and hate speech-filled reaction

23  videos which appear when viewers search for "UppcercaseCHASE1," videos.  These hate speech

24  reaction videos also appear in the Defendants' recommended videos in the "Up Next" application

25  for the UppercaseCHASE1 channel.  Some of the reaction videos appear to be monetized, despite

26  the fact that UppercaseCHASE1's video has been demonetized by Defendants, resulting in hate

27  speech which copies the original video of UppercaseCHASE1 generating money, while at the

28  same time, Defendants refuse to allow the creator himself from realizing any financial gain from

1   his own work.

2       185.    As averred above, Mr. Ross and the LGBTQ+ Plaintiffs support the right of free

3   Speech and expression for all YouTube Community Members, but that right does not mean that

4   Defendants get to promote anti-LGBTQ+ hate speech by exempting it from the same content-

5   based restrictions and distribution restraints that are used to suppress the right of the LGBTQ+

6   Community to speak back and distribute LGBTQ+ content on a level and equal playing field.  And

7   it certainly does not give Defendants carte blanche discretion to censor, restrain, demonetize, or

8   otherwise squelch LGBTQ+ Community content and engagement that is compliant with

9   Defendants' content-based regulations and practices.

10              **4.      Brett Somers a/k/a AMP (Watts The Safeword)**

11      186.    Plaintiff Brett Somers, also known as AMP, is the creator and owner of Watts The

12   Safeword, a YouTube channel dedicated to developing and posting sexual education materials

13   which include both LGBTQ+ and non-traditional practices, as well as discussing events,

14   conventions, and issues relevant to the LGBTQ+ Community.  Mr. Somers has a degree in art

15   design, and is trained to use video and photographic software applications, as well as to create

16   computer code for gaming, which he did professionally for a number of years.

17      187.    On May 25, 2014, Mr. Somers started the Watts The Safeword channel on

18   YouTube.  A week or two later, he uploaded the first video.  Thereafter, on average, Mr. Somers

19   uploaded a new video on a bi-weekly basis.  As of last year, Mr. Somers had uploaded 227 videos

20   to the Watts The Safeword channel on YouTube; had generated 1.3 million views, and had

21   193,000 subscribers.  Watts The Safeword generated $5,751.00 in just one month, November

22   2018.  However, since that highpoint, as a result of Defendants' strategies, Watts The Safeword

23   generates only $200-$300 monthly from YouTube.  This Plaintiff's channel no longer is able to

24   generate 30,000 – 40,000 new subscriptions on a regular basis, as it did in 2018.  Watts The

25   Safeword's views have become sporadic, inconsistent, and unpredictable.

26      188.    Commencing within the past two years, Defendants harmed and continue to harm

27   Watts The Safeword by employing many of the same strategies it has applied to other LGBTQ+

28   Plaintiffs and putative members of the LGBTQ+ Community Class.

189.    Defendants have been and continue to strip Watts The Safeword's custom Thumbnails from search results for most of its videos.  This strategy is not applied based upon the content of the videos, because Mr. Somers often collaborates with other LGBTQ+ creators and has seen collaborative videos posted to the collaborator's channel bearing the custom Thumbnails, while the identical video posted to Watts The Safeword's channel have had the custom Thumbnails stripped by Defendants.

190.    Defendants have and continue to "Demonetize" many of Watts The Safeword's videos on grounds that they purportedly fail to comply with community standards, and have refused to reverse their decisions despite Mr. Somers's appeals and repeated requests for more guidance regarding the bases of their decisions to demonetize specific videos.

191.    Defendants indiscriminately use their "Restricted Mode" filters and limitations and place to nearly all of Watts The Safeword's videos into that viewer restraint.  Defendants do this for arbitrary, capricious, discriminatory anticompetitive, and other unlawful reasons by restricting Mr. Somers' videos regardless of whether the actual content violates Defendants' Community Guidelines or other content-based regulations or standards.  For example, videos consisting of Mr. Somers discussing his experience traveling to events, festivals or conventions have been restricted and do not appear in searches performed in "Restricted Mode," despite the absence of any content involving sexually explicit, practices, or activities.  Like the other LGBTQ+ Plaintiffs, Mr. Somers Watts The Safeword's videos are restricted regardless of content merely because Mr. Somers' expresses viewpoints, discusses topics, or affiliates with the members of the LGBTQ+ Community.  In August 2019, Defendants restricted videos of Mr. Somers doing nothing more than drinking tea and recommending tea for self-care, while leaving unrestricted countless videos posted by other YouTube creators doing the very same thing.

192.    Defendants also misapplied age restrictions to Watts The Safeword's videos, limiting videos to viewers 18 years of age or over, regardless of the actual content of the video. While many videos on the channel dealing with sex and include graphic sexual images are not suitable for younger audiences, Defendants have applied age restrictions as a one-size-fits-all, eschewing their contractual and legal obligations to review the content of each and every video so

FIRST AMENDED CLASS ACTION COMPLAINT FOR DAMAGES, INJUNCTIVE RELIEF, RESTITUTION, AND DECLARATORY JUDGMENT

1   that travel videos about LGBTQ+ events and issues, festivals and conventions are not stigmatized

2   and restricted as inappropriate merely because they discuss or mention LGBTQ+ persons or

3   topics.

4          193.   Google/YouTube's censorship tools treat LGBTQ+ videos, like those posted by

5   Watts The Safeword more harshly, resulting in its videos generating far fewer views than similar

6   videos posted by creators who do not identify LGBTQ+.  As a result of the more stringent

7   censorship applied to members of the LGBTQ+ Community, videos posted by Watts The

8   Safeword generate far less revenue than those videos posted by creators who do not identify

9   LGBTQ+.

10

| Plaintiff's video | YouTube Status | Comparable videos | You Tube Status |
|---|---|---|---|
| "Kinky Wish Shopping Haul," posted September 2018; generated 1.3 million views https://www.youtube.com/watch?v=Ppk9Ms1SflE&t=134s | Age Restricted; Limited Monetization | "Fiance Rates My Very Extra Wish Clothing," posted March 2019; generated 1.5 million views https://www.youtube.com/watch?v=S8kw9t7qf6c | Unrestricted; Limited Monetization; |
|  |  | "Mini Dress Try On," posted October 2018; generated 3.5 million views https://www.youtube.com/watch?v=Xgw4qHFwffI | Unrestricted; Limited Monetization |
| "Kinky Wish Shopping Haul 2" posted April 2019; generated 305,000 views: https://www.youtube.com/watch?v=8c9oXDCDuYc&t=728s | Age Restricted; Limited Monetization | "Trying on Bikinis from Wish Under $10," posted August 2019; generated 891,000 views https://www.youtube.com/watch?v=S7Ro5MaIlFc | Unrestricted; Full Monetization |
| "Mermaid Tie," posted October 2019 featuring a how to tie legs together; generated 27,474 views https://www.youtube.com/watch?v=QZDGgaAghR4&t=10s | Age Restricted on the day after it was posted; Demonetized without explanation despite YouTube representatives having stated that the video was monetized after conducting a manual review. | https://www.youtube.com/watch?v=6l-JuZx0070 | Unrestricted; Full Monetization |
| "Wish Halloween Try On Haul," posted October 2019; generated 30,014 views https://www.youtube.com/watch?v=9ZuwMlgtlmk | Not Age Restricted; Restricted Mode; Limited Monetization | "AMI Clubwear Sexy Halloween Costume Try On Haul," posted October 2018; generated 1.2 million views https://www.youtube.com/watch?v=1CNei4QdACE&t=224s | Not Age Restricted; Full Monetization |

FIRST AMENDED CLASS ACTION COMPLAINT FOR DAMAGES, INJUNCTIVE RELIEF, RESTITUTION, AND DECLARATORY JUDGMENT

| Plaintiff's video | YouTube Status | Comparable videos | You Tube Status |
|---|---|---|---|
| | | "Boyfriend Reacts to my Halloween Costumes," posted October 2019 by a creator whose channel describes her as a 15 year old; generated 782,000 views https://www.youtube.com/watch?v=XQsiqXLGOJQ&t=1s | Not Age Restricted; Full Monetization |
| | | "Boyfriend and his Friends Rater my Halloween Costumes," posted October 2019 by a creator whose channel describes her as a 15 year old; generated 394,000 views https://"www.youtube.com/watch?v=UWiFJTAINq0 | Not Age Restricted; Full Monetization |
| | | "New Hot Halloween Costume Try-On Haul," posted October 2019; generated 169,000 views https://www.youtube.com/watch?v=vFRW9vahDS0 | Not Age Restricted; Full Monetization |

194.    Defendants have also engaged in outright censorship of Watts The Safeword's LGBTQ+-related content by removing videos from its platform without explanation and imposing age restrictions on the channel without regard to the content of the video uploaded.  In one instance, Defendants imposed age restrictions on Watts The Safeword's video featuring Mr. Somers talking about traveling to a convention while seated in a car.  The video contains no sexual graphics or content at all.  But Defendants did not restrict videos of the actual convention, featuring sex toys and other sexual content when posted by other creators, that were fully monetized for profit by Defendants.

195.    Even when Defendants allow Watts The Safeword's videos to remain on the platform, Google/YouTube prevent those videos from appearing in response to searches performed by both subscribers and the public at large.  And like other LGBTQ+ Plaintiffs, Mr. Somers has received comments and tweets on the Twitter platform from viewers who have been unable to find content uploaded by Watts The Safeword using the Defendants' search application.

196.    Defendants continue to restrain the innocuous travel videos of Watts The Safeword under its Restricted Mode, age restrictions, and demonetization rules and practices, while allowing objectively and sexually explicit content that Google/YouTube sponsor and/or profit from to run

FIRST AMENDED CLASS ACTION COMPLAINT FOR DAMAGES, INJUNCTIVE RELIEF, RESTITUTION, AND DECLARATORY JUDGMENT

1  unrestricted on the YouTube Platform.  For example, Defendants apply the Restricted Mode filter

2  to Watts The Safeword's video depicting rubber garments, where no bare buttocks are exposed at

3  all.  Nonetheless, Defendants sponsor and monetize explicit and sexualized video content

4  depicting bare buttocks, without any restrictions on a YouTube channel known as the James

5  Charles Channel.  The James Charles content depicts a sexually ambiguous young man who

6  creates and uploads videos demonstrating female-styled make-up techniques, nail care

7  demonstrations, and recommendations for make-up and personal care products.  One recent video

8  even features Mr. Charles at the Coachella Music Festival, acting as a "make-up guru."  Mr.

9  Charles is wearing a white G-string and chaps which cover his genitals but expose his bare

10  buttocks.



22  The video also depicts Mr. Charles spanking the bare buttocks of another other festival attendee,

23  who is wearing a similar G-string and chaps in black.



A second video from the Coachella Music Festival depicts Mr. Charles wearing a black G-string with pubic hairs visible.



While the LGBTQ+ Plaintiffs take no issue and offer no view as to whether Defendants should or can regulate Mr. Charles' content, what Defendants cannot do is use their unfettered and absolute discretion to apply purportedly neutral viewpoint regulations that apply equally all users of YouTube as a discriminatory, fraudulent, anticompetitive, and unlawful pretext to promote content that Google/YouTube sponsors and restrict and harm that of its competitor, Mr. Somers.

### 5.  Lindsay Amer (Queer Kid Stuff)

197.  Plaintiff Lindsay Amer is the creator and owner of Queer Kid Stuff, a YouTube educational channel created to serve as a support for LGBTQ+ parents, LGBTQ+ children between the ages of 3 and 17, who have questions or face bullying for perceived LGBTQ+ status, and librarians and educators seeking assistance with respect to how to field questions about LGBTQ+ issues and support children affected by LGBTQ+ issues.  Mx. Amer has an

FIRST AMENDED CLASS ACTION COMPLAINT FOR DAMAGES, INJUNCTIVE RELIEF, RESTITUTION, AND DECLARATORY JUDGMENT

undergraduate degree in gender studies and theater; and a graduate degree in performance studies.

198.    In 2015, they created the Queer Kid Stuff channel as a vehicle to upload their original video content.  On May10, 2016, Mx. Amer uploaded the first Queer Kid Stuff education video.  Initially, the video was shared and received roughly 2,000 views without negative comments or reaction videos.  Within months of the uploading of the first video, the Huffington Post published a favorable article discussing the video.

199.    On June 23, 2016, The Daily Stormer, a Neo Nazi website on that appears on Defendant Google's search engine site published a commentary by Andrew Anglin entitled, "Sick Dyke Creates Educational Program to Brainwash Children Into the Homosexual Lifestyle," which quotes from the Huffington Post article, and bashes both Queer Kid Stuff and Ms. Amer:

> "Lindsey Amer is a twisted lesbo who is obsessed with psychologically abusing children, and has created an entire 'educational' program to teach children to become homosexual perverts. . . .  [Homos] are always pushing for the ability to recruit younger and younger victims into their sex-cult, and now, our jewed-out society has reached the point where we are ready to show their recruitment propaganda to pre-schoolers – in order to prove we're not haters, of course. . . .  Please visit this creature on Twitter and let her know what you think of her plot. . . . Oh, and ask her if she's Jewish."  A Anglin, Daily Stormer, June 23, 2016.

The article included a link to the Queer Kid Stuff Twitter account and Mx. Amer's personal profile.

200.    The Daily Stormer commentary generated an avalanche of hate speech directed at Mx. Amer and the Queer Kid Stuff channel.  The hate speech involved vicious and obscene anti-Semitic, misogynist, and homophobic content, as well as other obscene material, and culminated in a death threat against Mx. Amer.  Defendants permitted all of that hate speech to appear directly in the comment section of Mx. Amer's Queer Kid Stuff channel.  And although Defendant Google finally removed The Daily Stormer from their platform in the fall of 2017, the hate speech directed at Mx. Amer continued unabated on the channel.

201.    As with the other the LGBTQ+ Plaintiffs in this case, Mx. Amer supports the right of all to express their viewpoints in a civil and protected manner.  But Mx. Amer, and the other LGBTQ+ Plaintiffs take serious issue with Defendants systematic efforts to restrain or financially

FIRST AMENDED CLASS ACTION COMPLAINT FOR DAMAGES, INJUNCTIVE RELIEF, RESTITUTION, AND DECLARATORY JUDGMENT

1  harm Mx. Amer's content and their ability to defend and protect themselves on a platform that

2  promises to treat everyone equally.  That is not the case here, because Defendants selectively

3  apply their content-based regulations and filtering to promote and profit from homophobic

4  hatemongers who are allowed to inundate Mx. Amer and other LGBTQ+ channels when their

5  content directly and objectively violates Defendants content-based rules that they claim exist only

6  to "keep the platform safe" for all of the YouTube Community, including Mx. Amer and the other

7  LGBTQ+ members of that Community.

8          202.    On September 14, 2016, four months after Mx. Amer uploaded the first video to the

9  Queer Kid Stuff channel, they uploaded the second video.  The four month delay between the first

10  and second video was the direct result of the fear and chilling affect that the hate speech allowed

11  and/or promoted by Defendants had on Mx. Amer.  Mx. Amer was and continues to be unable to

12  remove that hate speech using Defendants' available filter tool.  Repeated attempts to handle the

13  tidal waves of hate speech that Defendants continue to allow to be directed at the Queer Kid Stuff

14  channel has also interfered with Mx. Amer's ability to reach and engage with their intended

15  audience.

16          203.    In total, Queer Kid Stuff published 12 new videos between September 14, 2016 and

17  January 27, 2017.  With the uploading of each new video, a new wave of hate speech filled the

18  comments section of the channel.  For every positive comment that appeared, dozens of hate-filled

19  comments appeared and pushed the positive comment down the queue so that viewers would only

20  see hate-filled comments when they watched Queer Kid Stuff content.

21          204.    Despite repeated complaints to Defendants about the hate speech comments, and

22  after devoting considerable efforts to reconfigure the Defendants' filters to screen them, a number

23  of members of Queer Kid Stuff's intended audience, including parents, wrote to Mx. Amer

24  complaining about the obscene hateful comments posted on the Queer Kid Stuff channel and

25  informing Mx. Amer, that despite their approval of the intended content on the channel, these

26  parents could not share the quality videos with their children, because it would expose the children

27  to content which they deemed harmful and injurious.  One parent wrote:

28          "I'm really glad that I ran into your channel today, as I found the

1   videos to be easy enough for my 5 year old to enjoy and understand
2   the content.  This really is a godsend for me, a trans demi girl who
    has major problems with panic attacks just trying to address the
3   subject with them.

4   The only thing that I wish would get addressed with your channel
    would be doing something with the comments section.  While it's
5   great that there are some positive encouragement from some
    viewers, others turn it into a dumpster fire dipped in cancer.  I'm
6   glad that my child can't read well enough to understand the
    comments, but I think other children will inherently get exposed to
7   transphobic, ablest, and queerphobic nonsense that may undermine
    the positive message of the videos."

8   Another parent wrote:

9   "My 7 year old son (who self-identifies as queer) is home from
    school today. . . We love your channel . . . I wanted to reach out
10  because even though we watch your videos, I have a strict policy
    against reading YouTube comments.  YouTube suggested a bunch
11  of hateful anti-queer videos in response to our watching yours, and
    as I went through the list to tell YouTube I am not interested in any
12  of these, I ended up reading some of the comments.  How
    disheartening.  Talk about homophobia.  I am literally crying right
13  now at some of these and am quite glad my son is in the other room,
    since I'm not sure I'm emotionally up to explain it to him right now.
14  . . ."

15      205.    Because Defendants failed to regulate or filter the hate speech directed to the Queer

16  Kid Stuff channel between 2016 and 2018, Mx. Amer was forced to disable the comments section

17  to the channel in the fall of 2018 and to forego the ability to fully engage with and reach Queer

18  Kid Stuff's intended audience with its content.   In the process, however, Mx. Amer noticed the

19  hatemongers had started to upload and copy portions of or entire Queer Kid Stuff videos that they

20  then displayed on the platform with disparaging, obscene, and hateful content, including fake

21  voiceovers, or with the commentator inserted into a frame in the corner of the Queer Kid Stuff

22  videos.  Most of the reaction videos include links to the Queer Kid Stuff channel which acted as an

23  amplifier for generating hate speech comments.

24      206.    The obscene, hate speech filled reaction videos, many of which were spawned by

25  The Daily Stormer article, also appear in searches for Queer Kid Stuff on YouTube, and appear in

26  "Up Next," recommendations on the screen whenever viewers watched Queer Kid Stuff videos,

27  thereby exposing LGBTQ+ parents and children to inappropriate hurtful material.  Mx. Amer

28  repeatedly complained to Google/YouTube about the hate speech reaction videos which appear in

1   the recommended "Up Next" material, and in the search results for "Queer Kid Stuff," but

2   Defendants refused to subject that content to their Community Guidelines and other speech

3   regulations, or to prevent reaction video creators from posting links to the Queer Kid Stuff channel

4   on the reaction videos.

5         207.    Despite extended discussions with Google/YouTube representatives, who assued

6   Mx. Amer that Queer Kid Stuff would be eligible for uploading to the new YouTube Kids

7   channel, Queer Kid Stuff remains excluded from that children's programming venue.

8         208.    In all, Queer Kid Stuff has uploaded more than 100 videos, of which Defendants

9   have only allowed 94 to remain accessible to viewers; the channel has more than 2 million views

10   and more than 15,000 subscribers.  Queer Kid Stuff's growth has been substantially stymied by

11   Defendants' selected, discriminatory, anticompetitive and unlawful use of its content regulation

12   and monetization policies and practices, and has generated less than $500 per year.  Defendants

13   should be ashamed of themselves for promising LGBTQ+ consumers that the same rules apply

14   equally to everyone and then singling out the LGBTQ+ Plaintiffs, like Mx. Amer, and the greater

15   LGBTQ+ Community for content and monetization violations while promoting and profiting from

16   homophobic hate speech that threatens violence and goes unregulated on the YouTube Platform.

17         **6.**    **Stephanie Frosch (ElloSteph, ElloStephExtras and StephFrosch)**

18         209.    Plaintiff Stephanie Frosch is the creator and owner of ElloSteph, ElloStephExtras

19   and StephFrosch, YouTube channels dedicated to developing and uploading video content for the

20   LGBTQ+ Community.  Ms. Frosch is an LGBTQ internet activist who has appeared as a speaker

21   at conventions, and she has been interviewed on MTV and the main stream media regarding her

22   YouTube experience and treatment at the hands of YouTube.  Beginning on October 5, 2009, Ms.

23   Frosch has been creating and uploading original videos to her YouTube channels.  In 2009, Ms.

24   Frosch earned approximately $23,000 from ad revenue generated by her channels.  In addition, she

25   earned money from the sale of merchandise and from separate brand sponsorship agreements

26   connected with videos posted on her channels.  As of today, she has created and uploaded 189

27   different videos for audiences 13 years and older.  ElloSteph has 376,000 subscribers and 36.5

28   million views.  ElloStephExtras has an additional 6,980 subscribers and an additional 134,858

1   views.  She also operates a merchandise store at www.districtlines.com/ellosteph.

2       210.    ElloSteph proved to be a popular and very successful YouTuber channel until 2017

3   when Google/YouTube employed many of the same strategies they have applied to other

4   LGBTQ+ Plaintiffs and putative members of the LGBTQ+ Community Class.

5           a.      Many of Ms. Frosch's videos are not available when Restricted Mode is

6   activated, regardless of whether the video itself contains no nudity, profanity, sexual conduct, or

7   discussions of sexual activities.  Despite the fact that Ms. Frosch's videos are not viewable when

8   Restricted Mode is activated, some of those same videos were copied by other YouTubers and

9   posted on their channels, where they can be viewed when Restricted Mode is activated.

10          b.      Many of Ms. Frosch's videos are not fully monetized despite the fact that

11  they do not include graphic images of violence or sexuality, include no nudity, profanity, sexual

12  conduct, or discussions of sexual activities.



25          c.      Google/YouTube has removed many of the customized thumbnail images

26  Ms. Frosch crafted for each of her videos uploaded to her channels.

27  For example the customized thumbnail images were removed for (1.)  "A Gay Cooking Show

28

FIRST AMENDED CLASS ACTION COMPLAINT FOR DAMAGES, INJUNCTIVE RELIEF, RESTITUTION,
AND DECLARATORY JUDGMENT

With My Girlfriend;" (2.)  "Day in the Life;"  (3.)  "Coming Out (Again);"  (4.)  "Life in Transit;"
(5)  "Teaching Kids How to Be Gay!;"  (6.)  "The Greatest Day of My Young Life;"  (7.)  "I got a
Secret Package in the Mail;" and (8.)  "Why I left YouTube/The Future of my Channel."

         d.      Hate speech, including obscene, violent, or threatening language regularly
appear in the comments sections of Ms. Frosch's videos.

         e.      YouTube has allowed other creators to copy Ms. Frosch's video content and
pays those creators revenue for their posting of Ms. Frosch's video content.

         f.      Commencing in late 2017, Google/YouTube started to remove longtime
subscribers to ElloSteph and ElloStephExtras.  Subscribers communicating with Ms. Frosch on
other social media platforms complained that their subscriptions had been dropped, and though
they attempted to re-subscribe to Ms. Frosch's channels, they could not do so.  The dropped
subscribers no longer received new video notifications, and were not aware when Ms. Frosch
posted new videos.  As a result of Defendants' practice, Ms. Frosch has lost many longstanding
subscribers who have been unable to re-subscribe to these channels and must search for Ms.
Frosch's channels and review the long list of her videos in order to identify new content.
YouTube has made it harder for these viewers to find Ms. Frosch's new videos resulting in
diminished viewing numbers for new content.

     211.    In 2017, Ms. Frosch was one of a group of the LGBTQ+ creators who approached
Google/YouTube and complained about how Google/YouTube's recent changes to the algorithm
had disproportionately affected the LGBTQ+ YouTube creators and viewers.  In order to
participate in direct discussions with Google/YouTube regarding the nature of the problems being
experienced, and possible solutions, Google/YouTube required Ms. Frosch to sign a Non-
Disclosure Agreement which prevents her from disclosing what Google/YouTube said during
those discussions.  MTV interviewed Ms. Frosch regarding the LGBTQ+ YouTubers issues.
ElloSteph is active on Twitter, Tumblr, FaceBook, and Instagram.

     212.    Despite having made her best efforts to work with Google/YouTube to resolve the
algorithm related issues with Google/YouTube, Ms. Frosch was unable to resolve any of those
issues.  Commencing in 2017, to avoid the censorship and filtering tools, Ms. Frosch engaged in

1   self-censoring and avoided using LGBTQ+ related terms in the titles, descriptions and tags for her

2   videos.

3         213.    The situation deteriorated further in 2018.  A large number of existing subscribers

4   to ElloSteph and ElloStephExtras, who for years had been automatically receiving notices from

5   YouTube when new video content was posted to the channels, stopped receiving notices from

6   YouTube.  For a period of years, YouTube automatically sent new video notices to all of the

7   subscribers of YouTube channels.  Neither Ms. Frosch, nor the subscribers to her channels,

8   received any notice from YouTube regarding the cessation of new video notices for existing

9   subscribers, nor the need for new subscribers to affirmatively request that new video notices be

10  sent to them.  YouTube's cessation of sending new video notices to existing subscribers has forced

11  existing subscribers to regularly check Ms. Frosch's channels to identify new content.  Here too,

12  YouTube has made it harder for Ms. Frosch's longstanding subscribers to locate and view new

13  videos on the channels resulting in diminished viewing numbers for new content.

14        214.    Because of Google/YouTube's conduct censoring and restricting access to

15  ElloSteph's videos, and demonetizing large numbers of posted videos, the channel ad revenues fell

16  to $12,000 in 2016; $5,000 in 2017, $3,500 in 2018 and $1,800 to date in 2019.  Ms. Frosch has

17  lost revenue from merchandise sales and from brand contracts which are tied to the channel.  In

18  2019, she has to work twice as hard to fulfill her brand contracts because of falling views for

19  videos posted to the channel.  Recently, Ms. Frosch was forced to "makegood" by creating and

20  posting a second video to fulfill her Audible contract because the 7,500 views generated by the

21  first video fell far short of the required 50,000 views.

22        215.    Such falling revenues and doubling workloads for sponsored brands have forced

23  Ms. Frosch to stop working as a fulltime YouTube creator, and to obtain other full time

24  employment elsewhere.  On February 3, 2018, Ms. Frosch created and posted a video explaining

25  her reasons reducing her commitment to YouTube

26  https://www.youtube.com/watch?v=wClG3AoF12g.  Defendants are effectively pushing Ms.

27  Frosch from the platform.  Defendants' censorship, filtering and practices have decimated Ms.

28  Frosch's revenues and caused harm to her and her brand.

1

### 7. Sal Cinquemani (SalBardo)

2      216.    Plaintiff Sal Cinquemani owns and operates salbardo.com.  He is an independent

3 film maker who writes, directs and produces films for LGBTQ+ audiences under the name "Sal

4 Bardo."  Mr. Cinquemani is an award-winning writer-director.  Mr. Cinquemani's movies and

5 music videos often tackle issues affecting the gay and LGBTQ+ communities.  Since March 27,

6 2011, Mr. Cinquemani has operated the YouTube channel youtube.com/user/salbardo, uploading

7 videos consisting of original short films, film trailers, interviews of actors, and out-takes from

8 films for purposes of promoting his independent films.  The Sal Bardo YouTube channel has

9 approximately 38,000 subscribers and 24.1 million views.

10          a.      His video, "It Gets Better," was posted July 11, 2011.  The video was

11 created as part of the fundraising campaign for the production of "Sam."  The video relates Mr.

12 Cinquemani's experience coming out as a gay man, and features him talking to the camera.  The

13 video was intended to support gay children, and features a photo of two men kissing which

14 appeared on the television show "Will and Grace."  The video does not depict anything with

15 graphic violence, graphic sexual content, nudity, profanity, or discussion of detailed sexual nature.

16 Commencing in early 2017, Google/YouTube applied the Restricted Mode to "It Gets Better," so

17 that it cannot be viewed by the children it was intended to support.  "It Gets Better," remains

18 inaccessible in Restricted Mode to this day.

19          b.      His movie "Sam," which debuted in 2013, is a short film about a child

20 confronting issues of gender identity and LGBTQ bullying.  "Sam" depicts no profanity, no

21 graphic violence, no sexual conduct, nor discussions of sexual conduct.  "Sam" has generated 7.3

22 million views on YouTube.  "Sam," has been screened in classrooms by teachers of middle school

23 and high school students throughout the United States.

24          c.      His music video "Paper Ring – Great Escape," debuted in 2015 and depicts

25 an elderly woman leaving her husband for a woman she had met decades earlier.  "Paper Ring –

26 Great Escape," has generated 53,000 views on YouTube.

27          d.      His movie, "Pink Moon" is a gay short film which debuted in 2015, has

28 15.4 million views on YouTube.

217.    Since March 27, 2011, Mr. Cinquemani has operated the YouTube channel

youtube.com/user/salbardo, principally as a promotional tool for his independent films --

uploading videos consisting of film trailers, interviews of actors, and out-takes from films.  Mr.

Cinquemani, using the name Sal Bardo, is active on Twitter, Vimeo and FaceBook.

218.    The Sal Bardo YouTube channel proved to be successful and popular between

2011 and 2016.  The channel has approximately 38,000 subscribers and has generated a total of

24.1 million views on YouTube.  Despite its enormous popularity given the relatively modest

number of videos posted on the channel, in 2017 the SalBardo YouTube channel began to suffer

from the same censorship which plagued other LGBTQ+ YouTube creators:

219.    Commencing in 2017, Mr. Cinquemani noticed that YouTube had made all but one

of the videos uploaded to the SalBardo YouTube channel unavailable when Restricted Mode was

activated.  Google/YouTube made "Sam," and videos like the "The Sam Trailer" and the

"Welcome" video inaccessible under Restricted Mode.  In March 2017, Mr. Cinquemani contacted

YouTube and asked why his videos which were specifically directed to LGBTQ+ youth audiences

had been made inaccessible under Restricted Mode.  YouTube's representative agreed to look into

the matter.

220.    In July 2017, Mr. Cinquemani's video "Requited Trailer," which had been posted

on the SalBardo channel since 2011 was flagged and removed from the channel by YouTube

purportedly for violating YouTube's community standards.  Mr. Cinquemani appealed the

decision, and "Requited Trailer" was reinstated to the SalBardo channel within a week.

221.    Commencing in October 2017, "Sam," which had been generating an average of

4,000 views per day started generating only 30 views per day.

222.    By December 2017, most of Mr. Cinquemani's videos remained inaccessible in

"Restricted Mode; moreover, YouTube had deemed the videos, including "Sam," to be "not

suitable for most advertisers," rendering the videos demonetized.  When Mr. Cinquemani

contacted YouTube's representative, she informed him that the reduced views generated by "Sam"

was likely caused by YouTube's new policy to deter child predators from

posting/viewing/engaging with videos that depict children.  "Sam" was being shadow banned; the

video no longer appeared as a video on the SalBardo channel, in response to searches by title or subject, and if viewers could find "Sam" on YouTube, the comments application had been disabled so that viewers could no longer make comments which might generate additional views. Mr. Cinquemani explained that the videos which had been demonetized did not involve materials that would appeal to child abusers, but were sensitive treatments of issues facing members of the LGBTQ community. YouTube's representative agreed to look further into the demonetization of the SalBardo videos.

223.    Between July 2017 and January 2018, SalBardo generated no revenues whatsoever, and nearly all of the channel's videos remained inaccessible when Restricted Mode was activated. Unable to persuade YouTube to change its treatment of the videos or to remonetize them, Mr. Cinquemani wrote an article discussing issues affecting YouTube's LGBTQ creators. The article was published in the Huffington Post on January 17, 2018, https://www.huffpost.com/entry/youtube-continues-to-restrict-lgbtq-content_b_5a5e6628e4b03ed177016e90.

224.    Two days after the Huffington Post published the article, YouTube's representative informed Mr. Cinquemani that "Sam" had been restored to the SalBardo channel, and was searchable; but that YouTube was having technical difficulties remonetizing the video. As a result of the application of Restricted Mode filters and the shadow ban, the views for "Sam" never recovered to the levels they were before October 2017 when YouTube censored the video. YouTube did not remonetize "Sam" until February of 2018.

225.    Late in January 2018, Google/YouTube notified Mr. Cinquemani that his videos "Chaser Trailer," and "Pink Moon Trailer" had finally been reviewed by YouTube and deemed "not suitable for most advertisers." Both videos contain content which is similar to other fully monetized videos on other YouTube channels.

226.    In early 2018, YouTube briefly reversed its application of Restricted Mode to most of the SalBardo videos, except for the "Chaser Trailer" and "Pink Moon Trailer." [By late 2019, those videos were again inaccessible under Restricted Mode.] However, the channel's videos remained demonetized. YouTube's representative was unable to explain why the videos remained

FIRST AMENDED CLASS ACTION COMPLAINT FOR DAMAGES, INJUNCTIVE RELIEF, RESTITUTION, AND DECLARATORY JUDGMENT

demonetized.  Where Google/YouTube has applied the Restricted Mode filter to "Chaser Trailer," and demonetized the video, Google/YouTube has fully monetized several versions of the "Fifty Shades Darker Trailer" which include highly sexualized scenes.

227.    By April 2018, YouTube had again notified Mr. Cinquemani that a number of the SalBardo videos, including "Sam," were deemed "not suitable for most advertisers."  Eventually some of the videos were remonetized.  However, "Pink Moon Trailer," which has been under YouTube review since January 2018, remains "under review," and demonetized.  However, Google/YouTube has fully monetized the "I, Tonya Trailer, which though is subject to Restricted Mode, is fully monetized.  the "I, Tonya Trailer," contains scenes with graphic violence, profanity and a derogatory LBGT epithet.

228.    On May 16, 2018, the SalBardo video "Gay short film – Pink Moon" which had generated on averaged 15,000 views per day, suddenly stopped generating views.  The number of daily views generated for this video dropped from an all-time high exceeding 50,000 views per day to just several hundred views per day.  YouTube had shadow banned this film, and it no longer was appearing in search results, appearing in the "Up Next" or recommended videos which appear when SalBardo videos or similar videos were played.

229.    By late December 2018, "Gay short film – Pink Moon" remained subject to a shadow ban, but was generating 1,500 views per day – one-tenth of what it was generating 7 months before YouTube's censorship.  Sometime in 2019, YouTube lifted the shadow ban, but the video has generated a fraction of the views that would have generated had YouTube not censored it.

230.    On September 16, 2019, YouTube demonetized the entire SalBardo channel and sent him this notice:

> During a recent review, our team of policy specialists carefully looked over the videos you've uploaded to your channel Sal Bardo.  we found that a significant portion of your channel is not in line with our YouTube Partner Program Policies. **As of today, your channel is not eligible to monetize and you will not have access to monetization tools and features.  Please go to your monetization page to read more about the specific policy our specialists flagged**.
>
> We know this is tough news, and sometimes we have to make difficult decisions. we have a responsibility to ensure our community is safe for creators, viewers and

advertisers.  At the same time, we understand that you may have unintentionally made mistakes.  **That's why you'll be able to reapply for the YouTube Partner Program in 30 days**.  This 30-day time period allows you to make changes to your channel to make sure it's in line with our policies.



Mr. Cinquemani appealed the decision at the first opportunity, after YouTube required him to wait 30 days.  On October 19, 2019, the channel was remonetized following his appeal, despite the fact that Mr. Cinquemani had not removed or altered any of the video content on the channel.  The demonetization caused the SalBardo channel to lose one full month of revenues.

231.    As a direct result of YouTube's repeated and improper application of Restricted Mode filters, demonetization and shadow bans, revenue generated by the SalBardo channel has dropped from $200 per month in 2016, to $40 per month in 2019, with some months earning absolute nothing at all because the entire channel was demonetized.

### 8.    Tamara Johnson (SVTV Network)

232.    Plaintiff Tamara (Sheri) Johnson owns and is the CEO of SVTV Network.com. Since May 30, 2012, she has operated the YouTube channel StudvilleTV.  This channel was renamed in 2016 to SVTV Network.  At that time, SVTV Network had uploaded approximately 300 original videos.  By 2016, the channel had generated more than 5 million views.  The SVTV Network YouTube channel is devoted to writing, developing, taping and producing short videos, original web series, animated series and feature length films for the LGBTQ+ audience 13 years of age and older.  The original videos uploaded to the channel do not include scenes of graphic violence, graphic sexual conduct, nudity, or detailed descriptions of sexual conduct, and the videos are suitable for teenagers.  SVTV Network now posts only 140 original videos, has 114,000 subscribers and generates 3.3 million views.

233.    Commencing in 2016, the StudvilleTV channel began to experience

FIRST AMENDED CLASS ACTION COMPLAINT FOR DAMAGES, INJUNCTIVE RELIEF, RESTITUTION, AND DECLARATORY JUDGMENT

Google/YouTube censorship similar to that experienced by other LGBTQ+ creators:

a.      Google/YouTube made numerous videos inaccessible by applying Restricted Mode filters despite the absence of video content that depicted graphic scenes of violence, graphic sexual conduct, nudity or detailed descriptions of sexual conduct.  While Google/YouTube restricted public access to StudvilleTV's videos, similar videos depicting similar plots, scenes, and dramatic twists posted by heterosexual YouTube creators were allowed to be posted widely, were accessible in Restricted Mode, and were fully monetized.  On many occasions, Ms. Johnson appealed the demonetization decisions as they were made, but Google/YouTube remonetized only a handful of such videos, leaving the majority of the channel's videos demonetized.

b.      Google/YouTube demonetized other videos claiming that the video content was not suitable for their advertisers.

c.      Over Ms. Johnson's objections, Google/YouTube allowed third party YouTube creators to copy StudvilleTV's original videos and post them to other channels which were unrestricted and fully monetized, allowing third parties to generate revenue from Ms. Johnson's copyrighted videos while they prohibited her from doing so herself.  For the past two years, third party creators have been posting and exploiting Ms. Johnson's videos and generating revenue for themselves.  Google/YouTube has prevented Ms. Johnson from earning money from those same videos.  Ignoring Ms. Johnson's objections regarding the copyright infringement, Google/YouTube allows the third party creators to continue to exploit the SVTV Network videos.

d.      Google/YouTube offers a music library application to creators who have a certain minimum number of viewers.  Use of music library content in videos carries with it certain requirements regarding monetization, affording credits, and use.  SVTV Network only used music content from the Google/YouTube music library which required attribution, but had no restrictions regarding monetization, and could be used in videos that were fully monetized and generating funds for SVTV Network.  Recently, Google/YouTube has started notifying SVTV Network that music used in videos created and posted since 2012 is generating "copyright strikes," resulting in all of the revenues generated by the video in which the music appears being redirected to the

FIRST AMENDED CLASS ACTION COMPLAINT FOR DAMAGES, INJUNCTIVE RELIEF, RESTITUTION, AND DECLARATORY JUDGMENT

music copyright owner.  This unannounced change in use of music library content has further demonetized SVTV Networks videos, by depriving it of revenue that it should be earning for older videos on its channel.

234.    As a direct and proximate result of Google/YouTube's application of filtering tools, Restricted Mode, and demonetization, StudvilleTV lost significant revenues and was unable to pay for the production costs and residual fees for the ongoing webseries.  In order to avoid further demonetization, and to ensure the widest possible audience for the StudvilleTV videos, Ms. Johnson started to self-censor and remove LGBTQ+ related words from video titles, descriptions and tags which are used to assist subscribers and viewers in finding the StudvilleTV video content. Despite best efforts to avoid censorship, eventually most of the videos posted on StudvilleTV were demonetized.

235.    When self-censorship proved inadequate to address Google/YouTube's censorship activities, Ms. Johnson contracted with Google/YouTube to sell unlimited views of individual videos to subscribers on a payment per video basis, where Google/YouTube collected payments from StudvilleTV viewers in exchange for the right to view an individual video for as many times as wanted without a time limit for viewing, and StudvilleTV would receive 45% of the gross revenues generated by sales.  In a single month, Google/YouTube generated $100,000 selling access to one episode of StudvilleTV's popular webseries "Studville TV – Episode 10" of season 3.  Google/YouTube kept $55,000 of the sales proceeds.

236.    The following month, without notice to StudvilleTV or the viewers who had paid for access to the video episode 10 of season 3; and without offering to refund to subscribers the monies which Google/YouTube charged to StudvilleTV's viewers, Google/YouTube suspended the video sales on the YouTube Platform, and made all of the StudvilleTV videos available to the public free of charge.  Google/YouTube thereby deprived StudvilleTV of any opportunity to generate revenue from any its original videos.  Those viewers who had paid for unlimited access to the episode 10 of season 3 demanded refunds of the video access charges from StudvilleTV. Google/YouTube pocketed the full $55,000 and never refunded any of that money though they alone were responsible for denying the viewers access to the video for which they had paid.

Viewers complained on various social media platforms that they wanted their money back, and did not get refunds.  Google/YouTube's conduct has deprived SVTV Network of the ability to pay actors residuals for episode 10 of season 3.

237.    In the fall of 2016, unable to make any money from popular videos and unable to pay residuals due to actors for the videos which were still on the StudvilleTV channel, Ms. Johnson launched an internet on-demand monthly subscription network https://www.svtvnetwork.com/ dedicated to original content specifically designed for LGBTQ+ audiences.  For the past three years, Ms. Johnson has been uploading her own independently produced original video webseries, and licensing the original independently produced videos of others on her internet platform in direct competition with Google/YouTube.

238.    In all, SCTV Network lost approximately $100,000 in 2016 as a result of Google/YouTube's censorship tools and improper application of Restricted Mode and monetization criteria; in addition to breaching the agreement with the StudvilleTV channel to sell individual videos..

239.    Since the launch of SVTVNetwork.com, Ms. Johnson uploaded season 4 of the Studville TV webseries onto her platform.  The highly anticipated season 4 launched in 2017 generated 15,000 subscribers who each paid $4.99 to watch the webseries.  Had Google/YouTube fulfilled their agreement to sell individual episodes of the Studville TV webseries on the YouTube Platform, Ms. Johnson believes that she would have generated at least $500,000 in viewer subscriptions for individual episodes.  Google/YouTube's breach of the agreement with the Studville TV channel has deprived Ms. Johnson of substantial additional revenues and has damaged the Studville TV brand.

240.    The StudvilleTV channel, renamed SVTV Network, now serves principally as a promotional site for SVTV Network.com (Ms. Johnson's platform), and currently has uploaded 140 videos, consisting of video teasers, trailers, interviews with cast members and celebrities, advertisements for movies, and bloopers and outtakes from the Studville TV webseries.

241.    Google/YouTube has imposed a minimum requirement for $100 in ad revenues before it will pay a channel for fully monetized videos.  As a result of this policy, and ongoing

problems with Google/YouTube's filtering and Restricted Mode censorship, SVTV Network is struggling to generate any revenues from the SVTV Network channel.

### 9.   Greg Scarnici (GregScarnici and UndercoverMusic)

242.   Plaintiff Greg Scarnici is a comedic writer, director, producer and performer who currently works as an Associate Producer at "Saturday Night Live," with over 25 years of experience working in television and comedy.  He has appeared in films, on television and in numerous internet uploads and posts.  Since September 14, 2007, Mr. Scarnici has operated the YouTube channels youtube.com/user/Greg Scarnici and youtube.com/user/Undercover Music, uploading videos consisting of short films, comedic sketches, parodies, and music videos for the LGBTQ+ audience aged 13 and older.  Videos posted to the two channels did not include graphic violence, graphic sexuality, nudity, or detailed discussions of sexual topics; however, many of the videos did depict members of the LGBTQ+ Community and portray scenes and discussion of issues important to the LGBTQ+ Community.  The Greg Scarnici YouTube channel currently has posted 127 videos, with approximately 9,600 subscribers and has generated 8.9 million views.

243.   As an early YouTube creator, Mr. Scarnici devoted substantial efforts and resources to building up his YouTube channel and amassing millions of views.  Videos posted to Mr. Scarnici's two channels would routinely generate from 2,000 to 50,000 views.  The music video parody videos were well received by viewers and profitable for Mr. Scarnici.

244.   In late 2016 or early 2017, the GregScarnici channel started to suffer from Google/YouTube's same improper censorship activities as those suffered by other LGBTQ+ creators:

a.   Initially, Google/YouTube informed Mr. Scarnici that specific videos posted on this channels were "not appropriate for all audiences" and were demonetized.  Mr. Scarnici attempted to dispute Google/YouTube's determination that the videos were "not appropriate for all audiences" and filed several appeals.  However, Google/YouTube did not respond to Mr. Scarnici's appeals or attempts to communicate with YouTube representatives.

b.   For some videos, Google/YouTube informed Mr. Scarnici that another YouTube creator owned the copyrights to the videos which were posted on one of Mr. Scarnici's

channels:

               i.       Mr. Scarnici created and uploaded the original "Fergalicious Parody" video on September 3, 2007.  Google/YouTube informed Mr. Scarnici that the parody violated an original copyright for another artist.  Mr. Scarnici wrote a detailed defense of his original music video parody in an attempt to appeal the decision, but YouTube ignored his letter. Ultimately, the "Fergalicious Parody" was removed from his channel.  Though Mr. Scarnici removed the video, incredibly, another YouTuber copied Mr. Scarnici's original parody to the Johndeere93 channel, where it has generated more than 336,000 views and remains visible to this day:  https://www.youtube.com/watch?v=kPSnwDdR27w.

               ii.      Mr. Scarnici created and uploaded the original "Ring the Alarm parody" on September 16, 2007.  Again, Google/YouTube informed Mr. Scarnici that this parody violated an original copyright for another artist, and insisted that the video be removed.  Mr. Scarnici complied with YouTube's request.  However, the very same video was posted on Raphers' YouTube channel where it has generated 195,612 views, and to this day remains posted for viewing:  https://www.youtube.com/watch?v=eY_mrU8MPfI.

               iii.     The very same thing happened with the "Madonna Medley" parody which Mr. Scarnici created and uploaded on September 24, 2007.  Mr. Scarnici removed this video from his channel at the insistence of Google/YouTube.  However, the very same video was posted on Tolichon's YouTube channel where it has generated 8,657 views.

Thus on at least three separate occasions, Google/YouTube forced Mr. Scarnici to remove his original parody videos on grounds of copyright infringement, but allowed – and continues to allow – third parties who have YouTube channels to post copies of Mr. Scarnici's original parody videos, in violation of Mr. Scarnici's copyrights for these videos.

               c.       Google/YouTube has allowed third party YouTubers to post and generate revenues from Mr. Scarnici's original videos, to which he owns all rights over Mr. Scarnici's express objection.  Live Nation Video Network asserted a copyright claim for Mr. Scarnici's "Top Top (Gay TV Show Parody)."  Mr. Scarnici disputed Live Nation Video Network's claim and explained that he owned all rights to this original video which he wrote, directed, produced and

appears in.  Without responding to Mr. Scarnici's communications or requiring Live Nation Video

Network to provide proof that it owned the copyright to the video, on December 13, 2017,

Google/YouTube informed Mr. Scarnici that "Live Nation Video Network has decided that their

copyright claim is still valid" and refused to pay Mr. Scarnici for ad revenue generated by his

video.  To avoid generating more revenue to the interloper, Mr. Scarnici privatized the video.

        d.     By 2017, any new videos posted on Mr. Scarnici's two channels were

generating as few as 300 views in all.  The channels were effectively demonetized and generating

no revenue.

        e.     By 2018, frustrated with Google/YouTube's repeated censorship, Restricted

Mode filters, demonetization and refusal to respect this copyright, Mr. Scarnici decided to reduce

his further YouTube efforts and presence.  He posted on the GregScarnici channel:

> Sorry I haven't been creating videos on YouTube lately.  With the algorithm
> changes, the recent crackdown on videos tagged #LGBT, which both caused an
> insane viewer drop-off and YouTube taking away monetization on my account, I
> have obviously not been inspired to create content no one will see.  Instead, I've
> been focusing on live performance again, and will be performing this show in
> NYC, San Francisco and LA this summer.  I hope to see you there!  Tickets and
> more info:  www.gregscarnici.com.
> https://www.youtube.com/user/gregscarnici/community.

        f.     In addition to harassing Mr. Scarnici and preventing him from generating

revenues from videos posted to the YouTube Platform, Google has begun to interfere with Mr.

Scarnici's ability to communicate with Plaintiffs' counsel.  Commencing in early September of

2019, Mr. Scarnici began communicating with counsel for Plaintiffs using a gmail account.  After

receiving at least 9 different email communications from Plaintiffs' attorneys' BGRfirm.com

server, on September 26, 2019 at 1:51 p.m., Mr. Scarnici received a phishing warning from

Google's gmail server:

FIRST AMENDED CLASS ACTION COMPLAINT FOR DAMAGES, INJUNCTIVE RELIEF, RESTITUTION,
AND DECLARATORY JUDGMENT



Mr. Scarnici clicked on the "Looks Safe" link on the warning.  Despite having done so, two more identical phishing warnings were sent to Mr. Scarnici by Google's gmail server at 4:30 p.m. and 4:41 p.m.  Additional warnings were sent in response to emails from Plaintiffs' counsel from the BGRfirm.com server to Mr. Scarnici's gmail account on October 23, 2019 and October 25, 2019.

## V.    CLASS ACTION ALLEGATIONS

245.    The LGBTQ+ Plaintiffs bring this action on behalf of themselves and a putative YouTube Community Class and an LGBTQ+ Community Subclass of YouTube users and consumers who are similarly situated under Rules 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure.  The YouTube Community Class and LGBTQ+ Community Class seeking monetary damages and injunctive relief on behalf of the following class of YouTube consumers and users:

**The YouTube Community Class Is Defined As**:

All persons or entities in the United States who are or were members, users and or consumers of YouTube who uploaded, posted, or viewed video content on YouTube subject to Google/YouTube's Terms of Service, Mission Statement, Community Guidelines, and/or any other content-based filtering, monetization, distribution, personal data use policies, advertising or regulation and practices any other regulations or practices that are related to the YouTube Platform on or after January 1, 2015 and continuing through to December 31, 2019 (the "Class Period").

Excluded from the YouTube Community Class are Defendants and their employees, affiliates, parents, subsidiaries, and co-conspirators, whether or not named in this Complaint, and the United States government.

1

### The LGBTQ+ Community Subclass Is Defined As:

> All persons or entities in the United States who (a) are or were members, users and or consumers of YouTube who uploaded, posted, or viewed video content on YouTube subject to Google/YouTube's Terms of Service, Mission Statement, Community Guidelines, and/or any other content-based filtering, monetization, distribution, personal data use policies, advertising or regulation and practices any other regulations or practices that are related to the YouTube Platform and (b) are part of a protected class of persons under the California or Federal law because of sexual orientation, gender identity, or gender or (c) create, post, distribute, monetize, or advertise video content on the YouTube Platform that discusses or relates to topics, issues or viewpoints that advocate for, are of interest to, or are intended for LGBTQ+ audiences, on or after January 1, 2015 and continuing through to December 31, 2019 (the "LGBTQ+ Subclass Period").

> Excluded from the LGBTQ+ Community Subclass are Defendants and their employees, affiliates, parents, subsidiaries, and co-conspirators, and any YouTube users who create, post, distribute, promote or engage in video or communications on the YouTube Platform that is directed against the LGBTQ+ Plaintiffs or LGBTQ+ Community and is objectively violent, obscene, threatening, or homophobic as alleged in the Complaint.

246.    The LGBTQ+ Plaintiffs believe that there are over 200 million members of the YouTube Community Class and hundreds of thousands of members of LGBTQ+ Community Subclass as defined and described above in the Complaint.  The exact number and identities of the YouTube Community Class and LGBTQ+ Community Subclass are known by Defendants, and the number of persons who fall within the definitions of the Class and/or Subclass are so numerous and geographically dispersed so as to make joinder of all members of the Class or Subclass in their individual capacities impracticable, inefficient, and unmanageable so as to effectively deny each putative Class or Subclass member his, her, or their rights to prosecute and obtain legal and equitable relief based on the claims and allegations averred in this Complaint.

247.    There are questions of law and fact common to the YouTube Community Class and the LGBTQ+ Community Subclass that relate to and/or are dispositive of the nature and allegations of unlawful conduct alleged in the Complaint, and the nature, type and common pattern of injury and harm caused by that unlawful conduct and sustained by the putative members of the Class and Subclass including, but not limited to:

a.      Whether Defendants' regulations and content-based restrictions violate the

free speech, antidiscrimination, consumer fraud and unfair competition, and contractual rights of the members of the YouTube Community Class and/or the LGBTQ+ Community Subclass;

b. Whether Defendants concealed, misrepresented or omitted to disclose material policies and practices regarding the unlawful regulation of video content, advertising, distribution, monetization, contractual obligations, and characteristics of the YouTube Platform to the members of the YouTube Community Class and/or LGBTQ+ Community Subclass;

c. Whether Defendants use unlawful, discriminatory, anticompetitive and fraudulent, deceptive, unfair, and/or bad faith filtering tools and practices, in the code and operation of their machine based, algorithmic, or A.I. filtering tools, and/or other practices and procedures to review, regulate, and restrict content, and/or regulate and restrict the advertising, monetization, distribution, and property rights of the YouTube Community Class and LGBTQ+ Community Subclass;

d. Whether Defendants are engaged in discriminatory practices against the members of the LGBTQ+ Community Subclass based on protected characteristics;

e. Whether Defendants' breached their form consumer contracts and obligations to the YouTube Community Class and LGBTQ+ Community Subclass;

f. Whether Defendants are engaged in unlawful, deceptive, unfair, or anticompetitive practices that violate federal or California law, and harmed and injured the YouTube Community Class and/or the LGBTQ+ Community Subclass;

g. Whether the conduct of Defendants, as alleged in this Complaint, caused injury to the business and property of the LGBTQ+ Plaintiffs and the members of the YouTube Community Class and LGBTQ+ Community

1          Subclass;

2     h.   Whether Defendants' alleged regulations, practices, and conduct has caused

3          or threatens to cause harm to the speech of the YouTube Community Class

4          or the LGBTQ+ Community Subclass to warrant the ordering of temporary,

5          preliminary and/or final injunctive relief and corresponding declaratory

6          relief with respect to the legal rights of the LGBTQ+ Plaintiffs and the

7          YouTube Community Class and LGBTQ+ Community Subclass;

8     i.   The scope, nature, substance, and enforcement of injunctive and equitable

9          relief sought by the YouTube Community Class and LGBTQ+ Community

10         Subclass;

11    j.   Whether Defendants were unjustly enriched or obtained profits or ill-gotten

12         financial gains as a result of the unlawful, discriminatory, deceptive, unfair,

13         or anticompetitive practices perpetrated against the LGBTQ+ Plaintiffs, the

14         YouTube Community Class, and the LGBTQ+ Community Subclass;

15    k.   Whether Defendants breached their contractual obligations and/or implied

16         duty of good faith and fair dealing under the consumer form contracts

17         entered into during the Class Period between Google/YouTube and the

18         LGBTQ+ Plaintiffs, the YouTube Community Class, and the LGBTQ+

19         Community Subclass;

20    l.   Whether Defendants' content-based regulations and filtering practices, on

21         their face and/or as applied, violate the free speech rights of the LGBTQ+

22         Plaintiffs and the YouTube Community Class and the LGBTQ+

23         Community Subclass; and

24    m.   whether Defendants' assertion of immunity from liability under the

25         Community Decency Act 15 U.S.C. § 230 (c) (the "CDA") with respect to

26         any of the claims or allegations asserted by the LGBTQ+ Plaintiffs, the

27         YouTube Community Class, and/or the LGBTQ+ Community Subclass

28         operates as an unlawful prior restraint of speech in violation of the First

1          Amendment of U.S. Constitution.

2          248.     During the Class Period, the LGBTQ+ Plaintiffs uploaded one or more videos to

3    YouTube and Plaintiffs Divino and Brett Somers each purchased Google Ads products in reliance

4    on the representations and failures to disclose alleged above.  At least some of that video content

5    uploaded by LGBTQ+ Plaintiffs was subjected to one or more human or algorithmic restriction

6    tools.  The interests of the LGBTQ+ Plaintiffs are coincident with, and not antagonistic to those of

7    the other members of the YouTube Community Class and the LGBTQ+ Community Subclass.

8          249.     Each of the LGBTQ+ Plaintiffs is a member of the YouTube Community Class and

9    LGBTQ+ Community Subclass class.

10          250.     The claims of the LGBTQ+ Plaintiffs are typical of the claims of YouTube

11    Community Class and LGBTQ+ Community Subclass members, and the LGBTQ+ Plaintiffs will

12    fairly and adequately protect the interests of the members of the LGBTQ+ Class.  The LGBTQ+

13    Plaintiffs are represented by counsel who are competent and experienced in the prosecution and

14    defense of similar claims and litigation, including class actions filed, prosecuted, defended, or

15    litigated in under California and federal law, in California and federal courts, in connection with

16    claims and certification of consumer and civil rights classes composed of members who reside in

17    California and/or the United States.

18          251.     The prosecution of separate actions by individual members of the YouTube

19    Community Class and LGBTQ+ Community Subclass would create a risk of inconsistent or

20    varying adjudications.

21          252.     The questions of law and fact common to the members of the YouTube Community

22    Class and the LGBTQ+ Community Subclass predominate over any questions of law or fact

23    affecting only individual members of the Class or Subclass, including legal and factual issues

24    relating to liability and the nature of the harm caused by Defendants' unlawful actions.

25          253.     A class action is superior to other available methods for the fair and efficient

26    adjudication of this controversy.  Treatment as a class action will permit a large number of

27    similarly situated persons to adjudicate their common claims in a single forum simultaneously,

28    efficiently and without the duplication of effort and expense that numerous individual actions

1    would engender.

2    254.    The YouTube Community Class and the LGBTQ+ Community Subclass are

3    readily definable and are categories for which records should exist in the files of Defendants, and

4    prosecution as a class action will eliminate the possibility of repetitious litigation.  Class treatment

5    will also permit the adjudication of relatively small claims by many members of the LGBTQ+

6    Community Subclass who otherwise could not afford to litigate claims such as those asserted in

7    this Complaint.

8    **FIRST CAUSE OF ACTION**

9    **(Viewpoint-Based Discrimination In Violation Of The First Amendment To U. S.**

10   **Constitution Pursuant To 42 U.S.C. § 1983)**

11   **(On Behalf Of The LGBTQ+ Plaintiffs Individually And The YouTube Community Class)**

12   255.    Plaintiff re-alleges and incorporates herein by reference, as though set forth in full,

13   each of the allegations set forth in paragraphs through 1 through 254 above.

14   256.    The First Amendment of the United States Constitution provides that:  "Congress

15   shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof;

16   or abridging the freedom of speech, or of the press; or the right of the people peaceably to

17   assemble, and to petition the Government for a redress of grievances."  U.S. Const. Amend. I.

18   The First Amendment governs the regulation of speech that occurs in designated "public forums"

19   or public spaces, limited public spaces, and "quasi-public" spaces where the public is invited to

20   engage in freedom of speech and expression.

21   257.    A private party who regulates speech in a "public forum," performs a public

22   function that is traditionally reserved for government alone.  In so doing, the party performs a

23   public function that is subject to judicial scrutiny under the First Amendment.  Thus, regardless of

24   whether the party regulating speech is a local government or a global corporate conglomerate, the

25   party regulating speech in a designated public forum is subject to some level of judicial review

26   under the First Amendment.

27   258.    Unlike private parties who invite members of the public to use their cable television

28   station to express themselves at selected and limited times, see, e.g., *Manhattan Cmty. Access*

FIRST AMENDED CLASS ACTION COMPLAINT FOR DAMAGES, INJUNCTIVE RELIEF, RESTITUTION,
AND DECLARATORY JUDGMENT

*Corp. v. Halleck*, 139 S. Ct. 1921, 204 L. Ed. 2d 405 (2019), the YouTube Platform is expressly and affirmatively designated by Defendants as an "open" platform on which YouTube invites the general public to engage in freedom of expression at any time, subject only to viewpoint neutral content based rules that apply equally to all, and are not based upon the speakers' identity or viewpoint.

259.    Google/YouTube affirmatively and unequivocally designate the YouTube Platform as a public forum, where the public is invited to engage in freedom of expression subject only to compliant viewpoint neutral content-based regulations.  Defendants memorialize the "public forum" designation in YouTube's Terms of Service, Mission Statement, and affirm this designation in sworn testimony and admissions made to Congress.  In return for, and in consideration of, the right to use the YouTube Platform as a viewpoint neutral public forum, Defendants obtain the contractual rights to the user's content, data, and audience, and then monetize those rights for profit.

260.    In operating the YouTube Platform, Defendants are operating a Company Town in which YouTube is designated as the public forum or "town-square" for the community to gather and engage in free speech, expression, communication, and to exchange ideas.  Together Google/YouTube treat all consumers as "members" of a "Community."  In addition to engaging in freedom of expression, members of the Community ("Community Members") are solicited and invited to use the YouTube Platform and ancillary and related products and services on Google to obtain essential products and services, including electronic mail and verbal communication services, financial, medical, educational, dietary and food, entertainment, sports, news, and GPS map and traffic information services.  For example, recently Google undertook "Project Nightingale," by which Google collects the private health data and records of more than 50 million Americans.  Google claims that it does so under a claim of color of law.  Specifically, Google asserts that "Project Nightingale," is authorized and operated under a federal statute that permits Google to access people's most confidential and personal information.  See, The Wall Street Journal, "Google's 'Project Nightingale' Gathers Personal Health Data on Millions of Americans," (November 12, 2019);  https://www.wsj.com/articles/google-s-secret-project-

1  nightingale-gathers-personal-health-data-on-millions-of-americans-11573496790.  Community

2  Members, Google/YouTube employees, contractors, and computerized artificial intelligence based

3  filtering tools are authorized and deployed to police the YouTube Platform for violations of the

4  Terms of Service, including "Community Guidelines" and other rules.  The policing decisions that

5  result are enforced subject to an appeals and review process, and can be enforced by imposing a

6  myriad of consequences for Community Members, including but not limited to application of

7  restrictions such as whether a specific video can remain on the YouTube Platform, whether it is

8  searchable, whether it can be viewed by all, most or even a fraction of Community Members,

9  whether the creator who posted the video can generate any revenue from the video, and if so, the

10  degree to which it can do so, the degree to which the video will appear in "up next" applications

11  on viewers' screens, whether the creator will receive a "strike" (the accumulation of which can

12  result in the termination of the creators' access to the YouTube Platform), whether the viewer's

13  access to the YouTube Platform will be terminated, and even whether the viewer's access to the

14  Google network of services will be terminated.

15       261.    Defendants also utilize section 230(c) of the Communications Decency Act, 47

16  U.S.C. § 230(c), to regulate speech on the YouTube Platform.  Google/YouTube rely upon and

17  invoke federal law under section 230(c) to preempt and immunize unlawful filtering, regulations,

18  and practices on the YouTube Platform, including practices which discriminate based upon race,

19  gender, sexual orientation, religion, political affiliation or commercial identity or individual

20  viewpoints, and in doing so, engage in unlawful discriminatory, arbitrary, and capricious

21  repression of public speech under color of federal law.

22       262.    As recently as August 23, 2019, Google/YouTube asserted to a three judge panel of

23  the Ninth Circuit Court of Appeals that Defendants were not subject to judicial scrutiny under the

24  First Amendment because they were not engaged in state action.  Simultaneously, Defendants

25  argued that they were relieved by a federal immunity statute of their express private contractual

26  and legal obligations to the general public and to the YouTube Community Members of ensuring

27  neutral content filtering and regulation under YouTube's own Terms of Service, Mission

28  Statement, and Community Guidelines, as affirmed by YouTube's sworn admissions to Congress.

1  Defendants also urged they were also immune from federal and state laws prohibiting censorship,

2  discrimination, unlawful business practices and consumer fraud.

3          263.    Although the impetus for Defendants' forbidden discrimination does not originate

4  with the federal government, Defendants' overly expansive reliance on section 230(c) immunity, a

5  federal statute, emboldens Google/YouTube to engage in and enforce otherwise illegal identity

6  and viewpoint based gender, sexual orientation, racial, religious and political animus and

7  discrimination.  If, as Defendants assert, section 230(c) not only encourages, but authorizes

8  discrimination against U.S. consumers and YouTube Community Members in violation of express

9  contractual obligations, anti-discrimination and consumer fraud laws, and federal and state

10  constitutional protections, Defendants' reliance on section 230(c)'s grant of federal immunity

11  evidences that in adopting section 230, the government did far more than adopt a passive position

12  toward Defendants' unlawful, discriminatory, and unconstitutional conduct – the Government

13  affirmatively encouraged it by immunizing Defendants and preempting state and federal laws

14  prohibiting Defendants' otherwise unlawful conduct.  Consequently, Defendants' reliance section

15  230(c) constitutes government action that directly and expressly encourages Defendants to engage

16  in unconstitutional, unlawful, and repugnant discriminatory conduct under color of federal law.

17          264.    Google/YouTube also invoke section 230(c) to exempt and preempt established

18  constitutional and statutory prohibitions against discriminatory speech filtering and other

19  violations of law that harm Plaintiffs and discriminate against them based on the gender, sexual

20  orientation, racial, ethnic, religious, cultural, political or other identity of the speaker or the

21  listener, or based on the viewpoint of the speaker or listener, rather than regulating the underlying

22  content of the speech or expression, i.e., regulating the actual contents of the videos uploaded to

23  the YouTube Platform.

24          265.    Thus, Google/YouTube are engaged in state action when regulating speech on

25  YouTube Platform, a designated public forum.  Google/YouTube are also engaged in government

26  action when they rely on a federal immunity statute to engage in conduct that would otherwise be

27  unlawful under federal and California law.

28          266.    Consequently, Defendants are engaged in unconstitutional, discriminatory, and

fraudulent speech regulation and related conduct.  Among other things, Defendants have restricted and restrained Plaintiff's speech and expression on the YouTube Platform, not because the content of Plaintiffs' videos violates any lawful, viewpoint neutral based rules -- but because Plaintiffs and their subscribers and many viewers identify as members of the LGBTQ+ Community, and Plaintiffs' express viewpoints and discuss issues of importance or interest to LGBTQ+ viewers and audiences.

267.    In addition to engaging in identity and viewpoint based discrimination, Defendants use and apply subjective, vague, and overbroad criteria which give Defendants unfettered and unbridled discretion to censor speech for arbitrary, capricious, or nonexistent reasons.  The criteria employed by Defendants do not adequately warn the YouTube Community, including Plaintiffs as to what is to be limited, restricted or flat out prohibited, allowing Defendants to censor speech at whim and based upon subjective animus towards the speaker who uploaded the video, the viewers of the video, or the particular cultural, political or religious viewpoints of the speaker or her viewers.

268.    Defendants also apply their censorship criteria, including the Terms of Service and Community Guidelines, as a pretext to censor and restrict Plaintiffs' speech, because Plaintiffs identify as LGBTQ+ or express views associated with the LGBTQ+ Community, just like their viewers – irrespective of the actual content of video in terms of the visual images presented, or words recorded in the video.

269.    Defendants have restricted or demonetized videos posted by Plaintiffs on the YouTube Platform, while allowing anti-LGBTQ+ hate speech, or other non-compliant video content to be posted by preferred or favored speakers, without restriction and with maximum revenue.  Defendants' application of filtering criteria and corresponding restraints on Plaintiffs' speech is arbitrary and capricious and/or is based on racial, gender, sexual orientations, political, cultural, religious, or other animus towards the identity and viewpoints of the speaker and her viewers, not upon the actual content of the video speech.

270.    Further, because Plaintiffs are so restrained and punished based on the identity or viewpoint of the video creator and/or the intended viewers, Defendants' actions also impinge on

and violate Plaintiff's right to free association and assembly. Plaintiff's right to free association

and assembly are violated when Google/YouTube block viewers' access to Plaintiffs' videos and

comments. Moreover, Defendants' have acted intentionally to deprive Plaintiffs and other

members of the LGBTQ+ Community on the YouTube Platform of their right to free speech.

271.     No compelling, significant, or legitimate reason justifies restricting or

demonetizing Plaintiffs' videos. Even if legitimate interests did exist to justify Google/YouTube's

restriction and demonetization rules generally, the restrictions which Defendants have imposed on

Plaintiffs' speech are not narrowly or reasonably tailored to further such interests, because, among

other things, the Defendants filtering practices and restraints are used to target and crush LGBTQ+

content creators and their subscribers and viewers by restricting and censoring Community

Guideline compliant, quality LGBTQ+ video content on the YouTube Platform.

272.     Given Google/YouTube's monopolistic absolute control over search results,

including video search results, as well as online video streaming, Plaintiffs have no alternative

affording a reasonable opportunity to reach their intended audience.

273.     Google/YouTube's discriminatory policies and their application of those policies

are not viewpoint neutral; they are unreasonable with respect to time, place, and manner; and they

are unreasonable in relation to the nature, purpose, and use of the public forum that is the

YouTube Platform. Rather, Defendants' discriminatory policies constitute an unreasonable prior

restraint on Plaintiffs' protected political speech, motivated by Defendants' own impermissible

discrimination against Plaintiffs' and their viewers' respective identities and viewpoints.

274.     As a direct and proximate result of Defendants' violations of the clearly established

First Amendment rights, Plaintiffs suffered and continue to suffer immediate and irreparable

injury in fact, including censorship, lost income, decreased viewership, and damage to brand and

reputation.

275.     Defendants' wrongful actions were taken under color of law and with oppression,

fraud, malice, and/or are arbitrary and capricious, and as part of Defendants' normal course of

business, effectuated through both the Google/YouTube artificial intelligence algorithms, as well

as by human agents, in violation of an established constitutional right, causing Plaintiffs financial

1   and other cognizable harms and injuries under 42 U.S.C. § 1983.

2

3                           **SECOND CAUSE OF ACTION**

4                      **(California Constitution Article I, Section 2)**

5   **(On Behalf Of The LGBTQ+ Plaintiffs Individually And The YouTube Community Class)**

6          276.    The LGBTQ+ Plaintiffs re-allege and incorporate herein by reference, as though set

7   forth in full, each of the allegations set forth in paragraphs 1 through 275 above.

8          277.    Article I, section 2 of the California Constitution protects the liberty of speech and

9   association, especially in public, quasi-public, and limited public spaces.

10         278.    In YouTube, Defendants created and maintain a public forum, or its functional

11  equivalent.  First, Defendants solicit the general public to use YouTube by representing that its

12  purpose, and primary use, is a place dedicated to free speech.  Second, Defendants expressly invite

13  the public to visit the YouTube platform to engage in freedom of expression.  Third, the size and

14  reach of YouTube's dominance over the expression and exchange of video-based speech is

15  unparalleled.  Fourth, the relationship between the ideas sought to be presented and the function or

16  purpose of the property are those of a "public forum," the cyber-equivalent of a town square where

17  citizens exchange ideas on matters of public interest or concern.  Given these factors, Defendants'

18  regulation of speech is supposed to be viewpoint-neutral, and the same rules should apply equally

19  to all.

20         279.    Defendants describe YouTube as a "service that enables more than a billion users

21  around the world to upload" videos, where users are urged to "Broadcast Yourself," "promote

22  yourself" or "do the broadcasting yourself."  Furthermore, in YouTube's Terms of Service,

23  Defendants state that YouTube is not legally or otherwise responsible for any third-party content:

24  YouTube is not "responsible for the accuracy, usefulness, safety, or intellectual property rights of

25  or relating to such Content"; responsibility for the "FOREGOING RESTS ENTIRELY WITH

26  YOU [THE USER]."  These are not the statements of a publisher who tells the public they only

27  print news "fit to print." Defendants do not merely sell edited news content to users; they monetize

28  third-party public speech inviting "everyone" to "express themselves" on a "nearly limitless range

1    of topics."

2          280.    Under California law, Defendants' regulation of speech on the YouTube platform

3    is state action because Defendants perform an exclusively and traditionally public function: the

4    regulation of speech within a designated public forum.  Accordingly, speech cannot be arbitrarily,

5    unreasonably, or discriminatorily excluded, regulated, or restricted on the basis of viewpoint or the

6    identity of the speaker and any such regulations must fully comply with protections afforded free

7    speech and expression under the Liberty of Speech Clause and the long established jurisprudence

8    governing the Clause's application.

9          281.    Videos of the Proposed Class constitute expressive speech and activity protected by

10   Article I, section 2 of the California Constitution.

11         282.    Defendants have restricted the speech and expressive conduct of the Proposed

12   Class based upon subjective, vague, and overbroad criteria that give Defendants unfettered and

13   unbridled discretion to censor speech for any reason, or no reason at all, no matter how arbitrary or

14   capricious.  Those criteria further fail to convey a sufficiently definite warning to the LGBTQ+

15   Plaintiffs or to the public as to what is prohibited or restricted.  Defendants' adoption and

16   application of those criteria on its face violates the Proposed LGBTQ+ Class' right to free speech

17   as guaranteed by Article I, section 2 of the California Constitution.  Further, that invidious

18   potential has been borne out and evidenced by Defendants' application of those policies and

19   procedures to censor the LGBTQ+ Plaintiffs.

20         283.    Defendants also apply their censorship criteria, including the Terms of Service and

21   Community Guidelines, as a pretext to censor and restrict the LGBTQ+ Plaintiffs' speech, based

22   not upon the content of the speech, but rather, upon the identity and political viewpoints of the

23   LGBTQ+ Plaintiffs.  Defendants' application of criteria and corresponding restraints on the

24   LGBTQ+ Plaintiffs' speech is arbitrary and capricious and/or is based upon political, religious, or

25   other animus towards the identity and viewpoints of the speaker, not the actual content of the

26   speech.

27         284.    Further, because the LGBTQ+ Plaintiffs are so restrained and punished because of

28   the speakers featured in its videos, as well as those speakers' opinions, Defendants' actions

impinge on and violate LGBTQ+ Plaintiff's right to free association and assembly.  Defendants'

actions also violate LGBTQ+ Plaintiff's right to free association and assembly, by blocking

viewers' access to videos and comments.

285.     No compelling, significant, or legitimate reason justifies Defendants' actions.  Even

if such interests did exist to justify Defendants' restriction and demonetization rules generally, the

restrictions imposed on the LGBTQ+ Plaintiffs' speech, are not narrowly or reasonably tailored to

further such interests, because they sweep within their ambit inoffensive and non-graphic

discussions intended and designed for educational purposes.  Given Defendants' monopolistic

control over search results, including video search results, as well as online video streaming, the

LGBTQ+ Plaintiffs have no alternative affording it a reasonable opportunity to reach their full

intended audience.

286.     Defendants' discriminatory policies and application of those policies are not

viewpoint-neutral, are unreasonable in time, place, and manner, and are unreasonable in relation to

the nature, purpose, and use of the forum.  They impose an unreasonable prior restraint on the

LGBTQ+ Plaintiffs' protected political speech, motivated by impermissible discrimination against

Plaintiffs' identity and viewpoint.

287.     Defendants' wrongful actions were taken with oppression, fraud, malice and/or are

arbitrary and capricious, and as part of Defendants' normal course of business, effectuated through

both algorithms, as well as through human agents.  And Defendants' actions were done with the

intent to deprive the LGBTQ+ Plaintiffs and their viewers of their rights under the California

Constitution.

288.     As a direct and proximate result of Defendants' violations of clearly established

law regarding public fora, LGBTQ+ Plaintiffs have suffered, and continue to suffer, immediate

and irreparable injury in fact, including lost income, reduced viewership, and damage to brand,

reputation, and goodwill, for which there exists no adequate remedy at law.

**THIRD CAUSE OF ACTION**

**(California Unruh Civil Rights Act—Civil Code §§ 51, *Et Seq.*)**

**(On Behalf Of The LGBTQ+ Plaintiffs And The YouTube Community Class)**

289.     The LGBTQ+ Plaintiffs re-allege and incorporate herein by reference, as though set forth in full, each of the allegations set forth in paragraphs 1 through 288 above.

290.     Defendants Google and YouTube host business establishments under the Unruh Civil Rights Act, California Civil Code § 51 *et seq.*  Defendants grant the public unrestricted access to YouTube for commercial reasons that are at the core of their business model and the source of virtually all of their revenue.

291.     Despite their promises of neutrality and a diversity of viewpoints, Defendants engage in a pattern and practice of intentional discrimination in the provision of their services, including discriminating against and censoring of the LGBTQ+ Plaintiffs' speech, based not upon the content of speech, but on their sexual orientation and political identity and viewpoint. Through the acts complained of herein, Defendants intentionally denied, and aided or incited in denying, the LGBTQ+ Plaintiffs full and equal accommodations, advantages, privileges, and services, by discriminating against it in demonetizing the LGBTQ+ Plaintiffs' content, and by placing its videos in Restricted Mode.

292.     A substantial motivating reason for Defendants' conduct is Defendants' subjective perception of the LGBTQ+ Plaintiffs' political identity, viewpoints, cultural and religious and sexual orientation, as well as those of others with whom the LGBTQ+ Plaintiffs are associated. Defendants' restrictions on the LGBTQ+ Plaintiffs' video content is the result of arbitrary, capricious, invidious, and pretext-based discrimination against the LGBTQ+ Plaintiffs' political and religious identity and sexual orientation and viewpoints.  It is also wholly without any legitimate, reasonable business interest, as the content of the restricted and demonetized the LGBTQ+ Plaintiffs' videos are completely compliant with the letter and spirit of Defendants' Terms of Service and Community Guidelines, including satisfying and complying with all of Defendants' criteria and rules for reaching younger and "sensitive" audiences.  In sum, Defendants are censoring and treating the LGBTQ+ Plaintiffs and their videos differently from Defendants'

1  own or preferred content, solely because of discriminatory animus towards the LGBTQ+

2  Plaintiffs' identities and views.

3       293.    Defendants' wrongful actions were taken with oppression, fraud and/or malice,

4  effectuated through both the Google/YouTube algorithms, as well as manual human review of the

5  LGBTQ+ Plaintiffs' videos and appeals.

6       294.    As a direct and proximate result of Defendants' unlawful discriminatory actions,

7  the LGBTQ+ Plaintiffs suffered, and continue to suffer, irreparable injury in fact, including, but

8  not limited to: lower viewership, lost advertising opportunities otherwise available to other

9  nonprofits, decreased ad revenue, and reputational damage, for which there exists no adequate

10  remedy at law.

11       295.    Defendants' violations of the Unruh Act further entitle the LGBTQ+ Plaintiffs to

12  recover statutory damages of up to three times the amount of actual damages in an amount to be

13  proven at trial, or a minimum of $4,000 per violation.

14                         **FOURTH CAUSE OF ACTION**

15             **(California Business And Professions Code §§ 17200, *Et Seq.*)**

16        **(On Behalf Of The LGBTQ+ Plaintiffs And The YouTube Community Class)**

17       296.    The LGBTQ+ Plaintiffs re-allege and incorporate herein by reference, as though set

18  forth in full, each of the allegations set forth in paragraphs 1 through 295 above.

19       297.    Defendants have committed acts of unfair competition, as defined by California

20  Business and Professions Code § 17200, by engaging in the practices described above.

21       298.    Defendants' policies and practices, and their application of the same to the

22  LGBTQ+ Plaintiffs, constitute unlawful, unfair or fraudulent business acts or practices within the

23  meaning of California Business and Professions Code § 17200.  Defendants' policies, as well as

24  their application, violate the policy and spirit of the Unruh Act, the Lanham Act, the California

25  Constitution, and prior court decisions.  In addition, Defendants compete with third-party content

26  providers like the LGBTQ+ Plaintiffs, and Defendants' arbitrary and capricious restrictions on

27  their competitors' speech and content significantly threatens or harms competition.  Those actions

28  are likely to mislead the public, and do mislead the public, about YouTube, Defendants' videos,

FIRST AMENDED CLASS ACTION COMPLAINT FOR DAMAGES, INJUNCTIVE RELIEF, RESTITUTION,
AND DECLARATORY JUDGMENT

the LGBTQ+ Plaintiffs, and the LGBTQ+ Plaintiffs' videos.  Content creators, advertisers, and viewers trust and rely on Defendants for an open marketplace of ideas and expression, and further that when videos are restricted or demonetized, that those videos are truly, and in good faith, deemed inappropriate for viewing by minors or sensitive viewers.

299.    There is no utility to the public for Defendants' actions, where those restrictions treat the LGBTQ+ Plaintiffs and others similarly situated differently, simply because of their perceived politics and the identity of their speaker.  To the extent that Defendants' arbitrarily and discriminatorily-applied policies have any utility whatsoever, that utility is significantly outweighed by the harm which they impose on consumers and the public.  Defendants have alternatives to this conduct that would be less harmful to consumers, but do not adopt or apply them because of their bias against the LGBTQ+ Plaintiffs and others similarly situated.

300.    As a direct and proximate result of the aforementioned acts, the LGBTQ+ Plaintiffs have suffered, and continue to suffer, immediate and irreparable injury in fact, including lost income, reduced viewership, and damage to brand, reputation, and goodwill, for which there exists no adequate remedy at law.

301.    Defendants' wrongful actions were taken with oppression, fraud and/or malice.

## FIFTH CAUSE OF ACTION

### (Breach Of Implied Covenant Of Good Faith And Fair Dealing)

### (On Behalf Of The LGBTQ+ Plaintiffs And The YouTube Community Class)

302.    The LGBTQ+ Plaintiffs re-allege and incorporate herein by reference, as though set forth in full, each of the allegations set forth in paragraphs 1 through 301 above.

303.    The LGBTQ+ Plaintiffs and Defendants entered into written contracts in which Defendants agreed to provide YouTube platform access, hosting, streaming, and advertising services to the LGBTQ+ Plaintiffs.  Those contracts give Google/YouTube vague, unfettered, and unilateral discretion to remove, restrict, demonetize, or de-emphasize content as Defendants see fit.

304.    Implied in those contracts is the implied covenant of good faith and fair dealing. This is particularly true because, in those contracts, Defendants assumed for themselves unilateral

1    and unfettered discretionary control over virtually every aspect of their relationship with the

2    LGBTQ+ Plaintiffs, control that Defendants have exercised at their whim, repeatedly and without

3    notice to the LGBTQ+ Plaintiffs, and without an opportunity for meaningful discussion or appeal.

4    To the extent that those discretionary powers are valid, Defendants are obligated to exercise them

5    fairly and in good faith.

6          305.    The LGBTQ+ Plaintiffs did all or substantially all of the significant things required

7    of them under their agreements with Defendants, or were excused from having to do those things.

8          306.    Defendants are bound by the implied covenant of good faith and fair dealing in

9    their agreements, terms, and policies, not to engage in any acts, conduct, or omissions, which

10   would impair or diminish the LGBTQ+ Plaintiffs' rights and benefits under the parties'

11   agreements.  Pursuant to the terms of those agreements, the LGBTQ+ Plaintiffs were supposed to

12   have equal access to a wide audience to promote its messages, and it was in reliance on

13   Defendants' representations they chose YouTube as the host of their videos.  Also pursuant to

14   those agreements, the LGBTQ+ Plaintiffs are entitled to some portion of the profits that

15   Defendants were making from the LGBTQ+ Plaintiffs' video content.  Instead, Defendants have,

16   by the acts and omissions complained of herein, intentionally and tortiously breached the implied

17   covenant of good faith and fair dealing by unfairly interfering with Plaintiffs' rights to receive the

18   benefits of those contracts.

19         307.    The foregoing acts and omissions were engaged in by Defendants with the

20   knowledge that they were bound to act consistently with the covenant of good faith and fair

21   dealing.  Those acts and omissions were not only failures to act fairly and in good faith, but they

22   were acts of oppression, fraud, and malice.

23         308.    As a direct and proximate result of the aforementioned conduct of Defendants, the

24   LGBTQ+ Plaintiffs have suffered, and continue to suffer, immediate and irreparable injury in fact,

25   including lost income, reduced viewership, and damage to brand, reputation, and goodwill, for

26   which there exists no adequate remedy at law.

27

28

FIRST AMENDED CLASS ACTION COMPLAINT FOR DAMAGES, INJUNCTIVE RELIEF, RESTITUTION,
AND DECLARATORY JUDGMENT

**SIXTH CAUSE OF ACTION**

**(Lanham Act—15 U.S.C. § 1125 *Et Seq.*)**

**(On Behalf Of The LGBTQ+ Plaintiffs )**

309.    The LGBTQ+ Plaintiffs re-allege and incorporate herein by reference, as though set forth in full, each of the allegations set forth in paragraphs 1 through 308 above.

310.    Google/YouTube are engaged in interstate commerce through hosting, creating, advertising, and soliciting and receiving revenue for advertising, and video streaming services on YouTube.

311.    In addition, Google/YouTube compete with content creators such as the LGBTQ+ Plaintiffs in the market of online video streaming by creating, hosting, and promoting their own video content, and the video content of a hand-picked cadre of creators with whom they partner or whom they sponsor.

312.    As alleged more fully above, Defendants use in commerce words, terms, names, symbols, devices, and combinations thereof, and false and misleading representations of fact that are both likely to cause confusion, or cause mistake, or to deceive as to the affiliation, connection, or association of the LGBTQ+ Plaintiffs with other persons, as to the origin, sponsorship or approval of goods or services by the LGBTQ+ Plaintiffs, and in commercial advertising and/or promotion, misrepresents the nature, characteristics and qualities of their, the LGBTQ+ Plaintiffs, and others' goods, services, or commercial activities.

313.    This improper conduct includes, without limitation, Defendants' inclusion of homophobic and hate speech content on or in close proximity to content posted by the LGBTQ+ Plaintiffs on YouTube, by way of video recommendations, playing anti-LGBTQ+ advertisements in connection with the LGBTQ+ Plaintiffs' videos, and the improper inclusion of homophobic and hate speech comments on or in close proximity to content posted by the LGBTQ+ Plaintiffs, which inclusion is part of Defendants' overall promotion of the YouTube service and significantly misleads consumers as to the affiliation, connection, or association of the LGBTQ+ Plaintiffs to the persons, viewpoints and opinions expressed in such content.

314.    This improper conduct further includes, without limitation, Defendants' improper

1  use of words, terms, names, symbols, devices, and combination thereof in connection with the

2  promotion of their service as a neutral public forum "Restricted Mode."

3      315.    As alleged more fully above, when a network administrator or an individual viewer

4  activates "Restricted Mode," each video subject to "Restricted Mode" appears with a Defendant-

5  created stamp of disapproval, including a red face including a red square bearing a foreboding and

6  disapproving facial expression that demeans and otherwise stigmatizes the content subject to

7  "Restricted Mode," together with text showing "This video is unavailable with Restricted Mode

8  enabled.  To view this video, you will need to disable Restricted Mode."

9      316.    As part of advertising and promoting YouTube to consumers that purportedly wish

10  to protect themselves from specific forms of content and as part of promoting YouTube's own

11  content, Defendants advertise "Restricted Mode" to consumers as a tool that will enable

12  consumers to shield themselves from content (1) Talking about drug use or abuse, or drinking

13  alcohol in videos; (2) Overly detailed conversations about or depictions of sex or sexual activity;

14  (3) Graphic descriptions of violence, violent acts, natural disasters and tragedies, or even violence

15  in the news; (4) Videos that cover specific details about events related to terrorism, war, crime,

16  and political conflicts that resulted in death or serious injury, even if no graphic imagery is shown;

17  (5) Inappropriate language, including profanity; and (6) Video content that is gratuitously

18  incendiary, inflammatory, or demeaning towards an individual or group.

19      317.    Defendants have applied "Restricted Mode" to numerous videos created and

20  uploaded to YouTube by the LGBTQ+ Plaintiffs that do not contain any elements (1) Talking

21  about drug use or abuse, or drinking alcohol in videos; (2) Overly detailed conversations about or

22  depictions of sex or sexual activity; (3) Graphic descriptions of violence, violent acts, natural

23  disasters and tragedies, or even violence in the news; (4) Videos that cover specific details about

24  events related to terrorism, war, crime, and political conflicts that resulted in death or serious

25  injury, even if no graphic imagery is shown; (5) Inappropriate language, including profanity; and

26  (6) Video content that is gratuitously incendiary, inflammatory, or demeaning towards an

27  individual or group.  In so doing, Defendants unlawfully enhance the image and goodwill of their

28  own content, and that of their partners and/or sponsored creators, while falsely degrading and

1  stigmatizing the LGBTQ+ Plaintiffs and their videos, including labeling their content as

2  "shocking," "inappropriate," "offensive," "sexually explicit,' "obscene," unfit for minors, or the

3  "gay thing" under the pretext of keeping the platform safe for users.

4       318.   These deceptive representations are particularly egregious in the context of

5  YouTube's repeated and false self-promotion, discussed above, as a viewpoint-neutral and

6  politically neutral place for free speech and "an open marketplace of ideas," where the public is

7  invited to engage in freedom of expression and speech.  In this context – where Defendants

8  represent to the public that the only content they restrict is content that is unprotected by principles

9  of free speech – Defendants repeated false representations and unfair competition both deceived,

10  and had a tendency to deceive, substantial segments of the LGBTQ+ Plaintiffs' audiences,

11  subscribers, viewers, and advertisers, who are induced by Defendants to falsely believe that the

12  LGBTQ+ Plaintiffs are associated with the hate speech that Defendants permit to be associated

13  with their content and, further, falsely believe that the LGBTQ+ Plaintiffs' content contains

14  elements that such subscribers, viewers, and advertisers wish to avoid – including content

15  (1) Talking about drug use or abuse, or drinking alcohol in videos; (2) Overly detailed

16  conversations about or depictions of sex or sexual activity; (3) Graphic descriptions of violence,

17  violent acts, natural disasters and tragedies, or even violence in the news; (4) Videos that cover

18  specific details about events related to terrorism, war, crime, and political conflicts that resulted in

19  death or serious injury, even if no graphic imagery is shown; (5) Inappropriate language, including

20  profanity; and (6) Video content that is gratuitously incendiary, inflammatory, or demeaning

21  towards an individual or group.

22       319.   As a direct and proximate result of Defendants' actions complained of herein, the

23  LGBTQ+ Plaintiffs have suffered, and continue to suffer, immediate and irreparable injuries in

24  fact, including injuries in the form of fewer subscribers to their respective YouTube channels,

25  diverted viewership and additional unlawfully obtained viewers for YouTube's produced content,

26  fewer viewers of their videos(particularly by isolated and vulnerable LGBTQ+ viewers who

27  would benefit from the video content), fewer notifications to subscribers regarding their posting of

28  new video content, fewer or no recommendations of their videos to viewers from Defendants,

decreased ad revenue, a reduction in advertisers willing to purchase advertisements shown on the LGBTQ+ Plaintiffs' videos, and damage to their respective brands, reputations and goodwill, which has collectively cost the LGBTQ+ Plaintiffs millions of dollars.

320.    Defendants' wrongful actions were taken with oppression, fraud and/or malice. The LGBTQ+ Plaintiffs have repeatedly attempted to remedy the situation, and Defendants have repeatedly refused to un-restrict or re-monetize the LGBTQ+ Plaintiffs' videos.  Defendants have attempted to justify their differential treatment of the LGBTQ+ Plaintiffs and their respective videos as necessary to protect sensitive viewers throughout the world, or as a response to an report that video content was offensive received from someone located somewhere in the world. Defendants' treatment of LGBTQ+ creator videos like those of the LGBTQ+ Plaintiffs is part of their normal course of business, effectuated through both the Google/YouTube algorithms, as well as through their agents manually reviewing Plaintiffs' videos and conducting appeals.

## SEVENTH CAUSE OF ACTION

### (Declaratory Relief)

### (On Behalf Of The LGBTQ+ Plaintiffs And The YouTube Community Class)

321.    The LGBTQ+ Plaintiffs re-allege and incorporate herein by reference, as though set forth in full, each of the allegations set forth in paragraphs 1 through 320 above.

322.    As set forth more fully above, an actual and justiciable controversy currently exists between the LGBTQ+ Plaintiffs and Defendants as to whether Defendants' policies, practices, and procedures alleged above, and their application thereof, violate the United States Constitution, California Constitution, the Unruh Civil Rights Act, the UCL, the express terms and implied convent of good faith and fair dealing in the contract or contracts between Defendants and the LGBTQ+ Plaintiffs, and the Lanham Act.

323.    The correct interpretation is that Defendants' policies and procedures violate both on their face and as applied, these constitutional protections and laws.  Defendants deny the correctness of this interpretation.

324.    A declaration of the parties' respective legal rights and obligations by the Court will clarify the extent to which Defendants' policies and procedures, and Defendants' application

of their policies and procedures, violate California and federal law; and will resolve most of the disputes and controversy that now exist because of the policies, practices, and procedures of Defendants and their application to the LGBTQ+ Plaintiffs and other members of the YouTube Community as alleged in this Complaint;

325.    The LGBTQ+ Plaintiffs and the YouTube Community Class are thus entitled to a judicial declaration that Defendants have violated and continue to violate the LGBTQ+ Plaintiffs' free speech rights, both facially and as applied, under Article I, section 2 of the California Constitution, the Unruh Civil Rights Act, the UCL Law, the express terms and implied convent of good faith and fair dealing in the contract or contracts between Defendants and the LGBTQ+ Plaintiffs, and the Lanham Act.

## PRAYER FOR RELIEF

1.    For a declaratory judgment that Defendants have violated and continue to violate the LGBTQ+ Plaintiffs' free speech rights, both facially and as applied, under the First Amendment to the United States Constitution; Article I, section 2 of the California Constitution; the Unruh Civil Rights Act; the UCL Law; the express terms and implied convent of good faith and fair dealing in the contract or contracts between Defendants and the LGBTQ+ Plaintiffs; and the Lanham Act.

2.    For an injunction requiring Defendants to:

a.    Cease and desist from capriciously restricting, demonetizing, or otherwise censoring any content of videos uploaded to the YouTube site in violation of federal and California law; and

b.    Cease and desist from censoring, restricting, restraining, or regulating speech based on the discretionary use or application of discriminatory, animus-based, arbitrary, capricious, vague, unspecified, or subjective criteria, rules, guidelines, and/or practices;

3.    For compensatory, special, and statutory damages in an amount to be proven at trial, including statutory damages pursuant to, *inter alia*, Civil Code § 51, 51.5, 52, Civil Procedure Code § 1021.5, 15 U.S.C. § 1117, 42 U.S.C. §§ 1981, 1983;

4.    A civil penalty of $2,500 for each violation pursuant to Business and Professions

Code §§ 17200, 17206, and 17536;

     5.    For punitive damages and exemplary damages in an amount to be proven at trial;

     6.    For restitution of financial losses or harm caused by Defendants' conduct and ill-gotten gains, and disgorgement of profit obtained from all unlawful conduct in an amount to be proven at trial;

     7.    Attorney's fees and costs of suit;

     8.    For prejudgment and post-judgment interest; and

     9.    For any and all other relief that the Court deems just and proper.

1

## <u>JURY DEMAND</u>

2

The LGBTQ+ Plaintiffs demand trial by jury on all issues of law so triable.

3

4      DATED:  November 12, 2019              Respectfully submitted,

5                                            BROWNE GEORGE ROSS LLP
                                                Peter Obstler
6                                               Debi A. Ramos

7

8                                            By:
9                                                     Debi Ramos
                                             Attorneys for LGBTQ+ Plaintiffs Divino LLC, Chris
10                                           Knight, Celso Dulay, Cameron Stiehl, BriaAndChrissy
                                             LLC, Bria Kam, Chrissy Chambers, Chase Ross, Brett
11                                           Somers, and Lindsay Amer

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

FIRST AMENDED CLASS ACTION COMPLAINT FOR DAMAGES, INJUNCTIVE RELIEF, RESTITUTION,
AND DECLARATORY JUDGMENT