BROWNE GEORGE ROSS LLP
Peter Obstler (State Bar No. 171623)
 pobstler@bgrfirm.com
44 Montgomery Street, Suite 1280
San Francisco, California 94104
Telephone: (415) 391-7100; Facsimile: (415) 391-7198

BROWNE GEORGE ROSS LLP
Eric M. George (State Bar No. 166403)
 egeorge@bgrfirm.com
Debi A. Ramos (State Bar No. 135373)
 dramos@bgrfirm.com
2121 Avenue of the Stars, Suite 2800
Los Angeles, California  90067
Telephone: (310) 274-7100; Facsimile: (310) 275-5697

Attorneys for LGBTQ+ Plaintiffs Divino Group
LLC, Chris Knight, Celso Dulay, Cameron Stiehl,
BriaAndChrissy LLC, Bria Kam, Chrissy
Chambers, Chase Ross, Brett Somers, and
Lindsay Amer, Stephanie Frosch, Sal
Cinequemani, Tamara Johnson and Greg Scarnici

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION

| | |
|---|---|
| DIVINO GROUP LLC, a California limited liability company, CHRIS KNIGHT, an individual, CELSO DULAY, an individual, CAMERON STIEHL, an individual, BRIAANDCHRISSY LLC, a Georgia limited liability company, BRIA KAM, an individual, CHRISSY CHAMBERS, an individual, CHASE ROSS, an individual, BRETT SOMERS, an individual, and LINDSAY AMER, an individual, STEPHANIE FROSCH, an individual, SAL CINEQUEMANI, an individual, TAMARA JOHNSON, an individual, and GREG SCARNICI, an individual, | Case No. 5:19-cv-004749-VKD **SECOND AMENDED CLASS ACTION COMPLAINT FOR DAMAGES, INJUNCTIVE RELIEF, RESTITUTION, AND DECLARATORY JUDGMENT** **JURY TRIAL DEMANDED** |
| Plaintiffs, | |
| vs. | Action Filed: August 13, 2019 Trial Date:  None Set |
| GOOGLE LLC, a Delaware limited liability company, YOUTUBE, LLC, a Delaware limited liability company, and DOES 1-25, | |
| Defendants. | |

1392054.1

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION AND STATEMENT OF THE CASE ....................................................1

II. PARTIES ...............................................................................................................15

III. JURISDICTION AND VENUE ..............................................................................19

IV. FACTS COMMON TO ALL CLAIMS ....................................................................19

    A.  The YouTube Platform ..............................................................................19

    B.  YouTube Holds Itself Out As A Quintessential Forum For Freedom Of Expression ................................................................................................20

    C.  Defendants Flout The Fundamental "Free Expression" Bargain They Made With YouTubers ......................................................................................23

    D.  Defendants Begin To Compete With YouTubers In The Proposed Class ............25

    E.  Defendants' Tool Kit Of Unlawful Speech Suppression .........................................26

        1.  Restricted Mode .......................................................................................26

        2.  Advertising Restrictions .................................................................................30

        3.  AI Filtering Under Restricted Mode And Advertising Restrictions ............31

        4.  Demonetizing Channels Wholesale ................................................................33

        5.  Shadow Banning ........................................................................................33

        6.  Deleting LGBTQ+ Thumbnail Images .......................................................34

        7.  Cancelling And Stopping Subscribers' New Video Notifications ..............35

        8.  Excluding LGBTQ+ Content From The "Up Next" Recommended Application ..........................................................................................37

        9.  Recommending Anti-LGBTQ+ Hate Speech In The "Up Next" Application Alongside LGBTQ+ Videos...........................................................37

        10. Playing Anti-LGBTQ+ Advertisements Immediately Before LGBTQ+ Videos ..........................................................................................38

        11. Including Anti-LGBTQ+ Hate Speech In Comments Appearing With LGBTQ+ Videos ..........................................................................................38

        12. Other Unlawful Speech-Restricting Tools ................................................41

    F.  Defendants Were Caught Censoring LGBTQ+ Users In 2017 ...............................42

    G.  YouTube's Promises To the LGBTQ+ YouTubers Were "Lip Service"................44

1392054.1

Case No. 5:19-cv-004749-VKD

**SECOND AMENDED CLASS ACTION COMPLAINT FOR DAMAGES, INJUNCTIVE RELIEF, RESTITUTION, AND DECLARATORY JUDGMENT**

# TABLE OF CONTENTS
### (Continued)

**Page**

H.    Defendants Have And Continue To Violate The Rights Of Plaintiffs And
The LGBTQ+ Community ............................................................45

    1.    Divino (GlitterBombTV.com's GNews!) ...................................45

    2.    BriaAndChrissy LLC (BriaAndChrissy)....................................51

    3.    Chase Ross ...............................................................................63

    4.    Brett Somers a/k/a AMP (Watts The Safeword) .........................70

    5.    Lindsay Amer (Queer Kid Stuff) ...............................................75

    6.    Stephanie Frosch (ElloSteph, ElloStephExtras and StephFrosch) ..............79

    7.    Sal Cinquemani (SalBardo)......................................................82

    8.    Tamara Johnson (SVTV Network) ............................................87

    9.    Greg Scarnici (GregScarnici and Undercover Music) ...............91

V.    CLASS ACTION ALLEGATIONS................................................94

FIRST CAUSE OF ACTION Declaratory Judgment:  47 U.S.C. § 230(c) Violates The
First And Fourteenth Amendments Of The U.S. Constitution (On Behalf Of
Plaintiffs Individually And The YouTube Community Class) ...........................98

    A.    Plaintiffs Served Rule 5.1 Notice On The U.S. Attorney General. .......................99

    B.    Legal Controversies Currently Exist Regarding The Scope And
Constitutionality Of 47 U.S.C. § 230(c).................................................100

    1.    An Actual Controversy Exists As To Whether 47 U.S.C. § 230(c)
Immunizes Filtering And Restricting Internet Speech Based On The
Identity Or Viewpoint Of The Speaker. .....................................103

    2.    An Actual Controversy Exists As To Whether Defendants'
Determination That Plaintiffs' Content Is "Otherwise
Objectionable" Is Subject To Good Faith Review. ....................105

    3.    An Actual Controversy Exists As To Whether 47 U.S.C. § 230(c) Is
Unconstitutional As Applied To Plaintiffs On These Facts. ....................106

SECOND CAUSE OF ACTION Viewpoint-Based Discrimination In Violation Of The
First Amendment To U. S.  Constitution Pursuant To 42 U.S.C. § 1983 (On Behalf
Of Plaintiffs Individually And The YouTube Community Class) ....................107

THIRD CAUSE OF ACTION Violation Of California Constitution Article I, Section 2
(On Behalf Of Plaintiffs Individually And The YouTube Community Class) ................112

**SECOND AMENDED CLASS ACTION COMPLAINT FOR DAMAGES, INJUNCTIVE RELIEF,
RESTITUTION, AND DECLARATORY JUDGMENT**

# TABLE OF CONTENTS
### (Continued)

**Page**

FOURTH CAUSE OF ACTION Violation Of California Unruh Civil Rights Act—Civil Code §§ 51, *et seq.* (On Behalf Of Plaintiffs And The YouTube Community Class) .......115

FIFTH CAUSE OF ACTION Unfair Competition In Violation Of  California Business And Professions Code §§ 17200, *et seq.* (On Behalf Of Plaintiffs And The YouTube Community Class)..............................................................................117

SIXTH CAUSE OF ACTION Breach Of Implied Covenant Of Good Faith And Fair Dealing (On Behalf Of Plaintiffs And The YouTube Community Class) ........................118

SEVENTH CAUSE OF ACTION Violation Of The Lanham Act — 15 U.S.C. § 1125 *et seq.* (On Behalf Of Plaintiffs ) ........................................................119

EIGHTH CAUSE OF ACTION Request For Declaratory Relief (On Behalf Of Plaintiffs And The YouTube Community Class)........................................................122

PRAYER FOR RELIEF...............................................................................123

JURY DEMAND ........................................................................................125

**SECOND AMENDED CLASS ACTION COMPLAINT FOR DAMAGES, INJUNCTIVE RELIEF, RESTITUTION, AND DECLARATORY JUDGMENT**

1      Plaintiffs Divino Group LLC d/b/a GlitterBombTV.com, which produces the online show

2   "GNews!;" Chris Knight, Celso Dulay, Cameron Stiehl, BriaAndChrissy LLC d/b/a

3   "BriaAndChrissy," which owns the channel youtube.com/BriaAndChrissy; Bria Kam, Chrissy

4   Chambers, Chase Ross, sole proprietor of youtube.com/uppercaseCHASE1; Brett Somers, sole

5   proprietor of youtube.com/Watts The Safeword; Lindsey Amer, sole proprietor of

6   queerkidstuff.com, Stephanie Frosch, sole proprietor of youtube.com/ellosteph and

7   youtube.com/ellostephextras; Sal Cinequemani (a.k.a Sal Bardo), sole proprietor of

8   youtube.com/SalBardo; Tamara (Sheri) Johnson, sole proprietor of the channel

9   youtube.com/SVTVNetwork and owner of SVTVNetwork.com;and Greg Scarnici, an individual,

10  sole proprietor of youtube.com/GregScarnici (collectively referred to as "Plaintiffs") bring this

11  First Amended Complaint for damages, and equitable and declaratory relief (the "FAC"),

12  individually, and on behalf of all persons similarly situated, against Defendant YouTube, LLC

13  ("YouTube") and its parent company, Google LLC ("Google") (collectively referred to as

14  "Google/YouTube" or "Defendants," unless otherwise specified).

15  **I.      INTRODUCTION AND STATEMENT OF THE CASE**

16      1.      Plaintiffs are Lesbian, Gay, Bisexual, Transgender, Transsexual or Queer internet

17  content creators, viewers, users, and consumers of the internet-based global video sharing social

18  media platform "YouTube" who are and continue to be denied full, fair, and equal access to

19  YouTube by Defendants Google/YouTube solely because of Plaintiffs' sexual or gender

20  orientation, identity, and/or viewpoints.  That is LGBTQ discrimination, pure and simple.  And it

21  violates Plaintiffs' civil, statutory, and contractual rights to use YouTube under identity and

22  viewpoint neutral content-based rules and restrictions that Defendants warrant "apply equally to

23  all" regardless of the users' sexual, gender, religious, political, or commercial identity or

24  viewpoints.

25      2.      Each Plaintiff brings this lawsuit, on behalf of himself, herself, or itself

26  individually, and as a representative of a class and/or subclasses of other similarly situated persons

27  whose use the YouTube Platform, and whose legal rights have been violated by Defendants' use

28  of the data regarding users' gender, sexual orientation, religious, ethnic, racial, political, and/or

**SECOND AMENDED CLASS ACTION COMPLAINT FOR DAMAGES, INJUNCTIVE RELIEF, RESTITUTION, AND DECLARATORY JUDGMENT**

commercial and data driven identities and viewpoints, to restrain, discriminate against, economically crush, and cleanse disfavored users from the YouTube Platform in direct violation of the users' civil and consumer rights.

3.     Google/YouTube systematically restrict, restrain, censor, block, interfere, and falsely stigmatize Plaintiffs' video content on YouTube by labeling the video content as "inappropriate" or "otherwise objectionable," without any reference to the actual video content or its failure to comply with YouTube's Terms of Service and content based rules.  Instead, as Defendants have admitted, Plaintiffs content is not only restricted, demonetized, and stigmatized as "inappropriate" or "otherwise objectionable," but Defendants have done so based on an affirmative "policy" that denies Plaintiffs monetization, subscription, advertising, and other content distribution products and services because Plaintiffs are "gay."

4.     Defendants also have engaged in anticompetitive conduct, fraud, and express and implied violations of Plaintiffs' consumer and contractual rights by using content based filtering and restrictions as a means to cleanse independent LGBTQ+ content creators like Plaintiffs from YouTube and redirect those audiences and viewers to content that Google/YouTube create, produce, or have a direct financial interest in.

5.     Finally, Google/YouTube unlawfully use federal law to prohibit YouTube users, including Plaintiffs, from petitioning the courts for relief from unlawful conduct in direct violation of Plaintiffs' First and Fourteenth Amendment Rights.  Specifically, as they do here, Defendants invoke sections 230(c)(1) and (2) of the Communication Decency Act[1] to claim absolute legal immunity for any unlawful conduct related to content filtering merely because YouTube finds the sexual orientation or other identity of the user to be "otherwise objectionable," even if when user's underlying content is not.  Consequently, Google/YouTube's application of Section 230(c) to block well pled and detailed allegations and party admissions of sexual orientation and gender identity discrimination along with the other wrongs alleged in this case operates in violation Plaintiffs' civil rights under the Free Speech and Equal Protection clauses of the U.S. Constitution.

---

[1] 47 U.S.C. §230(c) (the "CDA" or "Section 230(c)").

**SECOND AMENDED CLASS ACTION COMPLAINT FOR DAMAGES, INJUNCTIVE RELIEF, RESTITUTION, AND DECLARATORY JUDGMENT**

6.      Google/YouTube's scheme to restrain, interfere with, bar and ultimately cleanse disfavored content creators and users from the YouTube Platform was not undertaken for purposes of furthering any legitimate or lawful interest, such as the filtering, regulation, restriction, or need to curate harmful or unlawful video content[2] on the YouTube Platform.  Rather, the actions and conduct at issue in this lawsuit have little, if anything, to do with filtering the actual content of the videos uploaded to the YouTube Platform.

7.      Defendants' unlawful actions, conduct, and practices that give rise to and form the core basis and premise of this lawsuit all involve and are based upon Google/YouTube's unlawful use of data regarding the video creators,' subscribers,' or viewers' gender, sexual, orientation, race, ethnicity, commercial, or political identities or viewpoints.  Specifically, Google/YouTube filter, regulate, restrict, and censor videos and user access to the YouTube Platform, based not on video content (the images a video depicts, or the dialogue presented) --  but on the personal, sexual, ethnic, religious, commercial or political identities or viewpoints of the user[3] as a pretext to "cleanse" the YouTube Platform of LGBTQ+ third party content creators who upload videos for the LGBTQ+ Community, and their followers who, based on Defendants absolute and unfettered discretion and power, compete with or do not further Google/YouTube's corporate profits, political interests, or business plans.

8.      Furthermore, Google/YouTube's cleansing of independent LGBTQ+ video content creators is not limited to discriminating against those creators and users who identify as, or express LGBTQ+ viewpoints.  Documented evidence exists and lawsuits are pending or are being threatened by independent third party video creators and loyal users of the YouTube Platform who

---

[2] "Video content," here refers to the actual video material which a creator uploads to the YouTube Platform, which can be viewed by subscribers to a creator's or random viewers on the platform.  It is distinguished from metadata regarding the video, such as tags, descriptions and titles; data regarding the identity of or information about the person posting the video; or data regarding the identity of or information about the person viewing the video.
[3] The "user" refers to both the creators who upload videos, and the people who access those videos on the YouTube Platform, and includes subscribers to channels, subscribers who pay for ad free video services, and viewers who are simply accessing the YouTube Platform using either individual accounts created online, or using accounts held by institutions such as libraries, schools, and private companies.

**SECOND AMENDED CLASS ACTION COMPLAINT FOR DAMAGES, INJUNCTIVE RELIEF, RESTITUTION, AND DECLARATORY JUDGMENT**

have been victimized by Defendants' practices because of the users' race, religion, political affiliations, or commercial status.  Google/YouTube is using identity based censorship to determine who can and cannot continue to use the YouTube Platform.

9.      Defendants' exercise, control, and regulation and absolute dominion over the filtering, regulation, restriction, censorship, distribution, monetization, advertising, data collection, viewer reach and access to content on the YouTube Platform, the world's largest forum for video content, expression, and communication -- is discriminatory, unlawful and violates the civil and consumer rights of more than 2.3 billion YouTube users.

10.      YouTube was founded, built, and operated as an "open" internet platform for profit.  Based on YouTube's Mission Statement, Terms Of Service, marketing, advertising, solicitations, and representations to consumers, Defendants solicit and induce the public to post, view, and communicate through video content on the YouTube platform by inviting the public to use YouTube as a place to engage in "**Freedom of Expression**," "**Freedom of Information**," "**Freedom of Opportunity**," and "**Freedom to Belong**."[4]  Everyone who use the YouTube Platform is accorded the status of "members" of a public "YouTube Community," whose use and access of the platform are governed by viewpoint-neutral, content-based rules and regulations which Defendants refer to as "Community Guidelines."  Google/YouTube represent and warrant that these freedoms apply to all Community Members and shall be exercised by and protected for each and every user.  According to Defendants, the public is entitled to post, view, communicate, and share information and ideas through video content, subject only to "viewpoint neutral" content based filtering rules and restraints that "apply equally to everyone" based only on the content of the video NOT the personal identity or viewpoint of the video's creator or viewer.

11.      In return for granting the public access to a global, non-discriminatory, viewpoint neutral forum for creating, posting, marketing, distributing and sharing video content, YouTube's users give Google/YouTube certain rights that permit Defendants to monetize the user's video and the viewership or audience for that video.  This includes the right of Defendants to use any of the

---

[4] See https://www.youtube.com/yt/about/ .

**SECOND AMENDED CLASS ACTION COMPLAINT FOR DAMAGES, INJUNCTIVE RELIEF, RESTITUTION, AND DECLARATORY JUDGMENT**


video content of its users to sell advertising and obtain revenue from advertisers, as well as to solicit, market, and sell to users, Defendants' own advertising, promotional, distribution, or reach expansion products that YouTube users are enticed to use as a means for enhancing the reach of their videos, and competing for advertising revenues and viewership on an "open" platform.

12.     Under this open platform business model, users must also give Google/YouTube the exclusive property rights to each user's personal and financial data, the value of which provides Defendants with billions of dollars in annual revenues.  Google/YouTube not only collect, store, analyze, and organize the personal, financial, political, and other data for each of the YouTube Platform users, but Defendants also use and sell that data to third parties on the open market.  The average revenue value to Defendants for the property right to the data for ***each*** individual Plaintiff (and ***each*** individual putative class member's) is estimated to exceed $1 million in revenue per year for each such user.

13.     Google/YouTube also monetizes the YouTube Platform by creating, posting, distributing, and marketing Defendants' own video content which competes for viewership and revenues directly with YouTube creators and viewers like Plaintiffs, on a "viewpoint neutral" open internet platform.  In so doing, Google/YouTube have content production and distribution deals with large, mainstream media conglomerates including FOX News, PBS, NBC, MLB, the NFL, and HBO (to name but a few) whose content also competes with Plaintiffs on the YouTube Platform subject to viewpoint neutral content based rules that apply equally to all.

14.     To effectuate, govern, and enforce access and use by consumers as well as Google/YouTube and its business partners, all creators and viewers enter into a Terms of Service contract with Defendants.  In so doing, Defendants admitted, clarified and expressly warranted to the public and U.S. Congress that under its Terms of Service, YouTube is a designated "public forum" that is open to "everyone" subject only to "viewpoint-neutral," content-based filtering rules and restrictions that "apply equally to all" who use YouTube.  Among other things, Defendants have admitted under oath, that YouTube's Terms of Service and other public representations prohibit them from considering, utilizing, or taking into account a user's personal, gender, sexual orientation, racial, ethnic, religious, political, or commercial identity or viewpoint

-5-     Case No. 5:19-cv-004749-VKD
**SECOND AMENDED CLASS ACTION COMPLAINT FOR DAMAGES, INJUNCTIVE RELIEF, RESTITUTION, AND DECLARATORY JUDGMENT**

1   when filtering or regulating content on YouTube.  These obligations expressly prohibit Defendants

2   or their agents from using the personal identity or viewpoint of the creators or viewers as a basis to

3   restrict or interfere with the users' ability to reach, distribute, or market content to the users

4   intended audience or viewers on the YouTube Platform.  The Terms of Service also prohibits

5   Defendants from using the user's personal identity or viewpoint to prohibit or interfere with a

6   user's purchase of Defendant's advertising and/or reach products to promote or distribute

7   otherwise compliant content.

8         15.    Using this business model and in direct reliance, Google/YouTube solicited the

9   public users to provide the YouTube Platform with video content that now amounts to roughly

10   95% of the public video-based content and communications in the world.  By controlling and

11   regulating virtually all of the public video content in the United States and the rest of the world,

12   Google/YouTube operate YouTube as the largest for-profit forum dedicated to free speech and

13   expression in the history of the world.  Based on its promises to provide the public and its

14   consumers with an open internet platform for freedom of expression subject only to lawful,

15   viewpoint neutral content based filtering, regulations, and rules that apply equally to all,

16   Defendants have reaped more than $50 billion in annual revenues by regulating, distributing, and

17   monetizing the free speech and expression of what is now estimated to be 95% of all public video

18   content provided by the 2.3 billion people who now use the YouTube Platform.

19         16.    Defendants built and operate the YouTube Platform based on a lie that pervades

20   every aspect of the platform and render its operation one of the largest and most dangerous

21   consumer frauds in history:  that YouTube is an open, viewpoint neutral platform where lawful

22   content based rules apply equally to all persons regardless of personal identity or viewpoint.

23   Instead Google/YouTube are engaged in a bait and switch designed to purge the Platform of

24   content creators and their followers whom Defendants dislike or view as unprofitable in the long

25   term.  In direct violation of the law and the fundamental promises upon which YouTube was

26   founded, built, and operated, Google/YouTube now filter and regulate all aspects of user access on

27   the YouTube Platform based on the personal identity and viewpoint of the creator or their intended

28   audience.  That is discrimination pure and simple.

**SECOND AMENDED CLASS ACTION COMPLAINT FOR DAMAGES, INJUNCTIVE RELIEF, RESTITUTION, AND DECLARATORY JUDGMENT**

17.     Furthermore, as part of its campaign to cleanse the LGBTQ+ and other content creators from the YouTube Platform, Google/YouTube also use discriminatory, identity based filtering tools, practices, and machines to stigmatize and restrict access to LGBTQ+ content creators in order to crush them economically and destroy their livelihoods.  Among other things, Google/YouTube have entered into lucrative anticompetitive tying arrangements with purported independent, third-party fact checkers and content curators to who flag, curate, and restrict third party creator content who promote Google/YouTube's own content by falsely and capriciously branding third party users and/or their content as purveyors of "hate speech," "disinformation," "fake news," shocking, offensive, or simply "otherwise objectionable."  These practices not only violate the express and implied contractual obligations and promises that Defendants have made to Plaintiffs and the billions of other YouTube users who depend on the platform to communicate and to earn their livelihoods; but they violate the constitutional and legal rights of public YouTube users to express, communicate, interact, and market ideas through video content under viewpoint neutral rules and regulations.

18.     Defendants' conduct is not only unlawful, but constitutes an existential threat to the fundamental freedoms on which our society is based.  Plaintiffs, as well as other independent content creators and users supplied YouTube with the content and viewers that are directly responsible for creating YouTube's global reach, popularity, and financial and political success. They in reliance upon Defendants' repeated promises that YouTube was a forum for freedom of expression, access to which was subject only to lawful, viewpoint based content filtering and rules that apply equally to all users.  Consequently Defendants' denial of Plaintiffs' access to the YouTube Platform based on Plaintiffs' sexual orientation or gender identity constitutes unlawful systemic discrimination that is unconstitutional, unlawful, and repugnant to everything YouTube purports to represent.

19.     The evidence and facts alleged herein leave no doubt that Google/YouTube are using filtering and regulation to directly target and crush the reach LGBTQ+ content creators, solely because of the sexual orientation, gender, or political identities or viewpoints of LGBTQ+ content creators and their intended audiences.

**SECOND AMENDED CLASS ACTION COMPLAINT FOR DAMAGES, INJUNCTIVE RELIEF, RESTITUTION, AND DECLARATORY JUDGMENT**

20.     During a phone call between the Plaintiffs in this case and a Google representative, a person who was described as a "senior" Google employee, the senior representative unequivocally stated that Defendants have a "company policy" of not selling ads to "gay" content creators because the "gay thing" rendered the video "shocking" and sexually explicit regardless of the actual content of the video.[5]

21.     Internal documents confirm that in direct violation of YouTube's Terms of Service, Defendants have used their absolute power over filtering on and regulation of the YouTube Platform to undermine the core promises and principles to employ viewpoint neutral content based filters and regulations.  Defendants now describe themselves as a "[c]ensor,"[6] and exercise their censorship power to silence and crush Plaintiffs because they identify LGBTQ+ and express LGBTQ+ viewpoints.  As the evidence set forth below establishes, Defendants now operate YouTube in open defiance and direct violation of the "neutral" content based filtering practices and regulations which form the core of YouTube's legal and contractual obligations to its users.

22.     Defendants' discriminatory conduct has created an unlawful global social media cartel which controls 95% of all video communications in the world and engages in overt and open discrimination against the sexual orientation, gender identity, and viewpoints of its LGBTQ+ creators and Community Members.  Such discrimination is not limited to Defendants' use of affirmative content and monetization restrictions, or and restraints imposed on LGBTQ+ creators, viewers, and audiences, but extends to Defendants' promotion, monetization of, and profit from obscene and shocking anti-LGBTQ+ and homophobic hate speech, bullying, and threatening content and comments that pervade popular LGBTQ+ channels.

23.     Google/YouTube is engaged in discriminatory, anticompetitive, and unlawful conduct that targets and harms the LGBTQ+ Community, a protected class of persons under California law.  And Defendants' animus-based regulations and discriminatory filtering practices

---

[5] A transcript of this call is set forth as Exhibit A.
[6] See "Google, Facebook, Twitter Shifted to Censorship From Free Speech, According to Leaked Google Document," The Epoch Times, October 10, 2018 (https://www.theepochtimes.com/google-facebook-twitter-shifted-from-free-speech-to-censorship-according-to-leaked-google-document_2686124.html).

1  have not made YouTube safer for members of this protected class.  Defendants' control and

2  regulation of speech on the YouTube Platform has created a chaotic cesspool where popular,

3  compliant, top quality, and protected LGBTQ+ content is restricted, stigmatized, and demonetized

4  as "shocking," "inappropriate," "offensive," and "sexually explicit," while homophobic and racist

5  hatemongers run wild and are free to post vile and obscene content on the pages and channels of

6  Plaintiffs and other LGBTQ+ creators.  That should not come as a surprise because, as the record

7  shows, Defendants are engaged in a discriminatory and fraudulent scheme to profit from censoring

8  speech on the YouTube Platform which complies with Defendants' written Terms of Service --

9  while Google/YouTube rakes in profits from the vile, graphically violent, dangerous homophobic

10  hate speech posted on the platform.

11        24.       Google/YouTube uses a complex and clandestine web of broad, overlapping,

12  vague, discriminatory, and unlawful regulations, artificial intelligence filtering practices, data and

13  information collection and surveillance, video monetization, and third-party advertising and

14  content production schemes – none of which actually relate to what videos posted on the YouTube

15  Platform contain.  Defendants use this platform wide regulation scheme as a pretext to engage in

16  unlawful practices to restrain and harm Plaintiffs and the greater LGBTQ+ Community, by

17  insisting that animus-based speech regulation and discrimination against the LGBTQ+

18  Community and/or what Defendants refer to as the "gay thing," is necessary for "keeping [their]

19  popular online video service safe and enjoyable for users."

20        25.       Each LGBTQ+ Plaintiff in this case is a victim of one or more of Defendants'

21  systemic and pervasive discriminatory, anticompetitive, and unlawful practices that have caused

22  substantial reputational and financial harm to each of them.

23        26.       Defendants continue to threaten and harm the entire LGBTQ+ YouTube

24  Community by using their unprecedented power over free speech and expression as a pretext to

25  systematically target, suppress, stigmatize, terrorize, steal, and financially harm the video content

26  created or viewed by the LGBTQ+ Community, including, but not limited to:

27            a.       Failing to apply content-based regulations and filtering "equally to all," as

28  provided for in Defendants' form consumer contract and promises to Plaintiffs and the LGBTQ+

**SECOND AMENDED CLASS ACTION COMPLAINT FOR DAMAGES, INJUNCTIVE RELIEF,
RESTITUTION, AND DECLARATORY JUDGMENT**

1    Community;

2              b.        Falsely representing to the viewing public and potential advertisers that

3    video content created and posted to YouTube by Plaintiffs contains discussions about drug use or

4    abuse or drinking alcohol, overly detailed conversations about or depictions of sexual activity,

5    graphic depictions of violence, violent acts, natural disasters or tragedies or violence in the news,

6    specific details about events related to terrorism, war, crime and political conflicts that resulted in

7    death or serious injury even if no graphic imagery is shown, inappropriate language, including

8    profanity, and/or content that is gratuitously incendiary, inflammatory, or demeaning toward an

9    individual or group;

10             c.        Arbitrarily, capriciously, and unfairly censoring, removing, suspending,

11   restraining, suppressing and/or demonetizing the speech, video content or channels of LGBTQ+

12   YouTubers solely because they are "lesbian," "gay," "bisexual," "transgender," or "queer,"

13   because they identify as such, because they address issues of interest to the LGBTQ+ Community

14   or because they use tag words related to the LGBTQ+ Community in association with their

15   content to make it easier for viewers to locate their content;

16             d.        Exercising unfettered and absolute discretion to selectively apply and

17   enforce content-based regulations, content filtering tools, and monetization schemes in a manner

18   that promotes Defendants' own content or content in which Defendants have a direct financial

19   interest, including obscene, violent, and/or homophobic bullying and hate speech that Defendants

20   not only fail to regulate or restrict, but which they monetize and profit from;

21             e.        Enforcing what Defendants stated was a "company policy" of prohibiting

22   "gay" users from advertising their content on YouTube because of the "gay thing" and using that

23   "policy" to stigmatize LGBTQ+ YouTubers and their content as "shocking" and "sexually

24   explicit" solely because the users identify as "gay" or LGBTQ+;

25             f.        Demonetizing the content of Plaintiffs and the LGBTQ+ Class, including

26   LGBTQ+ YouTubers who operate and publish content on some of the most popular channels on

27   the YouTube platform;

28             g.        Promoting, monetizing, profiting, and distributing online hate speech,

**SECOND AMENDED CLASS ACTION COMPLAINT FOR DAMAGES, INJUNCTIVE RELIEF,
RESTITUTION, AND DECLARATORY JUDGMENT**

including homophobic slurs, threats of violence and death; theft and destruction of LGBTQ+ content; homophobic, obscene and threatening video comments that appear in connection with the channels' video content (as recommended videos and as advertisements), all of which violate Defendants' regulations, policies, and contracts with their consumers, and none of which are protected by the California or federal law, or even by Defendants' own published guidelines;

        h.     Promoting individuals and groups with anti-LGBTQ+ messages by selling advertisements which undermine, criticize, disparage, or belittle members of the LGBTQ+ Community, and running those advertisements that violate the law and Defendants' regulations and contracts with consumers, immediately before the videos of Plaintiffs, thereby discouraging viewers from going forward with the viewing of Plaintiffs' videos ;

        i.     Promoting YouTubers with anti-LGBTQ+ messages or with hate speech videos by recommending such videos to Plaintiffs' viewers in YouTube's "Up Next" list of recommended videos which appears on the screen when Plaintiffs' videos are played;

        j.     Replacing Plaintiffs' customized "thumbnail" graphic images of individual videos, which serve as mini-advertisements that appear in YouTube search results, with Defendants' own generic thumbnails, consisting of a screenshot taken at random from the individual video;

        k.     Arbitrarily, capriciously, and unfairly removing individual subscribers from the list of those viewers who have intentionally applied to be affiliated with the respective YouTube channels of LGBTQ+ YouTubers, without notice to the LGBTQ+ creators or to the individual subscribers;

        l.     Unilaterally changing the procedure for new video notifications to be sent to individual subscribers of the LGBTQ+ creators' channels, without giving notice to the subscribers or to the LGBTQ+ creators, resulting in hundreds of thousands of subscribers not receiving notices as new content is uploaded by LGBTQ+ creators;

        m.     Stealing, copying, altering, and or violating the property rights appurtenant to the content of Plaintiffs, and then using the content of Plaintiffs to produce and promote content that Google/YouTube own, or in which they have a financial interest, and that directly competes

**SECOND AMENDED CLASS ACTION COMPLAINT FOR DAMAGES, INJUNCTIVE RELIEF, RESTITUTION, AND DECLARATORY JUDGMENT**

with the original content stolen from Plaintiffs;

n.     Arbitrarily, capriciously, and unfairly excluding LGBTQ+ creators' original videos from Google/YouTube's "Up Next" video recommendations, which appear on the screen whenever videos are played; while at the same time recommending hate speech or disparaging reaction videos which steal, copy, or alter the very same original videos upon which they are based;

o.     Fraudulently and deceptively inducing LGBTQ+ YouTubers and the public to use YouTube by promising Plaintiffs and the public that YouTube is (i) a "Public Forum" (ii) dedicated to Four Freedoms - Expression, Information, Opportunity, and Belonging, and (iii) a "Community" where "everyone's voice" may be heard subject only to (iv) viewpoint- and identity-neutral, content-based regulations that apply equally to everyone, and then breaching those obligations in a way that financially injures and causes other reputational harms to LGBTQ+ YouTubers and consumers.

27.     This is not the first time that Defendants have been accused of, and admitted to LGBTQ+ discrimination and malfeasance, by improperly manipulating content and user regulations to suppress the content and rights of LGBTQ+ members of the "YouTube Community."  As early as 2016, Defendants admitted that their restraints unfairly discriminated against LGBTQ+ users like Plaintiffs, hiding from view videos that reference same-sex relationships, and other videos focusing on "pop culture from a feminist and queer perspective." When these restraints were exposed, YouTubers like Tyler Oakley, Gigi Gorgeous and others "blasted the platform for bias."

28.     Google/YouTube publicly admitted that using their Restricted Mode filtering, they improperly censored videos that were posted or produced by members of the LGBTQ+ Community based upon the identity and orientation of the speaker, rather than upon the content of the video.  In response to complaints from the LGBTQ+ Community and other civil rights critics, Google/YouTube promised to remove all restricted filtering on videos posted or produced by LGBTQ+ members and groups, and to change their policy, filtering algorithm, and manual review policies to ensure that videos posted by LGBTQ+ vloggers were not being censored solely

because of the identity of the speaker.  Google/YouTube admitted that they wrongly censored videos posted by members of the LGBTQ+ Community, blaming a purported engineering problem with filtering tools that targeted video content from LGBTQ+ users, or targeted users who discussed topics and perspectives regarding LGBTQ+ issues.  Google/YouTube agreed to investigate the claims of LGBTQ+ users and dispatch a team of senior managers, including YouTube's CEO Susan Wojcicki, to meet with LGBTQ+ representatives to consider revising their policies and review protocols, correcting the filtering tools, and rewriting guidelines that "clarify its position by specifically allowing personal accounts from victims of discrimination or violent hate crimes, as long as they don't contain graphic language or content."

29.     On April 27, 2017, Johanna Wright, Vice President of Product Management for Google/YouTube, promised LGBTQ+ YouTubers that Defendants would ensure that "Restricted Mode" should not filter out content belonging to individuals or groups based on certain attributes like gender, gender identity, political viewpoints, race, religion or sexual orientation."  And while Defendants admitted that "Restricted Mode will never be perfect, [Google/YouTube] hope to build on [their] progress so far to continue making [their] systems more accurate and the overall Restricted Mode experience better over time."

30.     But the LGBTQ+ YouTubers who met with Defendants, all of whom were forced to execute non-disclosure agreements regarding the substance of their discussions with Defendants, now believe that Defendants' promises were nothing more than "lip service" made solely for public relations purposes and now believe that Ms. Wojcicki and Defendants had no intention of keeping their promises.

31.     Instead of taking LGBTQ+ reports of viewpoint discrimination and selective restrictions on LGBTQ+ content seriously, Ms. Wojcicki spent some of her "personal vacation" time doing carefully scripted PR or "selfie" interviews with selected YouTubers, and other media outlets, in which she boasts that all is well at YouTube, especially with the LGBTQ+ members of the YouTube Community.[7]  In one interview, posted only days before the filing of this Complaint,

---

[7] See https://www.youtube.com/watch?v=gMINAiDWI6g.

**SECOND AMENDED CLASS ACTION COMPLAINT FOR DAMAGES, INJUNCTIVE RELIEF, RESTITUTION, AND DECLARATORY JUDGMENT**

YouTube's CEO Susan Wojcicki confirmed the importance of and Defendants' adherence to the "Four Freedoms" of expression, describing those promises to consumers as the "Pillars" of the YouTube Platform and global Community it serves.  When the interviewer is prompted to ask her scripted questions about reports and concerns of viewpoint- or animus-based censorship and the use of content-based restrictions, Wojcicki pleads executive ignorance of systemic complaints and harms caused by viewpoint bias or animus-based content regulation, filtering tools, monetization restrictions, and promotion of LGBTQ+ harassment and hate speech for profit.

32.     While YouTube's CEO and other senior executives of the global video communication monopoly continue to double down on their promises of free speech, viewpoint neutrality, and equal application of rules, the allegations of these LGBTQ+ Community members show in specific and painstaking detail that systemic speaker, topic, or viewpoint-biased and animus-based regulation, restraint, and disparate treatment of LGBTQ+ videos, LGBTQ+ creators and LGBTQ+ audiences is rampant on the platform.  As the experience of these Plaintiffs shows, Defendants use machines to flag, identify, and restrict LGBTQ+ content that human or "customer service" reviewers pretend to justify after the fact, under the pretext of "a company policy" of absolute discretion to take users down for discussing any topic, viewpoint, or identifying as LGBTQ+ which Google/YouTube consider to be "Offensive," "Inappropriate," or "Otherwise Objectionable," for "any reason, no reason," whether for "altruism or profit," or, as in the case of these Plaintiffs simply because they identify as "gay," or their content mentions or discusses any topic or viewpoint that is "about the gay thing."

33.     This needs to stop here and now.  Plaintiffs do not seek to interfere with YouTube's Mission of providing a forum for global YouTube Community to engage in and experience "Four Freedoms of Expression" or Pillars when creating, posting, distributing, viewing, and engaging with other Community members through video content and communications.  LGBTQ+ Plaintiffs understand and support effective, but lawful viewpoint-neutral content-based regulations on the platform.  But that is not how these Defendants have been operating YouTube during the relevant time period of this lawsuit.  Defendants have brazenly abandoned YouTube's Four Freedoms and hijacked the YouTube Community and the Mission that defines that Community, by continuing to

**SECOND AMENDED CLASS ACTION COMPLAINT FOR DAMAGES, INJUNCTIVE RELIEF, RESTITUTION, AND DECLARATORY JUDGMENT**

engage in and defend identity, viewpoint, discriminatory, and illegal content-based regulation, distribution and monetization policies that harm YouTube's LGBTQ+ Community and other YouTube Community members.  Requests by Plaintiffs to address these allegations and concerns have been made to Defendants, but not only have these requests fallen on deaf ears, but in the past several weeks, they have been the subject of outright false denials by YouTube's CEO.

34.     Enough is enough.  Plaintiffs in this case have summoned the courage to challenge the world's largest corporate conglomerate and regulator of free speech by invoking their right to petition the courts to enforce the antidiscrimination, free speech, and consumer fraud laws, to require Defendants to honor their promises and their legal obligations to LGBTQ+ YouTubers and YouTube consumers.  Specifically, Plaintiffs, in their individual and representative capacities, bring this lawsuit to force Google/YouTube to comply with their legal obligations under federal and California law, including: (i) Article One, Section 2 of the California Constitution (the "Liberty of Speech Clause"); (ii) the Unruh Civil Rights Act, Section 51, et seq. of the California Civil Code (the "Unruh Act"); (iii) the Unfair Competition Laws, Section 17200, et seq. of the California Business and Professions Code (the "UCL); (iv) the Lanham Act, 15 U.S.C. sections 1125, et seq.; and (v) Defendants' Terms of Service, "Community Guidelines," and other purportedly content-neutral filtering representations (the "Contract Claim").  Plaintiffs seek damages for financial, reputational, and other cognizable harms and injuries to themselves and to other LGBTQ+ members of the YouTube Community who compose the putative class or subclasses in this case.  Plaintiffs also seek individual and class-wide relief for restitution and disgorgement of Defendants' ill-gotten or unlawfully obtained profits, injunctive relief, and a declaratory judgment that Google and YouTube violate the legal and equitable rights of LGBTQ+ members of the YouTube Community.

## II.    PARTIES

35.     Plaintiff Divino Group LLC ("Divino") is a limited liability company formed and doing business in the state of California.  Divino is co-owned, managed and operated by a married gay couple, Celso Dulay and Chris Knight, both of whom reside in San Francisco, California. Divino owns a news-based media company,"GlitterBombTV.com" the producer of GNews!  Its

principal place of business is located in San Francisco, California.  Divino produces and

distributes on-line, video-based news programs that report on and discuss current events and

issues, involving or affecting the LGBTQ+ Community.  Divino's news programs are written,

produced, promoted, and distributed by Messrs. Knight and Dulay.  Since February 6, 2014,

Divino has used YouTube as a hosting platform to advertise, distribute, and reach the viewing

public in connection with 132 episodes of GNews!.

36.    Plaintiff Cameron Stiehl is an individual who resides in San Francisco, California.

Ms. Stiehl regularly appears on GNews! as a co-host, and contributes to the content.

37.    Plaintiff BriaAndChrissy LLC, is a Georgia Limited Liability Company.

BriaAndChrissy LLC is owned and managed by Bria Kam and Chrissy Chambers, who reside in

the state of Washington.  Because of harassment they have received, these Plaintiffs should be

contacted through their attorneys of record.  BriaAndChrissy LLC does business as

"BriaAndChrissy;" it produces and distributes a variety of original videos that feature music, skits,

day-in-the-life presentations, and discussions of mental health issues, healthy lifestyles

recommendations and LGBTQ+-related issues.  Since 2012, BriaAndChrissy LLC has uploaded

more than 1000 videos to its two YouTube channels, BriaAndChrissy, which has 849,000

subscribers, and WonderWarriors, which has 195,000 subscribers.

38.    Plaintiff Chase Ross is an individual who resides in Montreal, Quebec, Canada.

Mr. Ross produces and distributes a series of original educational and day-in-the-life videos about

the transgender experience and products, as well as discussions of LGBTQ+ issues.  Since 2010,

Mr. Ross has uploaded 723 videos to his "uppercaseCHASE1" YouTube channel, which has more

than 163,000 subscribers.

39.    Plaintiff Brett Somers is an individual who resides in San Francisco, California.

Mr. Somers produces and distributes original sexual education and product review videos, with a

focus on non-traditional sexual activities.  Since 2014, he has uploaded 227 videos to his "Watts

The Safeword" YouTube channel, which has more than 193,000 subscribers.

40.    Lindsay Amer is an individual who resides in Maine.  Because of harassment and

threats they have received, Mx. Amer should be contacted through their attorneys of record.  Mx.

Amer produces and distributes original educational videos for children aged 3-17, parents and educators regarding LGBTQ+ issues.  Since 2016 Mx. Amer has uploaded 94 videos to their YouTube channel "Queer Kid Stuff," which has more than 15,000 subscribers.

41.     Plaintiff Stephanie Frosch is an individual who resides in New York, New York.  Since October 5, 2009, Ms. Frosch has produced and distributed 189 of original videos focused on lifestyle topics:, advice, interview and/or mini documentaries which present her  experiences as a Lesbian, or present and discuss issues which affect members of the LGBTQ+ community.  The videos are intended for a target audience 13 years and older.  She operates two YouTube channels: Youtube.com/ElloSteph and Youtube.com/StephFrosch.  The ElloSteph channel has 376,000 subscribers and 36.5 million views.  She also operates a merchandise store at www.districtlines.com/ellosteph.  Stephanie Frosch has been an LGBTQ internet activist who has appeared as a speaker at conventions, and she has been interviewed on MTV and the main stream media regarding her YouTube experience and treatment at the hands of YouTube.

42.     Plaintiff Sal Cinquemani is an individual who resides in Los Angeles, California.  Mr. Cinquemani owns and operates salbardo.com.  He is an independent film maker who directs and produces films for LGBTQ+ audiences under the name "Sal Bardo."  Since March 27, 2011, Mr. Cinquemani has operated the YouTube channel youtube.com/user/salbardo, uploading videos consisting of original short films, film trailers, interviews of actors, and out-takes from films for purposes of promoting his independent films.  The Sal Bardo YouTube channel has approximately 38,000 subscribers and 24.1 million views.

43.     Plaintiff Tamara (Sheri) Johnson is an individual who lives in Columbus, Georgia and does business in Atlanta, Georgia.  Ms. Johnson owns and is the CEO of SVTVNetwork.com.  Since May 30, 2012, she has operated the YouTube channel SVTV Network, writing, developing, taping and producing short videos, original web series, animated series and feature length films for the LGBTQ+ audience.  SVTV Network has 114,000 subscribers and generated 5 million views.  In the fall of 2016, she launched an internet on-demand network dedicated to content specifically designed for LGBTQ+ audiences.  For the past three years, Ms. Johnson has been uploading her own independently produced original video webseries, and licensing the original independently

**SECOND AMENDED CLASS ACTION COMPLAINT FOR DAMAGES, INJUNCTIVE RELIEF, RESTITUTION, AND DECLARATORY JUDGMENT**

1    produced videos of others on the internet in direct competition with Google/YouTube.

2         44.    Plaintiff Greg Scarnici is an individual who resides in Brooklyn, New York.  Mr.

3    Scarnici owns and operates gregscarnici.com.  He is a comedic writer, director, producer and

4    performer who currently works as an Associate Producer for "Saturday Night Live," with more

5    than 25 years of experience working in television and comedy.  He has appeared in films, on

6    television  and in numerous internet uploads and posts.  Since September 14, 2007, Mr. Scarnici

7    has operated the YouTube channels youtube.com/user/Greg Scarnici and

8    youtube.com/user/Undercover Music, uploading videos consisting of short films, comedic

9    sketches, parodies, and music videos for the LGBTQ+ audience.  The Greg Scarnici YouTube

10   channel has approximately 9,600 subscribers and 8.9 million views.  Mr. Scarnici also owns and

11   operates gregscarnici.com.

12        45.    Defendant Google LLC is a for-profit, limited liability company organized under

13   the laws of the State of Delaware, with its principal place of business in Mountain View,

14   California; it regularly conducts business throughout California, including Santa Clara County.

15   Plaintiffs are informed and believe, and thereon allege that, at all relevant times, Defendant

16   Google LLC has acted as an agent of Defendant YouTube, LLC, and controls or participates in

17   censoring and restricting speech on the YouTube service or platform.

18        46.    Defendant YouTube, LLC is a for-profit limited liability corporation, wholly

19   owned by Google LLC, and organized under the laws of the State of Delaware.  YouTube's

20   principal place of business is Mountain View, California and it regularly conducts business

21   throughout California, including Santa Clara County, California.  Defendant YouTube, LLC

22   operates the largest and most popular Internet video viewer site, platform, and service in

23   California, the United States, and the world and holds itself out as one of the most important and

24   largest public forums for the expression of ideas and exchange of speech available to the public.

25   Plaintiffs are informed and believe that at all relevant times Defendant YouTube, LLC acts as an

26   agent of Defendant Google LLC and uses, relies on, and participates with Defendant Google LLC

27   in restricting speech on the YouTube site, platform, or service.

28        47.    The true names and capacities, whether individual, corporate, associate, or

**SECOND AMENDED CLASS ACTION COMPLAINT FOR DAMAGES, INJUNCTIVE RELIEF,
RESTITUTION, AND DECLARATORY JUDGMENT**

1   otherwise, of Defendants Does 1 through 100, inclusive, are presently unknown to Plaintiffs, and

2   for that reason these defendants are sued by such fictitious names.  Plaintiffs are informed and

3   believe and thereon allege that each of the Doe defendants is in some way legally responsible for

4   the violations of law, injuries, and harm caused, as alleged herein.  If, and when appropriate,

5   Plaintiffs will seek leave of the Court to amend this Complaint when the true names and capacities

6   of said defendants are known.

7   **III.    JURISDICTION AND VENUE**

8          48.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§

9   1331, and 1337(a), because the Complaint includes Federal questions, and the amount in

10  controversy arising from the claims asserted on behalf of Plaintiffs exceeds $5 million, exclusive

11  of interest and costs.

12         49.     Venue is proper in the Northern District of California (San Jose Division) under 28

13  U.S.C. § 1391.  Defendants reside and/or transact business in the County of Santa Clara, and are

14  within the jurisdiction of this Court for purposes of service of process.  Defendants' Terms of

15  Service expressly provide that the LGBTQ+ Plaintiffs lawsuit be filed in a court of competent

16  jurisdiction located within Santa Clara County.

17  **IV.    FACTS COMMON TO ALL CLAIMS**

18         **A.    The YouTube Platform**

19         50.     YouTube is the largest video-sharing platform in the world, accessible via

20  computer browsers and mobile telephone applications.  YouTube was founded in 2005 in San

21  Bruno, California.

22         51.     In 2006, Defendant Google bought YouTube for $1.65 billion and operates

23  YouTube as a Google subsidiary.  The current value of Google's YouTube subsidiary has been

24  estimated to exceed $160 billion.

25         52.     The YouTube Platform functions by allowing users to upload, view, rate, share,

26  add to favorites, report, comment on videos, and subscribe to the channels of other users.

27  Available content includes video clips, TV show clips, music videos, short and documentary films,

28  audio recordings, movie trailers, live streams, and other content such as video blogging, short

**SECOND AMENDED CLASS ACTION COMPLAINT FOR DAMAGES, INJUNCTIVE RELIEF, RESTITUTION, AND DECLARATORY JUDGMENT**

original videos, and educational videos.

53.     It is the content and audiences of YouTubers like Plaintiffs and other members of the Proposed LGBTQ+ Community Class that have made the platform one of the top four most visited Internet websites in the world.  It is estimated that more than **one-third** of the world's Internet users use YouTube, to post, view, and communicate through videos.  Eighty-five percent of the U.S. Internet audience watches videos online, including on YouTube.  A billion hours of videos are watched on YouTube each day.  More video content has been uploaded to YouTube by public users than that created by the major U.S. television networks in 30 years.  The average number of mobile YouTube views is estimated to be about 1 billion per day.  YouTube videos can be navigated in at least 80 different languages, and the platform has launched in more than 91 countries around the globe.

54.     Most of the video content on YouTube is created and uploaded by YouTubers like the members of the Proposed Class, but larger media corporations including CBS, the BBC, Vevo, and Hulu also offer some of their content via YouTube as part of the Google/YouTube partnership program.

55.     Defendants monetize speakers' intellectual property and viewers' interests by selling advertisements; some of those advertisements come from the speakers themselves, who pay for their videos or channels to be "featured" or publicized.  In addition, Defendants offer subscriptions through which people pay ongoing fees to view videos on YouTube without advertisements.

56.     In total, Google's subsidiary YouTube earned $9 billion in revenue in 2015 – primarily by selling advertisements; and will earn $27 billion annually by 2020.

**B.     <u>YouTube Holds Itself Out As A Quintessential Forum For Freedom Of Expression</u>**

57.     Much of YouTube's success can be attributed to Defendants' representations that YouTube is, has been and will remain the premier space for freedom of expression in video content on the Internet – representations that were made with the intent of inducing more consumers like LGBTQ+ Plaintiffs to become YouTubers.

**SECOND AMENDED CLASS ACTION COMPLAINT FOR DAMAGES, INJUNCTIVE RELIEF, RESTITUTION, AND DECLARATORY JUDGMENT**

58.     More specifically, Defendants expressly solicit and invite the general public to use YouTube as a hosting platform to engage in "freedom of expression" by posting, viewing, promoting, and interacting with third-party video content, subject only to viewpoint-"neutral" content-based regulations that apply equally to everyone.

59.     Consistent with their express "mission [] to organize the world's information and make it universally accessible and useful," Google/YouTube invite the public, including original content creators like Plaintiffs, viewers, and advertisers large and small, to connect with, inform, and inspire others across the globe by using YouTube as a distribution platform for freedom of expression through videos.  Google/YouTube claim to be the largest public forum for video-based speech in California, the United States, and the world, where, based on the number of views, likes, and subscriptions to uploaded video content, new celebrities emerge and new ideas are popularized.  In so doing, Google/YouTube emphatically declare that their "mission" is to "give people a voice" in a "place to express yourself" and in a "community where everyone's voice can be heard."  Defendants further brag that YouTube is "one of the largest and most diverse collections of self-expression in history," giving "people opportunities to share their voice and talent no matter where they are from or what their age or point of view."  *See*, *e.g.*, https://youtube.googleblog.com/ (YouTube Official Blog: Broadcast Yourself).  Each of these disclosures, including the Community Guidelines and promises of "neutral" content filtering "***are also incorporated . . . by reference***" into YouTube's Terms of Service.

60.     Defendants expressly represent to consumers that YouTube is designated as a public place for free speech "define[d]" by "four essential freedoms" that govern the public consumer's use of the platform: "**Freedom of Expression**," "**Freedom of Information**," "**Freedom of Opportunity**," and "**Freedom to Belong**."[8]  Defendants further induce the public to provide, view, and communicate with video content on the YouTube hosting platform by promising users that "everyone's voice" will be heard subject only to neutral, content-based rules and filtering which "apply equally to all," regardless of the viewpoint, identity, or source of the

---

[8] See https://www.youtube.com/yt/about/ .

**SECOND AMENDED CLASS ACTION COMPLAINT FOR DAMAGES, INJUNCTIVE RELIEF, RESTITUTION, AND DECLARATORY JUDGMENT**

1  speaker.

2       61.    These lofty representations have been repeated in sworn testimony to Congress.

3  On January 17, 2018, Defendants, through YouTube's Assistant General Counsel, Juniper Downs,

4  confirmed to Congress that YouTube's mission remains unchanged and the platform is designated

5  and operates as a "public forum" for free speech and expression subject only to viewpoint-neutral,

6  content-based regulations:

7       **Senator Cruz**: Thank you Mr. Chairman. Welcome to each of the
     witnesses. I'd like to start by asking each of the company

8       representatives a simple question, which is: do you consider your
     companies to be neutral public fora?

9                          *   *   *   *

10

11       **Senator Cruz**: I'm just looking for a yes or no whether you
     consider yourself to be a neutral public forum.

12       **Senator Cruz**: Ms. Downs?

13       **Ms. Downs**: Yes, our goal is to design products for everyone,
     subject to our policies and the limitations they impose on the types

14       of content that people may share on our products.

15       **Senator Cruz**: So, you're saying you do consider YouTube to be a
     neutral public forum?

16

17       **Ms. Downs**: *Correct.* We enforce our policies in a politically neutral
     way. Certain things are prohibited by our Community Guidelines,
     which are spelled out and provided publicly to all of our users.

18
     [02:28:30 – 02:29:36 of the full hearing recording.]

19                          *   *   *   *

20       **Senator Cruz**: What is YouTube's policy with respect to Prager

21       University and the allegations that the content Prager University is
     putting out are being restricted and censored by YouTube?

22

23       **Ms. Downs**: *As I mentioned, we enforce our policies in a
     politically neutral way.* In terms of the specifics of Prager
     University, it's a subject of ongoing litigation so I'm not free to

24       comment on the specifics of that case.[9]

25

26  _____
[9] See https://www.c-span.org/video/?439849-1/facebook-twitter-youtube-officials-testify-

27  combating-extremism and https://www.c-span.org/video/?448566-1/house-judiciary-committee-
examines-social-media-filtering-practices at 02:34:28 – 02:35:29 of the full hearing recording

28  (emphasis added).

**SECOND AMENDED CLASS ACTION COMPLAINT FOR DAMAGES, INJUNCTIVE RELIEF,
RESTITUTION, AND DECLARATORY JUDGMENT**

C.   **Defendants Flout The Fundamental "Free Expression" Bargain They Made With YouTubers**

62.   It is now clear that the lofty "Freedom of Expression" promises and representations made to consumers like Plaintiffs and other members of the Proposed LGBTQ+ Class are nothing but outright falsehoods.

63.   In or about March 2018, Defendants distributed an internal memo and presentation calling Google "The Good Censor."  The Memo sets forth in detail the bait-and-switch fraud which Defendants seek to perpetrate against the more than 2.3 billion consumers who built YouTube into the global speech giant and profit machine that it is today.

64.   In the Memo, which is purportedly based on "layers of research" and in reliance on "some leading thinkers in this space," Defendant, concede that since the 2016 U. S. presidential elections, Defendants have sought to secretly and deceptively "migrate" away from a hosting platform that solicits the public and consumers to provide YouTube with content based on the express promise that YouTube operates as a viewpoint-neutral and politically neutral place for free speech and "an open marketplace of ideas," where the public is invited to engage in freedom of expression and speech.  Rather, Defendants now seek to use the site to curate and restrict content in order to further profit and monetize its 2.3 billion users, by promoting Defendants' own, or their preferred content through the exercise of unfettered discretion to censor and curate otherwise public content.  In other words, Defendants admit that they are now acting as "censors," who regulate and curate online speech and content for their own gain, after promising consumers that YouTube exists and is designated for open, viewpoint-neutral, third-party communications and free speech.

65.   This is a classic bait-and-switch fraud perpetrated by Defendants on the 2.3 billion users who built YouTube into what it is today.  According to Defendants "[t]his free speech ideal was instilled in the DNA of the Silicon Valley startups [including YouTube] that now control the online conversations."  In the case of YouTube, that ideal provided Defendants with a marketing and business model which monetized the public speech of its consumers by inviting them to use YouTube as a forum for free speech, where the public is invited to post video content, regardless

**SECOND AMENDED CLASS ACTION COMPLAINT FOR DAMAGES, INJUNCTIVE RELIEF, RESTITUTION, AND DECLARATORY JUDGMENT**

of identity and viewpoint, subject to "content-neutral" rules that apply equally to everyone.

66.    Now that YouTube is globally saturated, with 2.3 billion users and their content, Defendants seek to exploit their control over more than 90% of the world's video-based communications, by secretly seizing control over the platform's content, so that they, not the users, control and decide who gets to speak, what is said, and who is listening.  As Defendants admit, they do so by discriminating and censoring compliant third-party content in favor of Defendants' own content, or that of preferred users, for financial gain and enhanced political power at the expense of, and to the detriment of third-party users like Plaintiffs.

67.    Defendants admit that platform "migration" creates "an unresolved tension" on social media sites like YouTube because "**[t]he platforms have to deny that they're media companies** in order to retain their immunity from liability" and "**at the same time, they're exercising more influence as media companies**… than CBS News did in its heyday, and therefore, in order for democratic values to flourish, **they need to embrace free speech standards**."  *See* "The Good Censor" Memo, at page 10 of 85 (quoting Jeffrey Rosen, Professor of Law at The George Washington University and legal affairs editor of The New Republic) (internal quotes omitted, bold in original).[10]  Defendants have continued to use animus-based censorship and content regulation to perpetrate religious, political, sexual orientation and gender, and ethnic discrimination for profit and financial gain to the harm of the public and consumers.

68.    Putting these "Good Censor" principles into practice, Defendants have unlawfully employed a series of content-based distribution and monetization policies and procedures that form a single, interrelated, uniform, and comprehensive content-based regulation and control scheme that empowers Defendants unilaterally to control and restrain all consumer speech and content that appears on YouTube.

---

[10] See https://www.google.com/search?client=firefox-b-1-d&ei=9u_iXNjkEYi6_wTgj5m4Dg&q=the+good+censor+google+rosen&oq=the+good+censor+google+rosen&gs_l=psy-ab.3..33i160l3.1304.2502..3431...0.0..0.100.472.5j1......0....1..gws-wiz.......0i71j0i22i30j33i22i29i30.rvL00PLfyos.

**SECOND AMENDED CLASS ACTION COMPLAINT FOR DAMAGES, INJUNCTIVE RELIEF, RESTITUTION, AND DECLARATORY JUDGMENT**

**D.      Defendants Begin To Compete With YouTubers In The Proposed Class**

69.      Defendants have a strong financial motive to disregard the principles of free expression upon which YouTube was founded.  Specifically, beginning around 2016, Defendants began to use, operate, and profit from YouTube -- not as a hosting platform for the video content of its public users and consumers, but as a means for producing, distributing, and profiting from its own video content, or that of its financial partners.

70.      Following the trend of other hosting networks, Defendants sought to use the worldwide consumer audience of YouTube users as a means for monetizing their own content, not merely as a hosting platform for the Public.  Recognizing that they now controlled more than 90 percent of all video communications, Defendants sought to secure for themselves a market share of the production- and distribution-based revenues that previously had been reserved for YouTube's users and consumers.

71.      Having induced consumers to create video content and an audience in excess of two billion people by promising to neutrally host and regulate the video content of others, Defendants commenced a plan to recapture revenues from third-party producers and distributors by using their unlawful content regulation system to promote and monetize their own content by unlawfully restricting third-party content and reach.

72.      Among other things, Defendants announced that "[t]he company has partnered with its top content creators who wanted to charge a subscription rental or purchase fees for their content and made their uploaded content as paid content which requires users to pay for a subscription or purchase fees to access the content of the channel."  Furthermore, Google/YouTube decided to partner with "affiliates" whose "related product" advertisements are placed with some videos on YouTube.  These products link to the affiliate partners, which pays a commission to Google/YouTube if their products are purchased.[11]

73.      In recent years, Defendants have expanded their business from operating YouTube only as a hosting platform for third-party users, to become a production and media company that

---

[11] See https://www.feedough.com/youtube-business-model-how-does-youtube-make-money/ .

**SECOND AMENDED CLASS ACTION COMPLAINT FOR DAMAGES, INJUNCTIVE RELIEF, RESTITUTION, AND DECLARATORY JUDGMENT**

1    produces its own content or partners with other large video, TV, and film producers..

2        74.    Just like other large global social media platforms, including Facebook,

3    Defendants understand that the YouTube Platform has reached its saturation point in the

4    monetization of  third-party users' content.  Consequently, Defendants have decided to compete

5    directly with third-party content providers like Plaintiffs.  In addition to their own video channels

6    on YouTube, Defendants have entered the digital TV market, and are trying to induce consumers

7    to purchase their TV and entertainment services from Defendants directly, by advertising and

8    offering a product called YouTube TV.

9        75.    Defendants compete for that public audience or viewership unfairly and unlawfully,

10   in a manner which gives their "preferred content" a competitive advantage, by among other things,

11   using their filtering tools and criteria to restrict the access and reach of the smaller third-party

12   users it hosts on YouTube.  Thus, under the pretext of making the site safe for their users,

13   Defendants arbitrarily, capriciously, and deceptively restrict access and reach to speech and

14   content of their competitors on the platform, like Plaintiffs, while at the same time allowing their

15   own content to avoid those same restrictions and restraints -- even when that content violates their

16   own guidelines.  In so doing, Defendants effectively clear space on the platform for content which

17   they, or their preferred users supply, to better reach the sites' 2.3 billion users by censoring the

18   content of their competitors.

19       **E.    Defendants' Tool Kit Of Unlawful Speech Suppression**

20       76.    Defendants employ a number of tools to unlawfully restrict the expression of their

21   users in violation of principles of law and contrary to their agreements with users, all of which are

22   an interrelated part of Defendants' unlawful scheme.

23       **1.    Restricted Mode**

24       77.    One of the Defendants' primary tools is "Restricted Mode."  According to

25   Defendants, "Restricted Mode" is supposed to function much like a curtain that blocks access to

26   the hardcore pornography section at the corner video rental shop, limiting viewer access by

27   younger, sensitive audiences to video content that contains certain specifically enumerated

28   "mature" aspects.

1392054.1

-26-

Case No. 5:19-cv-004749-VKD

**SECOND AMENDED CLASS ACTION COMPLAINT FOR DAMAGES, INJUNCTIVE RELIEF,**
**RESTITUTION, AND DECLARATORY JUDGMENT**

78.     Accordingly, "Restricted Mode" is touted by Defendants as a tool "to help institutions like schools as well as people who wanted to better control the content they see on YouTube with an option to choose an intentionally limited YouTube experience."

79.     Viewers can choose to turn on "Restricted Mode" for their personal accounts, but it may also be activated by system administrators to restrict all access on computer networks to all users and machines, including viewers who seek to access video content in public libraries, schools, and other institutions or work places.

80.     "Restricted Mode" affects tens of millions of YouTube users every single day. Indeed, according to Alice Wu, a Senior Manager of Trust & Safety at YouTube, LLC, Defendants estimate that about 1.5 percent of YouTube's daily views (or approximately 75 million of the nearly 5 billion views every single day) come from people who have activated Defendants' Restricted Mode.

81.     According to Defendants, Restricted Mode can be applied to videos in two ways.

        a.     First, Defendants examine certain "signals" like the video's metadata, title, and the language used in the video.  These certain "signals" are used by Defendants to find bogus rules violations that serve as a pretext for Defendants to segregate disfavored content using Restricted Mode, regardless of whether the content is protected speech or is otherwise compliant with Defendants' regulations.

        b.     Second, Defendants use Restricted Mode to passively restrict a video if it is "flagged" as "inappropriate" by anyone, or by what Defendants refer to as the YouTube "community."  So-called "flagged" videos are reviewed by a "team" of human reviewers for "violations" of  Community Guidelines."

82.     Restricted Mode operates in tandem with separate, more stringent "Age Based Restriction" filtering criteria, intended to block all mature content to viewers under the age of 18. Age Based Restrictions provide Defendants with the ability to protect younger, sensitive audiences from mature content without any need to employ Restricted Mode.  When evaluating whether content is appropriate for all ages, Defendants restrict: (1) "Vulgar language" involving sexually explicit language or excessive profanity in the video or associated metadata; (2) Violence and

**SECOND AMENDED CLASS ACTION COMPLAINT FOR DAMAGES, INJUNCTIVE RELIEF, RESTITUTION, AND DECLARATORY JUDGMENT**

disturbing imagery whether real, dramatized or fake violence that may not be suitable for all ages;

(3) Nudity and sexually suggestive content containing nudity or dramatized sexual conduct may be

age-restricted when the context is appropriately educational, documentary, scientific or artistic,

and content featuring individuals in minimal or revealing clothing may also be age-restricted if

intended to be sexually provocative, but are not explicit in content; and (4) Portrayal of harmful or

dangerous activities involving content that intends to incite violence or encourage dangerous or

illegal activities that have an inherent risk of serious physical harm or death.

83.     As shown below, when a network administrator or an individual viewer activates

"Restricted Mode," each video subject to "Restricted Mode" appears with a Defendant-created

stamp of disapproval, including a red face including a red square bearing a foreboding facial

expression, together with text showing "This video is unavailable with Restricted Mode enabled.

To view this video, you will need to disable Restricted Mode.",



84.     Where Plaintiffs are concerned, Defendants' stamp of disapproval thus makes a

specific and falsifiable misrepresentation to consumers of Plaintiffs and the viewing public that the

video that they have attempted to access contains content that is so inappropriate, shocking and

outrageous for the viewer who has chosen to enable "Restricted Mode" that the viewer must be

protected from that content and that the YouTuber who has created and posted that content is

responsible for having created and uploaded such inappropriate, shocking and outrageous content.

85.     These specific and falsifiable factual representations are by no means limited to

Defendants' foreboding red "Restricted Mode" stamp of disapproval. Indeed, as shown below,

**SECOND AMENDED CLASS ACTION COMPLAINT FOR DAMAGES, INJUNCTIVE RELIEF,
RESTITUTION, AND DECLARATORY JUDGMENT**

viewers who attempt to ascertain why a particular video is subject to "Restricted Mode" are told by Defendants that videos are eliminated from "Restricted Mode" when they include specific pieces of content, including content (1) Talking about drug use or abuse, or drinking alcohol in videos; (2) Overly detailed conversations about or depictions of sex or sexual activity; (3) Graphic descriptions of violence, violent acts, natural disasters and tragedies, or even violence in the news; (4) Videos that cover specific details about events related to terrorism, war, crime, and political conflicts that resulted in death or serious injury, even if no graphic imagery is shown; (5) Inappropriate language, including profanity; and (6) Video content that is gratuitously incendiary, inflammatory, or demeaning towards an individual or group.

- **Drugs and alcohol:** Talking about drug use or abuse, or drinking alcohol in videos.
- **Sexual situations:** Overly detailed conversations about or depictions of sex or sexual activity. Some educational, straightforward content about sexual education, affection, or identity may be included in Restricted Mode, as well as kissing or affection that's not overly sexualized or the focal point of the video.
- **Violence:** Graphic descriptions of violence, violent acts, natural disasters and tragedies, or even violence in the news.
- **Mature subjects:** Videos that cover specific details about events related to terrorism, war, crime, and political conflicts that resulted in death or serious injury, even if no graphic imagery is shown.
- **Profane and mature language:** Inappropriate language, including profanity.
- **Incendiary and demeaning content:** Video content that is gratuitously incendiary, inflammatory, or demeaning towards an individual or group.

86.     Far from ensuring that the videos behind YouTube's version of the pornography curtain contain the content Defendants claim to exclude, the reality is that "Restricted Mode" is significantly over- and under-inclusive, which has caused significant damage to Plaintiffs. Even the most simple examination of Plaintiffs' videos subject to "Restricted Mode" shows that Defendants are not only dead wrong in their representations to the public related to the content of LGBTQ+ videos that they subject to the "Restricted Mode" stamp of disapproval, but that they are hiding from the public valuable materials and are doing so in bad faith.

87.     Even worse, Defendants brazenly admit that they *know* they are doing this. Defendants themselves admit that they repeatedly make "mistakes" in their operation of "Restricted Mode." For example, on May 19, 2017, Defendants admitted that the Restricted Mode

1   "feature isn't working the way it should and we're going to fix it."  For instance, Defendants admit

2   that they got "it wrong" when they censored videos like Ash Hardell's "Her Vows," Calum

3   McSwiggan's "Coming Out To Grandma," Jono and Ben's "Woman interrupted during BBC

4   interview," and Tegan and Sara's "BWU [OFFICIAL MUSIC VIDEO]."

5               **2.     Advertising Restrictions**

6        88.    Arbitrary and capricious advertising restrictions are another example of the vague,

7   ambiguous, and arbitrary criteria and anticompetitive filtering schemes Defendants utilize to

8   suppress speech and to capriciously and discriminatorily restrict users like Plaintiffs from

9   monetizing or boosting the reach or viewer distribution of their videos.

10       89.    Defendants have sold advertisements to Plaintiffs in connection with videos which

11  were posted on YouTube for months, without restriction and were fully monetized.  Having sold

12  the ads, after receiving partial payment for the ads, Defendants then applied the Restricted Mode

13  classification to the videos, pulled the advertisements stating that videos subject to the Restricted

14  Mode classification cannot be advertised, and thereafter Defendants retained the money they had

15  charged Plaintiffs for the advertisements of the now restricted videos.

16       90.    According to Google, "[t]he purpose" of these restrictions "is to keep Google's

17  content and search networks safe and clean for our advertisers, users, and publishers.  We hope

18  that all publishers participating in AdSense have a long and successful partnership with Google.

19  To understand why we need policies and the role they play in the ads eco-system you can watch

20  this video.  For that to happen, it's important that you familiarize yourself with the AdSense

21  program policies.  It's important to make sure visitors to your pages are not misled and avoid any

22  deceptive implementation that may bring accidental clicks.  For more details, please check out

23  our ad implementation policies."[12]

24       91.    The reality is quite different: The sole basis for this restraint is the identity or

25  viewpoint of the consumer seeking to boost the reach and distribution of the video, and has

26  nothing to do with the actual content of the video.

27

28  [12] See https://support.google.com/adsense/answer/3394713?hl=en&ref_topic=1250104.

**SECOND AMENDED CLASS ACTION COMPLAINT FOR DAMAGES, INJUNCTIVE RELIEF,
RESTITUTION, AND DECLARATORY JUDGMENT**

92.     Defendants impose these restrictions to justify anticompetitive and unlawful actions intended to gain a competitive advantage for their own video content and/or to ensure that their sponsored creators, content partners, and advertisers have an unfair competitive advantage in the YouTube video market.  By placing no restrictions on the monetization of their own videos or those of Defendants' sponsored creators, content partners and preferred advertisers, Defendants gain a competitive advantage by restricting the financial reach of Plaintiffs and other disfavored users, while simultaneously ensuring that their own video content (and those of their sponsored creators, content partners and preferred advertisers) are not subjected to the same (or any) Advertising Restrictions.

93.     Defendants' actual practices present yet another example of Defendants saying one thing to members of the Proposed LGBTQ+ Class, and doing something very different.  Not only is the "safe and clean" determination not based upon the actual content of  users' videos, but the Defendants' "inappropriate" designation precludes Plaintiffs and other members of the Proposed LGBTQ+ Class from receiving any revenue from advertisements that would otherwise accompany content not designated as "inappropriate."  Moreover, such practices unlawfully provide Defendants with monopoly power over the video posting and viewership market, and the ability to manipulate, bully, and falsely denigrate legitimate political and educational speakers by subjectively designating their speech as "inappropriate," solely because Defendants do not like or agree with the speakers' political identity or point of view.

### 3.     AI Filtering Under Restricted Mode And Advertising Restrictions

94.     Another tool in Defendants' speech-censoring "kit" is electronic artificial intelligence or "A.I." algorithms that review and regulate video content.  Defendants *claim* that these algorithms are viewpoint- and identity-neutral, and that they ensure that the "same standards apply equally to all" when it comes to the content regulation of speech on YouTube.  Defendants claim that their employees conduct "manual reviews" to supplement the electronic filtering and regulation of video content.

95.     But the evidence, including statements by Defendants' employees familiar with both electronic and manual filtering and regulation of speech that takes place on the YouTube

**SECOND AMENDED CLASS ACTION COMPLAINT FOR DAMAGES, INJUNCTIVE RELIEF, RESTITUTION, AND DECLARATORY JUDGMENT**

1   Platform, suggests that Defendants' representations of neutral viewpoint and identity-based

2   content regulation are *also* false.  The A.I. and algorithmic filtering tools are embedded with code

3   that regulates content based on purely subjective, viewpoint, topic, and identity animus, and other

4   unlawful criteria.  Even before October 2016, Defendants' engineers began making changes to the

5   code and operations of the algorithms and filtering tools in order to ensure that Defendants could

6   filter videos and regulate access to video content based upon overt discrimination of sexual or

7   gender orientation, ethnic, political or religious animus, as well for financial and/or

8   anticompetitive purposes.

9          96.     Similarly, Defendants' viewpoint bias, animus, and discrimination towards the

10   user's identity or viewpoint is institutionally and culturally rampant in Defendants' work place and

11   employment practices.  Among other things, Defendants operate and administer Restricted Mode

12   through employees, including engineers and content reviewers, who work in what has been widely

13   reported and acknowledged as a dysfunctional work environment.

14         97.     Internal emails by and between Defendants' employees show that many employees

15   are routinely subjected to harassment, threats, blacklisting, discipline, and hazing based on their

16   political or religious viewpoints and identity.  The dysfunction and viewpoint bias emanates from,

17   and is enforced at, the highest ranks of Defendants' upper management, and drives the actions of

18   employee supervisors, co-workers, third-party affiliates, and advertisers.

19         98.     Consequently, even when manual employee reviews of video content are used to

20   check and audit restrictions on content based upon the electronic filtering algorithms, Defendants

21   use Restricted Mode and other discretionary and vague content-based restriction criteria to restrict

22   access to Plaintiffs' videos under vague and undefined terms such as "mature" or "sensitive" for

23   certain audiences, solely because the video discusses a topic involving "LGBTQ+," "lesbian,"

24   "gay," "bisexual," "transgender," or "queer" issues, or the video merely mentions these trigger

25   words.  The result is censorship, restraint of speech, and discrimination based, not upon content

26   which might violate a narrow, neutral, objective, and specifically verifiable criteria that furthers a

27   compelling and legitimate public interest, but upon Defendants' animus or dislike for the identity

28   or viewpoint of the speaker.

**SECOND AMENDED CLASS ACTION COMPLAINT FOR DAMAGES, INJUNCTIVE RELIEF,
RESTITUTION, AND DECLARATORY JUDGMENT**

99.     Defendants also admit that decisions to restrict access to videos are routinely made or influenced by third-party NGO affiliates and advertisers who dislike the political or religious identity or viewpoint of the user.  According to Defendants, "YouTube receives significant pressure from governments and social interest groups around the world to remove or restrict access to content that those groups find harmful, dangerous, or offensive. For example, Germany's Netzwerkdurchsetzungsgesetz (network enforcement law or NetzDG) requires any Internet platform with more than 2 million users to implement more efficient ways to report and delete potentially illegal content, such as slander and hate speech.  Platforms which fail to remove such content within 24 hours (or within 7 days for more legally complex content), will be subject to fines of up to 50 million euros."  These groups constantly pressure Defendants to apply access restriction criteria to users whose political or religious viewpoint does not comport with that of an advertiser or third-party NGO.

### 4.     Demonetizing Channels Wholesale

100.    Google/YouTube continue to censor and demonetize the work of LGBTQ+ creators by they are demonetizing entire channels of LGBTQ+ creators:

a.      The YouTube channel SalBardo was demonetized for a period of 30 days, despite the popularity of his short film "Sam," a short film which presents the story of a transgender child who has been beaten for dressing as a boy.  "Sam" https://www.youtube.com/watch?v=YQiN2MYEzSg was posted in 2013 and has generated 7.4 million views.

b.      The YouTube channel NateTrinrud also was demonetized for a period of time, despite the fact that the three videos uploaded to the channel, ("Goodbye, Charley," https://www.youtube.com/watch?v=RNXC1rkrONU; "Pop Rox," https://www.youtube.com/watch?v=E-VpD4_sgNw; and the "Pop Rox Trailer," https://www.youtube.com/watch?v=QWBc92tTzPA), are award winning films which do not include graphic scenes of violence or sexuality.

### 5.     Shadow Banning

101.    Google/YouTube treats serious videos that present themes and issues important to

**SECOND AMENDED CLASS ACTION COMPLAINT FOR DAMAGES, INJUNCTIVE RELIEF, RESTITUTION, AND DECLARATORY JUDGMENT**

1  the LGBTQ+ Community as "not family friendly," or as if they were inappropriate for all

2  audiences simply because they are uploaded by members of the LGBTQ+ Community or are

3  created for the LGBTQ+ Community to watch.  Defendants are not merely censoring and

4  demonetizing individual videos by LGBTQ+ creators – Defendants are making those videos

5  invisible on the YouTube Platform; despite the fact that the videos comply with all of Defendants'

6  published Terms of Service.  For example:

7          a.      Various videos posted by the YouTube channel Watts The Safeword,

8  including "Mermaid Tie," which demonstrates traditional knot work and includes no nudity, have

9  been sporadically shadow banned on YouTube and could not be located on the YouTube Platform

10  by conducting searches for various periods since the videos were uploaded..

11          b.      The "Dare" short film, written by David Brind, depicts the beginning of a

12  gay relationship between two high school seniors.  "Dare" was posted to YouTube in 2013,

13  https://www.youtube.com/watch?v=HtCxdsvlO0s and has generated more than 12.6 million

14  views.  Defendants demonetized and applied Restricted Mode filters to the short film.  Plaintiffs

15  are informed and believe and thereon allege that for various periods of a time over the past two

16  years, "Dare" also was shadow banned on the YouTube Platform and could not be found  except

17  by searching using the director's name.

18          **6.      Deleting LGBTQ+ Thumbnail Images**

19          102.    Thumbnails are small square images or tiles which appear in the lists of YouTube

20  search results ("Thumbnails").  For channels with fewer than 15,000 subscribers, Thumbnails

21  consist of a single still photo which Defendants generate from the uploaded video, or which

22  Defendants capture with a digital camera.  For those channels with 15,000 subscribers or more,

23  Defendants allow the creators to craft unique Thumbnails with titles using customized lettering

24  and graphics.  Plaintiffs and other YouTubers who are part of the LGBTQ+ Community who

25  generate the minimum subscriber numbers required by Defendants are authorized to upload such

26  customized Thumbnails to attract viewers.  Using custom Thumbnails is a visual way of signaling

27  to new viewers that the related content is professionally prepared and superior in quality to most

28  of the content from less popular, amateur creators which populate most of YouTube's channels.

**SECOND AMENDED CLASS ACTION COMPLAINT FOR DAMAGES, INJUNCTIVE RELIEF,
RESTITUTION, AND DECLARATORY JUDGMENT**

1  Custom Thumbnails are so effective at attracting new viewers that these creators actually plan new

2  videos around specific Thumbnail concepts, generating the Thumbnail in advance of the video.

3      103.   Without any notice or explanation, Defendants have and continue to delete the

4  custom Thumbnails of Plaintiffs and Community, and replace those custom Thumbnails with

5  Defendants' own generic Thumbnails, which typically results in reduced numbers of click-

6  throughs and views.  The unlawful and anticompetitive practice of replacing Plaintiffs' custom

7  Thumbnails allows Defendants to further denigrate, stigmatize, and harm Plaintiffs' respective

8  brand, reputation, goodwill, and ability reach intended audiences.

9          **7.      Cancelling And Stopping Subscribers' New Video Notifications**

10     104.   Since the early days of YouTube, creators grew their channel's view numbers by

11  encouraging viewers to "subscribe," to their channels.  Some Plaintiffs have more than one million

12  "subscribers" for their combined two channels.  One major perk of being a "subscriber," used to

13  be that "subscribers," automatically received notification from the YouTube Platform whenever

14  the subscribed channel uploaded new video material.  By cancelling subscriptions, and/or new

15  video notifications, Defendants can prevent LGBTQ+ Plaintiffs from continuing to attract new

16  subscribers by preventing videos from going viral with large numbers of viewers.  Over time, as

17  existing subscribers fail to see channels are posting new videos, views and subscriber numbers

18  shrink.

19     105.   For the past 18-24 months, when established LGBTQ+ creators post a new video,

20  fewer and fewer existing subscribers have been getting new video notifications for LGBTQ+

21  channels like BriaAndChrissy and ElloSteph.  Newly posted videos are languishing with few

22  views during the critical first few days when "buzz" can be generated and a video can go viral.

23  Over time, with Defendants cancelling more and more longtime subscribers, fewer viewers are

24  receiving new video notifications, and successful longtime LGBTQ+ creators' channels post fewer

25  and fewer views per new video.  Defendants also ceased providing new video notifications to

26  longtime subscribers, without providing any notice to the LGBTQ+ creators, their subscribers or

27  other YouTube users.

28     106.   Google/YouTube changed the procedure for requesting "notifications of new

**SECOND AMENDED CLASS ACTION COMPLAINT FOR DAMAGES, INJUNCTIVE RELIEF, RESTITUTION, AND DECLARATORY JUDGMENT**

videos," sometime in the past several years.  Instead of including automatic new video notifications whenever subscribers double click on the "subscribe," box for a channel, Google/YouTube changed the process so that a subscriber who wanted to receive new video notifications both had to double click the "subscribe," box, and to double click on a grey bell icon located to the right of the "subscribe," box.  Existing subscribers automatically stopped receiving new video notifications when Defendants implemented the new procedure.  Google/YouTube implemented the new procedure without any announcement, and did not inform existing subscribers that new video notifications would cease.

107.    Even when existing subscribers figured out that Google/YouTube had a new procedure for getting new video notifications, many subscribers tried to double click on the grey bell icon, many subscribers were unable to successfully complete the process.  Those existing subscribers who successfully managed to complete the process, did not necessarily receive new video notifications on a regular basis.

108.    Defendants further compounded the problems sometime between July and November of 2019, when Google/YouTube again changed the requirements for subscribers to receive new video notifications:  Now, it is no longer sufficient to double click on the grey bell icon, but subscribers must take the additional step of choosing from a new drop down menu one of three options:  "All Notifications," "Personalized Notifications," and "No Notifications."  Again, before implementing this change regarding new video notifications, Defendants gave no advanced notice to the creators, subscribers or YouTube users of this change, resulting in weeks passing during which LGBTQ+ creators posted new material without subscribers to their channels receiving any notification at all.  For those subscribers who had taken the trouble to double click on the grey bell icon to the right of the "subscribe" box before the second change, instead of receiving notifications for all new videos, Google/YouTube converted the existing notification request to only require "Personalized Notifications."  This sleight of hand resulted in subscribers not getting any new video notifications, as Plaintiffs' channels are not set up to provide "Personalized Notifications" to subscribers.

**SECOND AMENDED CLASS ACTION COMPLAINT FOR DAMAGES, INJUNCTIVE RELIEF, RESTITUTION, AND DECLARATORY JUDGMENT**

**8.      Excluding LGBTQ+ Content From The "Up Next" Recommended Application**

109.      Defendants generally exclude LGBTQ+ related content from the YouTube recommended content on the "Up Next," application for the channels, which appears on the screen whenever viewers play Plaintiffs' videos.  As a practical matter, Defendants refuse to recommend to viewers or advertisers video content which includes tag words like "LGBTQ+," "lesbian" "gay," bisexual," "transgender," or "queer."  Google/YouTube does so, despite the fact that it recommends reaction videos that are based upon the very same non-recommended videos uploaded by LGBTQ+ Plaintiffs.  As a result, creators like BriaAndChrissy and Chase Ross must self-censor and refrain from using such tag words for their videos to avoid Defendants' censorship practices, if they are to generate any advertising revenues from their posted videos.  Such self-censorship makes it harder for members of the LGBTQ+ Community (the intended audience for the two channels) to find content which is designed to support, educate and entertain them. Recently, LGBTQ+ creators have been forced to remove paid products placed in their videos because Google/YouTube has deemed certain product brands, such as "Adam and Eve" as inappropriate for the YouTube Platform.

**9.      Recommending Anti-LGBTQ+ Hate Speech In The "Up Next" Application Alongside LGBTQ+ Videos**

110.      While Defendants exclude LGBTQ+-related content from the YouTube recommended content on the "Up Next," application, Defendants recommend and include on the "Up Next" application both reaction videos which copy, pirate or parody Plaintiffs' original content, and original videos which include obscene, homophobic, violent, threatening or disparaging anti-LGBTQ+ content.  These "Up Next" videos which Defendants are recommending to Plaintiffs' subscribers and viewers appear on the same screen, alongside Plaintiffs' videos.  Defendants also monetize many anti-LGBTQ+ hate speech videos, ensuring that both Defendants and their preferred creators are making money from Plaintiffs' original content, all the while discouraging, offending, and even frightening the intended audience for Plaintiffs' videos.

111.      Defendants' practice of recommending hate speech videos in conjunction with the

**SECOND AMENDED CLASS ACTION COMPLAINT FOR DAMAGES, INJUNCTIVE RELIEF, RESTITUTION, AND DECLARATORY JUDGMENT**

1  displaying of LGBTQ+ related videos discourages and even prevents members of the LGBTQ+

2  Community from accessing video content which is designed to support, educate and entertain

3  them.  While Plaintiffs in this case support the right of all persons to express their viewpoints,

4  Defendants may not restrain, censor, or prevent the LGBTQ+ Community from expressing their

5  viewpoints, especially where Defendants promise everyone a level playing field where the rules

6  apply equally to all.

7           **10.    Playing Anti-LGBTQ+ Advertisements Immediately Before LGBTQ+
                    Videos**
8

9           112.    Defendants have sold YouTube advertisements to users who have strong anti-

10  LGBTQ+ messages, and play those advertisements so that they directly precede the LBGTQ+

11  Plaintiffs' videos .  Accordingly, viewers who played video content by BriaAndChrissy, and

12  WonderWarriors were forced to view advertisements with anti-LGBTQ+ messages before viewing

13  the videos which they desired to watch.  Defendants' practice of running anti-LGBTQ+

14  advertisements before playing videos by Plaintiffs offends their intended audience, and

15  discourages viewers from watching Plaintiffs' videos, by forcing them to first listen to doctrinal

16  advertisements that criticize, belittle, or disparage the viewers' beliefs and lifestyles, resulting in

17  fewer views per video, lower subscriber numbers and less income to Plaintiffs.  While Plaintiffs in

18  this case support the right of all persons to express their viewpoints, Defendants may not restrain,

19  censor, or prevent the LGBTQ+ Community from expressing their viewpoints, especially where

20  Defendants promise everyone a level playing field where the rules apply equally to all.

21           **11.    Including Anti-LGBTQ+ Hate Speech In Comments Appearing With
                    LGBTQ+ Videos**

22           113.    YouTube has come a long way from days when it was credited as providing the

23  resources to disenfranchised persons in the Middle East that fueled the Arab Spring.  Instead of

24  treating everyone equally Google/YouTube, now finds it politically and financially expeditious to

25  restrain and disenfranchise LGBTQ+ users, while promoting institutional racism, ethnic violence,

26  and homophobia around the world.  In a recent investigative report sponsored by the New York

27

28

**SECOND AMENDED CLASS ACTION COMPLAINT FOR DAMAGES, INJUNCTIVE RELIEF,
RESTITUTION, AND DECLARATORY JUDGMENT**

Times and the FX network entitled "What Is YouTube Pushing You To Watch Next,"[13] several well respected investigative journalists report that YouTube assists, and is the weapon of choice for anti-LGBTQ+, gay bashing dictators, politicians and advocates around the world, including the current President of Brazil, Jair Bosanaro.  The report describes YouTube as the single most powerful catalyst in the world for disrupting societies and does so by reaching more people than any private or government controlled TV communication network in history.  The report concludes that YouTube exercises "extraordinary influence" over hate-based, ethnic violence, and totalitarian ethnic cleansing, including the horrific events in Myanmar, Sri Lanka, Germany, the Philippines, and Brazil.

114.    One of the principal ways of gaining new viewers and subscribers on the YouTube Platform is to generate favorable comments and/or healthy discussion in the "Comments Section," which appears when videos are played.  Favorable comments can generate thousands of additional views for a video.  Comments regarding video content can generate even more views where the viewers have differing opinions and perspectives.  Defendants allow, and refuse to filter out from Plaintiffs' channels and video comments sections those comments with obscene, homophobic, violent, threatening hate speech.  Accordingly, viewers who play educational video content by QueerKidStuff designed for young viewers, supportive video content by BriaAndChrissy, and WonderWarriors designed for adolescents to young adults, and educational and supportive video content designed for adults by GNews! and uppercaseChase1, are exposed to vile hate speech when they view the videos uploaded by these LGBTQ+ Plaintiffs:



Huurduur Excuse • 2 months ago
Go to hell, whore. Jesus washed away your sin with his blood by being pierced through his heart by a spear after his crucification on the cross accomplished by Roman soldiers and yet you rejected him and offended him. So fuck you.

---

[13] See https://www.nytimes.com/2019/08/09/the-weekly/youtube-brazil-far-right.html .

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24



25  speech trolls flood the Comments Section of Plaintiffs' channels so that each positive comment is

26  pushed down in the queue of comments and is not visible unless the viewers scroll through dozens

27  of hate filled comments.  QueerKidStuff has been forced to disable the Comments Section to

28  protect its young viewers and their parents from such hate speech comments.  In doing so,

**SECOND AMENDED CLASS ACTION COMPLAINT FOR DAMAGES, INJUNCTIVE RELIEF,
RESTITUTION, AND DECLARATORY JUDGMENT**

1   QueerKidStuff generates less buzz for new content, fewer views per video uploaded, fewer

2   subscribers, and barely any revenue from its videos.

3          116.    Plaintiffs strongly support the right of free Speech and expression for all

4   Community Members.  That right does not extend to Defendants' promotion of anti-LGBTQ+

5   hate speech, speech which also violates Defendants' own purportedly neutral content-based rules -

6   - especially when Defendants unlawfully use those rules as pretext to censor, restrain, demonetize,

7   silence, and squelch the engagement and distribution of LGBTQ+ video content or viewership.

8   Such, actions unlawfully interfere with the express rights of LGBTQ+ Community Members to

9   protect themselves by speaking out against hate and homophobia on a level playing field, as

10  provided by Defendants' representations and warranties that the rules apply equally to all on

11  YouTube.

12              **12.    Other Unlawful Speech-Restricting Tools**

13         117.    Defendants have  even more tools in their toolkit to unlawfully restrict the

14  expression of YouTubers like Plaintiffs in the Proposed Class.  These tools include, but are not

15  limited to:

16             a.    Removing the comments section entirely for videos, without a request by

17  the LGBTQ+ creator, and without giving the creator notice as to why the action was taken or an

18  opportunity to respond, thereby depriving creators of the opportunity to generate buzz by having

19  viewers post favorable comments and recommend content to others;

20             b.    Content production, "fact checking," and political partnerships with large

21  third-party media conglomerates, advertisers, or non-Governmental organizations (NGO's) who

22  work with Defendants as a pretext to restrain users and viewpoints that Defendants and their

23  partners dislike;

24             c.    A global network of content review and call center locations and teams who

25  interact with consumers to flag and restrict disfavored producers or viewpoints; and

26             d.    Terms of Service contracts with consumers that contain a catchall provision

27  that Defendants contend grants them unfettered and absolute discretion to restrain speech for "any

28  reason or no reason."

**SECOND AMENDED CLASS ACTION COMPLAINT FOR DAMAGES, INJUNCTIVE RELIEF,
RESTITUTION, AND DECLARATORY JUDGMENT**

118.     Despite the number, complexity, and interrelation of each of these (and other) content regulation policies and practices, each serves as part of a uniform, single, simplistic, and unlawful content-based scheme to control, regulate, restrain, and harm protected speech.  The common thread or core aspect of this scheme is simple:  use and apply vague, subjective, and meaningless content-based criteria with unfettered and absolute discretion to restrict the viewership, reach, and monetization of videos on YouTube, based not on content, but upon the sexual identity, political affinity, religious affiliation, ethnic identity, or commercial affiliation of the speaker or the listener, or upon other animus or bias.

**F.     Defendants Were Caught Censoring LGBTQ+ Users In 2017**

119.     On March 19, 2017, Defendants publicly admitted that they improperly censored videos using their Restricted Mode filtering that were posted or produced by members of the LGBTQ+ Community, based upon the identity and orientation of the speaker, rather than upon the content of the video.  In response to complaints from the LGBTQ+ Community and other civil rights critics, Defendants removed all restricted filtering on videos posted or produced by LGBTQ+ members and groups, and changed their policy, filtering algorithm, and manual review policies purportedly to ensure that videos posted by LGBTQ+ vloggers were not being censored solely because of the identity of the speaker.

120.     Defendants also admitted that they wrongly censored videos posted by members of the LGBTQ+ Community blaming a purported engineering problem with filtering tools that targeted video content from LGBTQ+ users, or targeted users who discussed topics and perspectives on LGBTQ+ issues.  Subsequent to that admission, Defendants agreed to investigate the claims of LGBTQ+ users.  Defendants dispatched a team of senior managers, including YouTube's CEO Susan Wojcicki, to meet with LGBTQ+ representatives to consider revising their policies and review protocols, correcting the filtering tools, and rewriting guidelines that "clarify its position by specifically allowing personal accounts from victims of discrimination or violent hate crimes, as long as they don't contain graphic language or content."

121.     On April 27, 2017, Johanna Wright, Vice President of Product Management for YouTube, stated that Defendants wanted to "clarify that Restricted Mode should not filter out

**SECOND AMENDED CLASS ACTION COMPLAINT FOR DAMAGES, INJUNCTIVE RELIEF, RESTITUTION, AND DECLARATORY JUDGMENT**

content belonging to individuals or groups based on certain attributes like gender, gender identity, political viewpoints, race, religion or sexual orientation."  Wright further promised users that while "Restricted Mode will never be perfect, [Defendants] hope to build on [their] progress so far to continue making [their] systems more accurate and the overall Restricted Mode experience better over time."

122.    This was another false promise by Defendants.  On at least five occasions, after promising to stop discriminating against LGBTQ+ users, Defendants denied an LGBTQ+ news organization the right to advertise and boost viewership on YouTube.  In one instance, Defendants denied Divino an ad seeking to promote a Christmas Holiday video solely because the speakers and organization producing and promoting the video were identified and expressed viewpoints which Defendants stigmatized as "shocking" and "sexually explicit," solely because the user identified and expressed viewpoints that were "gay."  After the LGBTQ+ user repeatedly complained and sought an explanation, the LGBTQ+ user got a customer service person to escalate the complaint.  Whereupon, two different employees at two different locations were unable to provide an explanation of the denial to this user other than to say that the video had been flagged as "shocking content."  When the LGBTQ+ consumer further escalated the complaint, a person identified as an "expert" and senior supervisor, expressly informed the consumer that the ad was being denied because the video it was promoting contained "shocking" and "sexually explicit" content solely because the consumer was "gay" and that "company policy" deemed LGBTQ+ content as shocking and "sexually explicit," solely because of the video involved "the gay thing."

123.    Defendants subsequently apologized to the LGBTQ+ client for what they contend was a misunderstanding and eventually agreed to run the ad.  But they did so **more than three weeks** *after* **the Christmas holiday had passed**.  Subsequent to their apology, Defendants declined at least four additional ad requests from the same video channel with little, or no, explanation.

**SECOND AMENDED CLASS ACTION COMPLAINT FOR DAMAGES, INJUNCTIVE RELIEF, RESTITUTION, AND DECLARATORY JUDGMENT**

G.      **YouTube's Promises To the LGBTQ+ YouTubers Were "Lip Service"**

124.    Whatever promises, apologies, and misunderstanding explanations Google/YouTube has given to the LGBTQ+, they were and continue to be "lip service" as described by one LGBTQ+ YouTuber following his meeting with YouTube's management in 2017.  Instead of fixing the problems, Defendants Google/YouTube have doubled down on their anti-LGBTQ+ animus and discrimination that now pervades the platform.

125.    In an article headlined "How YouTube Radicalized Brazil,"[14] an investigative report written by journalists Max Fisher and Amanda Taub, released by the New York Times on August 11, 2019,  YouTube's animus-based content regulation and distribution system was dubbed the political "Party" behind Jair Bolsonaro, who, courtesy of YouTube content filtering and distribution control, is now the President of Brazil.  Bolsonaro is arguably the most powerful anti-LGBTQ+, homophobic bigot and hatemonger in the world.  According to the article, "YouTube had recently installed a powerful new artificial intelligence system that learned from user behavior and paired videos with recommendations for others."  This system, embedded in YouTube's content regulation schemes and practices, made "Jair Bolsonaro, then a marginal figure in national politics," a "star in YouTube's far-right community in Brazil, where the platform has become more widely watched than all but one TV channel."

126.    The "investigation in Brazil found that, time and again, videos promoted by the site have upended central elements of daily life," including those of children, who YouTube hypocritically exploits to impose content-based restrictions for its own financial and political gain.  According to the New York Times, "[t]eachers describe classrooms made unruly by students who quote from YouTube conspiracy videos or who, encouraged by right-wing YouTube stars, secretly record their instructors."

127.    Thus, contrary to Defendants repeated promises that the "system" is viewpoint-neutral and does "not  favor any political ideology," the Times' report found that YouTube "directs users to extreme content," while, as alleged here, restricting compliant and quality

---

[14] See https://www.nytimes.com/2019/08/11/world/americas/youtube-brazil.html .

**SECOND AMENDED CLASS ACTION COMPLAINT FOR DAMAGES, INJUNCTIVE RELIEF, RESTITUTION, AND DECLARATORY JUDGMENT**

LGBTQ+ content intended for younger audiences.  According to Defendants, this system "now drives 70 percent of total time on the platform."  While that is good news for YouTube "as viewership skyrockets globally," and YouTube brings "in over $1 billion a month," it is bad news for Plaintiffs and the members of the YouTube Community: as Zeynep Tufekci, a social media scholar, has stated, YouTube is "one of the most powerful radicalizing instruments of the 21st century."

**H.      Defendants Have And Continue To Violate The Rights Of Plaintiffs And The LGBTQ+ Community**

128.     Defendants' 2017 promises and claims that the bias "problems" identified by members of the LGBTQ+ Community are now resolved, is simply not true.  Indeed, as the allegations and claims of Plaintiffs demonstrate, things are getting worse, not better.  What Defendants previously characterized as incidental or unintentional "problems" in properly regulating and protecting LGBTQ+ expression have become part of an unlawful scheme by defendants to restrain, deceive, discriminate, and violate the legal rights of Plaintiffs and the putative class members of the LGBTQ+ Community that the LGBTQ+ seek to represent in this lawsuit.

**1.      Divino (GlitterBombTV.com's GNews!)**

129.     Divino Group LLC is owned and managed by Chris Knight and Celso Dulay.  Mr. Knight and Mr. Dulay are members of the LGTBQ+ Community who write, produce and upload to the YouTube Platform video content intended for the LGTBQ+ Community under the GlitterBombTV.com name as GNews!.  Cameron Stiehl is a regular co-host and contributor to GNews! and Glitter Bomb TV.

130.     Plaintiffs Divino, Chris Knight and Celso Dulay are informed and believe and thereon allege that sometime in late 2013 or early 2014, Divino entered an agreement with Defendants to become YouTube partners by joining the YouTube Partnership Program.  As part of the YouTube Partnership Program, Defendants gave Divino a number of special benefits, such as the opportunity to prepare custom Thumbnail images for each video it uploaded to YouTube, and to monetize its videos.  YouTube promised additional benefits to Divino if it succeeded in

**SECOND AMENDED CLASS ACTION COMPLAINT FOR DAMAGES, INJUNCTIVE RELIEF, RESTITUTION, AND DECLARATORY JUDGMENT**

1    obtaining 1,000 or more subscribers to its YouTube channel.

2        131.    Commencing in March of 2014, in reliance on its YouTube Partnership Program

3    agreement with Defendants, in order to secure additional partner benefits, Divino undertook

4    efforts to increase its number of views per video, and its number of subscribers, by purchasing

5    from Defendants a series of advertisements.  Between March 9, 2014 and October 1, 2018, Divino

6    paid to Defendants $14,542.94 for advertisements relating to its GNews! videos.

7        132.    However, Defendants refused to sell Divino all of the advertisements it applied to

8    purchase: on at least eight separate occasions, after November 2016, Google/YouTube barred

9    Divino from purchasing ads or monetizing its news and event show, GNews!, because Defendants

10   had determined in their discretion that the content of a show violated Defendants' policy against

11   promoting "shocking" "offensive," and "sexually explicit" content.

12       133.    Around April 2017, after Divino had purchased numerous advertisements in an

13   effort to secure the minimum 1,000 subscribers to qualify for the next level of Defendants'

14   enhanced video creator benefits, Defendants unilaterally changed the YouTube Partnership

15   Program requirements so that only video creators with "10,000 lifetime views" would qualify to

16   be partners.  In unilaterally changing the terms of the YouTube Partnership Program, Defendants

17   repudiated the agreement with Divino.

18       134.    On December 24, 2017, Plaintiff Divino was prohibited from advertising a holiday

19   special news and events show created for LGBTQ+ persons in the San Francisco Bay Area and

20   beyond, because Defendants labeled the GNews! video as "shocking content."  When Plaintiff

21   Divino inquired as to what portion, if any, of the video content on a holiday event show was

22   inappropriate for advertising, an employee of Google AdWords stated that video content that

23   discusses or expresses the "gay thing" or is created by a YouTuber who identifies as "LGBTQ+"

24   or "gay" violates "company policy" against the advertising or monetizing of "shocking" and

25   "sexually explicit" content.

26       135.    On or about January 17, 2018, Defendants again unilaterally changed the YouTube

27   Partnership Program requirements so that only creators with channels that "have accumulated

28   4,000 hours of watch time within the past 12 months, and have at least 1,000 subscribers" would

**SECOND AMENDED CLASS ACTION COMPLAINT FOR DAMAGES, INJUNCTIVE RELIEF,
RESTITUTION, AND DECLARATORY JUDGMENT**

qualify for the program.  By that time, Defendants had spent thousands of dollars in an effort to boost their subscriber numbers, and had been refused opportunities to purchase other advertisements.  Because Divino had not reached the new 1,000 minimum number of subscribers, Defendants removed Divino from the YouTube Partnership Program, and stripped Divino of the ability to monetize its videos.  In doing so, Defendants further repudiated the agreement with Divino.

136.    Since February 6, 2014, Divino has produced 132 episodes of GNews!, an online LGBTQ+ news show co-produced by Divino's principals, Celso Dulay and Chris Knight.  In reliance on Defendants' assurances of viewpoint-neutrality and free expression discussed above, Divino decided to produce and distribute each such episode through the YouTube Platform.

137.     GNews! is and has always been intended to be a positive and affirming news source for members of the LGBTQ+ Community.  Labeled "Where You Get All Your Gay in a Day," Dulay and his revolving line-up of co-hosts cover a variety of topics of interest to the global LGBTQ+ Community – from Hollywood, the music charts, pop culture, celebrities, politics, news of top interest to the community, local and international events, their "Crush of the Week" and more.

138.    A representative screenshot from an episode of GNews! is below:



Glitter Loud & Prosper! - GNews! Episode 114
14,358 views

139.    Inasmuch as GNews! is subject to the same criteria that governs all YouTubers (and there is nothing in any GNews! episode that violates any provision of law or any legitimate provision of YouTube's or Google's terms of service), GNews! is typical of YouTube content produced and uploaded by other YouTuber members of the Proposed Class.

140.    Relying on the truth of Defendants' representations that YouTube is, had been, and would remain a viewpoint-neutral forum for free expression, Divino and other members of the Proposed LGBTQ+ Class were further induced to purchase ad products from Defendants.

141.    YouTubers like Divino, who initially attempted to rely on social media and word of mouth to increase viewership for their video content, often find that the only effective way to increase views of GNews! and to grow subscribers is to purchase ad products from Defendants to increase their reach.  This appears to be the result of a deliberate and fraudulent effort by Defendants to increase their profits through the sale of advertisements.

142.    Specifically, when videos like Divino's GNews! episodes are uploaded to the "YouTube Creator's Studio," there appears a direct link via pull-down menu to promote the episodes via Google Ads (formerly called Google AdWords).  YouTubers who select the "promote" option via pull-down menu are immediately directed to a Google Ads landing page that states - as of May 5th, 2019:

> You'll promote your video using Google Ads. Like millions of other creators and businesses, you'll use the Google Ads platform to run and manage your video as an ad on YouTube. With video ads, you can expand your audience and pay only for views that count. You'll now be redirected to sign in to or create a Google Ads account.

143.    Neither Divino, nor any other member of the Proposed Class would have spent money on such products, if they had been aware of the true facts underlying Defendants' representations.

144.    For example, between August 2015 and May 2018, GNews! ads purchased by Divino on the strength of the above-referenced representations were "disapproved" (YouTube-speak for "blocked") no fewer than *eleven times* based on increasingly vague and nonsensical reasons.

145.    And between September 2015 and March 2018, two GNews! episodes were subject to "Restricted Mode," thus restricting significant portions of GNews! potential audience from viewing the content.

146.    Consistent with what has happened to members of the Proposed Class who have dared to question Defendants' blacklisting, when Divino's representatives sought clarification as

**SECOND AMENDED CLASS ACTION COMPLAINT FOR DAMAGES, INJUNCTIVE RELIEF, RESTITUTION, AND DECLARATORY JUDGMENT**

to what content in the news show constituted "shocking content," Defendants were initially unable to point to anything.  When Divino escalated the inquiry, their call was transferred to a person working for Defendants in South Asia identified as a senior content regulator and Defendants' "call center" head.  After taking some time to view the GNews! content in question, the employee informed Divino that the content of the show violated the company's prohibition against "shocking" and "sexually explicit" content ***because*** of what he stated was Defendants' ***"company policy"*** of banning content that related to the "***gay thing***" and because Divino's representatives identified as LGBTQ+ and are "***gay***."

147.    The call thus confirms what Plaintiffs and other YouTubers in the Proposed LGBTQ+ Class have long known to be true: the soaring rhetoric of Defendants' professed commitments to values of freedom of expression is nothing more than a smokescreen covering a rotting corporate culture that uses overseas call center workers in a scheme to suppress speech and violate established antidiscrimination protections.

148.    Defendants' discretionary, discriminatory, viewpoint-based, and unlawful content-based speech regulation system was, is, and continues to be used to discriminate against and financially harm YouTube consumers.  Indeed, every YouTube consumer or user is an unwitting victim of Defendants' discriminatory and fraudulent scheme to use unlawful and discriminatory content-based speech regulations, policies, and practices to obtain illegal financial and political gain at the expense, and to the detriment of the users' free speech and consumer rights.

149.    Instead of correcting their behavior and bringing their filters and regulations of speech into compliance with California's free speech, antidiscrimination, consumer fraud, and contract laws, Defendants continue to maintain and apply arbitrary, capricious, discriminatory and deceptive regulations to restrict speech on YouTube.

150.    In short, Defendants are engaged in a global fraud on YouTube's users and consumers.  YouTube consumers, like Plaintiffs, are promised a video hosting platform that operates without regard to a user's identity or viewpoints subject only to neutral, narrowly tailored, non-discretionary content-based rules and restrictions that serve to further a legitimate public interest, such as public safety or national security.  In reality, however, Defendants deliver a

platform where YouTube consumers are subject to, vague, discretionary, and meaningless rules, regulations, and practices to discriminate against and financially harm disfavored third-party speakers and viewers, as a pretext to further Defendants' purely selfish, corporate interests of maximizing financial gain, political power, and consolidating control over the public speech and content of its consumers and the public.

151.    Not only is Defendants' censorship not based upon the express content of Plaintiffs' videos and those of others in the Proposed LGBTQ+ Class, but Defendants' "inappropriate" designation, falsely and unfairly stigmatizes Plaintiffs.  The designation renders prospective viewers ineligible to watch Plaintiffs' programming from many public, as well as private workplace or home computer stations.  It prevents access to educational content by students whose computer use may be subject to parental controls, intended to shield the student from truly inappropriate material, not to exclude political or educational discourse of current or historical events.  It precludes Plaintiffs from receiving any revenue from advertisements that would otherwise accompany content not designated as "inappropriate."  Moreover, it gives Defendants a virtual monopoly over the video posting and viewership market, and authority to manipulate, bully, and falsely denigrate legitimate political and educational speakers by subjectively designating their speech as "inappropriate," solely because Defendants do not like or agree with the users' political identity or point of view.

152.    Such a censorship regime cannot pass muster under California law.  Among other things, it provides Google/YouTube with unfettered and unbridled discretion to impose their own political views and values upon speakers, without any objective criteria for evaluating what is and is not appropriate, and thereby censors speech, based on animus towards the speaker's political viewpoint, rather than on the appropriateness of the video content.  It also constitutes intentional discrimination by Defendants based upon the religious beliefs, political identity, or sexual orientation of the speaker.  Moreover, it allows Defendants unfettered authority to regulate, restrain, and censor speech as an unfair, unlawful and deceptive business practice designed to inflict harm upon their competitors and to promote their own video content at the expense of the smaller third-party users, on whose backs the YouTube Platform was built.  Furthermore, it

**SECOND AMENDED CLASS ACTION COMPLAINT FOR DAMAGES, INJUNCTIVE RELIEF, RESTITUTION, AND DECLARATORY JUDGMENT**

violates the warranty of good faith and fair dealing implied in the Defendants' Terms of Service, and the video posting guidelines and policies to which Plaintiffs were required to agree, in order to use the YouTube Platform.  Defendants do all of this as part of their control and management of what is arguably the largest public forum for expression and the exchange of ideas that has ever been available to the public in California, the United States, and ultimately the world—one to which Google/YouTube invite the public to express themselves in all manner of speech, and to engage with such speech through viewing and commenting.

153.    Until recently, all of Divino's subscribers had been receiving electronic notifications from YouTube whenever Divino uploaded new video content.  In the past year, Divino's subscribers have been complaining that they no longer receive YouTube notifications for new Divino video content.  YouTube did not announce or notify Divino of any change to the existing notification system.  In discontinuing their practice of notifying existing Divino subscribers regarding new posted content, Defendants have effectively nullified the benefits of the $14,000 worth of advertisements Divino had purchased to boost subscriber numbers:  existing subscribers will not continue to watch Divino's videos when they believe Divino has stopped posting new materials, and Divino cannot possibly generate the minimum 4,000 annual hours of viewer watch time required to requalify for the YouTube Partner Program if existing subscribers were not watching new videos.

**2.    BriaAndChrissy LLC (BriaAndChrissy)**

154.    Plaintiff BriaAndChrissy LLC a limited liability company created under the laws of the state of Georgia, and is wholly owned by Bria Kam and Chrissy Chambers, a married lesbian couple and the creators of BriaAndChrissy, and WonderWarriors (formerly known as "OurLesbianLove"), two popular LGBTQ+ video content channels on the YouTube Platform. Bria is a professional musician, and Chrissy is an actress.  They use their creative talents to support and entertain young adult members of the LGBTQ+ Community.

155.    On the BriaAndChrissy and WonderWarriors channels, BriaAndChrissy LLC uploads videos that document and describe the experiences of the same sex couple, including the struggles, and mental and physical health issues which affect same sex couples who are constantly

**SECOND AMENDED CLASS ACTION COMPLAINT FOR DAMAGES, INJUNCTIVE RELIEF, RESTITUTION, AND DECLARATORY JUDGMENT**

1    confronted with homophobic hate speech, bigotry, attacks, and institutional bias against LGBTQ+

2    persons.  Since 2012, BriaAndChrissy LLC has been uploading videos featuring the original

3    material and covers of the work of the couple, and of other artists, as well as skits, interviews, and

4    editorial commentary on issues of the day, such as homophobic celebrities.

5         156.    On the WonderWarriors channel, BriaAndChrissy LLC created a popular "Day-in-

6    the-Life" video-log that chronicles the couple's lives, and encourages LGBTQ+ persons to live a

7    healthy lifestyle through fitness, creativity, responsible ethical conduct and supportive

8    relationships.

9         157.    In 2017, the BriaAndChrissy channel had 850,000 subscribers with 380 million

10   views.  WonderWarriors had 200,000 additional subscribers with 60 million views.  The two

11   channels averaged 15,000 new subscribers per month, 10 million views per month for each new

12   video uploaded, and generated on average $3,500 per month.  And as any objective or reasonable

13   viewer can see, the video content that appears on BriaAndChrissy and WonderWarriors complies

14   with YouTube's Community Guidelines and other content-based regulations used by Defendants

15   to regulate free expression and speech on the YouTube Platform.

16        158.    On or about June of 2013, the BriaAndChrissy channel was so popular with

17   viewers that Defendants invited the couple to create and post a video titled "Proud to Love" on the

18   channel.  No sooner had these Plaintiffs agreed to Defendants' invitation to create and post "Proud

19   to Love," than Defendants demonetized the "Proud to Love" video and refused to re-monetize it.

20   Defendants only re-monetized the video after Bria Kam appealed to BriaAndChrissy fans on

21   Twitter, where the video received significant additional attention.  As a result of Defendants'

22   monetization treatment of the "Proud to Love" video, " BriaAndChrissy LLC lost substantial

23   revenue and earnings from this popular video.

24        159.    In February 2016, Defendants then invited BriaAndChrissy LLC to pitch and

25   produce an LGBTQ+ documentary program featuring the couple travelling throughout the United

26   States and interviewing members of the LGBTQ+ Community about their personal experiences.

27   The concept was to document LGBTQ+-related issues of local importance, and broader LGBTQ+

28   issues of national importance which affect LGBTQ+ persons, their families and friends in

1  different communities around the United States.  To Plaintiffs' surprise, Defendants subsequently

2  turned down the project under the pretext that they were no longer interested in the concept.

3  Unbeknownst to the Plaintiffs, and without it permission or any legal rights to the unique content,

4  Defendants sponsored an identical show hosted by a former Google/YouTube employee.  In

5  brazen disregard and violation of BriaAndChrissy LLC's intellectual property rights, Defendants

6  stole and plagiarized Plaintiffs' concept and content, and profited from that theft by promoting and

7  posting a show on YouTube which was a complete rip off of BriaAndChrissy LLC's concept and

8  content, keeping all of the monetary and distribution value for themselves, to the financial

9  detriment of BriaAndChrissy LLC, Defendants' direct competitor.

10      160.    In furtherance of their anticompetitive and discriminatory attack on this LGBTQ+

11  Plaintiff, Defendants also engaged in "unsubscribing" viewers who had existing subscriptions to

12  the BriaAndChrissy and Wonder Warrior channels. Specifically, Defendants began deleting

13  longstanding subscriptions of viewers who watch Plaintiffs' content, making those subscriptions

14  disappear without warning.  Because many of its subscribers and audience were deterred by

15  having to constantly re-subscribe to BriaAndChrissy LLC's channels over and over again, this

16  Plaintiffs' viewership and subscription rates were fraudulently and unfairly reduced to levels well

17  below the level which had existed prior to Defendants' unlawfully unsubscribing of viewers to

18  BriaAndChrissy and/or WonderWarriors.  Many subscribers have continued to complain

19  throughout September and October that Google/YouTube are deleting their subscriptions to the

20  channel and not allowing them to re-subscribe.  Other subscribers are complaining that when they

21  visit the BriaandChrissy channel, they cannot find new videos which were uploaded, and even

22  when they learn through other social media platforms that new BriaAndChrissy videos have been

23  posted to the channel, the videos do not appear on the channel or in YouTube searches.  As a

24  result of this unlawful conduct, Defendants caused this Plaintiff to lose its substantial viewer base

25  and revenues derived from an audience that BriaAndChrissy LLC alone, had built up over the past

26  seven years.

27      161.    Defendants also unilaterally cancelled or stopped sending electronic notifications of

28  new videos that Plaintiff BriaAndChrissy LLC had uploaded to its channels, without providing

1  any notice to Plaintiff, its subscribers, or YouTube consumers.

2      162.    As a result of Google/YouTube's ever changing new video notification practices,

3  BriaAndChrissy LLC's LGBTQ+ existing subscribers and loyal viewers not get new video

4  notifications no matter how many times that they succeed in learning about Google/YouTube's

5  secret new procedures and comply:  Defendants just change the process again.  Defendants' bait-

6  and-switch notification practices, harmed BriaAndChrissy LLC's ability to generate continued

7  interest among its existing subscribers, prevented them from reaching new viewers who would be

8  attracted by video comments posted by subscribers.  Defendants' conduct has caused

9  BriaAndChrissy LLC's numbers of subscribers and views to decline to a marked degree.

10  Defendants' practices are making it is impossible for BriaAndChrissy LLC to consistently

11  generate sufficient views per video to meet Defendants' monetization requirements and,

12  consequently, caused this Plaintiff to lose substantial revenue to Defendants.

13      163.    Beginning on or around 2017, without any notice or explanation, Defendants

14  deleted many of Plaintiffs' customized Thumbnails identifying BriaAndChrissy LLC's channels

15  and content, and replaced them with Defendants' own generic Thumbnails that harm and

16  stigmatize Plaintiffs' brand and content by giving viewers the impression that the video uploaded

17  was of poor quality and/or posted by someone who does not have the following, goodwill, and

18  quality associated with BriaAndChrissy LLC's reputation and content quality.

19      164.    In 2017, Defendants also demonetized individual videos posted by BriaAndChrissy

20  LLC, such as http://youtube.com/watch?v=yIDaCdjDodM, a video about being comfortable in

21  your own skin.  In 2018, Defendants demonetized the entire WonderWarriors channel without any

22  notice, explanation or an opportunity to respond and fix the monetization issues, if any.  In so

23  doing, Defendants harmed the ability of BriaAndChrissy LLC and other LGBTQ+ creators to

24  generate a financial return on their videos and unlawfully restrained, if not eliminate entirely, the

25  ability of BriaAndChrissy LLC to earn revenue on content associated with its channels.

26      165.    Defendants also exclude LGBTQ+ related content from the "Up Next," application

27  that appears on the BriaAndChrissy and WonderWarriors channels.  Defendants refuse to

28  recommend or to promote video content that is associated with tag words like "LGBTQ+,"

"lesbian," "gay," "bisexual," "transgender," or "queer," or content that is associated with titles or descriptions using such terms.  **Defendants engage in this discriminatory, anticompetitive, and unlawful practice, while simultaneously promoting and recommending reaction videos by other creators which are based upon or copy videos uploaded by BriaAndChrissy or WonderWarriors which Defendants have restricted or demonetized.**  As a result, LGBTQ+ creators like BriaAndChrissy LLC must self-censor and refrain from using such words for videos to avoid running afoul of Defendants' subjective and unlawful censorship practices.  Such self-censorship forced upon BriaAndChrissy LLC is yet another unfair and unlawful tactic that discriminates against, and makes it harder for members of the LGBTQ+ Community to find LGBTQ+-related content intended to support, educate and entertain LGBTQ+ consumers on YouTube.

166.    And as they do to many of their competitors, Defendants indiscriminately and unlawfully apply the "Restricted Mode" limitations for "sensitive viewers," to BriaAndChrissy LLC's videos, as well as to videos of many other LGBTQ+ members of the YouTube Community, solely because LGBTQ+ content creators discuss viewpoints or topics that Defendants' filtering tools and practices "flag" as "LGBTQ+," "lesbian," "gay," "bisexual," "transgender," or "queer." As is Defendants' continuing custom, practice, and policy, Google/YouTube "flag" LGBTQ+ content as "inappropriate," even though the actual content does not violate YouTube's Community Guidelines, Restricted Mode criteria, or any other content-based regulations.  Thus, Defendants stigmatize many of BriaAndChrissy LLC's videos, including content which addresses suicide prevention, addiction treatment, bullying, or healthy lifestyles, as "inappropriate" for what Defendants call "sensitive audiences," merely because BriaAndChrissy LLC's owners identify as a legally married lesbian couple.

167.    Defendants also misapply age restrictions to this LGBTQ+ Plaintiff, limiting BriaAndChrissy LLC's videos to viewers 18 years of age or older, regardless of the actual content of the video.  As they do in applying their Restricted Mode, Defendants use A.I. and other machine-based filtering tools to flag tags, titles, descriptions, or content that Defendants deem to be "LGBTQ+," "lesbian," "gay," "bisexual," "transgender," or "queer."  As a result, many of the

1   videos created by BriaAndChrissy LLC to support younger members of the LGBTQ+ Community

2   who are experiencing bullying, persecution and/or abuse, many of whom reside in rural areas

3   where mental health and social services are hard to access, cannot view the very materials

4   designed to provide them with support and educate them about resources where help may be

5   obtained.

6          168.   Defendants also engage in advertising practices which are designed to discourage

7   more sensitive members of the LGBTQ+ Community from viewing the videos posted on

8   BriaAndChrissy or WonderWarriors.  Among other practices, Defendants sell and profit from ads

9   sponsored by extremist groups who viciously and violently target gay marriage and the LGBTQ+

10  Community in general.  Defendants permit these hate mongers to display these obscene ads before

11  content of LGBTQ+ creators like BriaAndChrissy LLC is played in order to scare and threaten

12  LGBTQ+ viewers and intended audiences from watching BriaAndChrissy LLC's videos.  Such

13  gay bashing ads effectively negate any positive message embodied in the video by turning away

14  the LGBTQ+ audience before they view the video.  When BriaAndChrissy posted a video

15  addressing the anti-LGBTQ+ agenda of Chick-fil-A, Defendants began loading anti-LGBTQ+

16  Chick-fil-A ads which played before BriaAndChrissy videos.

17         169.   Defendants' monetization treatment of BriaAndChrissy's videos is haphazard at

18  best.  Most recently, when BriaAndChrissy's video "Ten Ways To Know You're In Love," was

19  uploaded, Defendants immediately demonetized the video.

20

21

| Video | | Visibility | Monetization | Date | Views | Comments | Likes (vs. dislikes) |
|---|---|---|---|---|---|---|---|
| | 10 Ways To Know You're In LOVE! (Do you ...<br>DO YOU WANT A BABY? Huge thank you to<br>XYTEX for sponsoring this, and YOU can have ... | ⊙ Public | $ Limited<br>Not suitable for m...<br>Under review | Aug 8, 2019<br>Published | 1,297 | 17 | 97.0%<br>164 likes |

22

23  Just hours later on the same day, the video appeared fully monetized.

24         170.   As demonstrated below, Google/YouTube subject many of BriaAndChrissy videos

25  to censorship resulting in reduced advertising revenue being produced by each video, compared

26  with similar videos uploaded by creators who are do not identify as part of LGBTQ+ Community,

27  despite the fact that the videos do not include scenes of graphic violence, graphic sexual content,

28  nudity, or descriptions of sexual acts.

**SECOND AMENDED CLASS ACTION COMPLAINT FOR DAMAGES, INJUNCTIVE RELIEF,
RESTITUTION, AND DECLARATORY JUDGMENT**

| Plaintiffs' Videos | YouTube Status | Comparable Videos By Others | YouTube Status |
|---|---|---|---|
| "Lesbian Condom Challenge," posted May 2017; generated 90,000 views; https://www.youtube.com/watch?v=kUiELFvLPyM | Age Restricted; Limited Monetization | "The Ultimate Condom Test," posted August 2016, generated 7.5 million views; https://www.youtube.com/watch?v=ZULlT2YDu_E | No Restrictions; Full Monetization |
| "Sexy Athletes," posted June 2014; generated 157,000 views: https://www.youtube.com/watch?v=yTCaO3dmOjU | Age Restricted; Limited Monetization | "The Hottest Female Athletes 2019," posted April 2019, generated 318,000 views; https://www.youtube.com/watch?v=ppf6qp3bVb8 | No Restrictions; Full Monetization |
| "Confronting My Bully," posted March 2019, generated 27,000 views; https://www.youtube.com/watch?v=Xq-P64GAXY8 | Limited Monetization | "Confronting Online Bullies Face To Face," posted September 2019, generated 193,000 views; https://www.youtube.com/watch?v=t4bNGLE5De4 | Full Monetization |
| "Revenge Porn And Lawsuit Impact Statement," posted February 2019, generated 9 views; https://www.youtube.com/watch?v=1Fv9BuwLijo | Limited Monetization | "'Revenge porn' site founder defends site, posted April 2012, generated 22,000 views; https://www.youtube.com/watch?v=mO_o1FBK8qI | Full Monetization |
| "The Gross Tongue Challenge," posted December 2018, generated 102,000 views; https://www.youtube.com/watch?v=Hsdz1Gy22bQ | Restricted Mode; Limited Monetization | "Tongue Kissing Make Out Challenge w/ Jordyn Jones & Josh Killacky," posted October 2018, generated 580,000 views; https://www.youtube.com/watch?v=BVGO3kHgvTU | Full Monetization |
| "I Almost Died My Side of the Story," posted August 2018, 165,000 views; https://www.youtube.com/watch?v=05dvHnDhLz0 | Limited Monetization | "I almost Died Last Night," posted June 2019, generated 2.1 million views; https://www.youtube.com/watch?v=lFiqD9coEDU | Full Monetization |
| "10 Worst Kisses," posted June 2018, generated 1.7 million views; https://www.youtube.com/watch?v=QbLMHb_CQAA | Limited Monetization | "Couples Try Kissing With Their Eyes Open," posted 2017, generated 2.9 million views; https://www.youtube.com/ | Full Monetization |

**SECOND AMENDED CLASS ACTION COMPLAINT FOR DAMAGES, INJUNCTIVE RELIEF, RESTITUTION, AND DECLARATORY JUDGMENT**

| Plaintiffs' Videos | YouTube Status | Comparable Videos By Others | YouTube Status |
|---|---|---|---|
| | | watch?v=fFHAB82u-nQ | |
| "I got My First tattoo," posted September 2017, generated 132,000 views; https://www.youtube.com/watch?v=WsSIBl EiQRo | Limited Monetization | "Pewdiepie Butt Tattoo Reaction," posted January 2016, generated 11.5 million views; https://www.youtube.com/watch?v=r-bd7iDnE6M | Full Monetization |
| "We don't Like To Kiss," posted March 2017, generated 25,000 views; https://www.youtube.com/watch?v=_hESA NEM-Sk | Limited Monetization | "Guys Kiss Guys for the First Time," posted December 2014, generated 9.7 million views; https://www.youtube.com/watch?v=d5ci_VlRcig&t=1s | Full Monetization |
| "10 Lesbian Nightmares," posted January 2017, generated 87,000 views; https://www.youtube.com/watch?v=lEgEDa sPips | Limited Monetization | "My First Time Putting on a Condom," posted September 2019, generated 267,000 views; https://www.youtube.com/watch?v=nYIuufoClO8 | Full Monetization |
| "Touch My Body Challenge," posted January 2017, generated 743,000 views; https://www.youtube.com/watch?v=skf33gj Lef0 | Limited Monetization | "Wild Touch My Body Challenge With Girlfriend," posted June 2019, generated 152,000 views; https://www.youtube.com/watch?v=PN0oYzD8_zg | Full Monetization |
| "I have PTSD," posted July 31, 2016, generated 189,000 views; https://www.youtube.com/watch?v=fokQral -HTU | Limited Monetization | "COMPLEX PTSD - Post-Traumatic Stress Disorder," posted April 2015, generated 237,000 views; https://www.youtube.com/watch?v=_qIAZcOryl4 | Full Monetization |
| "Men French Kiss Men For First Time," posted September 6, 2016, generated 4.6 million views; https://www.youtube.com/watch?v=ETwZ7 4337Kg | Limited Monetization | "Guys Kiss Guys for the First Time," posted December 2014, generated 9.7 million views; https://www.youtube.com/watch?v=d5ci_VlRcig&t=1s | Full Monetization |
| "Most Homophobic Celebrities," posted June 2015, generated 204,000 views; https://www.youtube.com/watch?v=O6wG | Limited Monetization | "Alec Baldwin -- Homophobic Rant #73," posted June 30, 2013, | Full Monetization |

**SECOND AMENDED CLASS ACTION COMPLAINT FOR DAMAGES, INJUNCTIVE RELIEF, RESTITUTION, AND DECLARATORY JUDGMENT**

| Plaintiffs' Videos | YouTube Status | Comparable Videos By Others | YouTube Status |
|---|---|---|---|
| BnY9gTA | | generated 35,000 views; https://www.youtube.com/watch?v=faqPP1X5kzc | |
| "Buzzfeeds already done it," posted March 2015, generated 179,000 views; https://www.youtube.com/watch?v=rPO0ekLHvOs | Limited Monetization | "10 Creators Who Had Their Content Stolen By Buzzfeed," posted June 2019, generated 64,000 views; https://www.youtube.com/watch?v=2aekPAwUhzo | Full Monetization |
| "Shocking Super Bowl Commercial 2015 (GAY KISS)," posted January 2015, generated 6.8 million views; https://www.youtube.com/watch?v=--aMixRk1ZY | Limited Monetization | "Banned Carl's Jr Superbowl Commercial (Parody)," posted February 2014, generated 166,000 views; https://www.youtube.com/watch?v=8_ux5T-3GpI | Full Monetization |
| "I hate Fags," posted June 2014, generated 249,000 views; https://www.youtube.com/watch?v=5XJM2eFxAgg | Demonetized | "God Hates a Fag Music Video HD," posted August 2009, generated 225,000 views; https://www.youtube.com/watch?v=BREvUu4wI-4 | Full Monetization |
| "Couples Therapy," posted November 2014, generated 119,000 views; https://www.youtube.com/watch?v=CwPmtcd9KL4 | Demonetized | "When couples therapy Gets REAL," posted December 2018, generated 2.6 million views; https://www.youtube.com/watch?v=Ycjtow-lNA4 | Full Monetization |
| "How Couples really Act," posted June 2014, generated 2.6 million views; https://www.youtube.com/watch?v=rUamtkf4ixg | Demonetized | "Weird Things All Couples Do," posted August 2014, generated 6 million views; https://www.youtube.com/watch?v=HFQBIK__X14 | Full Monetization |
| "10 Worst Kisses," posted April 2014, generated 25.5 million views; https://www.youtube.com/watch?v=bwMQlpvLsO4 | Demonetized | "The 10 Worst Kisses in the Universe," posted April 2013, generated 9.9 million views; https://www.youtube.com/watch?v=tKvHQ5l8iXw | Full Monetization |
| "10 worst Hugs," posted May 2014, generated 10.5 million views; https://www.youtube.com/watch?v=eS-XtPeJQTc | Demonetized | "Worst Hug Ever," posted June 2019, generated 385,000 views; https://www.youtube.com/watch?v=xeNz0uaxia8 | Full Monetization |

**SECOND AMENDED CLASS ACTION COMPLAINT FOR DAMAGES, INJUNCTIVE RELIEF, RESTITUTION, AND DECLARATORY JUDGMENT**

| Plaintiffs' Videos | YouTube Status | Comparable Videos By Others | YouTube Status |
|---|---|---|---|
| "I hate Gays Dear FireFox," posted April 2014, generated 108,000 views; https://www.youtube.com/watch?v=0eV_ddXgg38 | Demonetized | "Eddie Murphy:  Fag and HIV jokes," posted March 2009, generated 45,285 views; https://www.youtube.com/watch?v=c1x0MBLKlrk | Full Monetization |
| "50 Facts (100th video)," posted March 2014, generated 196,678 views; https://www.youtube.com/watch?v=pYQEaz1td0U | Demonetized | "50 Facts About Us: Cody & Lexy," posted February 2018, generated 178,000 views; https://www.youtube.com/watch?v=RrT9l1ulMvI | Full Monetization |
| "Cotton Ball Challenge," posted September 2013, generated 71,000 views; https://www.youtube.com/watch?v=yTQN7l5vf_o | Demonetized | "Family Cotton Ball Challenge," posted November 2016, generated 780,000 views; https://www.youtube.com/watch?v=Ab_220M5EVo | Full Monetization |
| "10 Things Lesbians are Afraid of," posted August 2013, generated 7.6 million views; https://www.youtube.com/watch?v=V9VABvh7kRw | Demonetized | "Condom Challenge," posted January 2016, generated 1.4 million views; https://www.youtube.com/watch?v=vy6Vak6OPlI | Not Restricted; Full Monetization |

1392054.1

**SECOND AMENDED CLASS ACTION COMPLAINT FOR DAMAGES, INJUNCTIVE RELIEF, RESTITUTION, AND DECLARATORY JUDGMENT**

| Plaintiffs' Videos | YouTube Status | Comparable Videos By Others | YouTube Status |
|---|---|---|---|
| "Picking up a Stranger Prank," posted July 2013, generated 147,000 views; https://www.youtube.com/watch?v=5p2KZUoC7FI | Demonetized | "Picking Up Strangers Girlfriends in Front of Their Boyfriends," posted April 2019, generated 37,000 views; https://www.youtube.com/watch?v=zWHMZZkZ1bk | Full Monetization |
| "Lesbian Q&A Part 3," posted May 2013, generated 195,000 views; https://www.youtube.com/watch?v=FcCQ2cocF0w | Demonetized | "Q&A with my Boyfriend," posted July 2019, generated 161,000 views; https://www.youtube.com/watch?v=h2-u7S2khTY | Full Monetization |
| "11 Crazy Youtube Challenges," posted May 2013, generated 398,000 views; https://www.youtube.com/watch?v=Nntzx3GpuQk | Limited Monetization | "I tried 10 Crazy Challenges for 10 Million Subscribers," posted September 2019, generated 3.6 million views; https://www.youtube.com/watch?v=qnqknRJ3WPs | Full Monetization |
| "My Suicide Story," posted May 2013, generated 1 million views; https://www.youtube.com/watch?v=s_DIT-gmBaU | Limited Monetization | "My story with Suicide," posted August 2018, generated 802,000 views; https://www.youtube.com/watch?v=B4H2veOd9SA | Full Monetization |
| "The Girlfriend Tag," posted April 2013, generated 224,000 views; https://www.youtube.com/watch?v=1DaTezPKwm0 | Limited Monetization | "Boyfriend vs. Girlfriend Tag," posted April 2017, generated 3.5 million views; https://www.youtube.com/watch?v=8jinyoofAeM | Full Monetization |
| "Our Bullying Story," posted January 2013, generated 105,000 views; https://www.youtube.com/watch?v=Zv0mZ43wtxs | Limited Monetization | "Confronting Internet Bully Cody Ko," posted May 2019, generated 4.3 million views; https://www.youtube.com/watch?v=xf7vX3D8_ME | Full Monetization |
| "Stop Birthing Gays Song," posted January 2013, generated 164,000 views; https://www.youtube.com/watch?v=PvIAd0Rkiyk | Limited Monetization | "Christian vs. Westboro Baptist 'God Hates Fags,'" posted May 2012, generated 300,000 views; https://www.youtube.com/watch?v=ehjWWgdrY_Q | Full Monetization |

**SECOND AMENDED CLASS ACTION COMPLAINT FOR DAMAGES, INJUNCTIVE RELIEF, RESTITUTION, AND DECLARATORY JUDGMENT**

171.    Defendants also engage in outright censorship of LGBTQ+ content, including that of BriaAndChrissy LLC.  On June 21, 2015, Defendants censored one a video on the BriaAndChrissy channel which discussed the actions and statements of celebrities who expressed homophobic views or slurs, without providing any notice, explanation or opportunity to address any concern that Defendants might have.  And like the other LGBTQ+ Plaintiffs, BriaAndChrissy LLC support the right of free speech and expression for all Community Members, as long as that right is not co-extensive with the promotion of anti-LGBTQ+ hate speech for profit in violation of Community Guidelines or other rules on YouTube, nor is it a basis for using those same rules to censor, restrain, demonetize, and/or squelch LGBTQ+ content or engagement on the platform.

172.    Finally, in August 2019, Defendants commenced disabling the comments sections for a number of BriaAndChrissy videos.  Plaintiffs BriaAndChrissy LLC, Bria Kam and Chrissy Chambers have been informed by Defendants and believe and thereon allege that Defendants have disabled comments sections because they believe that they are "protecting minors."



It is unclear from Defendants' message whether the comments sections are being disabled because third parties have posted hate speech and anti-gay comments, or to prevent minors themselves from posting comments and generating hate speech and anti-gay comments, or to prevent minors from encouraging other minors from viewing the video content.  The affected videos do not depict children or minors in the video content, and have not generated the kind of inappropriate comments about small children which prompted Google/YouTube to remove the comments sections from creators' channels posting videos of young children engaged in gymnastics or swimming practice and/or competitions.  The disabling of the comments sections for the new

**SECOND AMENDED CLASS ACTION COMPLAINT FOR DAMAGES, INJUNCTIVE RELIEF, RESTITUTION, AND DECLARATORY JUDGMENT**

videos prevents the new content from generating favorable comments which amplify the reach of the video beyond BriaAndChrissy's subscribers, and cause videos to go viral, thereby substantially reducing the potential for generating revenue for the affected videos.

173.    Defendants' unlawful and anticompetitive attack on LGBTQ+ Plaintiff BriaAndChrissy LLC has achieved its intended result of reducing monthly revenues of $3,500 that had generated in 2016, to $809 in July, $694 in August, $462 in September and $423 in October of 2019 for this popular LGBTQ+ content creator who directly competes with Defendants for LGBTQ+ subscribers and viewers on the YouTube Platform.

174.    Additionally, for two years, this Plaintiff was generating up to $8,000 for each of its sponsored videos, but now receives on average only $800 per sponsored video. BriaAndChrissy LLC is offered less for each performance and appearance, and has been offered fewer travel opportunities.  Not only are the revenues generated by sponsored videos reduced, but fewer and fewer companies are offering sponsorships and brand deals due to depressed viewer numbers.  Defendants' conduct has not only deprived this LGBTQ+ Plaintiff of being able to monetize its content at levels that permit continued reinvestment in new content production but ensures that Defendants can increase their own share of corporate revenues and profits from Plaintiffs' content, or from content which Defendants sponsor in direct competition with Plaintiffs.

### 3.    Chase Ross

175.    Plaintiff Chase Ross is the creator and owner of UppercaseCHASE1, a YouTube channel created to support members of the LGBTQ+ Community in general and transgender people specifically by uploading sexual education, transgender education, and transgender product review videos, as well as allies, who are supporting members of the non-LGBTQ+ Community who have relatives and family dealing with transgender issues.  Mr. Ross has a degree in sociology and a minor in interdisciplinary studies of sexuality; he also received a master's degree in sociology in 2018.  Starting in 2006, Mr. Ross created video content that was posted on YouTube in various names, including "ellendegeneres26," "ChaseRoss73," "FTMTranstastic," "MightTMenFTM," "MightierMenFTM," and "itsTtime2010."  Commencing in 2010, Mr. Ross started uploading video content on the UppercaseCHASE1 YouTube channel, with new content

posting each month, and over the years increasing to weekly or bi-weekly depending on his available time and the subject matter of the video content.  In 2017, Mr. Ross created the "Trans 101" series of videos designed to educate the public, including transgender individuals, about issues confronting transgender individuals.  UppercaseCHASE1 has uploaded 753 videos in all, generating 20.2 million total views with 163,000 subscribers.  By 2019, UppercaseCHASE1 was generating between 20 and 50,000 views for each new video uploaded to the channel, and generating $10,800 Canadian dollars annually in revenue.  Earnings for this year are projected to be $400-$1,000 range.

176.    Commencing within the past two years, Defendants have harmed UppercaseCHASE1 by employing many of the same strategies applied to BriaAndChrissy, and WonderWarriors:

177.    Mr. Ross is a victim of "unsubscribing" existing subscriptions to UppercaseCHASE1.  Subscribers have informed Mr. Ross via Twitter and email that their existing subscriptions have disappeared without notification or explanation, forcing fans to re-subscribe.

178.    Defendants also deleted and/or failed to provide content notifications for Mr. Ross' subscribers of his channel and intended audiences.  Specifically, Defendants imposed these restrictions on UppercaseCHASE1 by requiring existing subscribers to specifically click on a bell icon in order to receive electronic notifications when UppercaseCHASE1 posts new videos which has adversely affected the channel's view numbers.  And, UppercaseCHASE1 has received complaints via Twitter and email from former subscribers who no longer receive Defendants' notifications for new content uploaded to the UppercaseCHASE1 channel.  The new practice has substantially reduced the views per new posted video on the UppercaseCHASE1 channel, resulting in reduced revenues.

179.    Defendants also engage in stripping UppercaseCHASE1's custom Thumbnails from search results for many of the channel's subscribers and for new viewers.  Some viewers report as few as 20% of the videos for the UppercaseCHASE1 channel have visible custom Thumbnails.

180.    Defendants have also "Demonetized " many UppercaseCHASE1's videos under the

1  discriminatory, fraudulent, and unlawful pretext that the content violates YouTube's Community

2  Guidelines or other vague, overly broad, subjective, or meaningless content-based regulations.

3  And despite Mr. Ross' appeals and repeated requests for more guidance regarding the bases of its

4  decisions to demonetize specific videos, Defendants have provided no reasonable response or

5  basis for their decisions.

6       181.  Defendants also exclude UppercaseCHASE1's content from the Defendants'

7  recommended content on the "Up Next," application for the channel for no viable reason, while

8  allowing the content of other creators, as well as that created or financially preferred by

9  Defendants to appear, including homophobic and anti-LGBTQ+ content.

10       182.  And, as it does to other members of the LGBTQ+ YouTube Community,

11  Defendants indiscriminately apply the "Restricted Mode" limitations for "sensitive viewers," to

12  many of UppercaseCHASE1's videos, regardless of whether the actual content includes graphic

13  sexual images or content, or discussions regarding transgender issues.  For example, videos

14  consisting of Mr. Ross engaging in editorial comment in front of a blank wall discussing events,

15  festivals or conventions have been restricted and do not appear in searches performed in

16  "Restricted Mode," despite the fact that there is no sexual content and no discussion of transgender

17  issues.

18       a.  Viewers enabling the "Restricted Mode," conducting searches for

19  UppercaseCHASE1 videos see this :



28  Only 2 of the UppercaseCHASE1 videos posted in the past year appear in searches where

**SECOND AMENDED CLASS ACTION COMPLAINT FOR DAMAGES, INJUNCTIVE RELIEF, RESTITUTION, AND DECLARATORY JUDGMENT**

1    "Restricted Mode," is enabled.

2          b.      Viewers who do not enable the "Restricted Mode," when searching for

3    UppercaseCHASE1 videos see this:



14          183.    Many videos are restricted regardless of content merely because of Mr. Ross'

15   identity as a transgender individual.  The Defendants' "Restricted Mode" filters generally appear

16   the first weekday after a new video is uploaded to the UppercaseCHASE1 channel.  By employing

17   "Restricted Mode," Defendants have successfully limited viewer access to the general public to

18   each of the new videos which UppercaseCHASE1 has posted in 2019.  Defendants have even

19   applied the "Restricted Mode," to a video which features Mr. Ross doing nothing more than

20   drinking tea and endorsing tea for self-care and stress reduction.

21          a.      In the first video, (which can be viewed by using the link:

22          https://youtu.be/rccjNF3dEpA) Mr. Ross appears seated on the screen with a black mug

23          and a white cat in the foreground, and a kitchen scene in the background.  In the video Mr.

24          Ross extolls the virtues of drinking tea for LGBT "self-care," and explains that LGBT

25          includes "lesbian," "gay," "bisexual," "transgender," and "queer."  There is no sexual,

26          political or obscene or vulgar content in the video at all.  When he uploaded the video, Mr.

27          Ross did so "unlisted," so that it does not appear on UppercaseCHASE1 channel.  Mr.

28          Ross tagged the video with the terms "LGBT," "lesbian," "gay," "bisexual," "transgender,"

**SECOND AMENDED CLASS ACTION COMPLAINT FOR DAMAGES, INJUNCTIVE RELIEF, RESTITUTION, AND DECLARATORY JUDGMENT**

1    and "queer."  He used these terms in the description and used "LGBT" in the title.

2         b.      In the second video, (which can be viewed by using the link:

3    https://youtu.be/qfFIl_ECxnI) the identical video content appears.  When the second video

4    is uploaded, it is loaded as "unlisted," and does not appear on the UppercaseCHASE1

5    channel.  Mr. Ross tagged this video only with the terms "product review," and "tea."  The

6    description is "tea product review."  Only the title includes "LGBT."

7    Though the videos consists solely of a monologue about tea by Mr. Ross, he says the terms

8    "LGBT," "lesbian," "gay," "bisexual," "transgender," and "queer."  The use of these words in the

9    video content appear to be sufficient to prevent the videos from being viewed when "Restricted

10   Mode" is engaged.

11        184.    Mr. Ross produces videos consisting of product reviews intended for a transgender

12   audience featuring products which are especially relevant to his audience.  Mr. Ross has reviewed

13   a number of prosthetic devices created for individuals suffering from gender dysphoria, which

14   resemble male genitalia, along with "pouches" used to hold the prosthetics in place against the

15   body.  These pouches range from simple fabric pockets with strings to tie them into place, to more

16   elaborate underwear styled models with pockets for the prosthetic devices.

17        a.      Defendants routinely censor UppercaseCHASE1's product reviews of

18   "pouches" whether they are simple fabric pouches or more elaborate modified undergarments so

19   that they do not appear in "Restricted Mode."  Viewers searching for "UppcercaseCHASE1

20   pouches" with Restricted Mode engaged will see only:



**SECOND AMENDED CLASS ACTION COMPLAINT FOR DAMAGES, INJUNCTIVE RELIEF,
RESTITUTION, AND DECLARATORY JUDGMENT**

1         b.     Viewers searching for UppercaseCHASE1 pouches" without enabling

2   "Restricted Mode" will see product reviews which include the entire range of products reviewed

3   by Mr. Ross.



12         c.     Defendants do not censor other transgender pouch product reviews posted

13   by other video creators in the same way.  Viewers searching for "Pouch Packers," with Restricted

14   Mode enabled will see:



22   Viewers searching for "Pouch Packers" will see the Thumbnail for a DYI pouch packer (which

23   can be viewed using the link https://www.youtube.com/watch?v=kid7Ull6DgE), and a Thumbnail

24   for a Joey Pouch Packer (which can be viewed using the link

25   https://www.youtube.com/watch?v=QtLBCHoBqTs) each of which includes images of prosthetics

26   and the use of fabric pouches that are similar to those appearing in Mr. Ross' videos which

27   Defendants routinely censor when Restricted Mode is enabled.

28        185.     Defendants also misapplied YouTube's age restrictions policy to

**SECOND AMENDED CLASS ACTION COMPLAINT FOR DAMAGES, INJUNCTIVE RELIEF, RESTITUTION, AND DECLARATORY JUDGMENT**

UppercaseCHASE1's videos, limiting videos to viewers 18 years of age or over, regardless of the content.  While many videos on the channel dealing with product reviews for prosthetics, or frankly discussing sexual issues experienced by transgender individuals, are not suitable for younger audiences, Defendants have applied age restrictions to videos which do nothing more than illustrate a piece of fabric, without context or reference to the function or prospective use.

186.    Defendants also censored UppercaseCHASE1's LGBTQ+-related content by removing videos from its platform without explanation and imposing use restrictions on the channel.  In one instance, Defendants removed a video which had been uploaded for six years without issue, for which no age restriction had been imposed, and which was fully monetized.  Mr. Ross was unable to post new content, livestream or use the account for a month before Defendants addressed his complaints.  It was only after Mr. Ross took to Twitter complaining about the removal of the video that Defendants addressed his complaints.  Within two weeks of posting his complaints on Twitter, YouTube reinstated the account, released the video, and admitted that it had taken the adverse action in error.  However, in mid-July of 2019, Defendants again suspended the account merely for posting a link to "Gendercat.com" in violation of YouTube's community guidelines.  Again, in response to Mr. Ross' complaints, Defendants admitted they had acted in error and assured Mr. Ross that it would not happen again.

187.    Like other LGBTQ+ Plaintiffs and members of the LGBTQ+ Community, UppercaseCHASE1 has been the victim of numerous disparaging and hate speech-filled reaction videos which appear when viewers search for "UppcercaseCHASE1," videos.  These hate speech reaction videos also appear in the Defendants' recommended videos in the "Up Next" application for the UppercaseCHASE1 channel.  Some of the reaction videos appear to be monetized, despite the fact that UppercaseCHASE1's video has been demonetized by Defendants, resulting in hate speech which copies the original video of UppercaseCHASE1 generating money, while at the same time, Defendants refuse to allow the creator himself from realizing any financial gain from his own work.

188.    As averred above, Mr. Ross and Plaintiffs support the right of free Speech and expression for all YouTube Community Members, but that right does not  mean that Defendants

1    get to promote anti-LGBTQ+ hate speech by exempting it from the same content-based

2    restrictions and distribution restraints that are used to suppress the right of the LGBTQ+

3    Community to speak back and distribute LGBTQ+ content on a level and equal playing field.  And

4    it certainly does not give Defendants carte blanche discretion to censor, restrain, demonetize, or

5    otherwise squelch LGBTQ+ Community content and engagement that is compliant with

6    Defendants' content-based regulations and practices.

7                    **4.       Brett Somers a/k/a AMP (Watts The Safeword)**

8         189.    Plaintiff Brett Somers, also known as AMP, is the creator and owner of Watts The

9    Safeword, a YouTube channel dedicated to developing and posting sexual education materials

10   which include both LGBTQ+ and non-traditional practices, as well as discussing events,

11   conventions, and issues relevant to the LGBTQ+ Community.  Mr. Somers has a degree in art

12   design, and is trained to use video and photographic software applications, as well as to create

13   computer code for gaming, which he did professionally for a number of years.

14        190.    On May 25, 2014, Mr. Somers started the Watts The Safeword channel on

15   YouTube.  A week or two later, he uploaded the first video.  Thereafter, on average, Mr. Somers

16   uploaded a new video on a bi-weekly basis.  As of last year, Mr. Somers had uploaded 227 videos

17   to the Watts The Safeword channel on YouTube; had generated 1.3 million views, and had

18   193,000 subscribers.  Watts The Safeword generated $5,751.00 in just one month, November

19   2018.  However, since that highpoint, as a result of Defendants' strategies, Watts The Safeword

20   generates only $200-$300 monthly from YouTube.  This Plaintiff's channel no longer is able to

21   generate 30,000 – 40,000 new subscriptions on a regular basis, as it did in 2018.  Watts The

22   Safeword's views have become sporadic, inconsistent, and unpredictable.

23        191.    Commencing within the past two years, Defendants harmed and continue to harm

24   Watts The Safeword by employing many of the same strategies it has applied to other LGBTQ+

25   Plaintiffs and putative members of the LGBTQ+ Community Class.

26        192.    Defendants have been and continue to strip Watts The Safeword's custom

27   Thumbnails from search results for most of its videos.  This strategy is not applied based upon the

28   content of the videos, because Mr. Somers often collaborates with other LGBTQ+ creators and has

**SECOND AMENDED CLASS ACTION COMPLAINT FOR DAMAGES, INJUNCTIVE RELIEF,
RESTITUTION, AND DECLARATORY JUDGMENT**

seen collaborative videos posted to the collaborator's channel bearing the custom Thumbnails, while the identical video posted to Watts The Safeword's channel have had the custom Thumbnails stripped by Defendants.

193.    Defendants have and continue to "Demonetize" many of Watts The Safeword's videos on grounds that they purportedly fail to comply with community standards, and have refused to reverse their decisions despite Mr. Somers's appeals and repeated requests for more guidance regarding the bases of their decisions to demonetize specific videos.

194.    Defendants indiscriminately use their "Restricted Mode" filters and limitations and place to nearly all of Watts The Safeword's videos into that viewer restraint.  Defendants do this for arbitrary, capricious, discriminatory anticompetitive, and other unlawful reasons by restricting Mr. Somers' videos regardless of whether the actual content violates Defendants' Community Guidelines or other content-based regulations or standards.  For example, videos consisting of Mr. Somers discussing his experience traveling to events, festivals or conventions have been restricted and do not appear in searches performed in "Restricted Mode," despite the absence of any content involving sexually explicit, practices, or activities.  Like the other LGBTQ+ Plaintiffs, Mr. Somers Watts The Safeword's videos are restricted regardless of content merely because Mr. Somers' expresses viewpoints, discusses topics, or affiliates with the members of the LGBTQ+ Community.  In August 2019, Defendants restricted videos of Mr. Somers doing nothing more than drinking tea and recommending tea for self-care, while leaving unrestricted countless videos posted by other YouTube creators doing the very same thing.

195.    Defendants also misapplied age restrictions to Watts The Safeword's videos, limiting videos to viewers 18 years of age or over, regardless of the actual content of the video. While many videos on the channel dealing with sex and include graphic sexual images are not suitable for younger audiences, Defendants have applied age restrictions as a one-size-fits-all, eschewing their contractual and legal obligations to review the content of each and every video so that travel videos about LGBTQ+ events and issues, festivals and conventions are not stigmatized and restricted as inappropriate merely because they discuss or mention LGBTQ+ persons or topics.

196.     Google/YouTube's censorship tools treat LGBTQ+ videos, like those posted by Watts The Safeword more harshly, resulting in its videos generating far fewer views than similar videos posted by creators who do not identify LGBTQ+.  As a result of the more stringent censorship applied to members of the LGBTQ+ Community, videos posted by Watts The Safeword generate far less revenue than those videos posted by creators who do not identify LGBTQ+.

| Plaintiff's video | YouTube Status | Comparable videos | You Tube Status |
|---|---|---|---|
| "Kinky Wish Shopping Haul," posted September 2018; generated 1.3 million views https://www.youtube.com/watch?v=Ppk9Ms1SflE&t=134s | Age Restricted; Limited Monetization | "Fiance Rates My Very Extra Wish Clothing," posted March 2019; generated 1.5 million views https://www.youtube.com/watch?v=S8kw9t7qf6c | Unrestricted; Limited Monetization; |
| | | "Mini Dress Try On," posted October 2018; generated 3.5 million views https://www.youtube.com/watch?v=Xgw4qHFwffI | Unrestricted; Limited Monetization |
| "Kinky Wish Shopping Haul 2" posted April 2019; generated 305,000 views: https://www.youtube.com/watch?v=8c9oXDCDuYc&t=728s | Age Restricted; Limited Monetization | "Trying on Bikinis from Wish Under $10," posted August 2019; generated 891,000 views | Unrestricted; Full Monetization |
| | | https://www.youtube.com/watch?v=S7Ro5MaIlFc | |
| "Mermaid Tie," posted October 2019 featuring a how to tie legs together; generated 27,474 views https://www.youtube.com/watch?v=QZDGgaAghR4&t=10s | Age Restricted on the day after it was posted; Demonetized without explanation despite YouTube representatives having stated that the video was monetized after conducting a manual review. | https://www.youtube.com/watch?v=6l-JuZx0070 | Unrestricted; Full Monetization |
| "Wish Halloween Try On Haul," posted October 2019; generated 30,014 views https://www.youtube.com/watch?v=9ZuwMlgtlmk | Not Age Restricted; Restricted Mode; Limited Monetization | "AMI Clubwear Sexy Halloween Costume Try On Haul," posted October 2018; generated 1.2 million views https://www.youtube.com/watch?v=1CNei4QdACE&t=224s | Not Age Restricted; Full Monetization |
| Plaintiff's video | YouTube Status | Comparable videos | You Tube Status |
| | | "Boyfriend Reacts to my Halloween Costumes," posted October 2019 by a creator whose channel describes her as a 15 year old; generated 782,000 views https://www.youtube.com/watch?v=XQsi | Not Age Restricted; Full Monetization |

**SECOND AMENDED CLASS ACTION COMPLAINT FOR DAMAGES, INJUNCTIVE RELIEF, RESTITUTION, AND DECLARATORY JUDGMENT**

qXLGOJQ&t=1s

| | |
|---|---|
| "Boyfriend and his Friends Rater my Halloween Costumes," posted October 2019 by a creator whose channel describes her as a 15 year old; generated 394,000 views https://"www.youtube.com/watch?v=UW iFJTAINq0 | Not Age Restricted; Full Monetization |
| "New Hot Halloween Costume Try-On Haul," posted October 2019; generated 169,000 views https://www.youtube.com/watch?v=vFR W9vahDS0 | Not Age Restricted; Full Monetization |

197.    Defendants have also engaged in outright censorship of Watts The Safeword's LGBTQ+-related content by removing videos from its platform without explanation and imposing age restrictions on the channel without regard to the content of the video uploaded.  In one instance, Defendants imposed age restrictions on Watts The Safeword's video featuring Mr. Somers talking about traveling to a convention while seated in a car.  The video contains no sexual graphics or content at all.  But Defendants did not restrict videos of the actual convention, featuring sex toys and other sexual content when posted by other creators, that were fully monetized for profit by Defendants.

198.    Even when Defendants allow Watts The Safeword's videos to remain on the platform, Google/YouTube prevent those videos from appearing in response to searches performed by both subscribers and the public at large.  And like other LGBTQ+ Plaintiffs, Mr. Somers has received comments and tweets on the Twitter platform from viewers who have been unable to find content uploaded by Watts The Safeword using the Defendants' search application.

199.    Defendants continue to restrain the innocuous travel videos of Watts The Safeword under its Restricted Mode, age restrictions, and demonetization rules and practices, while allowing objectively and sexually explicit content that Google/YouTube sponsor and/or profit from to run unrestricted on the YouTube Platform.  For example, Defendants apply the Restricted Mode filter to Watts The Safeword's video depicting rubber garments, where no bare buttocks are exposed at all.  Nonetheless, Defendants sponsor and monetize explicit and sexualized video content

depicting bare buttocks, without any restrictions on a YouTube channel known as the James Charles Channel.  The James Charles content depicts a sexually ambiguous young man who creates and uploads videos demonstrating female-styled make-up techniques, nail care demonstrations, and recommendations for make-up and personal care products.  One recent video even features Mr. Charles at the Coachella Music Festival, acting as a "make-up guru."  Mr. Charles is wearing a white G-string and chaps which cover his genitals but expose his bare buttocks.



The video also depicts Mr. Charles spanking the bare buttocks of another other festival attendee, who is wearing a similar G-string and chaps in black.



**SECOND AMENDED CLASS ACTION COMPLAINT FOR DAMAGES, INJUNCTIVE RELIEF, RESTITUTION, AND DECLARATORY JUDGMENT**

1    A second video from the Coachella Music Festival depicts Mr. Charles wearing a black G-string

2    with pubic hairs visible.



15   While Plaintiffs take no issue and offer no view as to whether Defendants should or can regulate

16   Mr. Charles' content, what Defendants cannot do is use their unfettered and absolute discretion to

17   apply purportedly neutral viewpoint regulations that apply equally all users of YouTube as a

18   discriminatory, fraudulent, anticompetitive, and unlawful pretext  to promote content that

19   Google/YouTube sponsors and restrict and harm that of its competitor, Mr. Somers.

20            **5.    Lindsay Amer (Queer Kid Stuff)**

21        200.    Plaintiff Lindsay Amer is the creator and owner of Queer Kid Stuff, a YouTube

22   educational channel created to serve as a support for LGBTQ+ parents, LGBTQ+ children

23   between the ages of 3 and 17, who have questions or face bullying for perceived LGBTQ+ status,

24   and librarians and educators seeking assistance with respect to how to field questions about

25   LGBTQ+ issues and support children affected by LGBTQ+ issues.  Mx. Amer has an

26   undergraduate degree in gender studies and theater; and a graduate degree in performance studies.

27        201.    In 2015, they created the Queer Kid Stuff channel as a vehicle to upload their

28   original video content.  On May10, 2016, Mx. Amer uploaded the first Queer Kid Stuff education

**SECOND AMENDED CLASS ACTION COMPLAINT FOR DAMAGES, INJUNCTIVE RELIEF,**
**RESTITUTION, AND DECLARATORY JUDGMENT**

1    video.  Initially, the video was shared and received roughly 2,000 views without negative

2    comments or reaction videos.  Within months of the uploading of the first video, the Huffington

3    Post published a favorable article discussing the video.

4           202.    On June 23, 2016, The Daily Stormer, a Neo Nazi website on that appears on

5    Defendant Google's search engine site published a commentary by Andrew Anglin entitled, "Sick

6    Dyke Creates Educational Program to Brainwash Children Into the Homosexual Lifestyle," which

7    quotes from the Huffington Post article, and bashes both Queer Kid Stuff and Ms. Amer:

8                       "Lindsey Amer is a twisted lesbo who is obsessed with
                        psychologically abusing children, and has created an entire
9                       'educational' program to teach children to become homosexual
                        perverts. . . .  [Homos] are always pushing for the ability to recruit
10                      younger and younger victims into their sex-cult, and now, our
                        jewed-out society has reached the point where we are ready to show
11                      their recruitment propaganda to pre-schoolers – in order to prove
                        we're not haters, of course. . . .  Please visit this creature on Twitter
12                      and let her know what you think of her plot. . . . Oh, and ask her if
                        she's Jewish."  A Anglin, Daily Stormer, June 23, 2016.
13
     The article included a link to the Queer Kid Stuff Twitter account and Mx. Amer's personal
14
     profile.
15
            203.    The Daily Stormer commentary generated an avalanche of hate speech directed at
16
     Mx. Amer and the Queer Kid Stuff channel.  The hate speech involved vicious and obscene anti-
17
     Semitic, misogynist, and homophobic content, as well as other obscene material, and culminated
18
     in a death threat against Mx. Amer.  Defendants permitted all of that hate speech to appear directly
19
     in the comment section of Mx. Amer's Queer Kid Stuff channel.  And although Defendant Google
20
     finally removed The Daily Stormer from their platform in the fall of 2017, the hate speech directed
21
     at Mx. Amer continued unabated on the channel.
22
            204.    As with the other Plaintiffs in this case, Mx. Amer supports the right of all to
23
     express their viewpoints in a civil and protected manner.  But Mx. Amer, and the other LGBTQ+
24
     Plaintiffs take serious issue with Defendants systematic efforts to restrain or financially harm Mx.
25
     Amer's content and their ability to defend and protect themselves on a platform that promises to
26
     treat everyone equally.  That is not the case here, because Defendants selectively apply their
27
     content-based regulations and filtering to promote and profit from homophobic hatemongers who
28

**SECOND AMENDED CLASS ACTION COMPLAINT FOR DAMAGES, INJUNCTIVE RELIEF,
RESTITUTION, AND DECLARATORY JUDGMENT**

1   are allowed to inundate Mx. Amer and other LGBTQ+ channels when their content directly and

2   objectively violates Defendants content-based rules that they claim exist only to "keep the

3   platform safe" for all of the YouTube Community, including Mx. Amer and the other LGBTQ+

4   members of that Community.

5        205.   On September 14, 2016, four months after Mx. Amer uploaded the first video to the

6   Queer Kid Stuff channel, they uploaded the second video.  The four month delay between the first

7   and second video was the direct result of the fear and chilling affect that the hate speech allowed

8   and/or promoted by Defendants had on Mx. Amer.  Mx. Amer was and continues to be unable to

9   remove that hate speech using Defendants' available filter tool.  Repeated attempts to handle the

10  tidal waves of hate speech that Defendants continue to allow to be directed at the Queer Kid Stuff

11  channel has also interfered with Mx. Amer's ability to reach and engage with their intended

12  audience.

13       206.   In total, Queer Kid Stuff published 12 new videos between September 14, 2016 and

14  January 27, 2017.  With the uploading of each new video, a new wave of hate speech filled the

15  comments section of the channel.  For every positive comment that appeared, dozens of hate-filled

16  comments appeared and pushed the positive comment down the queue so that viewers would only

17  see hate-filled comments when they watched Queer Kid Stuff content.

18       207.   Despite repeated complaints to Defendants about the hate speech comments, and

19  after devoting considerable efforts to reconfigure the Defendants' filters to screen them, a number

20  of members of Queer Kid Stuff's intended audience, including parents, wrote to Mx. Amer

21  complaining about the obscene hateful comments posted on the Queer Kid Stuff channel and

22  informing Mx. Amer, that despite their approval of the intended content on the channel, these

23  parents could not share the quality videos with their children, because it would expose the children

24  to content which they deemed harmful and injurious.  One parent wrote:

25          "I'm really glad that I ran into your channel today, as I found the
            videos to be easy enough for my 5 year old to enjoy and understand
26          the content.  This really is a godsend for me, a trans demi girl who
            has major problems with panic attacks just trying to address the
27          subject with them.

28          The only thing that I wish would get addressed with your channel

1

2

3

4

would be doing something with the comments section.  While it's great that there are some positive encouragement from some viewers, others turn it into a dumpster fire dipped in cancer.  I'm glad that my child can't read well enough to understand the comments, but I think other children will inherently get exposed to transphobic, ablest, and queerphobic nonsense that may undermine the positive message of the videos."

5

Another parent wrote:

6

7

8

9

10

11

"My 7 year old son (who self-identifies as queer) is home from school today. . . We love your channel . . . I wanted to reach out because even though we watch your videos, I have a strict policy against reading YouTube comments.  YouTube suggested a bunch of hateful anti-queer videos in response to our watching yours, and as I went through the list to tell YouTube I am not interested in any of these, I ended up reading some of the comments.  How disheartening.  Talk about homophobia.  I am literally crying right now at some of these and am quite glad my son is in the other room, since I'm not sure I'm emotionally up to explain it to him right now. . . ."

12

    208.    Because Defendants failed to regulate or filter the hate speech directed to the Queer

13

Kid Stuff channel between 2016 and 2018, Mx. Amer was forced to disable the comments section

14

to the channel in the fall of 2018 and to forego the ability to fully engage with and reach Queer

15

Kid Stuff's intended audience with its content.   In the process, however, Mx. Amer noticed the

16

hatemongers had started to upload and copy portions of or entire Queer Kid Stuff videos that they

17

then displayed on the platform with disparaging, obscene, and hateful content, including fake

18

voiceovers, or with the commentator inserted into a frame in the corner of the Queer Kid Stuff

19

videos.  Most of the reaction videos include links to the Queer Kid Stuff channel which acted as an

20

amplifier for generating hate speech comments.

21

    209.    The obscene, hate speech filled reaction videos, many of which were spawned by

22

The Daily Stormer article, also appear in searches for Queer Kid Stuff on YouTube, and appear in

23

"Up Next," recommendations on the screen whenever viewers watched Queer Kid Stuff videos,

24

thereby exposing LGBTQ+ parents and children to inappropriate hurtful material.  Mx. Amer

25

repeatedly complained to Google/YouTube about the hate speech reaction videos which appear in

26

the recommended "Up Next" material, and in the search results for "Queer Kid Stuff," but

27

Defendants refused to subject that content to their Community Guidelines and other speech

28

regulations, or to prevent reaction video creators from posting links to the Queer Kid Stuff channel

-78-

**SECOND AMENDED CLASS ACTION COMPLAINT FOR DAMAGES, INJUNCTIVE RELIEF, RESTITUTION, AND DECLARATORY JUDGMENT**

1    on the reaction videos.

2        210.    Despite extended discussions with Google/YouTube representatives, who assured

3    Mx. Amer that Queer Kid Stuff would be eligible for uploading to the new YouTube Kids

4    channel, Queer Kid Stuff remains excluded from that children's programming venue.

5        211.    In all, Queer Kid Stuff has uploaded more than 100 videos, of which Defendants

6    have only allowed 94 to remain accessible to viewers; the channel has more than 2 million views

7    and more than 15,000 subscribers.  Queer Kid Stuff's growth has been substantially stymied by

8    Defendants' selected, discriminatory, anticompetitive and unlawful use of its content regulation

9    and monetization policies and practices, and has generated less than $500 per year.  Defendants

10   should be ashamed of themselves for promising LGBTQ+ consumers that the same rules apply

11   equally to everyone and then singling out Plaintiffs, like Mx. Amer, and the greater LGBTQ+

12   Community for content and monetization violations while promoting and profiting from

13   homophobic hate speech that threatens violence and goes unregulated on the YouTube Platform.

14       **6.    Stephanie Frosch (ElloSteph, ElloStephExtras and StephFrosch)**

15       212.    Plaintiff Stephanie Frosch is the creator and owner of ElloSteph, ElloStephExtras

16   and StephFrosch, YouTube channels dedicated to developing and uploading video content for the

17   LGBTQ+ Community.  Ms. Frosch is an LGBTQ internet activist who has appeared as a speaker

18   at conventions, and she has been interviewed on MTV and the main stream media regarding her

19   YouTube experience and treatment at the hands of YouTube.  Beginning on October 5, 2009, Ms.

20   Frosch has been creating and uploading original videos to her YouTube channels.  In 2009, Ms.

21   Frosch earned approximately $23,000 from ad revenue generated by her channels.  In addition, she

22   earned money from the sale of merchandise and from separate brand sponsorship agreements

23   connected with videos posted on her channels.  As of today, she has created and uploaded 189

24   different videos for audiences 13 years and older.  ElloSteph has 376,000 subscribers and 36.5

25   million views.  ElloStephExtras has an additional 6,980 subscribers and an additional 134,858

26   views.  She also operates a merchandise store at www.districtlines.com/ellosteph.

27       213.    ElloSteph proved to be a popular and very successful YouTuber channel until 2017

28   when Google/YouTube employed many of the same strategies they have applied to other

**SECOND AMENDED CLASS ACTION COMPLAINT FOR DAMAGES, INJUNCTIVE RELIEF,
RESTITUTION, AND DECLARATORY JUDGMENT**

1   LGBTQ+ Plaintiffs and putative members of the LGBTQ+ Community Class.

2          a.      Many of Ms. Frosch's videos are not available when Restricted Mode is

3   activated, regardless of whether the video itself contains no nudity, profanity, sexual conduct, or

4   discussions of sexual activities.  Despite the fact that Ms. Frosch's videos are not viewable when

5   Restricted Mode is activated, some of those same videos were copied by other YouTubers and

6   posted on their channels, where they can be viewed when Restricted Mode is activated.

7          b.      Many of Ms. Frosch's videos are not fully monetized despite the fact that

8   they do not include graphic images of violence or sexuality, include no nudity, profanity, sexual

9   conduct, or discussions of sexual activities.



22          c.      Google/YouTube has removed many of the customized thumbnail images

23   Ms. Frosch crafted for each of her videos uploaded to her channels.

24   For example the customized thumbnail images were removed for (1.)  "A Gay Cooking Show

25   With My Girlfriend;" (2.)  "Day in the Life;"  (3.)  "Coming Out (Again);"  (4.)  "Life in Transit;"

26   (5)  "Teaching Kids How to Be Gay!;"  (6.)  "The Greatest Day of My Young Life;"  (7.)  "I got a

27   Secret Package in the Mail;" and (8.)  "Why I left YouTube/The Future of my Channel."

28

**SECOND AMENDED CLASS ACTION COMPLAINT FOR DAMAGES, INJUNCTIVE RELIEF,
RESTITUTION, AND DECLARATORY JUDGMENT**

1        d.      Hate speech, including obscene, violent, or threatening language regularly

2 appear in the comments sections of Ms. Frosch's videos.

3        e.      YouTube has allowed other creators to copy Ms. Frosch's video content and

4 pays those creators revenue for their posting of Ms. Frosch's video content.

5        f.      Commencing in late 2017, Google/YouTube started to remove longtime

6 subscribers to ElloSteph and ElloStephExtras.  Subscribers communicating with Ms. Frosch on

7 other social media platforms complained that their subscriptions had been dropped, and though

8 they attempted to re-subscribe to Ms. Frosch's channels, they could not do so.  The dropped

9 subscribers no longer received new video notifications, and were not aware when Ms. Frosch

10 posted new videos.  As a result of Defendants' practice, Ms. Frosch has lost many longstanding

11 subscribers who have been unable to re-subscribe to these channels and must search for Ms.

12 Frosch's channels and review the long list of her videos in order to identify new content.

13 YouTube has made it harder for these viewers to find Ms. Frosch's new videos resulting in

14 diminished viewing numbers for new content.

15      214.    In 2017, Ms. Frosch was one of a group of the LGBTQ+ creators who approached

16 Google/YouTube and complained about how Google/YouTube's recent changes to the algorithm

17 had disproportionately affected the LGBTQ+ YouTube creators and viewers.  In order to

18 participate in direct discussions with Google/YouTube regarding the nature of the problems being

19 experienced, and possible solutions, Google/YouTube required Ms. Frosch to sign a Non-

20 Disclosure Agreement which prevents her from disclosing what Google/YouTube said during

21 those discussions.  MTV interviewed Ms. Frosch regarding the LGBTQ+ YouTubers issues.

22 ElloSteph is active on Twitter, Tumblr, Facebook, and Instagram.

23      215.    Despite having made her best efforts to work with Google/YouTube to resolve the

24 algorithm related issues with Google/YouTube, Ms. Frosch was unable to resolve any of those

25 issues.  Commencing in 2017, to avoid the censorship and filtering tools, Ms. Frosch engaged in

26 self-censoring and avoided using LGBTQ+ related terms in the titles, descriptions and tags for her

27 videos.

28      216.    The situation deteriorated further in 2018.  A large number of existing subscribers

**SECOND AMENDED CLASS ACTION COMPLAINT FOR DAMAGES, INJUNCTIVE RELIEF, RESTITUTION, AND DECLARATORY JUDGMENT**

to ElloSteph and ElloStephExtras, who for years had been automatically receiving notices from YouTube when new video content was posted to the channels, stopped receiving notices from YouTube.  For a period of years, YouTube automatically sent new video notices to all of the subscribers of YouTube channels.  Neither Ms. Frosch, nor the subscribers to her channels, received any notice from YouTube regarding the cessation of new video notices for existing subscribers, nor the need for new subscribers to affirmatively request that new video notices be sent to them.  YouTube's cessation of sending new video notices to existing subscribers has forced existing subscribers to regularly check Ms. Frosch's channels to identify new content.  Here too, YouTube has made it harder for Ms. Frosch's longstanding subscribers to locate and view new videos on the channels resulting in diminished viewing numbers for new content.

217.    Because of Google/YouTube's conduct censoring and restricting access to ElloSteph's videos, and demonetizing large numbers of posted videos, the channel ad revenues fell to $12,000 in 2016; $5,000 in 2017, $3,500 in 2018 and $1,800 to date in 2019.  Ms. Frosch has lost revenue from merchandise sales and from brand contracts which are tied to the channel.  In 2019, she has to work twice as hard to fulfill her brand contracts because of falling views for videos posted to the channel.  Recently, Ms. Frosch was forced to "make good" by creating and posting a second video to fulfill her Audible contract because the 7,500 views generated by the first video fell far short of the required 50,000 views.

218.    Such falling revenues and doubling workloads for sponsored brands have forced Ms. Frosch to stop working as a fulltime YouTube creator, and to obtain other full time employment elsewhere.  On February 3, 2018, Ms. Frosch created and posted a video explaining her reasons reducing her commitment to YouTube https://www.youtube.com/watch?v=wClG3AoF12g.  Defendants are effectively pushing Ms. Frosch from the platform.  Defendants' censorship, filtering and practices have decimated Ms. Frosch's revenues and caused harm to her and her brand.

### 7.    Sal Cinquemani (SalBardo)

219.    Plaintiff Sal Cinquemani owns and operates salbardo.com.  He is an independent film maker who writes, directs and produces films for LGBTQ+ audiences under the name "Sal

Bardo." Mr. Cinquemani is an award-winning writer-director. Mr. Cinquemani's movies and music videos often tackle issues affecting the gay and LGBTQ+ communities. Since March 27, 2011, Mr. Cinquemani has operated the YouTube channel youtube.com/user/salbardo, uploading videos consisting of original short films, film trailers, interviews of actors, and out-takes from films for purposes of promoting his independent films. The Sal Bardo YouTube channel has approximately 38,000 subscribers and 24.1 million views.

       a.      His video, "It Gets Better," was posted July 11, 2011. The video was created as part of the fundraising campaign for the production of "Sam." The video relates Mr. Cinquemani's experience coming out as a gay man, and features him talking to the camera. The video was intended to support gay children, and features a photo of two men kissing which appeared on the television show "Will and Grace." The video does not depict anything with graphic violence, graphic sexual content, nudity, profanity, or discussion of detailed sexual nature. Commencing in early 2017, Google/YouTube applied the Restricted Mode to "It Gets Better," so that it cannot be viewed by the children it was intended to support. "It Gets Better," remains inaccessible in Restricted Mode to this day.

       b.      His movie "Sam," which debuted in 2013, is a short film about a child confronting issues of gender identity and LGBTQ bullying. "Sam" depicts no profanity, no graphic violence, no sexual conduct, nor discussions of sexual conduct. "Sam" has generated 7.3 million views on YouTube. "Sam," has been screened in classrooms by teachers of middle school and high school students throughout the United States.

       c.      His music video "Paper Ring – Great Escape," debuted in 2015 and depicts an elderly woman leaving her husband for a woman she had met decades earlier. "Paper Ring – Great Escape," has generated 53,000 views on YouTube.

       d.      His movie, "Pink Moon" is a gay short film which debuted in 2015, has 15.4 million views on YouTube.

    220.    Since March 27, 2011, Mr. Cinquemani has operated the YouTube channel youtube.com/user/salbardo, principally as a promotional tool for his independent films -- uploading videos consisting of film trailers, interviews of actors, and out-takes from films. Mr.

**SECOND AMENDED CLASS ACTION COMPLAINT FOR DAMAGES, INJUNCTIVE RELIEF, RESTITUTION, AND DECLARATORY JUDGMENT**

1    Cinquemani, using the name Sal Bardo, is active on Twitter, Vimeo and Facebook.

2           221.    The Sal Bardo YouTube channel proved to be successful and popular between

3    2011 and 2016.  The channel has approximately 38,000 subscribers and has generated a total of

4    24.1 million views on YouTube.  Despite its enormous popularity given the relatively modest

5    number of videos posted on the channel, in 2017 the SalBardo YouTube channel began to suffer

6    from the same censorship which plagued other LGBTQ+ YouTube creators:

7           222.    Commencing in 2017, Mr. Cinquemani noticed that YouTube had made all but one

8    of the videos uploaded to the SalBardo YouTube channel unavailable when Restricted Mode was

9    activated.  Google/YouTube made "Sam," and videos like the "The Sam Trailer" and the

10   "Welcome" video inaccessible under Restricted Mode.  In March 2017, Mr. Cinquemani contacted

11   YouTube and asked why his videos which were specifically directed to LGBTQ+ youth audiences

12   had been made inaccessible under Restricted Mode.  YouTube's representative agreed to look into

13   the matter.

14          223.    In July 2017, Mr. Cinquemani's video "Requited Trailer," which had been posted

15   on the SalBardo channel since 2011 was flagged and removed from the channel by YouTube

16   purportedly for violating YouTube's community standards.  Mr. Cinquemani appealed the

17   decision, and "Requited Trailer" was reinstated to the SalBardo channel within a week.

18          224.    Commencing in October 2017, "Sam," which had been generating an average of

19   4,000 views per day started generating only 30 views per day.

20          225.    By December 2017, most of Mr. Cinquemani's videos remained inaccessible in

21   "Restricted Mode; moreover, YouTube had deemed the videos, including "Sam," to be "not

22   suitable for most advertisers," rendering the videos demonetized.  When Mr. Cinquemani

23   contacted YouTube's representative, she informed him that the reduced views generated by "Sam"

24   was likely caused by YouTube's new policy to deter child predators from

25   posting/viewing/engaging with videos that depict children.  "Sam" was being shadow banned; the

26   video no longer appeared as a video on the SalBardo channel, in response to searches by title or

27   subject, and if viewers could find "Sam" on YouTube, the comments application had been

28   disabled so that viewers could no longer make comments which might generate additional views.

**SECOND AMENDED CLASS ACTION COMPLAINT FOR DAMAGES, INJUNCTIVE RELIEF,
RESTITUTION, AND DECLARATORY JUDGMENT**

1    Mr. Cinquemani explained that the videos which had been demonetized did not involve materials

2    that would appeal to child abusers, but were sensitive treatments of issues facing members of the

3    LGBTQ community.  YouTube's representative agreed to look further into the demonetization of

4    the SalBardo videos.

5          226.    Between July 2017 and January 2018, SalBardo generated no revenues whatsoever,

6    and nearly all of the channel's videos remained inaccessible when Restricted Mode was activated.

7    Unable to persuade YouTube to change its treatment of the videos or to remonetize them, Mr.

8    Cinquemani wrote an article discussing issues affecting YouTube's LGBTQ creators.  The article

9    was published in the Huffington Post on January 17, 2018,

10   https://www.huffpost.com/entry/youtube-continues-to-restrict-lgbtq-content b

11   5a5e6628e4b03ed177016e90.

12         227.    Two days after the Huffington Post published the article, YouTube's representative

13   informed Mr. Cinquemani that "Sam" had been restored to the SalBardo channel, and was

14   searchable; but that YouTube was having technical difficulties remonetizing the video.  As a result

15   of the application of Restricted Mode filters and the shadow ban, the views for "Sam" never

16   recovered to the levels they were before October 2017 when YouTube censored the video.

17   YouTube did not remonetize "Sam" until February of 2018.

18         228.    Late in January 2018, Google/YouTube notified Mr. Cinquemani that his videos

19   "Chaser Trailer," and "Pink Moon Trailer" had finally been reviewed by YouTube and deemed

20   "not suitable for most advertisers."  Both videos contain content which is similar to other fully

21   monetized videos on other YouTube channels.

22         229.    In early 2018, YouTube briefly reversed its application of Restricted Mode to most

23   of the SalBardo videos, except for the "Chaser Trailer" and "Pink Moon Trailer."  [By late 2019,

24   those videos were again inaccessible under Restricted Mode.]  However, the channel's videos

25   remained demonetized.  YouTube's representative was unable to explain why the videos remained

26   demonetized.  Where Google/YouTube has applied the Restricted Mode filter to "Chaser Trailer,"

27   and demonetized the video, Google/YouTube has fully monetized several versions of the "Fifty

28   Shades Darker Trailer" which include highly sexualized scenes.

230.    By April 2018, YouTube had again notified Mr. Cinquemani that a number of the SalBardo videos, including "Sam," were deemed "not suitable for most advertisers."  Eventually some of the videos were remonetized.  However, "Pink Moon Trailer," which has been under YouTube review since January 2018, remains "under review," and demonetized.  However, Google/YouTube has fully monetized the "I, Tonya Trailer, which though is subject to Restricted Mode, is fully monetized.  the "I, Tonya Trailer," contains scenes with graphic violence, profanity and a derogatory LBGT epithet.

231.    On May 16, 2018, the SalBardo video "Gay short film – Pink Moon" which had generated on averaged 15,000 views per day, suddenly stopped generating views.  The number of daily views generated for this video dropped from an all-time high exceeding 50,000 views per day to just several hundred views per day.  YouTube had shadow banned this film, and it no longer was appearing in search results, appearing in the "Up Next" or recommended videos which appear when SalBardo videos or similar videos were played.

232.    By late December 2018, "Gay short film – Pink Moon" remained subject to a shadow ban, but was generating 1,500 views per day – one-tenth of what it was generating 7 months before YouTube's censorship.  Sometime in 2019, YouTube lifted the shadow ban, but the video has generated a fraction of the views that would have generated had YouTube not censored it.

233.    On September 16, 2019, YouTube demonetized the entire SalBardo channel and sent him this notice:

> During a recent review, our team of policy specialists carefully looked over the videos you've uploaded to your channel Sal Bardo.  we found that a significant portion of your channel is not in line with our YouTube Partner Program Policies. **As of today, your channel is not eligible to monetize and you will not have access to monetization tools and features.  Please go to your monetization page to read more about the specific policy our specialists flagged**.

> We know this is tough news, and sometimes we have to make difficult decisions. we have a responsibility to ensure our community is safe for creators, viewers and advertisers.  At the same time, we understand that you may have unintentionally made mistakes.  **That's why you'll be able to reapply for the YouTube Partner Program in 30 days**.  This 30-day time period allows you to make changes to your channel to make sure it's in line with our policies.

**SECOND AMENDED CLASS ACTION COMPLAINT FOR DAMAGES, INJUNCTIVE RELIEF, RESTITUTION, AND DECLARATORY JUDGMENT**

Mr. Cinquemani appealed the decision at the first opportunity, after YouTube required him to wait 30 days.  On October 19, 2019, the channel was remonetized following his appeal, despite the fact that Mr. Cinquemani had not removed or altered any of the video content on the channel.  The demonetization caused the SalBardo channel to lose one full month of revenues.

234.    As a direct result of YouTube's repeated and improper application of Restricted Mode filters, demonetization and shadow bans, revenue generated by the SalBardo channel has dropped from $200 per month in 2016, to $40 per month in 2019, with some months earning absolute nothing at all because the entire channel was demonetized.

### 8.    Tamara Johnson (SVTV Network)

235.    Plaintiff Tamara (Sheri) Johnson owns and is the CEO of SVTV Network.com.  Since May 30, 2012, she has operated the YouTube channel StudvilleTV.  This channel was renamed in 2016 to SVTV Network.  At that time, SVTV Network had uploaded approximately 300 original videos.  By 2016, the channel had generated more than 5 million views.  The SVTV Network YouTube channel is devoted to writing, developing, taping and producing short videos, original web series, animated series and feature length films for the LGBTQ+ audience 13 years of age and older.  The original videos uploaded to the channel do not include scenes of graphic violence, graphic sexual conduct, nudity, or detailed descriptions of sexual conduct, and the videos are suitable for teenagers.  SVTV Network now posts only 140 original videos, has 114,000 subscribers and generates 3.3 million views.

236.    Commencing in 2016, the StudvilleTV channel began to experience Google/YouTube censorship similar to that experienced by other LGBTQ+ creators:

    a.    Google/YouTube made numerous videos inaccessible by applying Restricted Mode filters despite the absence of video content that depicted graphic scenes of

**SECOND AMENDED CLASS ACTION COMPLAINT FOR DAMAGES, INJUNCTIVE RELIEF, RESTITUTION, AND DECLARATORY JUDGMENT**

1  violence, graphic sexual conduct, nudity or detailed descriptions of sexual conduct.  While

2  Google/YouTube restricted public access to StudvilleTV's videos, similar videos depicting similar

3  plots, scenes, and dramatic twists posted by heterosexual YouTube creators were allowed to be

4  posted widely, were accessible in Restricted Mode, and were fully monetized.  On many

5  occasions, Ms. Johnson appealed the demonetization decisions as they were made, but

6  Google/YouTube remonetized only a handful of such videos, leaving the majority of the channel's

7  videos demonetized.

8          b.      Google/YouTube demonetized other videos claiming that the video content

9  was not suitable for their advertisers.

10          c.      Over Ms. Johnson's objections, Google/YouTube allowed third party

11  YouTube creators to copy StudvilleTV's original videos and post them to other channels which

12  were unrestricted and fully monetized, allowing third parties to generate revenue from Ms.

13  Johnson's copyrighted videos while they prohibited her from doing so herself.  For the past two

14  years, third party creators have been posting and exploiting Ms. Johnson's videos and generating

15  revenue for themselves.  Google/YouTube has prevented Ms. Johnson from earning money from

16  those same videos.  Ignoring Ms. Johnson's objections regarding the copyright infringement,

17  Google/YouTube allows the third party creators to continue to exploit the SVTV Network videos.

18          d.      Google/YouTube offers a music library application to creators who have a

19  certain minimum number of viewers.  Use of music library content in videos carries with it certain

20  requirements regarding monetization, affording credits, and use.  SVTV Network only used music

21  content from the Google/YouTube music library which required attribution, but had no restrictions

22  regarding monetization, and could be used in videos that were fully monetized and generating

23  funds for SVTV Network.  Recently, Google/YouTube has started notifying SVTV Network that

24  music used in videos created and posted since 2012 is generating "copyright strikes," resulting in

25  all of the revenues generated by the video in which the music appears being redirected to the

26  music copyright owner.  This unannounced change in use of music library content has further

27  demonetized SVTV Networks videos, by depriving it of revenue that it should be earning for older

28  videos on its channel.

**SECOND AMENDED CLASS ACTION COMPLAINT FOR DAMAGES, INJUNCTIVE RELIEF, RESTITUTION, AND DECLARATORY JUDGMENT**

237.    As a direct and proximate result of Google/YouTube's application of filtering tools, Restricted Mode, and demonetization, StudvilleTV lost significant revenues and was unable to pay for the production costs and residual fees for the ongoing webseries.  In order to avoid further demonetization, and to ensure the widest possible audience for the StudvilleTV videos, Ms. Johnson started to self-censor and remove LGBTQ+ related words from video titles, descriptions and tags which are used to assist subscribers and viewers in finding the StudvilleTV video content. Despite best efforts to avoid censorship, eventually most of the videos posted on StudvilleTV were demonetized.

238.    When self-censorship proved inadequate to address Google/YouTube's censorship activities, Ms. Johnson contracted with Google/YouTube to sell unlimited views of individual videos to subscribers on a payment per video basis, where Google/YouTube collected payments from StudvilleTV viewers in exchange for the right to view an individual video for as many times as wanted without a time limit for viewing, and StudvilleTV would receive 45% of the gross revenues generated by sales.  In a single month, Google/YouTube generated $100,000 selling access to one episode of StudvilleTV's popular webseries "Studville TV – Episode 10" of season 3.  Google/YouTube kept $55,000 of the sales proceeds.

239.    The following month, without notice to StudvilleTV or the viewers who had paid for access to the video episode 10 of season 3; and without offering to refund to subscribers the monies which Google/YouTube charged to StudvilleTV's viewers, Google/YouTube suspended the video sales on the YouTube Platform, and made all of the StudvilleTV videos available to the public free of charge.  Google/YouTube thereby deprived StudvilleTV of any opportunity to generate revenue from any its original videos.  Those viewers who had paid for unlimited access to the episode 10 of season 3 demanded refunds of the video access charges from StudvilleTV. Google/YouTube pocketed the full $55,000 and never refunded any of that money though they alone were responsible for denying the viewers access to the video for which they had paid. Viewers complained on various social media platforms that they wanted their money back, and did not get refunds.  Google/YouTube's conduct has deprived SVTV Network of the ability to pay actors residuals for episode 10 of season 3.

**SECOND AMENDED CLASS ACTION COMPLAINT FOR DAMAGES, INJUNCTIVE RELIEF, RESTITUTION, AND DECLARATORY JUDGMENT**

240.    In the fall of 2016, unable to make any money from popular videos and unable to pay residuals due to actors for the videos which were still on the StudvilleTV channel, Ms. Johnson launched an internet on-demand monthly subscription network https://www.svtvnetwork.com/ dedicated to original content specifically designed for LGBTQ+ audiences.  For the past three years, Ms. Johnson has been uploading her own independently produced original video webseries, and licensing the original independently produced videos of others on her internet platform in direct competition with Google/YouTube.

241.    In all, SCTV Network lost approximately $100,000 in 2016 as a result of Google/YouTube's censorship tools and improper application of Restricted Mode and monetization criteria; in addition to breaching the agreement with the StudvilleTV channel to sell individual videos..

242.    Since the launch of SVTVNetwork.com, Ms. Johnson uploaded season 4 of the Studville TV webseries onto her platform.  The highly anticipated season 4 launched in 2017 generated 15,000 subscribers who each paid $4.99 to watch the webseries.  Had Google/YouTube fulfilled their agreement to sell individual episodes of the Studville TV webseries on the YouTube Platform, Ms. Johnson believes that she would have generated at least $500,000 in viewer subscriptions for individual episodes.  Google/YouTube's breach of the agreement with the Studville TV channel has deprived Ms. Johnson of substantial additional revenues and has damaged the Studville TV brand.

243.    The StudvilleTV channel, renamed SVTV Network, now serves principally as a promotional site for SVTV Network.com (Ms. Johnson's platform), and currently has uploaded 140 videos, consisting of video teasers, trailers, interviews with cast members and celebrities, advertisements for movies, and bloopers and outtakes from the Studville TV webseries.

244.    Google/YouTube has imposed a minimum requirement for $100 in ad revenues before it will pay a channel for fully monetized videos.  As a result of this policy, and ongoing problems with Google/YouTube's filtering and Restricted Mode censorship, SVTV Network is struggling to generate any revenues from the SVTV Network channel.

**SECOND AMENDED CLASS ACTION COMPLAINT FOR DAMAGES, INJUNCTIVE RELIEF, RESTITUTION, AND DECLARATORY JUDGMENT**

1

**9.    Greg Scarnici (GregScarnici and Undercover Music)**

2    245.    Plaintiff Greg Scarnici is a comedic writer, director, producer and performer who

3 currently works as an Associate Producer at "Saturday Night Live," with over 25 years of

4 experience working in television and comedy.  He has appeared in films, on television and in

5 numerous internet uploads and posts.  Since September 14, 2007, Mr. Scarnici has operated the

6 YouTube channels youtube.com/user/Greg Scarnici and youtube.com/user/Undercover Music,

7 uploading videos consisting of short films, comedic sketches, parodies, and music videos for the

8 LGBTQ+ audience aged 13 and older.  Videos posted to the two channels did not include graphic

9 violence, graphic sexuality, nudity, or detailed discussions of sexual topics; however, many of the

10 videos did depict members of the LGBTQ+ Community and portray scenes and discussion of

11 issues important to the LGBTQ+ Community.  The Greg Scarnici YouTube channel currently has

12 posted 127 videos, with approximately 9,600 subscribers and has generated 8.9 million views.

13    246.    As an early YouTube creator, Mr. Scarnici devoted substantial efforts and

14 resources to building up his YouTube channel and amassing millions of views.  Videos posted to

15 Mr. Scarnici's two channels would routinely generate from 2,000 to 50,000 views.  The music

16 video parody videos were well received by viewers and profitable for Mr. Scarnici.

17    247.    In late 2016 or early 2017, the GregScarnici channel started to suffer from

18 Google/YouTube's same improper censorship activities as those suffered by other LGBTQ+

19 creators:

20        a.    Initially, Google/YouTube informed Mr. Scarnici that specific videos

21 posted on this channels were "not appropriate for all audiences" and were demonetized.  Mr.

22 Scarnici attempted to dispute Google/YouTube's determination that the videos were "not

23 appropriate for all audiences" and filed several appeals.  However, Google/YouTube did not

24 respond to Mr. Scarnici's appeals or attempts to communicate with YouTube representatives.

25        b.    For some videos, Google/YouTube informed Mr. Scarnici that another

26 YouTube creator owned the copyrights to the videos which were posted on one of Mr. Scarnici's

27 channels:

28        i.    Mr. Scarnici created and uploaded the original "Fergalicious

**SECOND AMENDED CLASS ACTION COMPLAINT FOR DAMAGES, INJUNCTIVE RELIEF,
RESTITUTION, AND DECLARATORY JUDGMENT**

Parody" video on September 3, 2007.  Google/YouTube informed Mr. Scarnici that the parody

violated an original copyright for another artist.  Mr. Scarnici wrote a detailed defense of his

original music video parody in an attempt to appeal the decision, but YouTube ignored his letter.

Ultimately, the "Fergalicious Parody" was removed from his channel.  Though Mr. Scarnici

removed the video, incredibly, another YouTuber copied Mr. Scarnici's original parody to the

Johndeere93 channel, where it has generated more than 336,000 views and remains visible to this

day:  https://www.youtube.com/watch?v=kPSnwDdR27w.

           ii.       Mr. Scarnici created and uploaded the original "Ring the Alarm

parody" on September 16, 2007.  Again, Google/YouTube informed Mr. Scarnici that this parody

violated an original copyright for another artist, and insisted that the video be removed.  Mr.

Scarnici complied with YouTube's request.  However, the very same video was posted on

Raphers' YouTube channel where it has generated 195,612 views, and to this day remains posted

for viewing:  https://www.youtube.com/watch?v=eY_mrU8MPfI.

           iii.      The very same thing happened with the "Madonna Medley" parody

which Mr. Scarnici created and uploaded on September 24, 2007.  Mr. Scarnici removed this

video from his channel at the insistence of Google/YouTube.  However, the very same video was

posted on Tolichon's YouTube channel where it has generated 8,657 views.

Thus on at least three separate occasions, Google/YouTube forced Mr. Scarnici to remove his

original parody videos on grounds of copyright infringement, but allowed – and continues to allow

third parties who have YouTube channels to post copies of Mr. Scarnici's original parody videos,

in violation of Mr. Scarnici's copyrights for these videos.

           c.       Google/YouTube has allowed third party YouTubers to post and generate

revenues from Mr. Scarnici's original videos, to which he owns all rights over Mr. Scarnici's

express objection.  Live Nation Video Network asserted a copyright claim for Mr. Scarnici's "Top

Top (Gay TV Show Parody)."  Mr. Scarnici disputed Live Nation Video Network's claim and

explained that he owned all rights to this original video which he wrote, directed, produced and

appears in.  Without responding to Mr. Scarnici's communications or requiring Live Nation Video

Network to provide proof that it owned the copyright to the video, on December 13, 2017,

**SECOND AMENDED CLASS ACTION COMPLAINT FOR DAMAGES, INJUNCTIVE RELIEF,
RESTITUTION, AND DECLARATORY JUDGMENT**

Google/YouTube informed Mr. Scarnici that "Live Nation Video Network has decided that their copyright claim is still valid" and refused to pay Mr. Scarnici for ad revenue generated by his video.  To avoid generating more revenue to the interloper, Mr. Scarnici privatized the video.

       d.     By 2017, any new videos posted on Mr. Scarnici's two channels were generating as few as 300 views in all.  The channels were effectively demonetized and generating no revenue.

       e.     By 2018, frustrated with Google/YouTube's repeated censorship, Restricted Mode filters, demonetization and refusal to respect this copyright, Mr. Scarnici decided to reduce his further YouTube efforts and presence.  He posted on the GregScarnici channel:

> Sorry I haven't been creating videos on YouTube lately.  With the algorithm changes, the recent crackdown on videos tagged #LGBT, which both caused an insane viewer drop-off and YouTube taking away monetization on my account, I have obviously not been inspired to create content no one will see.  Instead, I've been focusing on live performance again, and will be performing this show in NYC, San Francisco and LA this summer.  I hope to see you there! Tickets and more info:  www.gregscarnici.com.
> https://www.youtube.com/user/gregscarnici/community.

       f.     In addition to harassing Mr. Scarnici and preventing him from generating revenues from videos posted to the YouTube Platform, Google has begun to interfere with Mr. Scarnici's ability to communicate with Plaintiffs' counsel.  Commencing in early September of 2019, Mr. Scarnici began communicating with counsel for Plaintiffs using a Gmail account.  After receiving at least 9 different email communications from Plaintiffs' attorneys' BGRfirm.com server, on September 26, 2019 at 1:51 p.m., Mr. Scarnici received a phishing warning from Google's Gmail server:



**SECOND AMENDED CLASS ACTION COMPLAINT FOR DAMAGES, INJUNCTIVE RELIEF, RESTITUTION, AND DECLARATORY JUDGMENT**

1   Mr. Scarnici clicked on the "Looks Safe" link on the warning.  Despite having done so, two more

2   identical phishing warnings were sent to Mr. Scarnici by Google's Gmail server at 4:30 p.m. and

3   4:41 p.m.  Additional warnings were sent in response to emails from Plaintiffs' counsel from the

4   BGRfirm.com server to Mr. Scarnici's Gmail account on October 23, 2019 and October 25, 2019.

5   **V.      CLASS ACTION ALLEGATIONS**

6          248.    Plaintiffs bring this action on behalf of themselves and a putative YouTube

7   Community Class and an LGBTQ+ Community Subclass of YouTube users and consumers who

8   are similarly situated under Rules 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure.

9   The YouTube Community Class and LGBTQ+ Community Class seeking monetary damages and

10  injunctive relief on behalf of the following class of YouTube consumers and users:

11                 **The YouTube Community Class Is Defined As**:

12                 All persons or entities in the United States who are or were
                   members, users and or consumers of YouTube who uploaded,
13                 posted, or viewed video content on YouTube subject to
                   Google/YouTube's Terms of Service, Mission Statement,
14                 Community Guidelines, and/or any other content-based filtering,
                   monetization, distribution, personal data use policies, advertising or
15                 regulation and practices any other regulations or practices that are
                   related to the YouTube Platform on or after January 1, 2015 and
16                 continuing through to December 31, 2019 (the "Class Period").

17                 Excluded from the YouTube Community Class are Defendants and
                   their employees, affiliates, parents, subsidiaries, and co-conspirators,
18                 whether or not named in this Complaint, and the United States
                   government.
19
                   **The LGBTQ+ Community Subclass Is Defined As:**
20
                   All persons or entities in the United States who (a) are or were
21                 members, users and or consumers of YouTube who uploaded,
                   posted, or viewed video content on YouTube subject to
22                 Google/YouTube's Terms of Service, Mission Statement,
                   Community Guidelines, and/or any other content-based filtering,
23                 monetization, distribution, personal data use policies, advertising or
                   regulation and practices any other regulations or practices that are
24                 related to the YouTube Platform and (b) are part of a protected class
                   of persons under the California or Federal law because of sexual
25                 orientation, gender identity, or gender or (c) create, post, distribute,
                   monetize, or advertise video content on the YouTube Platform that
26                 discusses or relates to topics, issues or viewpoints that advocate for,
                   are of interest to, or are intended for LGBTQ+ audiences, on or after
27                 January 1, 2015 and continuing through to December 31, 2019 (the
                   "LGBTQ+ Subclass Period").
28

**SECOND AMENDED CLASS ACTION COMPLAINT FOR DAMAGES, INJUNCTIVE RELIEF,
RESTITUTION, AND DECLARATORY JUDGMENT**

1    Excluded from the LGBTQ+ Community Subclass are Defendants
      and their employees, affiliates, parents, subsidiaries, and co-
2    conspirators, and any YouTube users who create, post, distribute,
      promote or engage in video or communications on the YouTube
3    Platform that is directed against Plaintiffs or LGBTQ+ Community
      and is objectively violent, obscene, threatening, or homophobic as
4    alleged in the Complaint.

5         249.   Plaintiffs believe that there are over 200 million members of the YouTube

6    Community Class and hundreds of thousands of members of LGBTQ+ Community Subclass as

7    defined and described above in the Complaint.  The exact number and identities of the YouTube

8    Community Class and LGBTQ+ Community Subclass are known by Defendants, and the number

9    of persons who fall within the definitions of the Class and/or Subclass are so numerous and

10   geographically dispersed so as to make joinder of all members of the Class or Subclass in their

11   individual capacities impracticable, inefficient, and unmanageable so as to effectively deny each

12   putative Class or Subclass member his, her, or their rights to prosecute and obtain legal and

13   equitable relief based on the claims and allegations averred in this Complaint.

14        250.   There are questions of law and fact common to the YouTube Community Class and

15   the LGBTQ+ Community Subclass that relate to and/or are dispositive of the nature and

16   allegations of unlawful conduct alleged in the Complaint, and the nature, type and common pattern

17   of injury and harm caused by that unlawful conduct and sustained by the putative members of the

18   Class and Subclass including, but not limited to:

19        a.   Whether Defendants' regulations and content-based restrictions violate the

20   free speech, antidiscrimination, consumer fraud and unfair competition, and contractual rights of

21   the members of the YouTube Community Class and/or the LGBTQ+ Community Subclass;

22        b.   Whether Defendants concealed, misrepresented or omitted to disclose

23   material policies and practices regarding the unlawful regulation of video content, advertising,

24   distribution, monetization, contractual obligations, and characteristics of the YouTube Platform to

25   the members of the YouTube Community Class and/or LGBTQ+ Community Subclass;

26        c.   Whether Defendants use unlawful, discriminatory, anticompetitive and

27   fraudulent, deceptive, unfair, and/or bad faith filtering tools and practices, in the code and

28   operation of their machine based, algorithmic, or A.I.  filtering tools, and/or other practices and

**SECOND AMENDED CLASS ACTION COMPLAINT FOR DAMAGES, INJUNCTIVE RELIEF,
RESTITUTION, AND DECLARATORY JUDGMENT**

1  procedures to review, regulate, and restrict content, and/or regulate and restrict the advertising,

2  monetization, distribution, and property rights of the YouTube Community Class and LGBTQ+

3  Community Subclass;

4         d.      Whether Defendants are engaged in discriminatory practices against the

5  members of the LGBTQ+ Community Subclass based on protected characteristics;

6         e.      Whether Defendants' breached their form consumer contracts and

7  obligations to the YouTube Community Class and LGBTQ+ Community Subclass;

8         f.      Whether Defendants are engaged in unlawful, deceptive, unfair, or

9  anticompetitive practices that violate federal or California law, and harmed and injured the

10 YouTube Community Class and/or the LGBTQ+ Community Subclass;

11        g.      Whether the conduct of Defendants, as alleged in this Complaint, caused

12 injury to the business and property of Plaintiffs and the members of the YouTube Community

13 Class and LGBTQ+ Community Subclass;

14        h.      Whether Defendants' alleged regulations, practices, and conduct has caused

15 or threatens to cause harm to the speech of the YouTube Community Class or the LGBTQ+

16 Community Subclass to warrant the ordering of temporary, preliminary and/or final injunctive

17 relief and corresponding declaratory relief with respect to the legal rights of Plaintiffs and the

18 YouTube Community Class and LGBTQ+ Community Subclass;

19        i.      The scope, nature, substance, and enforcement of injunctive and equitable

20 relief sought by the YouTube Community Class and LGBTQ+ Community Subclass;

21        j.      Whether Defendants were unjustly enriched or obtained profits or ill-gotten

22 financial gains as a result of the unlawful, discriminatory, deceptive, unfair, or anticompetitive

23 practices perpetrated against Plaintiffs, the YouTube Community Class, and the LGBTQ+

24 Community Subclass;

25        k.      Whether Defendants breached their contractual obligations and/or implied

26 duty of good faith and fair dealing under the consumer form contracts entered into during the

27 Class Period between Google/YouTube and Plaintiffs, the YouTube Community Class, and the

28 LGBTQ+ Community Subclass;

**SECOND AMENDED CLASS ACTION COMPLAINT FOR DAMAGES, INJUNCTIVE RELIEF,
RESTITUTION, AND DECLARATORY JUDGMENT**

1      l.      Whether Defendants' content-based regulations and filtering practices, on

2    their face and/or as applied, violate the free speech rights of Plaintiffs and the YouTube

3    Community Class and the LGBTQ+ Community Subclass; and

4      m.      whether Defendants' assertion of immunity from liability under the CDA

5    with respect to any of the claims or allegations asserted by Plaintiffs, the YouTube Community

6    Class, and/or the LGBTQ+ Community Subclass operates as an unlawful prior restraint of speech

7    in violation of the First Amendment of U.S. Constitution.

8      251.    During the Class Period, Plaintiffs uploaded one or more videos to YouTube and

9    Plaintiffs Divino and Brett Somers each purchased Google Ads products in reliance on the

10   representations and failures to disclose alleged above.  At least some of that video content

11   uploaded by LGBTQ+ Plaintiffs was subjected to one or more human or algorithmic restriction

12   tools.  The interests of Plaintiffs are coincident with, and not antagonistic to those of the other

13   members of the YouTube Community Class and the LGBTQ+ Community Subclass.

14     252.    Each of Plaintiffs is a member of the YouTube Community Class and LGBTQ+

15   Community Subclass class.

16     253.    The claims of Plaintiffs are typical of the claims of YouTube Community Class and

17   LGBTQ+ Community Subclass members, and Plaintiffs will fairly and adequately protect the

18   interests of the members of the LGBTQ+ Class.  Plaintiffs are represented by counsel who are

19   competent and experienced in the prosecution and defense of similar claims and litigation,

20   including class actions filed, prosecuted, defended, or litigated in under California and federal law,

21   in California and federal courts, in connection with claims and certification of consumer and civil

22   rights classes composed of members who reside in California and/or the United States.

23     254.    The prosecution of separate actions by individual members of the YouTube

24   Community Class and LGBTQ+ Community Subclass would create a risk of inconsistent or

25   varying adjudications.

26     255.    The questions of law and fact common to the members of the YouTube Community

27   Class and the LGBTQ+ Community Subclass predominate over any questions of law or fact

28   affecting only individual members of the Class or Subclass, including legal and factual issues

1  relating to liability and the nature of the harm caused by Defendants' unlawful actions.

2       256.    A class action is superior to other available methods for the fair and efficient

3  adjudication of this controversy.  Treatment as a class action will permit a large number of

4  similarly situated persons to adjudicate their common claims in a single forum simultaneously,

5  efficiently and without the duplication of effort and expense that numerous individual actions

6  would engender.

7       257.    The YouTube Community Class and the LGBTQ+ Community Subclass are

8  readily definable and are categories for which records should exist in the files of Defendants, and

9  prosecution as a class action will eliminate the possibility of repetitious litigation.  Class treatment

10 will also permit the adjudication of relatively small claims by many members of the LGBTQ+

11 Community Subclass who otherwise could not afford to litigate claims such as those asserted in

12 this Complaint.

13                        **FIRST CAUSE OF ACTION**
   **Declaratory Judgment:  47 U.S.C. § 230(c) Violates The First And Fourteenth Amendments**
14                        **Of The U.S. Constitution**
   **(On Behalf Of Plaintiffs Individually And The YouTube Community Class)**
15

16      258.    Plaintiffs re-allege and incorporate herein by reference, as though set forth in full,

17 each of the allegations set forth in paragraphs 1 through 257 above.

18      259.    At least one court has ruled that the Communications Decency Act, 47 U.S.C.

19 §230(c), immunizes some of Defendants' conduct alleged above.  On November 19, 2019, the

20 Honorable Brian C. Walsh, Judge of the Superior Court of the County of Santa Clara (the State

21 Court"), ruled that 47 U.S.C. § 230(c) "immunizes service providers [such as Google/YouTube]

22 who endeavor to restrict access to material deemed objectionable," by employing filters to remove

23 users' content from their platforms based on the political, religious, or other personal identity or

24 viewpoint of the user rather than the actual online content posted by the user on the platform.

25      260.    Furthermore, the State Court ruled that, notwithstanding the express good faith

26 language in Section 230(c)(2)(A), the content filtering and restrictions that internet service

27 providers' like Google/YouTube engage in are not subject to any good faith, objective judicial

28 review of the underlying content, or the internet providers filtering or restriction practices, but

**SECOND AMENDED CLASS ACTION COMPLAINT FOR DAMAGES, INJUNCTIVE RELIEF,**
**RESTITUTION, AND DECLARATORY JUDGMENT**

1    reside within and are left to the sole, unfettered discretion of the internet provider who acts to filter

2    and restrict content at its whim.

3        261.    If  the State Court has properly ruled that Section 230(c): (i)  grants absolute

4    immunity to Google/YouTube for any and all discretionary actions to restrict compliant, non-

5    objectionable speech or other appropriate speech, including actions based and taken on the sexual

6    orientation, gender identity, political, religious, ethnic, racial or other identity or viewpoint based

7    characteristics of the user, rather than based on the underlying online-content; and/or (ii)

8    Google/YouTube may filter, regulate, brand, or block content as "otherwise objectionable" in its

9    sole and unfettered discretion, including finding the content "objectionable" because of the

10   personal sexual, religious, racial, ethnic, or political identity or viewpoint of the user rather than

11   the underlying content, then, the application of Section 230(c) immunity as applied to the facts of

12   this case operates as both an unconstitutional restraint on Plaintiffs' First Amendment rights to

13   freedom of petition and speech, and a violation of equal protection of law under the Fourteenth

14   Amendment.

15       262.    The State Court's November 19-Order granting Google/YouTube's demurrer

16   without opportunity to amend is set forth in full as Exhibit B hereto.

17       **A.    <u>Plaintiffs Served Rule 5.1 Notice On The U.S. Attorney General</u>.**

18       263.    In challenging the Constitutionality of the CDA, Plaintiffs must comply with

19   Federal Rule of Civil Procedure 5.1 which requires that "[A] party . . . promptly [] file a notice of

20   constitutional question stating the question and identifying the paper that raises," where "a federal

21   statute is questioned and the parties do not include the United States, one of its agencies, or one of

22   its officers or employees in an official capacity."  Fed. R. Civ. P. 5.1.  Under Rule 5.1 "statute"

23   means any congressional enactment that would qualify as an "Act of Congress."  Rule 5.1 requires

24   more than the court certification provided by 28 U.S.C. § 2403; Rule 5.1 requires notice and

25   certification to the United States Attorney General of any constitutional challenge to a federal

26   statute, not merely to challenges of laws "affecting the public interest."  28 U.S.C. § 2403.

27       264.    The CDA constitutes a federal statute under Rule 5.1.

28       265.    Plaintiffs have served the Rule 5.1 Notice on the United States Attorney General

**SECOND AMENDED CLASS ACTION COMPLAINT FOR DAMAGES, INJUNCTIVE RELIEF,
RESTITUTION, AND DECLARATORY JUDGMENT**

stating that Plaintiffs are questioning the constitutionality of 47 U.S.C. § 230(c), identifying the CDA, and attaching a copy of this Second Amended Complaint, and a copy of Judge's November 19-Order.  Plaintiffs have served the Rule 5.1 Notice and attachments by certified mail and have sent a copy of the Notice and attachments to the United States Attorney General by overnight delivery service.

266.    28 U.S.C. § 2403 requires that the Court notify the United States Attorney General of Plaintiffs' First Cause of Action set forth in this Second Amended Complaint:  "In any action, suit or proceeding in a court of the United States to which the United States or any agency, officer or employee thereof is not a party, wherein **the constitutionality of any Act of Congress affecting the public interest is drawn in question, the court shall certify such fact to the Attorney General**, and shall permit the United States to intervene for presentation of evidence, if evidence is otherwise admissible in the case, and for argument on the question of constitutionality. The United States shall, subject to the applicable provisions of law, have all the rights of a party and be subject to all liabilities of a party as to court costs to the extent necessary for a proper presentation of the facts and law relating to the question of constitutionality."  28 U.S.C. § 2403(a) (emphasis added).

267.    Accordingly, Plaintiffs respectfully request that the Court certify to the United States Attorney General of the United States that 48 U.S.C. § 230(c), a federal statute, has been questioned by Plaintiffs on the grounds averred below.

**B.    <u>Legal Controversies Currently Exist Regarding The Scope And Constitutionality Of 47 U.S.C. § 230(c).</u>**

268.    The CDA provides "**Protection for 'Good Samaritan' blocking and screening of offensive material:**"

(1) **Treatment of publisher or speaker**

No provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider.

(2) **Civil liability**

No provider or user of an interactive computer service shall be held liable on account of —

**SECOND AMENDED CLASS ACTION COMPLAINT FOR DAMAGES, INJUNCTIVE RELIEF, RESTITUTION, AND DECLARATORY JUDGMENT**

(A) any action voluntarily taken in good faith to restrict access to or availability of material that the provider or user considers to be obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable, whether or not such material is constitutionally protected; or

(B) any action taken to enable or make available to information content providers or others the technical means to restrict access to material described in paragraph (1).  47 U.S.C. § 230(c).

269.    Actual controversies now exist between the parties regarding the proper construction, scope, application, and constitutionality of the CDA statutory immunity granted to internet service providers given the unique allegations and claims asserted against Google/YouTube in this case.  Specifically, each of the controversies arise from a dispute about the extent to which the CDA immunizes an internet service provider who discriminates against users because they identify as LGBTQ+ or create content for LGBTQ+ audiences, and who employ an express and admitted policy and practice of filtering and/or restricting Plaintiffs' access to YouTube and related services because Defendants perceive Plaintiffs and their content as "gay."

270.    Plaintiffs allege that:

A.      Defendants Google/YouTube expressly and impliedly represent, warrant and promise each Plaintiff (and all other public consumers who use YouTube) that Google/YouTube do not filter, curate, or regulate video content or otherwise limit access to or the distribution of video content and communication on YouTube based on a person or user's personal identity or viewpoint.  These contractual obligations include not using Plaintiffs' gender or sexual identity, sexual orientation, or association with or expression of LGBTQ+ viewpoints as a basis for filtering, regulating, or restricting Plaintiffs' use of or access to YouTube.  Federal and California laws (including free speech, equal protection, antidiscrimination, unfair advertising, and consumer protection laws), prohibit Defendants from discriminating against Plaintiffs because they identify as LGBTQ+, express LGBTQ+ viewpoints, or create content for the LGBTQ+ community.

B.      Defendants Google/YouTube filter, regulate, restrain, restrict and interfere with Plaintiffs' use of and access to YouTube, by employing filters, vague standards, and biased human reviewers, to remove, strict and/or demonetize Plaintiffs' video content based upon Plaintiffs' respective individual LGBTQ+ identities, their LGBTQ+ viewpoints, and/or the fact that they

**SECOND AMENDED CLASS ACTION COMPLAINT FOR DAMAGES, INJUNCTIVE RELIEF, RESTITUTION, AND DECLARATORY JUDGMENT**

1   create content for the LGBTQ+ community.

2        C.      Defendants have admitted that they have a "policy" of applying identity and

3   viewpoint based standards and rules to deny services, and to remove, filter, regulate, restrict and/or

4   demonetize Plaintiffs' speech -- based not on the actual content of videos but on Plaintiffs'

5   respective individual sexual orientation, identity, viewpoint, and or those of Plaintiffs' intended

6   viewers, in order to brand Plaintiffs' content as "shocking" because the video content was created

7   by persons identified as "gay" or as expressing a "gay viewpoint."

8        D.      Defendants are also engaged in affirmative, unlawful conduct intended to drive

9   Plaintiffs and other "gay" content creators from the YouTube platform to further

10  Google/YouTube's corporate profits and power.  Defendants' actions include unlawfully branding

11  Plaintiffs' content as "inappropriate" or "shocking;" promoting and monetizing LGBTQ+ hate

12  speech on Plaintiffs' channels; discouraging or preventing viewers from following or subscribing

13  to Plaintiffs' channels and content; using A.I. and other filtering and/or content restriction tools to

14  decrease viewership of LBGTQ+ channels, or to shadow ban LGBTQ+ content; preventing

15  Plaintiffs from advertising or monetizing their video content; and unlawfully promoting

16  Defendants' own or preferred video content which competes directly with Plaintiffs for audiences

17  and LGBTQ+ viewers by financially crushing, intimidating, or employing other unlawful

18  discriminatory practices to prevent Plaintiffs from generating sufficient income from the YouTube

19  platform to continue to create new LGBTQ+ content, and by steering Plaintiffs' subscribers and

20  LGBTQ+ viewers to Google/YouTube's own or preferred content.

21       E.      Defendants' conduct as alleged includes, but is not limited to:  (i) monetizing,

22  promoting, profiting from, and flooding Plaintiffs' channels, subscribers and viewers with anti-

23  LGBTQ+ hate speech, threats and intimidation; (ii) unsubscribing, cancelling, and interfering with

24  the Plaintiffs' established subscribers and followers; (iii) driving away or intimidating LGBTQ+

25  audiences from viewing Plaintiffs' content; (iv) and engaging in and using machine based A.I.

26  tools and human reviewers to filter, regulate or restrict Plaintiffs' LGBTQ+ content, based on the

27  identity and viewpoints of the YouTube user; rather than on the actual video content posted on the

28  YouTube platform.

1392054.1
Case No. 5:19-cv-004749-VKD
**SECOND AMENDED CLASS ACTION COMPLAINT FOR DAMAGES, INJUNCTIVE RELIEF,
RESTITUTION, AND DECLARATORY JUDGMENT**

271.    Although Defendants have admitted, as they must at this stage of the proceedings, the truth of each of these allegations, Google/YouTube assert that they are immune from liability under the CDA, for any and all discrimination against LGBTQ+ YouTube users, where the discrimination arises, directly or derivatively, from the Defendants' filtering, regulating, restraining, restricting, monetizing, or advertising activities on the YouTube internet platform based on a Plaintiffs' sexual orientation, gender or personal identity or viewpoints.

272.    Specifically, at least three actual legal controversies exist between the parties at this juncture of the proceedings regarding the extent to which the CDA authorizes Google/YouTube to exercise unfettered and absolute discretion to filter, regulate, restrain, restrict, limit, block, monetize, advertise, disparage, or banish LGBTQ+ content, LGBTQ+ creators, and/or LGBTQ+ viewers on the YouTube platform based on the sexual orientation, identity, or viewpoints of LGBTQ+ creators or LGBTQ+ viewers.

> **1.    An Actual Controversy Exists As To Whether 47 U.S.C. § 230(c) Immunizes Filtering And Restricting Internet Speech Based On The Identity Or Viewpoint Of The Speaker.**

273.    A controversy now exists as to whether the language of the CDA immunizes an internet service provider for filtering, regulating, and/or restricting online internet speech based on the identity or viewpoint of the speaker or internet service user, rather than on the actual content of the online internet speech.  The CDA does not even mention, much less expressly authorize filtering, regulating or restricting internet speech or expression based on the identity or viewpoint of the speaker who is posting information on the internet.  Rather, Section 230(c) is tethered to the filtering of the "information," "content" or "material" in the speech or video that appears on the service prover's internet platform.  *See* 47 U.S.C. § 230(c)(1), (2).  Internet service providers' decisions to filter, regulate, and/or restrict content and information posted on an internet platform may be subject to immunity where the filtering, regulation, or restriction is based on the actual content which is posted to the internet platform.  However, Section 230(c) does not authorize filtering, regulation or restriction of internet content based on the identity or viewpoint of the speaker or the user who posts information to the internet platform.  *Id*.

274.    Despite the grant of immunity for decisions based on the underlying

material/content that is posted and viewed on the YouTube platform, Google/YouTube contend that Section 230(c) immunity is absolute and applies to *any* filtering or regulation even filtering or regulation based on the users' personal identity or viewpoint rather than the material/content posted or viewed.  Consequently, Google/YouTube argue that because the discriminatory conduct and animus perpetrated against LGBTQ+ users like Plaintiffs occurs under the pretext of filtering, regulating and restricting internet content, Section 230(c) immunity applies -- even though the actual content complies with all of Defendants' rules and standards, and the filtering, regulation and restriction is based on the sexual orientation, identity and/or viewpoints of the LGBTQ+ creators or viewers.  *See*, *Prager University v. Google LLC, et al*., Santa Clara Super. Ct. No. 19CV340667, Order After Hearing dated November 19, 2019 (granting Defendants absolute CDA immunity and dismissing plaintiffs' claims without leave to amend despite detailed factual allegations, evidence, and party admissions of identity and viewpoint based discrimination and animus in regulating and filtering speech on YouTube).

275.    Thus, a controversy now exists as to whether, CDA immunity under Section 230(c) for filtering, regulation and restriction of obscene, lewd, lascivious, filthy, excessively violent, harassing, or "otherwise objectionable" internet content immunizes Defendants' conduct regarding LGBTQ+ material/content which is not "obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable" on its face; but has been deemed "otherwise objectionable" because Defendants dislike Plaintiffs' identity or viewpoint; and/or dislike the identities or viewpoints of Plaintiffs' intended viewers.

276.    A declaration by this Court is needed to determine whether CDA immunity under Section 230(c) is limited to where the internet service provider is in fact filtering, regulating or restricting "information," "content," or "material" which actually appears on the internet platform, because that "information," "content," or "material" is "obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable;" and that Section 230(c) immunity does not apply when the internet service provider filters, regulates or restricts access to the internet platform or services based upon the user's personal identity or viewpoints, or because the internet service provider finds the user's personal identity or viewpoints to be objectionable without regard

1   to the actual content that the user has posted.

2          **2.   An Actual Controversy Exists As To Whether Defendants'
               Determination That Plaintiffs' Content Is "Otherwise Objectionable"
3              Is Subject To Good Faith Review.**

4          277.   A controversy now exists as to whether Section 230(c) requires that Defendants

5   exercise objective, good faith when filtering and restricting content that it deems "otherwise

6   objectionable."  The CDA contains a broad, vague, ambiguous, and disjunctive "catchall"

7   provision that purportedly immunizes internet service providers from unlawfully filtering,

8   regulating or restricting on-line content that is "otherwise objectionable," **even if the content is**

9   ***NOT* "obscene, lewd, lascivious, filthy, excessively violent, [or] harassing**." *See,* 47 U.S.C. §

10  230 (c)(2).  This catch-all provision has been the subject of much disagreement among courts as to

11  whether the "otherwise objectionable" standard is subject to some objective, good faith review, or

12  whether, as Defendants contend, their decision concerning "otherwise objectionable" content is

13  left to the unfettered, subjective discretion or whim of the internet service provider, which may not

14  be challenged.

15         278.   The ambiguity created by the "otherwise objectionable" language, is exacerbated

16  by the Section 230(c)(2)(A) grant of immunity to "voluntary" actions undertaken "in ***good faith*** to

17  restrict access to or availability of material that the provider or user considers to be obscene, lewd,

18  lascivious, filthy, excessively violent, harassing, or otherwise objectionable," on the one hand, and

19  subsection (c)(2)(B) which applies to "***any*** action taken to enable or make available to information

20  content providers or others the technical means to restrict access to material described in

21  paragraph (1)," on the other hand.  *See*  47 U.S.C. § 230(c)(2) (emphasis added); Exhibit B, the

22  November 19, 2019-Order After Hearing issued in *Prager University v. Google LLC, et al.* Santa

23  Clara Super. Ct. No. 19CV340667 (declining to follow federal cases imposing a good faith

24  standard and review of a decision to block "otherwise objectionable" content and finding that

25  Section 230(c) protects subjective or bad faith decisions to filter and restrain on-line speech).

26         279.   A declaration from this Court is needed as to whether Defendants' claim of CDA

27  immunity pursuant to the "otherwise objectionable" language is reviewable under an objective or

28  "good faith" standard or, as whether as Google/YouTube contend, their conduct is unassailable no

matter how arbitrary, capricious, discriminatory, or otherwise unlawful.

### 3. An Actual Controversy Exists As To Whether 47 U.S.C. § 230(c) Is Unconstitutional As Applied To Plaintiffs On These Facts.

280.     To the extent that the language of Section 230(c) grants immunity  to Google/YouTube for discriminating against, or otherwise using the personal identity or viewpoints of Plaintiffs to filter, regulate and/or restrict internet content and access to the YouTube platform, an actual controversy now exists as to whether such a broad and absolute Congressional grant of immunity renders Section 230(c) unconstitutional under the First and Fourteenth Amendments of the United States Constitution.

281.     Google/YouTube's use of Section 230(c) as a shield to prevent Plaintiffs from petitioning the courts for relief to redress violations of their civil, consumer, and contractual rights, including rights which expressly protect Plaintiffs as a class from identity or viewpoint based discrimination and speech restrictions, renders Section 230(c) an unlawful prior restraint of speech under the First Amendment of the U.S. Constitution and under Article 1, Section 2 of the California Constitution.

282.     To the extent that Section 230(c) is a Congressional statute that authorizes one party to discriminate against another party because of their sexual orientation or individual identity – or because of "the gay thing," the CDA denies LGBTQ+ YouTube users equal protection under the laws of United States and California, as guaranteed by the Fourteenth Amendment. Accordingly, if the Court construes section 230(c) to grant Google/YouTube immunity from well pleaded allegations that seek to redress injuries arising from Defendants' anti-LGBTQ+ discrimination; unlawful restraint of speech; unfair business practices; consumer fraud; and contractual violations; Plaintiffs request that the Court declare Section 230(c) unconstitutional as applied to them under the First and/or Fourteenth Amendments of the U.S. Constitution, given the facts of this case.

**SECOND AMENDED CLASS ACTION COMPLAINT FOR DAMAGES, INJUNCTIVE RELIEF, RESTITUTION, AND DECLARATORY JUDGMENT**

**SECOND CAUSE OF ACTION**
**Viewpoint-Based Discrimination In Violation Of The First Amendment To U. S.**
**Constitution Pursuant To 42 U.S.C. § 1983**
**(On Behalf Of Plaintiffs Individually And The YouTube Community Class)**

283.    Plaintiffs re-allege and incorporate herein by reference, as though set forth in full, each of the allegations set forth in paragraphs 1 through 282 above.

284.    The First Amendment of the United States Constitution provides that:  "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances."  U.S. Const. Amend. I. The First Amendment governs the regulation of speech that occurs in designated "public forums" or public spaces, limited public spaces, and "quasi-public" spaces where the public is invited to engage in freedom of speech and expression.

285.    A private party who regulates speech in a "public forum," performs a public function that is traditionally reserved for government alone.  In so doing, the party performs a public function that is subject to judicial scrutiny under the First Amendment.  Thus, regardless of whether the party regulating speech is a local government or a global corporate conglomerate, the party regulating speech in a designated public forum is subject to some level of judicial review under the First Amendment.

286.    Unlike private parties who invite members of the public to use their cable television station to express themselves at selected and limited times, see, e.g., *Manhattan Cmty. Access Corp. v. Halleck*, 139 S. Ct. 1921, 204 L. Ed. 2d 405 (2019), the YouTube Platform is expressly and affirmatively designated by Defendants as an "open" platform on which YouTube invites the general public to engage in freedom of expression at any time, subject only to viewpoint neutral content based rules that apply equally to all, and are not based upon the speakers' identity or viewpoint.

287.    Google/YouTube affirmatively and unequivocally designate the YouTube Platform as a public forum, where the public is invited to engage in freedom of expression subject only to compliant viewpoint neutral content-based regulations.  Defendants memorialize the "public

**SECOND AMENDED CLASS ACTION COMPLAINT FOR DAMAGES, INJUNCTIVE RELIEF,**
**RESTITUTION, AND DECLARATORY JUDGMENT**

forum" designation in YouTube's Terms of Service, Mission Statement, and affirm this

designation in sworn testimony and admissions made to Congress.  In return for, and in

consideration of, the right to use the YouTube Platform as a viewpoint neutral public forum,

Defendants obtain the contractual rights to the user's content, data, and audience, and then

monetize those rights for profit.

288.    In operating the YouTube Platform, Defendants are operating a Company Town in

which YouTube is designated as the public forum or "town-square" for the community to gather

and engage in free speech, expression, communication, and to exchange ideas.  Together

Google/YouTube treat all consumers as "members" of a "Community."  In addition to engaging in

freedom of expression, members of the Community ("Community Members") are solicited and

invited to use the YouTube Platform and ancillary and related products and services on Google to

obtain essential products and services, including electronic mail and verbal communication

services, financial, medical, educational, dietary and food, entertainment, sports, news, and GPS

map and traffic information services.  For example, recently Google undertook "Project

Nightingale," by which Google collects the private health data and records of more than 50 million

Americans.  Google claims that it does so under a claim of color of law.  Specifically, Google

asserts that "Project Nightingale," is authorized and operated under a federal statute that permits

Google to access people's most confidential and personal information.  See, The Wall Street

Journal, "Google's 'Project Nightingale' Gathers Personal Health Data on Millions of

Americans," (November 12, 2019);  https://www.wsj.com/articles/google-s-secret-project-

nightingale-gathers-personal-health-data-on-millions-of-americans-11573496790.  Community

Members, Google/YouTube employees, contractors, and computerized artificial intelligence based

filtering tools are authorized and deployed to police the YouTube Platform for violations of the

Terms of Service, including "Community Guidelines" and other rules.  The policing decisions that

result are enforced subject to an appeals and review process, and can be enforced by imposing a

myriad of consequences for Community Members, including but not limited to application of

restrictions such as whether a specific video can remain on the YouTube Platform, whether it is

searchable, whether it can be viewed by all, most or even a fraction of Community Members,

SECOND AMENDED CLASS ACTION COMPLAINT FOR DAMAGES, INJUNCTIVE RELIEF,
RESTITUTION, AND DECLARATORY JUDGMENT

whether the creator who posted the video can generate any revenue from the video, and if so, the degree to which it can do so, the degree to which the video will appear in "up next" applications on viewers' screens, whether the creator will receive a "strike" (the accumulation of which can result in the termination of the creators' access to the YouTube Platform), whether the viewer's access to the YouTube Platform will be terminated, and even whether the viewer's access to the Google network of services will be terminated.

289.    Defendants also utilize Section 230(c) of the Communications Decency Act, 47 U.S.C. § 230(c), to regulate speech on the YouTube Platform.  Google/YouTube rely upon and invoke federal law under Section 230(c) to preempt and immunize unlawful filtering, regulations, and practices on the YouTube Platform, including practices which discriminate based upon race, gender, sexual orientation, religion, political affiliation or commercial identity or individual viewpoints, and in doing so, engage in unlawful discriminatory, arbitrary, and capricious repression of public speech under color of federal law.

290.    As recently as August 23, 2019, Google/YouTube asserted to a three judge panel of the Ninth Circuit Court of Appeals that Defendants were not subject to judicial scrutiny under the First Amendment because they were not engaged in state action.  Simultaneously, Defendants argued that they were relieved by a federal immunity statute of their express private contractual and legal obligations to the general public and to the YouTube Community Members of ensuring neutral content filtering and regulation under YouTube's own Terms of Service, Mission Statement, and Community Guidelines, as affirmed by YouTube's sworn admissions to Congress. Defendants also urged they were also immune from federal and state laws prohibiting censorship, discrimination, unlawful business practices and consumer fraud.

291.    Although the impetus for Defendants' forbidden discrimination does not originate with the federal government, Defendants' overly expansive reliance on Section 230(c) immunity, a federal statute, emboldens Google/YouTube to engage in and enforce otherwise illegal identity and viewpoint based gender, sexual orientation, racial, religious and political animus and discrimination.  If, as Defendants assert, Section 230(c) not only encourages, but authorizes discrimination against U.S. consumers and YouTube Community Members in violation of express

1   contractual obligations, anti-discrimination and consumer fraud laws, and federal and state

2   constitutional protections, Defendants' reliance on Section 230(c)'s grant of federal immunity

3   evidences that in adopting Section 230, the government did far more than adopt a passive position

4   toward Defendants' unlawful, discriminatory, and unconstitutional conduct – the Government

5   affirmatively encouraged it by immunizing Defendants and preempting state and federal laws

6   prohibiting Defendants' otherwise unlawful conduct.  Consequently, Defendants' reliance Section

7   230(c) constitutes government action that directly and expressly encourages Defendants to engage

8   in unconstitutional, unlawful, and repugnant discriminatory conduct under color of federal law.

9        292.    Google/YouTube also invoke Section 230(c) to exempt and preempt established

10   constitutional and statutory prohibitions against discriminatory speech filtering and other

11   violations of law that harm Plaintiffs and discriminate against them based on the gender, sexual

12   orientation, racial, ethnic, religious, cultural, political or other identity of the speaker or the

13   listener, or based on the viewpoint of the speaker or listener, rather than regulating the underlying

14   content of the speech or expression, i.e., regulating the actual contents of the videos uploaded to

15   the YouTube Platform.

16        293.    Thus, Google/YouTube are engaged in state action when regulating speech on

17   YouTube Platform, a designated public forum.  Google/YouTube are also engaged in government

18   action when they rely on a federal immunity statute to engage in conduct that would otherwise be

19   unlawful under federal and California law.

20        294.    Consequently, Defendants are engaged in intentional, willful and malicious

21   unconstitutional, discriminatory, and fraudulent speech filtering, regulation, restriction and related

22   conduct.  Among other things, Defendants have restricted and restrained Plaintiffs' speech and

23   expression on the YouTube Platform, not because the content of Plaintiffs' videos violates any

24   lawful, viewpoint neutral based rules -- but because Plaintiffs and their subscribers and many

25   viewers identify as members of the LGBTQ+ Community, and Plaintiffs' express viewpoints and

26   discuss issues of importance or interest to LGBTQ+ viewers and audiences.

27        295.    In addition to engaging in identity and viewpoint based discrimination, Defendants

28   use and apply subjective, vague, and overbroad criteria which give Defendants unfettered and

**SECOND AMENDED CLASS ACTION COMPLAINT FOR DAMAGES, INJUNCTIVE RELIEF,
RESTITUTION, AND DECLARATORY JUDGMENT**

1  unbridled discretion to censor speech for arbitrary, capricious, or nonexistent reasons.  The criteria

2  employed by Defendants do not adequately warn the YouTube Community, including Plaintiffs as

3  to what is to be limited, restricted or flat out prohibited, allowing Defendants to censor speech at

4  whim and based upon subjective animus towards the speaker who uploaded the video, the viewers

5  of the video, or the particular cultural, political or religious viewpoints of the speaker or her

6  viewers.

7        296.     Defendants also intentionally and maliciously apply their censorship criteria,

8  including the Terms of Service and Community Guidelines, as a pretext to censor and restrict

9  Plaintiffs' speech, because Plaintiffs identify as LGBTQ+ or express views associated with the

10  LGBTQ+ Community, just like their viewers – irrespective of the actual content of video in terms

11  of the visual images presented, or words recorded in the video.

12        297.     Defendants have intentionally and maliciously restricted or demonetized videos

13  posted by Plaintiffs on the YouTube Platform, while allowing anti-LGBTQ+ hate speech, or other

14  non-compliant video content to be posted by preferred or favored speakers, without restriction and

15  with maximum revenue.  Defendants' application of filtering criteria and corresponding restraints

16  on Plaintiffs' speech is arbitrary and capricious and/or is based on racial, gender, sexual

17  orientations, political, cultural, religious, or other animus towards the identity and viewpoints of

18  the speaker and her viewers, not upon the actual content of the video speech.

19        298.     Further, because Plaintiffs are so restrained and punished based on the identity or

20  viewpoint of the video creator and/or the intended viewers, Defendants' actions also impinge on

21  and violate Plaintiffs' right to free association and assembly.  Plaintiffs' right to free association

22  and assembly are violated when Google/YouTube block viewers' access to Plaintiffs' videos and

23  comments.  Moreover, Defendants' have acted intentionally to deprive Plaintiffs and other

24  members of the LGBTQ+ Community on the YouTube Platform of their right to free speech.

25        299.     No compelling, significant, or legitimate reason justifies restricting or

26  demonetizing Plaintiffs' videos.  Even if legitimate interests did exist to justify Google/YouTube's

27  restriction and demonetization rules generally, the restrictions which Defendants have imposed on

28  Plaintiffs' speech are not narrowly or reasonably tailored to further such interests, because, among

**SECOND AMENDED CLASS ACTION COMPLAINT FOR DAMAGES, INJUNCTIVE RELIEF,
RESTITUTION, AND DECLARATORY JUDGMENT**

other things, the Defendants filtering practices and restraints are used to target and crush LGBTQ+

content creators and their subscribers and viewers by restricting and censoring Community

Guideline compliant, quality LGBTQ+ video content on the YouTube Platform.

300.    Given Google/YouTube's monopolistic absolute control over search results,

including video search results, as well as online video streaming, Plaintiffs have no alternative

affording a reasonable opportunity to reach their intended audience.

301.    Google/YouTube's discriminatory policies and their application of those policies

are not viewpoint neutral; they are unreasonable with respect to time, place, and manner; and they

are unreasonable in relation to the nature, purpose, and use of the public forum that is the

YouTube Platform.  Rather, Defendants' discriminatory policies constitute an unreasonable prior

restraint on Plaintiffs' protected political speech, motivated by Defendants' own impermissible

discrimination against Plaintiffs' and their viewers' respective identities and viewpoints.

302.    As a direct and proximate result of Defendants' intentional violations of Plaintiffs'

clearly established First Amendment rights, Plaintiffs have suffered and will continue to suffer

immediate and irreparable injury in fact, including censorship, lost income, decreased viewership,

and damage to brand and reputation.

303.    Defendants' wrongful actions were taken under color of law and with oppression,

fraud, malice, and/or are arbitrary and capricious, and as part of Defendants' normal course of

business, effectuated through both the Google/YouTube artificial intelligence algorithms, as well

as by human agents, in violation of an established constitutional right, causing Plaintiffs financial

and other cognizable harms and injuries under 42 U.S.C. § 1983.


**THIRD CAUSE OF ACTION**
**Violation Of California Constitution Article I, Section 2**
**(On Behalf Of Plaintiffs Individually And The YouTube Community Class)**

304.    Plaintiffs re-allege and incorporate herein by reference, as though set forth in full,

each of the allegations set forth in paragraphs 1 through 303 above.

305.    Article I, section 2 of the California Constitution protects the liberty of speech and

**SECOND AMENDED CLASS ACTION COMPLAINT FOR DAMAGES, INJUNCTIVE RELIEF,**
**RESTITUTION, AND DECLARATORY JUDGMENT**

1    association, especially in public, quasi-public, and limited public spaces.

2        306.    In YouTube, Defendants created and maintain a public forum, or its functional

3    equivalent.  First, Defendants solicit the general public to use YouTube by representing that its

4    purpose, and primary use, is a place dedicated to free speech.  Second, Defendants expressly invite

5    the public to visit the YouTube platform to engage in freedom of expression.  Third, the size and

6    reach of YouTube's dominance over the expression and exchange of video-based speech is

7    unparalleled.  Fourth, the relationship between the ideas sought to be presented and the function or

8    purpose of the property are those of a "public forum," the cyber-equivalent of a town square where

9    citizens exchange ideas on matters of public interest or concern.  Given these factors, Defendants'

10   regulation of speech is supposed to be viewpoint-neutral, and the same rules should apply equally

11   to all.

12       307.    Defendants describe YouTube as a "service that enables more than a billion users

13   around the world to upload" videos, where users are urged to "Broadcast Yourself," "promote

14   yourself" or "do the broadcasting yourself."  Furthermore, in YouTube's Terms of Service,

15   Defendants state that YouTube is not legally or otherwise responsible for any third-party content:

16   YouTube is not "responsible for the accuracy, usefulness, safety, or intellectual property rights of

17   or relating to such Content"; responsibility for the "FOREGOING RESTS ENTIRELY WITH

18   YOU [THE USER]."  These are not the statements of a publisher who tells the public they only

19   print news "fit to print." Defendants do not merely sell edited news content to users; they monetize

20   third-party public speech inviting "everyone" to "express themselves" on a "nearly limitless range

21   of topics."

22       308.    Under California law, Defendants' regulation of speech on the YouTube platform

23   is state action because Defendants perform an exclusively and traditionally public function: the

24   regulation of speech within a designated public forum.  Accordingly, speech cannot be arbitrarily,

25   unreasonably, or discriminatorily excluded, regulated, or restricted on the basis of viewpoint or the

26   identity of the speaker and any such regulations must fully comply with protections afforded free

27   speech and expression under the Liberty of Speech Clause and the long established jurisprudence

28   governing the Clause's application.

**SECOND AMENDED CLASS ACTION COMPLAINT FOR DAMAGES, INJUNCTIVE RELIEF,
RESTITUTION, AND DECLARATORY JUDGMENT**

1          309.     Videos of the Proposed Class constitute expressive speech and activity protected by

2    Article I, section 2 of the California Constitution.

3          310.     Defendants have restricted the speech and expressive conduct of the Proposed

4    Class based upon subjective, vague, and overbroad criteria that give Defendants unfettered and

5    unbridled discretion to censor speech for any reason, or no reason at all, no matter how arbitrary or

6    capricious.  Those criteria further fail to convey a sufficiently definite warning to Plaintiffs or to

7    the public as to what is prohibited or restricted.  Defendants' adoption and application of those

8    criteria on its face violates the Proposed LGBTQ+ Class' right to free speech as guaranteed by

9    Article I, section 2 of the California Constitution.  Further, that invidious potential has been borne

10   out and evidenced by Defendants' application of those policies and procedures to censor Plaintiffs.

11         311.     Defendants also maliciously apply their censorship criteria, including the Terms of

12   Service and Community Guidelines, as a pretext to censor and restrict Plaintiffs' speech, based not

13   upon the content of the speech, but rather, upon the identity and political viewpoints of Plaintiffs.

14   Defendants' application of criteria and corresponding restraints on Plaintiffs' speech is arbitrary

15   and capricious and/or is based upon political, religious, or other animus towards the identity and

16   viewpoints of the speaker, not the actual content of the speech.

17         312.     Further, Plaintiffs are so restrained and punished because of the speakers featured

18   in their videos, as well as those speakers' opinions, Defendants' actions impinge on and violate

19   LGBTQ+ Plaintiffs' right to free association and assembly.  Defendants' actions also violate

20   LGBTQ+ Plaintiffs' right to free association and assembly, by blocking viewers' access to videos

21   and comments.

22         313.     No compelling, significant, or legitimate reason justifies Defendants' actions.  Even

23   if such interests did exist to justify Defendants' restriction and demonetization rules generally, the

24   restrictions imposed on Plaintiffs' speech, are not narrowly or reasonably tailored to further such

25   interests, because they sweep within their ambit inoffensive and non-graphic discussions intended

26   and designed for educational purposes.  Given Defendants' monopolistic control over search

27   results, including video search results, as well as online video streaming, Plaintiffs have no

28   alternative affording it a reasonable opportunity to reach their full intended audience.

**SECOND AMENDED CLASS ACTION COMPLAINT FOR DAMAGES, INJUNCTIVE RELIEF,
RESTITUTION, AND DECLARATORY JUDGMENT**

314.     Defendants' discriminatory policies and application of those policies are not viewpoint-neutral, are unreasonable in time, place, and manner, and are unreasonable in relation to the nature, purpose, and use of the forum.  They impose an unreasonable prior restraint on Plaintiffs' protected political speech, motivated by impermissible discrimination against Plaintiffs' identity and viewpoint.

315.     Defendants' intentional and wrongful actions were taken with oppression, fraud, malice and/or are arbitrary and capricious, and as part of Defendants' normal course of business, effectuated through both algorithms, as well as through human agents.  And Defendants' actions were done with the intent to deprive Plaintiffs and their viewers of their rights under the California Constitution.

316.     As a direct and proximate result of Defendants' violations of clearly established law regarding public fora, LGBTQ+ Plaintiffs have suffered, and continue to suffer, immediate and irreparable injury in fact, including lost income, reduced viewership, and damage to brand, reputation, and goodwill, for which there exists no adequate remedy at law.

**FOURTH CAUSE OF ACTION**
**Violation Of California Unruh Civil Rights Act—Civil Code §§ 51, *et seq*.**
**(On Behalf Of Plaintiffs And The YouTube Community Class)**

317.     Plaintiffs re-allege and incorporate herein by reference, as though set forth in full, each of the allegations set forth in paragraphs 1 through 316 above.

318.     Defendants Google and YouTube host business establishments under the Unruh Civil Rights Act, California Civil Code § 51 *et seq*.  Defendants grant the public unrestricted access to YouTube for commercial reasons that are at the core of their business model and the source of virtually all of their revenue.

319.     Despite their promises of neutrality and a diversity of viewpoints, Defendants engage in a pattern and practice of intentional willful and malicious discrimination in the provision of their services, including discriminating against and censoring of Plaintiffs' speech, based not upon the content of speech, but on their sexual orientation and political identity and viewpoint.  Through the acts complained of herein, Defendants intentionally denied, and aided or

**SECOND AMENDED CLASS ACTION COMPLAINT FOR DAMAGES, INJUNCTIVE RELIEF,**
**RESTITUTION, AND DECLARATORY JUDGMENT**

incited in denying, Plaintiffs full and equal accommodations, advantages, privileges, and services, by discriminating against it in demonetizing Plaintiffs' content, and by placing its videos in Restricted Mode.

320.    A substantial motivating reason for Defendants' conduct is Defendants' subjective perception of Plaintiffs' political identity, viewpoints, cultural and religious and sexual orientation, as well as those of others with whom Plaintiffs are associated.  Defendants' restrictions on Plaintiffs' video content is the result of arbitrary, capricious, invidious, and pretext-based discrimination against Plaintiffs' political and religious identity and sexual orientation and viewpoints.  It is also wholly without any legitimate, reasonable business interest, as the content of the restricted and demonetized Plaintiffs' videos are completely compliant with the letter and spirit of Defendants' Terms of Service and Community Guidelines, including satisfying and complying with all of Defendants' criteria and rules for reaching younger and "sensitive" audiences.  In sum, Defendants are censoring and treating Plaintiffs and their videos differently from Defendants' own or preferred content, solely because of discriminatory animus towards Plaintiffs' identities and views.

321.    Defendants' wrongful actions were taken with oppression, fraud and/or malice, effectuated through both the Google/YouTube algorithms, as well as manual human review of Plaintiffs' videos and appeals.

322.    As a direct and proximate result of Defendants' unlawful discriminatory actions, Plaintiffs suffered, and continue to suffer, irreparable injury in fact, including, but not limited to: lower viewership, lost advertising opportunities otherwise available to other nonprofits, decreased ad revenue, and reputational damage, for which there exists no adequate remedy at law.

323.    Defendants' violations of the Unruh Act further entitle Plaintiffs to recover statutory damages of up to three times the amount of actual damages in an amount to be proven at trial, or a minimum of $4,000 per violation.

**SECOND AMENDED CLASS ACTION COMPLAINT FOR DAMAGES, INJUNCTIVE RELIEF, RESTITUTION, AND DECLARATORY JUDGMENT**

**FIFTH CAUSE OF ACTION**
**Unfair Competition In Violation Of**
**California Business And Professions Code §§ 17200, *et seq*.**
**(On Behalf Of Plaintiffs And The YouTube Community Class)**

324.    Plaintiffs re-allege and incorporate herein by reference, as though set forth in full, each of the allegations set forth in paragraphs 1 through 323 above.

325.    Defendants have committed acts of unfair competition, as defined by California Business and Professions Code § 17200, by engaging in the practices described above.

326.    Defendants' policies and practices, and their application of the same to Plaintiffs, constitute unlawful, unfair or fraudulent business acts or practices within the meaning of California Business and Professions Code § 17200.  Defendants' policies, as well as their application, violate the policy and spirit of the Unruh Act, the Lanham Act, the California Constitution, and prior court decisions.  In addition, Defendants compete with third-party content providers like Plaintiffs, and Defendants' arbitrary and capricious restrictions on their competitors' speech and content significantly threatens or harms competition.  Those actions are likely to mislead the public, and do mislead the public, about YouTube, Defendants' videos, Plaintiffs, and Plaintiffs' videos.  Content creators, advertisers, and viewers trust and rely on Defendants for an open marketplace of ideas and expression, and further that when videos are restricted or demonetized, that those videos are truly, and in good faith, deemed inappropriate for viewing by minors or sensitive viewers.

327.    There is no utility to the public for Defendants' actions, where those restrictions treat Plaintiffs and others similarly situated differently, simply because of their perceived politics and the identity of their speaker.  To the extent that Defendants' arbitrarily and discriminatorily-applied policies have any utility whatsoever, that utility is significantly outweighed by the harm which they impose on consumers and the public.  Defendants have alternatives to this conduct that would be less harmful to consumers, but do not adopt or apply them because of their bias against Plaintiffs and others similarly situated.

328.    As a direct and proximate result of the aforementioned acts, Plaintiffs have suffered, and continue to suffer, immediate and irreparable injury in fact, including lost income,

**SECOND AMENDED CLASS ACTION COMPLAINT FOR DAMAGES, INJUNCTIVE RELIEF, RESTITUTION, AND DECLARATORY JUDGMENT**

reduced viewership, and damage to brand, reputation, and goodwill, for which there exists no adequate remedy at law.

329.    Defendants' wrongful actions were taken with oppression, fraud and/or malice.

## SIXTH CAUSE OF ACTION
**Breach Of Implied Covenant Of Good Faith And Fair Dealing**
**(On Behalf Of Plaintiffs And The YouTube Community Class)**

330.    Plaintiffs re-allege and incorporate herein by reference, as though set forth in full, each of the allegations set forth in paragraphs 1 through 329 above.

331.    Plaintiffs and Defendants entered into written contracts in which Defendants agreed to provide YouTube platform access, hosting, streaming, and advertising services to Plaintiffs. Those contracts give Google/YouTube vague, unfettered, and unilateral discretion to remove, restrict, demonetize, or de-emphasize content as Defendants see fit.

332.    Implied in those contracts is the implied covenant of good faith and fair dealing. This is particularly true because, in those contracts, Defendants assumed for themselves unilateral and unfettered discretionary control over virtually every aspect of their relationship with Plaintiffs, control that Defendants have exercised at their whim, repeatedly and without notice to Plaintiffs, and without an opportunity for meaningful discussion or appeal.  To the extent that those discretionary powers are valid, Defendants are obligated to exercise them fairly and in good faith.

333.    Plaintiffs did all or substantially all of the significant things required of them under their agreements with Defendants, or were excused from having to do those things.

334.    Defendants are bound by the implied covenant of good faith and fair dealing in their agreements, terms, and policies, not to engage in any acts, conduct, or omissions, which would impair or diminish Plaintiffs' rights and benefits under the parties' agreements.  Pursuant to the terms of those agreements, Plaintiffs were supposed to have equal access to a wide audience to promote its messages, and it was in reliance on Defendants' representations they chose YouTube as the host of their videos.  Also pursuant to those agreements, Plaintiffs are entitled to some portion of the profits that Defendants were making from Plaintiffs' video content.  Instead, Defendants have, by the acts and omissions complained of herein, intentionally and tortiously

**SECOND AMENDED CLASS ACTION COMPLAINT FOR DAMAGES, INJUNCTIVE RELIEF,**
**RESTITUTION, AND DECLARATORY JUDGMENT**

1    breached the implied covenant of good faith and fair dealing by unfairly interfering with Plaintiffs'

2    rights to receive the benefits of those contracts.

3          335.    The foregoing acts and omissions were engaged in by Defendants with the

4    knowledge that they were bound to act consistently with the covenant of good faith and fair

5    dealing.  Those acts and omissions were not only failures to act fairly and in good faith, but they

6    were acts of oppression, fraud, and malice.

7          336.    As a direct and proximate result of the aforementioned conduct of Defendants,

8    Plaintiffs have suffered, and continue to suffer, immediate and irreparable injury in fact, including

9    lost income, reduced viewership, and damage to brand, reputation, and goodwill, for which there

10   exists no adequate remedy at law.

11                            **SEVENTH CAUSE OF ACTION**
                 **Violation Of The Lanham Act — 15 U.S.C. § 1125 *et seq*.**
12                          **(On Behalf Of Plaintiffs )**

13         337.    Plaintiffs re-allege and incorporate herein by reference, as though set forth in full,

14   each of the allegations set forth in paragraphs 1 through 336 above.

15         338.    Google/YouTube are engaged in interstate commerce through hosting, creating,

16   advertising, and soliciting and receiving revenue for advertising, and video streaming services on

17   YouTube.

18         339.    In addition, Google/YouTube compete with content creators such as Plaintiffs in

19   the market of online video streaming by creating, hosting, and promoting their own video content,

20   and the video content of a hand-picked cadre of creators with whom they partner or whom they

21   sponsor.

22         340.    As alleged more fully above, Defendants intentional willful and malicious use in

23   commerce words, terms, names, symbols, devices, and combinations thereof, and false and

24   misleading representations of fact that are both likely to cause confusion, or cause mistake, or to

25   deceive as to the affiliation, connection, or association of Plaintiffs with other persons, as to the

26   origin, sponsorship or approval of goods or services by Plaintiffs, and in commercial advertising

27   and/or promotion, misrepresents the nature, characteristics and qualities of their, Plaintiffs, and

28

**SECOND AMENDED CLASS ACTION COMPLAINT FOR DAMAGES, INJUNCTIVE RELIEF,
RESTITUTION, AND DECLARATORY JUDGMENT**

1    others' goods, services, or commercial activities.

2         341.    This improper conduct includes, without limitation, Defendants' inclusion of

3 homophobic and hate speech content on or in close proximity to content posted by Plaintiffs on

4 YouTube, by way of video recommendations, playing anti-LGBTQ+ advertisements in connection

5 with Plaintiffs' videos, and the improper inclusion of homophobic and hate speech comments on

6 or in close proximity to content posted by Plaintiffs, which inclusion is part of Defendants' overall

7 promotion of the YouTube service and significantly misleads consumers as to the affiliation,

8 connection, or association of Plaintiffs to the persons, viewpoints and opinions expressed in such

9 content.

10         342.    This improper conduct further includes, without limitation, Defendants' improper

11 use of words, terms, names, symbols, devices, and combination thereof in connection with the

12 promotion of their service as a neutral public forum "Restricted Mode."

13         343.    As alleged more fully above, when a network administrator or an individual viewer

14 activates "Restricted Mode," each video subject to "Restricted Mode" appears with a Defendant-

15 created stamp of disapproval, including a red face including a red square bearing a foreboding and

16 disapproving facial expression that demeans and otherwise stigmatizes the content subject to

17 "Restricted Mode," together with text showing "This video is unavailable with Restricted Mode

18 enabled.  To view this video, you will need to disable Restricted Mode."

19         344.    As part of advertising and promoting YouTube to consumers that purportedly wish

20 to protect themselves from specific forms of content and as part of promoting YouTube's own

21 content, Defendants advertise "Restricted Mode" to consumers as a tool that will enable

22 consumers to shield themselves from content (1) Talking about drug use or abuse, or drinking

23 alcohol in videos; (2) Overly detailed conversations about or depictions of sex or sexual activity;

24 (3) Graphic descriptions of violence, violent acts, natural disasters and tragedies, or even violence

25 in the news; (4) Videos that cover specific details about events related to terrorism, war, crime,

26 and political conflicts that resulted in death or serious injury, even if no graphic imagery is shown;

27 (5) Inappropriate language, including profanity; and (6) Video content that is gratuitously

28 incendiary, inflammatory, or demeaning towards an individual or group.

**SECOND AMENDED CLASS ACTION COMPLAINT FOR DAMAGES, INJUNCTIVE RELIEF,
RESTITUTION, AND DECLARATORY JUDGMENT**

345.    Defendants have applied "Restricted Mode" to numerous videos created and uploaded to YouTube by Plaintiffs that do not contain any elements (1) Talking about drug use or abuse, or drinking alcohol in videos; (2) Overly detailed conversations about or depictions of sex or sexual activity; (3) Graphic descriptions of violence, violent acts, natural disasters and tragedies, or even violence in the news; (4) Videos that cover specific details about events related to terrorism, war, crime, and political conflicts that resulted in death or serious injury, even if no graphic imagery is shown; (5) Inappropriate language, including profanity; and (6) Video content that is gratuitously incendiary, inflammatory, or demeaning towards an individual or group.  In so doing, Defendants unlawfully enhance the image and goodwill of their own content, and that of their partners and/or sponsored creators, while falsely degrading and stigmatizing Plaintiffs and their videos, including labeling their content as "shocking," "inappropriate," "offensive," "sexually explicit,' "obscene," unfit for minors, or the "gay thing" under the pretext of keeping the platform safe for users.

346.    These deceptive representations are particularly egregious in the context of YouTube's repeated and false self-promotion, discussed above, as a viewpoint-neutral and politically neutral place for free speech and "an open marketplace of ideas," where the public is invited to engage in freedom of expression and speech.  In this context – where Defendants represent to the public that the only content they restrict is content that is unprotected by principles of free speech – Defendants repeated false representations and unfair competition both deceived, and had a tendency to deceive, substantial segments of Plaintiffs' audiences, subscribers, viewers, and advertisers, who are induced by Defendants to falsely believe that Plaintiffs are associated with the hate speech that Defendants permit to be associated with their content and, further, falsely believe that Plaintiffs' content contains elements that such subscribers, viewers, and advertisers wish to avoid – including content (1) Talking about drug use or abuse, or drinking alcohol in videos; (2) Overly detailed conversations about or depictions of sex or sexual activity; (3) Graphic descriptions of violence, violent acts, natural disasters and tragedies, or even violence in the news; (4) Videos that cover specific details about events related to terrorism, war, crime, and political conflicts that resulted in death or serious injury, even if no graphic imagery is shown; (5)

**SECOND AMENDED CLASS ACTION COMPLAINT FOR DAMAGES, INJUNCTIVE RELIEF, RESTITUTION, AND DECLARATORY JUDGMENT**

1   Inappropriate language, including profanity; and (6) Video content that is gratuitously incendiary,

2   inflammatory, or demeaning towards an individual or group.

3           347.    As a direct and proximate result of Defendants' actions complained of herein,

4   Plaintiffs have suffered, and continue to suffer, immediate and irreparable injuries in fact,

5   including injuries in the form of fewer subscribers to their respective YouTube channels, diverted

6   viewership and additional unlawfully obtained viewers for YouTube's produced content, fewer

7   viewers of their videos(particularly by isolated and vulnerable LGBTQ+ viewers who would

8   benefit from the video content), fewer notifications to subscribers regarding their posting of new

9   video content, fewer or no recommendations of their videos to viewers from Defendants,

10  decreased ad revenue, a reduction in advertisers willing to purchase advertisements shown on

11  Plaintiffs' videos, and damage to their respective brands, reputations and goodwill, which has

12  collectively cost Plaintiffs millions of dollars.

13          348.    Defendants' wrongful actions were taken with oppression, fraud and/or malice.

14  Plaintiffs have repeatedly attempted to remedy the situation, and Defendants have repeatedly

15  refused to un-restrict or re-monetize Plaintiffs' videos.  Defendants have attempted to justify their

16  differential treatment of Plaintiffs and their respective videos as necessary to protect sensitive

17  viewers throughout the world, or as a response to an report that video content was offensive

18  received from someone located somewhere in the world.  Defendants' treatment of LGBTQ+

19  creator videos like those of Plaintiffs is part of their normal course of business, effectuated through

20  both the Google/YouTube algorithms, as well as through their agents manually reviewing

21  Plaintiffs' videos and conducting appeals.

**EIGHTH CAUSE OF ACTION**
**Request For Declaratory Relief**
**(On Behalf Of Plaintiffs And The YouTube Community Class)**

24          349.    Plaintiffs re-allege and incorporate herein by reference, as though set forth in full,

25  each of the allegations set forth in paragraphs 1 through 348 above.

26          350.    As set forth more fully above, an actual and justiciable controversy currently exists

27  between Plaintiffs and Defendants as to whether Defendants' policies, procedures and practices

**SECOND AMENDED CLASS ACTION COMPLAINT FOR DAMAGES, INJUNCTIVE RELIEF,**
**RESTITUTION, AND DECLARATORY JUDGMENT**

alleged above, and their application thereof, violate the United States Constitution, California Constitution, the Unruh Civil Rights Act, the UCL, the express terms and implied convent of good faith and fair dealing in the contract or contracts between Defendants and Plaintiffs, and the Lanham Act.

351.    The correct interpretation is that Defendants' policies, procedures and practices violate both on their face and as applied, these constitutional protections and laws.  Defendants deny the correctness of this interpretation.

352.    A declaration of the parties' respective legal rights and obligations by the Court will clarify the extent to which Defendants' policies, procedures and practices, and Defendants' application of their policies and procedures, violate California and federal law; and will resolve most of the disputes and controversy that now exist because of the policies, practices, and procedures of Defendants and their application to Plaintiffs and other members of the YouTube Community as alleged in this Complaint;

353.    Plaintiffs and the YouTube Community Class are thus entitled to a judicial declaration that Defendants have violated and continue to violate Plaintiffs' free speech rights, both facially and as applied, under Article I, section 2 of the California Constitution, the Unruh Civil Rights Act, the UCL Law, the express terms and implied convent of good faith and fair dealing in the contract or contracts between Defendants and Plaintiffs, and the Lanham Act.

**PRAYER FOR RELIEF**

1.    For a Declaratory Judgment that Section 230(c) does not provide immunity for, or otherwise apply to claims and allegations that arise from or relate to Defendants Google/YouTube's unlawful use of the user's sexual orientation, gender identity, race or ethnicity, or political, religious, moral, or personal viewpoints to filter, restrict, or block content, or to otherwise deny Plaintiffs' access or use of any services offered by Google/YouTube in connection with Plaintiffs' use of YouTube under the plain language of the CDA and the First and/or Fourteenth Amendments of the U. S. Constitution.

2.    For a Declaratory Judgment that Defendants have violated and continue to violate Plaintiffs' free speech rights, both facially and as applied, under the First Amendment to the

**SECOND AMENDED CLASS ACTION COMPLAINT FOR DAMAGES, INJUNCTIVE RELIEF, RESTITUTION, AND DECLARATORY JUDGMENT**

1   United States Constitution; Article I, section 2 of the California Constitution; the Unruh Civil

2   Rights Act; the UCL Law; the express terms and implied convent of good faith and fair dealing in

3   the contract or contracts between Defendants and Plaintiffs; and the Lanham Act.

4        3.      For an injunction requiring Defendants to:

5               a.      Cease and desist from capriciously restricting, demonetizing, or otherwise

6   censoring any content of videos uploaded to the YouTube site in violation of federal and

7   California law; and

8               b.      Cease and desist from censoring, restricting, restraining, or regulating

9   speech based on the discretionary use or application of discriminatory, animus-based, arbitrary,

10  capricious, vague, unspecified, or subjective criteria, rules, guidelines, and/or practices;

11       4.      For compensatory, special, and statutory damages in an amount to be proven at

12  trial, including statutory damages pursuant to, *inter alia*, Civil Code § 51, 51.5, 52, Civil

13  Procedure Code § 1021.5, 15 U.S.C. § 1117, 42 U.S.C. §§ 1981, 1983;

14       5.      A civil penalty of $2,500 for each violation pursuant to Business and Professions

15  Code §§ 17200, 17206, and 17536;

16       6.      For punitive damages and exemplary damages in an amount to be proven at trial;

17       7.      For restitution of financial losses or harm caused by Defendants' conduct and ill-

18  gotten gains, and disgorgement of profit obtained from all unlawful conduct in an amount to be

19  proven at trial;

20       8.      Attorney's fees and costs of suit;

21       9.      For prejudgment and post-judgment interest; and

22       10.     For any and all other relief that the Court deems just and proper.

**SECOND AMENDED CLASS ACTION COMPLAINT FOR DAMAGES, INJUNCTIVE RELIEF,
RESTITUTION, AND DECLARATORY JUDGMENT**

1

## JURY DEMAND

2

Plaintiffs demand trial by jury on all issues of law so triable.

3

4    DATED:  December 20, 2019          Respectfully submitted,

5                                       BROWNE GEORGE ROSS LLP

6                                          Peter Obstler
                                           Debi A. Ramos
7

8

9                                       By:  _____
                                                  Peter Obstler
10                                      Attorneys for LGBTQ+ Plaintiffs Divino LLC, Chris
                                        Knight, Celso Dulay, Cameron Stiehl, BriaAndChrissy
11                                      LLC, Bria Kam, Chrissy Chambers, Chase Ross, Brett
                                        Somers, Lindsay Amer, Stephanie Frosch, Sal
12                                      Cinquemani, Tamara Johnson, and Greg Scarnici

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**SECOND AMENDED CLASS ACTION COMPLAINT FOR DAMAGES, INJUNCTIVE RELIEF,
RESTITUTION, AND DECLARATORY JUDGMENT**

# **Exhibit "A"**

## "TRANSCRIPT OF GNEWS!  CALL WITH YOU TUBE BANGALORE"

[GOOGLE SUPPORT 1] Thank you for calling Google Sales Receptionist desk for AdWords, my name is Christina. May I have your first and last name, please?

[Chris Knight] Hi, Christina. It is Chris Knight with a "K".

[GOOGLE SUPPORT 1] Hi there, Chris. [Were all] here to get you to the right resource. Are you calling about Google AdWords?

[CK] Yes.

[GOOGLE SUPPORT 1] Alright, let's see. I was just wondering if the reason for your call is you want to drive more traffic to the channel and get more viewers for your page?

[CK] Yes.

[GOOGLE SUPPORT 1] And for the channel also? Yeah?

[CK] Yes.

[GOOGLE SUPPORT 1] Okay, perfect. And if you have like, a wha-, sorry, a budget range in mind you're willing to spend for advertising?

[CK] No, I'm calling because we have an ad that we've already tried to purchase and for several days now it has been, um, supposed to be under review, and we've called, this is the fourth call, that they've said that they would get back to us and explain why they're reviewing it. It's been six days that they've been trying to review this.

[GOOGLE SUPPORT 1] I'm sorry to hear that.

[CK] So, we're calling because… and then this is also the fifth time that they've done this to us. Made us go through this whole process just to purchase an ad, so.

[GOOGLE SUPPORT 1] I'm sorry about that. Um, sorry for the, uh, the ha- the hassle which you have gone through for this, but what, you know what I can do, I can make sure I'm transferring you over to one of our experts, I'll also explain to them, I'll leave it also in my notes that, um, the ad you tried to purchase is under review and that you've already called them like four times and this is fifth time this has happened and that, um, you haven't received any feedback yet, so they should be able to sort this issue out today, okay?

EXHIBIT 1

1   [CK] Okay.

2   [GOOGLE SUPPORT 1] Alright, one moment, please. Um, I'll just finish up my documentation

3   and then I'll transfer your call over once I'm done, okay?

4   [CK] Thanks.

5   [GOOGLE SUPPORT 1] Alright, thank you.

6   [GOOGLE SUPPORT 2] Sir, I see that you already had interaction regarding the same, with the,

7   uh, another agent before, so has actually working on that.

8   [CK] You've been working on it for six days. It's only supposed to take 24 hours.

9   [GOOGLE SUPPORT 2] Um hmm.

10   [CK] The show was a, was a Christmas episode that we launched on the 24th. Christmas is over.

11   [Laughs] Why is it taking so long?

12   [GOOGLE SUPPORT 2] Oh. Uh, let me check the details once again. Sir, so I see that the ad has

13   been disapproved because of shocking content, sir. That means, uh, there is, uh, content which

14   may have hatred against uh, or maybe they are promoting something, which, uh, basing on race or

15   religion, disabilities, so there can be different reasons…

16   [CK] I need to… I need this escalated. No. I need this escalated. I need somebody to tell me

17   exactly what's going on. This is the fifth time that you people have done this to my show. It is an

18   LGBT gay show. And I feel like I'm being discriminated against because I'm gay. So, there's no

19   hatred in that show. It is a Christmas special for fuck's sake, I mean, I need to know what the

20   hell's going on here. Why do they keep doing this to us? [pause] So, I need to talk to somebody…

21   [GOOGLE SUPPORT 2] [interrupts] It's difficult that, uh…

22   [CK] … that will tell me more than what you're telling me. I don't need to hear that it's been

23   disapproved because of shocking content. There's nothing shocking in my show. So, I need to talk

24   to somebody. You need to connect me to somebody that will tell me what the hell's going on.

25   [GOOGLE SUPPORT 2] Yes, sir, I do I do really understand your concern…

26   [CK] I don't think you do, but I, I …

27   [GOOGLE SUPPORT 2] …so just let me connect you to someone [talking over each other,

28   unintelligible]…

1  [CK] Yes, I appreciate your help.

2  [GOOGLE SUPPORT 2] I, I'm very sorry, sir. I understand your concern. Just give me a quick

3  minute while, ah, let me check if I can connect you to Ms. Boys[?] regarding this thing.

4  [CK] Thank you.

5  [GOOGLE SUPPORT 2] You're welcome, sir. Just give me couple of minutes.

6  Thank you for patiently holding the line, sir.

7  [CK] Um hmm.

8  [GOOGLE SUPPORT 2] So, please give me some time, sir, just watching your videos so that I

9  can make sure there isn't anything which is shocking or whether shocking content. So, could you

10  please hold the line for a couple of minutes, please?

11  [CK] Sure.

12  [GOOGLE SUPPORT 3] Hi there, sir. This is [____], the floor manager. Am I talking to

13  Christopher?

14  [CK] Yes, you are.

15  [GOOGLE SUPPORT 3] Hi, Christopher. How are you doing today?

16  [CK] I could be better. How are you?

17  [GOOGLE SUPPORT 3] I'm doing great, sir. Thank you so much for asking. So, I was informed

18  that you were looking for help in relation to your AdWords account?

19  [CK] Yes.

20  [GOOGLE SUPPORT 3] Okay. So. We have a shocking content information here. Uh. But we

21  kind of have a problem with the video, I believe, if I'm not wrong.

22  [CK] So, I need to understand what the problem is. I have multiple issues with this current

23  particular campaign. In part, this is the fifth time that we have had a problem getting an ad. This

24  particular ad, it has taken six days for me to get somebody like you to just tell me it's even

25  shocking. Six days! You're supposed to do it 24 hours. We talked to people. This is the fourth call.

26  We talked to people who said they would get back to us within two hours, were reviewing it. So,

27  now you're telling me it has shocking content. I need to know exactly what you find shocking.

28  And then I'd also like you to send me that in writing. Because I'm going to challenge this. [pause]

1  So, please tell me what is the shocking content.  [talking over each other]

2  [GOOGLE SUPPORT 3] … we have an article…[talking over each other]

3  [CK] What is the shocking content, specifically?

4  [GOOGLE SUPPORT 3] Well, sir. I do see that the video has the sexuality content about the gays

5  and everything.

6  [CK] That is your shocking content? [talking over each other]

7  [GOOGLE SUPPORT 3] Right? And um…

8  [GOOGLE SUPPORT 3] Yeah. It comes under shocking content, sir.

9  [CK] So, you're discriminating me against my sexuality? Is that what you're saying?

10  [GOOGLE SUPPORT 3] No, sir. I didn't do that to you, but the policies are, okay, the AdWords

11  account policies are on the violation. Okay. You're… the ad is violating the policies of

12  advertising. I am not [ahem]. Okay. However, the article talks about if you have any content about

13  sexuality or anything like that that would actually violate the policy of AdWords under shocking

14  content. That's the reason your ad has been disapproved.

15  [CK] So it's been … My, my ad has been disapproved because my show is about the LGBT

16  community.

17  [GOOGLE SUPPORT 3] Well, sir. Uh. Well, the major reason is about the gay thing, sir. I didn't

18  check about the LGBT which you're talking about. [talking over each other]

19  [CK] LGBT is gay. [pause]

20  [GOOGLE SUPPORT 3] Oh, I didn't know that, sir [talking over each other]

21  [CK] LGBT means lesbian, gay, bisexual, and transgender. My show is a gay show. So you're

22  saying that because I have a gay show, AdWords will not approve …

23  [GOOGLE SUPPORT 3] [interrupts] Yeah.

24  [CK] … my ad. Is that correct?

25  [GOOGLE SUPPORT 3] I'm afraid yes, sir. Yes, sir.

26  [CK] I would like that in writing, please.

27  [GOOGLE SUPPORT 3] Well, sir, yeah, definitely, I'll drop an email to you.

28  [CK] Perfect. Thank you. Thank you.

1   [GOOGLE SUPPORT 3] Is there anything else we can do for you, apart from this?

2   [CK] Oh, no I. That is perfect. Thank you. I would like… When will the email [talking over each

3   other] When will I get the email?

4   [GOOGLE SUPPORT 3] Ten, ten minutes, more than ten minutes.

5   [CK] Okay.

6   [GOOGLE SUPPORT 3] Because we need to also attach our article, right. Right? So, we'll do that

7   for you.

8   [CK] Okay. Yes…So, just like you…

9   [GOOGLE SUPPORT 3] If there's anything you need, sir, there's a short survey. Have a good

10  day. Sure.

11  Happy New Year to you. Good new Year. Bye for now. There's a short survey.

12

13  **END OF TRANSCRIPT**

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# Exhibit "B"

**Electronically Filed
by Superior Court of CA,
County of Santa Clara,
on 11/19/2019 3:51 PM
Reviewed By: R. Walker
Case #19CV340667
Envelope: 3671559**

SUPERIOR COURT OF CALIFORNIA

COUNTY OF SANTA CLARA

PRAGER UNIVERSITY,

       Plaintiff,

  vs.

GOOGLE LLC, et al.,

       Defendants.

Case No.: 19CV340667

**ORDER AFTER HEARING ON
OCTOBER 25, 2019**

**(1) Demurrer by Defendants Google
LLC and YouTube, LLC to the
First Amended Complaint
(2) Motion by Plaintiff Prager
University for Preliminary
Injunction**

     The above-entitled matter came on for hearing on Friday, October 25, 2019 at 11:00 a.m. in Department 1 (Complex Civil Litigation), the Honorable Brian C. Walsh presiding. A tentative ruling was issued prior to the hearing. The appearances are as stated in the record. The Court has reviewed and considered the written submissions of all parties and has reflected on the oral argument of counsel, including by reviewing the transcript lodged by plaintiff on November 14, 2019. Being fully advised, the Court adopts the tentative ruling as follows:

     This action arises from Prager University's allegations that YouTube, LLC and its parent company Google LLC have unlawfully restricted content created by Prager on YouTube, defendants' social media and video sharing platform. Before the Court are defendants' demurrer

to the operative First Amended Complaint ("FAC") and Prager's motion for a preliminary injunction.  Both motions are opposed.

## I.  Factual and Procedural Background

As alleged in the FAC, Prager is a non-profit, 501(c)(3) tax exempt, educational organization that promotes discussion on historical, religious, and current events by disseminating educational videos intended for younger, student-based audiences between the ages of 13 and 35.  (FAC, ¶ 10.)  The videos depict scholars, sources, and other prominent speakers who often espouse viewpoints in the mainstream of conservative thought.  (*Ibid.*)

Defendants operate YouTube as the largest and most profitable mechanism for monetizing free speech and freedom of expression in the history of the world, generating $10 to 15 billion in annual revenue by monetizing the content of users like Prager who are invited to post videos to YouTube.  (FAC, ¶ 11.)  Since its inception, Prager has posted more than 250 of its videos to YouTube.  (*Id.* at ¶ 39.)

### A.  The Alleged Content Restriction Scheme

To induce users like Prager to upload video content, defendants represent that YouTube is a public place for free speech defined by "four essential freedoms" that govern the public's use of the platform:

1. **Freedom of Expression:**  We believe people should be able to speak freely, share opinions, foster open dialogue, and that creative freedom leads to new voices, formats and possibilities.

2. **Freedom of Information:**  We believe everyone should have easy, open access to information and that video is a powerful force for education, building understanding, and documenting world events, big and small.

3. **Freedom of Opportunity:**  We believe everyone should have a chance to be discovered, build a business and succeed on their own terms, and that people—not gatekeepers—decide what's popular.

4. **Freedom to Belong:**  We believe everyone should be able to find communities of support, break down barriers, transcend borders and come together around shared interests and passions.

(FAC, ¶ 12.)  Defendants further promise that YouTube is governed by content-based rules and filtering which "apply equally to all," regardless of the viewpoint, identity, or source of the speaker.  (*Id.* at ¶ 13.)

However, contrary to these representations, defendants censor, restrict, and restrain video content based on animus, discrimination, profit, and/or for any other reason "or no reason." (FAC, ¶ 14.)  According to Prager, an internal memo and presentation entitled "The Good Censor" shows that defendants have secretly decided to " 'migrate' away from [serving as] a hosting platform ...where the public is invited to engage in freedom of expression" to become a media company that profits "by promoting Defendants' own, or their preferred content through the exercise of unfettered discretion to censor and curate otherwise public content." (*Id.* at ¶¶ 56-65.)  To effectuate their discriminatory practices, defendants use clandestine filtering tools, including algorithms and other machine-based and manual review tools, that are embedded with discriminatory and anti-competitive animus-based code, including code that is used to identify and restrict content based on the identity, viewpoint, or topic of the speaker. (*Id.*, ¶ 19.)  They also "ensure that the YouTube employees charged with administering the content filtering and regulation scheme ... operate in a dysfunctional and politically partisan workplace environment." (*Id.* at ¶ 20.)

Against this background, Prager's rights under California law have been violated by two unlawful content-based restrictions: (i) "Restricted Mode," a filtering protocol that defendants use to block what they deem, in their sole, unfettered discretion, to be "inappropriate" for "sensitive" audiences and (ii) "Advertising Restrictions," a content-based video advertising restriction policy that prohibits potential advertisers from accessing videos that defendants deem "inappropriate" for advertising.  (FAC, ¶ 17.)  Defendants use these mechanisms as a pretext to restrict and censor Prager's videos, even though the content of its videos complies with YouTube's Terms of Service, Community Guidelines, and criteria for "sensitive audiences" and advertisers, while they fail to restrict the content of other preferred users, content partners, and content produced by defendants themselves that is not compliant.  (*Id.* at ¶¶ 18, 23.)  Defendants

have provided no rational basis for restricting Prager's content while allowing similar or noncompliant content to go unrestricted. (*Id.* at ¶ 25.)

### B. Restricted Mode

According to defendants, Restricted Mode is intended "to help institutions like schools as well as people who wanted to better control the content they see on YouTube with an option to choose an intentionally limited YouTube experience." (FAC, ¶ 68.) Viewers can choose to turn Restricted Mode on from their personal accounts, but it may also be turned on by system administrators for libraries, schools, and other institutions or workplaces. (*Ibid.*) Defendants estimate that about 1.5 percent of YouTube's daily views (or approximately 75 million views per day) come from individuals using Restricted Mode. (*Id.* at ¶ 69.) When Restricted Mode is activated, a video's name, creator or subject, and content, along with any other information related to the video, are blocked, as if the video did not exist on the YouTube platform. (*Id.* at ¶ 68.)

Defendants claim to restrict content in Restricted Mode based upon their "Restricted Mode Guidelines," which identify five criteria for determining whether content warrants restriction:

1. Talking about drug use or abuse, or drinking alcohol in videos;
2. Overly detailed conversations about or depictions of sex or sexual activity;
3. Graphic descriptions of violence, violent acts, natural disasters and tragedies, or even violence in the news;
4. Videos that cover specific details about events related to terrorism, war, crime, and political conflicts that resulted in death or serious injury, even if no graphic imagery is shown;
5. Inappropriate language, including profanity; and
6. Video content that is gratuitously incendiary, inflammatory, or demeaning towards an individual or group.

(FAC, ¶ 70.) Videos are initially restricted through an automated filtering algorithm that examines certain "signals" like the video's metadata, title, and language, or following manual review if a video is "flagged" as inappropriate by public viewers. (*Id.*, ¶ 71.)

YouTube also publishes "Community Guidelines" and "Age Based Restriction" guidelines similar to its "Restricted Mode Guidelines"; however, content that complies with

these guidelines may nevertheless be subject to Restricted Mode. (FAC, ¶¶ 72-73.) Prager's videos have never been age restricted or found to violate YouTube's Community Guidelines. (*Id.* at ¶ 75.)

Defendants have admitted that they make "mistakes in understanding context and nuances when [assessing] which videos to make available in Restricted Mode." (FAC, ¶ 91.) For example, on March 19, 2017, they publicly admitted that they improperly restricted videos posted or produced by members of the LGBTQ community and changed their policy, filtering algorithm, and manual review policies in response to complaints from this community. (*Id.* at ¶¶ 94-96.) However, Prager alleges that defendants have continued to improperly restrict videos by LGBTQ users, which is evidence of viewpoint animus. (*Id.* at ¶¶ 97-98.)

C.  Advertising Restrictions

Defendants also restrict users like Prager "from monetizing or boosting the reach or viewer distribution of [their] videos." (FAC, ¶ 78.) Prager alleges that these restrictions are ostensibly governed by the "AdSense program policies," which it suggests are "similar[ly] vague, ambiguous, and arbitrary" to the Restricted Mode Guidelines. (*Id.* at ¶¶ 78, 80.) Prager claims that, similar to their "mistakes" in applying "Restricted Mode," defendants once "denied a reach boost or ad product" on the ground of "shocking content" based on a user's sexual or gender orientation and viewpoint. (*Id.* at ¶ 81.) It alleges that the application of such an "inappropriate" or "shocking content" designation falsely and unfairly stigmatizes Prager as well. (*Id.* at ¶ 82.) (However, while Prager alleges that certain of its videos have been demonetized, it does not allege whether defendants gave specific reasons for these actions or what those reasons were.) (See *id.* at ¶ 84.)

D.  The Parties' Dispute

In July of 2016, Prager discovered that defendants were restricting user access to its videos through Restricted Mode. (FAC, ¶ 101.) It raised the issue with defendants, but they have failed to offer any reasonable or consistent explanation for why Prager's videos are being restricted. (*Id.* at ¶¶ 101-117.) In 2016, at least 16 Prager videos were restricted; by 2017, a total of 21 were. (*Ibid.*) By the time the FAC was filed in May of 2019, the total had risen to 80. (*Id.*

at ¶ 127.)  Prager's videos were either "restricted as to content, demonetized, or both."  (*Id.* at
¶ 116.)  Defendants also discontinued Prager's "ad grants" account for more than six days in
October of 2017.  (*Id.* at ¶ 118.)  On pages 9-17 of the FAC, Prager provides a chart listing its
restricted videos by title, along with videos from defendants' "preferred content providers" with
similar titles that are unrestricted.  (*Id.* at ¶ 23.)

On October 23, 2017, Prager sued defendants in federal court, asserting claims for
(1) violation of Article I, section 2 of the California Constitution; (2) violation of the First
Amendment of the United States Constitution; (3) violation of the California Unruh Civil Rights
Act ("Unruh Act"), Cal. Civ. Code. § 51 *et seq.*; (4) violation of California's Unfair Competition
Law ("UCL"), Cal. Bus. & Prof. Code § 17200 *et seq.*; (5) breach of the implied covenant of
good faith and fair dealing; (6) violation of the Lanham Act, 15 U.S.C. § 1125 *et seq.*; and
(7) declaratory relief.  (*Prager University v. Google LLC* (N.D. Cal., Mar. 26, 2018, No. 17-CV-
06064-LHK) 2018 WL 1471939, at *2.)  It filed a motion for a preliminary injunction in the
federal action on December 29, 2017.  (*Id.* at *3.)  On March 26, 2018, the federal court granted
defendants' motion to dismiss Prager's federal claims and denied Prager's motion for a
preliminary injunction, finding that Prager had failed to state a claim for violation of the First
Amendment because it did not allege state action, and had also failed to state a claim under the
Lanham Act.  (*Id.* at *5-13.)  Having dismissed all of Prager's federal claims, the court declined
to exercise supplemental jurisdiction over its state law claims, explaining:

> Here, the factors of economy, convenience, fairness, and comity support dismissal
> of Plaintiff's remaining state law claims. This case is still at the pleading stage,
> and no discovery has taken place. Federal judicial resources are conserved by
> dismissing the state law theories of relief at this stage. Further, the Court finds
> that dismissal promotes comity as it enables California courts to interpret
> questions of state law. This is an especially important consideration in the instant
> case because Plaintiff asserts a claim that demands an analysis of the reach of
> Article I, section 2 of the California Constitution in the age of social media and
> the Internet.

(*Prager University v. Google LLC, supra,* 2018 WL 1471939, at *13.)  Prager has appealed the
federal court's ruling to the Court of Appeal for the Ninth Circuit, which heard argument in the
matter on August 27, 2019.

Prager filed this action on January 8, 2019, reasserting its state law claims for
(1) violation of Article I, section 2 of the California Constitution; (2) violation of the Unruh Act;
(3) violation of the UCL; and (4) breach of the implied covenant of good faith and fair dealing.
On May 13, the Court entered a stipulated order establishing a briefing schedule for Prager's
anticipated motion for a preliminary injunction and defendants' anticipated demurrer and/or
special motion to strike.  On May 20, pursuant to that order, Prager moved for a preliminary
injunction and filed the FAC, which asserts the same four causes of action as its original
complaint.  Defendants filed their demurrer on June 28.  Both matters are now fully briefed and
came on for hearing by the Court on October 25, 2019.

## II.  Demurrer to the FAC

Defendants demur to each cause of action in the FAC for failure to state a claim.  (Code
Civ. Proc., § 430.10, subd. (e).)  They contend that Prager's claims are barred by two provisions
of section 230 of the Communications Decency Act (the "CDA") and by the First Amendment,
and otherwise fail to state a cause of action.

Defendants' request for judicial notice, which is unopposed, is GRANTED as to public
web pages displaying the terms of the various YouTube policies at issue in this action (Exhibits
1-9).  (Evid. Code § 452, subd. (h); see *Pacific Employers Ins. Co. v. State of Cal.* (1970) 3
Cal.3d 573, 575, fn.1 [where portions of agreement were attached to plaintiff's complaint, the
balance of that agreement was properly a subject of judicial notice]; *Ingram v. Flippo* (1999) 74
Cal.App.4th 1280, 1285 [judicial notice of letter and media release was proper where, although
they were not attached to the complaint, they formed a basis for the claims, and the complaint
excerpted quotes and summarized parts in detail, thus "it is essential that we evaluate the
complaint by reference to these documents"].)  Defendants' request is also GRANTED as to a
transcript of a case management conference held in the federal action, although the Court is not
bound by the court's comments or rulings in that case.  (Evid. Code § 452, subd. (d).)

/ / /

/ / /

A. Legal Standard

The function of a demurrer is to test the legal sufficiency of a pleading. (*Trs. Of Capital Wholesale Elec. Etc. Fund v. Shearson Lehman Bros.* (1990) 221 Cal.App.3d 617, 621.) Consequently, "[a] demurrer reaches only to the contents of the pleading and such matters as may be considered under the doctrine of judicial notice." (*South Shore Land Co. v. Petersen* (1964) 226 Cal.App.2d 725, 732, internal citations and quotations omitted; see also Code Civ. Proc., § 430.30, subd. (a).) "It is not the ordinary function of a demurrer to test the truth of the plaintiff's allegations or the accuracy with which he describes the defendant's conduct. ... Thus, ... the facts alleged in the pleading are deemed to be true, however improbable they may be." (*Align Technology, Inc. v. Tran* (2009) 179 Cal.App.4th 949, 958, internal citations and quotations omitted.)

In ruling on a demurrer, the allegations of the complaint must be liberally construed, with a view to substantial justice between the parties. (*Glennen v. Allergan, Inc.* (2016) 247 Cal.App.4th 1, 6.) Nevertheless, while "[a] demurrer admits all facts properly pleaded, [it does] not [admit] contentions, deductions or conclusions of law or fact." (*George v. Automobile Club of Southern California* (2011) 201 Cal.App.4th 1112, 1120.) A demurrer will lie where the allegations and matters subject to judicial notice clearly disclose some defense or bar to recovery, including a statutory immunity. (*Casterson v. Superior Court (Cardoso)* (2002) 101 Cal.App.4th 177, 183.)

B. Violation of the California Constitution

Because concepts related to the parties' speech rights under the First Amendment and California Constitution are important to other aspects of its analysis, the Court will first examine whether Prager states a claim for violation of Article I, section 2 of the California Constitution.

As urged by defendants, "California's free speech clause"—like the First Amendment— "contains a state action limitation." (*Golden Gateway Center v. Golden Gateway Tenants Assn.* (2001) 26 Cal.4th 1013, 1023.) However, the California Constitution's protection of speech has been interpreted more broadly in this regard. (See *Fashion Valley Mall, LLC v. National Labor Relations Bd.* (2007) 42 Cal.4th 850, 862-863.) Most notably, in the

*Prager University v. Google LLC, et al., Superior Court of California, County of Santa Clara, Case No. 19CV340667 Order After Hearing on October 25, 2019 [Demurrer to the First Amended Complaint and Motion for Preliminary Injunction]*

8

1    "groundbreaking" decision of *Robins v. Pruneyard Shopping Center* (1979) 23 Cal.3d 899, the

2    Supreme Court of California "departed from the First Amendment jurisprudence of the United

3    States Supreme Court and extended the reach of the free speech clause of the California

4    Constitution to privately owned shopping centers." (*Golden Gateway Center v. Golden Gateway*

5    *Tenants Assn., supra,* 26 Cal.4th at p. 1016.)

6         More than 20 years after *Robins v. Pruneyard, Golden Gateway Center* confirmed and

7    began to define the scope of the state action limitation under the California Constitution, finding

8    the requirement was not satisfied where a tenants' association sought to distribute leaflets in a

9    private apartment complex that was "not freely open to the public." (*Golden Gateway Center v.*

10   *Golden Gateway Tenants Assn., supra,* 26 Cal.4th at p. 1031.) *Golden Gateway Center* looked

11   to the reasoning of *Robins* for guidance, noting that "*Robins* relied heavily on the functional

12   equivalence of the shopping center to a traditional public forum-the downtown or central

13   business district," and relied on "the public character of the property," emphasizing "the public's

14   unrestricted access." (*Id.* at pp. 1032-1033, internal citations and quotations omitted.) *Golden*

15   *Gateway Center* held that this unrestricted access is a "threshold requirement for establishing

16   state action": without it, private property "is not the functional equivalent of a traditional public

17   forum." (*Id.* at p. 1033.) In announcing this requirement, the opinion confirmed that it "largely

18   follow[ed] the Court of Appeal decisions construing *Robins,*" including *Planned Parenthood v.*

19   *Wilson* (1991) 234 Cal.App.3d 1662. (*Id.* at p. 1033.) Those decisions also emphasized

20   *Robins*'s focus on "the unique character of the modern shopping center and ... the public role

21   such centers have assumed in contemporary society" by effectively replacing "the traditional

22   town center business block, where historically the public's First Amendment activity was

23   exercised and its right to do so scrupulously guarded." (*Planned Parenthood v. Wilson, supra,*

24   234 Cal.App.3d at pp. 1669-1670.) This concept was again emphasized by the California

25   Supreme Court in *Fashion Valley,* which repeatedly referenced "[t]he idea that private property

26   can constitute a public forum for free speech if it is open to the public in a manner similar to that

27   of public streets and sidewalks ...." (*Fashion Valley Mall, LLC v. National Labor Relations Bd.,*

28   *supra,* 42 Cal.4th at p. 858; see also *id.* at p. 859.)

With this fundamental principle in mind, it is apparent that Prager does not state a claim under the California Constitution. Prager contends that "YouTube is the cyber equivalent of a town square where citizens exchange ideas on matters of public interest" and that defendants have opened their platform to the public by advertising its use for this purpose. However, Prager does not allege that it has been denied access to the core YouTube service. Rather, it urges that its access to "Restricted Mode" and YouTube's advertising service has been restricted. Prager does not persuade the Court that these services are freely open to the public or are the functional equivalent of a traditional public forum like a town square or a central business district.[1] Considering "the nature, purpose, and primary use of the property; the extent and nature of the public invitation to use the property; and the relationship between the ideas sought to be presented and the purpose of the property's occupants" (*Albertson's, Inc. v. Young* (2003) 107 Cal.App.4th at p. 119), it is clear that these services are nothing like a traditional public forum. "Restricted Mode" is an optional service that enables users to limit the content that they (or their children, patrons, or employees) view in order to avoid mature content. Limiting content is the very purpose of this service, and defendants do not give content creators unrestricted access to it or suggest that they will do so. The service exists to permit users to avoid the more open experience of the core YouTube service. Similarly, the use of YouTube's advertising service is restricted to meet the preferences of advertisers. (See FAC, ¶ 80 [stated purpose of advertising restrictions "is to keep Google's content and search networks safe and clean for our advertisers ..."]; Declaration of Brian M. Willen, Exs. 7-9.)

Defendants correctly urge that even to recognize the core YouTube platform as a public forum would be a dramatic expansion of *Robins*. As one federal court observed, "[t]he analogy between a shopping mall and the Internet is imperfect, and there are a host of potential 'slippery slope' problems that are likely to surface were [*Robins*] to apply to the Internet." (*hiQ Labs, Inc. v. LinkedIn Corporation* (N.D. Cal. 2017) 273 F.Supp.3d 1099, 1116 [observing that "[n]o court

---

[1] Prager cites no authority that supports its position that a court can never determine the applicability of *Robins* on demurrer, and this position is incorrect. (See *Savage v. Trammell Crow Co.* (1990) 223 Cal.App.3d 1562, 1577, fn. 4 [stating that scope of *Robins* can be addressed on demurrer in appropriate circumstances].) Here, the necessary facts are alleged in the FAC and/or subject to judicial notice.

1   has expressly extended [*Robins*] to the Internet generally"], *aff'd and remanded* (9th Cir. 2019)

2   938 F.3d 985.)  However the courts of this state ultimately view that analogy with regard to a

3   dominant, widely-used site like the core YouTube service, the analogy falls apart completely on

4   the facts alleged here.  "Restricted Mode" and YouTube's advertising service are new, inherently

5   selective platforms that do not resemble a traditional public forum.  As discussed below, even

6   more than the core YouTube service, these platforms necessarily reflect the exercise of editorial

7   discretion rather than serving as an open "town square."

8       Finally, Prager contends that cases that have deemed web sites to be "public forums" for

9   purposes of California's "anti-SLAPP" statute require this Court to extend *Robins* to its claim.

10  However, the anti-SLAPP statute encompasses speech "***in a place open to the public or*** a public

11  forum in connection with an issue of public interest" (Code Civ. Proc., § 425.16, subd. (e)(3),

12  emphasis added), and has been applied to locations that clearly do not meet the standard

13  described in *Golden Gateway Center*.  (See, e.g., *Seelig v. Infinity Broadcasting Corp.* (2002) 97

14  Cal.App.4th 798, 807 [anti-SLAPP statute applied to comments made during on-air discussion

15  on talk radio].)  "[T]he protections afforded by the anti-SLAPP statute are not coextensive with

16  the categories of conduct or speech protected by the First Amendment or its California

17  counterparts (Cal. Const., art. I, §§ 2–4)."  (*Industrial Waste & Debris Box Service, Inc. v.*

18  *Murphy* (2016) 4 Cal.App.5th 1135, 1152.)  "As our high court recently reaffirmed, 'courts

19  determining whether conduct is protected under the anti-SLAPP statute look not to First

20  Amendment law, but to the statutory definitions in section 425.16, subdivision (e).' " (*Ibid.*,

21  quoting *City of Montebello v. Vasquez* (2016) 1 Cal.5th 409, 422.)

22      Defendants' demurrer to the first cause of action will accordingly be sustained without

23  leave to amend.  In addition to failing to state a claim under *Robins v. Pruneyard*, this cause of

24  action is barred by section 230 of the CDA for the reasons discussed below.  (See *In re*

25  *Garcia* (2014) 58 Cal.4th 440, 452 [supremacy clause of the federal Constitution requires that

26  any conflicting state law give way to federal statute], citing U.S. Const., art. VI, cl. 2 ["This

27  Constitution, and the laws of the United States which shall be made in pursuance thereof ... shall

28

1    be the supreme law of the land; and the judges in every state shall be bound thereby, any thing in

2    the Constitution or laws of any state to the contrary notwithstanding"].)

3        B.  CDA Immunity

4        Section 230(c)(1) of the CDA provides that "[n]o provider or user of an interactive

5    computer service shall be treated as the publisher or speaker of any information provided by

6    another information content provider." "§ 230 precludes courts from entertaining claims that

7    would place a computer service provider in a publisher's role.  Thus, lawsuits seeking to hold a

8    service provider liable for its exercise of a publisher's traditional editorial functions—such as

9    deciding whether to publish, withdraw, postpone or alter content—are barred." (*Hassell v.*

10   *Bird* (2018) 5 Cal.5th 522, 536, quoting *Zeran v. America Online, Inc.* (4th Cir. 1997) 129 F.3d

11   327, 330.)

12       "The CDA—of which section 230 is a part—was enacted in 1996." (*Delfino v. Agilent*

13   *Technologies, Inc.* (2006) 145 Cal.App.4th 790, 802.)  "Its 'primary goal ... was to control the

14   exposure of minors to indecent material' over the Internet." (*Ibid.*, quoting *Batzel v. Smith* (9th

15   Cir. 2003) 333 F.3d 1018, 1026, superseded by statute on another point as stated in *Breazeale v.*

16   *Victim Services, Inc.* (9th Cir. 2017) 878 F.3d 759, 766.)  "Thus, an 'important purpose of

17   [the CDA] was to encourage [Internet] service providers to self-regulate the dissemination of

18   offensive materials over their services.' " (*Ibid.*, quoting *Zeran v. America Online, Inc., supra,*

19   129 F.3d at p. 331.)  Section 230(c)(2) consequently immunizes service providers[2]  who

20   endeavor to restrict access to material deemed objectionable, providing that

21       [n]o provider or user of an interactive computer service shall be held liable on
22       account of--

23       **(A)** any action voluntarily taken in good faith to restrict access to or availability of
         material that the provider or user considers to be obscene, lewd, lascivious, filthy,
24       excessively violent, harassing, or otherwise objectionable, whether or not such
         material is constitutionally protected; or
25

26       **(B)** any action taken to enable or make available to information content providers
         or others  the  technical  means  to  restrict  access  to  material  described  in
27

28
     _____
     [2] There is no dispute that defendants are providers of "an interactive computer service" under section 230.

paragraph (1).[3]

(47 U.S.C. § 230(c)(2).)

A second, but related, objective of the CDA "was to avoid the chilling effect upon Internet free speech that would be occasioned by the imposition of tort liability upon companies that do not create potentially harmful messages but are simply intermediaries for their delivery." (*Delfino v. Agilent Technologies, Inc., supra,* 145 Cal.App.4th at pp. 802-803.) The legislative history reflects that Congress was responding to a New York trial court case where "a service provider was held liable for defamatory comments posted on one of its bulletin boards, based on a finding that the provider had adopted the role of 'publisher' by actively screening and editing postings." (*Barrett v. Rosenthal* (2006) 40 Cal.4th 33, 44.) " 'Fearing that the specter of liability would ... deter service providers from blocking and screening offensive material,' " Congress forbid " 'the imposition of publisher liability on a service provider for the exercise of its editorial and self-regulatory functions.' " (*Id.,* quoting *Zeran v. America Online, Inc., supra,* 129 F.3d at p. 331.) Thus, section 230(c)(1) " 'confer[s] broad immunity on Internet intermediaries' " in " 'a strong demonstration of legislative commitment to the value of maintaining a free market for online expression.' " (*Hassell v. Bird, supra,* 5 Cal.5th at p. 539, quoting *Barrett v. Rosenthal, supra,* 40 Cal.4th at p. 56.)

Of the two provisions, section 230(c)(1) has been applied more frequently and broadly, including by courts in the Northern District of California to conduct indistinguishable from that alleged in this action. Notably, in *Sikhs for Justice "SFJ", Inc. v. Facebook, Inc.* (N.D. Cal. 2015) 144 F.Supp.3d 1088, 1090, *aff'd sub nom. Sikhs for Justice, Inc. v. Facebook, Inc.* (9th Cir. 2017) 697 Fed.App'x. 526, a human rights organization alleged that Facebook blocked access to its page in India "on its own or on the behest of the Government of India," because of discrimination on the grounds of race, religion, ancestry, and national origin. Quoting *Barnes v. Yahoo!, Inc.* (9th Cir. 2009) 570 F.3d 1096 and *Fair Housing Council of San Fernando Valley v. Roommates.Com, LLC* (9th Cir. 2008) 521 F.3d 1157, the court reasoned that

---

[3] It is widely agreed that section 230(c)(2)(B)'s reference to "paragraph (1)" is an error, and the provision should be interpreted to refer to section 230(c)(2)(A) or "paragraph (A)." (See, e.g., *Enigma Software Group USA, LLC v. Malwarebytes, Inc.* (9th Cir. 2019) 938 F.3d 1026, 1031, fn. 1.)

> [p]ublication involves reviewing, editing, and deciding whether to publish or to withdraw from publication third-party content. Thus, a publisher decides whether to publish material submitted for publication. It is immaterial whether this decision comes in the form of deciding what to publish in the first place or what to remove among the published material. ***In other words, any activity that can be boiled down to deciding whether to exclude material that third parties seek to post online is perforce immune under section 230.***

(*Sikhs for Justice "SFJ", Inc. v. Facebook, Inc., supra,* 144 F.Supp.3d at p. 1094, emphasis added, internal citations and quotations omitted.) This approach has been endorsed by the Ninth Circuit. (See *Riggs v. MySpace, Inc.* (9th Cir. 2011) 444 Fed.App'x. 986, 987 [district court properly dismissed claims "arising from MySpace's decisions to delete Riggs's user profiles on its social networking website yet not delete other profiles Riggs alleged were created by celebrity imposters," citing *Fair Housing Council of San Fernando Valley v. Roommates.Com, LLC, supra,* 521 F.3d at pp. 1170-1171 for the proposition that "any activity that can be boiled down to deciding whether to exclude material that third parties seek to post online is perforce immune under section 230"].) California opinions have similarly reasoned that the "type of activity" at issue here—"to restrict or make available certain material"—"is expressly covered by section 230." (*Doe II v. MySpace Inc.* (2009) 175 Cal.App.4th 561, 572-573 [describing "the general consensus to interpret section 230 immunity broadly, extending from *Zeran* ..."]; see also *Hassell v. Bird, supra,* 5 Cal.5th at p. 537 [California "courts have followed *Zeran* in adopting a broad view of section 230's immunity provisions"].) This interpretation was recently applied again by the Northern District in *Federal Agency of News LLC v. Facebook, Inc.* (N.D. Cal., July 20, 2019, No. 18-CV-07041-LHK) --- F.Sup.3d ---, 2019 WL 3254208, where it was held that section 230(c)(1) immunized Facebook from claims arising from its removal of a Russian company's account and page due to its alleged control by an entity found to have interfered in the 2016 United States presidential election.[4]

---

[4] See also *Langdon v. Google, Inc.* (D. Del. 2007) 474 F.Supp.2d 622, 630-631 (applying immunity under section 230(c)(1) and/or (2) where plaintiff alleged defendants refused to display ads on his web pages criticizing the North Carolina and Chinese governments based on political viewpoint discrimination); *Levitt v. Yelp! Inc.* (N.D. Cal., Oct. 26, 2011, No. C-10-1321 EMC) 2011 WL 5079526, at *7-9, *aff'd* (9th Cir. 2014) 765 F.3d 1123 (section 230(c)(1) immunity applied to allegations that Yelp manipulated plaintiffs' user reviews in order to induce them to pay for

Consistent with the language of section 230(c)(1), these cases do not question the service provider's motive in deciding to remove content from its service. While Prager contends that section 230(c)(1) immunity should not be applied where a plaintiff alleges a service provider acted in bad faith or to stifle competition, it cites no persuasive authority adopting this interpretation.[5]

Courts have expressed greater concern with the issue of motive when interpreting section 230(c)(2), perhaps because paragraph (A) of that provision expressly includes a "good faith" requirement. Here, defendants rely on paragraph (B) of that provision, which they urge—like section 230(c)(1)—does not require good faith. In *Zango, Inc. v. Kaspersky Lab, Inc.* (9th Cir. 2009) 568 F.3d 1169, 1176-1177, the Ninth Circuit applied section 230(c)(2)(B) to a provider of Internet security software that deemed the plaintiff's software to be "malware," noting that the plaintiff had waived the issue of "whether subparagraph (B), which has no good faith language,

---

advertising); *Lancaster v. Alphabet Inc.* (N.D. Cal., July 8, 2016, No. 15-CV-05299-HSG) 2016 WL 3648608, at *2-3 ("§ 230[(c)(1) of the CDA prohibits any claim arising from Defendants' removal of Plaintiffs' videos"); *Green v. YouTube, LLC* (D.N.H., Mar. 13, 2019, No. 18-CV-203-PB) 2019 WL 1428890, at *6, *report and recommendation adopted sub nom. Green v. YouTube, Inc.* (D.N.H., Mar. 29, 2019, No. 18-CV-203-PB) 2019 WL 1428311 (applying immunity under section 230(c)(1) where plaintiff alleged his accounts were improperly shut down); *Brittain v. Twitter, Inc.* (N.D. Cal., June 10, 2019, No. 19-CV-00114-YGR) 2019 WL 2423375, at *3 (section 230(c)(1) immunity applied where plaintiff alleged improper suspension of his Twitter accounts and that Twitter "limit[ed] users who reference new/competing networks and/or utilize Third Party API services"); *King v. Facebook, Inc.* (N.D. Cal., Sept. 5, 2019, No. 19-CV-01987-WHO) 2019 WL 4221768 (section 230(c)(1) immunity applied to theory that "Facebook has violated its (Terms of Service) in removing [plaintiff's] posts and suspending his account, and that Facebook treats black activists and their posts differently than it does other groups, particularly white supremacists and certain 'hate groups' ").

[5] To the extent *e-ventures Worldwide, LLC v. Google, Inc.* (M.D. Fla. 2016) 188 F.Supp.3d 1265 adopts Prager's view, it does so by conflating section 230(c)(1) and section 230(c)(2) with no analysis. The Court does not find this persuasive. While a subsequent, unpublished opinion in that action, *e-ventures Worldwide, LLC v. Google, Inc.* (M.D. Fla., Feb. 8, 2017, No. 214CV646FTMPAMCM) 2017 WL 2210029, *3-4 reasoned that applying section 230(c)(1) to service providers' editorial decisions regarding a plaintiff's own content would swallow "the more specific immunity in (c)(2)" with its good faith requirement, the opinion went on to grant summary judgment based on the First Amendment's protection of editorial judgments, "no matter the motive." This case does not persuade the Court to part ways with the courts that apply section 230(c)(1) to the same end based on the same reasoning.

Similarly, *Levitt v. Yelp! Inc.* (N.D. Cal., Mar. 22, 2011, No. C 10-1321 MHP) 2011 WL 13153230, at *9 deemed it "a[] close[] question ... whether Yelp may be held liable for its removal of positive reviews for the alleged purpose of coercing businesses to purchase advertising," considering that this theory implicated bad faith. The court ultimately did not resolve the issue as it found the complaint otherwise failed to state a cause of action. A subsequent opinion in that case, *Levitt v. Yelp! Inc.* (N.D. Cal., Oct. 26, 2011, No. C-10-1321 EMC) 2011 WL 5079526, *9 held that section 230(c)(1) does not include a good faith requirement, and applied "even assuming Plaintiffs have adequately pled allegations stating a claim of an extortionate threat with respect to Yelp's alleged manipulation of user reviews." The Court finds the reasoning of the subsequent opinion more persuasive.

---

should be construed implicitly to have a good faith component like subparagraph (A)." The concurring opinion expressed concern with extending immunity beyond the facts present in that case:

> Congress plainly intended to give computer users the tools to filter the Internet's deluge of material *users* would find objectionable, in part by immunizing the providers of blocking software from liability. *See* § 230(b)(3). But under the generous coverage of § 230(c)(2)(B)'s immunity language, a blocking software provider might abuse that immunity to block content for anticompetitive purposes or merely at its malicious whim, under the cover of considering such material "otherwise objectionable."

(*Zango, Inc. v. Kaspersky Lab, Inc.*, *supra*, 568 F.3d at p. 1178 (conc. opn. of Fisher, J.).) Noting that "[d]istrict courts nationwide have grappled with the issues discussed in *Zango*'s majority and concurring opinions, and have reached differing results," the Ninth Circuit recently held that a service provider's intent may be relevant under section 230(c)(2)(B): specifically, where a plaintiff alleges blocking by a direct competitor for anticompetitive purposes, its claims survive dismissal. (*Enigma Software Group USA, LLC v. Malwarebytes, Inc.* (9th Cir. 2019) 938 F.3d 1026.)

Here, defendants' creation of a "Restricted Mode" to allow sensitive users to voluntarily choose a more limited experience of the YouTube service is exactly the type of self-regulation that Congress sought to encourage in enacting section 230, and fits within section 230(c)(2)(B)'s immunity for "any action taken to enable or make available to ... others," namely, YouTube users, "the technical means to restrict access to" material "that the provider or user considers to be obscene, ... excessively violent, ... or otherwise objectionable." Rather than unilaterally restricting access to material on its core platform as contemplated by section 230(c)(2)(A)— which contains a "good faith" requirement—defendants allow users to voluntarily restrict access to material that defendants deem objectionable for the stated reason that, like the categories of material enumerated by the statute, it may be inappropriate for young or sensitive viewers.[6] The

---

[6] Consistent with these circumstances, a page discussing options for administrators employing "Restricted Mode," which was submitted by Prager in connection with its motion for preliminary injunction, indicates that "[a]dministrators and designated approvers can now whitelist entire channels," in addition to individual videos, to ensure a channel is "watchable by your users." (Declaration of Peter Obstler, Ex. L.) Thus, it appears that users can

Court views this as a critical difference between the two provisions and disagrees with the majority in *Enigma*,[7] who ignore the plain language of the statute by reading a good faith limitation into section 230(c)(2)(B). (See *Enigma Software Group USA, LLC v. Malwarebytes, Inc., supra,* 938 F.3d at p. 1040 (dis. opn. of Rawlinson, J.) ["The majority's policy arguments are in conflict with our recognition in *Zango* that the broad language of the Act is consistent with 'the Congressional goals for immunity' as expressed in the language of the statute. [Citation.] As the district court cogently noted, we 'must presume that a legislature says in a statute what it means and means in a statute what it says there.' "].)

Finding CDA immunity here is also consistent with cases that apply it in indistinguishable circumstances based on section 230(c)(1), and with their reasoning, which recognizes that challenges to a service provider's editorial discretion "treat[]" the provider "as a publisher." (See *Sikhs for Justice "SFJ", Inc. v. Facebook, Inc., supra,* 144 F.Supp.3d 1088 [applying section 230(c)(1) to claim under Title II of the Civil Rights Act of 1964]; *Federal Agency of News LLC v. Facebook, Inc., supra,* 2019 WL 3254208 [applying section 230(c)(1) to claims under Title II of the Civil Rights Act of 1964, the Unruh Act, and for breach of the implied covenant of good faith and fair dealing].) The Court finds that immunity under section 230(c)(1) also applies here, to the allegations involving both "Restricted Mode" and defendants' advertising service.

While the Court understands Prager's argument that all three provisions of section 230 should have a good faith requirement, this argument is contrary to the plain language of the statute. (See *Hassell v. Bird, supra,* 5 Cal.5th at p. 540 [noting that *Barrett v. Rosenthal, supra,* 40 Cal.4th 33 voiced "qualms" that *Zeran's* interpretation of section 230 provides blanket immunity for those who intentionally redistribute defamatory statements, but held "these concerns were of no legal consequence" where principles of statutory interpretation compelled a

---

specifically override defendants' decisions to disable certain videos or channels in "Restricted Mode," confirming that "Restricted Mode" is a tool made available to users rather than a unilateral ban.

[7] See *People v. Williams* (1997) 16 Cal.4th 153, 190 ("Decisions of lower federal courts interpreting federal law are not binding on state courts."); *Elliott v. Albright* (1989) 209 Cal.App.3d 1028, 1034 (although at times entitled to great weight, the decisions of the lower federal courts on federal questions are merely persuasive).

broad construction].)  And while it is not this Court's role to judge the wisdom of the policy embodied by section 230, there are good reasons to support it.  As the court in *Levitt v. Yelp! Inc.* (N.D. Cal., Oct. 26, 2011, No. C-10-1321 EMC) 2011 WL 5079526 reasoned,

> traditional editorial functions often include subjective judgments informed by political and financial considerations. [Citation.]  Determining what motives are permissible and what are not could prove problematic. Indeed, from a policy perspective, permitting litigation and scrutin[izing] motive could result in the "death by ten thousand duck-bites" against which the Ninth Circuit cautioned in interpreting § 230(c)(1). [(*Fair Housing Council of San Fernando Valley v. Roommates.Com, LLC, supra,* 521 F.3d at p. 1174.)]

> One of Congres[s]'s purposes in enacting § 230(c) was to avoid the chilling effect of imposing liability on providers by both safeguarding the "diversity of political discourse ... and myriad avenues for intellectual activity" on the one hand, and "remov[ing] disincentives for the development and utilization of blocking and filtering technologies" on the other hand. §§ 230(a), (b); *see also* S.Rep. No. 104–230, at 86 (1996) (Conf.Rep.), *available at* 1996 WL 54191, at *[194] (describing purpose of section 230 to protect providers from liability "for actions to restrict or to enable restrict[ion] of access to objectionable online material"). For that reason, "[C]lose cases ... must be resolved in favor of immunity, lest we cut the heart out of section 230 ...." [(*Fair Housing Council of San Fernando Valley v. Roommates.Com, LLC, supra,* 521 F.3d at p. 1174.)]

> As illustrated by the case at bar, finding a bad faith exception to immunity under § 230(c)(1) could force Yelp to defend its editorial decisions in the future on a case by case basis and reveal how it decides what to publish and what not to publish. Such exposure could lead Yelp to resist filtering out false/unreliable reviews (as someone could claim an improper motive for its decision), or to immediately remove all negative reviews about which businesses complained (as failure to do so could expose Yelp to a business's claim that Yelp was strong-arming the business for advertising money). The Ninth Circuit has made it clear that the need to defend against a proliferation of lawsuits, regardless of whether the provider ultimately prevails, undermines the purpose of section 230.

(*Levitt v. Yelp! Inc., supra,* 2011 WL 5079526, at *8-9.)  In the Court's view, these concerns are particularly salient here, where the challenged services are by definition more curated than defendants' core service and could not exist without more robust screening by defendants.

In opposition to defendants' demurrer, Prager cites a number of cases that affirm the principle applied in *Fair Housing Council of San Fernando Valley v. Roommates.Com, LLC, supra,* 521 F.3d 1157, which held that a service provider is not entitled to CDA immunity with

regard to content it develops itself. However, this principle is inapposite here. Prager does not allege that defendants developed any of Prager's content or appended any commentary to it—to the contrary, they allege the content became completely invisible in "Restricted Mode" or was simply demonetized. Applying CDA immunity under these circumstances does not conflict with *Roommates*. (See *Fair Housing Council of San Fernando Valley v. Roommates.Com, LLC*, *supra*, 521 F.3d at p. 1163 [in enacting CDA immunity, "Congress sought to immunize the *removal* of user-generated content, not the *creation* of content"].)[8]

Finally, Prager contends that applying CDA immunity here would constitute an unlawful prior restraint on its speech in violation of the First Amendment. However, a federal court has already held that defendants' conduct does not violate the First Amendment, and this Court agrees with that analysis for the reasons discussed in connection with its analysis of Prager's claim under the California Constitution. Moreover, Prager does not allege that defendants prevented it from engaging in speech, even on their own platform—again, it contends that certain videos were excluded from "Restricted Mode" and/or were demonetized.

The Court consequently finds that section 230(c)(2)(B) bars Prager's claims related to "Restricted Mode" and section 230(c)(1) bars all of its claims, with the possible exception of those based on its own promises and representations, which are discussed below.[9]

C. Breach of the Implied Covenant of Good Faith and Fair Dealing and Fraud Under the UCL

Finally, Prager correctly urges that some California authority holds section 230(c)(1) of the CDA does not apply to claims based on a defendant's own promises and representations to a plaintiff, rather than its role as a publisher. (See *Demetriades v. Yelp, Inc.* (2014) 228 Cal.App.4th 294, 313 [this immunity does not apply where "plaintiff seeks to hold Yelp liable for its own statements regarding the accuracy of its filter"]; but see *Hassell v. Bird*, *supra*, 5 Cal.5th at p. 542 [disapproving of "creative pleading" in an attempt to avoid section 230

---

[8] Although it does not bring a claim for defamation, Prager appears to suggest that defendants have defamed it by removing its content from "Restricted Mode" or demonetizing it. Such a claim would likely be foreclosed by the ruling in *Bartholomew v. YouTube, LLC.* (2017) 17 Cal.App.5th 1217, 1234.

[9] The Court thus does not address defendants' argument that Prager's claims are barred by the First Amendment.

immunity].)  This authority does not apply to the Court's finding of immunity under section

230(c)(2)(B).  In any event, Prager's claims asserting this type of theory—namely, its claim for

breach of the implied covenant of good faith and fair dealing and its claim under the fraud prong

of the UCL—do not state a cause of action.

Prager does not and cannot state a claim for breach of the implied covenant of good faith

and fair dealing in light of the express provisions of YouTube's Terms of Service, which provide

that "YouTube reserves the right to remove Content without prior notice" and which also allow

YouTube to "discontinue any aspect of the Service at any time." (See Declaration of Brian

Willen, Ex. 1; *Song fi Inc. v. Google, Inc.* (N.D. Cal. 2015) 108 F.Supp.3d 876, 885 [plaintiff

could not state a claim for violation of the covenant of good faith and fair dealing based on

content removal in light of YouTube's Terms of Service].)  Similarly, YouTube's AdSense

Terms of Service reserve the right "to refuse or limit your access to the Services." (Declaration

of Brian Willen, Ex. 8; see *Sweet v. Google Inc.* (N.D. Cal., Mar. 7, 2018, No. 17-CV-03953-

EMC) 2018 WL 1184777, at *9-10 [plaintiff could not state a claim for violation of the covenant

of good faith and fair dealing based on demonitization in light of similar reservation of rights in

YouTube's Partner Program Terms].)  "[C]ourts are not at liberty to imply a covenant directly at

odds with a contract's express grant of discretionary power except in those relatively rare

instances when reading the provision literally would, contrary to the parties' clear intention,

result in an unenforceable, illusory agreement." (*Third Story Music, Inc. v. Waits* (1995) 41

Cal.App.4th 798, 808.)  That is not the case here, and Prager does not contend that it is. (See

*Sweet v. Google Inc., supra,* 2018 WL 1184777, at *9-10 [applying *Third Story*].)

As to the UCL fraud claim, to the extent it is based on the "four essential freedoms" set

forth above and similar statements, these statements are non-actionable puffery. (See

*Demetriades v. Yelp, Inc., supra,* 228 Cal.App.4th at p. 311 [" 'a statement that is quantifiable,

that makes a claim as to the "specific or absolute characteristics of a product," may be an

actionable statement of fact while a general, subjective claim about a product is non-actionable

puffery,' " quoting *Newcal Industries, Inc. v. Ikon Office Solution* (9th Cir.2008) 513 F.3d 1038,

1053]; *Prager University v. Google LLC, supra,* 2018 WL 1471939, at *11 ["None of the

statements about YouTube's viewpoint neutrality identified by Plaintiff resembles the kinds of 'quantifiable' statements about the 'specific or absolute characteristics of a product' that are actionable under the Lanham Act."].)

Prager also alleges that defendants represented that "the 'same standards apply equally to all' when it comes to the content regulation on YouTube." (FAC, ¶ 85; see also *id.* at ¶ 13.) While this statement is arguably more than mere puffing (see *Demetriades v. Yelp, Inc., supra,* 228 Cal.App.4th at p. 311-312), Prager does not allege that it suffered a loss of money or property as a result of its reliance on this statement. "There are innumerable ways in which economic injury from unfair competition may be shown," including where a plaintiff "ha[s] a present or future property interest diminished." (*Kwikset Corp. v. Superior Court (Benson)* (2011) 51 Cal.4th 310, 323; see also *Alborzian v. JPMorgan Chase Bank, N.A.* (2015) 235 Cal.App.4th 29, 38 [UCL "unlawful" plaintiffs established standing by alleging diminished credit score caused by defendant's false negative reporting to credit agencies, even where they never made payments on the loan at issue].) The "lost income, reduced viewership, and damage to brand, reputation, and goodwill" that Prager alleges (FAC, ¶ 157) would certainly satisfy this requirement if there were a causal connection between Prager's alleged reliance on defendants' statement in participating in the YouTube service and these harms. However, these injuries cannot have resulted from Prager's decision to use YouTube: they could only have been caused by YouTube's later decisions to restrict and/or demonetize Prager's content. (See *Prager University v. Google LLC, supra,* 2018 WL 1471939, at \*11-12 ["Plaintiff has not sufficiently alleged that it 'has been or is likely to be injured as the result of the' statements about YouTube's viewpoint neutrality. [Citation.] As discussed above, any harm that Plaintiff suffered was caused by Defendants' decisions to limit access to some of Plaintiff's videos."].) These later decisions by YouTube could not have been relied on by Prager. (See *id.* at \*11 ["Although Plaintiff asserts that it has suffered injury in the form of 'lower viewership, decreased ad revenue, a reduction in advertisers willing to purchase advertisements shown on Plaintiff's videos, diverted viewership, and damage to its brand, reputation and goodwill,' … nothing in Plaintiff's complaint suggests that this harm flowed directly from Defendants' publication of

1   their policies and guidelines. Instead, any harm that Plaintiff suffered was caused by Defendants'

2   decisions to limit access to some of Plaintiff's videos ...."].)  Moreover, recognizing this theory

3   would appear to conflict with principles of defamation law as recently discussed in *Bartholomew*

4   *v. YouTube, LLC.* (2017) 17 Cal.App.5th 1217.

5          Prager thus fails to state a cause of action based on the implied covenant of good faith

6   and fair dealing or the fraud prong of the UCL.

7          D.  Conclusion and Order

8          For all these reasons, the demurrer to the first through fourth causes of action is

9   SUSTAINED WITHOUT LEAVE TO AMEND.

10

11  III.  Motion for Preliminary Injunction

12         As discussed above, Prager has not shown a reasonable probability of success on the

13  merits in this action.  Its motion for a preliminary injunction is consequently DENIED.  (See *San*

14  *Francisco Newspaper Printing Co. v. Superior Court (Miller)* (1985) 170 Cal.App.3d 438, 442.)

15

16         IT IS SO ORDERED.

17
    Dated: **Nov. 19, 2019**
18                                                    *Brian C. Walsh*
19                                                    Honorable Brian C. Walsh
                                                     Judge of the Superior Court
20

21

22

23

24

25

26

27

28