DAVID H. KRAMER, SBN 168452
LAUREN GALLO WHITE, SBN 309075
WILSON SONSINI GOODRICH & ROSATI
Professional Corporation
650 Page Mill Road
Palo Alto, CA 94304-1050
Telephone: (650) 493-9300
Facsimile: (650) 565-5100
Email: dkramer@wsgr.com
Email: lwhite@wsgr.com

Attorneys for Defendants
GOOGLE LLC and YOUTUBE, LLC

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN JOSE DIVISION

DIVINO GROUP LLC, a California limited
liability company, CHRIS KNIGHT, an
individual, CELSO DULAY, an individual,
CAMERON STIEHL, an individual,
BRIAANDCHRISSY LLC, a Georgia limited
liability company, BRIA KAM, an individual,
CHRISSY CHAMBERS, an individual,
CHASE ROSS, an individual, BRETT
SOMERS, an individual, and LINDSAY
AMER, an individual, STEPHANIE
FROSCH, an individual, SAL
CINEQUEMANI, an individual, TAMARA
JOHNSON, an individual, and GREG
SCARNICI, an individual,

Plaintiffs,

v.

GOOGLE LLC, a Delaware limited liability
company, YOUTUBE, LLC, a Delaware
limited liability company, and DOES 1-25,

Defendants.

CASE NO.: 5:19-cv-004749-VKD

**DEFENDANTS' MOTION TO
DISMISS SECOND AMENDED
CLASS ACTION COMPLAINT**

Date: March 31, 2020
Time: 10:00 a.m.
Place: Ctrm 2
Before: Magistrate Judge Virginia K.
DeMarchi

1

**TABLE OF CONTENTS**

2
**Page**

3    NOTICE OF MOTION AND MOTION .................................................................. 1

4    STATEMENT OF REQUESTED RELIEF ............................................................ 1

5    STATEMENT OF ISSUES TO BE DECIDED ..................................................... 1

6    MEMORANDUM OF POINTS AND AUTHORITIES ........................................ 1

7    FACTUAL BACKGROUND ................................................................................. 3

8         A.    The YouTube Service and Terms of Use ...................................... 3

9         B.    Restricted Mode .......................................................................... 4

10        C.    YouTube's Advertising Policies .................................................. 5

11        D.    Plaintiffs and Their Claims Against Google ................................ 6

12   ARGUMENT ......................................................................................................... 7

13   I.    GOOGLE IS PROTECTED FROM PLAINTIFFS' CLAIMS BY SECTION 230 .......... 7

14        A.    Google is Protected by Section 230(c)(1) ................................... 8

15        B.    Google's Restricted Mode Decisions are Protected by Section 230(c)(2)(B) ...... 11

16        C.    Plaintiffs Cannot Evade the Immunity Afforded by Section 230 ........ 12

17   II.   PLAINTIFFS FAIL TO STATE A VIABLE CAUSE OF ACTION ............................. 13

18        A.    Plaintiffs Cannot Assert Claims Under the Federal or State Constitutions ........ 13

19        B.    Plaintiffs Fail to State a Claim Under the Lanham Act ........................ 16

20              1.    Plaintiffs' False Advertising Claim Fails as a Matter of Law ........ 16

21              2.    Plaintiffs' False Association Claim Fails as a Matter of Law ........ 18

22              3.    Plaintiffs Fail to Plead Injury Under the Lanham Act ........ 19

23        C.    Plaintiffs Fail to State a Claim Under the Unruh Act ........................ 20

24        D.    Plaintiffs Fail to State a Claim Under the UCL ................................. 23

25        E.    Plaintiffs Fail to State a Claim for Breach of Implied Covenant ........ 24

26   CONCLUSION ..................................................................................................... 25

27

28

1

# TABLE OF AUTHORITIES

2

## CASES

3

*A.H. Lundberg Assocs., Inc. v. TSI, Inc.*,
    2014 U.S. Dist. LEXIS 149603 (W.D. Wash. Oct. 20, 2014)................................17

4

*AlterG, Inc. v. Boost Treadmills LLC*,
    388 F. Supp. 3d 1133 (N.D. Cal. 2019) ...............................................16

5

6

*Amro Elansari v. Jagex Inc.*,
    2020 U.S. App. LEXIS 1893 (3d Cir. Jan. 22, 2020)................................14

7

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ..............................................................7

8

9

*Barnes v. Yahoo!, Inc.*,
    570 F.3d 1096 (9th Cir. 2009), *aff'd*, 697 F. App'x 526 (9th Cir. 2017).....................8, 9, 12

10

*Bartholomew v. YouTube, LLC*,
    17 Cal. App. 5th 1217 (2017) ....................................................17

11

12

*Batzel v. Smith*,
    333 F.3d 1018 (9th Cir. 2003)................................................7, 8

13

*Brittain v. Twitter, Inc.*,
    2019 U.S. Dist. LEXIS 97132 (N.D. Cal. June 10, 2019), *appeal docketed*,
    No. 19-15522 (9th Cir. Aug. 19, 2019) ...........................................8

14

15

*Brosnan v. Tradeline Solutions, Inc.*,
    681 F. Supp. 2d 1094 (N.D. Cal. 2010) ...........................................16

16

17

*Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*,
    20 Cal. 4th 163 (1999)........................................................23, 24

18

*Chiu v. Pendragon N. Am., Inc.*,
    2019 U.S. Dist. LEXIS 169952 (C.D. Cal. May 6, 2019)................................21

19

20

*Cook, Perkiss and Liehe, Inc. v. N. Cal. Collection Serv., Inc.*,
    911 F.2d 242 (9th Cir. 1990)....................................................16

21

*Cullen v. Netflix, Inc.*,
    880 F. Supp. 2d 1017 (N.D. Cal. 2012) ...........................................23

22

23

*Darnaa, LLC v. Google, Inc.*,
    2015 U.S. Dist. LEXIS 161791 (N.D. Cal. Dec. 2, 2015) ...............................17

24

*Darnaa, LLC v. Google, Inc.*,
    2016 U.S. Dist. LEXIS 152126 (N.D. Cal. Nov. 2, 2016) ...............................9

25

26

*DeHoog v. Anheuser-Busch InBev SA/NV*,
    899 F.3d 758 (9th Cir. 2018), *cert. denied*, 139 S. Ct. 1267 (2019) ...................21

27

28

*Doe v. MySpace Inc.*,
   528 F.3d 413 (5th Cir. 2008)....................................................................................8

*Domen v. Vimeo, Inc.*,
   2020 U.S. Dist. LEXIS 7935 (S.D.N.Y. Jan. 14, 2020)..................................9, 15

*Duty Free Ams., Inc. v. Estee Lauder Cos.*,
   797 F.3d 1248 (11th Cir. 2015)..............................................................................19

*Earll v. eBay, Inc.*,
   599 F. App'x 695 (9th Cir. 2015)...........................................................................21

*Earll v. eBay, Inc.*,
   2011 U.S. Dist. LEXIS 100360 (N.D. Cal. Sept. 6, 2011) ...................................22

*Enigma Software Group USA, LLC v. Malwarebytes, Inc.*,
   946 F.3d 1040, 2019 U.S. App. LEXIS 38784 (9th Cir. Dec. 31, 2019) ......................11, 12

*Fair Hous. Council v. Roommate.com, LLC*,
   666 F.3d 1216 (9th Cir. 2012)................................................................................16

*Fair Hous. Council v. Roommates.com, LLC*,
   521 F.3d 1157 (9th Cir. 2008) (en banc).....................................................7, 8, 19

*Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc.*,
   314 F.3d 48 (2d Cir. 2002)......................................................................................17

*Fayer v. Vaughn*,
   649 F.3d 1061 (9th Cir. 2011)..................................................................................7

*Federal Agency of News LLC v. Facebook, Inc.*,
   2020 U.S. Dist. LEXIS 6159 (N.D. Cal. Jan. 13, 2020) ...................................9, 14

*Force v. Facebook, Inc.*,
   934 F.3d 53 (2d Cir. 2019), *petition for cert. filed* (U.S. Jan. 9, 2020)
   (No. 19-859) ...........................................................................................................10

*Freedom Watch, Inc. v. Google, Inc.*,
   368 F. Supp. 3d 30 (D.D.C. 2019) .........................................................................14

*Garcia v. Clovis Unified Sch. Dist.*,
   627 F. Supp. 2d 1187 (E.D. Cal. 2009)..................................................................22

*Genus Lifesciences Inc. v. Lannett Co.*,
   378 F. Supp. 3d 823 (N.D. Cal. 2019) ...................................................................19

*Gladwin v. Square, Inc.*,
   2020 Cal. Super. LEXIS 1 (Cal. Super. Ct. Jan. 10, 2020) ...................................21

*Golden Gateway Ctr. v. Golden Gateway Tenants Ass'n*,
   26 Cal. 4th 1013 (2001)..........................................................................................14

*Gonzalez v. Google Inc.*,
   282 F. Supp. 3d 1150 (N.D. Cal. 2017), *appeal docketed*, No. 18-16700
   (9th Cir. Sept. 10, 2018) ...................................................................................8, 10

*Gonzalez v. Planned Parenthood of L.A.*,
   759 F.3d 1112 (9th Cir. 2014) ..................................................................................7

*Greater L.A. Agency on Deafness, Inc. v. CNN, Inc.*,
   742 F.3d 414 (9th Cir. 2014) ..............................................................................20, 21

*Green v. AOL*,
   318 F.3d 465 (3d Cir. 2003) ....................................................................................12

*Green v. YouTube, LLC*,
   2019 U.S. Dist. LEXIS 55577 (D.N.H. Mar. 13, 2019), *report & rec'n
   adopted* , 2019 U.S. Dist. LEXIS 54101 (D.N.H. Mar. 29, 2019) ........................9

*Harris v. Capital Growth Investors XIV*,
   52 Cal. 3d 1142 (1991) ............................................................................................20

*hiQ Labs, Inc. v. LinkedIn Corp.*,
   273 F. Supp. 3d 1099 (N.D. Cal. 2017), *aff'd*, 938 F.3d 985 (9th Cir. 2019) .....................14

*Howard v. Am. Online, Inc.*,
   208 F.3d 741 (9th Cir. 2000) ...................................................................................14

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp.*,
   515 U.S. 557 (1995) .................................................................................................15

*Interlink Prods. Int'l, Inc. v. Cathy Trading, LLC*,
   2017 U.S. Dist. LEXIS 33548 (D.N.J. Mar. 9, 2017) .............................................17

*Karimi v. GMAC Mortg.*,
   2011 U.S. Dist. LEXIS 136071 (N.D. Cal. Nov. 28, 2011) .....................................25

*Kimzey v. Yelp! Inc.*,
   836 F.3d 1263 (9th Cir. 2016) ...................................................................................7

*Kinderstart.com LLC v. Google, Inc.*,
   2007 U.S. Dist. LEXIS 22637 (N.D. Cal. Mar. 16, 2007) ................................14, 24

*King v. Facebook, Inc.*,
   2019 U.S. Dist. LEXIS 151582 (N.D. Cal. Sept. 5, 2019) ........................................8

*Knievel v. ESPN*,
   393 F.3d 1068 (9th Cir. 2005) ....................................................................................3

*Kwikset Corp. v. Super. Ct.*,
   51 Cal. 4th 310 (2011) .............................................................................................24

*La'Tiejira v. Facebook, Inc.*,
   272 F. Supp. 3d 981 (S.D. Tex. 2017) ................................................................12, 13

*Lancaster v. Alphabet Inc.*,
    2016 U.S. Dist. LEXIS 88908 (N.D. Cal. July 8, 2016) ......................................................9

*Langdon v. Google, Inc.*,
    474 F. Supp. 2d 622 (D. Del. 2007) .............................................................................14, 15

*Levitt v. Yelp! Inc.*,
    2011 U.S. Dist. LEXIS 124082 (N.D. Cal. Oct. 26, 2011),
    *aff'd*, 765 F.3d 1123 (9th Cir. 2014) ...........................................................................10

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
    572 U.S. 118 (2014) ...............................................................................................................20

*Manhattan Cmty. Access Corp. v. Halleck*,
    139 S. Ct. 1921 (2019) .....................................................................................................13, 14

*Marco Bicego S.P.A. v. Kantis*,
    2017 U.S. Dist. LEXIS 95000 (N.D. Cal. June 20, 2017) ..............................................18, 19

*Mezey v. Twitter, Inc.*,
    2018 U.S. Dist. LEXIS 121775 (S.D. Fla. July 19, 2018) ......................................................9

*Miami Herald Pub. Co. v. Tornillo*,
    418 U.S. 241 (1974) .........................................................................................................13, 15

*Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*,
    591 F.3d 250 (4th Cir. 2009).................................................................................................7

*Oracle Am., Inc. v. CedarCrestone, Inc.*,
    938 F. Supp. 2d 895 (N.D. Cal. 2013) ...............................................................................23

*Park Mgmt. Corp. v. In Defense of Animals*,
    36 Cal. App. 5th 649 (2019)...............................................................................................14

*Parker v. PayPal, Inc.*,
    2017 U.S. Dist. LEXIS 130800 (E.D. Pa. Aug. 16, 2017)....................................................12

*Prager Univ. v. Google LLC (Prager I)*,
    2018 U.S. Dist. LEXIS 51000 (N.D. Cal. Mar. 26, 2018),
    *appeal docketed*, No. 18-15712 (9th Cir. Apr. 24, 2018)............................................ *passim*

*Prager Univ v. Google LLC (Prager II)*,
    2019 Cal. Super. LEXIS 2034 (Cal. Super. Ct. Nov. 19, 2019) ................................. *passim*

*Robins v. Pruneyard Shopping Ctr.*,
    23 Cal.3d 899 (1979), *aff'd*, 447 U.S. 74 (1980) ...............................................................14

*Sam Rubin Entm't, Inc. v. AARP, Inc.*,
    2016 U.S. Dist. LEXIS 174457 (C.D. Cal. Dec. 16, 2016)...................................................23

*Sepehry-Fard v. MB Fin. Servs.*,
    2014 U.S. Dist. LEXIS 71568 (N.D. Cal. May 23, 2014) .......................................................7

*Shulman v. Facebook.com*,
  2017 U.S. Dist. LEXIS 183110 (D.N.J. Nov. 6, 2017) ......................................................14

*Sikhs for Justice "SFJ", Inc. v. Facebook, Inc.*,
  144 F. Supp. 3d 1088 (N.D. Cal. 2015) .................................................................7, 8, 9, 13

*Song Fi, Inc. v. Google, Inc.*,
  2018 U.S. Dist. LEXIS 82015 (N.D. Cal. May 15, 2018) ................................................17

*Storek & Storek, Inc. v. Citicorp Real Estate, Inc.*,
  100 Cal. App. 4th 44 (2002) ..............................................................................................24

*Summit Tech., Inc. v. High-Line Med. Instruments, Co.*,
  933 F. Supp. 918 (C.D. Cal. 1996) ...............................................................................18, 19

*Sweet v. Google Inc.*,
  2018 U.S. Dist. LEXIS 37591 (N.D. Cal. Mar. 7, 2018) ................................................25

*Turner Broad. Sys., Inc. v. FCC*,
  512 U.S. 622 (1994) ...........................................................................................................13

*Turner v. Association of American Medical Colleges*,
  167 Cal. App. 4th 1401 (2008) ..........................................................................................20

*Wash. Post v. McManus*,
  944 F.3d 506 (4th Cir. 2019) .............................................................................................16

*Westlake Legal Grp. v. Yelp, Inc.*,
  599 F. App'x 481 (4th Cir. 2015) .........................................................................................8

*Zango, Inc. v. Kaspersky Lab, Inc.*,
  568 F.3d 1169 (9th Cir. 2009) ...........................................................................................11

*Zeran v. Am. Online, Inc.*,
  129 F.3d 327 (4th Cir. 1997).........................................................................................8, 13

*Zhang v. Baidu.com, Inc.*,
  10 F. Supp. 3d 433 (S.D.N.Y. 2014) ..................................................................................13

**STATUTES**

15 U.S.C. § 1125(a)........................................................................................16, 17, 18, 19, 20, 24

28 U.S.C. § 1367(c)(3) .............................................................................................................20

42 U.S.C. § 1983 ......................................................................................................................13

47 U.S.C. § 230(b)(3) ...............................................................................................................11

47 U.S.C. § 230(b)(4) ...............................................................................................................11

47 U.S.C. § 230(c) .............................................................................................................*passim*

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**NOTICE OF MOTION AND MOTION**

PLEASE TAKE NOTICE that on March 31, 2020, at 10:00 a.m. before Magistrate Judge Virginia K. DeMarchi, of the United States District Court for the Northern District of California, Courtroom 2, Fifth Floor, 208 South 1st Street, San Jose, California, Defendants Google LLC ("Google") and YouTube, LLC ("YouTube") shall and hereby do move for an order dismissing with prejudice all claims advanced by Plaintiffs in their Second Amended Class Action Complaint (ECF No. 20, "Complaint").

**STATEMENT OF REQUESTED RELIEF**

Pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure and 47 U.S.C. § 230(c), Google and YouTube request that the Court dismiss Plaintiffs' claims without leave to amend.

**STATEMENT OF ISSUES TO BE DECIDED**

1.      Whether Section 230 of the Communications Decency Act, 47 U.S.C. § 230(c)(1) & (c)(2)(B), bars Plaintiffs' claims.

2.      Whether the Complaint should otherwise be dismissed under Rule 12(b)(6) for failure to state a claim.

**MEMORANDUM OF POINTS AND AUTHORITIES**

As a free video hosting service with billions of users and a vast array of content on nearly every topic imaginable, YouTube offers a platform for people from wildly diverse backgrounds to share their perspectives and experiences. That includes creators with LGBTQ+ identities, who are among some of YouTube's most engaged users. YouTube greatly values these users and their contributions—the Complaint itself shows that YouTube has encouraged members of the LGBTQ+ community to use YouTube, taken seriously their concerns, and worked in good faith to address concerns that Plaintiffs and other LGBTQ+ content creators have raised.

At the same time, YouTube (and its parent company Google) is also committed to keeping its service inclusive for viewers and advertisers. One tool YouTube has developed for this purpose is "Restricted Mode," which offers a more limited YouTube experience for sensitive users—including children, students, and library patrons. Restricted Mode is a voluntary, opt-in feature, which means that videos unavailable in Restricted Mode remain available on YouTube's

general service, where they can be seen by anyone who has not chosen to activate Restricted Mode. In addition, while YouTube allows some content creators to display ads alongside their videos and earn a portion of the resulting ad revenue, YouTube has policies that work to ensure that ads do not appear with content that advertisers might find unsuitable.

The decisions that YouTube makes about what videos to display within Restricted Mode or to allow to be monetized with advertising require a nuanced and careful calibration. The interests of content creators like Plaintiffs are important, but they are not the only consideration: YouTube must also take into account the interests of parents, educators, or other sensitive users who opt into Restricted Mode, and it must consider the interests of its advertising partners who want to protect their brands from being advertised alongside videos that might offend or upset their customers. YouTube works hard to strike the appropriate balance, but its judgments will never be universally praised. Creators of all backgrounds will occasionally see unobjectionable videos flagged, or content that should be restricted slip through. For this reason, both in response to creators' appeals and on its own, YouTube regularly reviews its content-moderation and monetization decisions and reverses them when it finds mistakes.

Plaintiffs in this case are LGBTQ+ content creators who allege that Google and YouTube wrongly excluded some of their videos from Restricted Mode, disqualified some of their videos from advertising, or restricted their content in various other ways. Rather than see these for what they are—imperfections in YouTube's content review systems or just different views about how YouTube's policies should be applied—Plaintiffs assert they were motivated by anti-LGBTQ+ bias. On this implausible, inflammatory, and wholly inaccurate premise, Plaintiffs allege that Google and YouTube have violated the rights of Plaintiffs and other similarly situated creators under the U.S. and California Constitutions, federal and state statutes, and the common law. Anticipating that Google and YouTube may invoke their statutory rights under Section 230 of the Communications Decency Act ("CDA"), Plaintiffs also allege that that statute is unconstitutional.

All of these claims fail as a matter of law. Indeed, this case is merely one in a long line of failed efforts to hold YouTube liable for its decisions about how to regulate content on its

platform. That includes the *PragerU* cases, in which Judge Koh of this Court and Judge Walsh of

the Santa Clara County Superior Court recently dismissed virtually identical claims brought by

the same lawyers who represent Plaintiffs here. *Prager Univ. v. Google LLC (Prager I)*, 2018

U.S. Dist. LEXIS 51000 (N.D. Cal. Mar. 26, 2018); *Prager Univ v. Google LLC (Prager II)*,

2019 Cal. Super. LEXIS 2034 (Cal. Super. Ct. Nov. 19, 2019). As the *Prager* decisions confirm,

Plaintiffs' efforts to second-guess YouTube's editorial and self-regulatory judgments are barred

by Section 230 of the CDA, are contrary to the terms of the parties' own agreements, and fail on

their own terms. Neither the prolix nature of Plaintiffs' allegations nor their distracting rhetoric

provides any basis for a different result here. The Complaint should be dismissed with prejudice.

## **FACTUAL BACKGROUND**

### A.      The YouTube Service and Terms of Use

A subsidiary of Google, YouTube is the world's most widely used online video hosting

platform. ¶¶ 46, 50.[1]  Content creators upload videos to the service free of charge, enabling

YouTube's billions of users to view them, comment on them, and subscribe to their favorite

creators' channels. ¶ 52. YouTube provides people all over the world and from all backgrounds

with a platform to share their voices and talents. ¶ 59.

YouTube values the perspectives and experiences that LGBTQ+ content creators bring to

the platform. YouTube encourages content creators to share "stories about . . . opening up about

your sexuality" and "overcoming discrimination." Ex. 12.[2]  And YouTube's Community

Guidelines include "sexual orientation" and "gender identity" as "core characteristics" based on

which users may not promote hate or violence. Ex. 3. In 2017, when LGBTQ+ creators raised

issues about Restricted Mode, YouTube acknowledged that the feature was not fully working as

---

[1] Citations to "¶ _" are to the Complaint.

[2] Citations to "Ex. _" are exhibits attached to the Declaration of Lauren Gallo White. The Complaint alleges that "Plaintiffs and Defendants entered into written contracts in which Defendants agreed to provide YouTube platform access, hosting, streaming, and advertising services to Plaintiffs." ¶ 331. The Complaint thus incorporates by reference the terms, policies, and guidelines attached to the White Declaration. *See, e.g.*, ¶¶ 10, 14, 26.d, 33, 68, 78, 81, 248, 331, 344-346. The Court therefore may consider these documents in ruling on this motion. *Knievel v. ESPN*, 393 F.3d 1068, 1076 (9th Cir. 2005).

intended and agreed to make improvements. ¶¶ 28, 87. As for the Plaintiffs here, YouTube has addressed their individual concerns in good faith, and often removed restrictions from their videos, when appropriate under YouTube's policies, in response to their appeals. ¶¶ 186, 223, 227, 230, 233, 236.a.

While YouTube strives to make its service welcoming to content creators regardless of their background, sexual orientation, or gender identity, YouTube is not a free-for-all. The use of its service is governed by rules and an array of content policies. ¶¶ 10, 248, 288. Before creating channels and uploading their content to the service, Plaintiffs acknowledge they agreed to YouTube's Terms of Service and the incorporated Community Guidelines. ¶¶ 10, 14, 59, 248, 331. The Terms of Service provide that "YouTube reserves the right to remove Content without prior notice," including videos uploaded by content creators. Ex. 2.[3] The Community Guidelines are twelve "common-sense rules" prohibiting certain kinds of content, including "[n]udity or sexual content" and "[v]ulgar language." Exs. 3-4. Google and YouTube reserve the right to remove any content that they believe to be contrary to the Terms of Service and the incorporated Community Guidelines. Ex. 2.

**B.    Restricted Mode**

Some videos are consistent with YouTube's Community Guidelines but may nonetheless be inappropriate for more sensitive viewers. To make YouTube more inclusive for such viewers, while still allowing a wide range of content on the platform, YouTube offers a feature called Restricted Mode—an optional, opt-in setting that screens out content flagged as age-restricted or "potentially adult." ¶¶ 78-79; Ex. 12. "[P]otentially adult content" may fall within one or more of six categories, including "[o]verly detailed" discussions of sex or "overly sexualized" depictions or scenarios. ¶ 85; Ex. 12. Videos are flagged for exclusion from Restricted Mode in two ways— automatically by software that checks "'signals' like the video's metadata, title, and the language used in the video" and by human reviewers. ¶ 81; Ex. 12. Creators who believe their content has been wrongly excluded from Restricted Mode may appeal to YouTube. *Id.*

---

[3] Effective December 10, 2019, YouTube replaced this reservation with a functionally identical one: "YouTube is under no obligation to host or serve Content." Ex. 1.

Importantly, videos excluded from Restricted Mode are invisible only to the "small subset of users" who choose to enable it. Ex. 12. Only "about 1.5 percent of YouTube's daily views" come from accounts that have enabled Restricted Mode. ¶¶ 78-80. Excluded videos, as long as they comply with the Community Guidelines, remain freely available on YouTube's general service where they can be seen by anyone who has not turned on Restricted Mode. Exclusion from Restricted Mode, moreover, does not render a video ineligible for monetization. Ex. 12.

### C.    YouTube's Advertising Policies

YouTube allows content creators whose channels meet certain minimum viewership requirements to earn revenue from (or "monetize") their videos by running advertisements with them as part of the YouTube Partner Program. To be eligible to monetize their videos, in addition to the Terms of Service and Community Guidelines discussed above, Plaintiffs agreed to certain additional "written contracts," including YouTube's Partner Program Terms and the AdSense Terms of Service. *See* ¶ 331; Exs. 5-6, 10. In addition, Plaintiffs agreed to comply with YouTube's monetization policies, including the Advertiser-friendly content guidelines, which are designed to ensure that ads do not appear alongside videos with content that certain audiences might find objectionable. *See* ¶¶ 152, 248, 331; Exs. 5-11. YouTube uses automated software to identify content as inappropriate for advertising, and creators may appeal demonetization decisions for manual review. ¶ 94; Ex. 9.

The YouTube Partner Program Terms provide that "YouTube is not obligated to display any advertisements alongside your videos and may determine the type and format of ads available on the YouTube Service." Ex. 6. The AdSense Terms and Conditions also make clear that Google reserves the rights to "refuse or limit [a content creator's] access" to advertising services and "refuse to provide" those services to a creator's content. Ex. 10. Similarly, YouTube's advertising guidelines explain that "YouTube reserves the right, at its discretion, to not show ads on videos and watch pages."  Ex. 11.

### D.      Plaintiffs and Their Claims Against Google

Plaintiffs are individuals and entities who produce video content intended for or discussing issues affecting people with LGBTQ+ identities. ¶¶ 35-44. Plaintiffs' content includes news programs, music videos, "day-in-the-life" video logs, product reviews, educational videos for children, films, episodic series, and comedy sketches. *Id.* Each Plaintiff has operated a YouTube channel for at least three years, and some have been uploading videos for over a decade. *Id.* No Plaintiff alleges that they are currently prohibited from uploading content to YouTube or that their videos (other than videos they removed themselves) are presently unavailable on YouTube's general service (that is, without Restricted Mode turned on). Rather, Plaintiffs' allegations are far more limited: they claim that YouTube excluded some (but not all) of their videos from Restricted Mode, deemed some (but not all) of their videos inappropriate for advertising (or "demonetized" them), and took other actions that allegedly made it harder for viewers to find or access their videos and channels.[4]

Plaintiffs attempt to pile up these contractually-permitted alleged restrictions and weave them into a sprawling and vaguely defined attack. The Complaint is rife with conclusory rhetoric characterizing YouTube's actions as "a pretext," "discriminatory," "[a]rbitrary," "capricious," and even "anticompetitive." *E.g.*, ¶¶ 9, 17, 24-25, 88. Based on these allegations, Plaintiffs seek declaratory and injunctive relief and monetary damages against Google and YouTube based on seven causes of action, which are discussed in detail below. Plaintiffs also purport to represent a putative class consisting of all YouTube users and creators and a subclass of all LGBTQ+ YouTube users and creators over a four-year period. ¶ 248.

---

[4] *See* ¶¶ 133, 135 (alleged changes to eligibility requirements for the YouTube Partner Program); ¶¶ 104, 106, 108, 153, 161-162, 178, 216 (alleged changes to new-video notifications for subscribers); ¶¶ 160, 177, 213.f (subscriptions allegedly deleted); ¶¶ 103, 163, 179, 192, 213.c (custom "thumbnail" images allegedly deleted); ¶¶ 165, 181, 231 (videos allegedly excluded from a window that recommends videos); ¶¶ 26.n, 110-112, 181, 187, 209, 341 (anti-LGBTQ+ content allegedly allowed to appear near Plaintiffs' videos); ¶¶ 172, 225 (users allegedly unable to post comments); ¶¶ 114, 203-207, 213.d, 341 (other users allegedly posting hateful comments); ¶¶ 213.e, 236.c, 247.b (other users allegedly copying Plaintiffs' videos to their own channels); ¶¶ 101, 225, 231 (videos allegedly prevented from appearing in search results).

1

**ARGUMENT**

2    To survive a motion under Rule 12(b)(6), "[t]hreadbare recitals of the elements of a cause

3    of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S.

4    662, 678 (2009). Instead, Plaintiffs must allege "factual content that allows the court to draw the

5    reasonable inference that the defendant is liable for the misconduct alleged." *Id.* The Court is not

6    required to "assume the truth of legal conclusions merely because they are cast in the form of

7    factual allegations." *Prager I*, 2018 U.S. Dist. LEXIS 51000, at *9 (quoting *Fayer v. Vaughn*,

8    649 F.3d 1061, 1064 (9th Cir. 2011)). Nor should the Court accept allegations that contradict

9    documents attached to the Complaint or incorporated by reference, *Gonzalez v. Planned*

10   *Parenthood of L.A.*, 759 F.3d 1112, 1115 (9th Cir. 2014), or that rest on "unwarranted deductions

11   of fact[] or unreasonable inferences," *Sepehry-Fard v. MB Fin. Servs.*, 2014 U.S. Dist. LEXIS

12   71568, at *4 (N.D. Cal. May 23, 2014)).

13   **I.    GOOGLE IS PROTECTED FROM PLAINTIFFS' CLAIMS BY SECTION 230**

14   To facilitate the growth of the Internet and protect the self-regulatory judgments of online

15   service providers, Congress enacted Section 230 of the Communications Decency Act, 47 U.S.C.

16   § 230. *See Batzel v. Smith*, 333 F.3d 1018, 1027–28 (9th Cir. 2003). The statute immunizes

17   online platforms from claims seeking to hold them liable for acting as a "publisher or speaker" of

18   content submitted by another. § 230(c)(1). It also provides a separate immunity that bars claims

19   based on providing users with tools to block objectionable content. § 230(c)(2)(B).

20   To "protect websites not merely from ultimate liability, but from having to fight costly

21   and protracted legal battles," *Fair Hous. Council v. Roommates.com, LLC*, 521 F.3d 1157, 1174–

22   75 (9th Cir. 2008) (en banc), Section 230 immunity attaches "at the earliest possible stage of the

23   case," *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 255 (4th Cir. 2009). It

24   is well settled that this protection can and, where appropriate, should be applied at the pleading

25   stage. *See, e.g.*, *Kimzey v. Yelp! Inc.*, 836 F.3d 1263, 1265–66 (9th Cir. 2016) (affirming

26   dismissal of claims barred by Section 230). This is such a case: each of Plaintiffs' claims seeks to

27   hold YouTube liable for acts undertaken as publishers of Plaintiffs' videos, which is prohibited

28   by Section 230(c)(1). *See, e.g.*, *Sikhs for Justice "SFJ", Inc. v. Facebook, Inc.*, 144 F. Supp. 3d

1088, 1095 (N.D. Cal. 2015); *Prager II*, 2019 Cal. Super. LEXIS 2034, at *26–27. Plaintiffs'

claims are also independently barred by Section 230(c)(2)(B) insofar as they are premised on

exclusion of some of their videos from Restricted Mode. *See Prager II*, 2019 Cal. Super. LEXIS

2034, at *24-26 (same).

A.     **Google is Protected by Section 230(c)(1)**

Section 230(c)(1) provides that "[n]o provider or user of an interactive computer service

shall be treated as the publisher or speaker of any information provided by another information

content provider." 47 U.S.C. § 230(c)(1). This provision "precludes courts from entertaining

claims that would place a computer service provider in a publisher's role. Thus, lawsuits seeking

to hold a service provider liable for its exercise of a publisher's traditional editorial functions—

such as deciding whether to publish, withdraw, postpone or alter content—are barred." *Zeran v.*

*Am. Online, Inc.*, 129 F.3d 327, 330 (4th Cir. 1997); *accord Batzel*, 333 F.3d at 1031 n.18. As

the Ninth Circuit has explained, "publication involves reviewing, editing, and deciding whether

to publish or to withdraw from publication third-party content." *Barnes v. Yahoo!, Inc.*, 570 F.3d

1096, 1102 (9th Cir. 2009))), *aff'd*, 697 F. App'x 526 (9th Cir. 2017). It follows that "any

activity that can be boiled down to deciding whether to exclude material that third parties seek to

post online is perforce immune under section 230." *Id.* (quoting *Roommates.com*, 521 F.3d at

1170–71). That includes applying content review systems to user submissions, *Westlake Legal*

*Grp. v. Yelp, Inc.*, 599 F. App'x 481, 485 (4th Cir. 2015), controlling access to content based on

users' age, *Doe v. MySpace Inc.*, 528 F.3d 413, 420 (5th Cir. 2008), and deciding what content to

pair with ads, *Gonzalez v. Google Inc.*, 282 F. Supp. 3d 1150, 1168 (N.D. Cal. 2017).

Courts in this District and nationwide have repeatedly applied Section 230(c)(1) to reject

claims that attempt to hold online platforms liable for their decisions about how to regulate or

moderate user-submitted content. *See, e.g.*, *SFJ*, 144 F. Supp. 3d at 1095 (Facebook immune for

removing user's page); *King v. Facebook, Inc.*, 2019 U.S. Dist. LEXIS 151582, at *8-10 (N.D.

Cal. Sept. 5, 2019) (same for claims arising from Facebook "removing [plaintiff's] posts,

blocking his content, or suspending his accounts"); *Brittain v. Twitter, Inc.*, 2019 U.S. Dist.

LEXIS 97132, at *7-8 (N.D. Cal. June 10, 2019) (Twitter immune from claims based on

"deletion of [plaintiff's] Accounts").[5]  Following this line of cases, the state court in *Prager II* recently applied section 230(c)(1) to dismiss a case asserting the very same causes of action asserted here based on the very same conduct—YouTube excluding videos from Restricted Mode and demonetizing them. 2019 Cal. Super. LEXIS 2034, at *26-30.

Plaintiffs' claims fail for the same reason. Each of the three elements required for immunity is present. *See Barnes,* 570 F.3d at 1100-01 (three-part test). *First*, there can be no dispute that Google and YouTube are "interactive computer service" providers. *E.g.*, *Prager II*, 2019 Cal. Super. LEXIS 2034, at *20 n.2; *Darnaa, LLC v. Google, Inc.*, 2016 U.S. Dist. LEXIS 152126, at *20-21 (N.D. Cal. Nov. 2, 2016); *Lancaster*, 2016 U.S. Dist. LEXIS 88908, at *7. *Second*, Plaintiffs' claims are plainly based on content that they produced and uploaded to YouTube. There is no allegation (nor could there be) that YouTube created or developed the content at issue. ¶¶ 269, 281-282, 291, 298, 306, 313, 317. Because that content was "provided by another information content provider," Section 230(c)(1) applies. 47 U.S.C. § 230(c)(1); *SFJ*, 144 F. Supp. 3d at 1094-95.

*Third,* Plaintiffs' claims treat YouTube as a publisher by attacking YouTube's performance of traditional editorial functions. While presented under various causes of action, Plaintiffs' theories of liability amount to direct attacks, just as in *Prager II*, on YouTube's decisions to exclude certain videos from Restricted Mode, ¶¶ 297, 313, 319, 326, 334, 342-346, and its determinations that certain videos are not appropriate for advertisements, ¶¶ 297, 313, 319, 326, 334. These are all classic examples of YouTube's exercise of editorial judgments, which fall squarely within section 230(c)(1)'s protections. As the court in *Prager II* explained, "challenges to a service provider's editorial discretion 'treat' the provider 'as a publisher.'" 2019 Cal. Super. LEXIS 2034, at *26–27 (citing *SFJ*, 144 F. Supp. 2d 1088).

---

[5] *See also, e.g.*, *Federal Agency of News LLC v. Facebook, Inc.*, 2020 U.S. Dist. LEXIS 6159, at *14-25 (N.D. Cal. Jan. 13, 2020) (removal of Facebook account); *Domen v. Vimeo, Inc.*, 2020 U.S. Dist. LEXIS 7935, at *14-19 (S.D.N.Y. Jan. 14, 2020) (terminating Vimeo account); *Mezey v. Twitter, Inc.*, 2018 U.S. Dist. LEXIS 121775, at *1, *3 (S.D. Fla. July 19, 2018) (suspension of Twitter account); *Lancaster v. Alphabet Inc.*, 2016 U.S. Dist. LEXIS 88908, at *7–8 (N.D. Cal. July 8, 2016) (removal of YouTube videos); *Green v. YouTube, LLC*, 2019 U.S. Dist. LEXIS 55577, at *3-4, *15 (D.N.H. Mar. 13, 2019) (blocking content, closing or deleting accounts), *report & rec'n adopted* , 2019 U.S. Dist. LEXIS 54101 (D.N.H. Mar. 29, 2019).

The Complaint rattles off a list of other alleged misconduct of mostly unspecified significance that exemplifies YouTube's role as a publisher of user-submitted content. Plaintiffs allege that YouTube (1) changed the requirements for the YouTube Partner Program such that some Plaintiffs were no longer eligible, ¶¶ 133, 135; (2) changed the manner in which subscribers receive notifications of new videos, ¶¶ 106, 108, 153, 161-162, 178, 216; (3) deleted subscribers' subscriptions, ¶¶ 160, 177, 213.f; (4) deleted some custom "thumbnail" images displayed with Plaintiffs' videos in search results, ¶¶ 163, 179, 192, 213.c; (5) excluded some of Plaintiffs' videos from a window that recommends additional videos to watch, ¶¶ 165, 181, 231; (6) failed to prevent videos and ads with anti-LGBTQ+ content from appearing near some of Plaintiffs' videos, ¶¶ 26.n, 110-112, 181, 187, 209, 341; (7) disabled users from posting comments on some of Plaintiffs' videos, ¶¶ 172, 225; (8) failed to prevent other YouTube users from posting hateful comments, ¶¶ 114, 203-207, 213.d, 341; (9) failed to prevent other YouTube users from copying some of Plaintiffs' videos to their own channels, ¶¶ 213.e, 236.c, 247.b; and (10) prevented videos from appearing in search results, ¶¶ 225, 231.

Like the decisions regarding Restricted Mode and monetization, each of these alleged actions represents a decision by YouTube regarding whether and how to display content produced by others—what kinds of content to pair with ads, how to organize and present content to viewers, and whether and how to enable viewers to interact with content. These are decisions a publisher makes, and as such they are immunized by Section 230(c)(1). *See Gonzalez*, 282 F. Supp. 3d at 1168 (Section 230(c)(1) bars claims based on pairing content with ads); *Levitt v. Yelp! Inc.*, 2011 U.S. Dist. LEXIS 124082, at *20 (N.D. Cal. Oct. 26, 2011) (Section 230(c)(1) bars claims based on changing the order in which Yelp reviews appear), *aff'd*, 765 F.3d 1123 (9th Cir. 2014); *cf. Force v. Facebook, Inc.*, 934 F.3d 53, 66 (2d Cir. 2019) ("arranging and distributing third-party information inherently forms 'connections' and 'matches' among speakers, content, and viewers of content, whether in interactive internet forums or in more traditional media. That is an essential result of publishing.").

### B.    Google's Restricted Mode Decisions are Protected by Section 230(c)(2)(B)

In addition to being barred by Section 230(c)(1), Plaintiffs' claims—insofar as they rely on exclusion from Restricted Mode—fail independently under the separate immunity provided by Section 230(c)(2)(B). This provision immunizes a provider of an "interactive computer service" as to "any action taken to enable or make available" to a user "the technical means to restrict access" to "material that the provider or user considers to be obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable." 47 U.S.C. § 230(c)(2)(A)-(B).[6] The immunity "covers actions taken to enable or make available *to others* the technical means to restrict access to objectionable material." *Zango*, 568 F.3d at 1173–75. It applies whether the service provider or the user decides what kinds of objectionable material to filter out, *id.* at 1176.

As Judge Walsh recognized in *Prager II,* Section 230(c)(2)(B) bars claims seeking to hold YouTube liable for its decisions about how to apply Restricted Mode. 2019 Cal. Super. LEXIS 2034, at *25-26. After all, Restricted Mode is precisely the kind of tool covered by this immunity: it gives YouTube users the "technical means" to "restrict access" to content that they or YouTube deem "objectionable" for especially sensitive users (including material that may be too sexually explicit or violent). Indeed, it is a paradigm example of technology designed to "maximize user control" and to "empower parents to restrict their children's access to objectionable or inappropriate online material"—exactly what Congress intended Section 230(c)(2)(B) to encourage and protect. 47 U.S.C. § 230(b)(3)-(4).

Plaintiffs may point to the holding in *Enigma Software Group USA, LLC v. Malwarebytes, Inc.*, 946 F.3d 1040, 2019 U.S. App. LEXIS 38784 (9th Cir. Dec. 31, 2019), that content-restriction decisions driven by "anticompetitive animus" are not protected by Section 230(c)(2)(B). *Id.* at *21-23. But *Enigma's* narrow holding does not apply to this case. The key point in *Enigma* (emphasized throughout the Ninth Circuit's opinion) was that the plaintiff and defendant were "direct competitors"—business rivals that sold competing computer security

---

[6] The text of section 230(c)(2)(B) refers to section 230(c)(1), rather than section 230(c)(2)(A), which lists examples of objectionable content. Courts interpret this as a typographical error. *Zango, Inc. v. Kaspersky Lab, Inc.*, 568 F.3d 1169, 1173 n.5 (9th Cir. 2009).

software. *Id.* at \*12-13, \*20-21. Here, in contrast, YouTube and Plaintiffs are not direct competitors: Plaintiffs do not operate a video hosting platform, nor do they provide a rival tool for reviewing or restricting access to content. Plaintiffs are *users* of YouTube's services—not *competitors* with it. And Plaintiffs cannot evade the clear command of Section 230(c)(2)(B) to protect tools like Restricted Mode by tossing in token and facially implausible assertions of anticompetitive motive.

### C.    Plaintiffs Cannot Evade the Immunity Afforded by Section 230

Perhaps recognizing that a straightforward application of Section 230 bars Plaintiffs' claims, the Complaint advances the surprising argument that Section 230 is unconstitutional—a violation of Plaintiffs' rights under the First Amendment and the Fourteenth Amendment's Equal Protection Clause. ¶¶ 250.m, 258–262, 280–282. This argument is contrary to two decades of case law, which has consistently applied Section 230 immunity to protect online services like YouTube. Not only that, similar constitutional objections to Section 230 have been roundly rejected in the few cases where they have been raised. *See Green v. AOL*, 318 F.3d 465, 472 (3d Cir. 2003) (Section 230 does not violate the First Amendment); *Prager II*, 2019 Cal. Super. LEXIS 2034, at \*30 (same); *La'Tiejira v. Facebook, Inc.*, 272 F. Supp. 3d 981, 994-95 (S.D. Tex. 2017) (same); *Parker v. PayPal, Inc.*, 2017 U.S. Dist. LEXIS 130800, at \*16-17 (E.D. Pa. Aug. 16, 2017) (Section 230 does not violate due process or the Tenth Amendment).

For good reason: Section 230's protections against certain forms of civil liability do not remotely violate the Constitution. Section 230 does not require, coerce, or pressure online service providers to censor content. *Green*, 318 F.3d at 472 ("Section 230(c)(2) does not require AOL to restrict speech; rather it allows AOL to establish standards of decency without risking liability for doing so."). To the contrary, the statute protects the *voluntary* self-regulatory actions of private online platforms. As the Ninth Circuit has explained, the "statute is designed at once 'to promote the free exchange of information and ideas over the Internet and to encourage voluntary monitoring for offensive or obscene material.'" *Barnes*, 570 F.3d at 1099-1100 (citation omitted). Indeed, the whole purpose of Section 230 was to *avoid* the kind of government censorship that raised constitutional concerns. *See Enigma*, 2019 U.S. Appeal LEXIS 38784, at

*9-10 (discussing history of Section 230 and explaining its proponents' argument that "parents, not government bureaucrats, were better positioned to protect their children from offensive online material"). Rather than ban certain kinds of content from the Internet (or require service providers to block minors or others from accessing it), Section 230 opted for a different approach: leaving content moderation to private online service providers and protecting them (and their users) from liability both for content that they decide to moderate or remove, *SFJ*, 144 F. Supp. 3d at 1095, and for content that they decide to keep up, *Zeran*, 129 F.3d at 330-31.

Far from violating the Constitution, Section 230 actually reinforces the First Amendment rights of online service providers to exercise editorial judgments about how to regulate content on their services. *Accord Miami Herald Pub. Co. v. Tornillo*, 418 U.S. 241, 258 (1974) (First Amendment protects a newspaper's "exercise of editorial control and judgment"); *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 636-37 (1994) (same for cable companies' choice of which channels to carry); *Zhang v. Baidu.com, Inc.*, 10 F. Supp. 3d 433, 440-41 (S.D.N.Y. 2014) (applying these principles to online search engine). By providing a statutory protection that reinforces this core constitutional right to self-regulate, Section 230 does not transform the private judgments of online platforms into government-mandated "prior restraints." As discussed below, it is black-letter law that private parties like YouTube are not state actors and that "merely hosting speech by others" does not make them so. *Manhattan Cmty. Access Corp. v. Halleck*, 139 S. Ct. 1921, 1930-31 (2019). Section 230 does not change that reality. *See La'Tiejira*, 272 F. Supp. 3d at 995 (Facebook's "reliance on the CDA does not constitute 'official action'."). In short, Plaintiff's constitutional attack on Section 230 is frivolous: that established protection applies here and bars Plaintiff's claims.

## II.   PLAINTIFFS FAIL TO STATE A VIABLE CAUSE OF ACTION

Even apart from Section 230, Plaintiffs fail to state any legally viable cause of action.

### A.   Plaintiffs Cannot Assert Claims Under the Federal or State Constitutions

Plaintiffs' claims under both the First Amendment—premised on 42 U.S.C. § 1983—and the California Constitution are based on the theory that YouTube has held itself out as a "public forum," such that its private editorial decisions somehow became state action. ¶¶ 284-288, 306-

308. Every court that has addressed such efforts to treat private online services as state actors has

rejected them. That includes the recent decisions in *Prager*, which dismissed virtually identical

claims under the First Amendment, *Prager I*, 2018 U.S. Dist. LEXIS 51000, at \*26–27, and

under the California Constitution, *Prager II*, 2019 Cal. Super. LEXIS 2034, at \*15-17.[7]   Judge

Koh's First Amendment decision was supported by the U.S. Supreme Court's more recent

holding in *Halleck*, which confirms that a private business owner like YouTube "who opens its

property for speech by others is not transformed by that fact alone into a state actor." 139 S. Ct.

at 1926. This Court need go no further to dismiss Plaintiff's First Amendment claim.

Plaintiffs' related claim under the California Constitution fails for the same reason. Like

the First Amendment, California's Liberty of Speech clause has a "state action" requirement.

*Golden Gateway Ctr. v. Golden Gateway Tenants Ass'n*, 26 Cal. 4th 1013, 1031 (2001).

Plaintiffs may try to rely on the line of cases following *Robins v. Pruneyard Shopping Ctr.*, 23

Cal.3d 899 (1979), *aff'd*, 447 U.S. 74 (1980), which have held that a very limited class of private

real property—e.g., certain shopping malls, *id.* at 910, and a plaza in front of a privately owned

amusement park, *Park Mgmt. Corp. v. In Defense of Animals*, 36 Cal. App. 5th 649, 666

(2019)—can be treated as public forums. For several independent reasons, these cases do not

apply here.

*First*, "[n]o court has expressly extended *Pruneyard* to the Internet generally." *hiQ Labs,*

*Inc. v. LinkedIn Corp.*, 273 F. Supp. 3d 1099, 1116 (N.D. Cal. 2017), *aff'd*, 938 F.3d 985 (9th

Cir. 2019). As Judge Chen explained in rejecting a similar claim under the California

Constitution, the "analogy between a shopping mall and the Internet is imperfect, and there are a

host of potential 'slippery slope' problems that are likely to surface were *Pruneyard* to apply to

---

[7] *See also, e.g., Howard v. Am. Online, Inc.*, 208 F.3d 741, 754 (9th Cir. 2000) (AOL not a state actor); *Amro Elansari v. Jagex Inc.*, 2020 U.S. App. LEXIS 1893, at \*2-3 (3d Cir. Jan. 22, 2020) (private video game developer not a state actor); *Federal Agency of News LLC*, 2020 U.S. Dist. LEXIS 6159, at \*26-42 (Facebook not a state actor); *Freedom Watch, Inc. v. Google, Inc.*, 368 F. Supp. 3d 30, 40 (D.D.C. 2019) (Google, Facebook, Twitter, and Apple not state actors); *Shulman v. Facebook.com*, 2017 U.S. Dist. LEXIS 183110, at \*9 (D.N.J. Nov. 6, 2017) (same); *Kinderstart.com LLC v. Google, Inc.*, 2007 U.S. Dist. LEXIS 22637, at \*39-43 (N.D. Cal. Mar. 16, 2007) (Google not a state actor); *Langdon v. Google, Inc.*, 474 F. Supp. 2d 622, 631-32 (D. Del. 2007) (same). This is not an exhaustive list.

the Internet." *Id*. The state court in *Prager II* also was unwilling to accept this "dramatic expansion" of *Pruneyard*, 2019 Cal. Super. LEXIS 2034, at *17-18, and a federal court should be no more willing to stretch California law beyond any place it has gone before. Indeed, just last month, another federal court reached this same conclusion with respect to another private video-sharing service operator. *See Domen*, 2020 U.S. Dist. LEXIS 7935, at *24-27 ("The Vimeo website is not the equivalent of a California-based shopping center where 'large groups of citizens congregate.'. . . Rather, it is one of many alternative fora where citizens of many different states can choose to post their videos, so long as they abide by Vimeo's Terms of Service." (citation omitted)).

*Second*, this case is particularly ill-suited for a ruling that YouTube is operating a public forum because it does not involve YouTube's general service, but instead particular features—Restricted Mode and YouTube's Partner Program—that are by definition *not* freely and openly accessible to the public. Plaintiffs do not suggest that they were excluded from YouTube or deprived of their ability to use the service. Instead, Plaintiffs' claim is far more limited: they contend that some of their videos were deemed ineligible to appear in Restricted Mode or to be paired with advertising. But these discrete aspects of YouTube's service are in no possible sense a "public forum" under the California Constitution. As Judge Walsh explained in dismissing a virtually identical claim, Google and YouTube "do not give content creators unrestricted access" to Restricted Mode or advertising services "or suggest that they will do so." *Prager II*, 2019 Cal. Super. LEXIS 2034, at *16. Thus, as in *Prager II*, this Court need not address whether YouTube as a whole is a public forum (which it is not) in order to reject Plaintiffs' constitutional claim.

*Third*, Plaintiff's proposed expansion of the California Constitution would violate YouTube's own rights under the First Amendment. As discussed above, it is well settled that platforms for speech have a First Amendment right to make editorial judgments about how and under what circumstances to present and arrange third-party content, including how to select and pair content with advertising. *See, e.g.*, *Tornillo*, 418 U.S. at 258; *accord Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp.*, 515 U.S. 557, 569-70 (1995) (First Amendment protects parade organizer's choice of which groups to include in a parade); *Langdon*, 474 F. Supp. 2d at 629-30

(First Amendment barred attempt to force search engine to place ads prominently in results); *Wash. Post v. McManus*, 944 F.3d 506, 518 (4th Cir. 2019) ("'[T]he simple selection of a paid noncommercial advertisement for inclusion in a daily paper' falls 'squarely within the core of First Amendment security' just as much as any other piece of content."). Any holding that YouTube is liable under state law for making such decisions would run squarely into this right. Basic principles of constitutional avoidance resist any unprecedented application of California law that would set it in conflict with the First Amendment. *Cf. Fair Hous. Council v. Roommate.com, LLC*, 666 F.3d 1216, 1222-23 (9th Cir. 2012) (declining an interpretation of a California statute that would place it at odds with the U.S. Constitution under the "canon of constitutional avoidance").

### B.     Plaintiffs Fail to State a Claim Under the Lanham Act

A claim under section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), can take two forms: false association, § 1125(a)(1)(A); and false advertising, § 1125(a)(1)(B). While the Complaint is difficult to parse, Plaintiffs appear to assert both varieties. Both fail as a matter of law.

### 1.     Plaintiffs' False Advertising Claim Fails as a Matter of Law

The false-advertising prong is directed at a "false designation of origin, false or misleading description of fact, or false or misleading representation of fact" that, "in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another's goods, services, or commercial activities." § 1125(a)(1)(B); *see, e.g.*, *Brosnan v. Tradeline Solutions, Inc.*, 681 F. Supp. 2d 1094, 1099 (N.D. Cal. 2010); *Cook, Perkiss and Liehe, Inc. v. N. Cal. Collection Serv., Inc.*, 911 F.2d 242, 244 (9th Cir. 1990)). According to Plaintiffs, the act of excluding some of their videos from Restricted Mode falsely communicates to a user that the video falls into one of six categories of "potentially mature" content. ¶¶ 343-346. In *Prager I*, Judge Koh rejected a nearly identical claim, 2018 U.S. Dist. LEXIS 51000, at *31-38, and this Court should do likewise.

As an initial matter, this allegation fails—particularly in light of Rule 9(b), which applies to Lanham Act claims involving alleged misrepresentations, *AlterG, Inc. v. Boost Treadmills LLC*, 388 F. Supp. 3d 1133, 1152 (N.D. Cal. 2019)—because Plaintiffs identify no specific

1   "false or misleading statement of fact" implying that Plaintiffs' videos contain objectionable

2   content. *See A.H. Lundberg Assocs., Inc. v. TSI, Inc.*, 2014 U.S. Dist. LEXIS 149603, at *19

3   (W.D. Wash. Oct. 20, 2014). Instead, YouTube's only alleged public statement about Plaintiffs'

4   videos' exclusion from Restricted Mode is incontrovertibly truthful: "This video is unavailable

5   with Restricted Mode enabled. To view this video, you will need to disable Restricted Mode."

6   ¶¶ 83, 343. As a matter of law, no false impression could have flowed from this statement.

7   *Accord Prager II*, 2019 Cal. Super. LEXIS 2034, at *30 n.8; *Song Fi, Inc. v. Google, Inc.*, 2018

8   U.S. Dist. LEXIS 82015, at *4, *11–12 (N.D. Cal. May 15, 2018) (rejecting defamation claim

9   based on statement that video was removed "because its content violated YouTube's Terms of

10   Service."); *Bartholomew v. YouTube, LLC*, 17 Cal. App. 5th 1217, 1232-33 (2017) (same).

11   This theory separately fails because Plaintiffs do not allege that the categories of

12   "potentially mature" content described in YouTube's Restricted Mode guidelines constituted

13   "commercial advertising or promotion." 15 U.S.C. § 1125(a)(1)(B). Plaintiffs' conclusory

14   allegations, ¶¶ 342, 344, fall well short of establishing that these content guidelines were "part of

15   an organized campaign to penetrate the relevant market." *Prager I*, 2018 U.S. Dist. LEXIS

16   51000, at *32 (quoting *Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc.*, 314 F.3d 48, 57

17   (2d Cir. 2002)). As Judge Koh concluded regarding nearly identical allegations, YouTube's

18   Restricted Mode guidelines are more akin to instruction manuals, which "are not advertisements

19   or promotions" within the meaning of section 1125(a)(1)(B). *Prager I*, 2018 U.S. Dist. LEXIS

20   51000, at *34 (quoting *Interlink Prods. Int'l, Inc. v. Cathy Trading, LLC*, 2017 U.S. Dist. LEXIS

21   33548, at *13 (D.N.J. Mar. 9, 2017)); *accord Darnaa, LLC v. Google, Inc.*, 2015 U.S. Dist.

22   LEXIS 161791, at *23-25 (N.D. Cal. Dec. 2, 2015) (notice that plaintiff's video "had been

23   removed for violation of the YouTube Terms of Service" was not "commercial advertising or

24   promotion").

25   Plaintiffs also suggest that YouTube falsely represented itself as "a viewpoint-neutral and

26   politically neutral place for free speech," where "the only content [YouTube] restrict[s] is

27   content that is unprotected by principles of free speech." ¶ 346. These allegations seem to refer to

28   snippets from unspecified posts on YouTube's official blog that YouTube's "'mission' is to

'give people a voice' in a 'place to express yourself' and in a 'community where everyone's voice can be heard,'" and that "YouTube is 'one of the largest and most diverse collections of self-expression in history,' giving 'people opportunities to share their voice and talent no matter where they are from or what their age or point of view.'" ¶ 59; *see also* ¶ 60 (Four Freedoms). As Judge Koh held in rejecting a Lanham Act claim based on the same statements, these quotes "make no concrete and measurable guarantees or representations" and thus are non-actionable puffery. *Prager I*, 2018 U.S. Dist. LEXIS 51000, at *35-38.

That is especially so where the statements coexisted with public-facing guidelines that clearly explain what content is allowed on YouTube's service, what videos may be excluded from Restricted Mode, and what videos are eligible for monetization. *See* ¶¶ 10, 248, 288; Exs. 1-12. As even the Complaint shows, therefore, YouTube has never held itself out as a place where anything goes and where no user content will ever be moderated, much less excluded from appearing in Restricted Mode or from being paired with advertising. *See* ¶¶ 78, 81, 331. YouTube's general statements lauding free speech are not false advertising and cannot give rise to a claim under the Lanham Act.

### 2.    Plaintiffs' False Association Claim Fails as a Matter of Law

As relevant here, the Lanham Act's false association prong creates a claim against "[a]ny person who, on or in connection with any goods or services, . . . uses in commerce . . . any false designation of origin, false or misleading description of fact, or false or misleading representation of fact," which is likely to mislead "as to the *affiliation, connection, or association of such person with another person*." § 1125(a)(1)(A) (emphasis added); *accord Marco Bicego S.P.A. v. Kantis*, 2017 U.S. Dist. LEXIS 95000, at *10 (N.D. Cal. June 20, 2017) (laying out the 5 elements of a false-association claim (citing *Summit Tech., Inc. v. High-Line Med. Instruments, Co.*, 933 F. Supp. 918, 928 (C.D. Cal. 1996))).

Plaintiffs' allegations fail to identify a false *association* of the kind covered by the statute. By its terms, the Lanham Act prohibits only a narrow class of false associations: those that are likely to falsely imply an affiliation between *the person making the designation* (here, YouTube) and "another person". § 1125(a)(1)(A). The statute does not cover misleading

associations between the plaintiff and a third party. *See, e.g., Marco Bicego S.P.A.*, 2017 U.S. Dist. LEXIS 95000, at *9-10. In this case, however, Plaintiffs contend that the alleged appearance of anti-LGBTQ+ videos, advertisements, and comments near Plaintiffs' videos misleads users to believe that various third parties (anti-LGBTQ+ content creators and commenters) are affiliated with *Plaintiffs*. ¶¶ 341, 346. The Complaint offers no allegation of any false association between *YouTube* and any other person. This theory simply is not actionable under the Lanham Act.

Even taken on its own terms, however, Plaintiffs' attempt to state a false association claim is entirely far-fetched. They allege that the occasional appearance of unspecified anti-LGBTQ+ content from other users in Plaintiffs' videos' comment sections, or in video recommendations and advertisements near Plaintiffs' videos, misleads people into believing that Plaintiffs are somehow affiliated with anti-LGBTQ+ groups, and that Google and YouTube deliberately created this misperception. ¶¶ 340-341, 346, 348. On its face, this suggested association makes little sense: Plaintiffs clearly identify as LGBTQ+ creators, so why would third-party anti-gay content suggest any "connection" to the Plaintiffs? Moreover, the Complaint does not point to a single, specific statement by Google or YouTube that supposedly fostered such an association, much less one that amounts to a false or misleading "description" or "representation of fact." Plaintiffs' effort to hold YouTube liable for the statements of unrelated third parties fails to state a claim under the Lanham Act. *See Genus Lifesciences Inc. v. Lannett Co.*, 378 F. Supp. 3d 823, 847-48 (N.D. Cal. 2019) (no liability for third-party statements without allegations of "knowingly inducing" or "materially participating in" them (citing *Duty Free Ams., Inc. v. Estee Lauder Cos.*, 797 F.3d 1248, 1277 (11th Cir. 2015))). It also runs squarely into Section 230(c)(1). *See, e.g., Roommates.com*, 521 F.3d at 1162 ("Section 230 of the CDA immunizes providers of interactive computer services against liability arising from content created by third parties.").

### 3. Plaintiffs Fail to Plead Injury Under the Lanham Act

Finally, any claim under the Lanham Act requires that the alleged false designation or misrepresentation cause the plaintiff harm. *See Summit Tech.*, 933 F. Supp. at 928-29 ("false

1   association" requires that the "plaintiff has been or is likely to be damaged" by the misleading

2   designation); *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 133 (2014)

3   ("false advertising" requires harm "flowing directly from the deception wrought by the

4   defendant's advertising."). Here, however, Plaintiffs do not allege any causal connection

5   between any statement by YouTube and any damages they claim to have sustained. Instead, as in

6   *Prager I*, "any harm that Plaintiff[s] suffered was caused by [YouTube's] decisions to limit

7   access to some of Plaintiff[s'] videos," 2018 U.S. Dist. LEXIS 51000, at *35, *38, or its

8   decisions not to allow certain of Plaintiffs' videos to be monetized—not by general statements in

9   Google's and YouTube's policies and guidelines or by the alleged appearance of other users'

10  anti-LGBTQ+ content in proximity to some of Plaintiffs' videos. This independently defeats

11  Plaintiffs' claim.[8]

12      **C.      Plaintiffs Fail to State a Claim Under the Unruh Act**

13      "[A] plaintiff seeking to establish a case under the Unruh Act must plead and prove

14  intentional discrimination in public accommodations in violation of the terms of the Act. A

15  disparate impact analysis or test does not apply to Unruh Act claims." *Harris v. Capital Growth

16  Investors XIV*, 52 Cal. 3d 1142, 1175 (1991). The Unruh Act "does not extend to practices and

17  policies that apply equally to all persons." *Turner v. Association of American Medical Colleges*,

18  167 Cal. App. 4th 1401, 1408 (2008). Accordingly, a "policy that is neutral on its face is not

19  actionable under the act, even when it has a disproportionate impact on a protected class." *Id*.;

20  *accord Greater L.A. Agency on Deafness, Inc. v. CNN, Inc.*, 742 F.3d 414, 425 (9th Cir. 2014)

21  (Unruh Act plaintiff must "allege, and show, more than the disparate impact of a facially neutral

22  policy.").

23      Here, Plaintiffs cannot point to any YouTube policy that, by its terms, discriminates on

24  the basis of sexual orientation or gender identity. Plaintiffs do not allege (nor could they) that

25  YouTube's Restricted Mode or advertising policies contain provisions that discriminate against

26

27          [8] Because Plaintiffs fail to state a claim under either the First Amendment or the Lanham Act,
    this Court may decline to maintain supplemental jurisdiction over the state-law claims. 28 U.S.C.
28  § 1367(c)(3); *Prager I*, 2018 U.S. Dist. LEXIS 51000, at *42-44.

LGBTQ+ creators or content. By their terms, those policies apply equally to all creators, no matter their sexual orientation or gender identity. Exs. 9, 12. And nothing in those policies calls for or contemplates imposing greater restrictions on content that addresses LGBTQ+ issues. Insofar as the Unruh Act claim is premised on the idea that the impact of YouTube's facially neutral policies is felt more heavily by Plaintiffs than other creators, that theory fails as a matter of law. *See, e.g.*, *Gladwin v. Square, Inc.*, 2020 Cal. Super. LEXIS 1, at *12-21 (Cal. Super. Ct. Jan. 10, 2020) (dismissing Unruh Act claim based on application of facially neutral terms of use policy).

　　　　And that, indeed, is the theory advanced in Plaintiff's Complaint. For example, Plaintiffs allege that YouTube's systems flagged some of Plaintiffs' videos for exclusion from Restricted Mode or for demonetization, while leaving allegedly similar, non-LGBTQ+ content unrestricted. *E.g.*, ¶ 170 (BriaAndChrissy), ¶ 196 (Watts The Safeword). By their terms, these are disparate impact claims. *See, e.g.*, ¶ 214 (noting "how Google/YouTube's recent changes to the algorithm had disproportionately affected the LGBTQ+ YouTube creators and viewers"). That is not enough. *See CNN*, 742 F.3d at 426 (disparate impact on hearing-impaired viewers did not state an Unruh Act claim based on alleged policy of not captioning videos); *Earll v. eBay, Inc.*, 599 F. App'x 695, 696 (9th Cir. 2015) (eBay's "aural identification system" not discriminatory due to mere disparate impact on hearing-impaired users); *Chiu v. Pendragon N. Am., Inc.*, 2019 U.S. Dist. LEXIS 169952, at *15-17 (C.D. Cal. May 6, 2019) (car dealerships' requirements not discriminatory under Unruh Act absent allegations that they applied only to Asian customers).

　　　　Likewise, Plaintiffs' conclusory assertions that Google and YouTube deliberately programmed YouTube's algorithms to flag videos containing LGBTQ+ content, ¶¶ 7, 17, 26.c, 95, 98, rest, at best, on Plaintiffs' guess about the reasons their videos were restricted, ¶ 183. This "classic speculative conclusion" falls well short of stating a claim. *DeHoog v. Anheuser-Busch InBev SA/NV*, 899 F.3d 758, 765 (9th Cir. 2018); *see also CNN*, 742 F.3d at 426 (conclusory assertions of discriminatory intent insufficient under Unruh Act). In short, nothing in

1   the Complaint plausibly alleges that YouTube took any specific, concrete action with the intent

2   to discriminate against the video's creator based on sexual orientation or gender identity.[9]

3          The facts alleged in the Complaint actually undercut any such claim. The Complaint

4   acknowledges, for example, that none of the Plaintiffs were kicked off or stopped from using

5   YouTube. Even as to the Restricted Mode and advertising-related allegations that are the focus

6   of the Complaint, Plaintiffs admit that the restrictions they complain about affected only a

7   handful of their videos. It is undisputed that many, if not most, of Plaintiffs' videos were allowed

8   to appear in Restricted Mode and to earn advertising revenue. *See* ¶¶ 170, 180, 182, 193, 213

9   (not all Plaintiffs' videos excluded from Restricted Mode or demonetized); ¶¶ 157, 173-175, 190,

10  212, 217, 234, 238 (ad revenues earned by Plaintiffs). What is more, Plaintiffs admit that

11  YouTube often re-monetized or removed restrictions from their videos (when appropriate under

12  YouTube's policies) in response to their appeals. ¶¶ 186, 223, 227, 230, 233, 236.a. These facts,

13  which are apparent from the Complaint, are inconsistent with any claim that YouTube

14  intentionally suppressed Plaintiffs' content because of Plaintiffs' LGBTQ+ identity. Instead, they

15  underscore that this case is about Plaintiff's disagreement with various content-moderation

16  decisions that YouTube made. Plaintiffs believe that YouTube has on occasion misapplied its

17  own general, facially neutral content policies in ways that fell more heavily on Plaintiffs than

18  other creators. Even accepting those allegations as true, this simply is not the kind of intentional

19  discrimination required for a violation of the Unruh Act.

20         Finally, Plaintiffs' discrimination claim is undermined by their own acknowledgment of

21  YouTube's considerable LGBTQ+ outreach efforts: YouTube invited Plaintiffs and other

22  _____

23      [9] Plaintiffs refer to isolated remarks by a "floor manager" at an overseas Google call center claiming that an ad Plaintiff Chris Knight attempted to purchase was disapproved because of its

24  LGBTQ+ content, ¶¶ 20, 24, 26.e, 32, 122, 134, 146, 345, Compl. Ex. A, but this does not permit a plausible inference that Google and YouTube harbored any anti-LGBTQ+ animus. This is

25  particularly so given that Google and YouTube later apologized to Mr. Knight, assured him the comments were a "misunderstanding," and, moreover, ran his ad (which had never actually been

26  disapproved). *See* ¶ 123; *Earll v. eBay, Inc.*, 2011 U.S. Dist. LEXIS 100360, at *8-9 (N.D. Cal. Sept. 6, 2011) (eBay representatives' advice that plaintiff get the help of "a hearing person"

27  failed to plead intentional discrimination where others directed plaintiff to services for hearing-impaired users); *Garcia v. Clovis Unified Sch. Dist.*, 627 F. Supp. 2d 1187, 1210-11 (E.D. Cal.

28  2009) (one teacher's misconduct did not establish school district's "deliberate indifference" where the district "took steps to address [plaintiff's] complaints").

1   LGBTQ+ creators to pitch LGBTQ+-themed series, ¶ 159, sponsored such programs, ¶ 199,

2   encouraged Plaintiffs to post videos about their relationships, ¶ 158, and contracted with

3   LGBTQ+ content creators to offer for sale a television show aimed at an LGBTQ+ audience,

4   ¶ 238. These allegations confirm that YouTube—far from displaying anti-LGTBQ+ animus—

5   embraced the LGBTQ+ community, and they belie any suggestion that the content-moderation

6   decisions at issue here amounted to willful *speaker-based* discrimination based on sexual

7   orientation or gender identity. *Accord Cullen v. Netflix, Inc.*, 880 F. Supp. 2d 1017, 1024-25

8   (N.D. Cal. 2012) (Netflix's effort to increase the number of captioned videos "offset an inference

9   of intentional discrimination" against hearing-impaired users).[10]

10  **D.      Plaintiffs Fail to State a Claim Under the UCL**

11          The UCL "establishes three varieties of unfair competition"—unlawful, unfair, or

12  fraudulent. *Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*, 20 Cal. 4th 163, 180 (1999). The

13  "unlawful" prong "'borrows' violations of other laws and treats them as unlawful practices." *Id.*

14  Plaintiffs cannot state a claim under this prong because they fail to allege a predicate unlawful

15  act. *Accord Oracle Am., Inc. v. CedarCrestone, Inc.*, 938 F. Supp. 2d 895, 908 (N.D. Cal. 2013).

16          The UCL defines an "unfair" business practice differently depending on whether the

17  plaintiff sues as a competitor or as a consumer. If they are trying to sue as competitors, which is

18  far from clear, Plaintiffs must allege conduct that "threatens an incipient violation of an antitrust

19  law . . . or otherwise significantly threatens or harms competition." *Cel-Tech*, 20 Cal. 4th at 187.

20  Needless to say, Plaintiffs assert nothing close to that; instead, they present threadbare

21  conclusions that Google and YouTube compete with them by posting their own unspecified

22  

23          [10] Plaintiffs' allegations face other internal contradictions. The Complaint frequently
    compares what happened to one of Plaintiffs' videos with an allegedly similar video by another
24  LGBTQ+ content creator. *See, e.g.*, ¶ 184 (Chase Ross's reviews of products for trans men
    excluded from Restricted Mode, but not other trans product reviews), ¶ 192 (custom thumbnails
25  deleted from Watts The Safeword videos, but not identical videos on the channels of LGBTQ+
    collaborators), ¶¶ 197, 199 (Watts the Safeword videos excluded from Restricted Mode or
26  demonetized, but not similar videos by other LGBTQ+ creators). These allegations further
    undercut the notion that YouTube deliberately applied its policies to harm LGBTQ+ creators.
27  *See, e.g.*, *Sam Rubin Entm't, Inc. v. AARP, Inc.*, 2016 U.S. Dist. LEXIS 174457, at *14 (C.D.
    Cal. Dec. 16, 2016) ("internal inconsistencies between Plaintiff's allegations place[] them in
28  tension with the facial plausibility required in Twombly/Iqbal").

1   videos. ¶¶ 13, 69-74, 339. The thrust of Plaintiffs' allegations is that YouTube placed restrictions

2   on Plaintiffs' videos but not on allegedly similar videos by third parties. As a matter of law, this

3   is not enough to show anticompetitive intent on Google's or YouTube's part. *See*

4   *Kinderstart.com*, 2007 U.S. Dist. LEXIS 22637, at *18 (directing traffic to "*third-party* sites that

5   competed with KinderStart" did not show Google's intent to monopolize the search market).

6   "Injury to a competitor is not equivalent to injury to competition." *Cel-Tech*, 20 Cal. 4th at 186.

7        Instead, the thrust of Plaintiffs' claim appears to be that Google and YouTube acted

8   unfairly by allegedly misleading the public about YouTube's nature as a platform for free

9   expression. ¶ 326. Whether offered under the "unfair" prong or the "fraudulent" prong, this claim

10   fails for the same reasons as Plaintiffs' Lanham Act "false advertising" claim—YouTube's

11   statements about free expression and keeping an open platform are non-actionable, particularly

12   when viewed alongside YouTube's specific policies regarding Restricted Mode and advertising.

13   *Prager II*, 2019 Cal. Super. LEXIS 2034, at *32-33. And as for the statements that Plaintiffs'

14   videos were excluded from Restricted Mode, the Complaint fails to allege that Plaintiffs relied

15   on these statements in any way. *See Kwikset Corp. v. Super. Ct.*, 51 Cal. 4th 310, 326-27 (2011)

16   (plaintiff "must demonstrate actual reliance on the allegedly deceptive or misleading

17   statements"). Finally, Plaintiffs fail to allege financial harm as a result of any allegedly false

18   statement, as opposed to YouTube's decision to make certain of their videos less visible or

19   demonetize them. *Prager II*, 2019 Cal. Super. LEXIS 2034, at *33-34.

20        **E.      Plaintiffs Fail to State a Claim for Breach of Implied Covenant**

21        Plaintiffs allege that, through unspecified "acts and omissions," YouTube breached an

22   implied covenant of good faith and fair dealing arising from the contractual agreements between

23   each Plaintiff and YouTube. ¶¶ 331, 334. However, no breach of the implied covenant can occur

24   where the governing contracts "expressly authorized" the defendant's actions. *Storek & Storek,*

25   *Inc. v. Citicorp Real Estate, Inc.*, 100 Cal. App. 4th 44, 56-57 (2002). Plaintiffs allege no

26   conduct on YouTube's part that was not authorized by the express terms each Plaintiff agreed to

27   when signing up to use YouTube.

28

The Terms of Service expressly provide that "YouTube reserves the right to remove Content without prior notice." Ex. 2. Likewise, the YouTube Partner Program Terms explain that "YouTube is not obligated to display any advertisements alongside your videos and may determine the type and format of ads available on theYouTube Service." Ex. 6. Finally, Google and YouTube's policies regarding advertising and monetization reserve "the right to refuse or limit your access to [AdSense] Services," as well as "the right, at [YouTube's] discretion, to not show ads on videos and watch pages." Exs. 10-11. These terms reserve to YouTube the right to exclude videos from Restricted Mode and to deem videos ineligible for monetization. Given that the Terms of Service define "Content" broadly to include "text, software, scripts, graphics, photos, sounds, music, videos, audiovisual combinations, interactive features and other materials," Ex. 2, YouTube's right to exclude "Content" also covers Plaintiffs' allegations of deleted custom thumbnails, deleted subscriptions, changed notification functions, "shadow banned" videos, and all the other actions Google and YouTube allegedly took with regard to the content of Plaintiffs' videos and channels. Because these express contractual provisions permit the conduct of which Plaintiffs complain, Plaintiffs' claim for breach of the implied covenant of good faith and fair dealing must fail. *See Prager II*, 2019 Cal. Super. LEXIS 2034, at *31-32; *see also Sweet v. Google Inc.*, 2018 U.S. Dist. LEXIS 37591, at *25-26 (N.D. Cal. Mar. 7, 2018) (YouTube's decision not to allow plaintiff to monetize videos did not violate implied covenant because Terms of Service expressly authorized Google to withhold ads from videos).[11]

## **CONCLUSION**

For the foregoing reasons, the Complaint should be dismissed with prejudice.

---

[11] Because Plaintiffs' claim for declaratory relief (Count VIII) is based on their other claims—all of which are barred by the CDA and fail on their own merits—it too must be dismissed. *Karimi v. GMAC Mortg.*, 2011 U.S. Dist. LEXIS 136071, at *15–16 (N.D. Cal. Nov. 28, 2011).

1    Dated:  February 3, 2020                    WILSON SONSINI GOODRICH & ROSATI
                                                Professional Corporation
2
                                                By: _____ /s/ Lauren Gallo White _____
3                                                       Lauren Gallo White

4                                               Attorneys for Defendants
                                                GOOGLE LLC and YOUTUBE, LLC
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28