BROWNE GEORGE ROSS LLP
Peter Obstler (State Bar No. 171623)
  pobstler@bgrfirm.com
44 Montgomery Street, Suite 1280
San Francisco, California 94104
Telephone: (415) 391-7100; Facsimile: (415) 391-7198

BROWNE GEORGE ROSS LLP
Eric M. George (State Bar No. 166403)
  egeorge@bgrfirm.com
Debi A. Ramos (State Bar No. 135373)
  dramos@bgrfirm.com
2121 Avenue of the Stars, Suite 2800
Los Angeles, California  90067
Telephone: (310) 274-7100; Facsimile: (310) 275-5697

Attorneys for LGBTQ+ Plaintiffs Divino Group
LLC, Chris Knight, Celso Dulay, Cameron Stiehl,
BriaAndChrissy LLC, Bria Kam, Chrissy
Chambers, Chase Ross, Brett Somers, and
Lindsay Amer, Stephanie Frosch, Sal
Cinequemani, Tamara Johnson and Greg Scarnici

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION

| | |
|---|---|
| DIVINO GROUP LLC, a California limited liability company, CHRIS KNIGHT, an individual, CELSO DULAY, an individual, CAMERON STIEHL, an individual, BRIAANDCHRISSY LLC, a Georgia limited liability company, BRIA KAM, an individual, CHRISSY CHAMBERS, an individual, CHASE ROSS, an individual, BRETT SOMERS, an individual, and LINDSAY AMER, an individual, STEPHANIE FROSCH, an individual, SAL CINEQUEMANI, an individual, TAMARA JOHNSON, an individual, and GREG SCARNICI, an individual,<br><br>                    Plaintiffs,<br><br>          vs.<br><br>GOOGLE LLC, a Delaware limited liability company, YOUTUBE, LLC, a Delaware limited liability company, and DOES 1-25,<br><br>                    Defendants. | Case No. 5:19-cv-004749-VKD<br><br>**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS SECOND AMENDED CLASS ACTION COMPLAINT**<br><br><br>Hearing<br>Date:    March 31, 2020<br>Time:    10:00 a.m.<br>Place:   Courtroom 2<br>Before: Magistrate Judge Virginia DeMarchi |

1424511.2

TABLE OF CONTENTS

**Page**

I.   INTRODUCTION AND SUMMARY OF ARGUMENT.........................................................1

II.   SUMMARY OF PERTINENT FACTS AND ALLEGATIONS. ...........................................3

    A.   Defendants' Contracts, Agreements, And Promises To Consumers...........................4

    B.   Defendants' Discrimination Against LGBTQ+ Users. ...............................................5

        1.   Defendants' Admission Of A Policy Against The "Gay Thing." ....................7

        2.   Defendants' Anti-Competitive Filtering Tools And Conduct..........................7

III.   The CDA Does Not Immunize Defendants Unlawful  Conduct. ...................................10

    A.   §230(c) Does Not Immunize Discriminatory "Blocking And Screening" Of Users...........................................................................................................................11

        1.   No Immunity For Overt Discrimination Based On Sexual Identity Or Race................................................................................................................12

        2.   No Immunity for Anti-Competitive Filtering................................................13

        3.   No Immunity For Violating Intellectual Property Rights. .............................14

    B.   Defendants Are Not Entitled To "Immunity" Under 230(c)(1). ...............................15

        1.   No Publisher "Immunity" When Violating Contracts....................................15

        2.   No Publisher "Immunity" For Content Creators............................................16

        3.   §230(c)(2) Immunizes The Filtering Of Content Not People .......................17

    C.   Defendants Assertion Of Immunity Under 230(c) Is Unconstitutional. ...................19

IV.   PLAINTIFFS HAVE ALLEGED CLAIMS FOR RELIEF...............................................21

    A.   Plaintiffs Properly Pled Breach Of The Implied Covenant Of Good Faith And Fair Dealing (The Sixth Cause Of Action)...............................................................21

    B.   Plaintiffs Have Alleged A Claim Under The UCL (Fifth Cause of Action)..............23

    C.   Plaintiffs Properly Pled The Cause Of Action For Violation Of The Lanham Act Pursuant To 15 U.S.C. § 1125, et seq.................................................................24

    D.   Plaintiffs Properly Pled Claims for Violations of The Unruh Civil Rights Act (The Fourth Cause of Action). ...................................................................................27

    E.   Plaintiffs Have Properly Stated A Claim For Liberty Of Speech (The Third Cause Of Action)........................................................................................................28

    F.   Plaintiffs Have Pled Facts Sufficient State A Claim For Relief For Action Under Federal Law (The Second Cause Of Action). .................................................31

CONCLUSION. ...........................................................................................................................36

TABLE OF AUTHORITIES

**Page**

**FEDERAL CASES**

*Amalgamated Food Emp. Union Local 590 v. Logan Valley Plaza, Inc.*,
   391 U.S. 308 (1968), *abrogated by Hudgens v. N. L. R. B.*, 424 U.S. 507 (1976) ...................29

*American Bullion, Inc. v. Regal Assets, LLC*,
   2014 WL 7404597 (C.D. Cal. Dec. 30, 2014) ........................................................................31

*Baggett v. Bullitt*,
   377 U.S. 360 (1964) ................................................................................................................19

*Barnes v. Yahoo!, Inc.*,
   570 F.3d 1095 (9th Cir. 2009)................................................................................2, 15, 16, 19

*Barnes v. Yahoo!, Inc.*,
   570 F.3d 1096 (9th Cir. 2009)..........................................................................................15, 16, 21

*Brindley v. City of Memphis, Tennessee*,
   No. 17-cv-2849 (SHM), 2018 WL 3420819 (W.D. Tenn. July 13, 2018)...............................33

*Browne v. McCain*,
   612 F. Supp. 2d 1125 (C.D. Cal. 2009)..................................................................................27

*Butz v. Economou*,
   438 U.S. 478 (1978) ................................................................................................................20

*Chi. Lawyers' Comm. for Civil Rights Under Law, Inc. v. Craigslist, Inc.*,
   519 F.3d 666 (7th Cir.2008) ...................................................................................................15

*City of Boerne v. Flores*,
   521 U.S. 507 (1997) ................................................................................................................20

*City of Cincinnati v. Discovery Network, Inc.*
   (1993) 507 U.S. 410 ................................................................................................................31

*Clark v. Martinez*,
   543 U.S. 371 (2005) ................................................................................................................19

*Coastal Abstract Serv., Inc. v. First Am. Title Ins. Co.*,
   173 F.3d 725 (9th Cir. 1999)...............................................................................................26, 31

*Collegenet, Inc. v. XAP Corp.*,
   442 F. Supp. 2d 1070 (D. Or. 2006).......................................................................................26

*Cook, Perkiss and Liehe, Inc. v. Northern California Collection Service, Inc.*,
   911 F.2d 242 (9th Cir. 1990)..................................................................................................25

1

TABLE OF AUTHORITIES
(Continued)

2

**Page**

3

*Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*,
   473 U.S. 788 (1985) ................................................................33

4

*Cuviello v. City and County of San Francisco*,
   940 F.Supp.2d 1071 (N.D. Cal. 2013) ......................................28

5

6

*Eclectic Properties East, LLC v. Marcus & Millichap Co.*,
   751 F.3d 990 (9th Cir. 2014).....................................................27

7

8

*Enigma Software Grp. USA, LLC v. Malwarebytes, Inc.*,
   938 F.3d 1026 (9th Cir.), *opinion withdrawn and superseded on denial of reh'g,* 946
   F.3d 1040 (9th Cir. 2019)............................................... *passim*

9

10

*Fair Hous. Council of San Fernando Valley v. Roommates.com, LLC*,
   521 F.3d 1157 (9th Cir. 2008) ....................................... *passim*

11

*Galbraith v. County of Santa Clara*,
   307 F.3d 1119 (9th Cir. 2002).....................................................27

12

13

*Hall v. Bed Bath & Beyond, Inc.*,
   705 F.3d 1357 (Fed. Cir. 2013)...................................................26

14

15

*Hightower v. City and County of San Francisco*,
   77 F.Supp.3d 867 (N.D. Cal. 2014) ...........................................27

16

17

*hiQ Labs, Inc. v. LinkedIn Corp.*,
   273 F. Supp. 3d 1099 (N.D. Cal. 2017), aff'd, 938 F.3d 985 (9th Cir. 2019)...........................30

18

*Hoffman v. Capital Cities/ABC, Inc.*,
   255 F.3d 1180 (9th Cir. 2001).....................................................31

19

20

*Holomaxx Techs. v. Microsoft Corp.*,
   783 F.Supp.2d 1097 (N.D. Cal. Mar. 11, 2011)........................13

21

22

*Integrated Storage Consulting Servs., Inc. v. NetApp, Inc.*,
   No. 5:12-CV-06209-EJD, 2013 WL 3974537 (N.D. Cal. July 31, 2013)................................22

23

*Johnson v. Poway Unified School Dist.*,
   658 F.3d 954 (9th Cir. 2011).......................................................33

24

25

*Kirbyson v. Tesoro Refining and Marketing Co.*,
   2010 WL 2382395 (N.D. Cal. June 10, 2010) ...........................28

26

27

*Larkin Group, Inc. v. Aquatic Design Consultants, Inc.*,
   323 F. Supp. 2d 1121 (D. Kan. 2004) ........................................26

28

PLAINTIFFS' OPPOSITION TO DEFENDANTS'
MOTION TO DISMISS SECOND AMENDED CLASS ACTION COMPLAINT

1

TABLE OF AUTHORITIES
(Continued)

2

**Page**

3

*Lebron v. Nat'l R.R. Passenger Corp.*
    513 U.S. 374 (1995) ...................................................................................20

4

5

*Lee v. Katz,*
    276 F.3d 550 (9th Cir. 2002).........................................................................33

6

*Manhattan Cmty. Access Corp. v. Halleck,*
    --- -- U.S. --, 139 S. Ct. 1921 (2019)....................................................31, 34

7

8

*Marsh v. Alabama*
    326 U.S. 501 (1946) .......................................................................28, 33, 34

9

10

*McKnight v. Torres,*
    563 F.3d 890 (9th Cir.2009).........................................................................23

11

*McNeary-Calloway v. JP Morgan Chase Bank, N.A.,*
    863 F. Supp. 2d 928 (N.D. Cal. 2012) .........................................................23

12

13

*Menotti v. City of Seattle,*
    409 F.3d 1113 (9th Cir. 2005).......................................................................28

14

15

*Moose Lodge No. 107 v. Irvis,*
    707 U.S. 163 (1972) .........................................................................21, 31, 32

16

*NLRB v. Catholic Bishop of Chicago,*
    440 U.S. 490 (1979) .....................................................................................19

17

18

*Obergefell v. Hodges,*
    --- U.S. ---..................................................................................................20

19

20

*Packingham v. North Carolina,*
    582 U.S. ___, 137 S.Ct. 1730 (2017) .....................................................29, 34

21

*Perkins v. Linkedin Corp.,*
    53 F.Supp.3d 1222 (N.D. Cal. 2014) (Koh, J.) ...........................................31

22

23

*Pruneyard Shopping Center v. Robins,*
    447 U.S. 74 (1980) ...................................................................................28, 30

24

25

*Reno v. American Civil Liberties Union,*
    521 U.S. 844 (1997) ...................................................................20, 29, 30, 34

26

*Rust v. Sullivan,*
    500 U.S. 173 ...............................................................................................19

27

28

*Schieffelin & Co. v. Jack Co. of Boca, Inc.,*
    725 F. Supp. 1314 (S.D.N.Y. 1989) ............................................................27

TABLE OF AUTHORITIES
(Continued)

Page

*Seidman v. Paradise Valley Unified School Dist. No. 69,*
  327 F.Supp.2d 1098 (D. Ariz. 2004).........................................................28

*Seven-Up Co. v. Coca-Cola Co.,*
  83 F.3d 1379 (5th Cir. 1996)...................................................................26

*Shaw v. CitiMortgage, Inc.,*
  201 F. Supp. 3d 1222 (D. Nev. 2016) ......................................................22

*Sherman v. Yahoo! Inc.,*
  997 F. Supp.2d 1129 (S.D. Cal. 2014) .....................................................13

*Skinner v. Ry. Labor Executives' Ass'n,*
  489 U.S. 602 (1989) ....................................................................21, 31, 32

*Song fi Inc. v. Google, Inc.,*
  108 F. Supp.3d 876, 884 (N.D. Cal.2015) ................................................13

*Starr v. Baca,*
  652 F.3d 1202 (9th Cir. 2011)..................................................................27

*Trenouth v. U.S.,*
  764 F.2d 1305 (9th Cir. 1985)..................................................................33

*Venetian Casino Resort v. Local Joint Exec. Bd. Of Las Vegas,*
  257 F.3d 937 (9th Cir. 2001)....................................................................33

*Wells Fargo & Co. v. ABD Ins. & Fin. Servs., Inc.,*
  758 F.3d 1069 (9th Cir. 2014)..................................................................25

*Williams v. Gerber Prods. Co.,*
  552 F.3d 934 (9th Cir. 2008)....................................................................26

*Zango Inc. v. Kaspersky Lab, Inc.,*
  568 F.3d 1169 (9th Cir. 2009)......................................................12, 14, 18

**STATE CASES**

*Albertson's, Inc. v. Young,*
  107 Cal. App. 4th 106 (2003)...................................................................29

*Allred v. Harris,*
  14 Cal.App.4th 1386 .................................................................................28

*Allred v. Shawley,*
  232 Cal.App.3d 1489 (1991).................................................................28, 29

PLAINTIFFS' OPPOSITION TO DEFENDANTS'
MOTION TO DISMISS SECOND AMENDED CLASS ACTION COMPLAINT

TABLE OF AUTHORITIES
(Continued)

*Bank of Stockton v. Church of Soldiers*,
    44 Cal.App.4th 1623 (1996)......................................................................................28

*Barrett v. Rosenthal*,
    40 Cal.4th 33 (2006)................................................................................................30

*Briggs v. Eden Council for Hope & Opportunity*,
    19 Cal.4th 1106 (1999)............................................................................................30

*Fashion Valley Mall, LLC v. Nat'l Labor Relations Bd.*,
    42 Cal. 4th 850 (2007).............................................................................................28

*Golden Gateway Ctr. v. Golden Gateway Tenants Assn.*,
    26 Cal. 4th 1013 (2001)...........................................................................................29

*Koebke v. Bernardo Heights Country Club*,
    36 Cal. 4th 824 (2005).............................................................................................27

*McClain v. Octagon Plaza, LLC*,
    159 Cal.App.4th 784 (2008).....................................................................................21

*Perdue v. Crocker Nat'l Bank*,
    38 Cal.3d 913 (1985)...............................................................................................22

*Ralphs Grocery Co. v. Victory Consultants, Inc.*,
    17 Cal. App. 5th 245 (Cal. Ct. App. Oct. 24, 2017)...................................................30

*Snatchko v. Westfield, LLC*,
    187 Cal.App.4th 469 (2010).....................................................................................30

*Trader Joe's Co. v. Progressive Campaigns, Inc.*,
    73 Cal.App.4th 425 (1997).......................................................................................28

*Waller v. Truck Ins. Exchange, Inc.*,
    11 Cal.4th 1 (1995)..................................................................................................21

*Weinberg v. Feisel*,
    110 Cal. App. 4th at 1131, n.4 (2003)......................................................................30

**OTHER STATE CASES**

*Hilton Hotels Corp. v. Butch Lewis Prod., Inc.*,
    808 P.2d (Nev. 1991)..............................................................................................22

**STATUTES**

15 U.S.C. § 1125, et seq. ........................................................................................24

PLAINTIFFS' OPPOSITION TO DEFENDANTS'
MOTION TO DISMISS SECOND AMENDED CLASS ACTION COMPLAINT

TABLE OF AUTHORITIES
(Continued)

**Page**

42 U.S.C. § 1981 ...............................................................................23

47 U.S.C. §230 ......................................................................... *passim*

47 U.S.C. §230(c) ..................................................................... *passim*

47 U.S.C. §230(c)(1) .....................................................................15, 16

47 U.S.C. §230(c)(2) .....................................................................17, 18

47 U.S.C. §230(e)(2) ...........................................................................15

47 U.S.C. §230(f)(3) ............................................................................16

Cal. Civ. Code §§41, *et seq.* ...............................................................23

Cal. Civ. Code § 51(b) .........................................................................27

Cal. Code of Civ. Pro. §425.16 ...........................................................30

Lanham Act ..........................................................................23, 25, 31

**RULES**

Rule 12(b)(5) .......................................................................................29

**CONSTITUTIONAL PROVISIONS**

California Constitution, California Constitution ......................................23, 30

United States Constitution First Amendment............................... *passim*

United States Constitution Fourth Amendment .............................20, 31, 32

United States Constitution Eleventh Amendment...................................19

United States Constitution Fourteenth Amendment................................19, 32

**OTHER AUTHORITIES**

73 Ops. Cal. Atty. Gen. 213 (1990) ......................................................29

PLAINTIFFS' OPPOSITION TO DEFENDANTS'
MOTION TO DISMISS SECOND AMENDED CLASS ACTION COMPLAINT

1      Plaintiffs, Divino Group LLC ("Divino"), Chris Knight, Celso Dulay, Cameron Stiehl,

2  BriaAndChrissy LLC ("BriaAndChrissy"), Bria Kam, Chrissy Chambers, Chase Ross, Brett

3  Somers, and Lindsay Amer ("Amer"), Stephanie Frosch ("Frosch"), Sal Cinquemani

4  ("Cinquemani"), Tamara Johnson ("Johnson") and Greg Scarnici ("Scarnici") (collective the

5  "Plaintiffs") hereby oppose Defendants' Motion to Dismiss the Second Amended Complaint (the

6  "MTD"):

7  **I.**    **<u>INTRODUCTION AND SUMMARY OF ARGUMENT.</u>**

8      Plaintiffs are prominent and well respected LGBTQ+ and African American content creators

9  and users of the global social media site YouTube,  Each seeks legal and equitable relief

10  individually and on behalf of a putative class of YouTube users to redress Defendants overt sex,

11  race, and identity discrimination, profiling, and anticompetitive animus to deny Plaintiffs equal

12  access to YouTube.

13      In a pleading that contains 125 pages and 353 paragraphs, Plaintiffs allege details of specific

14  discriminatory and anticompetitive conduct whereby YouTube use purportedly neutral content

15  based criteria to deny or restrict Plaintiffs access to YouTube based not on Plaintiffs' underlying

16  video content but on the sexual identity, race, politics, religion, ethnicity, or commercial status of

17  Plaintiffs and users.  This is overt and illegal discrimination and anticompetitive animus that is

18  strictly prohibited by federal and state law, as well as Defendants terms of service and purported

19  rules and policies.  And it has caused substantial financial harm and other injuries to Plaintiffs, other

20  LGBTQ+ African American content creators, and the LGBTQ+ and African American users who

21  compose what Defendants call the "YouTube Community."

22      This evidence and detailed factual allegations includes multiple admissions by Defendants of

23  this overt discrimination, including a recorded phone call in which a senior content creator admitted

24  that Defendants have a "policy" of restricting access to LGBTQ+ content and creators because of

25  the "gay thing" and the sexual identity of "gay" or LGBTQ+ content creators.  It also violates

26  Defendants contractual terms of service and sworn promises to Congress and the public that

27  YouTube is an public and open internet platform, access to which is subject only on viewpoint

28  neutral content based rules that apply equally to everyone.  And Defendants open, viewpoint neutral

content based access rules is by no means a "free promise" for access.  Rather, in return for equal viewpoint neutral access to YouTube, Plaintiffs and the other estimated 2.3 billion YouTube users, "grant" Defendants a "perpetual" and "irrevocable license" to use and monetize 95% of the public video content in the world, including the estimated $50 billion in proprietary personal data that Defendants extract, organize, and monetize for profit.

The idea that Plaintiffs are not entitled to their day in court to prove these well pleaded claims is repugnant.  But that is precisely what Defendants argue in their motion to dismiss: that even accepting the 353 paragraphs of allegations, including multiple admissions and statements by Defendants and their employees, as true, Plaintiffs are not entitled to pursue legal relief for overt sex and race discrimination, anticompetitive conduct, and express breaches of contractual based promises as a matter of pure law based.  Defendants are mistaken.

Defendants may be the most powerful corporate litigant in the history of the world but they are not above the law.  Under established Ninth Circuit law Defendants not entitled to immunity under section 230(c) of the Communications Decency Act for overt discrimination, anticompetitive conduct, or breaches of contractual promises.  See *Enigma Software Grp. USA, LLC v. Malwarebytes, Inc.*, 946 F.3d 1040 (9th Cir. 2019); *Barnes v. Yahoo!, Inc.*, 570 F.3d 1095 (9th Cir. 2009); *Fair Hous. Council of San Fernando Valley v. Roommates.com, LLC*, 521 F.3d 1157 (9th Cir. 2008).  Any claim to the contrary subjects the CDA an almost certain constitutional death as an unlawful prior restraint of Plaintiffs' First Amendment right to petition and free speech, and denies them equal protection under the law.  Furthermore, Plaintiffs have more than satisfied the good faith and notice pleading requirements to pursue claims for relief under contract, unfair competition, false advertising, overt discrimination based on sexual and racial identity, and unlawful restraint and harm to free speech under both federal and California law.  Defendants are free to contest the truth of the serious allegations against them, but they cannot do so on motion to dismiss, or by denying Plaintiffs the reciprocal opportunity to prove them, engage in discovery, and have their day in Court. Accordingly, the Court should deny Defendants' motion to dismiss and allow for the commencement of initial disclosures and discovery.

## II.   SUMMARY OF PERTINENT FACTS AND ALLEGATIONS.

Defendants deny Plaintiffs equal access to YouTube and related service based on the sexual, racial, religious, ethnic, political or other personal identities and/or viewpoints.  Defendants engage in overt discrimination under the guise of screening and blocking videos, subject to viewpoint-neutral content based rules and guidelines.  Defendants were caught on a recorded call denying Plaintiffs access to YouTube services for a holiday video based on a "company policy" of branding Plaintiffs' content as "shocking," and "sexually explicit"-- not because of anything in the video, but according to a senior content curator, due to the "gay thing" and because Plaintiffs are "gay."  This is not an isolated incident:  Since before 2016, Defendants have known about it and admitted it was going on.  Despite Plaintiffs' repeated complaints about unfair treatment, problems have gotten worse as the result of screening and blocking tools that are overtly discriminatory and anticompetitive (including algorithms and electronic filters which gather, identity and apply animus-based computer code).  After years of lip service, Plaintiffs seek legal redress for the enormous damage caused by Defendants' discrimination alleging causes of action for breach of contract; unfair, unlawful, and fraudulent business practices; false advertising; race and sexual orientation discrimination; and constitutional free speech violations under both the California and the U.S. Constitutions.

Defendants operate YouTube, the world's largest video social media website in the history of the world.  By soliciting and promising consumers a neutral public forum for freedom of expression, subject only to identity and viewpoint-neutral rules, Defendants have obtained the licensing rights to the video content and personal data of more than 2.3 billion YouTuber users; Defendants now controls regulate, and monetize 95% of the world's public video content.   In so doing, Defendants have been caught red handed engaging in systematic and overt sexual identity and race discrimination in their content based filtering and regulation of access to YouTube and use that unlawful race and sex based profiling to further an anticompetitive scheme to promote their own content and financial interests by denying Plaintiffs and other independent users equal and neutral access to YouTube in direct violation of the law and their license agreements with consumers.

A.      **Defendants' Contracts, Agreements, And Promises To Consumers.**

Contrary to Defendants representations to this Court, YouTube is not a "free video hosting service."  See MTD at 1:17-19.  Upon joining YouTube, each Plaintiff electronically agrees to be governed by Defendants' Terms of Service ("TOS"), Community Guidelines ("Guidelines"), and Policies incorporated into the Guidelines ("Agreements").[1]  Under the Agreements, users "grant" Defendants "worldwide, non-exclusive, royalty-free, sublicensable and transferable license to use that Content . . . in connection with the Service and YouTube's . . . . business . . . ."  Terms of Service.  White Dec., Ex.1, p.5 of 7; Ex.2 ¶6.C, D; see also Ex.2 ¶5.A..  They also grant other users a "non-exclusive, royalty-free license to access" content, "reproduce, distribute, prepare derivative works, display, and perform it . . . as enabled by a feature of the Service."  *Id*.

Under that Agreement, Defendants promise users full and equal access to all services offered on YouTube subject to viewpoint neutral content based rules, including submitting "Content or other material" that (i) users are "solely responsible for" the content and its "consequences;" (ii) may not violate he intellectual property rights and restrictions on the video content, and (iii) is not "contrary to the YouTube Community Guidelines."  Furthermore, Defendants reserve "the right to decide whether Content violates these Terms," including, "but not limited to, pornography, obscenity, or excessive length," and, "in so doing, remove such Content and/or terminate a user's account" if, "in its sole discretion . . . submitting such material is determined to be "in violation of these Terms."

In exercising their discretion to deny user access, Defendants are limited to a determination that Plaintiffs have submitted video content or material submitted or engaged in some other conduct that violates intellectual property rights, Defendants Community Guidelines" or the other content based terms of YouTube's service.  White Dec., Ex.2 ¶7.B,  The Agreement, therefore is not "free,"

---

[1]      Defendants regularly unilaterally change the terms of these agreements, often without notice. Because the agreements exist electronically, and are executed electronically from drop down menus, users often have no copy of the version they executed.  Defendants attach only current or recent versions of these agreements and policies as exhibits to Ms. White's Declaration.  Because each Plaintiff executed earlier versions of such documents, without discovery, there is no way to establish the operative Agreements and policies for individual Plaintiffs.

but a billion dollar licensing agreement under which Defendants obtain a "perpetual" and "irrevocable" right to use, display, and monetize a user's content and the personal and proprietary data of the creator and viewers of the content in exchange for the right to access YouTube as "forum" where the public can engage in "freedom of expression," to communicate and interact with other users subject to viewpoint neutral content based filtering and regulations that apply equally to all.  The Agreement is governed by California law.  See White Dec., Ex. 2 ¶¶14; 4.I; see also ¶¶ 5, 6, 9, 14.

Under the agreements,  Defendants designate YouTube as a "passive website," that is open to the public, provided that  any person who "uses or visits" the YouTube website or "any YouTube products software, data feeds, and services provided" consents and legally agrees to YouTube's "Terms of Service," "Google's Privacy Policy," and "Community Guidelines," as "incorporated by reference" and are further clarified or modified by Defendants "without notice" (collectively the "Agreement").[2]  See White Dec. Ex. 2 at ¶ 1.A, B.  "Google/YouTube not only collect, store, analyze, and organize the personal, financial, political, and other data for each of the YouTube Platform users, but Defendants also use and sell that data to third parties on the open market."  *Id*., 5:5-12.

In 2018, Defendants testified under oath to Congress and confirmed that YouTube is "a neutral public forum" in which Defendants "enforce [their] policies in a politically neutral way."  *Id.*, 22:2-24. While Defendants profit from LGBTQ+ content and the important audience that their content serves, Defendants continue to fail to honor their promises to provide Plaintiffs equal access under viewpoint neutral content bases rules and regulations.  See *id.*, 13:17-21, 44:2-6, 49:9-13. This includes an enforceable promise that Defendants do not filter or block out content based on the creator's personal attributes, including gender, gender identity, political viewpoints, race, religion or sexual orientation.'"  *Id.*, 13:10-13.

**B.** **Defendants' Discrimination Against LGBTQ+ Users.**

Defendants mistreatment of the LGBTQ+ community is not new.  In 2016 Defendants

---

[2]   Defendants' Agreement is governed by California law.  See White Dec., Ex. 2 ¶¶14; 4.I; see also ¶¶ 5, 6, 9, 14.

admitted "that their restraints unfairly discriminated against LGBTQ+ users like Plaintiffs." *Id.*,
12:17-21.  Later, they "admitted that they wrongly censored videos posted by members of the
LGBTQ+ Community, blaming a purported engineering problem with filtering tools that targeted
video content from LGBTQ+ users, or targeted users who discussed topics and perspectives
regarding LGBTQ+ issues." *Id.*, 12:22-13:4, 3:7-17.  They made similar admissions in March
2017. *Id.*, 42:10-17.  In December 2017, Defendants finally acknowledged their company policy to
censor videos about the "gay thing." *Id.*, 10:21-24; 20:21-24; 43:6-21.  But despite this
acknowledgement Defendants continue to deny Plaintiffs equal access to YouTube resulting in some
cases in a 90% drop in the reach of independent LGBTQ+ content, even though the content
complies with all of YouTube's content based rules, including YouTube's Community Guidelines.
*See id.* 48:24-26;  47:7-28.

Plaintiff Divino Group provides just one example of how insidious, overt, repugnant, and
harmful Defendants' conduct is in this case. In addition to the usual TOS, Defendants and Divino
entered into a YouTube Partnership agreement allowing Divino to generate revenue from its
compliant videos. *Id.*, 45:23-25.  Defendants promised more benefits to Divino if it obtained **1,000
subscribers**. *Id.*, 45:27-46:1.  Divino then sought ads to increase its number of subscribers. *Id.*,
46:2-6.  Defendants refused to sell all of the ads Divino requested -- purportedly because Divino's
videos violated its Guidelines and/or policies. *Id.*, 46:7-11; 46:18-25; 48:20; 48:27-49:8.
Ultimately, Divino paid Defendants $14,542.94 for ads to boost viewer numbers. *Id.*, 46:4-6.  After
Divino bought ads, in April 2017 Defendants unilaterally changed requirements to "**10,000** lifetime
**views**." *Id.*, 46:12-17.  In January 2018, they changed the requirements to "at least **1,000
subscribers**" plus "**4,000 hours** of watch time within the past 12 months." *Id.*, 46:26-47:1.
Though Divino had already paid Defendants thousands of dollars on ads, it did not reach the new
requirements. *Id.*, 47:1-3.  Defendants then **demonetized Divino's channel** because it had not
achieved the "1,000 subscriber" threshold set for ***additional*** benefits. *Id.*, 47:3-6.  Defendants
"effectively nullified the benefits of the $14,000 worth of advertisements Divino had purchased to
boost subscriber numbers." *Id.*, 51:8-18.

Similarly, Plaintiff Johnson also contracted with Defendants to "sell unlimited views of

individual videos to subscribers on a payment per video basis," in exchange for 55% "of gross revenues." *Id.*, 89:9-14.  Defendants received $55,000 for video sales.  *Id.*, 90:14-16.  After just one month of performing the contract, Defendants repudiated the contract without notice to subscribers or Johnson, refused to refund the subscription charged, and **made all of Johnson's videos available without charge to the public** – but kept the $55,000 in revenue generated by the subscriptions.  *Id.*, 90:17-28.

### 1.    Defendants' Admission Of A Policy Against The "Gay Thing."

This is not a case of disparate impact but of overt discrimination.  Defendants have "an affirmative 'policy' that denies Plaintiffs monetization, subscription, advertising, and other content distribution products and services because Plaintiffs are 'gay.'" *Id.*, 2:7-11.  Defendants use "identity based censorship to determine who can and cannot continue to use the YouTube Platform." *Id.*, 4:2-3.  In March 2017, Defendants admitted that they improperly censored videos using their Restricted Mode filtering, based upon the identity and orientation of the creator, "rather than upon the content of the video." *Id.*, 42:10-17; see also 29:26-30:4.  Defendants blamed an "engineering problem with filtering tools that targeted video content from LGBTQ+ users, or targeted users who discussed topics and perspectives regarding LGBTQ+ issues." *Id.*, 12:22-13:4.  Months later, Defendants refused to sell Divino an ad for a compliant holiday video.  *Id.*, 43:6-21.  "[A] person identified as an 'expert' and senior supervisor," hired by Defendants admitted that the refusal was because of a "company policy" that deemed LGBTQ+ content as shocking and "sexually explicit," solely because the video involved "the gay thing." *Id*., at 10:21-24; 43:6-21; 43:16-21.  Defendants then denied Divino four more ads "with little, or no, explanation." *Id.*, 43:24-26.

### 2.    Defendants' Anti-Competitive Filtering Tools And Conduct.

"Restricted Mode" is one of Defendants' discriminatory tools which affects 75 million YouTube views daily.  *Id.*, 27:8-12.  Defendants describe it as a tool "to help institutions like schools as well as people who wanted to better control the content they see." *Id.*, 27:1-3.  Individual users, or system administrators in schools, libraries, companies or institutions can apply the "Restricted Mode" filter.  *Id.*, 27:4-7.  However, Defendants, in their "sole discretion" determine which videos are inaccessible under Restricted Mode.  *Id.*, 27:13-22.  This filtering software filters

information regarding the identity and viewpoint of users.  *Id.*, 32:2-8.

Defendants have restricted the reach and access of many of Plaintiffs' compliant videos under "Restricted Mode."  *Id.*, 55:12-23, 65:10-68:27, 71:8-20, 80:2-6, 83:7-15; 84:7-13, 85:5-6, 87:26-88:7, 90:20-27.  The access restriction is used "as a pretext . . . to segregate disfavored content" "regardless of whether the content is . . . otherwise compliant with Defendants' regulations."  *Id.*, 27:14-18.  Defendants also allow YouTube users (including hate mongers and homophobes throughout the world) to "'flag' as 'inappropriate'" otherwise compliant videos for "Restricted Mode," which are then evaluated by "human reviewers for ersatz 'violations' of Community Guidelines."  *Id.*, 27:19-22.  Reviewers are routinely subjected to harassment, threats, blacklisting, discipline, and hazing based on their political or religious viewpoints and identity."  *Id.*, 32:11-18.  Such reviews confirm and reinforce animus-based filtering.  *Id.*, 32:19-28.

Defendants employ a variety of content based regulations and restrictions as a pretext to discriminate against Plaintiffs, including "Age Restrictions," *Id.*, 55:24-56:5, 68:28-69:5, 71:21-28, 73:13-17, 73:22-25 79:2-4.  "Advertising Restrictions," *Id.*, 30:6-31:19; 48:20-23.  "Artificial Intelligence or Algorithmic, Machine Based Filtering" ("AI") *Id.*, 31:21-33:12.  "Demonetizing" user Channels and videos, *Id.*, at 33:14-26, 54:21-25, 33:16-20, 86:19-87:7, 33:21-26; 54:19-21, 64:28-65:2, 71:4-7, 80:7-21, 84:20-25, 85:5-28, 86:1-7, 88:8-9, 91:20-24,  "Monetization and Revenue Earning Restrictions" on advertising,  *Id.*, 56:24-28, 56:24-61:26.  Deleting content compliant videos without explanation, *Id.*, 72:1-5, 69:6-17, 73:9-12, 84:14-17.  "Shadow Banning," *Id.*, 33:28-34:17, 53:20-23, 65:5-9, 73:17-22, 84:26-28, 86:8-16.  "Deleting Thumbnails," specially created photo images with text to advertise videos, *Id.*, 34:19-36:8, 54:13-18, 64:24-27, 70:26-71:3, 80:22-27.  Cancelling Subscriptions/ Stopping Notifications of new videos, *Id.*, 35:10-36:27, 53:10-14, 64:12-14, 81:5-14.  Exclusion From "Up Next," *Id.*, 37:2-16, 54:26-55:2, 69:18-26.  Including Hate Speech In "Up Next" alongside LGBTQ+ videos *Id.*, 37:18-38:6.*Id.*, 78:21-79:1 and sponsoring Anti-LGBTQ+ Ads, *Id.*, 38:8-20, 56:5-16.  Using Comment Section to promote hate speech, *Id.*, 38:22-41:11, 39:10-41:2, 39:14-24:28, 76:4-22, 77:5-12, 77:13-78:20, 91:1-2.  Disabling Comments on LGBTQ+ videos without explanation, *Id.*, 62:10-28, 62:28-63:3.  Outsourcing manual content review to content curators  based in third world countries where gays are imprisoned,

persecuted, or ostracized to determine whether LGBTQ+ videos qualify as "otherwise objectionable" in the United States.  based in third world countries where gays are imprisoned, persecuted, or ostracized to determine whether LGBTQ+ videos qualify as "otherwise objectionable" in the United States.

What Defendants do not want the users to know, however, is that they are also content creators who directly compete on YouTube with Plaintiffs for reach, audiences, access, and monetization. *Id.*, 25:2-6; 23:10-22; 26:4-8.  Defendants have engineered software to "sort videos based on the identities and/or viewpoints of the creator, the viewers" and do so. *Id.*, 32:2-8. Defendants apply animus-based filtering to "economically crush, and cleanse disfavored users" [*Id.*, 1:25-2:3], reduce their reach [*Id.*, 7:25-28], and to "silence" them. *Id.*, at 8:6-11.  Defendants are "driv[ing] Plaintiffs and other 'gay' content creators from the YouTube platform" and "steering Plaintiffs' subscribers and LGBTQ+ viewers to [Defendants'] own or preferred content." *Id.*, 102:8-20.

In 2017, LGBTQ+ creators complained to YouTube about how "changes to the algorithm had disproportionately affected the LGBTQ+ YouTube creators and viewers." *Id.*, 81:15-17. Before discussing LGBTQ+ issues, Defendants required LGBTQ+ creators[3] to execute a Non-Disclosure Agreement ("NDA"). *Id.*, 12:17-21; 81:17-21.  Thereafter, they failed to fix the problems. *Id.*, 12:17-21; 44:2-6; 49:20-23; 81:23-25.

Defendants have become a national hub for homophobia.  Defendants: recommend

---

[3]      Plaintiff Frosch was required to sign an NDA before speaking with Defendants' representatives about her problems. *Id.*, 81:14-21.  The issues she raised were not resolved. *Id.*, 81:23-25.  Due to the NDA, Frosch cannot inform her lawyers or the Court as to the substance of what Defendants and did in those discussions. *Id.*, 81:15-21.  That is particularly troubling because Defendants assert that following the 2017 discussions in which Frosch participated, "YouTube [] addressed their individual concerns in good faith, and often removed restrictions from their videos, when appropriate under YouTube's policies, in response to their appeals. ¶¶ 186, 223, 227, 230, 233, 236.a."  MTD at 4:1 – 4.  Nowhere in the complaint is there any allegation that Defendants "addressed [Plaintiffs'] concerns in good faith," or that they "often removed restrictions . . . when appropriate under YouTube's policies."  To the contrary, Plaintiffs allege that many of their appeals have been ignored; YouTube has refused to address their concerns; and YouTube rarely explains the basis for their actions so that Plaintiffs can address them.  See SAC at 53:10-63:3; 83:7-15; 84:7-87:13. Defendants never resolved Frosch's problems and using the NDA to prevent her from testifying or proving evidence otherwise is improper. *Id.*, 81:23-27.

PLAINTIFFS' OPPOSITION TO DEFENDANTS'
MOTION TO DISMISS SECOND AMENDED CLASS ACTION COMPLAINT

homophobic reaction videos [*id.,* 12:2-6, 55:2-5, 69:18-26, 78:15-7, 78:21-79:1]; play anti-gay ads [*id.*, 56:6-23]; and promote hate speech and homophobic comments – all of which appear alongside LGBTQ+ videos.  *Id.*, 8:17-21, 9:1-6, 10:16-20, 10:28-11:5, 39:10-41:2, 76:15-22, 120:2-9.  Defendants are also a global homophobic force.  *Id.*, 38:23-39:9; 44:18-23, 44:24-45:1.

Around 2016, "Defendants began to use, operate, and profit from YouTube . . . . as a means for producing, distributing, and profiting from its own video content, or that of its financial partners."  *Id.*, 25:3-6.  Defendants are "a production and media company that produces its own content or partners with other large video, TV, and film producers."  *Id.*, 25:25-26.  "In addition to their own video channels on YouTube, Defendants have entered the digital TV market . . . by . . . offering a product called YouTube TV."  *Id.*, 26:4-8.  Defendants sought "a market share of the production – and distribution-based revenues."  *Id.*, 25:9-12.  Defendants "are using filtering and regulation to directly target and crush the reach LGBTQ+ content creators," and to "cleanse disfavored users," [*id.*, 1:27-2:3] "solely because of the sexual orientation, gender, or political identities or viewpoints of LGBTQ+ content creators and their intended audiences."  *Id.*, 25-28.  They use "their unlawful content regulation system to promote and monetize their own content by unlawfully restricting third-party content and reach."  *Id.*, 25:13-17.  They "compete for . . . viewership unfairly and unlawfully" by giving "preferred content a competitive advantage by . . . using their filtering tools and criteria to restrict the access and reach of the smaller third-party users it hosts."  *Id.*, 26:9-12.  Defendants "curate and restrict content in order to further profit and monetize its 2.3 billion users, by promoting Defendants' own or preferred content."  *Id.*, 23:15-18.  They "use animus-based censorship and content regulation to perpetrate religious, political, sexual orientation and gender and ethnic discrimination for profit and financial gain."  *Id.*, 24:16-18.  Defendants exempt their content and that of sponsored creators from the guidelines, and posts content that "violates [Defendants'] own guidelines."  *Id.*, 26:14-17.

## III.   The CDA Does Not Immunize Defendants Unlawful  Conduct.

The Communications Decency Act [47 U.S.C. §230] (the "CDA") immunizes "private blocking and screening" of "material" based on identity neutral content based criteria.  It does not and cannot immunize what Defendants contend: the blocking and screening of compliant content

1    based on overt discrimination or the profiling of the user's identity or viewpoint.

2    **A.    §230(c) Does Not Immunize Discriminatory "Blocking And Screening" Of**

3    **Users.**

4    Plaintiffs allege that Defendants engage in discriminatory filtering and regulation of content

5    on YouTube based on users sexual, racial, political, or other personal identity or viewpoint.

6    Defendants admit they have a "company policy" to block and screen videos involving "the gay

7    thing" or because the creator identifies as "gay."   SAC 10:21-24; 43:6-21; 43:16-21.   Plaintiffs also

8    allege that Defendants' filtering tools, discriminatory algorithms, computer code, and manual review

9    protocols discriminate against LGBTQ+, African American, and other groups of users to reduce the

10   competition for viewers and advertisers on YouTube.   Defendants also seek to use their power to

11   regulate content on and access to YouTube to unlawfully restrict the reach of the independent

12   content creators.   Defendants leverage their dual roles as content curators and content creators to

13   gain an economic advantage for themselves, their partners, and sponsored content creators

14   economically leverage and drive smaller, independent creators from the platform, and promote their

15   own, preferred content.   Unable to deny the truth of these allegations, including the admissions of

16   discrimination and anticompetitive conduct of senior employees and officers, Defendants contend

17   they are categorically immune from all liability under the CDA.   Defendants "so what?" defense

18   cannot pass muster.

19   "Providers do not have unfettered discretion to declare online content 'objectionable' and

20   blocking and filtering decisions that are driven by anticompetitive animus are not entitled to

21   immunity" under §230(c).   *Enigma Software Grp. USA, LLC v. Malwarebytes, Inc.*, 946 F.3d 1040,

22   1047 (9th Cir. 2019).   On its face, §230(c) immunizes only the blocking and screening of "offensive

23   *materials*."   47 U.S.C. §230(c) (emphasis added).   The plain language of the statute does not extend

24   to filtering or profiling users based on their personal characteristics or viewpoints.   It applies only

25   to: (i) the "[p]rotection for private blocking and screening of offensive *material*;" (ii) permits

26   blocking of "*material* that the provider . . . considers to be obscene . . . . or otherwise

27

28

objectionable"), and (iii) extends immunity to the "technical means to restrict access to **material**").[4] 230(c)(2)(A),(B) (emphasis added).  §230(c) does not mention blocking and screening of **"users,"** much less doing so based on a person's sexual, gender, religious, political, or commercial identity or viewpoints.  See 47 U.S.C. §230(c).  §230 immunizes the filtering of content, not the people who create on-line material.

No federal court has ever interpreted §230(c) to immunize an internet service provider from animus-based filtering, much less the kind of overt identity and viewpoint based discrimination perpetrated against Plaintiffs.  This court should not be the first.  As "is  clear to [the Ninth Circuit] from the statutory language, history and case law is that the criteria for blocking online material must be based on the characteristics of the online material, *i.e.* its content, and **not** on the identity of the entity that produced it."  *Enigma Software Grp. USA, LLC v. Malwarebytes, Inc.*, 938 F.3d 1026, 1032–33 (9th Cir.) (emphasis added), *opinion withdrawn and superseded on denial of reh'g,* 946 F.3d 1040 (9th Cir. 2019).  And contrary to Defendants assertion, "*Zango* did not . . . address whether there were limitations on a provider's discretion to declare online content 'objectionable.'" *Enigma Software Grp. USA, LLC v. Malwarebytes, Inc.*, 946 F.3d 1040, 1049 (9th Cir. 2019) (quoting *Zango Inc. v. Kaspersky Lab, Inc.,* 568 F.3d 1169, 1177 (9th Cir. 2009) (emphasis added). Rather "[w]hat is clear to us from the statutory language, history and case law is that the criteria for blocking online material must be based on the characteristics of the online material, *i.e.* its content, and **not** on the identity of the entity that produced it."  *Enigma Software Grp. USA, LLC v. Malwarebytes, Inc*., 938 F.3d 1026, 1032–33 (9th Cir.) (emphasis added), *opinion withdrawn and superseded on denial of reh'g,* 946 F.3d 1040 (9th Cir. 2019).  Applying that fundamental rule, Defendants are not entitled to absolute immunity.

### 1. No Immunity For Overt Discrimination Based On Sexual Identity Or Race.

The CDA does not provide Defendants with immunity for the overt discrimination against

---

[4] "[T]he substance of section 230(c) can and should be interpreted consistent with its caption." *Fair Hous. Council of San Fernando Valley v. Roommates.Com, LLC,* 521 F.3d 1157, 1163–64 (9th Cir. 2008) (quoting *Doe v. GTE Corp*., 347 F.3d 655, 659–60 (7th Cir.2003).

"gay" or the identity or personal viewpoints of YouTube users.  There are limits to immunity for blocking content, especially when the content complies with content based rules and the blocking is based, in part, or in whole, on the viewpoint or identity of the creator or their intended audience. See *Sherman v. Yahoo! Inc*., 997 F. Supp.2d 1129, 1138 (S.D. Cal. 2014); *Holomaxx Techs. v. Microsoft Corp*., 783 F.Supp.2d 1097, 1104 (N.D. Cal. Mar. 11, 2011).  There is no question that Defendants object to LGBTQ+ users because they of their identities or viewpoints.  SAC 2:7-11; 27:14-18, 55:12-23; 69:6-17, 72:1-5, 73:9-12, 84:14-17; 33:28-34:17, 53:20-23, 65:5-9, 73:17-22, 84:26-28, 86:8-16; 38:8-20, 56:5-16; 38:22-41:11, 39:10-41:2, 76:4-22, 77:5-78:20, 91:1-2; 27:8-12; 63:4-17; 82:11-18, 85:5-11, 89:1-8; 92:4-6; 82:19-25; 90:1-7; 93:7-13.  While some courts have held that the CDA immunizes Defendants who "subjectively believe the blocked or screened *material* is objectionable;" no court has ever extended immunity to a providers' subjective beliefs that the identity or viewpoint of the user is "objectionable," even if the user's content is not.  *See Song fi Inc. v. Google, Inc*., 108 F. Supp.3d 876, 884 (N.D. Cal.2015).  Defendants conduct is not immunized simply because they ***sincerely believe*** "gay" users or their viewpoints are "objectionable." *See Id.*

### 2.   No Immunity for Anti-Competitive Filtering.

§230(c) is founded upon strong public policies *favoring* competition:  In enacting the CDA, "Congress took the rather unusual step of setting forth policy goals," such as (a) encouraging "the development of technologies which maximize *user* control;" (b) empowering "parents to restrict their children's access to objectionable or inappropriate online *content*;" and (c) preserving "the vibrant and competitive free market that presently exists." Consequently, there is no immunity under the CDA for anti-competitive filtering or blocking of user content.  *Enigma Software Group USA, LLC v. Malwarebytes, Inc*., 946 F.3d 1040, 1047 (9th Cir. 2019).

In *Enigma*, the Ninth Circuit considered the question of §230(c) immunity for blocking content deemed "objectionable," and "what limitations, if any, there are on the ability of a filtering software provider to block users from receiving online programming."  846 F.3d 1040, 1050 (9th Cir. 2019).  Reasoning that immunizing filtering aimed at suppressing competition, rather than protecting internet users, contravened §230(b).  *Id.*, at 1051 (adopting Judge Fisher's concurring

opinion in *Zango, Inc. v. Kaspersky Lab, Inc.*, 568 F.3d 1169, 1178 (9th Cir. 2009).  The Court found that §230(c) does not afford "providers unbridled discretion to block online content" and held that "§230 does not provide immunity for blocking a competitor's program for anticompetitive reasons." *Id.*, at 1051-1052.  Where "[Plaintiff] has specifically alleged that the blocking here was anticompetitive, [its] claims survive the motion to dismiss." *Id.*, at 1052.  The Court reversed the dismissal of Plaintiff's state law and federal false advertising claims. *Id.* at 1054.  Here, Plaintiffs current "allegations of anticompetitive animus are sufficient to withstand dismissal" in the face of §230(c). *See Enigma Software Group USA, LLC v. Malwarebytes, Inc.*, 946 F.3d 1040, 1045 (9th Cir. 2019).

For purposes of this motion, Defendants must admit that they did what is alleged in the SAC: Defendants engage in animus-based filtering, for anti-competitive purposes, in direct violation of their contracts and other promises, and they are pushing off YouTube those LGBTQ+ users with whom Defendants do not sponsor.  *See, e.g.*¸ SAC 90:1-7; 90:4-7; 82:27-83:6, 83:26-84:1. If Defendants believe that Plaintiffs' lengthy detailed factual allegations regarding Defendants' anti-competitive conduct and its effects amount to "merely tossing in token and facially implausible assertions of anticompetitive motive," Defendants should dispute the allegations on the merits and raise any fact based defenses on summary adjudication, including defenses based upon purported statutory immunity, ***after*** the parties have engaged in discovery.  Attempts to dispute Plaintiffs' allegations regarding Defendants' overt and systematic use of anticompetitive and discriminatory animus-based filtering is premature.

### 3.   No Immunity For Violating Intellectual Property Rights.

Plaintiffs alleged that Defendants violated their intellectual property rights by:  (a) allowing other YouTube users to copy and post many of Plaintiffs' original videos without permission, and then paying ad revenue to those third parties [SAC 69:18-26, 81:3-4, 88:10-17, 92:22-93:3];  (b) "ripping off" a video series concept that BriaAndChrissy developed and pitched to them [*Id.*, 52:24-53:9]; (c) falsely asserting that others held intellectual property rights to original materials which Scarnici developed and produced [*Id.*, 91:25-92:13]; and (d) using granting free access to Plaintiffs' video content after agreeing that such content was specifically limited to pay-for-view access. *Id.*,

89:9-14, 90:14-28.

Violations of intellectual property rights are expressly exempted under the CDA.  See 47 U.S.C. §230(e)(2): "Nothing in this section shall be construed to limit or expand any law pertaining to intellectual property.  Thus, §230(c) does not apply on its face to breaches of contract or unfair business practices (e.g., deceptive practices and anti-competitive practices) based upon Defendants' violations of Plaintiffs' intellectual property rights.  *See Enigma Software Group USA, LLC v. Malwarebytes, Inc.*, 946 F.3d 1040, 1048 (9th Cir. 2019).

**B.    Defendants Are Not Entitled To "Immunity" Under 230(c)(1).**

§230(c)(1) states in pertinent part: No provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider.  47 U.S.C. §230(c)(1).  "[N]either this subsection nor any other declares a general immunity from liability deriving from third-party content," as Defendants argue here.  Indeed, "[s]ubsection (c)(1) does not mention 'immunity' or any synonym."  *Chi. Lawyers' Comm. for Civil Rights Under Law, Inc. v. Craigslist, Inc., 519 F.3d 666, 669 (7th Cir.2008).*  Consequently, §230(c)(1) only precludes liability for providers of interactive computer service in limited circumstances.  *See Fair Hous. Council of San Fernando Valley v. Roommates.com, LLC*, 521 F.3d 1157, 1171 (9th Cir. 2008).  Those circumstances are not present here and certainly do not include Defendants' breaches of contract and animus-based anticompetitive violations of law.

**1.    No Publisher "Immunity" When Violating Contracts.**

§230(c)(1) does not apply to contractual breaches by an internet service provider.  *Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1108-1109 (9th Cir. 2009).  In *Barnes*, the Ninth Circuit held that an internet service provider who expressly or implicitly breaches an enforceable promise or contract is not entitled to immunity under Section 230(c)(1).  "Liability for breach of promise is different from, and not merely a rephrasing of, liability for negligent undertaking [by a publisher.]"  *Id.*, 1106. "Contract liability," therefore "would come not from [Defendants] publishing conduct, but from [their] manifest intention to be legally obligated to do something."  That includes Defendants' obligation to provide Plaintiffs' identity and viewpoint neutral, discriminatory and animus free, access to YouTube.  *See Id.*, 1107.

230(c)(1) only "precludes liability when the duty that "the plaintiff alleges the defendant violated derives from the defendant's status or conduct as a publisher or speaker;" here the duty that Defendants is beyond the grant of immunity, because it "springs" from a contract and enforceable promise "not from any non-contractual conduct or capacity of the defendant." *Id.*, 1107 (citing *Doe v. GTE Corp.*, 347 F.3d 655, 662 (7th Cir 2003) (emphasis added). Thus, while §230(c)(1) "creates a baseline rule" of "no liability for publishing . . . the content of other information service providers, . . . [i]nsofar as [Defendants] made a promise with the constructive intent that it be enforceable, it has implicitly agreed to an alteration in such baseline" rule. *Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1108-1109 (9th Cir. 2009).

§230(c)(1) also does not apply to Plaintiffs' causes of action for free speech, anti-discrimination, false advertising, and unfair and fraudulent business practices because all arise from Defendants' breaches of contract and other promises to regulate content to the extent permitted by law.  §230(c)(1) does not apply to Plaintiffs' causes of action for violations of the Liberty of Speech and Unruh Act because they are claims that arise from Defendants promise to exercise their discretion to filter and regulate Plaintiffs' content to the fullest extent permitted by California law, including the State's express prohibition on discrimination and anticompetitive conduct.  White Dec., Ex.2 at ¶¶14; 4.I; 5, 6, 9, 14.

### 2. No Publisher "Immunity" For Content Creators.

Defendants cannot avoid liability as a publishers when they are also acting as an information content provider who are "responsible, in whole or in part, for the creation . . .of information provided through the Internet" 47 U.S.C. §230(f)(3). The Ninth Circuit has held that internet service providers who wear both the publisher hat and the "information content provider" hat, remain liable as content providers under §230(c)(1).  *Fair Hous. Council of San Fernando Valley v. Roommates.com, LLC,* 421 F.3d 1157, 1174-75 (9th Cir. 2008).

In *Roommates*, Plaintiff alleged that the website violated the Federal Housing Act by acting as a broker discriminating on the basis of race, color, religion, sex, familial status, or national origin in supplying housing over the internet.  *Id.*, 1162.  This included allegations that the defendant discriminated in the online registration process by asking applicants to disclose their "sex, family

status and sexual orientation," "requiring subscribers to answer the questions as a condition of using Roommate's services," creating an unlawful preference, limitation or discrimination, and publishing a "'profile page' for each subscriber" describing "personal information – such as his sex, sexual orientation and whether he has children." *Id*.  Defendants asserted "publisher" immunity under 230(c)(1).  The Ninth Circuit rejected Defendant's claim of §230(c) immunity because the defendant was "undoubtedly the 'information content provider' as to the [registration] questions and can claim no immunity for posting them on its website, or for forcing subscribers to answer them as a condition of using its services." *Id*., 1164.  Defendant, therefore, was not immune "for inducing third parties to express illegal preferences" *Id*., 1165.

Defendants' engineers created the Restricted Mode software, enabled it to cull from data regarding the identities and viewpoints of Plaintiffs and their viewers, and used it to sort LGBTQ+ content for discriminatory and anticompetitive purposes.  They did the same with respect to software for monetization determinations, "Up Next" video recommendations, and video searches.  Plaintiffs have also alleged that Defendants are promoting hate speech directed at LGBTQ+ viewers by running anti-gay ads, and displaying hate speech in comments sections on LGBTQ+ channels.  As in *Roommates,* Defendants "materially contribute" to the illegal conduct of those who produced the ads and write the comments and  wrote the computer programs which match discriminatory ads and comments to LGBTQ+ channels and viewers.  Accordingly, Defendants "not entitled to CDA immunity for the operation of its search system, which filters listings, or of its email notification system, which directs emails to subscribers according to discriminatory criteria." *Id*., 1167.

### 3.    §230(c)(2) Immunizes The Filtering Of Content Not People

§230(c)(2) provides: No provider or user of an interactive computer service shall be held liable on account of--(A) any action voluntarily *taken in good faith* to restrict access to or availability of *material* that the provider or user considers to be *obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable*, whether or not such *material* is constitutionally protected; or (B) any action taken to enable or make available to information content providers or others the technical means to *restrict access to material* described in paragraph (1).  47 U.S.C. §230(c)(2).

On its face, §230(c)(2) immunizes interactive computer service providers such as Defendants only when (i) acting in good faith, (ii) to restrict "material", (iii) that [Defendants] consider[] to be obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable," *Id.* Thus §230(c)(2), just like the other provision in §230(c), does not immunize the kind of bad faith anti-competitive conduct to restrict users' access to internet content and/or services based upon the users' identities or viewpoints, as alleged here.  See *Zango Inc. v. Kaspersky Lab, Inc*., 568 F.3d 1169, 1173-1175 (9th Cir. 2009); *cf., Enigma Software Grp USA, LLC v. Malwarebytes, Inc*., 946 F.3d 1040, 1052; see *Id*., 1054 (J. Rawlinson dissenting opn.) ([T]he majority holds that the criteria for blocking online material may not be based on the identity of the entity that produced it.")

Plaintiffs allege that Defendants are filtering YouTube users who belong to the LGBTQ Community or hold viewpoints which support that community, based wholly or in part on users' identities and viewpoints.  And Defendants admit as much and promised to stop that unlawful practice.  SAC 42:9-17; 13:10-16, 42:27-43:5.  Then Defendants got caught again filtering out Plaintiffs' content because of the "gay thing," which they informed Plaintiffs had now become company "policy."  *Id*., 46:18-25.[5]

Defendants' reliance on *Enigma Software Group USA, LLC v. Malwarebytes, Inc.*, 946 F.3d 1040, 2019 U.S. App. LEXIS 38784, at *12-13, *20-21 (9th Cir. Dec. 31, 2019) is entirely misplaced.  Defendants' factual assertion, that they and Plaintiffs are not direct competitors is solely based on the fact that Plaintiffs do not operate a video hosting platform, but are merely YouTube users – handily ignores Plaintiff Johnson's competing LBGTQ+ hosting website [SAC 90:1-19], and the independent filmmakers who use YouTube to compete against Defendants' original content and subscription services.  Id., 17:14-20, 34:11-17, 33:21-26.  Moreover, Defendants are raising a mere factual dispute -- one that Defendants necessarily lose under *Enigma*. because, as Plaintiffs allege, Defendants wear two hats: one as the platform operator and the other, as creator of original content

---

[5]     The transcript of Divino's December 24, 2017-telephone call reflects that Defendants did not even watch the holiday video ***until long after*** they had refused to sell Divino the ad, and that Defendants' decision was based on data regarding Divino's identity as an LGBTQ+ entity and/or Divino's viewpoints regarding LGBTQ+ issues or the on the identities or viewpoints of Gnews!' viewers.  The Court need only give a listen to that call to dispose of Defendants' motion.

who compete with each Plaintiffs for access YouTube and its 2.3 billion person audience for views, subscribers, advertising, and revenue based monetization.  *See* SAC 17:21-18:1; 24:2-6;  82:27-83:6, 83:26-84:1; 90:1-7.

### C.     Defendants Assertion Of Immunity Under 230(c) Is Unconstitutional.

In their Eighth Cause of Action, Plaintiffs seek a judicial determination that §230(c) immunity does not apply on its face to Defendants' filtering and regulating of content based on sex, race, or other discriminatory animus.  Should the Court decline to make this judicial declaration, however, Plaintiffs are required to ask the Court to declare §230(c), at least as applied in this case, as unconstitutional under First (right to petition and speech) and/or Fourteenth Amendment (equal protection of law), and to strike the Defendants' affirmative immunity defense accordingly.

In construing the statutory reach of Section 230(c), the Court should be guided by "the canon of constitutional avoidance in statutory interpretation."  *Clark v. Martinez*, 543 U.S. 371, 381–82 (2005) (citing *NLRB v. Catholic Bishop of Chicago,* 440 U.S. 490, 502 (1979)).  Constitutional avoidance is "a tool for choosing between competing plausible interpretations of a statutory text, resting on the reasonable presumption that Congress did not intend the alternative which raises serious constitutional doubts."  *Clark*, 543 U.S. at 381-82 (citing *Rust v. Sullivan,* 500 U.S. 173, 191).  "The canon is not a method of adjudicating constitutional questions by other means;" and is solely "a means of giving effect to congressional intent, not of subverting it."  *Id.*  It simply "presumes that the statute will be construed in such a way as to avoid the constitutional question presented," and "eliminate the necessity of deciding [the constitutional question]."  *Baggett v. Bullitt*, 377 U.S. 360, 375 (1964); *see also Barnes v. Yahoo!, Inc*., 570 U.S. 1095, 1101 fn.6 (2009); *Enigma Software Grp. USA, LLC v. Malwarebytes, Inc*. 946 F.3d 1040, 1047 (Congress did not intend to immunize filtering based on the identity of the content creator, rather than blocking and screening of internet materials based on the actual content of those materials in accordance with neutral rules and criteria).

To the extent that the Court finds otherwise §230(c) cannot pass muster under the First and Fourteenth Amendments.  CDA immunity under §230(c) is a creature of statute, untethered to sovereign immunity under the Eleventh Amendment.  Consequently, the CDA cannot alter or

abridge federal constitutional rights by immunizing constitutional offenders.  *See Butz v. Economou,* 438 U.S. 478, 490–91 (1978) ("since an unconstitutional act, even if authorized by statute, was viewed as not authorized in contemplation of law, there could be no immunity defense"); see also *Lebron v. Nat'l R.R. Passenger Corp.* 513 U.S. 374, 392 (1995)  (Congress "can no more relieve a [state actor] of its First Amendment restrictions than a similar pronouncement could exempt the Federal Bureau of Investigation from the Fourth Amendment.").  While Congress may determine how best to redress unconstitutional actions, it may not enact laws that substantively change or abridge the underlying liability arising from the right itself.  *City of Boerne v. Flores*, 521 U.S. 507, 519 (1997); *see also Obergefell v. Hodges,* --- U.S. ---; 135 S.Ct. 2584, 2605 (2015).

Defendants' construction of §230(c) is tantamount to "[l]egislation which alters the meaning of the Free Exercise Clause."  *City of Boerne*, 521 U.S. at 519.  Such a law "cannot be said to be enforcing the Clause" because "Congress does not enforce a constitutional right by changing what the right is." *Id.*  The "idea of the Constitution 'was to withdraw certain subjects from the vicissitudes of political controversy, to place them beyond the reach of majorities and officials and to establish them as legal principles to be applied by the courts.'"  *Obergefell*, 135 S.Ct. at 2605-06 (quoting *West Virginia Bd. of Ed. v. Barnette,* 319 U.S. 624, 638 (1943) .  Congress can no more deny Plaintiffs' right to petition the Court for relief to redress "egregious" and "blatant" discrimination violating the Constitution "than a similar pronouncement could exempt" the FBI "from the Fourth Amendment," or a state actor from abridging the fundamental constitutional right of same-sex couples to marry.  *Lebron*, 513 U.S. at 392; *Schuette*, 572 U.S. at 310-11.

Defendants' assertion of §230(c) to immunize conduct which unlawfully regulates, restrains, or otherwise harms Plaintiffs' protected speech, and does so by discriminating against them because they identify as members of the LGBTQ+ Community, and/or African American, also constitutes an unlawful restraint of speech under the First Amendment.  *See Reno v. American Civil Liberties Union,* 521 U.S. 844, 871–872 (1997) (striking §223 of the CDA as an unconstitutional restraint on speech).  Contrary to Defendants assertion that Plaintiffs' constitutional challenge to §230(c) is "frivolous," the CDA cannot be construed to preclude Plaintiffs from petitioning the Courts to redress discriminatory and unlawful restrictions their rights to free speech and equal benefits and

protection of the law.  *Id.; see also Skinner v. Ry. Labor Executives' Ass'n*, 489 U.S. 602, 615–16 (1989) (federal law or regulation that sanctions, endorses, protects, or is invoked in a manner that permits a private party to engage in race or sex discrimination, or is otherwise non-neutral as to the fundamental constitutional rights of a plaintiff, subjects both the statute and the defendant who invokes it to strict constitutional scrutiny ); *Moose Lodge No. 107 v. Irvis*, 707 U.S. 163, 179 (1972) (a non-neutral government decree that sanctions race discrimination is violates equal protection principles and renders private party invoking the decree as a "state actor" who may be liable for the alleged constitutional violation).[6]

## IV.    PLAINTIFFS HAVE ALLEGED CLAIMS FOR RELIEF

### A.    Plaintiffs Properly Pled Breach Of The Implied Covenant Of Good Faith And Fair Dealing (The Sixth Cause Of Action)

Under California law, every contract "imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement." *McClain v. Octagon Plaza, LLC,* 159 Cal.App.4th 784, 796 (2008) (quoting  *Carma Developers, Inc. v. Marathon Dev. Cal., Inc*., 2 Cal.4th 342, 371–72 (1992)).  The covenant "is based on general contract law and the long-standing rule that neither party will do anything which will injure the right of the other to receive the benefits of the agreement." *Waller v. Truck Ins. Exchange, Inc*., 11 Cal.4th 1, 36 (1995).  Five factual elements are required to establish a breach of the covenant of good faith and fair dealing: (1) the parties entered into a contract; (2) the plaintiff fulfilled his obligations under the contract; (3) any conditions precedent to the defendant's performance occurred; (4) the defendant unfairly interfered with the plaintiff's rights to receive the benefits of the contract; and (5) the plaintiff was harmed by the

---

[6]    Defendants' reliance on cases applying the CDA to "protect[] the voluntary self-regulatory actions of private online platforms," do not, have never, and could not extend immunity to voluntary or self-regulatory actions of race and sex discrimination against LGBTQ+,. African Americans, and other YouTube users without running afoul of the Constitution.  "[T]he whole purpose of Section 230 was to avoid the kind of government censorship that raised constitutional concerns."  *See Enigma*, 2019 U.S. Appeal LEXIS 38784, *9-10 ; *Barnes*, 570 F.3d at 1099-1100 (citation omitted).  "[L]eaving content moderation to private online service providers and protecting them (and their users) from liability both for content that they decide to moderate or remove" is a far cry from immunizing internet service providers from discriminating against users using animus-based filtering.

defendant's conduct.  Judicial Council of California Civil Jury Instruction 325.

The covenant is a "'supplement to an existing contract, and thus does not require parties to negotiate in good faith prior to any agreement.' The covenant of good faith finds particular application in situations where one party is invested with a discretionary power affecting the rights of another. Such power must be exercised in good faith." *Carma*, 2 Cal.4th at 372; see *Perdue v. Crocker Nat'l Bank*, 38 Cal.3d 913, 923, 216 (1985) ("[W]here a contract confers on one party a discretionary power affecting the rights of the other, a duty is imposed to exercise that discretion in good faith and in accordance with fair dealing.")

Breach of the implied covenant occurs "[w]here the terms of a contract are literally complied with but one party to the contract deliberately countervenes the intention and spirit of the contract." *Hilton Hotels Corp. v. Butch Lewis Prod., Inc.*, 808 P.2d at 923–24 (Nev. 1991).  "Establishing such a breach of the implied covenant depends upon the 'nature and purposes of the underlying contract and the legitimate expectations of the parties arising from the contract." *Integrated Storage Consulting Servs., Inc. v. NetApp, Inc.,* No. 5:12-CV-06209-EJD, 2013 WL 3974537, at *7 (N.D. Cal. July 31, 2013).  Breach of the implied covenant is "limited to assuring compliance with the express terms of the contract, and cannot be extended to create obligations not contemplated by the contract."  *Shaw v. CitiMortgage, Inc.*, 201 F. Supp. 3d 1222, 1252 (D. Nev. 2016).

Plaintiffs alleged that Defendants breached their express promises to provide full YouTube access subject only to the same viewpoint-neutral rules and criteria that Defendants apply to all users.  SAC 14:21-15:27.  Plaintiffs further allege that Defendants admitted they were employing animus-based filtering: in April 2017 [*Id.*, 13:10-15], and again in December 2017 when Defendants admitted to a "company policy" of discrimination.  *Id.*, 45:18-25.  Such animus-based filtering and policy constitute a *prima facie* case that Defendants illegally discriminate in determining who gets access to the website and services, and the degree of access afforded, and deprive Plaintiffs of their contractual benefits.  *Id.*, 13:22-15:5, 48:20-49:23, 51:8-18.  Defendants' use of race and sex based discrimination to screen and block access to internet services exceeds Plaintiffs' reasonable expectations under the Agreements as alleged, and is blatantly illegal.  Defendants' conduct also directly contradicts Defendants' 2018 sworn Congressional testimony that YouTube is a viewpoint

neutral public forum. SAC:3:9-19, 20:2-5, 25:11-22.  In so doing, Plaintiffs seek no obligations that are not contemplated by the contract, "but merely to force Defendants to do what they promised in writing and orally."  See *McKnight v. Torres*, 563 F.3d 890, 893 (9th Cir.2009).

In that regard, Defendants' contractual discretion is not unlimited and cannot authorize them to do exactly that which they promised not to do; *i.e.*, discriminate against Plaintiffs in the exercise of their discretion "to remove Plaintiffs' content without prior notice." MTD: 24:20-25:19.  Nothing in the Agreements authorize Defendants to apply animus-based filtering, and discriminate against users based on their individual identity or viewpoints.  Defendants cannot exercise contractual "discretion" so as to render illusory the Agreements providing full access to YouTube, subject only to viewpoint-neutral filtering and rules. Indeed Defendants promised the opposite by agreeing to exercise their discretion as "permitted under California law" and subject to viewpoint neutral content based rules that apply equally to all.  *Id; see also* The Unruh Civil Rights Act, Cal. Civ. Code §§41, *et seq.*; 42 U.S.C. § 1981; Art.1, § 2 Cal. Const.; U.S. Const. 1 and 14 Amend.  At best, Defendants tortured construction of its Agreement is a factual issue that must await discovery: "Whether Defendants' acts were done in bad faith and not within the reasonable expectations of the parties is a question of fact that cannot be decided at the pleading stage.")  *McNeary-Calloway v. JP Morgan Chase Bank, N.A.*, 863 F. Supp. 2d 928, 958 (N.D. Cal. 2012).

### B.   Plaintiffs Have Alleged A Claim Under The UCL (Fifth Cause of Action)

Plaintiffs have also alleged a claim for relied under the UCL for unlawful, unfair, and deceptive business practices.  *See* SAC 117:1-118:3.  With respect to the unlawful practices, Plaintiffs allege predicate violations of law include the denial of equal benefits under contract based on race and sex under the Unruh Act, 42 U.S.C. § 1981; the breaches of, and fraud associated with, the procurement of license agreements worth billions of dollars; the violation of Plaintiffs' intellectual and data property rights; false advertising and unlawful anticompetitive conduct under the Lanham Act; and overt and intentional violations of the Liberty of Speech, Free Speech, and equal protection of the law under the California and U.S. Constitutions.

Furthermore, with respect to unfair and anticompetitive practices, Defendants' racist, sexist profiling for purposes of advancing Defendants' own content and that of its partners and protégés,

by redirecting viewers and revenue from LGBTQ+ channels and pushing them off the website not only reduces competition; Defendants are robbing 2.3 billion users of their contract benefits: Defendants receive 100% of user's data and license to their content under the Agreements, while depriving all but the chosen few partners and sponsored creators access to a politically neutral public forum, subject only to content based identity and viewpoint neutral rules.

Defendants audaciously suggest that "Plaintiffs' detailed allegations undercut the notion that *YouTube deliberately applied its policies to harm LGBTQ+ creators*." MTD 23:23-28 (emphasis added). But Defendants **admit** they were doing it from 2016 through 2017. *Id.*, 13:10-15l 29:26-30:4, 42:10-17, 45:18-25,46:18-25. That admission is "game over" at the pleading stage. *See Id.* at 82:26-87:13. While Defendants prevented children and young people from accessing quality compliant LGBTQ+ videos, Defendants lined their pockets by posting or allowing multiple *fully monetized unrestricted versions* of the trailer for "Fifty Shades Darker" and "I, Tonya" were accessible. *Id.*, 85:1-7; 22-28.

Finally, Plaintiffs alleged that the severe, substantial, financial and irreparable injuries which LGBTQ+ users have suffered at the hands of Defendants is the direct and proximate result of Defendants' discriminatory and anti-competitive animus-based filtering: Among other things, Plaintiffs and their viewers have lost revenue and data rights [*Id.*, 3:4-8, 5:5-12, ]; viewers [*Id.*, 52:9-15, 63:25-64:5, 72:1-8, 77:18-78:5, 79:54-13, 81:28-10, 83:2-6, 91:13-19, 97:4-6 ]; money [*Id.*, 63:4-8, 70:14-22, 82:11-18, 87:10-13, 89:1-8, 90:24-27]; and Defendants have virtually pushed them off YouTube. *Id.*, 82:19-25, 91:1-7; 93:7-14.

### C.     Plaintiffs Properly Pled The Cause Of Action For Violation Of The Lanham Act Pursuant To 15 U.S.C. § 1125, et seq.

Defendants have made false and misleading statements to tens of millions of viewers that Plaintiffs' compliant videos are so shocking and outrageous that they fail to comply with Defendants' minimal, First Amendment-inspired, rules to protect YouTube as a public forum for free speech open to all on equal terms. SAC ¶346. Such false advertising is actionable under Lanham.

1    The factually dense SAC allegations more than satisfy the pleading requirements of a

2  Lanham Act false advertising claim: "(1) false statement of fact by [Google/YouTube] in a

3  commercial advertisement about its own or another's product; (2) [which] actually deceived or has

4  the tendency to deceive a substantial segment of its audience; (3) [which] is material, in that it is

5  likely to influence the purchasing decision; (4) [which] [Google/YouTube] caused [] to enter

6  interstate commerce; and [that] (5) [Plaintiffs] ha[ve] been or [are] likely to be injured as a result of

7  the false statement." *Wells Fargo & Co. v. ABD Ins. & Fin. Servs., Inc.*, 758 F.3d 1069, 1071 (9th

8  Cir. 2014).  This claim is not about the "***act of excluding***" anything, but rather arises from

9  Defendants ***false public statements*** that Plaintiffs' videos are shocking or appropriate.  *See supra*.

10  This is explicitly alleged to have been the proximate cause of cognizable injury to Plaintiffs as

11  content creators.  SAC, ¶ 347.  "A false advertising cause of action under the Act" such as

12  Plaintiffs', "is not limited to literal falsehoods but extends to ***false representations made by***

13  ***implication or innuendo***" like those made by Defendants.  See *Cook, Perkiss and Liehe, Inc. v.*

14  *Northern California Collection Service, Inc.*, 911 F.2d 242, 245 (9th Cir. 1990) (emphasis added).

15    Defendants make specific, demonstrably false commercial public representations[7] that

16  Plaintiffs' compliant videos "contain[] discussions about drug use or abuse or drinking alcohol;

17  overly detailed conversations about or depictions of sexual activity; graphic depictions of violence,

18  violent acts, natural disasters or tragedies or violence in the news; specific details about events

19  related to terrorism, war, crime and political conflicts that resulted in death or serious injury even if

20  no graphic imagery is shown; inappropriate language, including profanity; and/or content that is

21  gratuitously incendiary, inflammatory, or demeaning toward an individual or group."  SAC, ¶ 26.b.;

22  *see also, e.g.*, *Id.*, ¶¶ 83-85, 343-346.  Defendants further emphasize their negative message by

23  branding videos with a foreboding YouTube-specific red face (*Id.*, ¶ 83) and warn both advertisers

24  and viewers regarding the consequences proceeding.  *Id.*  Adding insult to injury, Google/YouTube

25  promote hate speech content on or in close proximity to LGBTQ+ content posted by Plaintiffs, thus

26  confusing Plaintiffs' valuable educational messages and causing the public to falsely believe that

27  _____

28  [7]    Defendants' representations affecting videos subject to "Restricted Mode" are seen
75,000,000 million times daily.  See SAC 27:8-12.

1  Plaintiffs are associated with these vile points of view.  SAC, ¶¶ 341, 346; See also *id.* at 27:8-12..

2       Actionable misrepresentations under Lanham "need not be made in a 'classic advertising

3  campaign' but may consist instead of more informal types of 'promotion.'"  *Coastal Abstract Serv.,*

4  *Inc. v. First Am. Title Ins. Co.*, 173 F.3d 725, 735 (9th Cir. 1999).  It is for this reason that similar

5  actionable misrepresentations have been found in privacy policies (*Collegenet, Inc. v. XAP Corp.*,

6  442 F. Supp. 2d 1070, 1078 (D. Or. 2006)); sales presentations (*Seven-Up Co. v. Coca-Cola Co.*, 83

7  F.3d 1379, 1386 (5th Cir. 1996)), and proposals for services (*Larkin Group, Inc. v. Aquatic Design*

8  *Consultants, Inc.*, 323 F. Supp. 2d 1121, 1128-29 (D. Kan. 2004)).

9       Here, Plaintiffs' LGBTQ+ compliant videos do not contain material that is "shocking" or

10  "inappropriate."  SAC, ¶¶ 345-346.  Falsely labeling compliant videos as "shocking" or

11  "inappropriate"  is the direct and proximate cause of significant, immediate, predictable – potentially

12  irreparable – injuries in fact to Plaintiffs in the form of diverted views, decreased subscriber

13  numbers, and lost advertising revenues, and other harm to channel and video reach, distribution, and

14  monetization.  *Id.*, ¶ 347.

15       Defendants' self-serving explanation that their false statements and admissions constitute

16  mere commercial "puffery" is premature, if not frivolous.  MTD 17-18.  Only in a "rare situation" is

17  granting a motion to dismiss on such grounds appropriate.  *Williams v. Gerber Prods. Co.*, 552 F.3d

18  934, 939 (9th Cir. 2008).  This is not such a situation.  Defendants' false statements as alleged by

19  Plaintiffs, demean Plaintiffs' compliant videos as "shocking," "sexually explicit" "offensive," or

20  otherwise inappropriate or objectionable for audiences; and constitute specific, quantifiable and

21  falsifiable representations.  The Court should not consider whether they qualify as "puffery" upon a

22  motion to dismiss stage.  *See also Hall v. Bed Bath & Beyond, Inc.*, 705 F.3d 1357, 1358 (Fed. Cir.

23  2013) (statements that are not "blustering" or "boasting" do not constitute "puffery").

24       The same is true with respect to Defendants' conduct in associating Plaintiffs' compliant

25  videos with vile hate speech. Defendants do not deny that Plaintiffs' videos are displayed beside

26  homophobic and hate speech content as alleged, but rather, Defendants ask whether consumers

27  would be confused by Defendants' placement of such video recommendations and ads as alleged in

28  the SAC.  MTD  19  As with Defendants' "puffery" assertions, it is premature to resolve factual

1    issues such as "likelihood of confusion" upon a motion to dismiss, especially given the detailed

2    allegations and admissions in the SAC.  See *e.g.*, *Browne v. McCain*, 612 F. Supp. 2d 1125, 1133

3    (C.D. Cal. 2009); (declining to resolve likelihood of confusion at motion to dismiss stage); *accord*

4    *Schieffelin & Co. v. Jack Co. of Boca, Inc.*, 725 F. Supp. 1314, 1323 (S.D.N.Y. 1989) (consumer

5    confusion is a question of fact).

6        **D.**    **Plaintiffs Properly Pled Claims for Violations of The Unruh Civil Rights Act**

7                **(The Fourth Cause of Action).**

8        The Unruh Act prohibits businesses from discriminating on the basis of certain protected

9    categories, including sex, race, color, and religion.  *Cal. Civ. Code* § 51(b). And this list of

10   categories is "illustrative, rather than restrictive," *Koebke v. Bernardo Heights Country Club*, 36

11   Cal. 4th 824, 840 (2005).  Discrimination cases do not have a heightened pleading standard for

12   demonstrating improper motive.  *Galbraith v. County of Santa Clara*, 307 F.3d 1119, 1125-26 (9th

13   Cir. 2002).  Plaintiff need only offer facts "tending to exclude" Defendants' alternative explanation

14   for the challenged conduct, thereby rendering the Complaint's allegations plausible.  *See Eclectic*

15   *Properties East, LLC v. Marcus & Millichap Co.*, 751 F.3d 990 (9th Cir. 2014); *Starr v. Baca*, 652

16   F.3d 1202, 1216-17 (9th Cir. 2011).

17       Here, Plaintiffs alleges that Defendants have engaged in pervasive overt discrimination

18   against the LGBTQ+ users.  SAC 12:14-14:20, 45:17-94:4.  Defendants use computer based and

19   manual filtering tools to restrict access to LGBTQ+ and African American users' equal access to

20   YouTube by identifying and using the users sexual or racial identity to restrict access.  Not only do

21   Plaintiffs allege that the computer code used to filter speech is based on racial or sexual identity

22   profiling, but Defendants use that filtering to implement a company policy of discrimination,

23   including denying access to services based on the user's identification as "gay," and treating content

24   created by or intended for LGBTQ+ audiences as per se "shocking," "sexually explicit," or

25   "inappropriate," even where the content complies with all of Defendants content based rules

26   Allegations that different speakers engaged in similar or identical speech were treated differently by

27   Defendants based on their personal identities is sufficient to establish a prima facie case that

28   Defendants engaged in identity or viewpoint based discrimination. *See, e.g., Hightower v. City and*

*County of San Francisco*, 77 F.Supp.3d 867 (N.D. Cal. 2014); *Cuviello v. City and County of San Francisco*, 940 F.Supp.2d 1071 (N.D. Cal. 2013); *Seidman v. Paradise Valley Unified School Dist. No. 69*, 327 F.Supp.2d 1098, 1112 (D. Ariz. 2004).  The FAC's allegations of differential treatment, without more, render dismissal on the pleadings inappropriate. *See Kirbyson v. Tesoro Refining and Marketing Co*., 2010 WL 2382395, *3 (N.D. Cal. June 10, 2010) (allegations of different treatment raised a plausible inference that plaintiff was victim of discrimination, making dismissal on pleadings "inappropriate" and "premature"); *see also Menotti v. City of Seattle*, 409 F.3d 1113, 1147-48 (9th Cir. 2005).

> **E.**      **Plaintiffs Have Properly Stated A Claim For Liberty Of Speech (The Third Cause Of Action).**

The Liberty of Speech "provision of our state Constitution grants broader rights to free expression than does the First Amendment to the United States Constitution."  It enshrines the fundamental "idea that private property can constitute a public forum for free speech if it is open to the public in a manner similar to that of public streets and sidewalks." *Fashion Valley Mall, LLC v. Nat'l Labor Relations Bd*., 42 Cal. 4th 850, 858–59 (2007) (quoting *Marsh v. Alabama* 326 U.S. 501, 502-03 (1946)) and (discussing *Robins v. Pruneyard Shopping Center* 23 Cal.3d 899 (1979), affirmed *sub nomine, Pruneyard Shopping Center v. Robins,* 447 U.S. 74 (1980).  "The more an owner, for his advantage, opens up his property for use by the public in general, the more do his rights become circumscribed by the statutory and constitutional rights of those who use it." *Id*., at 506.

Under California law, "state action" by a private property owner is not (and never has been) limited only to commercial shopping centers as Defendants contend.  [Cite.] The law's focus is solely "on whether the property owner has so opened up his or her property for public use as to make it the functional equivalent of a traditional public **forum**." *See, e.g.*, *Trader Joe's Co. v. Progressive Campaigns, Inc.*, 73 Cal.App.4th 425, 433-434 (1997); *Bank of Stockton v. Church of Soldiers,* 44 Cal.App.4th 1623, 1630 (1996); *Allred v. Harris*, 14 Cal.App.4th 1386, 1390-1391(1993); *Allred v. Shawley,* 232 Cal.App.3d 1489, 1501-1502 (1991).  "Whether private property is to be considered **quasi**-**public** property subject to the exercise of constitutional rights of

free speech and assembly depends" on the factual circumstances, including in part, "the nature, purpose, and primary use of the property; the extent and nature of the public invitation to use the property; and the relationship between the ideas sought to be presented and the purpose of the property's occupants." *Albertson's, Inc. v. Young*, 107 Cal. App. 4th 106, 119 (2003); *Allred v. Shawley, supra,* at 1501; 73 Ops. Cal. Atty. Gen. 213, 222–223 (1990).

Under Rule 12(b)(5), at a minimum the Court should give due consideration as to the sufficiency of what are factual or mixed questions of fact and law, as to the public character of YouTube.  Defendants openly solicit the public worldwide to use YouTube, and does so by expressly representing that it is public space dedicated to free speech where "everyone deserves to have a voice, and that the world is a better place when we listen, share and build community through our stories." SAC ¶¶ 47-48, 57.  Defendants specifically tell the world that YouTube is a public forum that "give[s] everyone a voice." "[YouTube] is what happens when you give everyone a voice;" "that is the power of YouTube," it is a social media website containing "the rawest, purest, most unfiltered portrait of what humans can do." *About YouTube* is found at: https://www.youtube.com/yt/about/.  Consequently, YouTube far apart from other cases where the public is invited to use private property primarily for the limited purpose of purchasing goods and services from private business establishments. See *Amalgamated Food Emp. Union Local 590 v. Logan Valley Plaza, Inc*., 391 U.S. 308, 324 (1968), *abrogated by Hudgens v. N. L. R. B.*, 424 U.S. 507 (1976); *Golden Gateway Ctr. v. Golden Gateway Tenants Assn.*, 26 Cal. 4th 1013, 1032 (2001); *Albertson's*, 107 Cal.App.4th at 114.

Another key factor in this *Pruneyard* analysis is Defendants' global dominance over 95% of the public video content ***ever produced in the world*** and their corresponding control over speech that is unparalleled in history.  *See* SAC 6:8-18, 8:14-21.  Moreover, FCC curtailment of net neutrality further concentrated private intermediaries' power, and will necessarily be "followed by an effort to crush . . . political opponents and favor . . . political supporters." *Id*  YouTube is a global forum for speech and social media and the equivalent of a town square where citizens exchange ideas on matters of public interest.  *See Packingham v. North Carolina,* 582 U.S. ___, 137 S.Ct. 1730, 1737 (2017);  *Reno,* 521 U.S. at 868.  Thus, "[t]he interest in encouraging freedom of

PLAINTIFFS' OPPOSITION TO DEFENDANTS'
MOTION TO DISMISS SECOND AMENDED CLASS ACTION COMPLAINT

1   expression in a democratic society outweighs any theoretical but unproven benefit of censorship" by

2   the Defendants.  *See Id.,*  at 885.

3          Defendants ignore substantial settled case law that internet "[w]eb sites accessible to the

4   public, where public may post speech are 'public forums' for purposes of the anti-SLAPP statute."

5   *Barrett v. Rosenthal*, 40 Cal.4th 33, 41, n. 4 (2006).  While *Hi Q. Labs* [*hiQ Labs, Inc. v. LinkedIn*

6   *Corp*., 273 F. Supp. 3d 1099 (N.D. Cal. 2017), aff'd, 938 F.3d 985 (9th Cir. 2019)]  was correct in

7   pointing out that Cal. Code of Civ. Pro. §425.16 does not expressly define a "public forum" for

8   purposes of anti-SLAPP law, it did not consider, and the parties did not raise established law that

9   California always determines the "public forum issue" under the anti-SLAPP laws with "sole

10  reference to [] First Amendment cases" and the public function doctrine under *Pruneyard* and its

11  progeny. *Weinberg v. Feisel,* 110 Cal. App. 4th at 1131, n.4 (2003); *see also Ralphs Grocery Co. v.*

12  *Victory Consultants, Inc.*, 17 Cal. App. 5th 245 (Cal. Ct. App. Oct. 24, 2017).  A "public forum"

13  under§ 425.16 is by definition a public forum under *Pruneyard,* and the California constitution. *See*

14  *Weinberg*, 110 Cal.App.4th at 1131, n.4; *Briggs v. Eden Council for Hope & Opportunity,* 19

15  Cal.4th 1106, 1123 (1999).  Contrary to Defendants' assertion, finding that social media sites are

16  public forums for purposes of section 425.16 is strong evidence, if not dispositive of, the public

17  forum analysis under California, as well as federal law.  *Id.*; *see also Ralphs Grocery Co.*, 17 Cal.

18  App. 5th at 257–58 (noting that 425.16 requires a threshold finding that moving party owns and

19  operates a public forum under *Pruneyard* and progeny).

20          Finally, Defendants arguments invoking the First Amendment to justify their own invidious

21  animus-based filtering and discriminatory censorship, were considered and rejected by the United

22  States Supreme Court.  In *Pruneyard*, the US Supreme Court affirmed the California Supreme Court

23  decision, holding:  to the extent that property owners have any First Amendment right "not to

24  speak," Defendants must vindicate those rights by "publicly dissociating [themselves] from the

25  views of the speakers," not by resorting to animus-based filtering and discriminatory unlawful

26  restraints on the right to free speech. 447 U.S. at 88; *see also Snatchko v. Westfield, LLC,* 187

27  Cal.App.4th 469, 491–92 (2010).  Defendants attempt to hide behind free speech principles to avoid

28

1    liability for violating those same principles, has clearly been rejected by other courts.[8]

2    **F.      Plaintiffs Have Pled Facts Sufficient State A Claim For Relief For Action Under**

3    **Federal Law (The Second Cause Of Action).**

4        Plaintiffs have alleged two related, but legally distinct, theories of state action under federal

5    law.  *First*, Plaintiffs allege that Defendants discriminatory regulation of speech is "state action"

6    under the "endorsement test" under which a private party invokes or applies a federal statute, in this

7    case Section 230 immunity under the CDA, to permit overt race and sex based discrimination that

8    would otherwise be unlawful.  See, *e.g. Skinner v. Ry. Labor Executives' Ass'n*, 489 U.S. 602, 615–

9    16 (1989) (use of non-neutral encouragement command or impetus under a federal regulation to

10   engage in drug testing makes private parties); *Moose Lodge No. 107 v. Irvis*, 707 U.S. 163, 179

11   (1972) (licensing statute that sanctioned and encouraged club to enforce a racially discriminatory

12   private rule).  Whether Defendants are engaged in state action here, where a private "internet service

13   provider,"  invokes §230(c) in such a way as to render that statute a non-neutral, non-passive

14   sanctioning of Defendants' discriminatory or unconstitutional conduct is an issue which no court has

15   *ever* considered – certainly the issue was not raised in *Manhattan Cmty. Access Corp. v. Halleck*, --

16   -- U.S. --, 139 S. Ct. 1921 (2019).

17       In *Skinner*, the Supreme Court held that "[w]hether a private party should be deemed an

18   agent or instrument of the Government for Fourth Amendment purposes necessarily turns on the

19   degree of the Government's  participation in the private party's activities and a question that can

20   only be resolved "in light of all the circumstances." 489 U.S. at 614-15.  After "[c]onsidering the

21   "specific features of the regulations," the Supreme Court found that "the Government did more than

22   adopt a passive position toward the underlying private conduct" by removing "all legal barriers to

---

[8]     All of those cases cited by Defendants involved traditional, editorialized, non-neutral
opinion, news, closed search engines, or other content providers who did not obtain licensing and
publication rights based on a promise of an open forum for speech subject only to viewpoint neutral
content based rules.  *See City of Cincinnati v. Discovery Network, Inc.*, (1993) 507 U.S. 410, 432;
*Hoffman v. Capital Cities/ABC, Inc.*, 255 F.3d 1180, 1184-85 (9th Cir. 2001); *see also Perkins v.
Linkedin Corp.*, 53 F.Supp.3d 1222, 1251-53 (N.D. Cal. 2014) (Koh, J.) (denying motion to dismiss
17200 unfair competition claim involving misleading commercial speech); *American Bullion, Inc. v.
Regal Assets, LLC*, 2014 WL 7404597 (C.D. Cal. Dec. 30, 2014) (modifying injunction on Lanham
Act false advertising claim over First Amendment objection).

the testing authorized by Subpart D," making plain "its strong preference for testing," and

mandating "that the railroads not bargain away the authority to perform tests granted by Subpart D."

The Court concluded that these facts "are clear indices of the Government's encouragement,

endorsement, and participation, and suffice to implicate [state action under] the Fourth

Amendment." *Id*. at 615-16.

In *Moose Lodge*, the Court held that state action "may emanate from rulings of

administrative and regulatory agencies as well as from legislative or judicial action" where "the

application of state sanctions to enforce such a rule would violate the Fourteenth Amendment."

"al]though the Liquor Control Board regulation in question is neutral in its terms, the result of its

application in a case where the constitution and bylaws of a club required racial discrimination

would be to invoke the sanctions of the State to enforce a concededly discriminatory private rule."

The assertion of Congressional grant of immunity for the kind of blatant sex and race

discrimination in filtering public internet speech under §230(c) alleged in the SAC is sufficiently

non-neutral to adequately plead state action and survive a motion to dismiss. Accepting as true the

Plaintiffs' allegations that Defendants undertook a "scheme to restrain, interfere with, bar and

ultimately cleanse disfavored content creators and users from the YouTube Platform" [SAC 3:1-4],

with animus-based filtering [*Id*., 3:10-17], in furtherance of company policy to discriminate against

"gays," [*Id*., 10:21-24], use of §230(c) to immunize such overt discrimination, and deny Plaintiffs'

their rights to petition for legal relief based on that discrimination – such allegations are sufficient to

subject Defendants conduct to scrutiny under the Constitution. 489 U.S. at 614-15. Under *Skinner*

and *Moose Lodge*, when an internet company uses a government decree like §230(c) in as a way that

results in encouraging or compelling discrimination and/or any other violation of a fundamental

constitutional right, at a minimum, the Court must "sift through the facts" and consider all the

circumstances to determine whether Defendants' conduct constitutes "state action" when blocking

and screening public speech.

Furthermore, Plaintiffs have alleged facts sufficient to establish at the pleading stage that

Defendants are regulating speech in a designated public forum subject to animus-based filtering that

Defendants are applying equally to everyone. The regulation of speech in a designated public forum

by a private party is a traditional and exclusive government function that constitutes state action as a matter of law.  *See Lee v. Katz*, 276 F.3d 550, 554-57 & n.4 (9th Cir. 2002).  Thus, the issue at this stage is not whether the regulation of speech by a private party in a public forum is state action, but *whether Defendants' operation, characterization, invitation to use, and other representations are sufficient to establish that Defendants have affirmatively designated YouTube as a public forum* for freedom of expression.

Given the SAC allegations, including Defendants' admissions and sworn Congressional testimony, it is clear:  Defendants have designated YouTube as a public forum for free expression. *See, e.g.*, *Johnson v. Poway Unified School Dist.*, 658 F.3d 954, 966 (9th Cir. 2011) (in considering a mixed question of law and fact involving assertion of First Amendment violation by a public employee, "two inquiries are needed," first, a factual inquiry as to the scope and content of the employee's job responsibilities, and second, applying those factual findings to the law); *Venetian Casino Resort v. Local Joint Exec. Bd. Of Las Vegas*, 257 F.3d 937, 947 (9th Cir. 2001) (forum analysis as to whether a private forum qualifies as a public forum requires the court to evaluate multiple factors, including the forum's historical use, its physical location, and its dedication to public use); *Trenouth v. U.S.*, 764 F.2d 1305, 1307 (9th Cir. 1985) (characterization of property alleged to be a public forum "mixed question of law and fact").

In *Marsh v. Alabama*, 326 U.S. 501 (1946) and subsequent decisions, the Supreme Court and the Ninth Circuit have reaffirmed the basic principle that that "[t]he more an owner, for his advantage, opens up his property for use by the public in general, the more do his rights become circumscribed by the statutory and constitutional rights of those who use it."  *Venetian*, 257 F.3d at 945-46; *Lee*, 276 F.3d at 555 (9th Cir. 2002)  ("Ownership does not always mean absolute dominion . . . . [Where] facilities are built and operated primarily to benefit the public ... their operation is essentially a public function ... subject to state regulation"); *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 801, 105 (1985) (when a speaker seeks "access to . . . private property dedicated to public use," it may "evoke First Amendment concerns"); *Brindley v. City of Memphis, Tennessee*, No. 17-cv-2849 (SHM), 2018 WL 3420819, at *4 (W.D. Tenn. July 13, 2018) ("When property is privately owned, it is subject to the First Amendment in proportion with the

1   owner's authorization of public use").

2          Contrary to Defendants' suggestion, *Halleck* expressly declined to overrule the public

3   function theory of state action articulated in *Marsh* and its progeny.  *Halleck* certainly stopped well

4   short of Defendants' position in this case.  *Halleck* considered only whether a cable television

5   provider that is required under a state licensing law to make a small, local channel available at

6   selected times for selected public users was a designated "public forum" for free speech.  The Court

7   merely held that based "on that fact alone" the allegations were not sufficient to transform a private

8   cable company into a state actor.  *Id*.  That is a far cry from the factual record here where

9   Defendants admit under oath, during Congressional hearings, that they designate, operate and invite

10  the public to use YouTube as a public forum for freedom of expression where the user's speech is

11  subject to regulation under viewpoint neutral content based rules.  SAC at 11:2-24.

12         Moreover, *Halleck* did not involve overt race and sex discrimination on a global scale.  On

13  two prior occasions, the Supreme Court found that global social media sites like YouTube bear all

14  of the character attributes of a traditional public forum.  *See Packingham v. North Carolina*, 582 --

15  U.S. --, 137 S.Ct. 1730, and *Reno,* 521 U.S. 844.  Unlike a small public access cable station, global

16  internet social media cases require Courts to "exercise extreme caution before suggesting that the

17  First Amendment provides scant protection for access to vast networks."  *Packingham*, 137 S.Ct. at

18  1736.  This is especially true here because Defendants have expressly designated YouTube the

19  "public forum" for "freedom of expression that controls 95% of all public video in the world., and

20  have done so as part of an online company town in which Defendants are involved in controlling all

21  the traditional public services offered by governments.

22  **V.   <u>CONCLUSION.</u>**

23         The Court should deny Defendants' motion to dismiss each specified claims for relief:

24  Plaintiffs' claims are amply supported by 353 paragraphs detailing that Defendants are engaged in

25  systematic and overt discrimination against the LGBTQ+ Community, applying anti-competitive

26  animus filtering, and breaching contractual promises and intellectual property rights.  The alleged

27  conduct is devastating and dangerous, not just to Plaintiffs, but to all YouTube users, especially

28  those who are LGBTQ+ and/or African American, who are being denied access to YouTube based

1424511.2                                   -34-                        Case No. 5:19-cv-004749-VKD

1  on their personal identity or viewpoints.  Here, at a minimum, Plaintiffs' are entitled to their day in

2  court.   Should the Court find any defects or factual omissions with respect to any of the claims,

3  Plaintiffs respectfully request leave to amend to cure the defect or omission.

4

5  DATED:  February 24, 2020                     Respectfully submitted,

6                                                BROWNE GEORGE ROSS LLP
                                                      Peter Obstler
7                                                     Debi A. Ramos

8

9
                                              By: _____ /s/ Peter Obstler_____
10                                                    Peter Obstler
                                              Attorneys for LGBTQ+ Plaintiffs
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFFS' OPPOSITION TO DEFENDANTS'
MOTION TO DISMISS SECOND AMENDED CLASS ACTION COMPLAINT

1

**PROOF OF SERVICE**

2

**STATE OF CALIFORNIA, COUNTY OF LOS ANGELES**

3

At the time of service, I was over 18 years of age and not a party to this action.  I am

4

employed in the County of Los Angeles, State of California.  My business address is 801 S. Figueroa Street, Suite 2000, Los Angeles, CA 90017.

5

On February 24, 2020, I served true copies of the following document(s) described as

6

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS SECOND AMENDED CLASS ACTION COMPLAINT**

7

on the interested parties in this action as follows:

8

**SEE ATTACHED SERVICE LIST**

9

10

**BY MAIL:**  I enclosed the document(s) in a sealed envelope or package addressed to the persons at the addresses listed in the Service List and placed the envelope for collection and mailing,

11

following our ordinary business practices.  I am readily familiar with the practice of Browne George Ross LLP for collecting and processing correspondence for mailing.  On the same day that

12

correspondence is placed for collection and mailing, it is deposited in the ordinary course of business with the United States Postal Service, in a sealed envelope with postage fully prepaid.  I am

13

a resident or employed in the county where the mailing occurred.  The envelope was placed in the mail at Los Angeles, California.

14

I declare under penalty of perjury under the laws of the State of California that the foregoing

15

is true and correct.

Executed on February 24, 2020, at Los Angeles, California.

16

17

18

19

_____

20

Jeremy Berk

21

22

23

24

25

26

27

28

-36-

Case No. 5:19-cv-004749-VKD

PLAINTIFFS' OPPOSITION TO DEFENDANTS'
MOTION TO DISMISS SECOND AMENDED CLASS ACTION COMPLAINT

**SERVICE LIST**
**Divino Group LLC v. Google LLC and YouTube, LLC**
**United States District Court - Case No. 5:19-cv-004749-VKD**

Office of the Attorney General
Department of Justice
950 Pennsylvania Avenue NW
Washington DC     20530-0001