DAVID H. KRAMER, SBN 168452
LAUREN GALLO WHITE, SBN 309075
KELLY M. KNOLL, SBN 305579
WILSON SONSINI GOODRICH & ROSATI
Professional Corporation
650 Page Mill Road
Palo Alto, CA 94304-1050
Telephone: (650) 493-9300
Facsimile: (650) 565-5100
Email: dkramer@wsgr.com
Email: lwhite@wsgr.com
Email: kknoll@wsgr.com

Attorneys for Defendants
GOOGLE LLC and YOUTUBE, LLC

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| DIVINO GROUP LLC, a California limited liability company, CHRIS KNIGHT, an individual, CELSO DULAY, an individual, CAMERON STIEHL, an individual, BRIAANDCHRISSY LLC, a Georgia limited liability company, BRIA KAM, an individual, CHRISSY CHAMBERS, an individual, CHASE ROSS, an individual, BRETT SOMERS, an individual, and LINDSAY AMER, an individual, STEPHANIE FROSCH, an individual, SAL CINEQUEMANI, an individual, TAMARA JOHNSON, an individual, and GREG SCARNICI, an individual,<br><br>        Plaintiffs,<br><br>        v.<br><br>GOOGLE LLC, a Delaware limited liability company, YOUTUBE, LLC, a Delaware limited liability company, and DOES 1-25,<br><br>        Defendants. | CASE NO.: 5:19-cv-04749-VKD<br><br>**STATEMENT OF RECENT DECISION**<br><br>Judge: Hon. Virginia K. DeMarchi |

Defendants Google LLC and YouTube, LLC respectfully submit as supplemental authority the recent decision from Magistrate Judge Kim in *Bob Lewis v. Google LLC, et al.,* Case No. 3:20-cv-00085-SK, ECF No. 63 (N.D. Cal. May 20, 2020) (Exhibit 1). Like this case, *Lewis* arises from claims that YouTube censored and demonetized videos for allegedly discriminatory reasons. The plaintiff asserted many of the same causes of action alleged here, including claims for violation of the First Amendment and the Lanham Act, unlawful discrimination, and breach of the implied covenant. In a comprehensive decision, Judge Kim granted Google's motion to dismiss with prejudice. First, the court held that plaintiff's claims were barred by Section 230(c)(1)—and in the process rejected the same constitutional attack on Section 230 that plaintiff makes here. Having addressed Section 230, the court then separately concluded that Lewis failed to state a claim for any of his asserted causes of action. The issues decided in *Lewis* are virtually identical to those raised in Google's motion to dismiss, and Google looks forward to discussing them with the Court at the upcoming hearing scheduled for June 2.

Dated:  May 20, 2020

WILSON SONSINI GOODRICH & ROSATI
Professional Corporation

By:  */s/  Lauren Gallo White*
Lauren Gallo White

Attorneys for Defendants
GOOGLE LLC and YOUTUBE, LLC

# Exhibit 1

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BOB LEWIS,

          Plaintiff,

    v.

GOOGLE LLC, et al.,

          Defendants.

Case No. 20-cv-00085-SK

**ORDER ON MOTION TO DISMISS**

Regarding Docket Nos. 23, 24, 27

      This matter comes before the Court upon consideration of the motion to dismiss filed by Defendants Google Inc. and YouTube, LLC (collectively, "Defendants"). Having carefully considered the parties' papers, relevant legal authority, and the record in the case, the Court hereby GRANTS Defendants' motion for the reasons set forth below. Also pending is a motion for a temporary restraining order and preliminary injunction and a motion for expedited discovery, both filed by Plaintiff Bob Lewis. The Court DENIES Plaintiff's motions as MOOT.

**BACKGROUND**

      Plaintiff "is a societal, cultural, and political commentator who owns and operates the website located at internet DNS address: MisandryToday.com, operates the YouTube Channel Misandry Today, and is the author of The Feminist Lie, It Was Never About Equality." (Dkt. No. 19 (Second Amended Complaint), ¶ 16.) Plaintiff Bob Lewis posts content on YouTube and brings this action to challenge Defendants' treatment of his posted content. (*Id*.) He alleges that Defendants are censoring and demonetizing his videos because of Defendants' opposition to Plaintiff's Christian religious affiliation, "national origin as a patriotic American citizen who supports American tradition and culture," and for exercising his First Amendment rights. (*Id*., ¶ 1.)

YouTube has a program which enables participants to receive a share of advertising revenue generated from advertisements posted on videos, which the parties label as "monetization." If YouTube determines that certain content is not suitable for advertisement, YouTube may restrict the advertisement, and that action is referred to as "demonetization."

**A.     State Actor Allegations.**

Plaintiff alleges that Defendants are agents of and are "joint enterprise state actors on behalf of the nations of The Peoples Republic of China, the EU, and the signatory governments of the Christchurch Call agreement." (*Id.*, ¶ 2.) Defendants allegedly enforce Chinese, EU, and Christchurch Call signatory government laws within the United States by criminalizing "hate speech" in violation of the United States Constitution. (*Id.*)

**1.     China.**

Defendants, along with other technology leaders, meet with the President of China in Seattle in September 2015. (*Id.*, ¶ 20.) Defendants have at least four offices in China staffed with hundreds of employees and, therefore, are required by the 2017 Chinese National Intelligence Law to "function as a joint enterprise collaborator and agent of the Chinese government." (*Id.*, ¶ 27.)

Until at least July 2019, Defendants worked on developing a search engine called Project Dragonfly for China that would be compatible with China's state sponsored censorship and intelligence activities. (*Id*, ¶¶ 28, 30, 31.)

**2.     European Union.**

In 2012, Defendants created a "Trusted Flagger" program. (*Id.*, ¶ 37.) On September 22, 2016, Defendants made the following statement:

> Back in 2012, we noticed that certain people were particularly active in reporting Community Guidelines violations with an extraordinarily high rate of accuracy. From this insight, the Trusted Flagger program was born to provide more robust tools for people or organizations who are particularly interested in and effective at notifying us of content that violates our Community Guidelines.
>
> As part of this program, Trusted Flaggers receive access to a tool that allows for reporting multiple videos at the same time.
>
> Our Trusted Flaggers' results around flagging content that violates our Community Guidelines speak for themselves: their reports are

United States District Court
Northern District of California

accurate over 90% of the time.  This is three times more accurate than
the average flagger.

(*Id.*)  Ninety percent of the time a Trusted Flagger flags a video for removal, that video is taken

offline.  (*Id.*)  One news outlet reported that British authorities are among the Trusted Flaggers.

The report stated that of the 200 people and organizations included in the pool of Trusted

Flaggers, ten slots were filled by governmental agencies.  (*Id.*, ¶ 38.)

Another news organization reported that Defendants, along with Facebook, Twitter and

Microsoft were working with the European Union to fight hate speech.  (*Id.*, ¶ 39.)  Google's

public policy and government relations director made the following public statement: "we have

always prohibited illegal hate speech on our platforms. . . We are pleased to work with the

Commission to develop co-and self-regulatory approaches to fighting hate speech online."  (*Id.*)

Defendants signed the European Union's Code of Conduct Agreement in which they

committed to removing illegal hate speech.  (*Id.*, ¶ 41.)  Defendants are abiding by the European

Union's Code of Conduct and have been expanding the censorship of hate speech into the United

States.  (*Id.*, ¶ 45.)

### 3.     Christchurch Call Agreement.

A news organization reported that multiple governments, including Britain, Canada,

Australia, Jordan, Senegal, Indonesia, Norway and Ireland, and big technology companies,

including Defendants, pledged to tackle terrorist and extremist violence online in response to the

attack on the Christchurch mosque.  (*Id.*, ¶ 52.)  The United States refused to sign on due to

freedom of speech concerns.  (*Id.*, ¶ 53.)

Defendants committed to sharing information with other online service providers and

foreign governments and notifying each other when they take down online content they disagree

with.  (*Id.*, ¶ 55.)  Online service providers, including Defendants, also agreed to work with the

signatory governments to shut down accounts.  (*Id.*, ¶ 56.)

### 4.     Google's Interactions with the United States Government.

Google won an exclusive, no-bid $27 million contract to provide the National Geospatial-

Intelligence Agency with geospatial visualization services.  (*Id.*, ¶ 196.)

Additionally, news organizations have reported that the Pentagon, the Census Bureau, and

intelligence agencies are working with Google and other large technology companies on the Pentagon's artificial intelligence and to fend off "fake news" and online disinformation campaigns (*Id.*, ¶¶ 197-199.)

**B.    Defendants' Conduct in the United States.**

Defendants operate the largest publicly accessible commercial website for people to purchase, rent, and view videos, movies and television shows in the United States.  (*Id.*, ¶ 64.)

All registered users of YouTube.com are required to sign YouTube's Terms of Service. (*Id.*, ¶ 81.)  YouTube's Terms of Service require users to stipulate they will not submit any content or material contrary to YouTube's Guidelines, or contrary to local, national, or international laws and regulations.  (*Id.*, ¶ 84.)

**C.    Defendants' Conduct Towards Plaintiff.**

Plaintiff joined YouTube as a registered user on August 13, 2016.  (*Id.*, ¶ 118.)  Plaintiff created a channel called "Misandry Today" and online he used the name of DDJ.  (*Id.*, ¶ 119.) Plaintiff published his first YouTube video, a commercial for his book The Feminist Lie, It Was Never About Equality, on May 29, 2017.  (*Id.*, ¶ 120.)  Plaintiff published a video commentary entitled, "The Social Media Constitutional Crisis" on YouTube.com on October 28, 2017.  (*Id.*, ¶ 121.)  Plaintiff published a video commentary entitled, "The Feminist & SJW Treason" on YouTube.com on November 3, 2017.  (*Id.*, ¶ 122.)  Plaintiff published a video commentary entitled, "The Legal Controversies Surrounding Social Media Companies" on YouTube on March 20, 2018.  (*Id.*, ¶ 123.)

Starting on October 28, 2017, YouTube demonetized many of Plaintiff's videos.  (*Id.*, ¶ 124.)  Plaintiff filed appeals with YouTube.  He won many of his appeals, but he lost 19.  (*Id.*, ¶ 124.)  For the appeals he won, YouTube did not compensate Plaintiff for the revenue he lost from the demonetization.  (*Id.*)  YouTube also restricted and removed some of Plaintiff's videos.  (*Id.*, ¶¶ 163, 165-169.)

YouTube maintains at least one, and possibly more, blacklists.  (*Id.*, ¶ 171.)  Defendants also created at least two programming frameworks which enable Defendants to "shadow ban," conceal, demote, or censor videos and other online content.  (*Id.*, ¶¶ 172, 174.)

United States District Court
Northern District of California

YouTube allows content creators to share advertisement revenue in return for posting video content, which is known as monetization and is part of Google's Adsense program. (*Id*., ¶ 193.) Website owners can join Google's Adsense program and get paid for advertisements on their websites. (*Id*., ¶ 194.) Google also runs an auction which allows advertisers to bid on ad placement. (*Id*., ¶ 195.)

**D.       YouTube's Terms and Guidelines.[1]**

To participate in YouTube's partner program and receive a share of advertising revenue generated from advertisements posted on videos ("monetization"), participants must agree to YouTube's Partner Program Terms. (Dkt. No. 28, ¶ 4, Ex. A.). The Partner Program Terms incorporate the YouTube's Terms of Service and YouTube's Partner Program Policies (now referred to as the "YouTube Monetization Policies"), which refer to YouTube's Advertiser-Friendly Content Guidelines. (*Id*., ¶¶ 5, 8, 10, 11, Exs. A, C, D.) YouTube's Terms of Service incorporates YouTube's Community Guidelines. (*Id*., ¶ 9, Ex. B.)

YouTube's Partner Program Terms provide in relevant part that "YouTube is not obligated to display any advertisements alongside your videos and may determine the type and format of ads available on the YouTube Service." (*Id*., Ex. A, ¶ 1.1.) YouTube's Community Guidelines state:

> If you think content is inappropriate, use the flagging feature to submit it for review by our YouTube staff. Our staff carefully reviews flagged content 24 hours a day, 7 days a week to determine whether there's a violation of our Community Guidelines.

(*Id*., Ex. B at p.1.) The Community Guidelines then lists several categories of prohibited material, including "Hateful content." The "Hateful content" section states:

---

[1] Courts may consider documents on a motion to dismiss where "the complaint necessarily relies upon a document or the contents of the document are alleged in a complaint, the document's authenticity is not in question and there are no disputed issues as to the document's relevance." *Coto Settlement v. Eisenberg*, 593 F.3d 1031, 1038 (9th Cir. 2010). In his operative complaint, Plaintiff repeatedly refers to his contracts with Defendants. (*See, e.g.*, Dkt. No. 19, ¶¶ 13, 81-84 (referring to YouTube's Terms of Service), ¶ 234 (referring to YouTube's Terms of Service and community guidelines), ¶ 245.) Plaintiff attached YouTube's Terms of Service as Exhibit S to his original complaint. (Dkt. No. 1.) The Terms of Service states that YouTube's Community Guidelines are incorporated by reference. (*Id*.) In a declaration in support of Defendants' motion to dismiss, Jorge Blanco Cano explains what contracts entities must agree to in order to post on YouTube's video-sharing website and to participate in YouTube's Partner Program to monetize posted videos. (Dkt. No. 28, ¶¶ 3-5.)

United States District Court
Northern District of California

> Our products are platforms for free expression. But we don't support content that promotes or condones violence against individuals or groups based on race or ethnic origin, religion, disability, gender, age, nationality, veteran status, caste, sexual orientation, or gender identity, or content that incites hatred on the basis of these core characteristics.

(*Id.*, Ex. B.) YouTube's monetization policy provides, in pertinent part:

> If you're in the YouTube Partner Program, it's important to follow the YouTube monetization policies, which include YouTube's Community Guidelines, Terms of Service, and Google AdSense program policies. These policies apply to anyone in the YouTube Partner Program. If you want to monetize videos with ads, they must also meet our Advertiser-friendly content guidelines.
>
> If you violate any of these policies, YouTube may take some or all of the following actions:
>
> - Disabling ads from your content
>
> - Disabling your AdSense account
>
> - Suspending your participation in the YouTube Partner Program
>
> - Suspending or even terminating your YouTube channel
>
> …
>
> Content that violates YouTube's Community Guidelines is not eligible for monetization and will be removed from YouTube. . . .
>
> Content that violates YouTube's Community Guidelines includes: . . . Hateful content . . . .

(*Id.*, Ex. C.) YouTube's Advertiser-friendly content guidelines provides "examples of content not suitable for ads, which will result in a 'limited or no ads' monetization state[,]" as well as topics that are "not advertiser-friendly[,]" such as: "Hateful content[,]" "Incendiary and demeaning[,]" and "Controversial issues and sensitive events[.]" (*Id.*, Ex. D.) "Hateful content" is further defined as:

> Content that incites hatred against, promotes discrimination, disparages, or humiliates an individual or group of people based on the following is not suitable for advertising:
>
> - Race
>
> - Ethnicity or ethnic origin
>
> - Nationality
>
> - Religion

- Disability

- Age

- Veteran status

- Sexual orientation

- Gender identity

- Any other characteristic associated with systemic discrimination or marginalization

(*Id*.)

**E.   Plaintiff's Claims.**

     **1.   42 U.S.C. § 1983 – First Amendment Violation.**

Plaintiff alleges that Defendants are state actors based on their relationship with China, the European Union, and the signatory countries of the Christchurch Call Agreement.  (*Id*., ¶ 208.) Defendants enforce the hate speech and other censorship laws of these countries within the United States, including against Plaintiff.  (*Id*., ¶ 212.)  Plaintiff further alleges that even if Defendants are not agents of a foreign government, they are pervasively intertwined with the United States government.  (*Id*., ¶ 217.)

     **2.   National Origin Discrimination Under 42 U.S.C. § 2000a.**

Plaintiff alleges that Defendants are an online theater and/or place of public exhibition or entertainment under 42 U.S.C. § 2000a.  (*Id*., ¶ 221.)

YouTube allegedly discriminated against Plaintiff on the basis of his national origin when YouTube demonetized many of his videos and then his entire channel, restricted, and removed his videos because he "is a patriotic American citizen who promotes Constitutional rights of Americans, Christian beliefs and American laws and culture.  (*Id*., ¶ 225.)

     **3.   47 U.S.C. § 230 Claims.**

Under his third claim, Plaintiff alleges that that the Communications Decency Act, 47 U.S.C § 230 is unconstitutional because it allows Defendants to censor without liability and because the statute is vague, overbroad, and internally inconsistent.  (*Id*., ¶¶ 94, 95, 229-31.)  In his eighth claim, Plaintiff brings a claim to challenge Defendants' ability to assert 47 U.S.C § 230 as a defense, asserting that Defendants do not meet the good faith requirements of the statute.  (*Id*.,

¶ 263.)

### 4. Lanham Act.

Plaintiff alleges that YouTube "markets itself as website that promotes free speech and freedom of expression free from censorship" and points to the following statement from YouTube on its website:

> Our Mission is to give everyone a voice and show them the world. We believe that everyone deserves to have a voice, and that the world is a better place when we listen, share and build community through our stories.
>
> Our values are based on four essential freedoms that define who we are.
>
> Freedom of Expression:
> We believe people should be able to speak freely, share opinions, foster open dialogue, and that creative freedom leads to new voices, formats, and possibilities.
>
> Freedom of Information
>
> We believe everyone should have easy, open access to information and that video is a powerful force for education, building understanding, and documenting world events, big and small.
>
> Freedom of Opportunity:
> We believe everyone should have a chance to be discovered, build a business and succeed on their own terms, and that people-not gatekeepers-decide what's popular.
>
> Freedom to Belong:
> We believe everyone should be able to find communities of support, breakdown barriers, transcend borders and come together around shared interests.

(*Id.*, ¶ 65.)  Plaintiff alleges that Defendants falsely advertise as a forum for open and intellectually diverse expression and misrepresent the nature of its services "as an equal, open and diverse public forum committed to American style free speech."  (*Id.*, ¶ 259.)

Plaintiff alleges that he has been harmed by lower and diverted viewership, decreased and lost ad revenue, a reduction in advertisers, and damage to his brand, reputation and goodwill.  (*Id.*, ¶ 260.)

### 5. Declaratory Relief Claim.

Plaintiff also seeks declaratory relief on all of his federal claims.  (*Id.*, ¶ 270.)

8

United States District Court
Northern District of California

### 6.     State-Law Claims.

#### i.     Fraud.

Plaintiff alleges that Defendants publicly presents YouTube as a free speech platform, free from unlawful censorship.  (Dkt. No. 19, ¶ 233.)  Defendants do not disclose the identity of their trusted flaggers, including that they use foreign governmental entities or agencies as flaggers.  (*Id.*, 234.)  Defendants also fail to disclose that American registered users could be censored or demonetized if a foreign government objects to it.  (*Id.*, ¶¶ 235, 236.)

Plaintiff further alleges that Defendants failed to disclose they: (1) adopted a "more censored European/Chinese ideological perspective" over "American Constitutional style free speech," (2) maintained blacklists of words, websites, users, and/or other material and content, and (3) used algorithm censorship and blacklists, such as Twiddler, Adscorer and other internal tools, it artificially promoted and demoted websites, YouTube channels, and other online material.  (*Id.*, ¶¶ 237, 239.)

Plaintiff alleges that he relied on these misrepresentations and/or omissions and was damaged by the demonetization of his channel and censorship of his videos.  (*Id.*, ¶ 243.)

#### ii.     Breach of Implied Covenant of Good Faith and Fair Dealing.

Plaintiff alleges that he entered into contracts with Defendants for their services and that the contracts give Defendants unilateral discretion to remove, restrict, demonetize or demote his content.  (*Id.*, ¶ 245.)  The contracts also allow Defendants to change the terms at any time without notice.  (*Id.*)

Plaintiff further alleges none of his demonetized or restricted videos violated the letter or spirit of their contracts.  (*Id.*, ¶ 247.)  Plaintiff contends that, pursuant to the contracts, he was entitled to a wide audience and to some portion of the ad revenue profits that Defendants earned from hosting Plaintiff's content.  (*Id.*, ¶ 248.)  Defendants breached the covenant of good faith and fair dealing by unfairly and unlawfully interfering with his rights to receive the benefits of the contracts.  (*Id.*)

#### iii.     Tortious Interference with Economic Advantage.

Plaintiff alleges that Defendants discriminates, demonetizes, and/or otherwise censors him

9

"as part of an ongoing pattern and practice to silence American citizens on behalf of foreign

government trust flaggers and/or other agents." (*Id.*, ¶ 265.)  Defendants intentionally and

maliciously interfered with Plaintiff's business interests by censoring and demonetizing him on

their websites and platforms.  (*Id.*, 267.)

## ANALYSIS

### A.        Applicable Legal Standard on Motion to Dismiss.

A motion to dismiss is proper under Federal Rule of Civil Procedure 12(b)(6) where the

pleadings fail to state a claim upon which relief can be granted.  On a motion to dismiss under

Rule 12(b)(6), the Court construes the allegations in the complaint in the light most favorable to

the non-moving party and takes as true all material allegations in the complaint.  *Sanders v.*

*Kennedy*, 794 F.2d 478, 481 (9th Cir. 1986).  Even under the liberal pleading standard of Rule

8(a)(2), "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires

more than labels and conclusions, and a formulaic recitation of the elements of a cause of action

will not do." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citing *Papasan v. Allain*,

478 U.S. 265, 286 (1986)).  Rather, a plaintiff must instead allege "enough facts to state a claim to

relief that is plausible on its face."  *Id.* at 570.

"The plausibility standard is not akin to a probability requirement, but it asks for more than

a sheer possibility that a defendant has acted unlawfully. . . . When a complaint pleads facts that

are merely consistent with a defendant's liability, it stops short of the line between possibility and

plausibility of entitlement to relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting

*Twombly*, 550 U.S. at 557) (internal quotation marks omitted).  If the allegations are insufficient to

state a claim, a court should grant leave to amend, unless amendment would be futile.  *See, e.g.*

*Reddy v. Litton Indus., Inc.*, 912 F.2d 291, 296 (9th Cir. 1990); *Cook, Perkiss & Liehe, Inc. v. N.*

*Cal. Collection Serv., Inc.*, 911 F.2d 242, 246-47 (9th Cir. 1990).

As a general rule, "a district court may not consider material beyond the pleadings in ruling

on a Rule 12(b)(6) motion."  *Branch v. Tunnell*, 14 F.3d 449, 453 (9th Cir. 1994), *overruled on*

*other grounds, Galbraith v. Cnty. of Santa Clara*, 307 F.3d 1119 (9th Cir. 2002) (citation omitted).

However, documents subject to judicial notice, such as matters of public record, may be

United States District Court
Northern District of California

United States District Court
Northern District of California

considered on a motion to dismiss. *See Harris v. Cnty of Orange*, 682 F.3d 1126, 1132 (9th Cir. 2011). In doing so, the Court does not convert a motion to dismiss to one for summary judgment. *See Mack v. S. Bay Beer Distrib.*, 798 F.2d 1279, 1282 (9th Cir. 1986), *overruled on other grounds by Astoria Fed. Sav. & Loan Ass'n v. Solimino*, 501 U.S. 104 (1991). The district court may also consider documents attached to and/or incorporated by reference in the complaint without converting the motion to dismiss into a motion for summary judgment. *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003). "The court need not . . . accept as true allegations that contradict matters properly subject to judicial notice . . . ." *Sprewell v. Golden State Warriors*, 266 F. 3d 979, 988 (9th Cir. 2001).

**B.      Defendants' Motion to Dismiss.**

Defendants move to dismiss all of Plaintiffs claims, except for his third and eighth claims, on the grounds that § 230 of the Communications Decency Act (the "CDA") immunizes them from Plaintiff's claims.[2]

**1.      Plaintiff's Third and Eighth Claims Regarding the CDA.**

In anticipation of Defendants' defenses, Plaintiff brings two claims challenging the CDA – Plaintiff's third claim alleging § 230 of the CDA is unconstitutional and Plaintiff's eighth claim alleging Defendants do not meet the "good faith" requirement of § 230(c)(2). Defendants argue that Plaintiff lacks standing to bring both of these claims because the CDA is a statute that which merely provides *Defendants* with a defense to liability.

Standing is a constitutional requirement of all federal courts, requiring plaintiffs to "demonstrate a personal stake in the outcome" in order to establish jurisdiction. *City of Los Angeles v. Lyons*, 461 U.S. 95, 101 (1983) (citing *Baker v. Carr*, 369 U.S. 186, 204 (1962)). Where a plaintiff lacks standing, a federal court "lacks subject matter jurisdiction over the suit." *Cetacean Cmty. v. Bush*, 386 F.3d 1169, 1174 (9th Cir. 2004). To satisfy the Constitution's standing requirements, a plaintiff must show (1) he has suffered an "injury in fact" that is (a)

---

[2] In his opposition brief, Plaintiff concedes that he cannot state an affirmative claim that Defendants' terms and conditions are unconscionable. Therefore, the Court grants Defendants' motion as to Plaintiff's sixth claim as unopposed.

United States District Court
Northern District of California

concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury must be fairly traceable to the challenged action of the defendant; and (3) it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). "[A] plaintiff must demonstrate standing for each claim he seeks to press and for each form of relief that is sought." *Town of Chester, N.Y. v. Laroe Estates, Inc.*, 137 S. Ct. 1645, 1650 (2017) (quoting *Davis v. Federal Election Comm'n*, 554 U.S. 724, 734 (2008)).

Here, Plaintiff has not alleged any facts to show he has suffered an injury in fact. Plaintiff's asserted injury depends upon his valid claim and Defendants' assertion of a defense provided by 47 U.S.C. § 230. Plaintiff will not suffer an injury unless and until Plaintiff pleads a valid claim, which, as discussed in this Order, he has not done, and until Defendants assert a defense to liability provided by 47 U.S.C. § 230. Therefore, the Court finds that Plaintiff lacks standing to bring his third and eighth claims challenging 47 U.S.C. § 230 and grants Defendants' motion on this ground.

### 2. Defendants' Ability to Assert Section 230 as a Defense to Liability.

Although Plaintiff cannot bring an independent claim to challenge the constitutionality of Section 230 of the CDA, the Court will address Plaintiff's argument raised in his third claim because Defendants assert this statute as a ground for dismissing Plaintiff's claims. Plaintiff argues that Section 230 violates the First Amendment because it restricts his speech. (Dkt. No. 32 (Plaintiff's Opp.) at 15.) In his SAC, Plaintiff alleges that § 230 is unconstitutional "because the statute doesn't define any of the terms included under §[230](c)(2)(A), such as: 'harassing, obscene, lewd, lascivious, filthy, excessively violent, objectionable.'" (Dkt. No. 19, ¶ 229.) It appears as though Plaintiff contends that § 230(c)(2) is unconstitutional. However, as discussed below, the Court finds that Plaintiff's claims are barred based on § 230(c)(1), not subdivision (c)(2). Moreover, to the extent Plaintiff argues that subdivision (c)(1) violates the First Amendment, it is not clear how. Section 230(c)(1) provides: "No provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." 47 U.S.C.A. § 230(c)(1). This provision does

not ban or restrict any speech.  *Cf. Green v. Am. Online (AOL)*, 318 F.3d 465, 472 (3d Cir. 2003) (rejecting claim that Section 230(c)(2) contravenes the First Amendment because it merely immunizes internet service providers of internet from liability: "Section 230(c)(2) does not *require* AOL to restrict speech; rather it allows AOL to establish standards of decency without risking liability for doing so.") (emphasis in original).

Plaintiff's other argument regarding the CDA in his eighth claim also applies only to subdivision (c)(2).  Plaintiff alleges that Defendants have not meet the "good faith" requirement under the statute (Dkt. No. 19, ¶ 263), but only subdivision (c)(2), not subdivision (c)(1), requires any "good faith."[3]  Therefore, Plaintiff has not shown that that Defendants are precluded from raising § 230(c)(1) as a defense to Plaintiff's claims.

### 3.      The CDA Bars Plaintiff's Remaining Claims.

Section 230 of the CDA "immunizes providers of interactive computer services against liability arising from content created by third parties."  *Fair Hous. Council of San Fernando Valley v. Roommates.com, LLC*, 521 F.3d 1157, 1162 (9th Cir. 2008) (*en banc*).  "Any activity that can be boiled down to deciding whether to exclude material that third parties seek to post online is perforce immune under section 230."  *Id.* at 1170-71.  Immunity under Section 230 "protect[s] websites not merely from ultimate liability, but [also] from having to fight costly and protracted legal battles."  *Id.* at 1175.  "[C]ourts have treated § 230(c) immunity as quite robust, adopting a relatively expansive definition of 'interactive computer service' and a relatively restrictive definition of 'information content provider.'"  *Carafano v. Metrosplash*, 339 F.3d 1119, 1123 (9th Cir. 2003); *Jane Doe No. 1 v. Backpage.com, LLC*, 817 F.3d 12, 18 (1st Cir. 2016) ("There has been near-universal agreement that section 230 should not be construed grudgingly.").  "[C]lose cases . . . must be resolved in favor of immunity."  *Roommates.Com*, 521 F.3d at 1174.  "When a plaintiff cannot allege enough facts to overcome Section 230 immunity, a plaintiff's

---

[3] Subdivision (c)(2) provides: "No provider or user of an interactive computer service shall be held liable on account of . . . any action voluntarily taken in good faith to restrict access to or availability of material that the provider or user considers to be obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable, whether or not such material is constitutionally protected[.]"  47 U.S.C.A. § 230(c)(2).

13

United States District Court
Northern District of California

1  claims should be dismissed." *See Dyroff v. Ultimate Software Grp., Inc.*, 934 F.3d 1093, 1097

2  (9th Cir. 2019). "Section 230 immunity extends to causes of action under both state and federal

3  law." *Fed. Agency of News LLC v. Facebook, Inc.*, --- F. Supp. 3d ---, 2020 WL 137154, at *5

4  (N.D. Cal. Jan. 13, 2020) (citing *Roommates*, 521 F.3d at 1164, 1169 n. 24).

5       Subsection (c)(1) of the CDA protects from liability (1) a provider or user of an interactive

6  computer service (2) whom a plaintiff seeks to treat as a publisher or speaker (3) of information

7  provided by another information content provider. *Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1100-

8  01 (9th Cir. 2009).

9                **i.**     **Interactive Computer Service.**

10       An "interactive computer service" is defined under the CDA  as "any information service,

11  system, or access software provider that provides or enables computer access by multiple users to

12  a computer server, including specifically a service or system that provides access to the Internet

13  and such systems operated or services offered by libraries or educational institutions." 47 U.S.C.

14  § 230(f)(2).  There does not appear to be any dispute that YouTube and Google are providers of an

15  interactive computer service.  *See Bennett v. Google, LLC*, 882 F.3d 1163, 1167 (D.C. Cir. 2018)

16  ("as many other courts have found, Google qualifies as an 'interactive computer service' provider

17  because it 'provides or enables computer access by multiple users to a computer server.'"); *see*

18  *also Black v. Google Inc.*, 2010 WL 3222147, at *2 (N.D. Cal. Aug. 13, 2010) (finding Google

19  immune under § 230), *aff'd by* 457 Fed. Appx. 622 (9th Cir. 2011); *Gonzalez v. Google, Inc.*, 282

20  F. Supp. 3d 1150, 1163 (N.D. Cal. 2017) (holding Google was an interactive computer service

21  provider and dismissing claims based on YouTube postings); *Lancaster v. Alphabet Inc.*, 2016

22  WL 3648608, at *3 (N.D. Cal. July 8, 2016) ("The Court finds . . . that YouTube and Google are

23  'interactive computer services.'").

24                **ii.**     **Treating Defendants as a Publisher or Speaker.**

25       In his claims, Plaintiff charges Defendants with wrongfully demonetizing, censoring,

26  restricting and removing his videos.  The Ninth Circuit has made clear that removing or restricting

27  postings falls within a publisher's traditional functions.  *Barnes*, 570 F.3d at 1101 (citing *Zeran v.*

28  *Amer. Online, Inc.*, 129 F.3d 327, 330 (4th Cir. 1997)) (listing "deciding whether to publish,

withdraw, postpone or alter content" as examples of "a publisher's traditional editorial functions")); *see also Ebeid v. Facebook, Inc.*, 2019 WL 2059662, at *5 (N.D. Cal. May 9, 2019) ("defendant's decision to remove plaintiff's posts undoubtedly falls under 'publisher' conduct"). "Subsection (c)(1), by itself, shields from liability all publication decisions, whether to edit, to remove, or to post, with respect to content generated entirely by third parties." *Barnes*, 570 F.3d at 1105; *see also Roommates.Com*, 521 F.3d at 1171 ("any activity that can be boiled down to deciding whether to exclude material that third parties seek to post online is perforce immune under section 230.").

Defendants argue and the Court agrees that their alleged demonetization of Plaintiff's postings also constitutes a publishing function under § 230. Courts have broadly interpreted what it means to be acting as a publisher under the CDA. *Jane Doe No. 1 v. Backpage.com, LLC*, 817 F.3d 12, 19 (1st Cir. 2016) ("The broad construction accorded to section 230 as a whole has resulted in a capacious conception of what it means to treat a website operator as the publisher or speaker of information provided by a third party."). In *Backpage.com*, the First Circuit held that choices that the defendant made about the posting standards for advertisements, such as rules for what terms were allowed in postings and the acceptance of anonymous payments, fell within publisher functions. *Id.* at 20; *see also id.* at 21 ("Features such as these, which reflect choices about what content can appear on the website and in what form, are editorial choices that fall within the purview of traditional publisher functions."); c*f. Stewart v. Rolling Stone LLC*, 181 Cal. App. 4th 664, 691 (2010) (First Amendment protections for newspapers as publishers has been extended to the content and placement of advertisements). Deciding whether to limit advertising on a posting is not different in nature from removing a post altogether. Both fall under the rubric of publishing activities. *See Barnes*, 570 F.3d at 1102 ("publication involves reviewing, editing, and deciding whether to publish or to withdraw from publication third-party content"). Thus, the Court finds that Plaintiff treats Defendants as a publisher in his allegations.

### iii. Provided by Another Information Content Provider.

Plaintiff's videos, and the advertisements from other third parties, constitute "information provided by another information content provider" under § 230. *Riggs v. MySpace, Inc.*, 444 F.

*United States District Court*
*Northern District of California*

App'x 986, 987 (9th Cir. 2011) (defendant's decision to delete plaintiff's profile from its social networking site was precluded by section 230(c)(1) of the CDA) (citing *Roommates.Com*, 521 F.3d at 1170-71) ("[A]ny activity that can be boiled down to deciding whether to exclude material that third parties seek to post online is perforce immune under section 230.")); *see also Ebeid v. Facebook, Inc.*, 2019 WL 2059662, at *5(N.D. Cal. May 9, 2019) (rejected argument that posts were not "information provided by another information content provider" because plaintiff himself – not some other third-party – provided the information and applied (c)(1) immunity to Facebook's decision to remove plaintiff's posts); *Lancaster*, 2016 WL 3648608, at * 3(applied (c)(1) immunity to YouTube's decision to remove plaintiff's videos from its site). As the court explained in *Ebeid*, "information provided by another information content provider" applies to any content that is "created entirely by individuals or entities other than the interactive computer service provider." *Ebeid*, 2019 WL 2059662, at *4.

Because the Court finds that Defendants provide an interactive computer service and that Plaintiff, through his first, second, fourth, fifth, seventh, ninth, and tenth claims, is seeking to hold Defendants liable as a publisher of information provided by another content provider, § 230(c)(1) bars these claims.

### 4. Failure to State Claims.

Additionally, the Court finds that Plaintiff's claims independently should be dismissed because he fails to allege sufficient facts to state his claims.

### i. Plaintiff's Section 1983 Claim Premised on the First Amendment.

Plaintiff's first claim is under 42 U.S.C. § 1983 for alleged violations of the First Amendment. To state a claim under Section 1983, a plaintiff must plead: "(1) a violation of rights protected by the Constitution or created by federal statute, (2) proximately caused (3) by conduct of a 'person' (4) acting under color of state law." *Crumpton v. Gates*, 947 F.2d 1418, 1420 (9th Cir. 1991). Here, Plaintiff is only suing private entities. *See Prager Univ. v. Google LLC*, -- F.3d ---, 2020 WL 913661, * 2, 3 (9th Cir. Feb. 26, 2020) ("YouTube is a private entity. . . ."[I]t is not transformed into a state actor solely by providing a forum for speech") (internal brackets, quotation marks and citation omitted). Plaintiff does not dispute that "normally private parties

United States District Court
Northern District of California

cannot be held as state actors." (Dkt. No. 32 at 4.) Instead, Plaintiff seeks to hold Defendants liable as "state" actors by connecting them to alleged conduct by the United States government and by foreign governments. However, even if Plaintiff's allegations were sufficient to hold Plaintiff's liable for conduct by the federal and by foreign governments, such allegations do not allege conduct under color of *state* law.

A defendant acts "under color of state law" where he, she, or it "exercised power possessed by virtue of *state law* and made possible only because the wrongdoer is clothed with the authority of state law." *West v. Atkins*, 487 U.S. 42, 49 (1988) (emphasis added). "[F]ederal officials who violate federal rights protected by § 1983 generally do not act under 'color of state law.'" *Kali v. Bowen*, 854 F.2d 329, 331 (9th Cir. 1988) (citation omitted) (where plaintiffs did not allege that federal and state officials conspired, federal officials' actions could not be deemed to have been under "color of state law"); *see also Cabrera v. Martin*, 973 F.2d 735, 742 (9th Cir. 1992) ("[f]ederal officials acting under federal authority are generally not considered to be state actors, [but] they may be liable under § 1983 if they are found to have conspired with or acted in concert with state officials to some substantial degree."). Similarly, acts by a foreign government and its officials "cannot constitute conduct under color of state law" under Section 1983. *Kimbell v. Benner*, 2018 WL 1135389, at *3 (C.D. Cal. Feb. 26, 2018) (citing *Gerritsen v. de la Madrid Hurtado*, 819 F.2d 1511, 1515 (9th Cir. 1987)); *cf. Ohno v. Yasuma*, 723 F.3d 984, 995 (9th Cir. 2013) ("'state actor' means an actor for whom a domestic governmental entity is in some sense responsible"). Accordingly, Plaintiff fails to state a claim under Section 1983 premised on the First Amendment.

### ii. Plaintiff's Claim of Discrimination under Title II of the Civil Rights Act.

Under Title II if the Civil Rights Act "[a]ll persons shall be entitled to the full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of any place of public accommodation . . . without discrimination or segregation on the ground of race, color, religion, or national origin." 42 U.S.C. § 2000a. Defendants argue that Plaintiff's Title II claim fails on the following three separate, independent grounds: (1) YouTube is not a place of

United States District Court
Northern District of California

public accommodation; (2) Plaintiff does not sufficiently allege facts to show intentional discrimination; and (3) Plaintiff failed to provide written notice. Because the Court finds that YouTube is not a place of public accommodation under the statute, Plaintiff's Title II claim fails, and the Court need not address Defendants' other grounds.

The statute defines "place of public accommodation" to mean:

> (1) any inn, hotel, motel, or other establishment which provides lodging to transient guests . . .;
>
> (2) any restaurant, cafeteria, lunchroom, lunch counter, soda fountain, or other facility principally engaged in selling food for consumption on the premises . . .;
>
> (3) any motion picture house, theater, concert hall, sports arena, stadium or other place of exhibition or entertainment; and
>
> (4) any establishment (A)(i) which is physically located within the premises of any establishment otherwise covered by this subsection, or (ii) within the premises of which is physically located any such covered establishment, and (B) which holds itself out as serving patrons of such covered establishment.

42 U.S.C.A. § 2000a(b).

Title II of the Civil Rights Act "covers only places, lodgings, facilities and establishments." *Clegg v. Cult Awareness Network*, 18 F.3d 752, 756 (9th Cir. 1994) (holding that a national organization was not sufficiently connected to a "place" open to the public). Construing the statutory language, the Ninth Circuit noted "[n]owhere does the statute . . . indicate congressional intent to regulate anything other than public facilities." *Id.* at 755. The court further found:

> Congress' intent in enacting Title II was to provide a remedy only for discrimination occurring in facilities or establishments serving the public: to conclude otherwise would obfuscate the term "place" and render nugatory the examples Congress provides to illuminate the meaning of that term.

*Id.*; *see also Noah v. AOL Time Warner, Inc.*, 261 F. Supp. 2d 532, 541 (E.D. Va. 2003) ("as the relevant case law and an examination the statute's exhaustive definition make clear, 'places of public accommodation' are limited to actual, physical places and structures, and thus cannot include chat rooms, which are not actual physical facilities but instead are virtual forums for communication"), *aff'd sub nom. Noah v. AOL-Time Warner, Inc.*, 2004 WL 602711 (4th Cir.

United States District Court
Northern District of California

Mar. 24, 2004)); *Ebeid v. Facebook, Inc.*, 2019 WL 2059662, at *6 (N.D. Cal. May 9, 2019) (finding services provided by Facebook's online platform were "unconnected to entry into a public place or facility and therefore the plain language of Title II [made] the statute inapplicable") (citing *Clegg*, 18 F.3d at 756).

Plaintiff's reliance on cases interpreting the American's with Disabilities Act is misplaced. The ADA is different statute with different statutory language that defines places of public accommodation. *See, e.g., Ramirez v. Petrillo*, 2012 WL 12887630, at *2 (D. Or. Sept. 19, 2012) (noting the important differences between the ADA and the Civil Rights Act, including that "the ADA has a more expansive definition of 'place of public accommodation,' than the Civil Rights Act) (internal quotation marks and citation omitted). "The ADA's more expansive definition of 'place of public accommodation' is not transferable to the Civil Rights Act: The Civil Rights Act expressly limits its scope to places of public accommodation "as defined in this section." *Id.*

Additionally, the Court notes that Ninth Circuit case upon which Plaintiff relies, *Robles v. Domino's Pizza, LLC*, expressly relies on the nexus between the company's website and its physical restaurants to find that the plaintiff could state a claim under the ADA:

> The alleged inaccessibility of Domino's website and app impedes access to the goods and services of its physical pizza franchise – which are places of public accommodation. . . . Customers use the website and app to locate a nearby Domino's restaurant and order pizzas for at-home delivery or in-store pickup. This nexus between Domino's website and app and physical restaurants – which Domino's does not contest – is critical to our analysis.

913 F.3d 898, 905 (9th Cir. 2019).

Because Title II of the Civil Rights Act applies only to physical facilities, the Court grants the motion to dismiss as to this claim.

### iii.     Lanham Act.

To state a claim under the Lanham act for false advertising under 15 U.S.C. § 1125(a)(1)(B), Plaintiff must allege: "a 'false or misleading representation of fact' 'in commercial advertising or promotion' that 'misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities.'" *Prager Univ. v. Google LLC*, 951 F.3d 991, 999 (9th Cir. Feb. 26, 2020) (quoting *Southland Sod Farms v.*

1    *Stover Seed Co.*, 108 F.3d 1134, 1139 & n. 2 (9th Cir. 1997)).

2           Defendants make two arguments against Plaintiff's claim under the Lanham Act.  First,

3    they argue that Plaintiff lacks standing because he complains of a harm he incurred as a consumer

4    from his use of YouTube, not as a competitor.  Second, Defendants argue that the statements

5    Plaintiff alleges as misrepresentations are non-actionable "puffery."

6                    **a.      Whether Plaintiff Alleges an Actionable Injury.**

7           A plaintiff has a cause of action under a statute only if his or her interests "fall within the

8    zone of interests protected by the law."  *Lexmark Int'l, Inc. v. Static Control Components, Inc.*,

9    572 U.S. 118, 129 (2014) (internal quotation marks and citation omitted).  "[T]to come within the

10   zone of interests in a suit for false advertising under § 1125(a), a plaintiff must allege an injury to

11   a commercial interest in reputation or sales."  *Id*. at 131-32.  A consumer cannot bring a claim

12   under the Lanham Act.  *Id*. at 132.  Additionally, a plaintiff must show proximate causation.

13   "[T]hus . . . a plaintiff suing under § 1125(a) ordinarily must show economic or reputational injury

14   flowing directly from the deception wrought by the defendant's advertising; and that that occurs

15   when deception of consumers causes them to withhold trade from the plaintiff."  *Id*. at 133.

16          Plaintiff argues in opposition to the motion that he is both a consumer of, and a competitor

17   with, Defendants because YouTube also creates and publishes videos.  However, Plaintiff does not

18   actually allege that he competes with YouTube.  Moreover, even if Plaintiff did or could allege

19   that he is a competitor with YouTube, the harm of which he complains stems from his relationship

20   with YouTube as a consumer.  The statements Plaintiff alleges which caused him harm relate to

21   the type of forum Defendants provide, not the videos or content they create.  (Dkt. No. 19, ¶ 65

22   (alleging YouTube "markets itself as website that promotes free speech and freedom of expression

23   free from censorship"), ¶ 259 (alleging Defendants "advertise themselves . . . as a forum for open

24   and intellectually diverse expression" and advertise their services "as an equal, open and diverse

25   public forum committed to American style free speech").)

26          Plaintiff alleges he has been injured by lower and diverted viewership, decreased and lost

27   ad revenue, a reduction in advertisers, and damage to his brand, reputation and goodwill.  (*Id*., ¶

28   260.)  It is not clear how Defendants' statements about hosting an open forum, as opposed to

United States District Court
Northern District of California

YouTube's censorship or demonetization of his videos, caused Plaintiff any reputational harm. Even if Plaintiff could allege facts to show that Defendants' statements about the openness of its forum caused Plaintiff some loss to his commercial interest or reputational harm, the harm occurred by YouTube's enforcement of its policies to those who post on its website. In other words, it is a harm Plaintiff incurred by interacting with YouTube as a consumer, not as a competitor. Therefore, Plaintiff lacks standing to bring a claim under the Lanham Act.

### b. Whether Plaintiff Alleges an Actionable Statement.

Additionally, Defendants argue that Plaintiff's claim fails for the independent reason that Plaintiff's alleged statements are mere "puffery." Statements are "considered puffery if the claim is extremely unlikely to induce consumer reliance. *Newcal Indus., Inc. v. Ikon Office Sol.*, 513 F.3d 1038, 1053 (9th Cir. 2008); *see also Coastal Abstract Serv. Inc. v. First Am. Title Ins. Co.*, 173 F.3d 725, 731 (9th Cir. 1999) (statements that are so vague they are not "capable of being proved false" are non-actionable). "Ultimately, the difference between a statement of fact and mere puffery rests in the specificity or generality of the claim." *Newcal Indus.*, 513 F.3d at 1053. A statement that is "quantifiable, that makes a claim as to the 'specific or absolute characteristics of a product,' may be an actionable statement of fact while a general subjective claim about a product is non-actionable puffery." *Id.* (quoting *Cook*, 911 F.2d at 246).

In *Prager University*, the Ninth Circuit held that a claim against YouTube failed because the plaintiff's alleged statements, including that "everyone deserves to have a voice" and "people should be able to speak freely . . ." as Plaintiff also alleges here, [4] were not actionable under the

---

[4] Plaintiff alleges that Defendants made the following statement:

> Our Mission is to give everyone a voice and show them the world. We believe that everyone deserves to have a voice, and that the world is a better place when we listen, share and build community through our stories.

> Our values are based on four essential freedoms that define who we are.

> Freedom of Expression:
> We believe people should be able to speak freely, share opinions, foster open dialogue, and that creative freedom leads to new voices, formats, and possibilities.

United States District Court
Northern District of California

United States District Court
Northern District of California

Lanham Act. *Prager University*, 951 F.3d at 1000. The Ninth Circuit explained that:

> YouTube's braggadocio about its commitment to free speech constitutes opinions that are not subject to the Lanham Act. Lofty but vague statements like "everyone deserves to have a voice, and that the world is a better place when we listen, share and build community through our stories" or that YouTube believes that "people should be able to speak freely, share opinions, foster open dialogue, and that creative freedom leads to new voices, formats and possibilities" are classic, non-actionable opinions or puffery.

*Id.* (citing *Newcal Indus., Inc. v. Ikon Office Sol.*, 513 F.3d 1038, 1053 (9th Cir. 2008)).

Defendants' statement about providing a voice and freedom of expression is the only statement Plaintiff alleges. To the extent Plaintiff includes a larger excerpt of Defendants' statement, including opinions on the freedom of information, of opportunity, and to belong, it is of a similar "[l]ofty but vague" nature, and thus, are similarly non-actionable opinions. *Prager University*, 951 F.3d at 1000.

Plaintiff also generally alleges that Defendants falsely advertise as a forum for open and intellectually diverse expression and falsely advertise their services "as an equal, open and diverse public forum committed to American style free speech." (*Id.*, ¶ 259.) It is not clear if Plaintiff is drawing that conclusion from the statement it quotes in paragraph 65 of its operative complaint, or if he is relying on additional statements. To the extent Plaintiff is merely drawing that conclusion from the statements quoted in paragraph 65, as stated above, the Ninth Circuit held that these

---

Freedom of Information

We believe everyone should have easy, open access to information and that video is a powerful force for education, building understanding, and documenting world events, big and small.

Freedom of Opportunity:
We believe everyone should have a chance to be discovered, build a business and succeed on their own terms, and that people-not gatekeepers-decide what's popular.

Freedom to Belong:
We believe everyone should be able to find communities of support, breakdown barriers, transcend borders and come together around shared interests.

(Dkt. No. 19, ¶ 65.)

statements are non-actionable puffery. To the extent Plaintiff is drawing this conclusion from other statements, Plaintiff's claim fails for not identifying the specific statements. Therefore, the Court grants Defendants' motion as to Plaintiff's claim under the Lanham Act for this additional reason.

### iv. Fraud.

To plead a claim for fraud based on an omission, Plaintiff must allege the following: "(1) the concealment or suppression of material fact, (2) a duty to disclose the fact to the plaintiff, (3) intentional concealment with intent to defraud, (4) justifiable reliance, and (5) resulting damages." *Mui Ho v. Toyota Motor Corp.*, 931 F. Supp. 2d 987, 999 (N.D. Cal. 2013); *see also Tenet Healthsystem Desert, Inc. v. Blue Cross of Cal.*, 245 Cal. App. 4th 821, 844 (2016). "[T]he elements of fraud and deceit based on concealment are the same as for intentional fraud, with the additional requirement that the plaintiff allege that the defendant concealed or suppressed a material fact in a situation in which the defendant was under a duty to disclose that material fact." *Tenet Healthsystem Desert*, 245 Cal. App. 4th at 844. Where, as here, the transactions do not involve fiduciary or confidential relationships, a duty to disclose arises when:

> (1) the defendant makes representations but does not disclose facts which materially qualify the facts disclosed, or which render his disclosure likely to mislead; (2) the facts are known or accessible only to defendant, and defendant knows they are not known to or reasonably discoverable by the plaintiff; [or] (3) the defendant actively conceals discovery from the plaintiff.

*Id.*

Plaintiff fails to allege facts sufficient to support a duty to disclose. Additionally, Plaintiff fails to allege concealment of any material facts or any reasonable reliance on the purported omissions in light of YouTube's disclosures in its terms and guidelines. A plaintiff cannot demonstrate reasonable reliance on an alleged omission when the purportedly omitted fact is disclosed in the contract. *Davis v. HSBC Bank Nevada, N.A.*, 691 F.3d 1152, 1163-64 (9th Cir. 2012) (finding plaintiff could not demonstrate justifiable reliance on purported failure to disclose annual fee because fee was disclosed in terms to which plaintiff agreed); *Circle Click Media LLC v. Regus Mgmt. Grp. LLC*, 2013 WL 57861, at *11 (N.D. Cal. Jan. 3, 2013) (same); *c.f. Woods v.*

United States District Court
Northern District of California

*Google, Inc.*, 889 F. Supp. 2d 1182, 1195-96 (N.D. Cal. 2012) (finding that plaintiff could not reasonably rely on statements that contradicted the clear language of an advertising agreement).

In essence, Plaintiff alleges that Defendants wrongfully censor hate speech and do so at the behest of foreign governments in contravention of "American Constitutional style free speech." (Dkt. No. 19, ¶ 237.)  In their fraud claim, Plaintiff allege that Defendants failed to disclose that they wrongfully censor hate speech and do so at the behest of foreign governments in contravention of American Constitutional free speech.  However, YouTube discloses that it reviews flagged content to determine whether it violates its Community Guidelines, which in turn state that "Hateful content" is prohibited.  (Dkt. No. 28, Ex. B.)  YouTube further discloses in its monetization policies that videos with ads must meet its Advertiser-friendly content guidelines and that content, including "Hateful content," which violates its Community Guidelines is not eligible for monetization.  (*Id*., Ex. C.)  YouTube's Advertiser-friendly content guidelines provides "examples of content not suitable for ads, which will result in a 'limited or no ads' monetization state[,]" as well as topics that are "not advertiser-friendly[,]" such as: "Hateful content[.]"  (*Id*., Ex. D.)

In light of these disclosures, the Court finds that Plaintiff fails to plead facts to show an omission which contradicts the terms of YouTube's terms and guidelines, which are incorporated by reference into Plaintiff's operative complaint.  Additionally, the Court finds that any reliance on the alleged omissions would not be reasonable in light of these disclosures.  To the extent Plaintiff alleges that blocking or demonetizing videos which violate YouTube's terms and guidelines is wrongful because it is done at the behest of foreign governments, Plaintiff has not alleged any facts to show how such an omission would be material.

Plaintiff also alleges that Defendants maintained "blacklists" and failed to disclose that they did so.  (Dkt. No. 19, ¶¶ 171, 180, 238, 239.)  However, Plaintiff fails to allege that he was on an alleged blacklist and/or what the blacklist was for or how Defendants used the blacklists.  In the absence of such allegations, Plaintiff fails to state a claim for fraud.

### v.   Breach of Implied Covenant of Good Faith and Fair Dealing.

"[U]nder California law, all contracts have an implied covenant of good faith and fair

United States District Court
Northern District of California

dealing." *In re Vylene Enterprises, Inc.*, 90 F.3d 1472, 1477 (9th Cir. 1996) (*citing Harm v. Frasher*, 181 Cal. App. 2d 405, 417 (1960)). The covenant "exists merely to prevent one contracting party from unfairly frustrating the other party's right to receive the benefits of the agreement actually made." *Guz v. Bechtel Nat. Inc.*, 24 Cal. 4th 317, 349 (2000). However, the covenant "cannot impose substantive duties or limits on the contracting parties beyond those incorporated in the specific terms of their agreement." *Id.* Thus, to the extent a plaintiff seeks to impose limits "beyond those to which the parties actually agreed, the [implied covenant] claim is invalid. To the extent the implied covenant claim seeks simply to invoke terms to which the parties *did* agree, it is superfluous." *Id.* at 352 (emphasis in original). "The central teaching of *Guz* is that in most cases, a claim for breach of the implied covenant can add nothing to a claim for breach of contract." *Lamke v. Sunstate Equipment Co., LLC.*, 387 F. Supp. 2d 1044, 1047 (N.D. Cal. 2004). Nevertheless, a plaintiff may bring implied covenant claim where the plaintiff alleges that the defendant acted in bad faith to frustrate the contract's benefits. *See Guz*, 24 Cal. 4th at 353 n.18 (acknowledging that "the covenant might be violated if termination of an at-will employee was a mere pretext to cheat the worker out of another contract benefit to which the employee was clearly entitled. . . .").

It is well established that "the scope of conduct prohibited by the covenant of good faith is circumscribed by the purposes and express terms of the contract." *Carma Developers (Cal.), Inc. v. Marathon Dev. California, Inc.*, 2 Cal. 4th 342, 373 (1992). "The implied covenant of good faith and fair dealing rests upon the existence of some specific contractual obligation." *Racine & Laramie, Ltd. v. Dep't of Parks & Recreation*, 11 Cal. App. 4th 1026, 1031 (1992) (citing *Foley v. Interactive Data Corp.*, 47 Cal. 3d 654, 683-84, 689-90 (1988)). "The covenant of good faith is read into contracts in order to protect the express covenants or promises of the contract, not to protect some general public policy interest not directly tied to the contract's purpose." *Foley*, 47 Cal. 3d at 690.

Here, Plaintiff alleges that he entered into contracts with Defendants for their services and that the contracts give Defendants unilateral discretion to remove, restrict, demonetize or demote his content. (Dkt. No. 19, ¶ 245.) The contracts also allow Defendants to change the terms at any

United States District Court
Northern District of California

25

1   time without notice.  (*Id*.)  Plaintiff further alleges none of his demonetized or restricted videos

2   violated the letter or spirit of their contracts.  (*Id*., ¶ 247.)  Plaintiff contends that, pursuant to the

3   contracts, he was entitled to a wide audience and to some portion of the profits from

4   advertisements that Defendants earned from hosting Plaintiff's content.  (*Id*., ¶ 248.)  Defendants

5   breached the covenant of good faith and fair dealing by unfairly and unlawfully interfering with

6   his rights to receive the benefits of the contracts.  (*Id*.)

7        As Plaintiff alleges, the contracts he had with Defendants authorized them to remove,

8   restrict and demonetize his posted videos unilaterally, at their discretion.  (*Id*., ¶ 245.)  As

9   YouTube's terms and guidelines state: "YouTube is not obligated to display any advertisements

10  alongside your videos and may determine the type and format of ads available on the YouTube

11  Service."  (Dkt. No. 28, Ex. A, ¶ 1.1.)  YouTube's Community Guidelines lists several categories

12  of prohibited material, including "Hateful content."  (*Id*., Ex. B.)  YouTube's monetization

13  policies provide that videos will only be "monetized" if they comply with YouTube's Advertiser-

14  friendly content guidelines and that content that violates its Community Guidelines, including

15  "Hateful content," is not eligible for monetization and will be removed from YouTube.  (*Id*., Ex.

16  C.)  YouTube's Advertiser-friendly content guidelines provides "examples of content not suitable

17  for ads, which will result in a 'limited or no ads' monetization state[,]" as well as topics that are

18  "not advertiser-friendly[,]" such as "Hateful content."  (*Id*., Ex. D.)

19        Plaintiff repeatedly complains in his operative complaint that Defendants are wrongfully

20  censoring his hate speech.  (Dkt. No. 19, ¶ 39 (alleging Defendants have been involved with the

21  European Union in launching an online "code of conduct" aimed at fighting hate speech), ¶ 41, ¶

22  45 (Google enforces the European Union's hate speech laws online), ¶ 60 (same regarding

23  Christchurch call agreement), ¶ 76 (Google abandoned free speech by demonetizing videos with

24  hateful content), ¶¶ 210-211, ¶ 212 (Defendants violated Plaintiff's First Amendment rights by

25  censoring and demonetizing his hate speech), ¶ 215 (Defendants knowingly enforced foreign

26  governments' hate speech and censorship laws against him), ¶ 272 (a controversy exists between

27  Plaintiff and Defendants regarding Defendants' hate speech policies).)  However, as Plaintiff

28  concedes, YouTube's terms and guidelines explicitly authorize YouTube to remove or demonetize

United States District Court
Northern District of California

content that violate its policies, including "Hateful content." Therefore, Defendants' removal or demonetization of Plaintiff's videos with "Hateful content" or hate speech was authorized by the parties' agreements and cannot support a claim for breach of the implied covenant of good faith and fair dealing. *Carma Developers*, 2 Cal. 4th at 374 ("if defendants were given the right to do what they did by the express provisions of the contract there can be no breach"); *see also Ebeid v. Facebook, Inc.*, 2019 WL 2059662, at *8 (N.D. Cal. May 9, 2019) (finding that plaintiff's breach of implied covenant of good faith and fair dealing claim failed because plaintiff conceded that Facebook had the contractual right to remove or disapprove any post or ad at Facebook's sole discretion). Thus, Plaintiff fails to state a claim for breach of the implied covenant of good faith and fair dealing.

### vi.    Tortious Interference with Economic Advantage.

In order to state a claim for tortious interference with prospective economic advantage, Plaintiff must allege: "(1) an economic relationship between the plaintiff and some third party, with the probability of future economic benefit to the plaintiff; (2) the defendant's knowledge of the relationship; (3) intentional acts on the part of the defendant designed to disrupt the relationship; (4) actual disruption of the relationship; and (5) economic harm to the plaintiff proximately caused by the acts of the defendant." *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1153 (2003) (internal quotations and citations omitted). Additionally, a plaintiff must plead "that the defendant's interference was wrongful 'by some measure beyond the fact of the interference itself.'" *Della Penna v. Toyota Motor Sales, U.S.A., Inc.*, 11 Cal. 4th 376, 393 (1995). "[A]n act is independently wrongful if it is unlawful . . . if it is proscribed by some constitutional, statutory, regulatory, common law, or other determinable legal standard." *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1159 (2003).

Plaintiff has not alleged an economic relationship that he has with a third party or that Defendant knew of any such relationship. Thus, Plaintiff fails to state a claim for tortious interference with prospective economic advantage. Additionally, Plaintiff fails to allege that Defendants' alleged interference was wrongful "by some measure beyond the fact of the interference itself." *Della Penna*, 11 Cal. 4th at 393. Accordingly, Plaintiff fails to allege facts

sufficient to state a claim for tortious interference with prospective economic advantage.

### vii. Declaratory Relief.

Plaintiff seeks declaratory relief on his federal claims. Because Plaintiff fails to allege facts sufficient to state these claims against Defendants, this claim fails as well.

## CONCLUSION

Therefore, for the foregoing reasons, the Court GRANTS Defendants' motion to dismiss and dismisses all of Plaintiff's claims. This dismissal is with prejudice because granting leave would be futile. Additionally, because the Court dismisses all of Plaintiff's claims with prejudice, the Court DENIES Plaintiff's motions for temporary restraining order and preliminary injunction and for expedited discovery as MOOT. The Court will issue a separate judgment in favor of Defendants. The Clerk is instructed to close the file.

**IT IS SO ORDERED**.

Dated: May 20, 2020

SALLIE KIM
United States Magistrate Judge