UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| DIVINO GROUP LLC, et al.,<br><br>    Plaintiffs,<br><br>  v.<br><br>GOOGLE LLC, et al.,<br><br>    Defendants. | Case No. 19-cv-04749-VKD<br><br>**ORDER GRANTING MOTION TO DISMISS**<br><br>Re: Dkt. No. 25 |

    Plaintiffs Divino Group LLC d/b/a GlitterBombTV.com, Chris Knight, Celso Dulay, Cameron Stiehl, BriaAndChrissy LLC d/b/a "BriaAndChrissy," Bria Kam, Chrissy Chambers, Chase Ross, Brett Somers, Lindsey Amer, Stephanie Frosch, Sal Cinquemani, Tamara (Sheri) Johnson, and Greg Scarnici assert the following claims against defendants Google LLC ("Google") and YouTube, LLC ("YouTube"): (1) violation of plaintiffs' First Amendment rights under 42 U.S.C. § 1983; (2) violation of Article I, section 2 of the California Constitution; (3) violation of the Unruh Act, California Civil Code § 51, et seq.; (4) unfair competition under California Business and Professions Code §§ 17200, et seq.; (5) breach of the implied covenant of good faith and fair dealing; and (6) false advertising and false association in violation of the Lanham Act, 15 U.S.C. § 1125, et seq. In addition, plaintiffs seek a declaration that Section 230 of the Communications Decency Act ("CDA"), 47 U.S.C. § 230(c), on which plaintiffs expect defendants to rely as an affirmative defense, is unconstitutional. Finally, plaintiffs separately seek a declaration that defendants have violated the rights and obligations pled as the bases for all of defendants' other claims. Dkt. No. 20.

    Defendants move to dismiss all claims in the second amended complaint ("SAC") for

failure to state a claim under Federal Rule of Civil Procedure 12(b)(6) and as barred under Section 230 of the CDA. Dkt. No. 25.

The Court heard oral argument on defendants' motion on June 2, 2020. Dkt. No. 58. Having considered the parties' submissions and the arguments made at the hearing, the Court grants defendants' motion to dismiss the SAC with limited leave to amend.

# I. BACKGROUND[1]

### A. YouTube's Services

A subsidiary of Google, YouTube is the world's most widely used online video hosting platform. Dkt. No. 20 ¶¶ 46, 50, 53. Content creators may upload videos to the YouTube platform without charge, enabling YouTube's billions of users to view them, comment on them, and subscribe to their favorite creators' channels. *Id.* ¶¶ 52-53.

Use of YouTube's services requires agreement to YouTube's Terms of Service, which incorporate YouTube's Community Guidelines.[2] *Id.* ¶¶ 10, 14, 59. The Terms of Service in operation at the time the SAC was filed state that "YouTube reserves the right to discontinue any aspect of the Service at any time" and that "YouTube reserves the right to remove Content without prior notice."[3] Dkt. No. 25-1, Ex. 2 at 2, 3.

### B. YouTube's Restricted Mode

To accommodate sensitive viewers, YouTube offers a feature called Restricted Mode, an optional, opt-in setting that allows viewers to screen out content flagged as age-restricted or "potentially adult." Dkt. No. 20 ¶¶ 77-79. Defendants employ Restricted Mode to "limit[] viewer

---

[1] Unless otherwise noted, the following factual allegations are taken from the SAC and from documents that are incorporated by reference in the SAC or that are the subject of judicial notice.

[2] The SAC repeatedly refers to the Terms of Service then in effect and the incorporated Community Guidelines, and these documents serve as the basis for plaintiffs' claims. *See, e.g.*, Dkt. No. 20 ¶ 331 ("Plaintiffs and Defendants entered into written contracts in which Defendants agreed to provide YouTube platform access, hosting, streaming, and advertising services to Plaintiffs."). The Court may properly consider these documents even though they are not attached to the SAC. *See* Section II.A.

[3] The version of YouTube's Terms of Service in operation at the time defendants filed their motion to dismiss states: "YouTube is under no obligation to host or serve Content." Dkt. No. 25-1, Ex. 1 at 2, 3.

access by younger, sensitive audiences to video content that contains certain specifically enumerated 'mature' aspects," including: talking about drug use or abuse or drinking alcohol in videos; overly detailed conversations about or depictions of sex or sexual activity; graphic descriptions of violence, violent acts, or natural disasters or tragedies; mature subjects such as terrorism, war, crime, and political conflicts resulting in death or serious injury, even if no graphic imagery is shown; profane language; or incendiary and demeaning content directed toward an individual or group. *Id.* ¶¶ 77, 85.  Videos may qualify for Restricted Mode in two ways: (1) YouTube's software may automatically designate a video for Restricted Mode based on an examination of "signals," such as the video's metadata, title, and language used in the video, or (2) a team of human reviewers may deem a video to have violated YouTube's Community Guidelines after a viewer "flags" the video as "inappropriate." *Id.* ¶ 81; *see also* Dkt. No. 25-1, Ex. 12 (YouTube Help website discussing Restricted Mode); *Prager Univ. v. Google LLC* ("*Prager III*"), 951 F.3d, 991, 996 (9th Cir. 2020) (describing Restricted Mode).  Restricted Mode "operates in tandem with separate, more stringent 'Age Based Restriction' filtering criteria, intended to block all mature content to viewers under the age of 18," which focuses on vulgar language (including sexually explicit language or excessive profanity), violence and disturbing imagery, nudity and sexually suggestive content, or portrayal of harmful or dangerous activities.  Dkt. No. 20 ¶ 82.  Of YouTube's daily views, 1.5% (or approximately 75 million of the nearly 5 billion daily views) are from viewers who have activated Restricted Mode.  *Id.* ¶ 80.

### C. YouTube's Advertising Policies

YouTube allows content creators whose channels meet certain minimum viewership requirements to earn revenue from, or "monetize," their videos by running advertisements with them as part of the YouTube Partner Program.  To be eligible for monetization, content creators are required to agree to certain additional terms of service, including YouTube's Partner Program Terms and the Google AdSense Terms of Service.[4]  *See* Dkt. No. 20 ¶ 331; Dkt. No. 25-1, Exs. 6, 10.  Creators seeking to monetize their videos must also agree to comply with YouTube's

---

[4] These documents are also incorporated by reference into the SAC.  *See* Section II.A.

3

monetization policies, including YouTube's advertiser-friendly content guidelines. *See* Dkt. No. 20 ¶¶ 152, 248, 331; Dkt. No. 25-1, Exs. 5-11. YouTube uses automated software to identify content it deems inappropriate for advertising. Content creators may appeal a decision finding their content inappropriate for advertising and may request further review. *See* Dkt. No. 20 ¶¶ 94-95; Dkt. No. 25-1, Ex. 9 at 1.

The YouTube Partner Program Terms provide that "YouTube is not obligated to display any advertisements alongside your videos and may determine the type and format of ads available on the YouTube Service." Dkt. No. 25-1, Ex. 6 at 1. The AdSense Terms of Service state that Google reserves the rights to "refuse or limit [a content creator's] access" to advertising services and to "refuse to provide" those services in connection with a creator's content. *Id.*, Ex. 10 at 1.

### D. Summary of Plaintiffs' Allegations

Plaintiffs are Lesbian, Gay, Bisexual, Transgender, Transsexual or Queer ("LGBTQ+") content creators who use YouTube's service. Dkt. No. 20 ¶¶ 1, 35-44. Each plaintiff operates or contributes to at least one YouTube channel that posts content related to LGBTQ+ interests. *Id.* Plaintiffs have collectively uploaded thousands of videos to YouTube. *Id.* ¶¶ 35, 37-41. At least some plaintiffs have sought to monetize their content by participating in defendants' advertisement programs. *See id.* ¶¶ 55, 89, 122, 132-135, 144, 170, 225, 228, 230, 233.

Plaintiffs allege that YouTube "holds itself out as one of the most important and largest public forums for the expression of ideas and exchange of speech available to the public," and that defendants have represented that "YouTube is, has been and will remain the premier space for freedom of expression in video content on the Internet." *Id.* ¶¶ 46, 57; *see also id.* ¶ 59 ("Google/YouTube claim to be the largest public forum for video-based speech in California, the United States, and the world . . . ."). Specifically, plaintiffs point to defendants' statements that their "mission" is to "give people a voice" in a "place to express yourself" and in a "community where everyone's voice can be heard," and to defendants' promises that "everyone's voice" will be heard, subject only to neutral, content-based rules and filtering that "apply equally to all" regardless of the viewpoint, identity, or source of the speaker. *Id.* ¶¶ 59-60. Plaintiffs also point to YouTube's testimony before Congress asserting that it enforces its policies in a neutral manner.

4

*Id.* ¶ 61.

Plaintiffs allege that, despite YouTube's purported viewpoint neutrality, defendants have discriminated against plaintiffs based on their sexual or gender orientation, identity, and/or viewpoints by censoring or otherwise interfering with certain videos that plaintiffs uploaded to YouTube. *Id.* ¶¶ 3, 7. According to plaintiffs, this censorship takes the form of placing age restrictions on some of plaintiffs' videos and/or limiting access to their videos through YouTube's Restricted Mode setting. *Id.* ¶¶ 28, 167, 170, 185, 195-197. Specifically, plaintiffs allege that defendants have restricted access to some of plaintiffs' videos based on defendants' discriminatory animus toward plaintiffs' sexual orientation, gender, or political identities or viewpoints. *Id.* ¶¶ 19-21, 299 ("No compelling, significant, or legitimate reason justifies restricting or demonetizing Plaintiffs' videos."). Plaintiffs also allege that defendants have "demonetized" some of their videos—by preventing advertisements from running on those videos—in a viewpoint-discriminatory manner. *See id.* ¶¶ 26.f, 100, 158, 164, 170, 180, 193, 217, 225, 233, 236, 247. Plaintiffs do not allege, however, that YouTube permanently removed any of their videos. Plaintiffs allege only that some of their videos have been demonetized or censored (in the form of an age restriction or exclusion through the Restricted Mode setting) based on defendants' intolerance towards plaintiffs' gender, sexual orientation, and political viewpoints.

In addition to Restricted Mode, age restriction filtering, and demonetization, plaintiffs allege that YouTube has engaged in other discriminatory acts based on their LGTBQ+ identities and viewpoints. These include advertising restrictions, use of discriminatory artificial intelligence and algorithms, demonetizing channels wholesale, "shadow banning" (i.e., not showing videos in search results), deleting LGBTQ+ video thumbnails, preventing subscribers from receiving notifications of plaintiffs' new videos, excluding LGBTQ+ content from recommended "Up Next" content, recommending anti-LGBTQ+ content in the "Up Next" feature, playing anti-LGBTQ+ advertisements immediately before plaintiffs' videos, and permitting anti-LGBTQ+ comments to appear on plaintiffs' content. *Id.* ¶¶ 88-118.

Plaintiffs also allege that defendants have begun producing and distributing content that competes with plaintiffs' content and therefore have a financial motivation to behave in

anticompetitive ways. *Id.* ¶¶ 69-75. Plaintiffs say these anticompetitive acts include use of filtering through Restricted Mode, age restriction, and use of AI algorithms as described above, restricting monetization or advertising reach, replacing thumbnails, removing or preventing users from subscribing to plaintiffs' channels, and excluding LGBTQ+ content from the "Up Next" feature—all in a manner that disadvantages plaintiffs and favors defendants' preferred content. *Id.* ¶¶ 75, 92, 95, 103, 160, 165.

## II. LEGAL STANDARD

"A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted 'tests the legal sufficiency of a claim.'" *Conservation Force v. Salazar*, 646 F.3d 1240, 1241–42 (9th Cir. 2011) (quoting *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001)). When determining whether a claim has been stated, the Court accepts as true all well-pled factual allegations and construes them in the light most favorable to the plaintiff. *Reese v. BP Exploration (Alaska) Inc.*, 643 F.3d 681, 690 (9th Cir. 2011). While a complaint need not contain detailed factual allegations, it "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible when it "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

The Court is not required to "'assume the truth of legal conclusions merely because they are cast in the form of factual allegations.'" *Prager Univ. v. Google LLC* ("*Prager I*"), No. 17-CV-06064-LHK, 2018 WL 1471939, at *3 (N.D. Cal. Mar. 26, 2018) (quoting *Fayer v. Vaughn*, 649 F.3d 1061, 1064 (9th Cir. 2011) (per curiam)). Nor does the Court accept allegations that contradict documents attached to the complaint or incorporated by reference, *Gonzalez v. Planned Parenthood of L.A.*, 759 F.3d 1112, 1115 (9th Cir. 2014), or that rest on "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008).

A court generally may not consider any material beyond the pleadings when ruling on a Rule 12(b)(6) motion. If matters outside the pleadings are considered, "the motion must be treated

as one for summary judgment under Rule 56." Fed. R. Civ. P. 12(d).  However, documents appended to the complaint, incorporated by reference in the complaint, or which properly are the subject of judicial notice may be considered along with the complaint when deciding a Rule 12(b)(6) motion. *Khoja v. Orexigen Therapeutics*, 899 F.3d 988, 998 (9th Cir. 2018); *see also Hal Roach Studios, Inc. v. Richard Feiner & Co., Inc.*, 896 F.2d 1542, 1555 n.19 (9th Cir. 1990). Likewise, a court may consider matters that are "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." *Roca v. Wells Fargo Bank, N.A.*, No. 15-cv-02147-KAW, 2016 WL 368153, at *3 (N.D. Cal. Feb. 1, 2016) (quoting Fed. R. Evid. 201(b)).

## III. DISCUSSION

### A. Request for Judicial Notice

Plaintiffs ask the Court to take judicial notice of an Executive Order issued on May 28, 2020 entitled "Preventing Online Censorship."  Dkt. No. 57.  Defendants do not object to plaintiffs' request.  Nevertheless, the Court finds the Executive Order has no bearing on defendants' motion to dismiss, and therefore denies the request.  *See infra* Section III.D.

### B. Federal Claims

#### 1. First Amendment claim

Plaintiffs assert a violation of their First Amendment rights under 42 U.S.C. § 1983.  Dkt. No. 20 ¶¶ 283-303.  To state a claim under § 1983, plaintiffs must plead facts showing that a person acting under color of state law proximately caused a violation of their constitutional or other federal rights. *Crumpton v. Gates*, 947 F.2d 1418, 1420 (9th Cir. 1991).  Defendants argue that plaintiffs' § 1983 claim necessarily fails because defendants are private entities, not state actors.  Dkt. No. 25 at 13–16; Dkt. No. 37 at 3–4.

Plaintiffs do not dispute that defendants are private entities.  However, they contend that defendants should be considered state actors subject to First Amendment constraints for two reasons.  First, plaintiffs argue that defendants have unreservedly "designated" YouTube as a public forum for free expression and have therefore taken on the traditional and exclusive government function of regulating speech in that forum according to the requirements of the First

Amendment. Dkt. No. 36 at 33. Second, plaintiffs say that by invoking the protections of a federal statute—Section 230 of the CDA—to unlawfully discriminate against plaintiffs and/or their content, defendants' private conduct becomes state action "endorsed" by the federal government. *Id.* at 31.

Defendants' first theory is expressly foreclosed by the Ninth Circuit's recent decision in *Prager University v. Google LLC* ("*Prager III*"), which held that YouTube's hosting of speech on a private platform is not a traditional and exclusive government function. 951 F.3d, 991, 997–98 (9th Cir. 2020). Observing that its conclusion involved a "straightforward application of the First Amendment," the Ninth Circuit noted that the Supreme Court has consistently declined to find that private entities engage in state action, except in limited circumstances. *Id.* at 997–99. Most recently, the Supreme Court summarized its relevant precedent as follows:

> [W]hen a private entity provides a forum for speech, the private entity is not ordinarily constrained by the First Amendment because the private entity is not a state actor. The private entity may thus exercise editorial discretion over the speech and speakers in the forum. . . . Providing some kind of forum for speech is not an activity that only governmental entities have traditionally performed. Therefore, a private entity who provides a forum for speech is not transformed by that fact alone into a state actor. After all, private property owners and private lessees often open their property for speech. . . . In short, merely hosting speech by others is not a traditional, exclusive public function and does not alone transform private entities into state actors subject to First Amendment constraints.

*Manhattan Cmty. Access Corp. v. Halleck*, 139 S. Ct. 1921, 1930 (2019).

To the extent plaintiffs suggest that defendants have effectively declared themselves the equivalent of "state actors" and must be treated as such for purposes of the First Amendment, plaintiffs cite no authority for such a radical proposition. *See Prager III*, 951 F.3d at 999 ("Whether a property is a public forum is not a matter of election by a private entity."); *Florer v. Congregation Pidyon Shevuyim, N.A.*, 639. F.3d 916, 922 (9th Cir. 2011) ("We start with the presumption that conduct by private actors is not state action. [Plaintiff] bears the burden of establishing that Defendants were state actors.") (internal citation omitted). The Court notes that the Ninth Circuit in *Prager III* specifically rejected plaintiffs' arguments, based on *Marsh v. Alabama*, 326 U.S. 501 (1946), that the ubiquity of YouTube's service is analogous to a private

8

entity assuming the traditional functions of government in operating a company town. *Prager III*, 951 F.3d at 998.

Plaintiffs' second theory—that the availability of protections under Section 230 of the CDA amounts to government endorsement of defendants' alleged discrimination—fails for at least two reasons. First, plaintiffs' thesis is that, by virtue of this federal statute, the federal government endorses YouTube's alleged discrimination. However, § 1983 applies only to action taken under color of *state* law—not *federal* law. *See Kali v. Bowen*, 854 F.2d 329, 331 (9th Cir. 1988) (noting that "[f]ederal officials who violate federal rights protected by § 1983 generally do not act under 'color of state law'") (internal quotation marks and citation omitted); *Lewis v. Google LLC*, 461 F. Supp. 3d 938, 955 (N.D. Cal. May 20, 2020) ("[E]ven if Plaintiff's allegations were sufficient to hold [Defendants] liable for conduct by the federal and by foreign governments, such allegations do not allege conduct under color of *state* law.") (emphasis original). A claim for a federal violation of constitutional rights must be brought as a *Bivens* claim. *See Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971). Plaintiffs do not plead a *Bivens* claim here.

Second, while a private entity may be considered a state actor when the government compels the private entity to take a particular action, *Blum v. Yaretsky*, 457 U.S. 991 (1982), plaintiffs fail to plead any such compulsion. In *Skinner v. Railway Labor Executives' Association*, 489 U.S. 602 (1989), on which plaintiffs rely, federal regulations (1) required private railroad companies to administer drug and alcohol tests to railroad employees involved in certain railway accidents and (2) authorized but did not require such tests for employees who violated certain safety rules in other circumstances. 489 U.S. at 606–11. The Supreme Court held that the regulations mandating testing constituted government action within the purview of the Fourth Amendment because a railroad that complies with such regulations does so by "compulsion of sovereign authority" and therefore must be viewed as an instrument or agent of the government. *Id.* at 614. The Supreme Court further held that the regulations allowing but not mandating testing nevertheless established that the government "did more than adopt a passive position toward the underlying private conduct" but had instead "encourage[ed], endors[ed], and participat[ed]" in the

testing. *Id.* at 615–16. Here, by contrast, nothing about Section 230 is coercive. As defendants persuasively argue, Section 230 reflects a deliberate *absence* of government involvement in regulating online speech: "Section 230 was enacted, in part, to maintain the robust nature of Internet communication, and accordingly, *to keep government interference in the medium to a minimum.*" *Batzel v. Smith*, 333 F.3d 1018, 1027 (9th Cir. 2003) (internal quotation marks and citation omitted) (emphasis added); *see also* 47 U.S.C. § 230(b)(2) ("It is the policy of the United States . . . to preserve the vibrant and competitive free market that presently exists for the Internet and other interactive computer services, *unfettered by Federal or State regulation*.") (emphasis added). Unlike the regulations in *Skinner*, Section 230 does not require private entities to do anything, nor does it give the government a right to supervise or obtain information about private activity. Furthermore, nothing in the SAC suggests that any governmental actor has actively encouraged, endorsed, or participated in particular conduct by YouTube. Specifically, plaintiffs do not allege that YouTube applied Restricted Mode designations to some of plaintiffs' videos or demonetized them "by compulsion of sovereign authority," or that the United States "actively encouraged, endorsed, and participated" in discriminatory decisions to apply Restricted Mode designations to certain videos or to make them ineligible for monetization.

Plaintiffs suggest that the mere availability of Section 230 immunity demonstrates that the government encourages discrimination. Dkt. No. 36 at 32. In *Moose Lodge No. 107 v. Irvis*, the Supreme Court expressly rejected a similar theory of state action in the context of an alleged Fourteenth Amendment violation:

> The Court has never held, of course, that discrimination by an otherwise private entity would be violative of the Equal Protection Clause if the private entity receives any sort of benefit or service at all from the State, or if it is subject to state regulation in any degree whatever. Since state-furnished services include such necessities of life as electricity, water, and police and fire protection, such a holding would utterly emasculate the distinction between private as distinguished from state conduct set forth in The Civil Rights Cases, supra, and adhered to in subsequent decisions. Our holdings indicate that where the impetus for the discrimination is private, the State must have 'significantly involved itself with invidious discriminations,' in order for the discriminatory action to fall within the ambit of the constitutional prohibition.

407 U.S. 163, 172–73 (1972) (internal citation omitted). In that case, the Supreme Court held that

a state liquor control board's issuance of a liquor license to a private club that refused to serve a Black man because of his race did not constitute the state's "significant involve[ment] with invidious discrimination." *Id.* at 175–77 (internal quotation marks omitted).

Citing *Roberts v. AT&T Mobility LLC*, 877 F.3d 833 (9th Cir. 2017) and *Denver Area Educational Telecommunications Consortium, Inc. v. FCC*, 518 U.S. 727 (1996), plaintiffs nevertheless argue that government action exists where Congress permits selective censorship of particular speech by a private entity. Dkt. No. 45 at 4–5. This argument is not persuasive. As the Ninth Circuit has explained, *Denver Area* does not depart from the Supreme Court's long-standing state action jurisprudence:

> We read *Denver Area* very narrowly. The case—its six opinions, with a majority opinion as to only one issue, plurality opinions as to others, and separate concurring and dissenting opinions—is "the epitome of a splintered opinion." . . . Moreover, the plurality opinion on which Plaintiffs rely is not binding. Thus, if any controlling state action analysis emerged from *Denver Area*, it would be the "common denominator" of the four-Justice plurality opinion and Justice Kennedy's opinion, joined by Justice Ginsburg—the only opinions to explicitly address state action. . . . Justice Kennedy, joined by Justice Ginsburg, wrote:
>
>> In [two of the challenged provision], Congress singles out one sort of speech for vulnerability to private censorship in a context where content-based discrimination is not otherwise permitted. The plurality at least recognizes this as state action, avoiding the mistake made by the Court of Appeals. . . .
>
> That is, state action exists when "Congress singles out one sort of speech for vulnerability to private censorship in a context where content-based discrimination is not otherwise permitted." . . . This narrow reading also accounts for *Denver Area*'s unique context, where cable operators were empowered by statute to censor speech on public television, and as a result were "unusually involved" with the government given their monopolistic-like power over cable systems.

*Roberts*, 877 F.3d at 840–41 (internal citations and alterations omitted); *see also Prager I*, 2018 WL 1471939, at *8 (finding that *Denver Area* did not address the circumstances in which a private property owner must be treated as a state actor for constitutional purposes). Unlike the cable systems operators in *Denver Area*, YouTube is not a government-regulated entity charged with providing public broadcasting services. And unlike the statute at issue in *Denver Area*, which permitted cable system operators to ban specific content, Section 230 of the CDA does not single

11

out particular types of speech as suitable for private censorship.  At most, Section 230 provides protection from civil liability for interactive computer service providers who elect to host information provided by another content provider, or who in good faith act to restrict materials that the provider or user considers "obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable," regardless of whether that material is constitutionally protected.  28 U.S.C. § 230(c); *see also Roberts*, 877 F.3d at 837 (concluding that a permissive federal statute giving a private entity the choice to arbitrate does not "encourage" arbitration such that the private entity's conduct is attributable to the government).

Accordingly, the Court finds that plaintiffs do not state a claim under 42 U.S.C. § 1983 for violation of the First Amendment because defendants are not state actors.

### 2. Lanham Act claim

In the SAC, plaintiffs assert violations of the Lanham Act, 15 U.S.C. § 1125(a)(1), based on allegations of false association as well as false advertising.  Dkt. No. 20 ¶¶ 337-348.  In particular, plaintiffs say that defendants' improper application of Restricted Mode to their videos constitutes false advertisement, because it degrades and stigmatizes plaintiffs' content by falsely labeling it as or implying that it contains "shocking," "inappropriate," "offensive," "sexually explicit," or "obscene" content or is otherwise unfit for minors.  *Id.* ¶¶ 344-345.  Additionally, plaintiffs say that defendants' inclusion of homophobic or hateful content in close proximity to plaintiffs' content through video recommendations, playing anti-LGBTQ+ ads on their videos, and permitting hateful comments on plaintiffs' videos as described above constitutes false association, because it misleads viewers as to plaintiffs' association or connection with the hateful anti-LGBTQ+ speech or viewpoints.  *Id.* ¶¶ 341, 346.

At the hearing on defendants' motion to dismiss, plaintiffs withdrew their claim based on false association.  Dkt. No. 62 at 29:9-13 ("THE COURT: . . . Do the plaintiffs also allege an 1125(a)(1)(A) false association claim or are you limiting your claim under the Lanham Act to false advertisement?  MR. OBSTLER: At this point we're limiting under false advertising.").  In addition, plaintiffs appear to have abandoned allegations that defendants violate the Lanham Act by describing YouTube as a viewpoint-neutral community that values freedom of expression, as

they do not oppose defendants' motion to dismiss their claim on this basis. *See* Dkt. No. 25 at 17–18; Dkt. No. 36 at 24–27.[5] Accordingly, the Court considers only whether plaintiffs state a claim for false advertising in violation of the Lanham Act.

To establish a claim for false advertising under § 1125(a)(1)(B), plaintiffs must plausibly allege that defendants made a false or misleading representation of fact in commercial advertising or promotion about defendants' own or plaintiffs' goods, services, or commercial activities. *Prager III*, 951 F.3d at 999 (citing *Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1139 (9th Cir. 1997)). The Ninth Circuit has explained that "commercial advertising or promotion" within the meaning of § 1125(a)(1)(B) requires the following:

> (1) commercial speech; (2) by a defendant who is in commercial competition with plaintiff; (3) for the purpose of influencing consumers to buy defendant's goods or services. While the representations need not be made in a "classic advertising campaign," but may consist instead of more informal types of "promotion," the representations (4) must be disseminated sufficiently to the relevant purchasing public to constitute "advertising" or "promotion" within that industry.

*Coastal Abstract Serv. Inc. v. First Am. Title Ins. Co.*, 173 F.3d 725, 735 (9th Cir. 1999).

Here, plaintiffs allege that by making their videos inaccessible through application of Restricted Mode, YouTube falsely implies that the videos contain shocking or inappropriate content, such as alcohol or drug abuse; detailed descriptions of sex or sexual activity; graphic descriptions of violence, violent acts, or natural disasters or tragedies; terrorism, war, crime, and political conflicts resulting in death or serious injury; profane language; or incendiary and demeaning content directed toward an individual or group. Dkt. No. 20 ¶¶ 342-346. Plaintiffs claim to have been injured "in the form of diverted views, decreased subscriber numbers, and lost advertising revenues, and other harm to channel and video reach, distribution, and monetization." Dkt. No. 36 at 26.

Again, plaintiffs' theory is foreclosed by the Ninth Circuit's decision in *Prager III*.

---

[5] Plaintiffs' arguments on this point are limited to a single sentence suggesting a decision regarding the viability of a claim based on such allegations is "premature." Dkt. No. 36 at 27; *see also* Dkt. No. 62 at 21:81-21 (explaining that "statements about freedom of expression and all" are "not the basis for a Lanham [Act] claim").

Considering precisely the same claim, the Ninth Circuit held that defendants' statements about videos being unavailable in Restricted Mode were not actionable as "commercial advertising or promotion"; they were simply accurate explanations of the application of defendants' content review and monitoring procedures. *Prager III*, 951 F.3d at 1000 ("The statements about Restricted Mode were made to explain a user tool, not for a promotional purpose to 'penetrate the relevant market' of the viewing public.") (quoting *Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc.*, 314 F.3d 48, 57 (2d Cir. 2002)). In addition, the Ninth Circuit explained that defendants' decision to make certain videos inaccessible in Restricted Mode did not imply any specific representation, as the Lanham Act requires:

> [T]he fact that certain PragerU videos were tagged to be unavailable under Restricted Mode does not imply any specific representation about those videos. Although a false advertising claim may be based on implied statements, those statements must be both specific and communicated as to deceive a significant portion of the recipients. The only statement that appears on the platform is that the video is 'unavailable with Restricted Mode enabled.' This notice does not have a tendency to mislead, confuse or deceive the public about the nature of PragerU's videos.

*Id.* (internal quotation marks, citations, and alterations omitted).

Plaintiffs here attempt to distinguish their claims from those in *Prager III*, arguing that they have alleged that defendants directly compete with plaintiffs for viewers and advertisers because they produce and post similar content, and that designating plaintiffs' videos for Restricted Mode drives views toward defendants' content instead. Dkt. No. 45 at 1–2. But even if plaintiffs' allegations of competition are true, plaintiffs rely on the same statements as those the Ninth Circuit considered and rejected in *Prager III*. Plaintiffs do not explain how the purported competition between plaintiffs and defendants transforms defendants' explanatory statements into commercial advertising and promotion or into specific representations of fact about particular videos.

Accordingly, the Court dismisses plaintiffs' claim for false advertising under the Lanham Act.

### C. State Claims

Plaintiffs' remaining claims are based on California state law. Specifically, plaintiffs

14

assert claims for: (1) violation of Article I, section 2 of the California Constitution; (2) violation of the Unruh Act, California Civil Code § 51, et seq.; (3) unfair competition under California Business and Professions Code §§ 17200, et seq.; and (4) breach of the implied covenant of good faith and fair dealing.

Where a federal court has original jurisdiction over claims based on the existence of a federal question, the court may exercise supplemental jurisdiction over state law claims if those claims meet the requirements of 28 U.S.C. § 1367(a). In this case, it is not clear whether plaintiffs rely on the exercise of supplemental jurisdiction or some other ground with respect to their state law claims. The SAC does not refer to 28 U.S.C. § 1367(a) but instead refers only to 28 U.S.C. §§ 1331 and 1337(a), both of which address jurisdiction of claims arising under federal law. Dkt. No. 20 ¶ 48. Assuming the SAC includes a typographical error and that plaintiffs mean to rely on 28 U.S.C. § 1367(a)—and not § 1337(a)—to support an exercise of supplemental jurisdiction over their state law claims, the Court considers whether to do so, given that this order dismisses plaintiffs' pending federal claims.

A court may decline to exercise supplemental jurisdiction where it "has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3); *see also Albingia Versicherungs A.G. v. Schenker Int'l, Inc.*, 344 F.3d 931, 937–38 (9th Cir. 2003), *as amended* 350 F.3d 916 (9th Cir. 2003) (holding that § 1367(c) grants federal courts the discretion to dismiss state law claims when all federal claims have been dismissed). In considering whether to retain supplemental jurisdiction, a court should consider factors such as "economy, convenience, fairness, and comity." *Acri v. Varian Assocs.*, 114 F.3d 999, 1001 (9th Cir. 1997) (en banc) (citations and internal quotation marks omitted). However, "in the usual case in which all federal-law claims are eliminated before trial, the balance of factors . . . will point toward declining to exercise jurisdiction over the remaining state-law claims." *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988).

Here, the factors of economy, convenience, fairness, and comity support dismissal of plaintiffs' remaining state law claims. This case is still at the pleading stage, and no discovery has taken place. Dismissing plaintiffs' state law theories of relief at this stage conserves federal

judicial resources. Further, the Court finds that dismissal promotes comity, as it enables California courts to interpret questions of state law. This is an especially important consideration here because plaintiffs assert a claim that demands an analysis of the reach of Article I, section 2 of the California Constitution and the Unruh Act in the context of content hosted by private entities on the Internet—an area in the which application of those laws is less well-developed. For these reasons, the Court declines to exercise supplement jurisdiction over plaintiffs' state law claims.

Although neither party raises the issue, it is unclear whether plaintiffs intend also to assert that this Court has independent original jurisdiction over the entire action under the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d). *Floyd v. Am. Honda Motor Co., Inc.*, 966 F.3d 1027, 1035–36 (9th Cir. 2020) (district court erred in focusing only on supplemental jurisdiction under 28 U.S.C. § 1367 and not considering whether plaintiffs' state law claims met requirements for original jurisdiction under CAFA). Although the SAC contains class action allegations, *see* Dkt. No. 20 ¶¶ 248-257, plaintiffs do not expressly invoke the Court's CAFA jurisdiction by name or by citation to the statute. *See* Dkt. No. 20 ¶ 48. However, even if plaintiffs had cited § 1332(d), they have not adequately pled CAFA jurisdiction, which requires minimal diversity, 100 or more putative class members, and more than $5 million in controversy. 28 U.S.C. § 1332(d). Plaintiffs say that they have lost revenue as the result of defendants' actions, but they do not plead an aggregate amount of damages, and they refer only in a conclusory manner to an amount in controversy exceeding $5 million. *Id.* ¶¶ 48, 157, 173-175, 190, 211, 217, 234. Because plaintiffs do not expressly invoke CAFA jurisdiction and do not allege facts that plausibly support such jurisdiction, the Court does not exercise jurisdiction over plaintiffs' state law claims under CAFA at this time.

In sum, the Court declines to exercise supplemental jurisdiction under § 1367(a) over plaintiffs' state law claims and instead dismisses those claims without prejudice. The Court will consider exercising supplemental jurisdiction if and when plaintiffs successfully plead a federal claim for relief. The Court also finds no basis to exercise original jurisdiction under § 1332(d). Plaintiffs may amend their complaint to attempt to plead CAFA jurisdiction under § 1332(d) if

16

they wish.

### D.    Claim for Declaratory Relief Regarding CDA Section 230 Immunity

Plaintiffs assert a claim seeking a declaration that Section 230 of the CDA is unconstitutional. Dkt. No. 20 ¶¶ 258-282; Dkt. No. 36 at 19–21. Defendants move to dismiss all claims in the SAC as barred under Section 230 of the CDA. Dkt. No. 35 at 7–13. For the reasons explained below, the Court dismisses plaintiffs' claim for declaratory relief and does not consider defendants' contention that all of plaintiffs' claims are barred under Section 203.

Section 230 of the CDA "immunizes providers of interactive computer services against liability arising from content created by third parties . . . ." *Fair Hous. Council of San Fernando Valley v. Roommates.com, LLC*, 521 F.3d 1157, 1162 (9th Cir. 2008) (en banc). "[A]ny activity that can be boiled down to deciding whether to exclude material that third parties seek to post online is perforce immune under section 230." *Id.* at 1170–71. Immunity under Section 230 "protect[s] websites not merely from ultimate liability, but [also] from having to fight costly and protracted legal battles." *Id*. at 1175. Plaintiffs contend that Section 230 immunizes constitutional violations and that it is, therefore, unconstitutional. Dkt. No. 36 at 20–21.

The Court need not reach the question of whether Section 230 immunity applies to bar plaintiffs' claims or whether the statute is unconstitutional. First, "declaratory relief is not an independent cause of action" but rather only a remedy. *VIA Techs., Inc. v. SONICBlue Claims LLC*, No. C 09-2109 PJH, 2010 WL 2486022, at *3 (N.D. Cal. June 16, 2010); *see also Fiedler v. Clark*, 714 F.2d 77, 79 (9th Cir. 1983); *Prager I*, 2018 WL 1471939, at *2 n.2; *Spangler v. Selene Fin. LP*, No. 16-cv-05103-WHO, 2016 WL 5681311, at *7 (N.D. Cal. Oct. 3, 2016). To the extent plaintiffs' first claim for declaratory relief depends on defendants' alleged violation of their First Amendment rights, plaintiffs have failed to state a claim for such a violation in the first instance. *See supra* Section III.B.1. The Court therefore also dismisses plaintiffs' related claim for declaratory relief. *Prager I*, 2018 WL 1471939, at *9 (granting motion to dismiss claim for First Amendment violation and claim for declaratory relief, to the extent that it is premised on a First Amendment violation); *Lewis*, 461 F. Supp. 3d at 963 (dismissing claim for declaratory relief reliant on federal claims because plaintiff failed to state the federal claims).

17

Second, Section 230 immunity is properly viewed and analyzed as an affirmative defense in the context of this action. Here, plaintiffs appear to have included a claim for declaratory relief in anticipation of defendants' assertion of Section 230 immunity as an affirmative defense to plaintiffs' claims. "[U]sing the Declaratory Judgment Act to anticipate an affirmative defense is not ordinarily proper, and numerous courts have refused to grant declaratory relief to a party who has come to court only to assert an anticipatory defense." *Veoh Networks, Inc. v. UMG Recordings, Inc.*, 522 F. Supp. 2d 1265, 1271 (S.D. Cal. 2007); *see also* 10B Fed. Prac. & Proc. Civ. § 2758 (4th ed.) ("[I]t is not the function of the federal declaratory action merely to anticipate a defense that otherwise could be presented in a state action."). Dismissal of a declaratory relief claim intended to anticipate an affirmative defense is appropriate, particularly where, as here, the Court need not consider the affirmative defense in order to resolve defendants' motion to dismiss plaintiffs' other claims. *See Veoh Networks*, 522 F. Supp. 2d at 1272.

Finally, the Court bears in mind the doctrine of constitutional avoidance. "If there is one doctrine more deeply rooted than any other in the process of constitutional adjudication, it is that we ought not to pass on questions of constitutionality . . . unless such adjudication is unavoidable." *Dep't of Com. v. U.S. House of Representatives*, 525 U.S. 316, 343 (1999) (quoting *Spector Motor Serv. v. McLaughlin*, 323 U.S. 101, 105 (1944)). Because the Court finds that plaintiffs have not stated a federal claim and declines supplemental jurisdiction over the currently pled state law claims, *see supra* Section III.C, addressing the constitutional question plaintiffs raise is not appropriate at this juncture.

### E. Omnibus Claim for Declaratory Relief

Plaintiffs' eighth claim for declaratory relief is based on all allegations that precede it in the SAC. *See* Dkt. No. 20 ¶ 349. In this claim, plaintiffs ask for a declaration that defendants have violated the U.S. Constitution, the California Constitution, the Unruh Civil Rights, California Business and Professions Code §§ 17200, et seq., the Lanham Act, and the express and implied terms of the parties' contracts. *Id.* ¶ 350. Putting aside the impropriety of pleading such an omnibus claim for declaratory relief, the Court dismisses plaintiffs' eighth claim for declaratory relief because plaintiffs have not stated any federal claims over which the Court may exercise

jurisdiction, and because the Court declines to exercise supplemental jurisdiction over plaintiffs' state law claims. *See supra* Sections III.B-C.

### F. Leave to Amend

While leave to amend generally is granted liberally, the Court has discretion to dismiss a claim without leave to amend if amendment would be futile. *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008); *Rivera v. BAC Home Loans Servicing, L.P.*, 756 F. Supp. 2d 1193, 1197 (N.D. Cal. 2010) (citing *Dumas v. Kipp*, 90 F.3d 386, 393 (9th Cir. 1996)). Because the Court finds that amendment would be futile as to plaintiffs' § 1983 claim for violation of the First Amendment, that claim is dismissed with prejudice. However, the Court cannot say that amendment would be futile as to plaintiffs' Lanham Act false advertising claim. Accordingly, the Court gives plaintiffs leave to amend their Lanham Act false advertising claim.

Because the Court declines to exercise supplemental jurisdiction over plaintiffs' state law claims, those claims are dismissed without prejudice. If plaintiffs choose to amend their Lanham Act claim as provided in this order, they may also reassert their state law claims at the same time. However, plaintiffs may not assert any new federal or state claims absent leave of Court upon a successful motion for leave to amend.

### IV. CONCLUSION

For the foregoing reasons, the Court grants defendants' motion to dismiss. Plaintiffs may file an amended complaint by **January 20, 2021**.

**IT IS SO ORDERED.**

Dated: January 6, 2021

*Virginia K. DeMarchi*
VIRGINIA K. DEMARCHI
United States Magistrate Judge