1 | BROWNE GEORGE ROSS
O'BRIEN ANNAGUEY & ELLIS LLP
2 | Peter Obstler (State Bar No. 171623)
   pobstler@bgrfirm.com
3 | Pete Wilson (State Bar No. 35742)
   pwilson@bgrfirm.com
4 | Eric M. George (State Bar No. 166403)
   egeorge@bgrfirm.com
5 | Dennis S. Ellis (State Bar No. 178196)
   dellis@bgrfirm.com
6 | Debi A. Ramos (State Bar No. 135373)
   dramos@bgrfirm.com
7 | 2121 Avenue of the Stars, Suite 2800
Los Angeles, California  90067
8 | (310) 274-7100; Facsimile: (310) 275-5697

9 | Attorneys for  Plaintiffs Divino Group LLC,
Chris Knight, Celso Dulay, Cameron Stiehl,
10 | BriaAndChrissy LLC, Bria Kam, Chrissy
Chambers, Chase Ross, Brett Somers, and
11 | Lindsay Amer, Stephanie Frosch, Sal
Cinequemani, Tamara Johnson and Greg Scarnici

12

13 | UNITED STATES DISTRICT COURT

14 | NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION

15 | DIVINO GROUP LLC, a California limited
liability company, CHRIS KNIGHT, an

Case No. 5:19-cv-004749-VKD

16 | individual, CELSO DULAY, an individual,
CAMERON STIEHL, an individual,

**THIRD AMENDED CLASS ACTION
COMPLAINT**

17 | BRIAANDCHRISSY LLC, a Georgia limited
liability company, BRIA KAM, an individual,
18 | CHRISSY CHAMBERS, an individual,
CHASE ROSS, an individual, BRETT

**JURY TRIAL DEMANDED**

19 | SOMERS, an individual, and LINDSAY
AMER, an individual, STEPHANIE
20 | FROSCH, an individual, SAL
CINEQUEMANI, an individual, TAMARA

Judge:  Hon. Virginia DeMarchi
Crtrm:  2

21 | JOHNSON, an individual, and GREG
SCARNICI, an individual,

22

Trial Date:  None Set

23 | Plaintiffs,

24 | vs.

25 | GOOGLE LLC, a Delaware limited liability
company, YOUTUBE, LLC, a Delaware
26 | liability company, and DOES 1-25,

27 | Defendants.

28

1

**TABLE OF CONTENTS**

2

                                                                                        **Page**

3   I.      INTRODUCTION AND STATEMENT OF THE CASE ................................................. 1

4   II.     PARTIES ....................................................................................................................... 15

5   III.    JURISDICTION AND VENUE .................................................................................... 19

6           A.    Federal Question Jurisdiction Under 28 U.S.C. §1331 ....................................... 19

7           B.    Class Action Fairness Act Jurisdiction Under 28 U.S.C. §1332(d)(2) ................... 20

8           C.    Supplemental Jurisdiction Under 28 U.S.C. §1367 ................................................ 21

9   IV.     FACTS COMMON TO ALL CLAIMS ........................................................................ 22

10          A.    The YouTube Platform .......................................................................................... 22

11          B.    YouTube Holds Itself Out As A Quintessential Forum For Freedom Of
12                Expression .............................................................................................................. 24

13          C.    Defendants Flout The Fundamental "Free Expression" Bargain They Made
                  With YouTubers ...................................................................................................... 26

14          D.    Defendants Begin To Compete With YouTubers In The Proposed Class ............. 28

15          E.    Defendants' Tool Kit Of Unlawful Speech Suppression ........................................ 29

16                1.    Restricted Mode ............................................................................... 30

17                2.    Advertising Restrictions ............................................................................. 34

18                3.    AI Filtering Under Restricted Mode And Advertising Restrictions ........... 35

19                4.    Demonetizing Channels Wholesale ........................................................... 37

20                5.    Shadow Banning ...................................................................................... 38

21                6.    Deleting  Thumbnail Images....................................................................... 38

22                7.    Cancelling And Stopping Subscribers' New Video Notifications............... 39

23                8.    Excluding  Content From The "Up Next" Recommended
                        Application ................................................................................................. 41

24
25                9.    Recommending Anti- Hate Speech In The "Up Next" Application
                        Alongside  Videos ..................................................................................... 41

26                10.   Playing Anti- Advertisements Immediately Before  Videos ...................... 42

27                11.   Including Anti- Hate Speech In Comments Appearing With Videos ......... 42

28                12.   Other Unlawful Speech-Restricting Tools ................................................ 45

**THIRD AMENDED CLASS ACTION COMPLAINT**

**TABLE OF CONTENTS**
(Continued)

|  |  | | **Page** |
|---|---|---|---|
| F. | Defendants Were Caught Censoring  Users In 2017 | | 46 |
| G. | YouTube's Promises To the  YouTubers Were "Lip Service" | | 48 |
| H. | Defendants Have And Continue To Violate The Rights Of Plaintiffs And The Community | | 49 |
|  | 1. | Divino (GlitterBombTV.com's GNews!) | 49 |
|  | 2. | BriaAndChrissy LLC (BriaAndChrissy) | 55 |
|  | 3. | Chase Ross | 67 |
|  | 4. | Brett Somers a/k/a AMP (Watts The Safeword) | 73 |
|  | 5. | Lindsay Amer (Queer Kid Stuff) | 79 |
|  | 6. | Stephanie Frosch (ElloSteph, ElloStephExtras and StephFrosch) | 82 |
|  | 7. | Sal Cinquemani (SalBardo) | 86 |
|  | 8. | Tamara Johnson (SVTV Network) | 90 |
|  | 9. | Greg Scarnici (GregScarnici and Undercover Music) | 94 |
| V. | CLASS ACTION ALLEGATIONS | | 97 |
| FIRST CAUSE OF ACTION Declaratory Judgment:  47 U.S.C. § 230(c) Violates The First And Fourteenth Amendments Of The U.S. Constitution (On Behalf Of Plaintiffs Individually And The YouTube Community Class) | | | 101 |
| A. | Plaintiffs Served Rule 5.1 Notice On The U.S. Attorney General. | | 102 |
| B. | Legal Controversies Currently Exist Regarding The Scope And Constitutionality Of 47 U.S.C. § 230(c). | | 104 |
|  | 1. | An Actual Controversy Exists As To Whether 47 U.S.C. § 230(c) Immunizes Filtering And Restricting Internet Speech Based On The Identity Or Viewpoint Of The Speaker. | 106 |
|  | 2. | An Actual Controversy Exists As To Whether Defendants' Determination That Plaintiffs' Content Is "Otherwise Objectionable" Is Subject To Good Faith Review. | 108 |
|  | 3. | An Actual Controversy Exists As To Whether 47 U.S.C. § 230(c) Is Unconstitutional As Applied To Plaintiffs On These Facts. | 109 |
| SECOND CAUSE OF ACTION Violation Of California Constitution Article I, Section 2 (On Behalf Of Plaintiffs Individually And The YouTube Community Class) | | | 110 |

1

**<u>TABLE OF CONTENTS</u>**
(Continued)

2

<u>Page</u>

3

THIRD CAUSE OF ACTION Violation Of California Unruh Civil Rights Act—Civil
        Code §§ 51, e*t seq*. (On Behalf Of Plaintiffs And The YouTube Community Class) ...... 112

4

FOURTH CAUSE OF ACTION Unfair Competition In Violation Of  California Business
        And Professions Code §§ 17200, *et seq*. (On Behalf Of Plaintiffs And The
        YouTube Community Class) ........................................................................................ 114

5

6

FIFTH CAUSE OF ACTION Breach Of Implied Covenant Of Good Faith And Fair
        Dealing (On Behalf Of Plaintiffs And The YouTube Community Class) ...................... 115

7

8

SIXTH CAUSE OF ACTION Violation Of The Lanham Act — 15 U.S.C. §§ 1125 *et seq*.
        (On Behalf Of Plaintiffs ) ............................................................................................ 117

9

PRAYER FOR RELIEF.................................................................................................... 121

10

JURY DEMAND................................................................................................................ 122

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Pursuant to the Court's Order dated January 6, 2021 (DKT # 65),[1] Plaintiffs Divino Group LLC, Chris Knight, Celso Dulay, and Cameron Stiehl, which own GlitterBombTV.com and produce the online show "GNews!"; BriaAndChrissy LLC (d/b/a "BriaAndChrissy"), Bria Kam, and Chrissy Chambers, which produce the YouTube channels "BriaAndChrissy" and "WonderWarriors"; Chase Ross, who produces the YouTube channel "uppercaseCHASE1"; Brett Somers, who produces the YouTube channel "WattsTheSafeword"; Lindsey Amer, who produces the YouTube channel "QueerKidStuff"; Stephanie Frosch, who produces the YouTube channels "ellosteph" and "ellostephextras"; Sal Cinequemani (a.k.a "Sal Bardo"), who produces the YouTube channel "salbardo"; Tamara (Sheri) Johnson, owner of SVTVNetwork.com, who produces the YouTube channel "SVTVNetwork"; and Greg Scarnici, owner of gregscarnici.com, who produces the YouTube channel "GregScarnici" (collectively referred to as "Plaintiffs") respectfully file this Third Amended Complaint for damages, and equitable and declaratory relief (the "TAC"), individually, and on behalf of all persons similarly situated, against Defendants YouTube, LLC ("YouTube") and its parent company, Google LLC ("Google") (collectively referred to as "Google/YouTube" or "Defendants," unless otherwise specified).

## I.   <u>INTRODUCTION AND STATEMENT OF THE CASE</u>

1.      Plaintiffs are Lesbian, Gay, Bisexual, Transgender, Transsexual or Queer internet content creators, viewers, users, and consumers of the internet-based global video sharing social media platform "YouTube" who are and continue to be denied full, fair, and equal access to YouTube by Defendants solely because of Plaintiffs' sexual or gender orientation, identity, and/or viewpoints.  That is LGBTQ discrimination, pure and simple.  And it violates Plaintiffs' civil, statutory, and contractual rights to use YouTube under identity and viewpoint-neutral, content-based rules and restrictions that Defendants warrant "apply equally to all" regardless of a user's

---

[1] Because the Court's January 6-Order appears to require leave of Court to add additional claims and many issues of law remain undecided at this juncture, a proper basis to seek leave at this time does not exist for reasons of efficiency as well as law.  Plaintiffs reserve the right to seek leave to add additional substantive claims, including claims for breach of contract, equitable relief and for an accounting, once the Court has settled the threshold legal issues that govern those claims in this case and in *Newman v. Google LLC*, Case No. 5:20-cv-04011-LHK (N. D. Cal.) (Koh, J.).

sexual, gender, religious, political, or commercial identity or viewpoint.

2.      Each Plaintiff brings this lawsuit, on behalf of himself, herself, or itself individually, and as a representative of a class and/or subclasses of other similarly situated persons who use the YouTube Platform, and whose legal rights have been violated by Defendants' use of data regarding users' gender, sexual orientation, religious, ethnic, racial, political, and/or commercial and data driven identities and viewpoints, to restrain, discriminate against, economically crush, and cleanse disfavored users from the YouTube Platform in direct violation of the Plaintiffs' civil and consumer rights.

3.      Defendants systematically restrict, restrain, censor, block, interfere, and falsely stigmatize Plaintiffs' video content on YouTube by labeling the video content as "inappropriate" or "otherwise objectionable," without any reference to the actual video content or why it fails to comply with YouTube's Terms of Service and content-based rules.  Instead, as Defendants have admitted, Plaintiffs' content is not only restricted, demonetized, and stigmatized as "inappropriate" and "otherwise objectionable," but Defendants have done so based on an affirmative policy that denies Plaintiffs access to YouTube (including monetization, subscription, advertising, and other content distribution products and services) because Plaintiffs are "gay."

4.      Defendants also have engaged in anticompetitive conduct, fraud, and express and implied violations of Plaintiffs' consumer and contractual rights by using content-based filtering and restrictions as a means to cleanse independent content creators like Plaintiffs from YouTube and redirect Plaintiffs' audiences and viewers to content that Defendants create, produce, or have a direct financial interest in.

5.      Finally, Defendants unlawfully use federal law to prohibit YouTube users, including Plaintiffs, from petitioning the courts for relief from Defendants' unlawful conduct in direct violation of Plaintiffs' First and Fourteenth Amendment Rights.  Specifically, as they do here, Defendants invoke section 230(c) of the Communication Decency Act[2] to claim absolute legal immunity for any unlawful conduct related to content filtering merely because they find

---

[2] 47 U.S.C. § 230(c) ("§230(c)").

**THIRD AMENDED CLASS ACTION COMPLAINT**

1    Plaintiffs' sexual orientation, identity traits, or viewpoints to be "otherwise objectionable," even if

2    when Plaintiffs' underlying content is not.  Consequently, Defendants' invocation of §230(c) and

3    its application to block well-pled and detailed allegations and party admissions of sexual

4    orientation and gender identity discrimination along with the other wrongs alleged in this case

5    would violate Plaintiffs' civil rights under the Free Speech and Equal Protection clauses of the

6    U.S. Constitution.

7         6.       Defendants' scheme to restrain, interfere with, bar and ultimately cleanse

8    disfavored content creators and users from the YouTube Platform was not undertaken for purposes

9    of furthering any legitimate or lawful interest, such as the filtering, regulation, restriction, or need

10   to curate harmful or unlawful video content[3] on the YouTube Platform.  Rather, the actions and

11   conduct at issue in this lawsuit have little, if anything, to do with filtering the actual content of the

12   videos uploaded to the YouTube Platform.

13        7.       Defendants' unlawful actions, conduct, and practices that give rise to and form the

14   core basis and premise of this lawsuit all relate to Defendants' unlawful use of data regarding

15   video creators', subscribers', or viewers' gender, sexual orientation, race, ethnicity, commercial,

16   or political identities or viewpoints.  Specifically, Defendants filter, regulate, restrict, and censor

17   videos and user access to the YouTube Platform, based not on video content—the audio or images

18   a video contains—but on the personal, sexual, ethnic, religious, commercial or political identities

19   or viewpoints of the user.[4]  Defendants claim videos are "inappropriate" and "otherwise

20   objectionable" as a pretext to "cleanse" the YouTube Platform of third-party content creators who

21   upload videos for their followers and the YouTube Community, and who compete with

22

23   [3] "Video content" refers to the actual video material which a creator uploads to the YouTube
     Platform, which can be viewed by subscribers to a creator's channel or random viewers on the
24   platform.  It is distinguished from metadata regarding the video, such as tags, descriptions and
     titles; data regarding the identity of or information about the person posting the video; or data
25   regarding the identity of or information about the person viewing the video.
     [4] The "user" refers to both content creators who upload videos, and the people who access those
26   videos on the YouTube Platform.  The term includes subscribers to channels, subscribers who pay
     for ad free video services, and viewers who are simply accessing the YouTube Platform using
27   either individual accounts or accounts held by institutions such as libraries, schools, and private
     companies.
28

1  Google/YouTube for viewership and do not further Google/YouTube's corporate profits, political

2  interests, or business plans.

3        8.     Furthermore, Defendants' cleansing of independent video content creators is not

4  limited to discriminating against those creators and users who identify as, or express viewpoints.

5  Documented evidence exists and lawsuits are pending or are being threatened by independent

6  third-party video creators and loyal users of the YouTube Platform who have been victimized by

7  Defendants' practices because of their race, religion, political affiliations, or commercial status.

8  Google/YouTube is using identity based censorship to determine who can and cannot continue to

9  use the YouTube Platform.

10        9.     Defendants exercise control and absolute dominion over the filtering, regulation,

11  restriction, censorship, distribution, monetization, advertising, data collection, viewer reach and

12  access to content on the YouTube Platform, the world's largest forum for online videos.

13  Defendants exercise their control in a manner that is discriminatory and unlawful, and violates the

14  civil and consumer rights of more than 2.3 billion YouTube users.

15        10.    YouTube was founded, built, and operates as an "open" internet platform for

16  profit.  Based on YouTube's Mission Statement, Terms Of Service, marketing, advertising,

17  solicitations, and representations to consumers, Defendants solicit and induce the public to post,

18  view, and communicate through video content on the YouTube platform by inviting the public to

19  use YouTube as a place to engage in "**Freedom of Expression**," "**Freedom of Information**,"

20  "**Freedom of Opportunity**," and "**Freedom to Belong**."[5]  Everyone who use the YouTube

21  Platform is accorded the status of "members" of a public "YouTube Community," whose use and

22  access to the platform is governed by viewpoint-neutral, content-based rules which Defendants

23  refer to as "Community Guidelines."  Defendants represent and warrant that these freedoms apply

24  to all Community Members and shall be exercised by and protected for each and every user.

25  According to Defendants, the public is entitled to post, view, communicate, and share information

26  and ideas through video content, subject only to viewpoint-neutral, content-based filtering rules

27

28  [5] See https://www.youtube.com/yt/about/ .

**THIRD AMENDED CLASS ACTION COMPLAINT**

and restraints that "apply equally to everyone." Defendants represent these rules are based only on the content of the video, NOT the personal identity or viewpoint of the video's creator or its viewer.

11.     In return for granting the public access to a global, non-discriminatory, viewpoint-neutral forum for creating, posting, marketing, distributing and sharing video content, YouTube's users give Defendants certain rights that permit Defendants to monetize their videos, viewership, and audiences. This includes the right of Defendants to use any of their video content to sell advertising and obtain revenue from advertisers, as well as to solicit, market, and sell to users Defendants' own advertising, promotional, distribution, or reach-expansion products that YouTube users are enticed to use as a means for enhancing the reach of their videos, and competing for advertising revenues and viewership on an "open" platform.

12.     Under this open platform business model, users must also give Defendants the exclusive property rights to their personal and financial data, the value of which provides Defendants with billions of dollars in annual revenues. Defendants not only collect, store, analyze, and organize the personal, financial, political, and other data for each of the YouTube Platform users, but Defendants also use and sell that data to third parties on the open market. The average revenue value to Defendants for the property right to the data for *each* individual Plaintiff (and *each* individual putative class member's) is estimated to exceed $1 million in revenue per year per user.

13.     Defendants also monetize the YouTube Platform by creating, posting, distributing, and marketing Defendants' own video content which competes for viewership and revenues directly with users like Plaintiffs, on a supposed viewpoint-neutral open internet platform. In so doing, Defendants have content production and distribution deals with large, mainstream media conglomerates including FOX News, PBS, NBC, MLB, the NFL, and HBO (to name but a few), whose content also competes with Plaintiffs on the YouTube Platform and are supposedly subject to the same viewpoint-neutral, content-based rules that apply equally to all.

14.     To effectuate, govern, and enforce access and use by consumers as well as Defendants and its business partners, all creators and viewers enter into a Terms of Service

contract with Defendants.  In relation to those agreements, Defendants have admitted, clarified and expressly warranted to the public and U.S. Congress that pursuant to its Terms of Service, YouTube is a designated "public forum" that is open to "everyone" subject only to "viewpoint-neutral," content-based filtering rules and restrictions that "apply equally to all" users.  Among other things, Defendants have admitted under oath, that YouTube's Terms of Service and other public representations prohibit them from considering, utilizing, or taking into account a user's personal, gender, sexual orientation, racial, ethnic, religious, political, or commercial identity or viewpoint when filtering or regulating content on YouTube.  These obligations expressly prohibit Defendants or their agents from using the personal identity or viewpoint of the creators or viewers as a basis to restrict or interfere with users' ability to reach, distribute, or market content to the users' intended audience or viewers on the YouTube Platform.  The Terms of Service also prohibit Defendants from using users' personal identity or viewpoint to prohibit or interfere with users' purchases of Defendants' advertising and/or reach products to promote or distribute otherwise compliant content.

15.     Using and in direct reliance of this business model, Defendants solicited the public, including Plaintiffs, to upload video content to the YouTube Platform, and they now control and exercise complete dominion over roughly 95% of the public video content and communications in the world.  By controlling and regulating virtually all of the public video content in the United States and the rest of the world, Defendants operate YouTube as the largest for-profit forum dedicated to free speech and expression in the history of the world.  Resulting from Defendants' promises to the public and consumers that it provides an open internet platform for freedom of expression, subject only to lawful, viewpoint-neutral content-based filtering, regulations, and rules that apply equally to all, Defendants have reaped more than $50 billion in annual revenues by regulating, distributing, and monetizing the free speech and expression of the approximately 2.3 billion people who use the YouTube Platform.

16.     Defendants founded, built, and now operate the YouTube Platform based on a lie that pervades every aspect of the platform and render its operation one of the largest and most dangerous consumer frauds in history—namely, that YouTube is an open, viewpoint-neutral

1   platform where lawful content-based rules apply equally to all users regardless of personal identity

2   or viewpoint.  Instead Defendants are engaged in a bait and switch designed to purge the Platform

3   of content creators and their followers whom Defendants dislike or view as unprofitable in the

4   long term.  In direct violation of the law and the fundamental promises upon which YouTube was

5   founded, built, and now operates, Defendants filter and regulate all aspects of user access on the

6   YouTube Platform based on the personal identity and viewpoint of the creator or their intended

7   audience.  That is discrimination pure and simple.

8          17.     Furthermore, as part of its campaign to cleanse third party content creators from the

9   YouTube Platform, Defendants also use discriminatory, identity-based filtering tools, practices,

10  and machines to stigmatize and restrict access to content creators in order to crush them

11  economically and destroy their livelihoods.  Among other things, Defendants have entered into

12  lucrative anticompetitive tying arrangements with purported independent, third-party fact checkers

13  and content curators who flag, curate, and restrict third-party creator content, and who promote

14  Defendants' own content by falsely and capriciously branding third-party users and/or their

15  content as purveyors of "hate speech," "disinformation," "fake news," and shocking, offensive, or

16  simply "otherwise objectionable" content.  These practices not only violate the express and

17  implied contractual obligations and promises Defendants have made to Plaintiffs and the billions

18  of YouTube users who depend on the platform to communicate and to earn their livelihoods, but

19  they violate their Constitutional and legal rights to express, communicate, interact, and market

20  ideas through video content under viewpoint-neutral rules and regulations.

21         18.     Defendants' conduct is not only unlawful, it constitutes an existential threat to the

22  fundamental freedoms upon which our society is based.  Plaintiffs, as well as other independent

23  content creators and users, supplied YouTube with the content and viewers that are directly

24  responsible for creating YouTube's global reach, popularity, and financial and political success.

25  Plaintiffs uploaded their videos to YouTube in reliance on Defendants' repeated promises that

26  YouTube was a forum for freedom of expression, access to which was subject only to lawful,

27  viewpoint-based content filtering and rules that apply equally to all users.  Consequently,

28  Defendants' denial of Plaintiffs' access to the YouTube Platform based on Plaintiffs' sexual

orientation or gender identity constitutes unlawful systemic discrimination that is unconstitutional, unlawful, and repugnant to everything YouTube purports to represent.

19.    The evidence and facts alleged herein leave no doubt that Defendants are using filtering and regulation to directly target and crush the reach content creators, solely because of the sexual orientation, gender, or political identities or viewpoints of content creators and their intended audiences.

20.    During a phone call between the Plaintiffs in this case and a Google representative described as a "senior" Google employee, the representative unequivocally stated that Defendants have a "company policy" of not selling ads to "gay" content creators because the "gay thing" rendered their videos "shocking" and sexually explicit regardless of the actual content of their videos.[6]

21.    Internal documents confirm that in direct violation of YouTube's Terms of Service, Defendants have used their absolute power over filtering and regulation of videos to undermine the core promises and principles they publicly advertise and promise: to employ viewpoint-neutral content-based filters and regulations. Defendants now describe themselves as a "[c]ensor,"[7] and exercise their censorship power to silence and crush Plaintiffs because they identify and express viewpoints with which Defendants disagree or deem unfavorable to their business. As the evidence set forth below establishes, Defendants are operating YouTube in open defiance and in direct violation of the viewpoint-neutral, content-based filtering practices and regulations which form the core of YouTube's legal and contractual obligations to its users.

22.    Defendants' discriminatory conduct has created an unlawful global social media cartel which controls 95% of all video communications in the world and engages in overt and open discrimination against the sexual orientation, gender identity, and viewpoints of its creators and Community Members. Such discrimination is not limited to Defendants' use of affirmative

---

[6] A transcript of this call is set forth as Exhibit A.
[7] See "Google, Facebook, Twitter Shifted to Censorship From Free Speech, According to Leaked Google Document," The Epoch Times, October 10, 2018 (https://www.theepochtimes.com/google-facebook-twitter-shifted-from-free-speech-to-censorship-according-to-leaked-google-document_2686124.html).

1    content and monetization restrictions, or and restraints imposed on creators, viewers, and

2    audiences, but extends to Defendants' promotion, monetization of, and profit from obscene,

3    shocking, anti-LGBTQ+, and homophobic hate speech, online bullying, and other threatening

4    content and comments that pervade popular channels, including those of Plaintiffs.

5         23.    Defendants are engaged in discriminatory, anticompetitive, and unlawful conduct

6    that targets and harms the Community, a protected class of persons under California law.  And

7    Defendants' animus-based regulations and discriminatory filtering practices have not made

8    YouTube safer for members of this protected class.  Defendants' control and regulation of speech

9    on the YouTube Platform has created a chaotic cesspool where popular, compliant, top quality,

10   and protected  content is restricted, stigmatized, and demonetized as "shocking," "inappropriate,"

11   "offensive," and "sexually explicit," while homophobic and racist hatemongers run wild and are

12   free to post vile and obscene content on the pages and channels of Plaintiffs and other creators.

13   That should not come as a surprise because, as the record shows, Defendants are engaged in a

14   discriminatory and fraudulent scheme to profit from censoring speech on the YouTube Platform

15   even when the speech complies with Defendants' written Terms of Service.  Meanwhile,

16   Defendants rake in profits from the vile, graphically violent, dangerous homophobic hate speech

17   posted on the platform, content that clearly violate Defendants' Terms of Service.

18        24.    Defendants use a complex and clandestine web of broad, overlapping, vague,

19   discriminatory, and unlawful regulations, artificial intelligence filtering practices, data and

20   information collection and surveillance, video monetization, and third-party advertising and

21   content production schemes – none of which actually relate to the content contained in the videos

22   posted on the YouTube Platform.  Defendants use this platform-wide regulation scheme as a

23   pretext to engage in unlawful practices to restrain and harm Plaintiffs and the greater Community,

24   by insisting that animus-based speech regulation and discrimination against the Community—

25   what Defendants refer to as the "gay thing"—is necessary for "keeping [their] popular online

26   video service safe and enjoyable for users."

27        25.    Each  Plaintiff in this case is a victim of one or more of Defendants' systemic and

28   pervasive discriminatory, anticompetitive, and unlawful practices that have caused substantial

**THIRD AMENDED CLASS ACTION COMPLAINT**

1    reputational and financial harm to each of them.

2        26.    Defendants continue to threaten and harm the entire  YouTube Community by

3    using their unprecedented power over free speech and expression as a pretext to systematically

4    target, suppress, stigmatize, terrorize, steal, and financially harm the video content created or

5    viewed by the  Community, including, but not limited to:

6             a.    Failing to apply content-based regulations and filtering "equally to all," as

7    provided for in Defendants' form consumer contract and Defendants' promises to Plaintiffs and

8    the  Community;

9             b.    Falsely representing to the viewing public and potential advertisers that

10   video content created and posted to YouTube by Plaintiffs contains discussions about drug use or

11   abuse or drinking alcohol; overly detailed conversations about or depictions of sexual activity;

12   graphic depictions of violence, violent acts, natural disasters or tragedies or violence in the news;

13   specific details about events related to terrorism, war, crime and political conflicts that resulted in

14   death or serious injury even if no graphic imagery is shown, inappropriate language, including

15   profanity; and/or content that is gratuitously incendiary, inflammatory, or demeaning toward an

16   individual or group;

17            c.    Arbitrarily, capriciously, and unfairly censoring, removing, suspending,

18   restraining, suppressing and/or demonetizing the speech, video content or channels of YouTubers

19   solely because they are "lesbian," "gay," "bisexual," "transgender," or "queer," or because they

20   identify as such, or because they address issues of interest to the Community associated with their

21   content or use tag words related to that Community in order to make it easier for viewers to locate

22   their content;

23            d.    Exercising unfettered and absolute discretion to selectively apply and

24   enforce content-based regulations, content filtering tools, and monetization schemes in a manner

25   that promotes Defendants' own content or content in which Defendants have a direct financial

26   interest, including obscene, violent, and/or homophobic bullying and hate speech that Defendants

27   not only fail to regulate or restrict, but from which they monetize and profit;

28            e.    Enforcing what Defendants stated was a "company policy" of prohibiting

1    "gay" users from advertising their content on YouTube because of the "gay thing" and using that

2    "policy" to stigmatize Plaintiffs and their content as "shocking" and "sexually explicit" solely

3    because they identify as "gay";

4            f.       Demonetizing the content of Plaintiffs and the Class, including YouTubers

5    who operate and publish content on some of the most popular channels on the YouTube platform;

6            g.       Promoting, monetizing, profiting, and distributing online hate speech,

7    including homophobic slurs, threats of violence and death; theft and destruction of content;

8    homophobic, obscene and threatening video comments that appear in connection with the

9    channels' video content (as recommended videos and as advertisements), all of which violate

10   Defendants' regulations, policies, and contracts with their consumers, and none of which are

11   protected by California or federal law, nor even by Defendants' own published guidelines;

12           h.       Promoting individuals and groups with anti-LGBTQ+ or homophobic

13   messages by selling advertisements which undermine, criticize, disparage, or belittle members of

14   the Community, and running those advertisements that violate the law and Defendants' regulations

15   and contracts with consumers, immediately before the videos of Plaintiffs, thereby discouraging

16   viewers from going forward with the viewing of Plaintiffs' videos;

17           i.       Promoting YouTubers with anti-LGBTQ+ or homophobic messages or with

18   hate speech videos by recommending such videos to Plaintiffs' viewers in YouTube's "Up Next"

19   list of recommended videos which appears on the screen when Plaintiffs' videos are played;

20           j.       Replacing Plaintiffs' customized "thumbnail" graphic images of individual

21   videos, which serve as mini-advertisements that appear in YouTube search results, with

22   Defendants' own generic thumbnails, consisting of a screenshot taken at random from the

23   individual video;

24           k.       Arbitrarily, capriciously, and unfairly removing individual subscribers from

25   the list of those viewers who have intentionally applied to be affiliated with the respective

26   YouTube channels of YouTubers, without notice to the creators or to the individual subscribers;

27           l.       Unilaterally changing the procedure for new video notifications to be sent to

28   individual subscribers of the creators' channels, without giving notice to the subscribers or to the

creators, resulting in hundreds of thousands of subscribers not receiving notices as new content is uploaded by creators;

m.     Stealing, copying, altering, and or violating the property rights appurtenant to the content of Plaintiffs, and then using the content of Plaintiffs to produce and promote content that Defendants own, or in which they have a financial interest, and that directly competes with the original content stolen from Plaintiffs;

n.     Arbitrarily, capriciously, and unfairly excluding  creators' original videos from YouTube's "Up Next" video recommendations, which appear on the screen whenever videos are played; while at the same time recommending hate speech or disparaging reaction videos which steal, copy, or alter the very same original videos upon which they are based;

o.     Fraudulently and deceptively inducing YouTubers and the public to use YouTube by promising Plaintiffs and the public that YouTube is (i) a "Public Forum" (ii) dedicated to Four Freedoms: Expression, Information, Opportunity, and Belonging, and (iii) a "Community" where "everyone's voice" may be heard, subject only to (iv) viewpoint- and identity-neutral, content-based regulations that apply equally to everyone, and then breaching those obligations in a way that financially injures and causes other reputational harms to YouTubers and consumers.

27.     This is not the first time that Defendants have been accused of, and admitted to discrimination and malfeasance, by improperly manipulating content and user regulations to suppress the content and rights of  members of the "YouTube Community."  As early as 2016, Defendants admitted that their restraints unfairly discriminated against users like Plaintiffs, hiding from view videos that reference same-sex relationships, and other videos focusing on "pop culture from a feminist and queer perspective."  When these restraints were exposed, YouTubers like Tyler Oakley, Gigi Gorgeous and others "blasted the platform for bias."

28.     Defendants publicly admitted that using their Restricted Mode filtering, they improperly censored videos that were posted or produced by members of the Community based on the identity and orientation of the speaker, rather than upon the content of the video.  In response to complaints from the Community and other civil rights critics, Defendants promised to remove

all restricted filtering on videos posted or produced by members and groups, and to change their policy, filtering algorithm, and manual review policies to ensure that videos posted by vloggers were not being censored solely because of the identity of the speaker. Defendants admitted that they wrongly censored videos posted by members of the Community, blaming a purported engineering problem with filtering tools that targeted video content from users, or targeted users who discussed topics and perspectives regarding issues. Defendants agreed to investigate the claims of users and dispatch a team of senior managers, including YouTube's CEO Susan Wojcicki, to meet with representatives to consider revising their policies and review protocols, correcting the filtering tools, and rewriting guidelines that "clarify its position by specifically allowing personal accounts from victims of discrimination or violent hate crimes, as long as they don't contain graphic language or content."

29.     On April 27, 2017, Johanna Wright, Vice President of Product Management for YouTube, promised YouTubers that Defendants would ensure that "Restricted Mode" should not filter out content belonging to individuals or groups based on certain attributes like gender, gender identity, political viewpoints, race, religion or sexual orientation. And while Defendants admitted that "Restricted Mode will never be perfect, [Defendants] hope to build on [their] progress so far to continue making [their] systems more accurate and the overall Restricted Mode experience better over time."

30.     But the YouTubers who met with Defendants and were forced to execute non-disclosure agreements regarding the substance of their discussions now believe that Defendants' promises were nothing more than "lip service" made solely for public relations purposes and that Ms. Wojcicki and Defendants had no intention of keeping their promises.

31.     Instead of taking reports of viewpoint discrimination and selective restrictions on content seriously, Ms. Wojcicki spent some of her "personal vacation" time doing carefully scripted PR or "selfie" interviews with selected YouTubers, and other media outlets, in which she boasts that all is well at YouTube, especially with the members of the YouTube Community.[8] In

---

[8] *See* https://www.youtube.com/watch?v=gMINAiDWI6g.

one interview, posted only days before the filing of Plaintiffs' original Complaint, YouTube's CEO Susan Wojcicki confirmed the importance of and Defendants' adherence to the "Four Freedoms" of expression, describing those promises to consumers as the "Pillars" of the YouTube Platform and global Community it serves.  When the interviewer is prompted to ask her scripted questions about reports and concerns of viewpoint- or animus-based censorship and the use of content-based restrictions, Wojcicki pleads executive ignorance of systemic complaints and harms caused by viewpoint bias or animus-based content regulation, filtering tools, monetization restrictions, and promotion of harassment and hate speech for profit.

32.     While YouTube's CEO and other senior executives of the global video communication monopoly continue to double down on their promises of free speech, viewpoint neutrality, and equal application of rules, the allegations of these Community members show in specific and painstaking detail that systemic speaker, topic, or viewpoint-based and animus-based regulation, restraint, and disparate treatment of  videos, creators and audiences is rampant on the platform.  As the experience of Plaintiffs shows, Defendants use machines to flag, identify, and restrict content that human or "customer service" reviewers pretend to justify after the fact, under the pretext of "a company policy" of absolute discretion to take users down for discussing any topic or viewpoint that Defendants consider to be "Offensive," "Inappropriate," or "Otherwise Objectionable," for "any reason" or "no reason," whether for "altruism or profit" or, as in the case of Plaintiffs, simply because they identify as "gay," or their content mentions or discusses any topic or viewpoint that is "about the gay thing."

33.     This needs to stop here and now.  Plaintiffs do not seek to interfere with YouTube's Mission of providing a forum for global YouTube Community to engage in and experience "Four Freedoms of Expression" or Pillars when creating, posting, distributing, viewing, and engaging with other Community members through video content and communications.  Plaintiffs understand and support effective, but lawful viewpoint-neutral, content-based regulations on the platform.  But that is not how Defendants have been operating YouTube during the relevant time period of this lawsuit.  Defendants have brazenly abandoned YouTube's Four Freedoms and hijacked the YouTube Community and the Mission that defines that Community by continuing to

1    engage in and defend identity, viewpoint, discriminatory, and illegal content-based regulation,

2    distribution and monetization policies that harm YouTube's  Community and other YouTube

3    Community members.  Plaintiffs have requested Defendants address these allegations and

4    concerns, but not only have their requests fallen on deaf ears, in the past several weeks they have

5    been the subject of outright false denials by YouTube's CEO.

6         34.     Enough is enough.  Plaintiffs in this case have summoned the courage to challenge

7    the world's largest corporate conglomerate and regulator of free speech by invoking their right to

8    petition the courts to enforce the antidiscrimination, free speech, and consumer fraud laws, and to

9    require Defendants to honor their promises and their legal obligations to YouTubers and YouTube

10    consumers.  Specifically, Plaintiffs, in their individual and representative capacities, bring this

11    lawsuit to force Defendants to comply with their legal obligations under federal and California

12    law, including: (i) Article 1, § 2 of the California Constitution (the "Liberty of Speech Clause");

13    (ii) the Unruh Civil Rights Act, § 51, *et seq.* of the California Civil Code (the "Unruh Act"); (iii)

14    the Unfair Competition Laws, § 17200, *et seq.* of the California Business and Professions Code

15    (the "UCL"); (iv) Defendants' Terms of Service, Community Guidelines, and other purportedly

16    content-neutral filtering representations (the "Implied Covenant of Good Fairth Claim"); and (v)

17    the Lanham Act, 15 U.S.C. §§ 1125, *et seq.*.  Plaintiffs seek damages for financial, reputational,

18    and other cognizable harms and injuries to themselves and to other members of the YouTube

19    Community who compose the putative class or subclasses in this case.  Plaintiffs also seek

20    individual and class-wide relief for restitution and disgorgement of Defendants' ill-gotten or

21    unlawfully obtained profits, injunctive relief, and a declaratory judgment that Google and

22    YouTube violate the legal and equitable rights of members of the YouTube Community.

23   **II.**    <u>**PARTIES**</u>

24         35.     Plaintiff Divino Group LLC ("Divino") is a limited liability company formed and

25    doing business in the state of California.  Divino is co-owned, managed and operated by a married

26    gay couple, Celso Dulay and Chris Knight, both of whom reside and are domiciled in San

27    Francisco, California.  Divino owns a news-based media company,"GlitterBombTV.com," the

28    producer of GNews!.  Its principal place of business is located in San Francisco, California.

Divino produces and distributes online, video-based news programs that report on and discuss current events and issues, involving or affecting the Community.  Divino's news programs are written, produced, promoted, and distributed by Messrs. Knight and Dulay.  Since February 6, 2014, Divino has used YouTube as a hosting platform to advertise, distribute, and reach the viewing public in connection with 132 episodes of GNews!.

36.     Plaintiff Cameron Stiehl is an individual who resides and is domiciled in San Francisco, California.  Ms. Stiehl regularly appears on GNews! as a co-host and contributes to the its content.

37.     Plaintiff BriaAndChrissy LLC is a Georgia Limited Liability Company.  BriaAndChrissy LLC is owned and managed by Bria Kam and Chrissy Chambers, who reside and are domiciled in the state of Washington.  Because of harassment they have received, these Plaintiffs should be contacted through their attorneys of record.  BriaAndChrissy LLC does business as "BriaAndChrissy" and produces and distributes a variety of original videos that feature music, skits, day-in-the-life presentations, and discussions of mental health issues, healthy lifestyles recommendations and LGBTQ+-related issues.  Since 2012, BriaAndChrissy LLC has uploaded more than 1000 videos to its two YouTube channels: BriaAndChrissy, which has 849,000 subscribers, and WonderWarriors, which has 195,000 subscribers.

38.     Plaintiff Chase Ross is an individual who is a Canadian citizen who resides in Montreal, Quebec, Canada.  Mr. Ross produces and distributes a series of original educational and day-in-the-life videos about the transgender experience and products, as well as discussions of issues.  Since 2010, Mr. Ross has uploaded 723 videos to his "uppercaseCHASE1" YouTube channel, which has more than 163,000 subscribers.

39.     Plaintiff Brett Somers is an individual who resides and is domiciled in San Francisco, California.  Mr. Somers produces and distributes original sexual education and product review videos, with a focus on non-traditional sexual activities.  Since 2014, he has uploaded 227 videos to his "Watts The Safeword" YouTube channel, which has more than 193,000 subscribers.

40.     Lindsay Amer is an individual who resides and is domiciled in Maine.  Because of harassment and threats they have received, Mx. Amer should be contacted through their attorneys

1  of record.  Mx. Amer produces and distributes original educational videos for children aged 3-17,

2  parents and educators regarding  issues.  Since 2016, Mx. Amer has uploaded 94 videos to their

3  YouTube channel "Queer Kid Stuff," which has more than 15,000 subscribers.

4        41.    Plaintiff Stephanie Frosch is an individual who resides in New York, New York,

5  but is domiciled in Florida.  Since October 5, 2009, Ms. Frosch has produced and distributed 189

6  of original videos focused on lifestyle topics, advice, interview and/or mini documentaries, which

7  present her experiences as a Lesbian, or present and discuss issues which affect members of the

8  Community.  The videos are intended for a target audience 13 years and older.  She operates two

9  YouTube channels:  "ElloSteph" and "StephFrosch."  The ElloSteph channel has 376,000

10  subscribers and 36.5 million views.  She also operates a merchandise store at

11  www.districtlines.com/ellosteph.  Stephanie Frosch has been an LGBTQ internet activist who has

12  appeared as a speaker at conventions and has been interviewed on MTV and the mainstream

13  media regarding her YouTube experience and treatment at the hands of YouTube.

14        42.    Plaintiff Sal Cinquemani is an individual who resides and is domiciled in Los

15  Angeles, California.  Mr. Cinquemani owns and operates salbardo.com.  He is an independent film

16  maker who directs and produces films for audiences under the name "Sal Bardo."  Since March

17  27, 2011, Mr. Cinquemani has operated the YouTube channel "Sal Bardo," uploading videos

18  consisting of original short films, film trailers, interviews of actors, and out-takes from films for

19  purposes of promoting his independent films.  The Sal Bardo YouTube channel has approximately

20  38,000 subscribers and 24.1 million views.

21        43.    Plaintiff Tamara (Sheri) Johnson is an individual who resides and is domiciled  in

22  Columbus, Georgia and does business in Atlanta, Georgia.  Ms. Johnson owns and is the CEO of

23  SVTVNetwork.com.  Since May 30, 2012, she has operated the YouTube channel "SVTV

24  Network," writing, developing, taping and producing short videos, original web series, animated

25  series and feature length films for her audience.  SVTV Network has 114,000 subscribers and

26  generated 5 million views.  In the fall of 2016, she launched an internet on-demand network

27  dedicated to content specifically designed for  audiences.  For the past three years, Ms. Johnson

28  has been uploading her own independently produced original video webseries and licensing the

1 original independently produced videos of others on the internet in direct competition with

2 Defendants.

3        44.     Plaintiff Greg Scarnici is an individual who resides and is domiciled in Brooklyn,

4 New York.  Mr. Scarnici owns and operates gregscarnici.com.  He is a comedic writer, director,

5 producer and performer who currently works as an Associate Producer for "Saturday Night Live,"

6 with more than 25 years of experience working in television and comedy.  He has appeared in

7 films, on television  and in numerous internet uploads and posts.  Since September 14, 2007, Mr.

8 Scarnici has operated the YouTube channels "Greg Scarnici" and "Undercover Music," uploading

9 videos consisting of short films, comedic sketches, parodies, and music videos for the  audience.

10 The Greg Scarnici YouTube channel has approximately 9,600 subscribers and 8.9 million views.

11 Mr. Scarnici also owns and operates gregscarnici.com.

12        45.     Defendant Google LLC is a for-profit, limited liability company organized under

13 the laws of the State of Delaware, with its principal place of business in Mountain View,

14 California; it regularly conducts business throughout California, including Santa Clara County.

15 Plaintiffs are informed and believe, and thereon allege that, at all relevant times, Defendant

16 Google LLC has acted as an agent of Defendant YouTube, LLC, and controls or participates in

17 censoring and restricting speech on the YouTube service or platform.

18        46.     Defendant YouTube, LLC is a for-profit limited liability corporation, wholly

19 owned by Google LLC, and organized under the laws of the State of Delaware.  YouTube's

20 principal place of business is Mountain View, California and it regularly conducts business

21 throughout California, including Santa Clara County, California.  Defendant YouTube, LLC

22 operates the largest and most popular Internet video viewer site, platform, and service in

23 California, the United States, and the world and holds itself out as one of the most important and

24 largest public forums for the expression of ideas and exchange of speech available to the public.

25 Plaintiffs are informed and believe that at all relevant times Defendant YouTube, LLC acts as an

26 agent of Defendant Google LLC and uses, relies on, and participates with Defendant Google LLC

27 in restricting speech on the YouTube site, platform, or service.

28        47.     The true names and capacities, whether individual, corporate, associate, or

**THIRD AMENDED CLASS ACTION COMPLAINT**

otherwise, of Defendants Does 1 through 100, inclusive, are presently unknown to Plaintiffs, and for that reason these defendants are sued by such fictitious names.  Plaintiffs are informed and believe and thereon allege that each of the Doe Defendants are in some way legally responsible for the violations of law, injuries, and harm caused, as alleged herein.  If, and when appropriate, Plaintiffs will seek leave of the Court to amend this Complaint when the true names and capacities of said defendants are known.

III.   **JURISDICTION AND VENUE**

48.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§1331, 1332(d) and 1367(a), and 2201.

A.    **Federal Question Jurisdiction Under 28 U.S.C. §1331**

49.    The Court has Jurisdiction under 28 U.S.C. §1331 ("§1331") because Plaintiffs have alleged two independent claims for relief under federal law in The First Claim for Relief (requesting declaratory judgment that §230(c) is an unconstitutional permissive speech law that violates the First Amendment as applied under *Denver Area*) and The Seventh Claim Relief (for false advertising in violation of the Lanham Act, 15 U.S.C. §§1125, *et seq*.)

50.    With respect to the First Claim for Relief, Plaintiffs' request for a declaratory judgment that §230(c) is unconstitutional under the First Amendment, as applied in this case, is an independent claim for relief that confers jurisdiction under §1331 because it challenges the enforcement of a federal law that Defendants have asserted and continue to assert as a complete defense to each and every claim set forth in this TAC.

51.    The claim is an independent federal claim for relief that arises under §1331 because it is based on and arises entirely as a constitutional challenge to a federal law under the First Amendment.

52.    The resolution of that federal question is necessary and required to adjudicate all of the other claims alleged in the TAC.

53.    The resolution of that question also has profound national implications for federal law and the entire federal system as a whole, because whether Congress enacted §230(c) to immunize an internet service provider for knowing, intentional, and systematic discrimination

against users based on their identity (e.g., their sex, gender, or orientation) and other personal traits or viewpoints, will settle the respective obligations and rights of every internet user and service provider who operates within the laws and jurisdiction of the United States.

54.     Thus, a claim for a declaratory judgment under 28 U.S.C. §2201, that a federal law governing speech regulation on the internet, and for which each and every claim in this case and all others involving unlawful internet content curation and access decisions are subject to, constitutes a "special and exceptional" circumstance from which federal jurisdiction under §1331 arises.  *See Gunn v. Minton*, 568 U.S. 251, 258 (2013) (claim raising dispositive federal issue with constitutional implications will give rise to a federal question if the federal issue is "(1) necessarily raised, (2) actually disputed, (3) substantial, and (4) capable of resolution in federal court without disrupting the federal-state balance approved by Congress"); *see also Atl. Richfield Co. v. Christian*, 140 S. Ct. 1335, 1350 (2020) (reaffirming "special exception" federal question jurisdiction in *Gunn*).

**B.      Class Action Fairness Act Jurisdiction Under 28 U.S.C. §1332(d)(2)**

55.     Federal jurisdiction also arises in this case under the Class Action Fairness Act, 28 U.S.C. §1332(d).

56.     The matter in controversy exceeds the sum or value of Five Million Dollars ($5,000,000), exclusive of interest and costs; moreover, the claims for relief seek, among other things statutory damages, compensatory damages, restitution, and other equitable relief that substantially exceed One Billion Dollars ($1,000,000,000);

57.     The case is a class action that seeks relief on behalf of a putative class composed of at least 200 million (200,000,000) users of YouTube (the "YouTube Community Class"). According to Defendants and other marketing and statistical sources, more than two-thirds of the YouTube Community Class reside outside California and Delaware but in one of the other 50 United States or territories and are subject to the choice-of-law and venue provisions set forth in Defendants Terms of Service.

58.     The case consists of a subclass that seeks relief on behalf of a putative subclass, which, according to Defendants and marketing and statistical other sources, is composed of at least

9.33 million users who identify as LGBTQ+ (the "LGBTQ+ Subclass").  According to those same sources, at least eighty-five percent or about 8 million members of the LGBTQ+ Subclass reside in states or territories subject the choice-of-law and venue provisions set forth in Defendants Terms of Service.

59.     Seven representative class Plaintiffs, Bria Kam (Washington), Chrissy Chambers (Washington), Chase Ross (Canada), Lindsay Amer (Maine), Stephanie Frosch (Florida), Tamara Johnson (Georgia) and Greg Scarnici (New York), and more than two-thirds of the persons who come within the YouTube Community Class and the LGBTQ+ Subclass are citizens of a "Foreign State" that is different from the state that Defendants are citizens of.

60.     The district court may not decline to exercise federal jurisdiction under §1332(d)(2) because:

(a)  This is a class action in which more than two-thirds of the aggregate members of all putative plaintiff classes are not citizens of California, the State in which the action was originally filed;

(b)  The claims asserted involve matters of national or interstate interests;

(c)  Each of the claims asserted is not governed exclusively by California, the State in which the action was originally filed, or by the laws of other States;

(d)  The class action has been pleaded in a manner that does not seek to "avoid" federal jurisdiction but expressly asserts and invokes federal jurisdiction;

(e)  The action was filed in a forum expressly mandated by Defendants' contractual venue and forum selection clause and, as a result, has a distinct nexus with the class members, the alleged harm, and/or the Defendants; and

(f)  As a result of Defendants' forum and venue selection, Plaintiffs are not aware of one or more other class actions asserting the same or similar claims on behalf of the same or other persons that have been filed in any other court.

**C.      Supplemental Jurisdiction Under 28 U.S.C. §1367**

61.     The district court has supplemental jurisdiction over all of the state claims in this case because they arise from the same nucleus of facts and are so related to the federal claims in

1  the action that form part of the same case or controversy under Article III of the United States

2  Constitution.

3     62.     The district court should not decline to exercise supplemental jurisdiction over the

4  state law claims, at least until the application and constitutionality of §230(c) is decided:

5        (a)   The scope and application of that federal law predominates the adjudication of

6     those claims;

7        (b)  As demonstrated in *Prager University v. Google LLC, et al.*, No. 19CV340667

8     (Cal. Super. Ct. Santa Clara Cnty. Nov. 19, 2019) the interests of comity, efficiency, and

9     fairness are impeded by sending a threshold federal question of national importance (as to

10    whether §230(c) bars license and other contractual obligations, race and sex

11    discrimination, and anti-competition or unfair business practices) to a state court which

12    must decide that issue under federal law; and

13       (c)  To the extent that this case presents novel or complex issues regarding the

14    application of the Liberty of Speech Clause and/or the Unruh act to unlawful sex, gender,

15    or other identity-based discrimination, the district court can certify those two discreet

16    issues to the California Supreme Court for resolution if necessary, once it has decided the

17    threshold federal question as to which, if any, of these claims are barred by federal law

18    under §230(c).

19    63.     Venue is proper in the Northern District of California (San Jose Division) under 28

20  U.S.C. §1391.  Defendants reside and/or transact business in the County of Santa Clara, and are

21  within the jurisdiction of this Court for purposes of service of process.  Defendants' Terms of

22  Service expressly provide that Plaintiffs' lawsuit be filed in a court of competent jurisdiction

23  located within Santa Clara County.

24  **IV.    FACTS COMMON TO ALL CLAIMS**

25     **A.     The YouTube Platform**

26    64.     YouTube is the largest video-sharing platform in the world, accessible via

27  computer browsers and mobile telephone applications.  YouTube was founded in 2005 in San

28  Bruno, California.

65.     In 2006, Defendant Google bought YouTube for $1.65 billion and operates YouTube as a Google subsidiary.  The current value of Google's YouTube subsidiary has been estimated to exceed $160 billion.

66.     The YouTube Platform functions by allowing users to upload, view, rate, share, add to favorites, report, comment on videos, and subscribe to the channels of other users. Available content includes video clips, TV show clips, music videos, short and documentary films, audio recordings, movie trailers, live streams, and other content such as video blogging, short original videos, and educational videos.

67.     It is the content and audiences of YouTubers like Plaintiffs and other members of the Proposed  Community Class that have made the platform one of the top four most visited Internet websites in the world.  It is estimated that more than *one-third* of the world's Internet users use YouTube, to post, view, and communicate through videos.  Eighty-five percent of the U.S. Internet audience watches videos online, including on YouTube.  A billion hours of videos are watched on YouTube each day.  More video content has been uploaded to YouTube by public users than that created by the major U.S. television networks in 30 years.  The average number of mobile YouTube views is estimated to be about 1 billion per day.  YouTube videos can be navigated in at least 80 different languages, and the platform has launched in more than 91 countries around the globe.

68.     Most of the video content on YouTube is created and uploaded by YouTubers like the members of the Proposed Class, but larger media corporations including CBS, the BBC, Vevo, and Hulu also offer some of their content via YouTube as part of the Google/YouTube partnership program.

69.     Defendants monetize speakers' intellectual property and viewers' interests by selling advertisements; some of those advertisements come from the speakers themselves, who pay for their videos or channels to be "featured" or publicized.  In addition, Defendants offer subscriptions through which people pay ongoing fees to view videos on YouTube without advertisements.

70.     In total, Google's subsidiary YouTube earned $9 billion in revenue in 2015 –

**THIRD AMENDED CLASS ACTION COMPLAINT**

primarily by selling advertisements; and will earn $27 billion annually by 2020.

**B.  YouTube Holds Itself Out As A Quintessential Forum For Freedom Of Expression**

71.    Much of YouTube's success can be attributed to Defendants' representations that YouTube is, has been and will remain the premier space for freedom of expression in video content on the Internet – representations that were made with the intent of inducing more consumers like Plaintiffs to become YouTubers.

72.    More specifically, Defendants expressly solicit and invite the general public to use YouTube as a hosting platform to engage in "freedom of expression" by posting, viewing, promoting, and interacting with third-party video content, subject only to viewpoint-"neutral" content-based regulations that apply equally to everyone.

73.    Consistent with their express "mission [] to organize the world's information and make it universally accessible and useful," Google/YouTube invite the public, including original content creators like Plaintiffs, viewers, and advertisers large and small, to connect with, inform, and inspire others across the globe by using YouTube as a distribution platform for freedom of expression through videos.  Google/YouTube claim to be the largest public forum for video-based speech in California, the United States, and the world, where, based on the number of views, likes, and subscriptions to uploaded video content, new celebrities emerge and new ideas are popularized.  In so doing, Google/YouTube emphatically declare that their "mission" is to "give people a voice" in a "place to express yourself" and in a "community where everyone's voice can be heard."  Defendants further brag that YouTube is "one of the largest and most diverse collections of self-expression in history," giving "people opportunities to share their voice and talent no matter where they are from or what their age or point of view."  *See, e.g.*, https://youtube.googleblog.com/ (YouTube Official Blog: Broadcast Yourself).  Each of these disclosures, including the Community Guidelines and promises of "neutral" content filtering "***are also incorporated . . . by reference***" into YouTube's Terms of Service.

74.    Defendants expressly represent to consumers that YouTube is designated as a public place for free speech "define[d]" by "four essential freedoms" that govern the public

consumer's use of the platform: "**Freedom of Expression**," "**Freedom of Information**," "**Freedom of Opportunity**," and "**Freedom to Belong**."[9]  Defendants further induce the public to provide, view, and communicate with video content on the YouTube hosting platform by promising users that "everyone's voice" will be heard subject only to neutral, content-based rules and filtering which "apply equally to all," regardless of the viewpoint, identity, or source of the speaker.

75.     These lofty representations have been repeated in sworn testimony to Congress. On January 17, 2018, Defendants, through YouTube's Assistant General Counsel, Juniper Downs, confirmed to Congress that YouTube's mission remains unchanged and the platform is designated and operates as a "public forum" for free speech and expression subject only to viewpoint-neutral, content-based regulations:

> **Senator Cruz**: Thank you Mr. Chairman. Welcome to each of the witnesses. I'd like to start by asking each of the company representatives a simple question, which is: do you consider your companies to be neutral public fora?
>
> *      *      *      *
>
> **Senator Cruz**: I'm just looking for a yes or no whether you consider yourself to be a neutral public forum.
>
> **Senator Cruz**: Ms. Downs?
>
> **Ms. Downs**: Yes, our goal is to design products for everyone, subject to our policies and the limitations they impose on the types of content that people may share on our products.
>
> **Senator Cruz**: So, you're saying you do consider YouTube to be a neutral public forum?
>
> **Ms. Downs**: *Correct.* We enforce our policies in a politically neutral way. Certain things are prohibited by our Community Guidelines, which are spelled out and provided publicly to all of our users.
>
> [02:28:30 – 02:29:36 of the full hearing recording.]
>
> *      *      *      *
>
> **Senator Cruz**: What is YouTube's policy with respect to Prager University and the allegations that the content Prager University is putting out are being restricted and censored by YouTube?

---

[9] See https://www.youtube.com/yt/about/ .

**Ms. Downs**: *As I mentioned, we enforce our policies in a politically neutral way.* In terms of the specifics of Prager University, it's a subject of ongoing litigation so I'm not free to comment on the specifics of that case.[10]

**C.      Defendants Flout The Fundamental "Free Expression" Bargain They Made With YouTubers**

76.      It is now clear that the lofty "Freedom of Expression" promises and representations made to consumers like Plaintiffs and other members of the Proposed Class are nothing but outright falsehoods.

77.      In or about March 2018, Defendants distributed an internal memo and presentation calling Google "The Good Censor." The Memo sets forth in detail the bait-and-switch fraud which Defendants seek to perpetrate against the more than 2.3 billion consumers who built YouTube into the global speech giant and profit machine that it is today.

78.      In the Memo, which is purportedly based on "layers of research" and in reliance on "some leading thinkers in this space," Defendant, concede that since the 2016 U. S. presidential elections, Defendants have sought to secretly and deceptively "migrate" away from a hosting platform that solicits the public and consumers to provide YouTube with content based on the express promise that YouTube operates as a viewpoint-neutral and politically neutral place for free speech and "an open marketplace of ideas," where the public is invited to engage in freedom of expression and speech. Rather, Defendants now seek to use the site to curate and restrict content in order to further profit and monetize its 2.3 billion users, by promoting Defendants' own, or their preferred content through the exercise of unfettered discretion to censor and curate otherwise public content. In other words, Defendants admit that they are now acting as "censors," who regulate and curate online speech and content for their own gain, after promising consumers that YouTube exists and is designated for open, viewpoint-neutral, third-party communications and free speech.

---

[10] See https://www.c-span.org/video/?439849-1/facebook-twitter-youtube-officials-testify-combating-extremism and https://www.c-span.org/video/?448566-1/house-judiciary-committee-examines-social-media-filtering-practices at 02:34:28 – 02:35:29 of the full hearing recording (emphasis added).

**THIRD AMENDED CLASS ACTION COMPLAINT**

79.     This is a classic bait-and-switch fraud perpetrated by Defendants on the 2.3 billion users who built YouTube into what it is today.  According to Defendants "[t]his free speech ideal was instilled in the DNA of the Silicon Valley startups [including YouTube] that now control the online conversations."  In the case of YouTube, that ideal provided Defendants with a marketing and business model which monetized the public speech of its consumers by inviting them to use YouTube as a forum for free speech, where the public is invited to post video content, regardless of identity and viewpoint, subject to "content-neutral" rules that apply equally to everyone.

80.     Now that YouTube is globally saturated, with 2.3 billion users and their content, Defendants seek to exploit their control over more than 90% of the world's video-based communications, by secretly seizing control over the platform's content, so that they, not the users, control and decide who gets to speak, what is said, and who is listening.  As Defendants admit, they do so by discriminating and censoring compliant third-party content in favor of Defendants' own content, or that of preferred users, for financial gain and enhanced political power at the expense of, and to the detriment of third-party users like Plaintiffs.

81.     Defendants admit that platform "migration" creates "an unresolved tension" on social media sites like YouTube because "**[t]he platforms have to deny that they're media companies** in order to retain their immunity from liability" and "**at the same time, they're exercising more influence as media companies**… than CBS News did in its heyday, and therefore, in order for democratic values to flourish, **they need to embrace free speech standards**."  *See* "The Good Censor" Memo, at page 10 of 85 (quoting Jeffrey Rosen, Professor of Law at The George Washington University and legal affairs editor of The New Republic) (internal quotes omitted, bold in original).[11]  Defendants have continued to use animus-based censorship and content regulation to perpetrate religious, political, sexual orientation and gender, and ethnic discrimination for profit and financial gain to the harm of the public and consumers.

---

[11] See https://www.google.com/search?client=firefox-b-1-d&ei=9u_iXNjkEYi6_wTgj5m4Dg&q=the+good+censor+google+rosen&oq=the+good+censor+google+rosen&gs_l=psy-ab.3..33i160l3.1304.2502..3431...0.0..0.100.472.5j1......0....1..gws-wiz.......0i71j0i22i30j33i22i29i30.rvL00PLfyos.

82.     Putting these "Good Censor" principles into practice, Defendants have unlawfully employed a series of content-based distribution and monetization policies and procedures that form a single, interrelated, uniform, and comprehensive content-based regulation and control scheme that empowers Defendants unilaterally to control and restrain all consumer speech and content that appears on YouTube.

**D.     Defendants Begin To Compete With YouTubers In The Proposed Class**

83.     Defendants have a strong financial motive to disregard the principles of free expression upon which YouTube was founded.  Specifically, beginning around 2016, Defendants began to use, operate, and profit from YouTube -- not as a hosting platform for the video content of its public users and consumers, but as a means for producing, distributing, and profiting from its own video content, or that of its financial partners.

84.     Following the trend of other hosting networks, Defendants sought to use the worldwide consumer audience of YouTube users as a means for monetizing their own content, not merely as a hosting platform for the Public.  Recognizing that they now controlled more than 90 percent of all video communications, Defendants sought to secure for themselves a market share of the production- and distribution-based revenues that previously had been reserved for YouTube's users and consumers.

85.     Having induced consumers to create video content and an audience in excess of two billion people by promising to neutrally host and regulate the video content of others, Defendants commenced a plan to recapture revenues from third-party producers and distributors by using their unlawful content regulation system to promote and monetize their own content by unlawfully restricting third-party content and reach.

86.     Among other things, Defendants announced that "[t]he company has partnered with its top content creators who wanted to charge a subscription rental or purchase fees for their content and made their uploaded content as paid content which requires users to pay for a subscription or purchase fees to access the content of the channel."  Furthermore, Google/YouTube decided to partner with "affiliates" whose "related product" advertisements are placed with some videos on YouTube.  These products link to the affiliate partners, which pays a

**THIRD AMENDED CLASS ACTION COMPLAINT**

1  commission to Google/YouTube if their products are purchased.[12]

2      87.    In recent years, Defendants have expanded their business from operating YouTube

3  only as a hosting platform for third-party users, to become a production and media company that

4  produces its own content or partners with other large video, TV, and film producers..

5      88.    Just like other large global social media platforms, including Facebook,

6  Defendants understand that the YouTube Platform has reached its saturation point in the

7  monetization of  third-party users' content.  Consequently, Defendants have decided to compete

8  directly with third-party content providers like Plaintiffs.  In addition to their own video channels

9  on YouTube, Defendants have entered the digital TV market, and are trying to induce consumers

10 to purchase their TV and entertainment services from Defendants directly, by advertising and

11 offering a product called YouTube TV.

12     89.    Defendants compete for that public audience or viewership unfairly and unlawfully,

13 in a manner which gives their "preferred content" a competitive advantage, by among other things,

14 using their filtering tools and criteria to restrict the access and reach of the smaller third-party

15 users it hosts on YouTube.  Thus, under the pretext of making the site safe for their users,

16 Defendants arbitrarily, capriciously, and deceptively restrict access and reach to speech and

17 content of their competitors on the platform, like Plaintiffs, while at the same time allowing their

18 own content to avoid those same restrictions and restraints -- even when that content violates their

19 own guidelines.  In so doing, Defendants effectively clear space on the platform for content which

20 they, or their preferred users supply, to better reach the sites' 2.3 billion users by censoring the

21 content of their competitors.

22     **E.    Defendants' Tool Kit Of Unlawful Speech Suppression**

23     90.    Defendants employ a number of tools to unlawfully restrict the expression of their

24 users in violation of principles of law and contrary to their agreements with users, all of which are

25 an interrelated part of Defendants' unlawful scheme.

26

27

28 [12] See https://www.feedough.com/youtube-business-model-how-does-youtube-make-money/ .

1

### 1.   Restricted Mode

2          91.     One of the Defendants' primary tools is "Restricted Mode."  According to

3   Defendants, "Restricted Mode" is supposed to function much like a curtain that blocks access to

4   the hardcore pornography section at the corner video rental shop, limiting access of younger,

5   sensitive audiences to video content that contains certain specifically enumerated "mature"

6   aspects.

7          92.     "Restricted Mode" is touted by Defendants as a tool "to help institutions like

8   schools as well as people who wanted to better control the content they see on YouTube with an

9   option to choose an intentionally limited YouTube experience."

10          93.     Viewers can choose to turn on "Restricted Mode" for their personal accounts, but it

11   may also be activated by system administrators to restrict all access on computer networks to all

12   users and machines, including viewers who seek to access video content in public libraries,

13   schools, and other institutions or workplaces.

14          94.      "Restricted Mode" affects tens of millions of YouTube users every single day.

15   Indeed, according to Alice Wu, a Senior Manager of Trust & Safety at YouTube, LLC,

16   Defendants estimate that about 1.5 percent of YouTube's daily views (or approximately 75 million

17   of the nearly 5 billion daily views) come from people who have activated Restricted Mode.

18          95.     According to Defendants, Restricted Mode can be applied to videos in two ways.

19                 a.      First, Defendants examine certain "signals" like the video's metadata, title,

20   and the language used in the video.  These "signals" are used by Defendants to find bogus rule

21   violations that serve as a pretext for Defendants to segregate disfavored content using Restricted

22   Mode, regardless of whether the content is protected speech or is otherwise compliant with

23   Defendants' rules, regulations, and Community Guidelines.

24                 b.      Second, Defendants use Restricted Mode to passively restrict a video if it is

25   "flagged" as "inappropriate" by any user, what Defendants refer to as the YouTube "community."

26   So-called "flagged" videos are reviewed by a "team" of human reviewers for "violations" of

27   Community Guidelines.

28          96.     Restricted Mode operates in tandem with separate, more stringent "Age

**THIRD AMENDED CLASS ACTION COMPLAINT**

1    Restriction" filtering criteria, intended to block all mature content from viewers under the age of

2    18.  Age Restrictions provide Defendants with the ability to protect younger, sensitive audiences

3    from mature content without the need to employ Restricted Mode.  When evaluating whether

4    content is appropriate for all ages, Defendants restrict: (1) "Vulgar language," involving sexually

5    explicit language or excessive profanity in the video or associated metadata; (2) Violence and

6    disturbing imagery, whether real, dramatized or fake violence that may not be suitable for all ages;

7    (3) Nudity and sexually suggestive, including non-explicit content featuring individuals in

8    minimal or revealing clothing if intended to be sexually provocative, but excepting nudity or

9    dramatized sexual conduct where the context is appropriately educational, documentary, scientific

10   or artistic; and (4) Portrayal of harmful or dangerous activities, including content that intends to

11   incite violence or encourage dangerous or illegal activities that have an inherent risk of serious

12   physical harm or death.

13        97.    As shown below, when a network administrator or an individual viewer activates

14   "Restricted Mode," each video subject to "Restricted Mode" appears with a Defendant-created

15   stamp of disapproval, including a red square bearing a foreboding facial expression, together with

16   text showing "This video is unavailable with Restricted Mode enabled.  To view this video, you

17   will need to disable Restricted Mode."



26        98.    This is a false statement, both on its face and by implication to viewers, because

27   YouTube represents to its users that only videos that contain "nudity, vulgarity, violence, hate,

28   shocking or sexually explicit material" in violation of YouTube's Terms of Service and

**THIRD AMENDED CLASS ACTION COMPLAINT**

Community Guidelines can be "Restricted."  Not only do Plaintiffs' videos not contain any such content, but Defendants' designation of their videos for Restricted Mode is based on Plaintiffs' personal identity rather than a neutral review of their videos' content.

99.    Defendants' false statements and implications that Plaintiffs' content contains "nudity, vulgarity, violence, hate, shocking or sexually explicit material" in violation of YouTube's viewpoint-neutral, content-based rules are sent directly to the same viewers and are made available to same advertisers for whom Defendants compete directly with Plaintiffs and other class members.

100.    These false statements and implications to millions of viewers that Plaintiffs' videos are "Restricted" because they contain "nudity, vulgarity, violence, hate, shocking or sexually explicit material," whether express or implied, is inconsistent with YouTube's purportedly viewpoint-neutral, content-based rules.

101.    These false statements and implications have a tendency to deceive or confuse viewers and advertisers who are led to believe by Defendants that Plaintiffs' videos contain "nudity, vulgarity, violence, hate, shocking or sexually explicit material."

102.    As a result of Defendants' false statements and implications, Plaintiffs' ability to compete for viewer reach, advertising, and other monetization opportunities on YouTube is substantially reduced, resulting in economic, reputational, and other harms to Plaintiffs.

103.    Defendants' branding of Plaintiffs' videos as "Restricted" makes or implies a specific and falsifiable misrepresentation to Plaintiffs' consumers and the viewing public, that the video that they attempted to access contains content that is so inappropriate, shocking and outrageous for viewers who have enabled "Restricted Mode," that such viewers must be protected from that content, and further that the YouTuber who has created and posted that content is responsible for having created and uploaded such inappropriate, shocking and outrageous content.

104.    These specific and falsifiable factual representations, both on their face and as implied, are by no means limited to Defendants' foreboding red "Restricted Mode" stamp of disapproval.  Indeed, as shown below, viewers who attempt to ascertain why a particular video is subject to "Restricted Mode" are told by Defendants that videos are eliminated from "Restricted

Mode" when they include specific pieces of content, including content (1) Talking about drug use or abuse, or drinking alcohol in videos; (2) Overly detailed conversations about or depictions of sex or sexual activity; (3) Graphic descriptions of violence, violent acts, natural disasters and tragedies, or even violence in the news; (4) Videos that cover specific details about events related to terrorism, war, crime, and political conflicts that resulted in death or serious injury, even if no graphic imagery is shown; (5) Inappropriate language, including profanity; and (6) Video content that is gratuitously incendiary, inflammatory, or demeaning towards an individual or group.

- **Drugs and alcohol:** Talking about drug use or abuse, or drinking alcohol in videos.
- **Sexual situations:** Overly detailed conversations about or depictions of sex or sexual activity. Some educational, straightforward content about sexual education, affection, or identity may be included in Restricted Mode, as well as kissing or affection that's not overly sexualized or the focal point of the video.
- **Violence:** Graphic descriptions of violence, violent acts, natural disasters and tragedies, or even violence in the news.
- **Mature subjects:** Videos that cover specific details about events related to terrorism, war, crime, and political conflicts that resulted in death or serious injury, even if no graphic imagery is shown.
- **Profane and mature language:** Inappropriate language, including profanity.
- **Incendiary and demeaning content:** Video content that is gratuitously incendiary, inflammatory, or demeaning towards an individual or group.

105.    Far from ensuring that the videos behind YouTube's version of the pornography curtain contain the content Defendants claim to exclude, the reality is that "Restricted Mode" is significantly over- and under-inclusive, which has caused significant economic, reputational, and other harms to Plaintiffs.  Even the most simple examination of Plaintiffs' videos subject to "Restricted Mode" demonstrates that Defendants are not only dead wrong about their misrepresentations about the content of Plaintiffs' videos which they subject to the "Restricted Mode" stamp of disapproval, but that they are hiding from the public valuable content and are doing so in bad faith to advance their own business or discriminatory interests.

106.    Even worse, Defendants brazenly admit that they ***know*** they are doing this and that they repeatedly make "mistakes" in their operation of  "Restricted Mode."  For example, on May 19, 2017, Defendants admitted that the Restricted Mode "feature isn't working the way it should and we're going to fix it."  Specifically, Defendants admit that they got "it wrong" when they

1    censored videos like Ash Hardell's "Her Vows," Calum McSwiggan's "Coming Out To

2    Grandma," Jono and Ben's "Woman interrupted during BBC interview," and Tegan and Sara's

3    "BWU [OFFICIAL MUSIC VIDEO]."

4                    **2.    Advertising Restrictions**

5          107.    Arbitrary and capricious advertising restrictions are another example of the vague,

6    ambiguous, and arbitrary criteria and anticompetitive filtering schemes Defendants utilize to

7    suppress speech and to capriciously and discriminatorily restrict users like Plaintiffs from

8    monetizing or boosting the reach or viewer distribution of their videos.

9          108.    Defendants have sold advertisements to Plaintiffs in connection with videos which

10   were posted on YouTube for months, without restriction and were fully monetized.  Having sold

11   the ads, after receiving partial payment for the ads, Defendants then applied the Restricted Mode

12   classification to the videos, pulled the advertisements stating that videos subject to the Restricted

13   Mode classification cannot be advertised, and thereafter Defendants retained the money they had

14   charged Plaintiffs for the advertisements of the now restricted videos.

15         109.    According to Google, "[t]he purpose" of these restrictions "is to keep Google's

16   content and search networks safe and clean for our advertisers, users, and publishers.  We hope

17   that all publishers participating in AdSense have a long and successful partnership with Google.

18   To understand why we need policies and the role they play in the ads eco-system you can watch

19   this video.  For that to happen, it's important that you familiarize yourself with the AdSense

20   program policies.  It's important to make sure visitors to your pages are not misled and avoid any

21   deceptive implementation that may bring accidental clicks.  For more details, please check out

22   our ad implementation policies."[13]

23         110.    The reality is quite different: The sole basis for this restraint is the identity or

24   viewpoint of the consumer seeking to boost the reach and distribution of the video, and has

25   nothing to do with the actual content of the video.

26         111.    Defendants impose these restrictions to justify anticompetitive and unlawful actions

27

28   ――――――――――――――――
     [13] See https://support.google.com/adsense/answer/3394713?hl=en&ref_topic=1250104.

1  intended to gain a competitive advantage for their own video content and/or to ensure that their

2  sponsored creators, content partners, and advertisers have an unfair competitive advantage in the

3  YouTube video market.  By placing no restrictions on the monetization of their own videos or

4  those of Defendants' sponsored creators, content partners and preferred advertisers, Defendants

5  gain a competitive advantage by restricting the financial reach of Plaintiffs and other disfavored

6  users, while simultaneously ensuring that their own video content (and those of their sponsored

7  creators, content partners and preferred advertisers) are not subjected to the same (or any)

8  Advertising Restrictions.

9       112.   Defendants' actual practices present yet another example of Defendants saying one

10  thing to members of the Proposed  Class, and doing something very different.  Not only is the

11  "safe and clean" determination not based upon the actual content of  users' videos, but the

12  Defendants' "inappropriate" designation precludes Plaintiffs and other members of the Proposed

13  Class from receiving any revenue from advertisements that would otherwise accompany content

14  not designated as "inappropriate."  Moreover, such practices unlawfully provide Defendants with

15  monopoly power over the video posting and viewership market, and the ability to manipulate,

16  bully, and falsely denigrate legitimate political and educational speakers by subjectively

17  designating their speech as "inappropriate," solely because Defendants do not like or agree with

18  the speakers' political identity or point of view.

19          **3.     AI Filtering Under Restricted Mode And Advertising Restrictions**

20       113.   Another tool in Defendants' speech-censoring "kit" is electronic artificial

21  intelligence or "A.I." algorithms that review and regulate video content.  Defendants *claim* that

22  these algorithms are viewpoint- and identity-neutral, and that they ensure that the "same standards

23  apply equally to all" when it comes to the content regulation of speech on YouTube.  Defendants

24  claim that their employees conduct "manual reviews" to supplement the electronic filtering and

25  regulation of video content.

26       114.   But the evidence, including statements by Defendants' employees familiar with

27  both electronic and manual filtering and regulation of speech that takes place on the YouTube

28  Platform, suggests that Defendants' representations of neutral viewpoint and identity-based

**THIRD AMENDED CLASS ACTION COMPLAINT**

content regulation are *also* false.  The A.I. and algorithmic filtering tools are embedded with code that regulates content based on purely subjective, viewpoint, topic, and identity animus, and other unlawful criteria.  Even before October 2016, Defendants' engineers began making changes to the code and operations of the algorithms and filtering tools in order to ensure that Defendants could filter videos and regulate access to video content based upon overt discrimination of sexual or gender orientation, ethnic, political or religious animus, as well for financial and/or anticompetitive purposes.

115.    On or about December 3, 2020, Dr. Timnit Gebru, the co-leader of Defendants' Ethical A.I. team and a well-respected Google researcher, was fired by the company after criticizing Defendants for, among other things, the biases built into the artificial intelligence systems that Defendants use to filter and block Plaintiffs' content and access to YouTube.

116.    Furthermore, Dr. Gebru said that Defendants fired her based on racial bias, suggesting that Dr. Gebru was an "angry black woman" for expressing her exasperation over Google's response to efforts by her and other employees to draw attention to bias in artificial intelligence.

117.    Dr. Gebru is the rule, not the exception, when it comes to Defendants' viewpoint bias, animus, and discrimination towards their users' and employees' identity or viewpoint.  That animus is institutionally and culturally rampant in Defendants' workplace and throughout their employment practices.  As Dr. Gebru is the latest to confirm,  Defendants operate and administer "Restricted Mode" and engage in other discriminatory practices relying on engineers, content reviewers, and other employees who operate and make purportedly identity and viewpoint-neutral content-based decisions in a "toxic," dysfunctional work environment that is rampant with animus and identity bias when it comes to a YouTube user's race or sexual or gender orientation.

118.    Internal emails by and between Defendants' employees show that many employees are routinely subjected to harassment, threats, blacklisting, discipline, and hazing based on their political or religious viewpoints and identity.  The dysfunction and viewpoint bias emanates from, and is enforced at, the highest ranks of Defendants' upper management, and drives the actions of employee supervisors, co-workers, third-party affiliates, and advertisers.

119.     Consequently, even when manual employee reviews of video content are used to check and audit restrictions on content based upon the electronic filtering algorithms, Defendants use Restricted Mode and other discretionary and vague content-based restriction criteria to restrict access to Plaintiffs' videos under vague and undefined terms such as "mature" or "sensitive" for certain audiences, solely because the video discusses a topic involving "," "lesbian," "gay," "bisexual," "transgender," or "queer" issues, or the video merely mentions these trigger words. The result is censorship, restraint of speech, and discrimination based, not upon content which might violate a narrow, neutral, objective, and specifically verifiable criteria that furthers a compelling and legitimate public interest, but upon Defendants' animus or dislike for the identity or viewpoint of the speaker.

120.     Defendants also admit that decisions to restrict access to videos are routinely made or influenced by third-party NGO affiliates and advertisers who dislike the political or religious identity or viewpoint of the user.  According to Defendants, "YouTube receives significant pressure from governments and social interest groups around the world to remove or restrict access to content that those groups find harmful, dangerous, or offensive. For example, Germany's Netzwerkdurchsetzungsgesetz (network enforcement law or NetzDG) requires any Internet platform with more than 2 million users to implement more efficient ways to report and delete potentially illegal content, such as slander and hate speech.  Platforms which fail to remove such content within 24 hours (or within 7 days for more legally complex content), will be subject to fines of up to 50 million euros."  These groups constantly pressure Defendants to apply access restriction criteria to users whose political or religious viewpoint does not comport with that of an advertiser or third-party NGO.

### 4.     Demonetizing Channels Wholesale

121.     Google/YouTube continue to censor and demonetize the work of creators by they are demonetizing entire channels of creators:

a.     The YouTube channel SalBardo was demonetized for a period of 30 days, despite the popularity of his short film "Sam," a short film which presents the story of a transgender child who has been beaten for dressing as a boy.  "Sam"

1   https://www.youtube.com/watch?v=YQiN2MYEzSg was posted in 2013 and has generated 7.4

2   million views.

3           b.      The YouTube channel NateTrinrud also was demonetized for a period of

4   time, despite the fact that the three videos uploaded to the channel, ("Goodbye, Charley,"

5   https://www.youtube.com/watch?v=RNXC1rkrONU; "Pop Rox,"

6   https://www.youtube.com/watch?v=E-VpD4_sgNw; and the "Pop Rox Trailer,"

7   https://www.youtube.com/watch?v=QWBc92tTzPA), are award winning films which do not

8   include graphic scenes of violence or sexuality.

9           **5.      Shadow Banning**

10  122.    Google/YouTube treats serious videos that present themes and issues important to

11  the  Community as "not family friendly," or as if they were inappropriate for all audiences simply

12  because they are uploaded by members of the  Community or are created for the  Community to

13  watch.  Defendants are not merely censoring and demonetizing individual videos by  creators –

14  Defendants are making those videos invisible on the YouTube Platform; despite the fact that the

15  videos comply with all of Defendants' published Terms of Service.  For example:

16          a.      Various videos posted by the YouTube channel Watts The Safeword,

17  including "Mermaid Tie," which demonstrates traditional knot work and includes no nudity, have

18  been sporadically shadow banned on YouTube and could not be located on the YouTube Platform

19  by conducting searches for various periods since the videos were uploaded..

20          b.      The "Dare" short film, written by David Brind, depicts the beginning of a

21  gay relationship between two high school seniors.  "Dare" was posted to YouTube in 2013,

22  https://www.youtube.com/watch?v=HtCxdsvlO0s and has generated more than 12.6 million

23  views.  Defendants demonetized and applied Restricted Mode filters to the short film.  Plaintiffs

24  are informed and believe and thereon allege that for various periods of a time over the past two

25  years, "Dare" also was shadow banned on the YouTube Platform and could not be found  except

26  by searching using the director's name.

27          **6.      Deleting  Thumbnail Images**

28  123.    Thumbnails are small square images or tiles which appear in the lists of YouTube

**THIRD AMENDED CLASS ACTION COMPLAINT**

search results ("Thumbnails").  For channels with fewer than 15,000 subscribers, Thumbnails consist of a single still photo which Defendants generate from the uploaded video, or which Defendants capture with a digital camera.  For those channels with 15,000 subscribers or more, Defendants allow the creators to craft unique Thumbnails with titles using customized lettering and graphics.  Plaintiffs and other YouTubers who are part of the  Community who generate the minimum subscriber numbers required by Defendants are authorized to upload such customized Thumbnails to attract viewers.  Using custom Thumbnails is a visual way of signaling to new viewers that the related content is professionally prepared and superior in quality to most of the content from less popular, amateur creators which populate most of YouTube's channels.  Custom Thumbnails are so effective at attracting new viewers that these creators actually plan new videos around specific Thumbnail concepts, generating the Thumbnail in advance of the video.

124.    Without any notice or explanation, Defendants have and continue to delete the custom Thumbnails of Plaintiffs and Community, and replace those custom Thumbnails with Defendants' own generic Thumbnails, which typically results in reduced numbers of click-throughs and views.  The unlawful and anticompetitive practice of replacing Plaintiffs' custom Thumbnails allows Defendants to further denigrate, stigmatize, and harm Plaintiffs' respective brand, reputation, goodwill, and ability reach intended audiences.

### 7.    Cancelling And Stopping Subscribers' New Video Notifications

125.    Since the early days of YouTube, creators grew their channel's view numbers by encouraging viewers to "subscribe," to their channels.  Some Plaintiffs have more than one million "subscribers" for their combined two channels.  One major perk of being a "subscriber," used to be that "subscribers," automatically received notification from the YouTube Platform whenever the subscribed channel uploaded new video material.  By cancelling subscriptions, and/or new video notifications, Defendants can prevent  Plaintiffs from continuing to attract new subscribers by preventing videos from going viral with large numbers of viewers.  Over time, as existing subscribers fail to see channels are posting new videos, views and subscriber numbers shrink.

126.    For the past 18-24 months, when established  creators post a new video, fewer and fewer existing subscribers have been getting new video notifications for  channels like

1   BriaAndChrissy and ElloSteph.  Newly posted videos are languishing with few views during the

2   critical first few days when "buzz" can be generated and a video can go viral.  Over time, with

3   Defendants cancelling more and more longtime subscribers, fewer viewers are receiving new

4   video notifications, and successful longtime  creators' channels post fewer and fewer views per

5   new video.  Defendants also ceased providing new video notifications to longtime subscribers,

6   without providing any notice to the  creators, their subscribers or other YouTube users.

7        127.    Google/YouTube changed the procedure for requesting "notifications of new

8   videos," sometime in the past several years.  Instead of including automatic new video

9   notifications whenever subscribers double click on the "subscribe," box for a channel,

10  Google/YouTube changed the process so that a subscriber who wanted to receive new video

11  notifications both had to double click the "subscribe," box, and to double click on a grey bell icon

12  located to the right of the "subscribe," box.  Existing subscribers automatically stopped receiving

13  new video notifications when Defendants implemented the new procedure.  Google/YouTube

14  implemented the new procedure without any announcement, and did not inform existing

15  subscribers that new video notifications would cease.

16       128.    Even when existing subscribers figured out that Google/YouTube had a new

17  procedure for getting new video notifications, many subscribers tried to double click on the grey

18  bell icon, many subscribers were unable to successfully complete the process.  Those existing

19  subscribers who successfully managed to complete the process, did not necessarily receive new

20  video notifications on a regular basis.

21       129.    Defendants further compounded the problems sometime between July and

22  November of 2019, when Google/YouTube again changed the requirements for subscribers to

23  receive new video notifications:  Now, it is no longer sufficient to double click on the grey bell

24  icon, but subscribers must take the additional step of choosing from a new drop down menu one of

25  three options:  "All Notifications," "Personalized Notifications," and "No Notifications."  Again,

26  before implementing this change regarding new video notifications, Defendants gave no advanced

27  notice to the creators, subscribers or YouTube users of this change, resulting in weeks passing

28  during which  creators posted new material without subscribers to their channels receiving any

**THIRD AMENDED CLASS ACTION COMPLAINT**

1    notification at all.  For those subscribers who had taken the trouble to double click on the grey bell

2    icon to the right of the "subscribe" box before the second change, instead of receiving notifications

3    for all new videos, Google/YouTube converted the existing notification request to only require

4    "Personalized Notifications."  This sleight of hand resulted in subscribers not getting any new

5    video notifications, as Plaintiffs' channels are not set up to provide "Personalized Notifications" to

6    subscribers.

7                    **8.      Excluding  Content From The "Up Next" Recommended Application**

8           130.    Defendants generally exclude  related content from the YouTube recommended

9    content on the "Up Next," application for the channels, which appears on the screen whenever

10   viewers play Plaintiffs' videos.  As a practical matter, Defendants refuse to recommend to viewers

11   or advertisers video content which includes tag words like "," "lesbian" gay," bisexual,"

12   "transgender," or "queer."  Google/YouTube does so, despite the fact that it recommends reaction

13   videos that are based upon the very same non-recommended videos uploaded by  Plaintiffs.  As a

14   result, creators like BriaAndChrissy and Chase Ross must self-censor and refrain from using such

15   tag words for their videos to avoid Defendants' censorship practices, if they are to generate any

16   advertising revenues from their posted videos.  Such self-censorship makes it harder for members

17   of the  Community (the intended audience for the two channels) to find content which is designed

18   to support, educate and entertain them.  Recently,  creators have been forced to remove paid

19   products placed in their videos because Google/YouTube has deemed certain product brands, such

20   as "Adam and Eve" as inappropriate for the YouTube Platform.

21                   **9.      Recommending Anti- Hate Speech In The "Up Next" Application**
                              **Alongside  Videos**

22

23          131.    While Defendants exclude -related content from the YouTube recommended

     content on the "Up Next," application, Defendants recommend and include on the "Up Next"
24
     application both reaction videos which copy, pirate or parody Plaintiffs' original content, and
25
     original videos which include obscene, homophobic, violent, threatening or disparaging anti-
26
     content.  These "Up Next" videos which Defendants are recommending to Plaintiffs' subscribers
27
     and viewers appear on the same screen, alongside Plaintiffs' videos.  Defendants also monetize
28

                              **THIRD AMENDED CLASS ACTION COMPLAINT**

1    many anti- hate speech videos, ensuring that both Defendants and their preferred creators are

2    making money from Plaintiffs' original content, all the while discouraging, offending, and even

3    frightening the intended audience for Plaintiffs' videos.

4         132.    Defendants' practice of recommending hate speech videos in conjunction with the

5    displaying of  related videos discourages and even prevents members of the  Community from

6    accessing video content which is designed to support, educate and entertain them.  While Plaintiffs

7    in this case support the right of all persons to express their viewpoints, Defendants may not

8    restrain, censor, or prevent the  Community from expressing their viewpoints, especially where

9    Defendants promise everyone a level playing field where the rules apply equally to all.

10        **10.    Playing Anti- Advertisements Immediately Before  Videos**

11        133.    Defendants have sold YouTube advertisements to users who have strong anti-

12   messages, and play those advertisements so that they directly precede the LBGTQ+ Plaintiffs'

13   videos .  Accordingly, viewers who played video content by BriaAndChrissy, and

14   WonderWarriors were forced to view advertisements with anti- messages before viewing the

15   videos which they desired to watch.  Defendants' practice of running anti- advertisements before

16   playing videos by Plaintiffs offends their intended audience, and discourages viewers from

17   watching Plaintiffs' videos, by forcing them to first listen to doctrinal advertisements that criticize,

18   belittle, or disparage the viewers' beliefs and lifestyles, resulting in fewer views per video, lower

19   subscriber numbers and less income to Plaintiffs.  While Plaintiffs in this case support the right of

20   all persons to express their viewpoints, Defendants may not restrain, censor, or prevent the

21   Community from expressing their viewpoints, especially where Defendants promise everyone a

22   level playing field where the rules apply equally to all.

23        **11.    Including Anti- Hate Speech In Comments Appearing With Videos**

24        134.    YouTube has come a long way from days when it was credited as providing the

25   resources to disenfranchised persons in the Middle East that fueled the Arab Spring.  Instead of

26   treating everyone equally Google/YouTube, now finds it politically and financially expeditious to

27   restrain and disenfranchise  users, while promoting institutional racism, ethnic violence, and

28   homophobia around the world.  In a recent investigative report sponsored by the New York Times

and the FX network entitled "What Is YouTube Pushing You To Watch Next,"[14] several well respected investigative journalists report that YouTube assists, and is the weapon of choice for anti-, gay bashing dictators, politicians and advocates around the world, including the current President of Brazil, Jair Bosanaro.  The report describes YouTube as the single most powerful catalyst in the world for disrupting societies and does so by reaching more people than any private or government controlled TV communication network in history.  The report concludes that YouTube exercises "extraordinary influence" over hate-based, ethnic violence, and totalitarian ethnic cleansing, including the horrific events in Myanmar, Sri Lanka, Germany, the Philippines, and Brazil.

135.    One of the principal ways of gaining new viewers and subscribers on the YouTube Platform is to generate favorable comments and/or healthy discussion in the "Comments Section," which appears when videos are played.  Favorable comments can generate thousands of additional views for a video.  Comments regarding video content can generate even more views where the viewers have differing opinions and perspectives.  Defendants allow, and refuse to filter out from Plaintiffs' channels and video comments sections those comments with obscene, homophobic, violent, threatening hate speech.  Accordingly, viewers who play educational video content by QueerKidStuff designed for young viewers, supportive video content by BriaAndChrissy, and WonderWarriors designed for adolescents to young adults, and educational and supportive video content designed for adults by GNews! and uppercaseChase1, are exposed to vile hate speech when they view the videos uploaded by these  Plaintiffs:



---

[14] See https://www.nytimes.com/2019/08/09/the-weekly/youtube-brazil-far-right.html .

**THIRD AMENDED CLASS ACTION COMPLAINT**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24



25    136.    Plaintiffs generally must spend substantial time and energy attempting to use

26  Defendants' word filters for the Comments Section application to remove the hate speech

27  comments.   creators often are unable to capture all of the different misspellings used in the hate

28  speech to avoid Defendants' word filters.  GNews! devotes significant resources to filtering and

**THIRD AMENDED CLASS ACTION COMPLAINT**

deleting hate speech which appears in its comments sections.  For new videos, hate speech trolls flood the Comments Section of Plaintiffs' channels so that each positive comment is pushed down in the queue of comments and is not visible unless the viewers scroll through dozens of hate filled comments.  QueerKidStuff has been forced to disable the Comments Section to protect its young viewers and their parents from such hate speech comments.  In doing so, QueerKidStuff generates less buzz for new content, fewer views per video uploaded, fewer subscribers, and barely any revenue from its videos.

137.    Plaintiffs strongly support the right of free Speech and expression for all Community Members.  That right does not extend to Defendants' promotion of anti- hate speech, speech which also violates Defendants' own purportedly neutral content-based rules -- especially when Defendants unlawfully use those rules as pretext to censor, restrain, demonetize, silence, and squelch the engagement and distribution of  video content or viewership.  Such, actions unlawfully interfere with the express rights of  Community Members to protect themselves by speaking out against hate and homophobia on a level playing field, as provided by Defendants' representations and warranties that the rules apply equally to all on YouTube.

### 12.    Other Unlawful Speech-Restricting Tools

138.    Defendants have  even more tools in their toolkit to unlawfully restrict the expression of YouTubers like Plaintiffs in the Proposed Class.  These tools include, but are not limited to:

a.    Removing the comments section entirely for videos, without a request by the  creator, and without giving the creator notice as to why the action was taken or an opportunity to respond, thereby depriving creators of the opportunity to generate buzz by having viewers post favorable comments and recommend content to others;

b.    Content production, "fact checking," and political partnerships with large third-party media conglomerates, advertisers, or non-Governmental organizations (NGO's) who work with Defendants as a pretext to restrain users and viewpoints that Defendants and their partners dislike;

c.    A global network of content review and call center locations and teams who

1    interact with consumers to flag and restrict disfavored producers or viewpoints; and

2            d.      Terms of Service contracts with consumers that contain a catchall provision

3    that Defendants contend grants them unfettered and absolute discretion to restrain speech for "any

4    reason or no reason."

5        139.    Despite the number, complexity, and interrelation of each of these (and other)

6    content regulation policies and practices, each serves as part of a uniform, single, simplistic, and

7    unlawful content-based scheme to control, regulate, restrain, and harm protected speech.  The

8    common thread or core aspect of this scheme is simple:  use and apply vague, subjective, and

9    meaningless content-based criteria with unfettered and absolute discretion to restrict the

10   viewership, reach, and monetization of videos on YouTube, based not on content, but upon the

11   sexual identity, political affinity, religious affiliation, ethnic identity, or commercial affiliation of

12   the speaker or the listener, or upon other animus or bias.

13       **F.      Defendants Were Caught Censoring  Users In 2017**

14       140.    On March 19, 2017, Defendants publicly admitted that they improperly censored

15   videos using their Restricted Mode filtering that were posted or produced by members of the

16   Community, based upon the identity and orientation of the speaker, rather than upon the content of

17   the video.  In response to complaints from the  Community and other civil rights critics,

18   Defendants removed all restricted filtering on videos posted or produced by  members and groups,

19   and changed their policy, filtering algorithm, and manual review policies purportedly to ensure

20   that videos posted by  vloggers were not being censored solely because of the identity of the

21   speaker.

22       141.    Defendants also admitted that they wrongly censored videos posted by members of

23   the  Community blaming a purported engineering problem with filtering tools that targeted video

24   content from  users, or targeted users who discussed topics and perspectives on  issues.

25   Subsequent to that admission, Defendants agreed to investigate the claims of users.  Defendants

26   dispatched a team of senior managers, including YouTube's CEO Susan Wojcicki, to meet with

27   representatives to consider revising their policies and review protocols, correcting the filtering

28   tools, and rewriting guidelines that "clarify its position by specifically allowing personal accounts

**THIRD AMENDED CLASS ACTION COMPLAINT**

1  from victims of discrimination or violent hate crimes, as long as they don't contain graphic

2  language or content."

3      142.    On April 27, 2017, Johanna Wright, Vice President of Product Management for

4  YouTube, stated that Defendants wanted to "clarify that Restricted Mode should not filter out

5  content belonging to individuals or groups based on certain attributes like gender, gender identity,

6  political viewpoints, race, religion or sexual orientation."  Wright further promised users that

7  while "Restricted Mode will never be perfect, [Defendants] hope to build on [their] progress so far

8  to continue making [their] systems more accurate and the overall Restricted Mode experience

9  better over time."

10      143.    This was another false promise by Defendants.  On at least five occasions, after

11  promising to stop discriminating against  users, Defendants denied an  news organization the right

12  to advertise and boost viewership on YouTube.  In one instance, Defendants denied Divino an ad

13  seeking to promote a Christmas Holiday video solely because the speakers and organization

14  producing and promoting the video were identified and expressed viewpoints which Defendants

15  stigmatized as "shocking" and "sexually explicit," solely because the user identified and expressed

16  viewpoints that were "gay."  After the  user repeatedly complained and sought an explanation, the

17  user got a customer service person to escalate the complaint.  Whereupon, two different employees

18  at two different locations were unable to provide an explanation of the denial to this user other

19  than to say that the video had been flagged as "shocking content."  When the  consumer further

20  escalated the complaint, a person identified as an "expert" and senior supervisor, expressly

21  informed the consumer that the ad was being denied because the video it was promoting contained

22  "shocking" and "sexually explicit" content solely because the consumer was "gay" and that

23  "company policy" deemed  content as shocking and "sexually explicit," solely because of the

24  video involved "the gay thing."

25      144.    Defendants subsequently apologized to the  client for what they contend was a

26  misunderstanding and eventually agreed to run the ad.  But they did so **more than three weeks**

27  **_after_ the Christmas holiday had passed**.  Subsequent to their apology, Defendants declined at

28  least four additional ad requests from the same video channel with little, or no, explanation.

**THIRD AMENDED CLASS ACTION COMPLAINT**

**G.     YouTube's Promises To the  YouTubers Were "Lip Service"**

145.    Whatever promises, apologies, and misunderstanding explanations Google/YouTube has given to the , they were and continue to be "lip service" as described by one YouTuber following his meeting with YouTube's management in 2017.  Instead of fixing the problems, Defendants Google/YouTube have doubled down on their anti- animus and discrimination that now pervades the platform.

146.    In an article headlined "How YouTube Radicalized Brazil,"[15] an investigative report written by journalists Max Fisher and Amanda Taub, released by the New York Times on August 11, 2019,  YouTube's animus-based content regulation and distribution system was dubbed the political "Party" behind Jair Bolsonaro, who, courtesy of YouTube content filtering and distribution control, is now the President of Brazil.  Bolsonaro is arguably the most powerful anti-, homophobic bigot and hatemonger in the world.  According to the article, "YouTube had recently installed a powerful new artificial intelligence system that learned from user behavior and paired videos with recommendations for others."  This system, embedded in YouTube's content regulation schemes and practices, made "Jair Bolsonaro, then a marginal figure in national politics," a "star in YouTube's far-right community in Brazil, where the platform has become more widely watched than all but one TV channel."

147.    The "investigation in Brazil found that, time and again, videos promoted by the site have upended central elements of daily life," including those of children, who YouTube hypocritically exploits to impose content-based restrictions for its own financial and political gain. According to the New York Times, "[t]eachers describe classrooms made unruly by students who quote from YouTube conspiracy videos or who, encouraged by right-wing YouTube stars, secretly record their instructors."

148.    Thus, contrary to Defendants repeated promises that the "system" is viewpoint-neutral and does "not  favor any political ideology," the Times' report found that YouTube "directs users to extreme content," while, as alleged here, restricting compliant and quality

---

[15] See https://www.nytimes.com/2019/08/11/world/americas/youtube-brazil.html .

content intended for younger audiences.  According to Defendants, this system "now drives 70 percent of total time on the platform."  While that is good news for YouTube "as viewership skyrockets globally," and YouTube brings "in over $1 billion a month," it is bad news for Plaintiffs and the members of the YouTube Community: as Zeynep Tufekci, a social media scholar, has stated, YouTube is "one of the most powerful radicalizing instruments of the 21st century."

**H.    Defendants Have And Continue To Violate The Rights Of Plaintiffs And The Community**

149.    Defendants' 2017 promises and claims that the bias "problems" identified by members of the  Community are now resolved, is simply not true.  Indeed, as the allegations and claims of Plaintiffs demonstrate, things are getting worse, not better.  What Defendants previously characterized as incidental or unintentional "problems" in properly regulating and protecting expression have become part of an unlawful scheme by defendants to restrain, deceive, discriminate, and violate the legal rights of Plaintiffs and the putative class members of the Community that the  seek to represent in this lawsuit.

**1.    Divino (GlitterBombTV.com's GNews!)**

150.    Divino Group LLC is owned and managed by Chris Knight and Celso Dulay.  Mr. Knight and Mr. Dulay are members of the LGTBQ+ Community who write, produce and upload to the YouTube Platform video content intended for the LGTBQ+ Community under the GlitterBombTV.com name as GNews!.  Cameron Stiehl is a regular co-host and contributor to GNews! and Glitter Bomb TV.

151.    Plaintiffs Divino, Chris Knight and Celso Dulay are informed and believe and thereon allege that sometime in late 2013 or early 2014, Divino entered an agreement with Defendants to become YouTube partners by joining the YouTube Partnership Program.  As part of the YouTube Partnership Program, Defendants gave Divino a number of special benefits, such as the opportunity to prepare custom Thumbnail images for each video it uploaded to YouTube, and to monetize its videos.  YouTube promised additional benefits to Divino if it succeeded in obtaining 1,000 or more subscribers to its YouTube channel.

152.    Commencing in March of 2014, in reliance on its YouTube Partnership Program agreement with Defendants, in order to secure additional partner benefits, Divino undertook efforts to increase its number of views per video, and its number of subscribers, by purchasing from Defendants a series of advertisements.  Between March 9, 2014 and October 1, 2018, Divino paid to Defendants $14,542.94 for advertisements relating to its GNews! videos.

153.    However, Defendants refused to sell Divino all of the advertisements it applied to purchase: on at least eight separate occasions, after November 2016, Google/YouTube barred Divino from purchasing ads or monetizing its news and event show, GNews!, because Defendants had determined in their discretion that the content of a show violated Defendants' policy against promoting "shocking" "offensive," and "sexually explicit" content.

154.    Around April 2017, after Divino had purchased numerous advertisements in an effort to secure the minimum 1,000 subscribers to qualify for the next level of Defendants' enhanced video creator benefits, Defendants unilaterally changed the YouTube Partnership Program requirements so that only video creators with "10,000 lifetime views" would qualify to be partners.  In unilaterally changing the terms of the YouTube Partnership Program, Defendants repudiated the agreement with Divino.

155.    On December 24, 2017, Plaintiff Divino was prohibited from advertising a holiday special news and events show created for  persons in the San Francisco Bay Area and beyond, because Defendants labeled the GNews! video as "shocking content."  When Plaintiff Divino inquired as to what portion, if any, of the video content on a holiday event show was inappropriate for advertising, an employee of Google AdWords stated that video content that discusses or expresses the "gay thing" or is created by a YouTuber who identifies as "" or "gay" violates "company policy" against the advertising or monetizing of "shocking" and "sexually explicit" content.

156.    On or about January 17, 2018, Defendants again unilaterally changed the YouTube Partnership Program requirements so that only creators with channels that "have accumulated 4,000 hours of watch time within the past 12 months, and have at least 1,000 subscribers" would qualify for the program.  By that time, Defendants had spent thousands of dollars in an effort to

**THIRD AMENDED CLASS ACTION COMPLAINT**

1    boost their subscriber numbers, and had been refused opportunities to purchase other

2    advertisements.  Because Divino had not reached the new 1,000 minimum number of subscribers,

3    Defendants removed Divino from the YouTube Partnership Program, and stripped Divino of the

4    ability to monetize its videos.  In doing so, Defendants further repudiated the agreement with

5    Divino.

6        157.    Since February 6, 2014, Divino has produced 132 episodes of GNews!, an online

7    news show co-produced by Divino's principals, Celso Dulay and Chris Knight.  In reliance on

8    Defendants' assurances of viewpoint-neutrality and free expression discussed above, Divino

9    decided to produce and distribute each such episode through the YouTube Platform.

10       158.     GNews! is and has always been intended to be a positive and affirming news

11   source for members of the  Community.  Labeled "Where You Get All Your Gay in a Day," Dulay

12   and his revolving line-up of co-hosts cover a variety of topics of interest to the global  Community

13   – from Hollywood, the music charts, pop culture, celebrities, politics, news of top interest to the

14   community, local and international events, their "Crush of the Week" and more.

15       159.    A representative screenshot from an episode of GNews! is below:



16

17

18

19

20

21

22

Glitter Loud & Prosper! - GNews! Episode 114
14,358 views

23       160.    Inasmuch as GNews! is subject to the same criteria that governs all YouTubers

24   (and there is nothing in any GNews! episode that violates any provision of law or any legitimate

25   provision of YouTube's or Google's terms of service), GNews! is typical of YouTube content

26   produced and uploaded by other YouTuber members of the Proposed Class.

27       161.    Relying on the truth of Defendants' representations that YouTube is, had been, and

28   would remain a viewpoint-neutral forum for free expression, Divino and other members of the

THIRD AMENDED CLASS ACTION COMPLAINT

Proposed Class were further induced to purchase ad products from Defendants.

162.    YouTubers like Divino, who initially attempted to rely on social media and word of mouth to increase viewership for their video content, often find that the only effective way to increase views of GNews! and to grow subscribers is to purchase ad products from Defendants to increase their reach. This appears to be the result of a deliberate and fraudulent effort by Defendants to increase their profits through the sale of advertisements.

163.    Specifically, when videos like Divino's GNews! episodes are uploaded to the "YouTube Creator's Studio," there appears a direct link via pull-down menu to promote the episodes via Google Ads (formerly called Google AdWords). YouTubers who select the "promote" option via pull-down menu are immediately directed to a Google Ads landing page that states - as of May 5th, 2019:

> You'll promote your video using Google Ads. Like millions of other creators and businesses, you'll use the Google Ads platform to run and manage your video as an ad on YouTube. With video ads, you can expand your audience and pay only for views that count. You'll now be redirected to sign in to or create a Google Ads account.

164.    Neither Divino, nor any other member of the Proposed Class would have spent money on such products, if they had been aware of the true facts underlying Defendants' representations.

165.    For example, between August 2015 and May 2018, GNews! ads purchased by Divino on the strength of the above-referenced representations were "disapproved" (YouTube-speak for "blocked") no fewer than *eleven times* based on increasingly vague and nonsensical reasons.

166.    And between September 2015 and March 2018, two GNews! episodes were subject to "Restricted Mode," thus restricting significant portions of GNews! potential audience from viewing the content.

167.    Consistent with what has happened to members of the Proposed Class who have dared to question Defendants' blacklisting, when Divino's representatives sought clarification as to what content in the news show constituted "shocking content," Defendants were initially unable to point to anything. When Divino escalated the inquiry, their call was transferred to a person

working for Defendants in South Asia identified as a senior content regulator and Defendants'
"call center" head.  After taking some time to view the GNews! content in question, the employee
informed Divino that the content of the show violated the company's prohibition against
"shocking" and "sexually explicit" content *because* of what he stated was Defendants' "*company*
*policy*" of banning content that related to the "*gay thing*" and because Divino's representatives
identified as  and are "*gay*."

168.    The call thus confirms what Plaintiffs and other YouTubers in the Proposed  Class
have long known to be true: the soaring rhetoric of Defendants' professed commitments to values
of freedom of expression is nothing more than a smokescreen covering a rotting corporate culture
that uses overseas call center workers in a scheme to suppress speech and violate established
antidiscrimination protections.

169.    Defendants' discretionary, discriminatory, viewpoint-based, and unlawful content-
based speech regulation system was, is, and continues to be used to discriminate against and
financially harm YouTube consumers.  Indeed, every YouTube consumer or user is an unwitting
victim of Defendants' discriminatory and fraudulent scheme to use unlawful and discriminatory
content-based speech regulations, policies, and practices to obtain illegal financial and political
gain at the expense, and to the detriment of the users' free speech and consumer rights.

170.    Instead of correcting their behavior and bringing their filters and regulations of
speech into compliance with California's free speech, antidiscrimination, consumer fraud, and
contract laws, Defendants continue to maintain and apply arbitrary, capricious, discriminatory and
deceptive regulations to restrict speech on YouTube.

171.    In short, Defendants are engaged in a global fraud on YouTube's users and
consumers.  YouTube consumers, like Plaintiffs, are promised a video hosting platform that
operates without regard to a user's identity or viewpoints subject only to neutral, narrowly
tailored, non-discretionary content-based rules and restrictions that serve to further a legitimate
public interest, such as public safety or national security.  In reality, however, Defendants deliver a
platform where YouTube consumers are subject to, vague, discretionary, and meaningless rules,
regulations, and practices to discriminate against and financially harm disfavored third-party

1  speakers and viewers, as a pretext to further Defendants' purely selfish, corporate interests of

2  maximizing financial gain, political power, and consolidating control over the public speech and

3  content of its consumers and the public.

4         172.   Not only is Defendants' censorship not based upon the express content of

5  Plaintiffs' videos and those of others in the Proposed  Class, but Defendants' "inappropriate"

6  designation, falsely and unfairly stigmatizes Plaintiffs.  The designation renders prospective

7  viewers ineligible to watch Plaintiffs' programming from many public, as well as private

8  workplace or home computer stations.  It prevents access to educational content by students whose

9  computer use may be subject to parental controls, intended to shield the student from truly

10  inappropriate material, not to exclude political or educational discourse of current or historical

11  events.  It precludes Plaintiffs from receiving any revenue from advertisements that would

12  otherwise accompany content not designated as "inappropriate."  Moreover, it gives Defendants a

13  virtual monopoly over the video posting and viewership market, and authority to manipulate,

14  bully, and falsely denigrate legitimate political and educational speakers by subjectively

15  designating their speech as "inappropriate," solely because Defendants do not like or agree with

16  the users' political identity or point of view.

17         173.   Such a censorship regime cannot pass muster under California law.  Among other

18  things, it provides Google/YouTube with unfettered and unbridled discretion to impose their own

19  political views and values upon speakers, without any objective criteria for evaluating what is and

20  is not appropriate, and thereby censors speech, based on animus towards the speaker's political

21  viewpoint, rather than on the appropriateness of the video content.  It also constitutes intentional

22  discrimination by Defendants based upon the religious beliefs, political identity, or sexual

23  orientation of the speaker.  Moreover, it allows Defendants unfettered authority to regulate,

24  restrain, and censor speech as an unfair, unlawful and deceptive business practice designed to

25  inflict harm upon their competitors and to promote their own video content at the expense of the

26  smaller third-party users, on whose backs the YouTube Platform was built.  Furthermore, it

27  violates the warranty of good faith and fair dealing implied in the Defendants' Terms of Service,

28  and the video posting guidelines and policies to which Plaintiffs were required to agree, in order to

1   use the YouTube Platform.  Defendants do all of this as part of their control and management of

2   what is arguably the largest public forum for expression and the exchange of ideas that has ever

3   been available to the public in California, the United States, and ultimately the world—one to

4   which Google/YouTube invite the public to express themselves in all manner of speech, and to

5   engage with such speech through viewing and commenting.

6        174.   Until recently, all of Divino's subscribers had been receiving electronic

7   notifications from YouTube whenever Divino uploaded new video content.  In the past year,

8   Divino's subscribers have been complaining that they no longer receive YouTube notifications for

9   new Divino video content.  YouTube did not announce or notify Divino of any change to the

10  existing notification system.  In discontinuing their practice of notifying existing Divino

11  subscribers regarding new posted content, Defendants have effectively nullified the benefits of the

12  $14,000 worth of advertisements Divino had purchased to boost subscriber numbers:  existing

13  subscribers will not continue to watch Divino's videos when they believe Divino has stopped

14  posting new materials, and Divino cannot possibly generate the minimum 4,000 annual hours of

15  viewer watch time required to requalify for the YouTube Partner Program if existing subscribers

16  were not watching new videos.

17            **2.    BriaAndChrissy LLC (BriaAndChrissy)**

18       175.   Plaintiff BriaAndChrissy LLC a limited liability company created under the laws of

19  the state of Georgia, and is wholly owned by Bria Kam and Chrissy Chambers, a married lesbian

20  couple and the creators of BriaAndChrissy, and WonderWarriors (formerly known as

21  "OurLesbianLove"), two popular  video content channels on the YouTube Platform.  Bria is a

22  professional musician, and Chrissy is an actress.  They use their creative talents to support and

23  entertain young adult members of the  Community.

24       176.   On the BriaAndChrissy and WonderWarriors channels, BriaAndChrissy LLC

25  uploads videos that document and describe the experiences of the same sex couple, including the

26  struggles, and mental and physical health issues which affect same sex couples who are constantly

27  confronted with homophobic hate speech, bigotry, attacks, and institutional bias against  persons.

28  Since 2012, BriaAndChrissy LLC has been uploading videos featuring the original material and

**THIRD AMENDED CLASS ACTION COMPLAINT**

covers of the work of the couple, and of other artists, as well as skits, interviews, and editorial commentary on issues of the day, such as homophobic celebrities.

177.    On the WonderWarriors channel, BriaAndChrissy LLC created a popular "Day-in-the-Life" video-log that chronicles the couple's lives, and encourages persons to live a healthy lifestyle through fitness, creativity, responsible ethical conduct and supportive relationships.

178.    In 2017, the BriaAndChrissy channel had 850,000 subscribers with 380 million views. WonderWarriors had 200,000 additional subscribers with 60 million views. The two channels averaged 15,000 new subscribers per month, 10 million views per month for each new video uploaded, and generated on average $3,500 per month. And as any objective or reasonable viewer can see, the video content that appears on BriaAndChrissy and WonderWarriors complies with YouTube's Community Guidelines and other content-based regulations used by Defendants to regulate free expression and speech on the YouTube Platform.

179.    On or about June of 2013, the BriaAndChrissy channel was so popular with viewers that Defendants invited the couple to create and post a video titled "Proud to Love" on the channel. No sooner had these Plaintiffs agreed to Defendants' invitation to create and post "Proud to Love," than Defendants demonetized the "Proud to Love" video and refused to re-monetize it. Defendants only re-monetized the video after Bria Kam appealed to BriaAndChrissy fans on Twitter, where the video received significant additional attention. As a result of Defendants' monetization treatment of the "Proud to Love" video, " BriaAndChrissy LLC lost substantial revenue and earnings from this popular video.

180.    In February 2016, Defendants then invited BriaAndChrissy LLC to pitch and produce an documentary program featuring the couple travelling throughout the United States and interviewing members of the Community about their personal experiences. The concept was to document -related issues of local importance, and broader issues of national importance which affect persons, their families and friends in different communities around the United States. To Plaintiffs' surprise, Defendants subsequently turned down the project under the pretext that they were no longer interested in the concept. Unbeknownst to the Plaintiffs, and without it permission or any legal rights to the unique content, Defendants sponsored an identical show hosted by a

1  former Google/YouTube employee.  In brazen disregard and violation of BriaAndChrissy LLC's

2  intellectual property rights, Defendants stole and plagiarized Plaintiffs' concept and content, and

3  profited from that theft by promoting and posting a show on YouTube which was a complete rip

4  off of BriaAndChrissy LLC's concept and content, keeping all of the monetary and distribution

5  value for themselves, to the financial detriment of BriaAndChrissy LLC, Defendants' direct

6  competitor.

7          181.    In furtherance of their anticompetitive and discriminatory attack on this  Plaintiff,

8  Defendants also engaged in "unsubscribing" viewers who had existing subscriptions to the

9  BriaAndChrissy and Wonder Warrior channels. Specifically, Defendants began deleting

10  longstanding subscriptions of viewers who watch Plaintiffs' content, making those subscriptions

11  disappear without warning.  Because many of its subscribers and audience were deterred by

12  having to constantly re-subscribe to BriaAndChrissy LLC's channels over and over again, this

13  Plaintiffs' viewership and subscription rates were fraudulently and unfairly reduced to levels well

14  below the level which had existed prior to Defendants' unlawfully unsubscribing of viewers to

15  BriaAndChrissy and/or WonderWarriors.  Many subscribers have continued to complain

16  throughout September and October that Google/YouTube are deleting their subscriptions to the

17  channel and not allowing them to re-subscribe.  Other subscribers are complaining that when they

18  visit the BriaandChrissy channel, they cannot find new videos which were uploaded, and even

19  when they learn through other social media platforms that new BriaAndChrissy videos have been

20  posted to the channel, the videos do not appear on the channel or in YouTube searches.  As a

21  result of this unlawful conduct, Defendants caused this Plaintiff to lose its substantial viewer base

22  and revenues derived from an audience that BriaAndChrissy LLC alone, had built up over the past

23  seven years.

24          182.    Defendants also unilaterally cancelled or stopped sending electronic notifications of

25  new videos that Plaintiff BriaAndChrissy LLC had uploaded to its channels, without providing

26  any notice to Plaintiff, its subscribers, or YouTube consumers.

27          183.    As a result of Google/YouTube's ever changing new video notification practices,

28  BriaAndChrissy LLC's  existing subscribers and loyal viewers not get new video notifications no

1   matter how many times that they succeed in learning about Google/YouTube's secret new

2   procedures and comply:  Defendants just change the process again.  Defendants' bait-and-switch

3   notification practices, harmed BriaAndChrissy LLC's ability to generate continued interest among

4   its existing subscribers, prevented them from reaching new viewers who would be attracted by

5   video comments posted by subscribers.  Defendants' conduct has caused BriaAndChrissy LLC's

6   numbers of subscribers and views to decline to a marked degree.  Defendants' practices are

7   making it is impossible for BriaAndChrissy LLC to consistently generate sufficient views per

8   video to meet Defendants' monetization requirements and, consequently, caused this Plaintiff to

9   lose substantial revenue to Defendants.

10          184.    Beginning on or around 2017, without any notice or explanation, Defendants

11   deleted many of Plaintiffs' customized Thumbnails identifying BriaAndChrissy LLC's channels

12   and content, and replaced them with Defendants' own generic Thumbnails that harm and

13   stigmatize Plaintiffs' brand and content by giving viewers the impression that the video uploaded

14   was of poor quality and/or posted by someone who does not have the following, goodwill, and

15   quality associated with BriaAndChrissy LLC's reputation and content quality.

16          185.    In 2017, Defendants also demonetized individual videos posted by BriaAndChrissy

17   LLC, such as http://youtube.com/watch?v=yIDaCdjDodM, a video about being comfortable in

18   your own skin.  In 2018, Defendants demonetized the entire WonderWarriors channel without any

19   notice, explanation or an opportunity to respond and fix the monetization issues, if any.  In so

20   doing, Defendants harmed the ability of BriaAndChrissy LLC and other  creators to generate a

21   financial return on their videos and unlawfully restrained, if not eliminate entirely, the ability of

22   BriaAndChrissy LLC to earn revenue on content associated with its channels.

23          186.    Defendants also exclude  related content from the "Up Next," application that

24   appears on the BriaAndChrissy and WonderWarriors channels.  Defendants refuse to recommend

25   or to promote video content that is associated with tag words like ","  "lesbian," "gay," "bisexual,"

26   "transgender," or "queer," or content that is associated with titles or descriptions using such terms.

27   **Defendants engage in this discriminatory, anticompetitive, and unlawful practice, while**

28   **simultaneously promoting and recommending reaction videos by other creators which are**

1   **based upon or copy videos uploaded by BriaAndChrissy or WonderWarriors which**

2   **Defendants have restricted or demonetized.**  As a result,  creators like BriaAndChrissy LLC

3   must self-censor and refrain from using such words for videos to avoid running afoul of

4   Defendants' subjective and unlawful censorship practices.  Such self-censorship forced upon

5   BriaAndChrissy LLC is yet another unfair and unlawful tactic that discriminates against, and

6   makes it harder for members of the  Community to find -related content intended to support,

7   educate and entertain  consumers on YouTube.

8          187.    And as they do to many of their competitors, Defendants indiscriminately and

9   unlawfully apply the "Restricted Mode" limitations for "sensitive viewers," to BriaAndChrissy

10  LLC's videos, as well as to videos of many other  members of the YouTube Community, solely

11  because  content creators discuss viewpoints or topics that Defendants' filtering tools and practices

12  "flag" as "," "lesbian," "gay," "bisexual," "transgender," or "queer."  As is Defendants'

13  continuing custom, practice, and policy, Google/YouTube "flag"  content as "inappropriate," even

14  though the actual content does not violate YouTube's Community Guidelines, Restricted Mode

15  criteria, or any other content-based regulations.  Thus, Defendants stigmatize many of

16  BriaAndChrissy LLC's videos, including content which addresses suicide prevention, addiction

17  treatment, bullying, or healthy lifestyles, as "inappropriate" for what Defendants call "sensitive

18  audiences," merely because BriaAndChrissy LLC's owners identify as a legally married lesbian

19  couple.

20         188.    Defendants also misapply age restrictions to this  Plaintiff, limiting BriaAndChrissy

21  LLC's videos to viewers 18 years of age or older, regardless of the actual content of the video.  As

22  they do in applying their Restricted Mode, Defendants use A.I. and other machine-based filtering

23  tools to flag tags, titles, descriptions, or content that Defendants deem to be "," "lesbian," "gay,"

24  "bisexual," "transgender," or "queer."  As a result, many of the videos created by BriaAndChrissy

25  LLC to support younger members of the  Community who are experiencing bullying, persecution

26  and/or abuse, many of whom reside in rural areas where mental health and social services are hard

27  to access, cannot view the very materials designed to provide them with support and educate them

28  about resources where help may be obtained.

189.   Defendants also engage in advertising practices which are designed to discourage more sensitive members of the Community from viewing the videos posted on BriaAndChrissy or WonderWarriors.  Among other practices, Defendants sell and profit from ads sponsored by extremist groups who viciously and violently target gay marriage and the Community in general. Defendants permit these hate mongers to display these obscene ads before content of creators like BriaAndChrissy LLC is played in order to scare and threaten viewers and intended audiences from watching BriaAndChrissy LLC's videos.  Such gay bashing ads effectively negate any positive message embodied in the video by turning away the audience before they view the video. When BriaAndChrissy posted a video addressing the anti- agenda of Chick-fil-A, Defendants began loading anti- Chick-fil-A ads which played before BriaAndChrissy videos.

190.   Defendants' monetization treatment of BriaAndChrissy's videos is haphazard at best.  Most recently, when BriaAndChrissy's video "Ten Ways To Know You're In Love," was uploaded, Defendants immediately demonetized the video.

| | Video | Visibility | Monetization | Date | Views | Comments | Likes (vs. dislikes) |
|---|---|---|---|---|---|---|---|
| ☐ | 10 Ways to Know You're in LOVE! (Do you ... DO YOU WANT A BABY? Huge thank you to XYTEX for sponsoring this, and YOU can have ... 8:51 | ⊙ Public | $ Limited Not suitable for m... Under review | Aug 8, 2019 Published | 1,297 | 17 | 97.0% 164 likes |

Just hours later on the same day, the video appeared fully monetized.

191.   As demonstrated below, Google/YouTube subject many of BriaAndChrissy videos to censorship resulting in reduced advertising revenue being produced by each video, compared with similar videos uploaded by creators who are do not identify as part of Community, despite the fact that the videos do not include scenes of graphic violence, graphic sexual content, nudity, or descriptions of sexual acts.

| Plaintiffs' Videos | YouTube Status | Comparable Videos By Others | YouTube Status |
|---|---|---|---|
| "Lesbian Condom Challenge," posted May 2017; generated 90,000 views; https://www.youtube.com/watch?v=kUiELFvLPyM | Age Restricted; Limited Monetization | "The Ultimate Condom Test," posted August 2016, generated 7.5 million views; https://www.youtube.com/watch?v=ZULIT2YDu_E | No Restrictions; Full Monetization |

| Plaintiffs' Videos | YouTube Status | Comparable Videos By Others | YouTube Status |
|---|---|---|---|
| "Sexy Athletes," posted June 2014; generated 157,000 views: https://www.youtube.com/watch?v=yTCaO3dmOjU | Age Restricted; Limited Monetization | "The Hottest Female Athletes 2019," posted April 2019, generated 318,000 views; https://www.youtube.com/watch?v=ppf6qp3bVb8 | No Restrictions; Full Monetization |
| "Confronting My Bully," posted March 2019, generated 27,000 views; https://www.youtube.com/watch?v=Xq-P64GAXY8 | Limited Monetization | "Confronting Online Bullies Face To Face," posted September 2019, generated 193,000 views; https://www.youtube.com/watch?v=t4bNGLE5De4 | Full Monetization |
| "Revenge Porn And Lawsuit Impact Statement," posted February 2019, generated 9 views; https://www.youtube.com/watch?v=1Fv9BuwLijo | Limited Monetization | "'Revenge' porn' site founder defends site, posted April 2012, generated 22,000 views; https://www.youtube.com/watch?v=mO_o1FBK8qI | Full Monetization |
| "The Gross Tongue Challenge," posted December 2018, generated 102,000 views; https://www.youtube.com/watch?v=Hsdz1Gy22bQ | Restricted Mode; Limited Monetization | "Tongue Kissing Make Out Challenge w/ Jordyn Jones & Josh Killacky," posted October 2018, generated 580,000 views; https://www.youtube.com/watch?v=BVGO3kHgvTU | Full Monetization |
| "I Almost Died My Side of the Story," posted August 2018, 165,000 views; https://www.youtube.com/watch?v=05dvHnDhLz0 | Limited Monetization | "I almost Died Last Night," posted June 2019, generated 2.1 million views; https://www.youtube.com/watch?v=lFiqD9coEDU | Full Monetization |
| "10 Worst Kisses," posted June 2018, generated 1.7 million views; https://www.youtube.com/watch?v=QbLMHb_CQAA | Limited Monetization | "Couples Try Kissing With Their Eyes Open," posted 2017, generated 2.9 million views; https://www.youtube.com/watch?v=fFHAB82u-nQ | Full Monetization |
| "I got My First tattoo," posted September 2017, generated 132,000 views; https://www.youtube.com/watch?v=WsSIBlEiQRo | Limited Monetization | "Pewdiepie Butt Tattoo Reaction," posted January 2016, generated 11.5 million views; https://www.youtube.com/watch?v=r-bd7iDnE6M | Full Monetization |

| Plaintiffs' Videos | YouTube Status | Comparable Videos By Others | YouTube Status |
|---|---|---|---|
| "We don't Like To Kiss," posted March 2017, generated 25,000 views; https://www.youtube.com/watch?v=_hESANEM-Sk | Limited Monetization | "Guys Kiss Guys for the First Time," posted December 2014, generated 9.7 million views; https://www.youtube.com/watch?v=d5ci_VlRcig&t=1s | Full Monetization |
| "10 Lesbian Nightmares," posted January 2017, generated 87,000 views; https://www.youtube.com/watch?v=lEgEDasPips | Limited Monetization | "My First Time Putting on a Condom," posted September 2019, generated 267,000 views; https://www.youtube.com/watch?v=nYIuufoClO8 | Full Monetization |
| "Touch My Body Challenge," posted January 2017, generated 743,000 views; https://www.youtube.com/watch?v=skf33gjLef0 | Limited Monetization | "Wild Touch My Body Challenge With Girlfriend," posted June 2019, generated 152,000 views; https://www.youtube.com/watch?v=PN0oYzD8_zg | Full Monetization |
| "I have PTSD," posted July 31, 2016, generated 189,000 views; https://www.youtube.com/watch?v=fokQral-HTU | Limited Monetization | "COMPLEX PTSD - Post-Traumatic Stress Disorder," posted April 2015, generated 237,000 views; https://www.youtube.com/watch?v=_qIAZcOryl4 | Full Monetization |
| "Men French Kiss Men For First Time," posted September 6, 2016, generated 4.6 million views; https://www.youtube.com/watch?v=ETwZ74337Kg | Limited Monetization | "Guys Kiss Guys for the First Time," posted December 2014, generated 9.7 million views; https://www.youtube.com/watch?v=d5ci_VlRcig&t=1s | Full Monetization |
| "Most Homophobic Celebrities," posted June 2015, generated 204,000 views; https://www.youtube.com/watch?v=O6wGBnY9gTA | Limited Monetization | "Alec Baldwin -- Homophobic Rant #73," posted June 30, 2013, generated 35,000 views; https://www.youtube.com/watch?v=faqPP1X5kzc | Full Monetization |

| Plaintiffs' Videos | YouTube Status | Comparable Videos By Others | YouTube Status |
|---|---|---|---|
| "Buzzfeeds already done it," posted March 2015, generated 179,000 views; https://www.youtube.com/watch?v=rPO0ekLHvOs | Limited Monetization | "10 Creators Who Had Their Content Stolen By Buzzfeed," posted June 2019, generated 64,000 views; https://www.youtube.com/watch?v=2aekPAwUhzo | Full Monetization |
| "Shocking Super Bowl Commercial 2015 (GAY KISS)," posted January 2015, generated 6.8 million views; https://www.youtube.com/watch?v=--aMixRk1ZY | Limited Monetization | "Banned Carl's Jr Superbowl Commercial (Parody)," posted February 2014, generated 166,000 views; https://www.youtube.com/watch?v=8_ux5T-3GpI | Full Monetization |
| "I hate Fags," posted June 2014, generated 249,000 views; https://www.youtube.com/watch?v=5XJM2eFxAgg | Demonetized | "God Hates a Fag Music Video HD," posted August 2009, generated 225,000 views; https://www.youtube.com/watch?v=BREvUu4wI-4 | Full Monetization |
| "Couples Therapy," posted November 2014, generated 119,000 views; https://www.youtube.com/watch?v=CwPmtcd9KL4 | Demonetized | "When couples therapy Gets REAL," posted December 2018, generated 2.6 million views; https://www.youtube.com/watch?v=Ycjtow-lNA4 | Full Monetization |
| "How Couples really Act," posted June 2014, generated 2.6 million views; https://www.youtube.com/watch?v=rUamtkf4ixg | Demonetized | "Weird Things All Couples Do," posted August 2014, generated 6 million views; https://www.youtube.com/watch?v=HFQBIK__X14 | Full Monetization |
| "10 Worst Kisses," posted April 2014, generated 25.5 million views; https://www.youtube.com/watch?v=bwMQlpvLsO4 | Demonetized | "The 10 Worst Kisses in the Universe," posted April 2013, generated 9.9 million views; https://www.youtube.com/watch?v=tKvHQ5l8iXw | Full Monetization |
| "10 worst Hugs," posted May 2014, generated 10.5 million views; https://www.youtube.com/watch?v=eS-XtPeJQTc | Demonetized | "Worst Hug Ever," posted June 2019, generated 385,000 views; https://www.youtube.com/watch?v=xeNz0uaxia8 | Full Monetization |

| Plaintiffs' Videos | YouTube Status | Comparable Videos By Others | YouTube Status |
|---|---|---|---|
| "I hate Gays Dear FireFox," posted April 2014, generated 108,000 views; https://www.youtube.com/watch?v=0eV_ddXgg38 | Demonetized | "Eddie Murphy:  Fag and HIV jokes," posted March 2009, generated 45,285 views; https://www.youtube.com/watch?v=c1x0MBLKlrk | Full Monetization |
| "50 Facts (100th video)," posted March 2014, generated 196,678 views; https://www.youtube.com/watch?v=pYQEaz1td0U | Demonetized | "50 Facts About Us: Cody & Lexy," posted February 2018, generated 178,000 views; https://www.youtube.com/watch?v=RrT9l1ulMvI | Full Monetization |
| "Cotton Ball Challenge," posted September 2013, generated 71,000 views; https://www.youtube.com/watch?v=yTQN7l5vf_o | Demonetized | "Family Cotton Ball Challenge," posted November 2016, generated 780,000 views; https://www.youtube.com/watch?v=Ab_220M5EVo | Full Monetization |
| "10 Things Lesbians are Afraid of," posted August 2013, generated 7.6 million views; https://www.youtube.com/watch?v=V9VABvh7kRw | Demonetized | "Condom Challenge," posted January 2016, generated 1.4 million views; https://www.youtube.com/watch?v=vy6Vak6OPlI | Not Restricted; Full Monetization |
| "Picking up a Stranger Prank," posted July 2013, generated 147,000 views; https://www.youtube.com/watch?v=5p2KZUoC7FI | Demonetized | "Picking Up Strangers Girlfriends in Front of Their Boyfriends," posted April 2019, generated 37,000 views; https://www.youtube.com/watch?v=zWHMZZkZ1bk | Full Monetization |
| "Lesbian Q&A Part 3," posted May 2013, generated 195,000 views; https://www.youtube.com/watch?v=FcCQ2cocF0w | Demonetized | "Q&A with my Boyfriend," posted July 2019, generated 161,000 views; https://www.youtube.com/watch?v=h2-u7S2khTY | Full Monetization |
| "11 Crazy Youtube Challenges," posted May 2013, generated 398,000 views; https://www.youtube.com/watch?v=Nntzx3GpuQk | Limited Monetization | "I tried 10 Crazy Challenges for 10 Million Subscribers," posted September 2019, generated 3.6 million views; https://www.youtube.com/watch?v=qnqknRJ3WPs | Full Monetization |

**THIRD AMENDED CLASS ACTION COMPLAINT**

| Plaintiffs' Videos | YouTube Status | Comparable Videos By Others | YouTube Status |
|---|---|---|---|
| "The Girlfriend Tag," posted April 2013, generated 224,000 views; https://www.youtube.com/watch?v=1DaTezPKwm0 | Limited Monetization | "Boyfriend vs. Girlfriend Tag," posted April 2017, generated 3.5 million views; https://www.youtube.com/watch?v=8jinyoofAeM | Full Monetization |
| "Our Bullying Story," posted January 2013, generated 105,000 views; https://www.youtube.com/watch?v=Zv0mZ43wtxs | Limited Monetization | "Confronting Internet Bully Cody Ko," posted May 2019, generated 4.3 million views; https://www.youtube.com/watch?v=xf7vX3D8_ME | Full Monetization |
| "Stop Birthing Gays Song," posted January 2013, generated 164,000 views: https://www.youtube.com/watch?v=PvIAd0Rkiyk | Limited Monetization | "Christian vs. Westboro Baptist 'God Hates Fags,'" posted May 2012, generated 300,000 views; https://www.youtube.com/watch?v=ehjWWgdrY_Q | Full Monetization |

192.    Defendants also engage in outright censorship of content, including that of BriaAndChrissy LLC.  On June 21, 2015, Defendants censored one a video on the BriaAndChrissy channel which discussed the actions and statements of celebrities who expressed homophobic views or slurs, without providing any notice, explanation or opportunity to address any concern that Defendants might have.  And like the other Plaintiffs, BriaAndChrissy LLC support the right of free speech and expression for all Community Members, as long as that right is not co-extensive with the promotion of anti- hate speech for profit in violation of Community Guidelines or other rules on YouTube, nor is it a basis for using those same rules to censor, restrain, demonetize, and/or squelch content or engagement on the platform.

193.    Finally, in August 2019, Defendants commenced disabling the comments sections for a number of BriaAndChrissy videos.  Plaintiffs BriaAndChrissy LLC, Bria Kam and Chrissy Chambers have been informed by Defendants and believe and thereon allege that Defendants have disabled comments sections because they believe that they are "protecting minors."

It is unclear from Defendants' message whether the comments sections are being disabled because third parties have posted hate speech and anti-gay comments, or to prevent minors themselves from posting comments and generating hate speech and anti-gay comments, or to prevent minors from encouraging other minors from viewing the video content.  The affected videos do not depict children or minors in the video content, and have not generated the kind of inappropriate comments about small children which prompted Google/YouTube to remove the comments sections from creators' channels posting videos of young children engaged in gymnastics or swimming practice and/or competitions.  The disabling of the comments sections for the new videos prevents the new content from generating favorable comments which amplify the reach of the video beyond BriaAndChrissy's subscribers, and cause videos to go viral, thereby substantially reducing the potential for generating revenue for the affected videos.

194.    Defendants' unlawful and anticompetitive attack on  Plaintiff BriaAndChrissy LLC has achieved its intended result of reducing monthly revenues of $3,500 that had generated in 2016, to $809 in July, $694 in August, $462 in September and $423 in October of 2019 for this popular  content creator who directly competes with Defendants for  subscribers and viewers on the YouTube Platform.

195.    Additionally, for two years, this Plaintiff was generating up to $8,000 for each of its sponsored videos, but now receives on average only $800 per sponsored video. BriaAndChrissy LLC is offered less for each performance and appearance, and has been offered fewer travel opportunities.  Not only are the revenues generated by sponsored videos reduced, but fewer and fewer companies are offering sponsorships and brand deals due to depressed viewer

1   numbers.  Defendants' conduct has not only deprived this  Plaintiff of being able to monetize its

2   content at levels that permit continued reinvestment in new content production but ensures that

3   Defendants can increase their own share of corporate revenues and profits from Plaintiffs' content,

4   or from content which Defendants sponsor in direct competition with Plaintiffs.

5                      **3.      Chase Ross**

6          196.    Plaintiff Chase Ross is the creator and owner of UppercaseCHASE1, a YouTube

7   channel created to support members of the  Community in general and transgender people

8   specifically by uploading sexual education, transgender education, and transgender product review

9   videos, as well as allies, who are supporting members of the non- Community who have relatives

10  and family dealing with transgender issues.  Mr. Ross has a degree in sociology and a minor in

11  interdisciplinary studies of sexuality; he also received a master's degree in sociology in 2018.

12  Starting in 2006, Mr. Ross created video content that was posted on YouTube in various names,

13  including "ellendegeneres26," "ChaseRoss73," "FTMTranstastic," "MightTMenFTM,"

14  "MightierMenFTM," and "itsTtime2010."  Commencing in 2010, Mr. Ross started uploading

15  video content on the UppercaseCHASE1 YouTube channel, with new content posting each month,

16  and over the years increasing to weekly or bi-weekly depending on his available time and the

17  subject matter of the video content.  In 2017, Mr. Ross created the "Trans 101" series of videos

18  designed to educate the public, including transgender individuals, about issues confronting

19  transgender individuals.  UppercaseCHASE1 has uploaded 753 videos in all, generating 20.2

20  million total views with 163,000 subscribers.  By 2019, UppercaseCHASE1 was generating

21  between 20 and 50,000 views for each new video uploaded to the channel, and generating $10,800

22  Canadian dollars annually in revenue.  Earnings for this year are projected to be $400-$1,000

23  range.

24         197.    Commencing within the past two years, Defendants have harmed

25  UppercaseCHASE1 by employing many of the same strategies applied to BriaAndChrissy, and

26  WonderWarriors:

27         198.    Mr. Ross is a victim of "unsubscribing" existing subscriptions to

28  UppercaseCHASE1.  Subscribers have informed Mr. Ross via Twitter and email that their existing

**THIRD AMENDED CLASS ACTION COMPLAINT**

1    subscriptions have disappeared without notification or explanation, forcing fans to re-subscribe.

2        199.    Defendants also deleted and/or failed to provide content notifications for Mr. Ross'

3    subscribers of his channel and intended audiences.  Specifically, Defendants imposed these

4    restrictions on UppercaseCHASE1 by requiring existing subscribers to specifically click on a bell

5    icon in order to receive electronic notifications when UppercaseCHASE1 posts new videos which

6    has adversely affected the channel's view numbers.  And, UppercaseCHASE1 has received

7    complaints via Twitter and email from former subscribers who no longer receive Defendants'

8    notifications for new content uploaded to the UppercaseCHASE1 channel.  The new practice has

9    substantially reduced the views per new posted video on the UppercaseCHASE1 channel,

10   resulting in reduced revenues.

11       200.    Defendants also engage in stripping UppercaseCHASE1's custom Thumbnails

12   from search results for many of the channel's subscribers and for new viewers.  Some viewers

13   report as few as 20% of the videos for the UppercaseCHASE1 channel have visible custom

14   Thumbnails.

15       201.    Defendants have also "Demonetized " many UppercaseCHASE1's videos under the

16   discriminatory, fraudulent, and unlawful pretext that the content violates YouTube's Community

17   Guidelines or other vague, overly broad, subjective, or meaningless content-based regulations.

18   And despite Mr. Ross' appeals and repeated requests for more guidance regarding the bases of its

19   decisions to demonetize specific videos, Defendants have provided no reasonable response or

20   basis for their decisions.

21       202.    Defendants also exclude UppercaseCHASE1's content from the Defendants'

22   recommended content on the "Up Next," application for the channel for no viable reason, while

23   allowing the content of other creators, as well as that created or financially preferred by

24   Defendants to appear, including homophobic and anti- content.

25       203.    And, as it does to other members of the  YouTube Community, Defendants

26   indiscriminately apply the "Restricted Mode" limitations for "sensitive viewers," to many of

27   UppercaseCHASE1's videos, regardless of whether the actual content includes graphic sexual

28   images or content, or discussions regarding transgender issues.  For example, videos consisting of

Mr. Ross engaging in editorial comment in front of a blank wall discussing events, festivals or conventions have been restricted and do not appear in searches performed in "Restricted Mode," despite the fact that there is no sexual content and no discussion of transgender issues.

        a.       Viewers enabling the "Restricted Mode," conducting searches for UppercaseCHASE1 videos see this :



Only 2 of the UppercaseCHASE1 videos posted in the past year appear in searches where "Restricted Mode," is enabled.

        b.       Viewers who do not enable the "Restricted Mode," when searching for UppercaseCHASE1 videos see this:



**THIRD AMENDED CLASS ACTION COMPLAINT**

1        204.    Many videos are restricted regardless of content merely because of Mr. Ross'

2  identity as a transgender individual.  The Defendants' "Restricted Mode" filters generally appear

3  the first weekday after a new video is uploaded to the UppercaseCHASE1 channel.  By employing

4  "Restricted Mode," Defendants have successfully limited viewer access to the general public to

5  each of the new videos which UppercaseCHASE1 has posted in 2019.  Defendants have even

6  applied the "Restricted Mode," to a video which features Mr. Ross doing nothing more than

7  drinking tea and endorsing tea for self-care and stress reduction.

8          a.     In the first video, (which can be viewed by using the link:

9          https://youtu.be/rccjNF3dEpA) Mr. Ross appears seated on the screen with a black mug

10          and a white cat in the foreground, and a kitchen scene in the background.  In the video Mr.

11          Ross extolls the virtues of drinking tea for LGBT "self-care," and explains that LGBT

12          includes "lesbian," "gay," "bisexual," "transgender," and "queer."  There is no sexual,

13          political or obscene or vulgar content in the video at all.  When he uploaded the video, Mr.

14          Ross did so "unlisted," so that it does not appear on UppercaseCHASE1 channel.  Mr.

15          Ross tagged the video with the terms "LGBT," "lesbian," "gay," "bisexual," "transgender,"

16          and "queer."  He used these terms in the description and used "LGBT" in the title.

17          b.     In the second video, (which can be viewed by using the link:

18          https://youtu.be/qfFIl_ECxnI) the identical video content appears.  When the second video

19          is uploaded, it is loaded as "unlisted," and does not appear on the UppercaseCHASE1

20          channel.  Mr. Ross tagged this video only with the terms "product review," and "tea."  The

21          description is "tea product review."  Only the title includes "LGBT."

22  Though the videos consists solely of a monologue about tea by Mr. Ross, he says the terms

23  "LGBT," "lesbian," "gay," "bisexual," "transgender," and "queer."  The use of these words in the

24  video content appear to be sufficient to prevent the videos from being viewed when "Restricted

25  Mode" is engaged.

26        205.    Mr. Ross produces videos consisting of product reviews intended for a transgender

27  audience featuring products which are especially relevant to his audience.  Mr. Ross has reviewed

28  a number of prosthetic devices created for individuals suffering from gender dysphoria, which

1    resemble male genitalia, along with "pouches" used to hold the prosthetics in place against the

2    body.  These pouches range from simple fabric pockets with strings to tie them into place, to more

3    elaborate underwear styled models with pockets for the prosthetic devices.

4              a.       Defendants routinely censor UppercaseCHASE1's product reviews of

5    "pouches" whether they are simple fabric pouches or more elaborate modified undergarments so

6    that they do not appear in "Restricted Mode."  Viewers searching for "UpppercaseCHASE1

7    pouches" with Restricted Mode engaged will see only:

8

9

10

11                          

12

13

14

15

16              b.       Viewers searching for UppercaseCHASE1 pouches" without enabling

17    "Restricted Mode" will see product reviews which include the entire range of products reviewed

18    by Mr. Ross.

19

20

21

22

23                          

24

25

26

27              c.       Defendants do not censor other transgender pouch product reviews posted

28    by other video creators in the same way.  Viewers searching for "Pouch Packers," with Restricted

1  Mode enabled will see:



10  Viewers searching for "Pouch Packers" will see the Thumbnail for a DYI pouch packer (which

11  can be viewed using the link https://www.youtube.com/watch?v=kid7Ull6DgE), and a Thumbnail

12  for a Joey Pouch Packer (which can be viewed using the link

13  https://www.youtube.com/watch?v=QtLBCHoBqTs) each of which includes images of prosthetics

14  and the use of fabric pouches that are similar to those appearing in Mr. Ross' videos which

15  Defendants routinely censor when Restricted Mode is enabled.

16      206.    Defendants also misapplied YouTube's age restrictions policy to

17  UppercaseCHASE1's videos, limiting videos to viewers 18 years of age or over, regardless of the

18  content.  While many videos on the channel dealing with product reviews for prosthetics, or

19  frankly discussing sexual issues experienced by transgender individuals, are not suitable for

20  younger audiences, Defendants have applied age restrictions to videos which do nothing more than

21  illustrate a piece of fabric, without context or reference to the function or prospective use.

22      207.    Defendants also censored UppercaseCHASE1's -related content by removing

23  videos from its platform without explanation and imposing use restrictions on the channel.  In one

24  instance, Defendants removed a video which had been uploaded for six years without issue, for

25  which no age restriction had been imposed, and which was fully monetized.  Mr. Ross was unable

26  to post new content, livestream or use the account for a month before Defendants addressed his

27  complaints.  It was only after Mr. Ross took to Twitter complaining about the removal of the video

28  that Defendants addressed his complaints.  Within two weeks of posting his complaints on

**THIRD AMENDED CLASS ACTION COMPLAINT**

1    Twitter, YouTube reinstated the account, released the video, and admitted that it had taken the
2    adverse action in error.  However, in mid-July of 2019, Defendants again suspended the account
3    merely for posting a link to "Gendercat.com" in violation of YouTube's community guidelines.
4    Again, in response to Mr. Ross' complaints, Defendants admitted they had acted in error and
5    assured Mr. Ross that it would not happen again.

6        208.    Like other  Plaintiffs and members of the  Community, UppercaseCHASE1 has
7    been the victim of numerous disparaging and hate speech-filled reaction videos which appear
8    when viewers search for "UppcercaseCHASE1," videos.  These hate speech reaction videos also
9    appear in the Defendants' recommended videos in the "Up Next" application for the
10   UppercaseCHASE1 channel.  Some of the reaction videos appear to be monetized, despite the fact
11   that UppercaseCHASE1's video has been demonetized by Defendants, resulting in hate speech
12   which copies the original video of UppercaseCHASE1 generating money, while at the same time,
13   Defendants refuse to allow the creator himself from realizing any financial gain from his own
14   work.

15       209.    As averred above, Mr. Ross and Plaintiffs support the right of free Speech and
16   expression for all YouTube Community Members, but that right does not  mean that Defendants
17   get to promote anti- hate speech by exempting it from the same content-based restrictions and
18   distribution restraints that are used to suppress the right of the  Community to speak back and
19   distribute  content on a level and equal playing field.  And it certainly does not give Defendants
20   carte blanche discretion to censor, restrain, demonetize, or otherwise squelch  Community content
21   and engagement that is compliant with Defendants' content-based regulations and practices.

22                 **4.        Brett Somers a/k/a AMP (Watts The Safeword)**

23       210.    Plaintiff Brett Somers, also known as AMP, is the creator and owner of Watts The
24   Safeword, a YouTube channel dedicated to developing and posting sexual education materials
25   which include both  and non-traditional practices, as well as discussing events, conventions, and
26   issues relevant to the  Community.  Mr. Somers has a degree in art design, and is trained to use
27   video and photographic software applications, as well as to create computer code for gaming,
28   which he did professionally for a number of years.

211.    On May 25, 2014, Mr. Somers started the Watts The Safeword channel on YouTube.  A week or two later, he uploaded the first video.  Thereafter, on average, Mr. Somers uploaded a new video on a bi-weekly basis.  As of last year, Mr. Somers had uploaded 227 videos to the Watts The Safeword channel on YouTube; had generated 1.3 million views, and had 193,000 subscribers.  Watts The Safeword generated $5,751.00 in just one month, November 2018.  However, since that highpoint, as a result of Defendants' strategies, Watts The Safeword generates only $200-$300 monthly from YouTube.  This Plaintiff's channel no longer is able to generate 30,000 – 40,000 new subscriptions on a regular basis, as it did in 2018.  Watts The Safeword's views have become sporadic, inconsistent, and unpredictable.

212.    Commencing within the past two years, Defendants harmed and continue to harm Watts The Safeword by employing many of the same strategies it has applied to other  Plaintiffs and putative members of the  Community Class.

213.    Defendants have been and continue to strip Watts The Safeword's custom Thumbnails from search results for most of its videos.  This strategy is not applied based upon the content of the videos, because Mr. Somers often collaborates with other  creators and has seen collaborative videos posted to the collaborator's channel bearing the custom Thumbnails, while the identical video posted to Watts The Safeword's channel have had the custom Thumbnails stripped by Defendants.

214.    Defendants have and continue to "Demonetize" many of Watts The Safeword's videos on grounds that they purportedly fail to comply with community standards, and have refused to reverse their decisions despite Mr. Somers's appeals and repeated requests for more guidance regarding the bases of their decisions to demonetize specific videos.

215.    Defendants indiscriminately use their "Restricted Mode" filters and limitations and place to nearly all of Watts The Safeword's videos into that viewer restraint.  Defendants do this for arbitrary, capricious, discriminatory anticompetitive, and other unlawful reasons by restricting Mr. Somers' videos regardless of whether the actual content violates Defendants' Community Guidelines or other content-based regulations or standards.  For example, videos consisting of Mr. Somers discussing his experience traveling to events, festivals or conventions have been restricted

1   and do not appear in searches performed in "Restricted Mode," despite the absence of any content

2   involving sexually explicit, practices, or activities.  Like the other  Plaintiffs, Mr. Somers Watts

3   The Safeword's videos are restricted regardless of content merely because Mr. Somers' expresses

4   viewpoints, discusses topics, or affiliates with the members of the  Community.  In August 2019,

5   Defendants restricted videos of Mr. Somers doing nothing more than drinking tea and

6   recommending tea for self-care, while leaving unrestricted countless videos posted by other

7   YouTube creators doing the very same thing.

8       216.    Defendants also misapplied age restrictions to Watts The Safeword's videos,

9   limiting videos to viewers 18 years of age or over, regardless of the actual content of the video.

10  While many videos on the channel dealing with sex and include graphic sexual images are not

11  suitable for younger audiences, Defendants have applied age restrictions as a one-size-fits-all,

12  eschewing their contractual and legal obligations to review the content of each and every video so

13  that travel videos about  events and issues, festivals and conventions are not stigmatized and

14  restricted as inappropriate merely because they discuss or mention  persons or topics.

15      217.    Google/YouTube's censorship tools treat  videos, like those posted by Watts The

16  Safeword more harshly, resulting in its videos generating far fewer views than similar videos

17  posted by creators who do not identify .  As a result of the more stringent censorship applied to

18  members of the  Community, videos posted by Watts The Safeword generate far less revenue than

19  those videos posted by creators who do not identify .

20

| Plaintiff's video | YouTube Status | Comparable videos | You Tube Status |
|---|---|---|---|
| "Kinky Wish Shopping Haul," posted September 2018; generated 1.3 million views https://www.youtube.com/watch?v=Ppk9Ms1SflE&t=134s | Age Restricted; Limited Monetization | "Fiance Rates My Very Extra Wish Clothing," posted March 2019; generated 1.5 million views https://www.youtube.com/watch?v=S8kw9t7qf6c | Unrestricted; Limited Monetization; |
| | | "Mini Dress Try On," posted October 2018; generated 3.5 million views https://www.youtube.com/watch?v=Xgw4qHFwffI | Unrestricted; Limited Monetization |
| "Kinky Wish Shopping Haul 2" posted April 2019; generated 305,000 views: https://www.youtube.com/watch? | Age Restricted; Limited Monetization | "Trying on Bikinis from Wish Under $10," posted August 2019; generated 891,000 views | Unrestricted; Full Monetization |

| | | | |
|---|---|---|---|
| v=8c9oXDCDuYc&t=728s | | https://www.youtube.com/watch?v=S7Ro5MaIlFc | |
| "Mermaid Tie," posted October 2019 featuring a how to tie legs together; generated 27,474 views https://www.youtube.com/watch?v=QZDGgaAghR4&t=10s | Age Restricted on the day after it was posted; Demonetized without explanation despite YouTube representatives having stated that the video was monetized after conducting a manual review. | https://www.youtube.com/watch?v=6l-JuZx0070 | Unrestricted; Full Monetization |
| "Wish Halloween Try On Haul," posted October 2019; generated 30,014 views https://www.youtube.com/watch?v=9ZuwMlgtlmk | Not Age Restricted; Restricted Mode; Limited Monetization | "AMI Clubwear Sexy Halloween Costume Try On Haul," posted October 2018; generated 1.2 million views https://www.youtube.com/watch?v=1CNei4QdACE&t=224s | Not Age Restricted; Full Monetization |
| Plaintiff's video | YouTube Status | Comparable videos "Boyfriend Reacts to my Halloween Costumes," posted October 2019 by a creator whose channel describes her as a 15 year old; generated 782,000 views https://www.youtube.com/watch?v=XQsiqXLGOJQ&t=1s | You Tube Status Not Age Restricted; Full Monetization |
| | | "Boyfriend and his Friends Rater my Halloween Costumes," posted October 2019 by a creator whose channel describes her as a 15 year old; generated 394,000 views https://"www.youtube.com/watch?v=UWiFJTAINq0 | Not Age Restricted; Full Monetization |
| | | "New Hot Halloween Costume Try-On Haul," posted October 2019; generated 169,000 views https://www.youtube.com/watch?v=vFRW9vahDS0 | Not Age Restricted; Full Monetization |

218.    Defendants have also engaged in outright censorship of Watts The Safeword's -related content by removing videos from its platform without explanation and imposing age restrictions on the channel without regard to the content of the video uploaded.  In one instance, Defendants imposed age restrictions on Watts The Safeword's video featuring Mr. Somers talking about traveling to a convention while seated in a car.  The video contains no sexual graphics or content at all.  But Defendants did not restrict videos of the actual convention, featuring sex toys and other sexual content when posted by other creators, that were fully monetized for profit by

1   Defendants.

2        219.    Even when Defendants allow Watts The Safeword's videos to remain on the

3   platform, Google/YouTube prevent those videos from appearing in response to searches

4   performed by both subscribers and the public at large.  And like other  Plaintiffs, Mr. Somers has

5   received comments and tweets on the Twitter platform from viewers who have been unable to find

6   content uploaded by Watts The Safeword using the Defendants' search application.

7        220.    Defendants continue to restrain the innocuous travel videos of Watts The Safeword

8   under its Restricted Mode, age restrictions, and demonetization rules and practices, while allowing

9   objectively and sexually explicit content that Google/YouTube sponsor and/or profit from to run

10   unrestricted on the YouTube Platform.  For example, Defendants apply the Restricted Mode filter

11   to Watts The Safeword's video depicting rubber garments, where no bare buttocks are exposed at

12   all.  Nonetheless, Defendants sponsor and monetize explicit and sexualized video content

13   depicting bare buttocks, without any restrictions on a YouTube channel known as the James

14   Charles Channel.  The James Charles content depicts a sexually ambiguous young man who

15   creates and uploads videos demonstrating female-styled make-up techniques, nail care

16   demonstrations, and recommendations for make-up and personal care products.  One recent video

17   even features Mr. Charles at the Coachella Music Festival, acting as a "make-up guru."  Mr.

18   Charles is wearing a white G-string and chaps which cover his genitals but expose his bare

19   buttocks.



**THIRD AMENDED CLASS ACTION COMPLAINT**

The video also depicts Mr. Charles spanking the bare buttocks of another other festival attendee, who is wearing a similar G-string and chaps in black.



A second video from the Coachella Music Festival depicts Mr. Charles wearing a black G-string with pubic hairs visible.



While Plaintiffs take no issue and offer no view as to whether Defendants should or can regulate Mr. Charles' content, what Defendants cannot do is use their unfettered and absolute discretion to apply purportedly neutral viewpoint regulations that apply equally all users of YouTube as a discriminatory, fraudulent, anticompetitive, and unlawful pretext  to promote content that

-78

**THIRD AMENDED CLASS ACTION COMPLAINT**

1  Google/YouTube sponsors and restrict and harm that of its competitor, Mr. Somers.

2  **5.    Lindsay Amer (Queer Kid Stuff)**

3  221.    Plaintiff Lindsay Amer is the creator and owner of Queer Kid Stuff, a YouTube

4  educational channel created to serve as a support for  parents,  children between the ages of 3 and

5  17, who have questions or face bullying for perceived  status, and librarians and educators seeking

6  assistance with respect to how to field questions about  issues and support children affected by

7  issues.  Mx. Amer has an undergraduate degree in gender studies and theater; and a graduate

8  degree in performance studies.

9  222.    In 2015, they created the Queer Kid Stuff channel as a vehicle to upload their

10  original video content.  On May10, 2016, Mx. Amer uploaded the first Queer Kid Stuff education

11  video.  Initially, the video was shared and received roughly 2,000 views without negative

12  comments or reaction videos.  Within months of the uploading of the first video, the Huffington

13  Post published a favorable article discussing the video.

14  223.    On June 23, 2016, The Daily Stormer, a Neo Nazi website on that appears on

15  Defendant Google's search engine site published a commentary by Andrew Anglin entitled, "Sick

16  Dyke Creates Educational Program to Brainwash Children Into the Homosexual Lifestyle," which

17  quotes from the Huffington Post article, and bashes both Queer Kid Stuff and Ms. Amer:

18  "Lindsay Amer is a twisted lesbo who is obsessed with
psychologically abusing children, and has created an entire
19  'educational' program to teach children to become homosexual
perverts. . . .  [Homos] are always pushing for the ability to recruit
20  younger and younger victims into their sex-cult, and now, our
jewed-out society has reached the point where we are ready to show
21  their recruitment propaganda to pre-schoolers – in order to prove
we're not haters, of course. . . .  Please visit this creature on Twitter
22  and let her know what you think of her plot. . . .  Oh, and ask her if
she's Jewish."  A Anglin, Daily Stormer, June 23, 2016.

23  The article included a link to the Queer Kid Stuff Twitter account and Mx. Amer's personal

24  profile.

25  224.    The Daily Stormer commentary generated an avalanche of hate speech directed at

26  Mx. Amer and the Queer Kid Stuff channel.  The hate speech involved vicious and obscene anti-

27  Semitic, misogynist, and homophobic content, as well as other obscene material, and culminated

28

**THIRD AMENDED CLASS ACTION COMPLAINT**

in a death threat against Mx. Amer.  Defendants permitted all of that hate speech to appear directly in the comment section of Mx. Amer's Queer Kid Stuff channel.  And although Defendant Google finally removed The Daily Stormer from their platform in the fall of 2017, the hate speech directed at Mx. Amer continued unabated on the channel.

225.    As with the other Plaintiffs in this case, Mx. Amer supports the right of all to express their viewpoints in a civil and protected manner.  But Mx. Amer, and the other  Plaintiffs take serious issue with Defendants systematic efforts to restrain or financially harm Mx. Amer's content and their ability to defend and protect themselves on a platform that promises to treat everyone equally.  That is not the case here, because Defendants selectively apply their content-based regulations and filtering to promote and profit from homophobic hatemongers who are allowed to inundate Mx. Amer and other  channels when their content directly and objectively violates Defendants content-based rules that they claim exist only to "keep the platform safe" for all of the YouTube Community, including Mx. Amer and the other  members of that Community.

226.    On September 14, 2016, four months after Mx. Amer uploaded the first video to the Queer Kid Stuff channel, they uploaded the second video.  The four month delay between the first and second video was the direct result of the fear and chilling affect that the hate speech allowed and/or promoted by Defendants had on Mx. Amer.  Mx. Amer was and continues to be unable to remove that hate speech using Defendants' available filter tool.  Repeated attempts to handle the tidal waves of hate speech that Defendants continue to allow to be directed at the Queer Kid Stuff channel has also interfered with Mx. Amer's ability to reach and engage with their intended audience.

227.    In total, Queer Kid Stuff published 12 new videos between September 14, 2016 and January 27, 2017.  With the uploading of each new video, a new wave of hate speech filled the comments section of the channel.  For every positive comment that appeared, dozens of hate-filled comments appeared and pushed the positive comment down the queue so that viewers would only see hate-filled comments when they watched Queer Kid Stuff content.

228.    Despite repeated complaints to Defendants about the hate speech comments, and after devoting considerable efforts to reconfigure the Defendants' filters to screen them, a number

**THIRD AMENDED CLASS ACTION COMPLAINT**

of members of Queer Kid Stuff's intended audience, including parents, wrote to Mx. Amer complaining about the obscene hateful comments posted on the Queer Kid Stuff channel and informing Mx. Amer, that despite their approval of the intended content on the channel, these parents could not share the quality videos with their children, because it would expose the children to content which they deemed harmful and injurious.  One parent wrote:

> "I'm really glad that I ran into your channel today, as I found the videos to be easy enough for my 5 year old to enjoy and understand the content.  This really is a godsend for me, a trans demi girl who has major problems with panic attacks just trying to address the subject with them.
>
> The only thing that I wish would get addressed with your channel would be doing something with the comments section.  While it's great that there are some positive encouragement from some viewers, others turn it into a dumpster fire dipped in cancer.  I'm glad that my child can't read well enough to understand the comments, but I think other children will inherently get exposed to transphobic, ablest, and queerphobic nonsense that may undermine the positive message of the videos."

Another parent wrote:

> "My 7 year old son (who self-identifies as queer) is home from school today. . . We love your channel . . . I wanted to reach out because even though we watch your videos, I have a strict policy against reading YouTube comments.  YouTube suggested a bunch of hateful anti-queer videos in response to our watching yours, and as I went through the list to tell YouTube I am not interested in any of these, I ended up reading some of the comments.  How disheartening.  Talk about homophobia.  I am literally crying right now at some of these and am quite glad my son is in the other room, since I'm not sure I'm emotionally up to explain it to him right now. . . ."

229.    Because Defendants failed to regulate or filter the hate speech directed to the Queer Kid Stuff channel between 2016 and 2018, Mx. Amer was forced to disable the comments section to the channel in the fall of 2018 and to forego the ability to fully engage with and reach Queer Kid Stuff's intended audience with its content.  In the process, however, Mx. Amer noticed the hatemongers had started to upload and copy portions of or entire Queer Kid Stuff videos that they then displayed on the platform with disparaging, obscene, and hateful content, including fake voiceovers, or with the commentator inserted into a frame in the corner of the Queer Kid Stuff videos.  Most of the reaction videos include links to the Queer Kid Stuff channel which acted as an

amplifier for generating hate speech comments.

230.    The obscene, hate speech filled reaction videos, many of which were spawned by The Daily Stormer article, also appear in searches for Queer Kid Stuff on YouTube, and appear in "Up Next," recommendations on the screen whenever viewers watched Queer Kid Stuff videos, thereby exposing  parents and children to inappropriate hurtful material.  Mx. Amer repeatedly complained to Google/YouTube about the hate speech reaction videos which appear in the recommended "Up Next" material, and in the search results for "Queer Kid Stuff," but Defendants refused to subject that content to their Community Guidelines and other speech regulations, or to prevent reaction video creators from posting links to the Queer Kid Stuff channel on the reaction videos.

231.    Despite extended discussions with Google/YouTube representatives, who assured Mx. Amer that Queer Kid Stuff would be eligible for uploading to the new YouTube Kids channel, Queer Kid Stuff remains excluded from that children's programming venue.

232.    In all, Queer Kid Stuff has uploaded more than 100 videos, of which Defendants have only allowed 94 to remain accessible to viewers; the channel has more than 2 million views and more than 15,000 subscribers.  Queer Kid Stuff's growth has been substantially stymied by Defendants' selected, discriminatory, anticompetitive and unlawful use of its content regulation and monetization policies and practices, and has generated less than $500 per year.  Defendants should be ashamed of themselves for promising  consumers that the same rules apply equally to everyone and then singling out Plaintiffs, like Mx. Amer, and the greater  Community for content and monetization violations while promoting and profiting from homophobic hate speech that threatens violence and goes unregulated on the YouTube Platform.

### 6.    Stephanie Frosch (ElloSteph, ElloStephExtras and StephFrosch)

233.    Plaintiff Stephanie Frosch is the creator and owner of ElloSteph, ElloStephExtras and StephFrosch, YouTube channels dedicated to developing and uploading video content for the Community.  Ms. Frosch is an LGBTQ internet activist who has appeared as a speaker at conventions, and she has been interviewed on MTV and the main stream media regarding her YouTube experience and treatment at the hands of YouTube.  Beginning on October 5, 2009, Ms.

**THIRD AMENDED CLASS ACTION COMPLAINT**

Frosch has been creating and uploading original videos to her YouTube channels.  In 2009, Ms.

Frosch earned approximately $23,000 from ad revenue generated by her channels.  In addition, she

earned money from the sale of merchandise and from separate brand sponsorship agreements

connected with videos posted on her channels.  As of today, she has created and uploaded 189

different videos for audiences 13 years and older.  ElloSteph has 376,000 subscribers and 36.5

million views.  ElloStephExtras has an additional 6,980 subscribers and an additional 134,858

views.  She also operates a merchandise store at www.districtlines.com/ellosteph.

234.    ElloSteph proved to be a popular and very successful YouTuber channel until 2017

when Google/YouTube employed many of the same strategies they have applied to other

Plaintiffs and putative members of the  Community Class.

        a.    Many of Ms. Frosch's videos are not available when Restricted Mode is

activated, regardless of whether the video itself contains no nudity, profanity, sexual conduct, or

discussions of sexual activities.  Despite the fact that Ms. Frosch's videos are not viewable when

Restricted Mode is activated, some of those same videos were copied by other YouTubers and

posted on their channels, where they can be viewed when Restricted Mode is activated.

        b.    Many of Ms. Frosch's videos are not fully monetized despite the fact that



**THIRD AMENDED CLASS ACTION COMPLAINT**

they do not include graphic images of violence or sexuality, include no nudity, profanity, sexual conduct, or discussions of sexual activities.

        c.     Google/YouTube has removed many of the customized thumbnail images Ms. Frosch crafted for each of her videos uploaded to her channels. For example the customized thumbnail images were removed for (1.) "A Gay Cooking Show With My Girlfriend;" (2.) "Day in the Life;" (3.) "Coming Out (Again);" (4.) "Life in Transit;" (5.) "Teaching Kids How to Be Gay!;" (6.) "The Greatest Day of My Young Life;" (7.) "I got a Secret Package in the Mail;" and (8.) "Why I left YouTube/The Future of my Channel."

        d.     Hate speech, including obscene, violent, or threatening language regularly appear in the comments sections of Ms. Frosch's videos.

        e.     YouTube has allowed other creators to copy Ms. Frosch's video content and pays those creators revenue for their posting of Ms. Frosch's video content.

        f.     Commencing in late 2017, Google/YouTube started to remove longtime subscribers to ElloSteph and ElloStephExtras. Subscribers communicating with Ms. Frosch on other social media platforms complained that their subscriptions had been dropped, and though they attempted to re-subscribe to Ms. Frosch's channels, they could not do so. The dropped subscribers no longer received new video notifications, and were not aware when Ms. Frosch posted new videos. As a result of Defendants' practice, Ms. Frosch has lost many longstanding subscribers who have been unable to re-subscribe to these channels and must search for Ms. Frosch's channels and review the long list of her videos in order to identify new content. YouTube has made it harder for these viewers to find Ms. Frosch's new videos resulting in diminished viewing numbers for new content.

        235.    In 2017, Ms. Frosch was one of a group of the creators who approached Google/YouTube and complained about how Google/YouTube's recent changes to the algorithm had disproportionately affected the YouTube creators and viewers. In order to participate in direct discussions with Google/YouTube regarding the nature of the problems being experienced, and possible solutions, Google/YouTube required Ms. Frosch to sign a Non-Disclosure Agreement which prevents her from disclosing what Google/YouTube said during those discussions. MTV

interviewed Ms. Frosch regarding the  YouTubers issues.  ElloSteph is active on Twitter, Tumblr, Facebook, and Instagram.

236.    Despite having made her best efforts to work with Google/YouTube to resolve the algorithm related issues with Google/YouTube, Ms. Frosch was unable to resolve any of those issues.  Commencing in 2017, to avoid the censorship and filtering tools, Ms. Frosch engaged in self-censoring and avoided using  related terms in the titles, descriptions and tags for her videos.

237.    The situation deteriorated further in 2018.  A large number of existing subscribers to ElloSteph and ElloStephExtras, who for years had been automatically receiving notices from YouTube when new video content was posted to the channels, stopped receiving notices from YouTube.  For a period of years, YouTube automatically sent new video notices to all of the subscribers of YouTube channels.  Neither Ms. Frosch, nor the subscribers to her channels, received any notice from YouTube regarding the cessation of new video notices for existing subscribers, nor the need for new subscribers to affirmatively request that new video notices be sent to them.  YouTube's cessation of sending new video notices to existing subscribers has forced existing subscribers to regularly check Ms. Frosch's channels to identify new content.  Here too, YouTube has made it harder for Ms. Frosch's longstanding subscribers to locate and view new videos on the channels resulting in diminished viewing numbers for new content.

238.    Because of Google/YouTube's conduct censoring and restricting access to ElloSteph's videos, and demonetizing large numbers of posted videos, the channel ad revenues fell to $12,000 in 2016; $5,000 in 2017, $3,500 in 2018 and $1,800 to date in 2019.  Ms. Frosch has lost revenue from merchandise sales and from brand contracts which are tied to the channel.  In 2019, she has to work twice as hard to fulfill her brand contracts because of falling views for videos posted to the channel.  Recently, Ms. Frosch was forced to "make good" by creating and posting a second video to fulfill her Audible contract because the 7,500 views generated by the first video fell far short of the required 50,000 views.

239.    Such falling revenues and doubling workloads for sponsored brands have forced Ms. Frosch to stop working as a fulltime YouTube creator, and to obtain other full time employment elsewhere.  On February 3, 2018, Ms. Frosch created and posted a video explaining

1    her reasons reducing her commitment to YouTube

2    https://www.youtube.com/watch?v=wClG3AoF12g.  Defendants are effectively pushing Ms.

3    Frosch from the platform.  Defendants' censorship, filtering and practices have decimated Ms.

4    Frosch's revenues and caused harm to her and her brand.

5                     **7.    Sal Cinquemani (SalBardo)**

6              240.    Plaintiff Sal Cinquemani owns and operates salbardo.com.  He is an independent

7    film maker who writes, directs and produces films for  audiences under the name "Sal Bardo."

8    Mr. Cinquemani is an award-winning writer-director.  Mr. Cinquemani's movies and music videos

9    often tackle issues affecting the gay and  communities.  Since March 27, 2011, Mr. Cinquemani

10   has operated the YouTube channel youtube.com/user/salbardo, uploading videos consisting of

11   original short films, film trailers, interviews of actors, and out-takes from films for purposes of

12   promoting his independent films.  The Sal Bardo YouTube channel has approximately 38,000

13   subscribers and 24.1 million views.

14             a.      His video, "It Gets Better," was posted July 11, 2011.  The video was

15   created as part of the fundraising campaign for the production of "Sam."  The video relates Mr.

16   Cinquemani's experience coming out as a gay man, and features him talking to the camera.  The

17   video was intended to support gay children, and features a photo of two men kissing which

18   appeared on the television show "Will and Grace."  The video does not depict anything with

19   graphic violence, graphic sexual content, nudity, profanity, or discussion of detailed sexual nature.

20   Commencing in early 2017, Google/YouTube applied the Restricted Mode to "It Gets Better," so

21   that it cannot be viewed by the children it was intended to support.  "It Gets Better," remains

22   inaccessible in Restricted Mode to this day.

23             b.      His movie "Sam," which debuted in 2013, is a short film about a child

24   confronting issues of gender identity and LGBTQ bullying.  "Sam" depicts no profanity, no

25   graphic violence, no sexual conduct, nor discussions of sexual conduct.  "Sam" has generated 7.3

26   million views on YouTube.  "Sam," has been screened in classrooms by teachers of middle school

27   and high school students throughout the United States.

28             c.      His music video "Paper Ring – Great Escape," debuted in 2015 and depicts

an elderly woman leaving her husband for a woman she had met decades earlier.  "Paper Ring – Great Escape," has generated 53,000 views on YouTube.

        d.      His movie, "Pink Moon" is a gay short film which debuted in 2015, has 15.4 million views on YouTube.

241.    Since March 27, 2011, Mr. Cinquemani has operated the YouTube channel youtube.com/user/salbardo, principally as a promotional tool for his independent films -- uploading videos consisting of film trailers, interviews of actors, and out-takes from films.  Mr. Cinquemani, using the name Sal Bardo, is active on Twitter, Vimeo and Facebook.

242.    The Sal Bardo YouTube channel proved to be successful and popular between 2011 and 2016.  The channel has approximately 38,000 subscribers and has generated a total of 24.1 million views on YouTube.  Despite its enormous popularity given the relatively modest number of videos posted on the channel, in 2017 the SalBardo YouTube channel began to suffer from the same censorship which plagued other  YouTube creators:

243.    Commencing in 2017, Mr. Cinquemani noticed that YouTube had made all but one of the videos uploaded to the SalBardo YouTube channel unavailable when Restricted Mode was activated.  Google/YouTube made "Sam," and videos like the "The Sam Trailer" and the "Welcome" video inaccessible under Restricted Mode.  In March 2017, Mr. Cinquemani contacted YouTube and asked why his videos which were specifically directed to  youth audiences had been made inaccessible under Restricted Mode.  YouTube's representative agreed to look into the matter.

244.    In July 2017, Mr. Cinquemani's video "Requited Trailer," which had been posted on the SalBardo channel since 2011 was flagged and removed from the channel by YouTube purportedly for violating YouTube's community standards.  Mr. Cinquemani appealed the decision, and "Requited Trailer" was reinstated to the SalBardo channel within a week.

245.    Commencing in October 2017, "Sam," which had been generating an average of 4,000 views per day started generating only 30 views per day.

246.    By December 2017, most of Mr. Cinquemani's videos remained inaccessible in "Restricted Mode; moreover, YouTube had deemed the videos, including "Sam," to be "not

1    suitable for most advertisers," rendering the videos demonetized.  When Mr. Cinquemani

2    contacted YouTube's representative, she informed him that the reduced views generated by "Sam"

3    was likely caused by YouTube's new policy to deter child predators from

4    posting/viewing/engaging with videos that depict children.  "Sam" was being shadow banned; the

5    video no longer appeared as a video on the SalBardo channel, in response to searches by title or

6    subject, and if viewers could find "Sam" on YouTube, the comments application had been

7    disabled so that viewers could no longer make comments which might generate additional views.

8    Mr. Cinquemani explained that the videos which had been demonetized did not involve materials

9    that would appeal to child abusers, but were sensitive treatments of issues facing members of the

10   LGBTQ community.  YouTube's representative agreed to look further into the demonetization of

11   the SalBardo videos.

12        247.    Between July 2017 and January 2018, SalBardo generated no revenues whatsoever,

13   and nearly all of the channel's videos remained inaccessible when Restricted Mode was activated.

14   Unable to persuade YouTube to change its treatment of the videos or to remonetize them, Mr.

15   Cinquemani wrote an article discussing issues affecting YouTube's LGBTQ creators.  The article

16   was published in the Huffington Post on January 17, 2018,

17   https://www.huffpost.com/entry/youtube-continues-to-restrict-lgbtq-content b

18   5a5e6628e4b03ed177016e90.

19        248.    Two days after the Huffington Post published the article, YouTube's representative

20   informed Mr. Cinquemani that "Sam" had been restored to the SalBardo channel, and was

21   searchable; but that YouTube was having technical difficulties remonetizing the video.  As a result

22   of the application of Restricted Mode filters and the shadow ban, the views for "Sam" never

23   recovered to the levels they were before October 2017 when YouTube censored the video.

24   YouTube did not remonetize "Sam" until February of 2018.

25        249.    Late in January 2018, Google/YouTube notified Mr. Cinquemani that his videos

26   "Chaser Trailer," and "Pink Moon Trailer" had finally been reviewed by YouTube and deemed

27   "not suitable for most advertisers."  Both videos contain content which is similar to other fully

28   monetized videos on other YouTube channels.

**THIRD AMENDED CLASS ACTION COMPLAINT**

250.   In early 2018, YouTube briefly reversed its application of Restricted Mode to most of the SalBardo videos, except for the "Chaser Trailer" and "Pink Moon Trailer." [By late 2019, those videos were again inaccessible under Restricted Mode.] However, the channel's videos remained demonetized. YouTube's representative was unable to explain why the videos remained demonetized. Where Google/YouTube has applied the Restricted Mode filter to "Chaser Trailer," and demonetized the video, Google/YouTube has fully monetized several versions of the "Fifty Shades Darker Trailer" which include highly sexualized scenes.

251.   By April 2018, YouTube had again notified Mr. Cinquemani that a number of the SalBardo videos, including "Sam," were deemed "not suitable for most advertisers." Eventually some of the videos were remonetized. However, "Pink Moon Trailer," which has been under YouTube review since January 2018, remains "under review," and demonetized. However, Google/YouTube has fully monetized the "I, Tonya Trailer, which though is subject to Restricted Mode, is fully monetized. the "I, Tonya Trailer," contains scenes with graphic violence, profanity and a derogatory LBGT epithet.

252.   On May 16, 2018, the SalBardo video "Gay short film – Pink Moon" which had generated on averaged 15,000 views per day, suddenly stopped generating views. The number of daily views generated for this video dropped from an all-time high exceeding 50,000 views per day to just several hundred views per day. YouTube had shadow banned this film, and it no longer was appearing in search results, appearing in the "Up Next" or recommended videos which appear when SalBardo videos or similar videos were played.

253.   By late December 2018, "Gay short film – Pink Moon" remained subject to a shadow ban, but was generating 1,500 views per day – one-tenth of what it was generating 7 months before YouTube's censorship. Sometime in 2019, YouTube lifted the shadow ban, but the video has generated a fraction of the views that would have generated had YouTube not censored it.

254.   On September 16, 2019, YouTube demonetized the entire SalBardo channel and sent him this notice:

During a recent review, our team of policy specialists carefully looked over the

videos you've uploaded to your channel Sal Bardo. we found that a significant portion of your channel is not in line with our <u>YouTube Partner Program Policies</u>. **As of today, your channel is not eligible to monetize and you will not have access to monetization tools and features. Please go to your monetization page to read more about the specific policy our specialists flagged**.

We know this is tough news, and sometimes we have to make difficult decisions. we have a responsibility to ensure our community is safe for creators, viewers and advertisers. At the same time, we understand that you may have unintentionally made mistakes. **That's why you'll be able to reapply for the YouTube Partner Program in 30 days**. This 30-day time period allows you to make changes to your channel to make sure it's in line with our policies.



Mr. Cinquemani appealed the decision at the first opportunity, after YouTube required him to wait 30 days. On October 19, 2019, the channel was remonetized following his appeal, despite the fact that Mr. Cinquemani had not removed or altered any of the video content on the channel. The demonetization caused the SalBardo channel to lose one full month of revenues.

255.    As a direct result of YouTube's repeated and improper application of Restricted Mode filters, demonetization and shadow bans, revenue generated by the SalBardo channel has dropped from $200 per month in 2016, to $40 per month in 2019, with some months earning absolute nothing at all because the entire channel was demonetized.

8.    **Tamara Johnson (SVTV Network)**

256.    Plaintiff Tamara (Sheri) Johnson owns and is the CEO of SVTV Network.com. Since May 30, 2012, she has operated the YouTube channel StudvilleTV. This channel was renamed in 2016 to SVTV Network. At that time, SVTV Network had uploaded approximately 300 original videos. By 2016, the channel had generated more than 5 million views. The SVTV Network YouTube channel is devoted to writing, developing, taping and producing short videos, original web series, animated series and feature length films for the audience 13 years of age and older. The original videos uploaded to the channel do not include scenes of graphic violence,

1  graphic sexual conduct, nudity, or detailed descriptions of sexual conduct, and the videos are

2  suitable for teenagers.  SVTV Network now posts only 140 original videos, has 114,000

3  subscribers and generates 3.3 million views.

4      257.    Commencing in 2016, the StudvilleTV channel began to experience

5  Google/YouTube censorship similar to that experienced by other  creators:

6      a.    Google/YouTube made numerous videos inaccessible by applying

7  Restricted Mode filters despite the absence of video content that depicted graphic scenes of

8  violence, graphic sexual conduct, nudity or detailed descriptions of sexual conduct.  While

9  Google/YouTube restricted public access to StudvilleTV's videos, similar videos depicting similar

10  plots, scenes, and dramatic twists posted by heterosexual YouTube creators were allowed to be

11  posted widely, were accessible in Restricted Mode, and were fully monetized.  On many

12  occasions, Ms. Johnson appealed the demonetization decisions as they were made, but

13  Google/YouTube remonetized only a handful of such videos, leaving the majority of the channel's

14  videos demonetized.

15      b.    Google/YouTube demonetized other videos claiming that the video content

16  was not suitable for their advertisers.

17      c.    Over Ms. Johnson's objections, Google/YouTube allowed third party

18  YouTube creators to copy StudvilleTV's original videos and post them to other channels which

19  were unrestricted and fully monetized, allowing third parties to generate revenue from Ms.

20  Johnson's copyrighted videos while they prohibited her from doing so herself.  For the past two

21  years, third party creators have been posting and exploiting Ms. Johnson's videos and generating

22  revenue for themselves.  Google/YouTube has prevented Ms. Johnson from earning money from

23  those same videos.  Ignoring Ms. Johnson's objections regarding the copyright infringement,

24  Google/YouTube allows the third party creators to continue to exploit the SVTV Network videos.

25      d.    Google/YouTube offers a music library application to creators who have a

26  certain minimum number of viewers.  Use of music library content in videos carries with it certain

27  requirements regarding monetization, affording credits, and use.  SVTV Network only used music

28  content from the Google/YouTube music library which required attribution, but had no restrictions

**THIRD AMENDED CLASS ACTION COMPLAINT**

1   regarding monetization, and could be used in videos that were fully monetized and generating

2   funds for SVTV Network.  Recently, Google/YouTube has started notifying SVTV Network that

3   music used in videos created and posted since 2012 is generating "copyright strikes," resulting in

4   all of the revenues generated by the video in which the music appears being redirected to the

5   music copyright owner.  This unannounced change in use of music library content has further

6   demonetized SVTV Networks videos, by depriving it of revenue that it should be earning for older

7   videos on its channel.

8        258.    As a direct and proximate result of Google/YouTube's application of filtering tools,

9   Restricted Mode, and demonetization, StudvilleTV lost significant revenues and was unable to pay

10   for the production costs and residual fees for the ongoing webseries.  In order to avoid further

11   demonetization, and to ensure the widest possible audience for the StudvilleTV videos, Ms.

12   Johnson started to self-censor and remove  related words from video titles, descriptions and tags

13   which are used to assist subscribers and viewers in finding the StudvilleTV video content.  Despite

14   best efforts to avoid censorship, eventually most of the videos posted on StudvilleTV were

15   demonetized.

16        259.    When self-censorship proved inadequate to address Google/YouTube's censorship

17   activities, Ms. Johnson contracted with Google/YouTube to sell unlimited views of individual

18   videos to subscribers on a payment per video basis, where Google/YouTube collected payments

19   from StudvilleTV viewers in exchange for the right to view an individual video for as many times

20   as wanted without a time limit for viewing, and StudvilleTV would receive 45% of the gross

21   revenues generated by sales.  In a single month, Google/YouTube generated $100,000 selling

22   access to one episode of StudvilleTV's popular webseries "Studville TV – Episode 10" of season

23   3.  Google/YouTube kept $55,000 of the sales proceeds.

24        260.    The following month, without notice to StudvilleTV or the viewers who had paid

25   for access to the video episode 10 of season 3; and without offering to refund to subscribers the

26   monies which Google/YouTube charged to StudvilleTV's viewers, Google/YouTube suspended

27   the video sales on the YouTube Platform, and made all of the StudvilleTV videos available to the

28   public free of charge.  Google/YouTube thereby deprived StudvilleTV of any opportunity to

1   generate revenue from any its original videos.  Those viewers who had paid for unlimited access

2   to the episode 10 of season 3 demanded refunds of the video access charges from StudvilleTV.

3   Google/YouTube pocketed the full $55,000 and never refunded any of that money though they

4   alone were responsible for denying the viewers access to the video for which they had paid.

5   Viewers complained on various social media platforms that they wanted their money back, and did

6   not get refunds.  Google/YouTube's conduct has deprived SVTV Network of the ability to pay

7   actors residuals for episode 10 of season 3.

8       261.    In the fall of 2016, unable to make any money from popular videos and unable to

9   pay residuals due to actors for the videos which were still on the StudvilleTV channel, Ms.

10  Johnson launched an internet on-demand monthly subscription network

11  https://www.svtvnetwork.com/ dedicated to original content specifically designed for  audiences.

12  For the past three years, Ms. Johnson has been uploading her own independently produced

13  original video webseries, and licensing the original independently produced videos of others on

14  her internet platform in direct competition with Google/YouTube.

15      262.    In all, SCTV Network lost approximately $100,000 in 2016 as a result of

16  Google/YouTube's censorship tools and improper application of Restricted Mode and

17  monetization criteria; in addition to breaching the agreement with the StudvilleTV channel to sell

18  individual videos..

19      263.    Since the launch of SVTVNetwork.com, Ms. Johnson uploaded season 4 of the

20  Studville TV webseries onto her platform.  The highly anticipated season 4 launched in 2017

21  generated 15,000 subscribers who each paid $4.99 to watch the webseries.  Had Google/YouTube

22  fulfilled their agreement to sell individual episodes of the Studville TV webseries on the YouTube

23  Platform, Ms. Johnson believes that she would have generated at least $500,000 in viewer

24  subscriptions for individual episodes.  Google/YouTube's breach of the agreement with the

25  Studville TV channel has deprived Ms. Johnson of substantial additional revenues and has

26  damaged the Studville TV brand.

27      264.    The StudvilleTV channel, renamed SVTV Network, now serves principally as a

28  promotional site for SVTV Network.com (Ms. Johnson's platform), and currently has uploaded

**THIRD AMENDED CLASS ACTION COMPLAINT**

1   140 videos, consisting of video teasers, trailers, interviews with cast members and celebrities,

2   advertisements for movies, and bloopers and outtakes from the Studville TV webseries.

3        265.   Google/YouTube has imposed a minimum requirement for $100 in ad revenues

4   before it will pay a channel for fully monetized videos.  As a result of this policy, and ongoing

5   problems with Google/YouTube's filtering and Restricted Mode censorship, SVTV Network is

6   struggling to generate any revenues from the SVTV Network channel.

7            **9.   Greg Scarnici (GregScarnici and Undercover Music)**

8        266.   Plaintiff Greg Scarnici is a comedic writer, director, producer and performer who

9   currently works as an Associate Producer at "Saturday Night Live," with over 25 years of

10  experience working in television and comedy.  He has appeared in films, on television and in

11  numerous internet uploads and posts.  Since September 14, 2007, Mr. Scarnici has operated the

12  YouTube channels youtube.com/user/Greg Scarnici and youtube.com/user/Undercover Music,

13  uploading videos consisting of short films, comedic sketches, parodies, and music videos for the

14  audience aged 13 and older.  Videos posted to the two channels did not include graphic violence,

15  graphic sexuality, nudity, or detailed discussions of sexual topics; however, many of the videos

16  did depict members of the  Community and portray scenes and discussion of issues important to

17  the  Community.  The Greg Scarnici YouTube channel currently has posted 127 videos, with

18  approximately 9,600 subscribers and has generated 8.9 million views.

19       267.   As an early YouTube creator, Mr. Scarnici devoted substantial efforts and

20  resources to building up his YouTube channel and amassing millions of views.  Videos posted by

21  Mr. Scarnici's two channels would routinely generate from 2,000 to 50,000 views.  The music

22  video parody videos were well received by viewers and profitable for Mr. Scarnici.

23       268.   In late 2016 or early 2017, the GregScarnici channel started to suffer from

24  Google/YouTube's same improper censorship activities as those suffered by other  creators:

25           a.   Initially, Google/YouTube informed Mr. Scarnici that specific videos

26  posted on this channels were "not appropriate for all audiences" and were demonetized.  Mr.

27  Scarnici attempted to dispute Google/YouTube's determination that the videos were "not

28  appropriate for all audiences" and filed several appeals.  However, Google/YouTube did not

                                   -94-                              Case No. 5:19-cv-004749-VKD

1  respond to Mr. Scarnici's appeals or attempts to communicate with YouTube representatives.

2          b.       For some videos, Google/YouTube informed Mr. Scarnici that another

3  YouTube creator owned the copyrights to the videos which were posted on one of Mr. Scarnici's

4  channels:

5                   i.       Mr. Scarnici created and uploaded the original "Fergalicious

6  Parody" video on September 3, 2007.  Google/YouTube informed Mr. Scarnici that the parody

7  violated an original copyright for another artist.  Mr. Scarnici wrote a detailed defense of his

8  original music video parody in an attempt to appeal the decision, but YouTube ignored his letter.

9  Ultimately, the "Fergalicious Parody" was removed from his channel.  Though Mr. Scarnici

10 removed the video, incredibly, another YouTuber copied Mr. Scarnici's original parody to the

11 Johndeere93 channel, where it has generated more than 336,000 views and remains visible to this

12 day:  https://www.youtube.com/watch?v=kPSnwDdR27w.

13                  ii.      Mr. Scarnici created and uploaded the original "Ring the Alarm

14 parody" on September 16, 2007.  Again, Google/YouTube informed Mr. Scarnici that this parody

15 violated an original copyright for another artist, and insisted that the video be removed.  Mr.

16 Scarnici complied with YouTube's request.  However, the very same video was posted on

17 Raphers' YouTube channel where it has generated 195,612 views, and to this day remains posted

18 for viewing:  https://www.youtube.com/watch?v=eY_mrU8MPfI.

19                  iii.     The very same thing happened with the "Madonna Medley" parody

20 which Mr. Scarnici created and uploaded on September 24, 2007.  Mr. Scarnici removed this

21 video from his channel at the insistence of Google/YouTube.  However, the very same video was

22 posted on Tolichon's YouTube channel where it has generated 8,657 views.

23 Thus on at least three separate occasions, Google/YouTube forced Mr. Scarnici to remove his

24 original parody videos on grounds of copyright infringement, but allowed – and continues to allow

25 third parties who have YouTube channels to post copies of Mr. Scarnici's original parody videos,

26 in violation of Mr. Scarnici's copyrights for these videos.

27          c.       Google/YouTube has allowed third party YouTubers to post and generate

28 revenues from Mr. Scarnici's original videos, to which he owns all rights over Mr. Scarnici's

**THIRD AMENDED CLASS ACTION COMPLAINT**

express objection.  Live Nation Video Network asserted a copyright claim for Mr. Scarnici's "Top

Top (Gay TV Show Parody)."  Mr. Scarnici disputed Live Nation Video Network's claim and

explained that he owned all rights to this original video which he wrote, directed, produced and

appears in.  Without responding to Mr. Scarnici's communications or requiring Live Nation Video

Network to provide proof that it owned the copyright to the video, on December 13, 2017,

Google/YouTube informed Mr. Scarnici that "Live Nation Video Network has decided that their

copyright claim is still valid" and refused to pay Mr. Scarnici for ad revenue generated by his

video.  To avoid generating more revenue to the interloper, Mr. Scarnici privatized the video.

      d.     By 2017, any new videos posted on Mr. Scarnici's two channels were

generating as few as 300 views in all.  The channels were effectively demonetized and generating

no revenue.

      e.     By 2018, frustrated with Google/YouTube's repeated censorship, Restricted

Mode filters, demonetization and refusal to respect this copyright, Mr. Scarnici decided to reduce

his further YouTube efforts and presence.  He posted on the GregScarnici channel:

> Sorry I haven't been creating videos on YouTube lately.  With the algorithm
> changes, the recent crackdown on videos tagged #LGBT, which both caused an
> insane viewer drop-off and YouTube taking away monetization on my account, I
> have obviously not been inspired to create content no one will see.  Instead, I've
> been focusing on live performance again, and will be performing this show in
> NYC, San Francisco and LA this summer.  I hope to see you there!  Tickets and
> more info:  www.gregscarnici.com.
> https://www.youtube.com/user/gregscarnici/community.

      f.     In addition to harassing Mr. Scarnici and preventing him from generating

revenues from videos posted to the YouTube Platform, Google has begun to interfere with Mr.

Scarnici's ability to communicate with Plaintiffs' counsel.  Commencing in early September of

2019, Mr. Scarnici began communicating with counsel for Plaintiffs using a Gmail account.  After

receiving at least 9 different email communications from Plaintiffs' attorneys' BGRfirm.com

server, on September 26, 2019 at 1:51 p.m., Mr. Scarnici received a phishing warning from

Google's Gmail server:

**THIRD AMENDED CLASS ACTION COMPLAINT**

1
2
3
4
5
6
7
8

RE: Google/YouTube: Developments [IWOV-DOCSLA.FID349140]

YouTube Lawsuit ×

Debi Ramos <dramos@bgrfirm.com>
to me

Thu, Sep 26, 1:51 PM

**This message seems dangerous**

Many people marked similar messages as phishing scams, so this might contain unsafe content. Avoid clicking links, downloading attachments, or replying with personal information.

Report dangerous       Looks safe

Would you like to discuss these issues now?

9   Mr. Scarnici clicked on the "Looks Safe" link on the warning.  Despite having done so, two more

10  identical phishing warnings were sent to Mr. Scarnici by Google's Gmail server at 4:30 p.m. and

11  4:41 p.m.  Additional warnings were sent in response to emails from Plaintiffs' counsel from the

12  BGRfirm.com server to Mr. Scarnici's Gmail account on October 23, 2019 and October 25, 2019.

13  **V.      CLASS ACTION ALLEGATIONS**

14          269.    Plaintiffs bring this action on behalf of themselves and a putative YouTube

15  Community Class and a LGBTQ+ Subclass of YouTube users and consumers who are similarly

16  situated under Rules 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure.  The

17  YouTube Community Class and LGBTQ+ Subclass seek monetary damages and injunctive relief

18  on behalf of the following class of YouTube consumers and users:

19                          **The YouTube Community Class Is Defined As**:

20              All persons or entities in the United States who are or were
                members, users and or consumers of YouTube who uploaded,
21              posted, or viewed video content on YouTube subject to the choice-
                of-law and venue provisions set forth in Defendants' Terms of
22              Service, Mission Statement, Community Guidelines, and/or any
                other content-based filtering, monetization, distribution, personal
23              data use policies, advertising or regulation and practices any other
                regulations or practices that are related to the YouTube Platform on
24              or after January 1, 2015 and continuing through to December 31,
                2019 (the "Class Period").
25
                Excluded from the YouTube Community Class are Defendants and
26              their employees, affiliates, parents, subsidiaries, and co-conspirators,
                whether or not named in this Complaint, and the United States
27              government.

28

**THIRD AMENDED CLASS ACTION COMPLAINT**

**The LGBTQ+ Subclass Is Defined As:**

All persons or entities in the United States who (a) are or were members, users and or consumers of YouTube who uploaded, posted, or viewed video content on YouTube subject to the choice-of-law and venue provisions set forth in Defendants' Terms of Service, Mission Statement, Community Guidelines, and/or any other content-based filtering, monetization, distribution, personal data use policies, advertising or regulation and practices any other regulations or practices that are related to the YouTube Platform and (b) are part of a protected class of persons under the California or Federal law because of sexual orientation, gender identity, or gender or (c) create, post, distribute, monetize, or advertise video content on the YouTube Platform that discusses or relates to topics, issues or viewpoints that advocate for, are of interest to, or are intended for audiences, on or after January 1, 2015 and continuing through to December 31, 2019 (the " Subclass Period").

Excluded from the LGBTQ+ Subclass are Defendants and their employees, affiliates, parents, subsidiaries, and co-conspirators, and any YouTube users who create, post, distribute, promote or engage in video or communications on the YouTube Platform that is directed against Plaintiffs or  Community and is objectively violent, obscene, threatening, or homophobic as alleged in the Complaint.

270.    Plaintiffs believe that there are over 200 million members of the YouTube Community Class and at least 9.33 million members of LGBTQ+ Subclass as defined and described above in the Complaint.  The exact number and identities of the YouTube Community Class and LGBTQ+ Subclass are known by Defendants, and the number of persons who fall within the definitions of the Class and/or Subclass are so numerous and geographically dispersed so as to make joinder of all members of the Class or Subclass in their individual capacities impracticable, inefficient, and unmanageable so as to effectively deny each putative Class or Subclass member his, her, or their rights to prosecute and obtain legal and equitable relief based on the claims and allegations averred in this Complaint.

271.    There are questions of law and fact common to the YouTube Community Class and the LGBTQ+ Subclass that relate to and/or are dispositive of the nature and allegations of unlawful conduct alleged in the Complaint, and the nature, type and common pattern of injury and harm caused by that unlawful conduct and sustained by the putative members of the Class and Subclass including, but not limited to:

a.       Whether Defendants' regulations and content-based restrictions violate the

free speech, antidiscrimination, consumer fraud and unfair competition, and contractual rights of the members of the YouTube Community Class and/or the LGBTQ+ Subclass;

b.      Whether Defendants concealed, misrepresented or omitted to disclose material policies and practices regarding the unlawful regulation of video content, advertising, distribution, monetization, contractual obligations, and characteristics of the YouTube Platform to the members of the YouTube Community Class and/or LGBTQ+ Subclass;

c.      Whether Defendants use unlawful, discriminatory, anticompetitive and fraudulent, deceptive, unfair, and/or bad faith filtering tools and practices, in the code and operation of their machine based, algorithmic, or A.I.  filtering tools, and/or other practices and procedures to review, regulate, and restrict content, and/or regulate and restrict the advertising, monetization, distribution, and property rights of the YouTube Community Class and LGBTQ+ Subclass;

d.      Whether Defendants are engaged in discriminatory practices against the members of the YouTube Community Class and LGBTQ+ Subclass based on protected characteristics;

e.      Whether Defendants' breached their form consumer contracts and obligations to the YouTube Community Class and LGBTQ+ Subclass;

f.      Whether Defendants are engaged in unlawful, deceptive, unfair, or anticompetitive practices that violate federal or California law, and harmed and injured the YouTube Community Class and/or the LGBTQ+ Subclass;

g.      Whether the conduct of Defendants, as alleged in this Complaint, caused injury to the business and property of Plaintiffs and the members of the YouTube Community Class and LGBTQ+ Subclass;

h.      Whether Defendants' alleged regulations, practices, and conduct has caused or threatens to cause harm to the speech of the YouTube Community Class or the LGBTQ+ Subclass to warrant the ordering of temporary, preliminary and/or final injunctive relief and corresponding declaratory relief with respect to the legal rights of Plaintiffs and the YouTube Community Class and LGBTQ+ Subclass;

1            i.      The scope, nature, substance, and enforcement of injunctive and equitable

2   relief sought by the YouTube Community Class and LGBTQ+ Subclass;

3            j.      Whether Defendants were unjustly enriched or obtained profits or ill-gotten

4   financial gains as a result of the unlawful, discriminatory, deceptive, unfair, or anticompetitive

5   practices perpetrated against Plaintiffs, the YouTube Community Class, and the LGBTQ+

6   Subclass;

7            k.      Whether Defendants breached their contractual obligations and/or implied

8   duty of good faith and fair dealing under the consumer form contracts entered into during the

9   Class Period between Defendants and Plaintiffs, the YouTube Community Class, and the

10   LGBTQ+ Subclass;

11            l.      Whether Defendants' content-based regulations and filtering practices, on

12   their face and/or as applied, violate the free speech rights of Plaintiffs and the YouTube

13   Community Class and the LGBTQ+ Subclass; and

14            m.      whether Defendants' assertion of immunity from liability under the §230

15   with respect to any of the claims or allegations asserted by Plaintiffs, the YouTube Community

16   Class, and/or the LGBTQ+ Subclass operates as an unlawful prior restraint of speech in violation

17   of the First Amendment of U.S. Constitution.

18        272.    During the Class Period, Plaintiffs uploaded one or more videos to YouTube and

19   Plaintiffs Divino and Brett Somers each purchased Google Ads products in reliance on the

20   representations and failures to disclose alleged above.  At least some of that video content

21   uploaded by  Plaintiffs was subjected to one or more human or algorithmic restriction tools.  The

22   interests of Plaintiffs are coincident with, and not antagonistic to those of the other members of the

23   YouTube Community Class and the LGBTQ+ Subclass.

24        273.    Each of Plaintiffs is a member of the YouTube Community Class and LGBTQ+

25   Subclass class.

26        274.    The claims of Plaintiffs are typical of the claims of YouTube Community Class and

27   LGBTQ+ Subclass members, and Plaintiffs will fairly and adequately protect the interests of the

28   members of the  Class.  Plaintiffs are represented by counsel who are competent and experienced

1   in the prosecution and defense of similar claims and litigation, including class actions filed,

2   prosecuted, defended, or litigated in under California and federal law, in California and federal

3   courts, in connection with claims and certification of consumer and civil rights classes composed

4   of members who reside in California and/or the United States.

5        275.    The prosecution of separate actions by individual members of the YouTube

6   Community Class and LGBTQ+ Subclass would create a risk of inconsistent or varying

7   adjudications.

8        276.    The questions of law and fact common to the members of the YouTube Community

9   Class and the LGBTQ+ Subclass predominate over any questions of law or fact affecting only

10   individual members of the Class or Subclass, including legal and factual issues relating to liability

11   and the nature of the harm caused by Defendants' unlawful actions.

12        277.    A class action is superior to other available methods for the fair and efficient

13   adjudication of this controversy.  Treatment as a class action will permit a large number of

14   similarly situated persons to adjudicate their common claims in a single forum simultaneously,

15   efficiently and without the duplication of effort and expense that numerous individual actions

16   would engender.

17        278.    The YouTube Community Class and the LGBTQ+ Subclass are readily definable

18   and are categories for which records should exist in the files of Defendants, and prosecution as a

19   class action will eliminate the possibility of repetitious litigation.  Class treatment will also permit

20   the adjudication of relatively small claims by many members of the LGBTQ+ Subclass who

21   otherwise could not afford to litigate claims such as those asserted in this Complaint.

**FIRST CAUSE OF ACTION**
**Declaratory Judgment:  47 U.S.C. § 230(c) Violates The First And Fourteenth Amendments
Of The U.S. Constitution
(On Behalf Of Plaintiffs Individually And The YouTube Community Class)**

25        279.    Plaintiffs re-allege and incorporate herein by reference, as though set forth in full,

26   each of the allegations set forth in paragraphs 1 through 278 above.

27        280.    Plaintiffs seek a declaratory judgment that §230(c) is unconstitutional under the

28   First Amendment if enforced by the Court to block any of the other claims for relief alleged in the

1  TAC.

2    281.    Specifically, Plaintiffs seek a declaratory judgment that §230(c)'s application as

3  "complete defense" to each of Plaintiffs' claims is unconstitutional under *Denver Area*, 518 U.S.

4  at 737, 747, 766-67.

5    282.    Plaintiffs' request for a declaratory judgment on the constitutionality of §230(c)

6  raises both statutory and constitutional issues under federal law that govern every claim in this

7  case.

8    283.    Plaintiffs' claim for a declaratory judgment on whether the application of §230(c)

9  as a permissive federal speech law violates the First Amendment constitutes a "special and small"

10  exception to the well pleaded complaint rule sufficient to create an independent basis for federal

11  question under 28 U.S.C. §1331.  *Gunn v. Minton*, 568 U.S. 251, 258 (2013).

12    284.    The constitutional challenge to a federal law that regulates speech on the internet

13  throughout the entire United States is one of a "special and small category of cases" that originate

14  in state law yet still arise under federal law for purposes of federal question jurisdiction under the

15  Supreme Court's recent opinion in *Atl. Richfield Co. v. Christian*, 140 S. Ct. 1335, 1350 (2020)

16  (reaffirming "special exception" federal question jurisdiction in *Gunn*).  The claim has

17  constitutional implications and gives rise to a federal question because it is (1) necessarily raised,

18  (2) actually disputed, (3) substantial, and (4) capable of resolution in federal court without

19  disrupting the federal-state balance approved by Congress).

20    285.    If the Court grants Defendants' request to enforce §230(c) as a complete defense to

21  Plaintiffs' claims of LGBTQ+ and identity based discrimination, breach and implied breach of

22  contractual obligations and promises, unfair business practices and false advertising, and Liberty

23  of Speech, the application of §230(c) immunity operates as an unconstitutional permissive speech

24  law that violates the First Amendment.

25    **A.    Plaintiffs Served Rule 5.1 Notice On The U.S. Attorney General.**

26    286.    In challenging the Constitutionality of the §230, Plaintiffs must comply with

27  Federal Rule of Civil Procedure 5.1 which requires that "[A] party . . . promptly [] file a notice of

28  constitutional question stating the question and identifying the paper that raises," where "a federal

**THIRD AMENDED CLASS ACTION COMPLAINT**

statute is questioned and the parties do not include the United States, one of its agencies, or one of its officers or employees in an official capacity."  Fed. R. Civ. P. 5.1.  Under Rule 5.1 "statute" means any congressional enactment that would qualify as an "Act of Congress."  Rule 5.1 requires more than the court certification provided by 28 U.S.C. § 2403; Rule 5.1 requires notice and certification to the United States Attorney General of any constitutional challenge to a federal statute, not merely to challenges of laws "affecting the public interest."  28 U.S.C. §2403.

287.    The §230 constitutes a federal statute under Rule 5.1.

288.    Plaintiffs have served the Rule 5.1 Notice on the United States Attorney General stating that Plaintiffs are questioning the constitutionality of 47 U.S.C. §230(c), identifying the §230, and attaching a copy of this Third Amended Complaint, and a copy of Judge's November 19-Order.  Plaintiffs have served the Rule 5.1 Notice and attachments by certified mail and have sent a copy of the Notice and attachments to the United States Attorney General by overnight delivery service.

289.    28 U.S.C. §2403 requires that the Court notify the United States Attorney General of Plaintiffs' First Cause of Action set forth in this Third Amended Complaint:  "In any action, suit or proceeding in a court of the United States to which the United States or any agency, officer or employee thereof is not a party, wherein **the constitutionality of any Act of Congress affecting the public interest is drawn in question, the court shall certify such fact to the Attorney General**, and shall permit the United States to intervene for presentation of evidence, if evidence is otherwise admissible in the case, and for argument on the question of constitutionality. The United States shall, subject to the applicable provisions of law, have all the rights of a party and be subject to all liabilities of a party as to court costs to the extent necessary for a proper presentation of the facts and law relating to the question of constitutionality."  28 U.S.C. §2403(a) (emphasis added).

290.    Accordingly, Plaintiffs respectfully request that the Court certify to the United States Attorney General of the United States that 48 U.S.C. §230(c), a federal statute, has been questioned by Plaintiffs on the grounds averred below.

**B.   Legal Controversies Currently Exist Regarding The Scope And Constitutionality Of 47 U.S.C. § 230(c).**

291.   §230 provides "**Protection for 'Good Samaritan' blocking and screening of offensive material:**"

(1) **Treatment of publisher or speaker**

No provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider.

(2) **Civil liability**

No provider or user of an interactive computer service shall be held liable on account of —

(A) any action voluntarily taken in good faith to restrict access to or availability of material that the provider or user considers to be obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable, whether or not such material is constitutionally protected; or

(B) any action taken to enable or make available to information content providers or others the technical means to restrict access to material described in paragraph (1).  47 U.S.C. § 230(c).

292.   Actual controversies now exist between the parties regarding the proper construction, scope, application, and constitutionality of §230 statutory immunity granted to internet service providers given the unique allegations and claims asserted against Google/YouTube in this case.  Specifically, each of the controversies arise from a dispute about the extent to which §230 immunizes an internet service provider who discriminates against users because they identify as  or create content for  audiences, and who employ an express and admitted policy and practice of filtering and/or restricting Plaintiffs' access to YouTube and related services because Defendants perceive Plaintiffs and their content as "gay."

293.   Plaintiffs allege that:

a.   Defendants Google/YouTube expressly and impliedly represent, warrant and promise each Plaintiff (and all other public consumers who use YouTube) that Google/YouTube do not filter, curate, or regulate video content or otherwise limit access to or the distribution of video content and communication on YouTube based on a person or user's personal identity or viewpoint.  These contractual obligations include not using Plaintiffs' gender or sexual

**THIRD AMENDED CLASS ACTION COMPLAINT**

identity, sexual orientation, or association with or expression of  viewpoints as a basis for filtering, regulating, or restricting Plaintiffs' use of or access to YouTube.  Federal and California laws (including free speech, equal protection, antidiscrimination, unfair advertising, and consumer protection laws), prohibit Defendants from discriminating against Plaintiffs because they identify as , express  viewpoints, or create content for the  community.

        b.     Defendants Google/YouTube filter, regulate, restrain, restrict and interfere with Plaintiffs' use of and access to YouTube, by employing filters, vague standards, and biased human reviewers, to remove, strict and/or demonetize Plaintiffs' video content based upon Plaintiffs' respective individual  identities, their  viewpoints, and/or the fact that they create content for the  community.

        c.     Defendants have admitted that they have a "policy" of applying identity and viewpoint based standards and rules to deny services, and to remove, filter, regulate, restrict and/or demonetize Plaintiffs' speech -- based not on the actual content of videos but on Plaintiffs' respective individual sexual orientation, identity, viewpoint, and or those of Plaintiffs' intended viewers, in order to brand Plaintiffs' content as "shocking" because the video content was created by persons identified as "gay" or as expressing a "gay viewpoint."

        d.     Defendants are also engaged in affirmative, unlawful conduct intended to drive Plaintiffs and other "gay" content creators from the YouTube platform to further Google/YouTube's corporate profits and power.  Defendants' actions include unlawfully branding Plaintiffs' content as "inappropriate" or "shocking;" promoting and monetizing  hate speech on Plaintiffs' channels; discouraging or preventing viewers from following or subscribing to Plaintiffs' channels and content; using A.I. and other filtering and/or content restriction tools to decrease viewership of LBGTQ+ channels, or to shadow ban  content; preventing Plaintiffs from advertising or monetizing their video content; and unlawfully promoting Defendants' own or preferred video content which competes directly with Plaintiffs for audiences and  viewers by financially crushing, intimidating, or employing other unlawful discriminatory practices to prevent Plaintiffs from generating sufficient income from the YouTube platform to continue to create new content, and by steering Plaintiffs' subscribers and  viewers to Google/YouTube's own or

**THIRD AMENDED CLASS ACTION COMPLAINT**

1  preferred content.

2          e.      Defendants' conduct as alleged includes, but is not limited to:  (i)

3  monetizing, promoting, profiting from, and flooding Plaintiffs' channels, subscribers and viewers

4  with anti- hate speech, threats and intimidation; (ii) unsubscribing, cancelling, and interfering with

5  the Plaintiffs' established subscribers and followers; (iii) driving away or intimidating  audiences

6  from viewing Plaintiffs' content; (iv) and engaging in and using machine based A.I. tools and

7  human reviewers to filter, regulate or restrict Plaintiffs'  content, based on the identity and

8  viewpoints of the YouTube user; rather than on the actual video content posted on the YouTube

9  platform.

10        294.    Although Defendants have admitted, as they must at this stage of the proceedings,

11  the truth of each of these allegations, Google/YouTube assert that they are immune from liability

12  under §230, for any and all discrimination against  YouTube users, where the discrimination

13  arises, directly or derivatively, from the Defendants' filtering, regulating, restraining, restricting,

14  monetizing, or advertising activities on the YouTube internet platform based on a Plaintiffs'

15  sexual orientation, gender or personal identity or viewpoints.

16        295.    Specifically, at least three actual legal controversies exist between the parties at this

17  juncture of the proceedings regarding the extent to which §230 authorizes Google/YouTube to

18  exercise unfettered and absolute discretion to filter, regulate, restrain, restrict, limit, block,

19  monetize, advertise, disparage, or banish  content,  creators, and/or  viewers on the YouTube

20  platform based on the sexual orientation, identity, or viewpoints of  creators or  viewers.

21        **1.**      **An Actual Controversy Exists As To Whether 47 U.S.C. § 230(c)**
               **Immunizes Filtering And Restricting Internet Speech Based On The**

22                 **Identity Or Viewpoint Of The Speaker.**

23        296.    A controversy now exists as to whether the language of §230 immunizes an internet

24  service provider for filtering, regulating, and/or restricting online internet speech based on the

25  identity or viewpoint of the speaker or internet service user, rather than on the actual content of the

26  online internet speech.  Section 230 does not even mention, much less expressly authorize

27  filtering, regulating or restricting internet speech or expression based on the identity or viewpoint

28  of the speaker who is posting information on the internet.  Rather, §230(c) is tethered to the

filtering of the "information," "content" or "material" in the speech or video that appears on the service prover's internet platform. *See* 47 U.S.C. §230(c)(1), (2). Internet service providers' decisions to filter, regulate, and/or restrict content and information posted on an internet platform may be subject to immunity where the filtering, regulation, or restriction is based on the actual content which is posted to the internet platform. However, §230(c) does not authorize filtering, regulation or restriction of internet content based on the identity or viewpoint of the speaker or the user who posts information to the internet platform. *Id*.

297.    Despite the grant of immunity for decisions based on the underlying material/content that is posted and viewed on the YouTube platform, Google/YouTube contend that §230(c) immunity is absolute and applies to ***any*** filtering or regulation even filtering or regulation based on the users' personal identity or viewpoint rather than the material/content posted or viewed. Consequently, Google/YouTube argue that because the discriminatory conduct and animus perpetrated against users like Plaintiffs occurs under the pretext of filtering, regulating and restricting internet content, §230(c) immunity applies -- even though the actual content complies with all of Defendants' rules and standards, and the filtering, regulation and restriction is based on the sexual orientation, identity and/or viewpoints of the creators or viewers.

298.    Thus, a controversy now exists as to whether, §230(c) immunity for filtering, regulation and restriction of obscene, lewd, lascivious, filthy, excessively violent, harassing, or "otherwise objectionable" internet content immunizes Defendants' conduct regarding material/content which is not "obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable" on its face; but has been deemed "otherwise objectionable" because Defendants dislike Plaintiffs' identity or viewpoint; and/or dislike the identities or viewpoints of Plaintiffs' intended viewers.

299.    A declaration by this Court is needed to determine whether §230(c) immunity is limited to where the internet service provider is in fact filtering, regulating or restricting "information," "content," or "material" which actually appears on the internet platform, because that "information," "content," or "material" is "obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable;" and that §230(c) immunity does not apply when

1  the internet service provider filters, regulates or restricts access to the internet platform or services

2  based upon the user's personal identity or viewpoints, or because the internet service provider

3  finds the user's personal identity or viewpoints to be objectionable without regard to the actual

4  content that the user has posted.

5              **2.   An Actual Controversy Exists As To Whether Defendants'**

6                  **Determination That Plaintiffs' Content Is "Otherwise Objectionable"**
                  **Is Subject To Good Faith Review.**

7        300.   A controversy now exists as to whether §230(c) requires that Defendants exercise

8  objective, good faith when filtering and restricting content that it deems "otherwise objectionable."

9  §230 contains a broad, vague, ambiguous, and disjunctive "catchall" provision that purportedly

10 immunizes internet service providers from unlawfully filtering, regulating or restricting on-line

11 content that is "otherwise objectionable," **even if the content is _NOT_ "obscene, lewd, lascivious,**

12 **filthy, excessively violent, [or] harassing**." *See,* 47 U.S.C. §230(c)(2).  This catch-all provision

13 has been the subject of much disagreement among courts as to whether the "otherwise

14 objectionable" standard is subject to some objective, good faith review, or whether, as Defendants

15 contend, their decision concerning "otherwise objectionable" content is left to the unfettered,

16 subjective discretion or whim of the internet service provider, which may not be challenged.

17       301.   The ambiguity created by the "otherwise objectionable" language, is exacerbated

18 by §230(c)(2)(A) grant of immunity to "voluntary" actions undertaken "in ***good faith*** to restrict

19 access to or availability of material that the provider or user considers to be obscene, lewd,

20 lascivious, filthy, excessively violent, harassing, or otherwise objectionable," on the one hand, and

21 subsection (c)(2)(B) which applies to "***any*** action taken to enable or make available to information

22 content providers or others the technical means to restrict access to material described in

23 paragraph (1)," on the other hand.  *See*  47 U.S.C. § 230(c)(2) (emphasis added); Exhibit B, the

24 November 19, 2019-Order After Hearing issued in *Prager University v. Google LLC, et al.* Santa

25 Clara Super. Ct. No. 19CV340667 (declining to follow federal cases imposing a good faith

26 standard and review of a decision to block "otherwise objectionable" content and finding that

27 §230(c) protects subjective or bad faith decisions to filter and restrain on-line speech).

28       302.   A declaration from this Court is needed as to whether Defendants' claim of §230

immunity pursuant to the "otherwise objectionable" language is reviewable under an objective or "good faith" standard or, as whether as Google/YouTube contend, their conduct is unassailable no matter how arbitrary, capricious, discriminatory, or otherwise unlawful.

### 3.    An Actual Controversy Exists As To Whether 47 U.S.C. § 230(c) Is Unconstitutional As Applied To Plaintiffs On These Facts.

303.    To the extent that the language of §230(c) grants immunity to Google/YouTube for discriminating against, or otherwise using the personal identity or viewpoints of Plaintiffs to filter, regulate and/or restrict internet content and access to the YouTube platform, an actual controversy now exists as to whether such a broad and absolute Congressional grant of immunity renders §230(c) unconstitutional under the First and Fourteenth Amendments of the United States Constitution.

304.    Google/YouTube's use of §230(c) as a shield to prevent Plaintiffs from petitioning the courts for relief to redress violations of their civil, consumer, and contractual rights, including rights which expressly protect Plaintiffs as a class from identity or viewpoint based discrimination and speech restrictions, renders §230(c) an unlawful prior restraint of speech under the First Amendment of the U.S. Constitution and under Article 1, Section 2 of the California Constitution. To the extent that §230(c) is a Congressional statute that authorizes one party to discriminate against another party because of their sexual orientation or individual identity – or because of "the gay thing," §230 denies  YouTube users equal protection under the laws of United States and California, as guaranteed by the Fourteenth Amendment. Accordingly, if the Court construes §230(c) to grant Google/YouTube immunity from well pleaded allegations that seek to redress injuries arising from Defendants' anti-discrimination; unlawful restraint of speech; unfair business practices; consumer fraud; and contractual violations; Plaintiffs request that the Court declare §230(c) unconstitutional as applied to them under the First and/or Fourteenth Amendments of the U.S. Constitution, given the facts of this case.

**SECOND CAUSE OF ACTION**
**Violation Of California Constitution Article I, Section 2**
**(On Behalf Of Plaintiffs Individually And The YouTube Community Class)**

305.     Plaintiffs re-allege and incorporate herein by reference, as though set forth in full, each of the allegations set forth in paragraphs 1 through 304 above.

306.     Article I, section 2 of the California Constitution protects the liberty of speech and association, especially in public, quasi-public, and limited public spaces.

307.     In YouTube, Defendants created and maintain a public forum, or its functional equivalent.  First, Defendants solicit the general public to use YouTube by representing that its purpose, and primary use, is a place dedicated to free speech.  Second, Defendants expressly invite the public to visit the YouTube platform to engage in freedom of expression.  Third, the size and reach of YouTube's dominance over the expression and exchange of video-based speech is unparalleled.  Fourth, the relationship between the ideas sought to be presented and the function or purpose of the property are those of a "public forum," the cyber-equivalent of a town square where citizens exchange ideas on matters of public interest or concern.  Given these factors, Defendants' regulation of speech is supposed to be viewpoint-neutral, and the same rules should apply equally to all.

308.     Defendants describe YouTube as a "service that enables more than a billion users around the world to upload" videos, where users are urged to "Broadcast Yourself," "promote yourself" or "do the broadcasting yourself."  Furthermore, in YouTube's Terms of Service, Defendants state that YouTube is not legally or otherwise responsible for any third-party content: YouTube is not "responsible for the accuracy, usefulness, safety, or intellectual property rights of or relating to such Content"; responsibility for the "FOREGOING RESTS ENTIRELY WITH YOU [THE USER]."  These are not the statements of a publisher who tells the public they only print news "fit to print." Defendants do not merely sell edited news content to users; they monetize third-party public speech inviting "everyone" to "express themselves" on a "nearly limitless range of topics."

309.     Under California law, Defendants' regulation of speech on the YouTube platform

**THIRD AMENDED CLASS ACTION COMPLAINT**

is state action because Defendants perform an exclusively and traditionally public function: the regulation of speech within a designated public forum.  Accordingly, speech cannot be arbitrarily, unreasonably, or discriminatorily excluded, regulated, or restricted on the basis of viewpoint or the identity of the speaker and any such regulations must fully comply with protections afforded free speech and expression under the Liberty of Speech Clause and the long established jurisprudence governing the Clause's application.

310.    Videos of the Proposed Class constitute expressive speech and activity protected by Article I, section 2 of the California Constitution.

311.    Defendants have restricted the speech and expressive conduct of the Proposed Class based upon subjective, vague, and overbroad criteria that give Defendants unfettered and unbridled discretion to censor speech for any reason, or no reason at all, no matter how arbitrary or capricious.  Those criteria further fail to convey a sufficiently definite warning to Plaintiffs or to the public as to what is prohibited or restricted.  Defendants' adoption and application of those criteria on its face violates the Proposed  Class' right to free speech as guaranteed by Article I, section 2 of the California Constitution.  Further, that invidious potential has been borne out and evidenced by Defendants' application of those policies and procedures to censor Plaintiffs.

312.    Defendants also maliciously apply their censorship criteria, including the Terms of Service and Community Guidelines, as a pretext to censor and restrict Plaintiffs' speech, based not upon the content of the speech, but rather, upon the identity and political viewpoints of Plaintiffs.  Defendants' application of criteria and corresponding restraints on Plaintiffs' speech is arbitrary and capricious and/or is based upon political, religious, or other animus towards the identity and viewpoints of the speaker, not the actual content of the speech.

313.    Further, Plaintiffs are so restrained and punished because of the speakers featured in their videos, as well as those speakers' opinions, Defendants' actions impinge on and violate Plaintiffs' right to free association and assembly.  Defendants' actions also violate  Plaintiffs' right to free association and assembly, by blocking viewers' access to videos and comments.

314.    No compelling, significant, or legitimate reason justifies Defendants' actions.  Even if such interests did exist to justify Defendants' restriction and demonetization rules generally, the

**THIRD AMENDED CLASS ACTION COMPLAINT**

1   restrictions imposed on Plaintiffs' speech, are not narrowly or reasonably tailored to further such

2   interests, because they sweep within their ambit inoffensive and non-graphic discussions intended

3   and designed for educational purposes.  Given Defendants' monopolistic control over search

4   results, including video search results, as well as online video streaming, Plaintiffs have no

5   alternative affording it a reasonable opportunity to reach their full intended audience.

6       315.    Defendants' discriminatory policies and application of those policies are not

7   viewpoint-neutral, are unreasonable in time, place, and manner, and are unreasonable in relation to

8   the nature, purpose, and use of the forum.  They impose an unreasonable prior restraint on

9   Plaintiffs' protected political speech, motivated by impermissible discrimination against Plaintiffs'

10  identity and viewpoint.

11      316.    Defendants' intentional and wrongful actions were taken with oppression, fraud,

12  malice and/or are arbitrary and capricious, and as part of Defendants' normal course of business,

13  effectuated through both algorithms, as well as through human agents.  And Defendants' actions

14  were done with the intent to deprive Plaintiffs and their viewers of their rights under the California

15  Constitution.

16      317.    As a direct and proximate result of Defendants' violations of clearly established

17  law regarding public fora,  Plaintiffs have suffered, and continue to suffer, immediate and

18  irreparable injury in fact, including lost income, reduced viewership, and damage to brand,

19  reputation, and goodwill, for which there exists no adequate remedy at law.

20                          **THIRD CAUSE OF ACTION**

21  **Violation Of California Unruh Civil Rights Act—Civil Code §§ 51, e*t seq*.**
    **(On Behalf Of Plaintiffs And The YouTube Community Class)**

22      318.    Plaintiffs re-allege and incorporate herein by reference, as though set forth in full,

23  each of the allegations set forth in paragraphs 1 through 317 above.

24      319.    Defendants Google and YouTube host business establishments under the Unruh

25  Civil Rights Act, California Civil Code §51 *et seq*.  Defendants grant the public unrestricted

26  access to YouTube for commercial reasons that are at the core of their business model and the

27  source of virtually all of their revenue.

28

**THIRD AMENDED CLASS ACTION COMPLAINT**

320.     Despite their promises of neutrality and a diversity of viewpoints, Defendants engage in a pattern and practice of intentional willful and malicious discrimination in the provision of their services, including discriminating against and censoring of Plaintiffs' speech, based not upon the content of speech, but on their sexual orientation and political identity and viewpoint.  Through the acts complained of herein, Defendants intentionally denied, and aided or incited in denying, Plaintiffs full and equal accommodations, advantages, privileges, and services, by discriminating against it in demonetizing Plaintiffs' content, and by placing its videos in Restricted Mode.

321.     A substantial motivating reason for Defendants' conduct is Defendants' subjective perception of Plaintiffs' political identity, viewpoints, cultural and religious and sexual orientation, as well as those of others with whom Plaintiffs are associated.  Defendants' restrictions on Plaintiffs' video content is the result of arbitrary, capricious, invidious, and pretext-based discrimination against Plaintiffs' political and religious identity and sexual orientation and viewpoints.  It is also wholly without any legitimate, reasonable business interest, as the content of the restricted and demonetized Plaintiffs' videos are completely compliant with the letter and spirit of Defendants' Terms of Service and Community Guidelines, including satisfying and complying with all of Defendants' criteria and rules for reaching younger and "sensitive" audiences.  In sum, Defendants are censoring and treating Plaintiffs and their videos differently from Defendants' own or preferred content, solely because of discriminatory animus towards Plaintiffs' identities and views.

322.     Defendants' wrongful actions were taken with oppression, fraud and/or malice, effectuated through both the Google/YouTube algorithms, as well as manual human review of Plaintiffs' videos and appeals.

323.     As a direct and proximate result of Defendants' unlawful discriminatory actions, Plaintiffs suffered, and continue to suffer, irreparable injury in fact, including, but not limited to: lower viewership, lost advertising opportunities otherwise available to other nonprofits, decreased ad revenue, and reputational damage, for which there exists no adequate remedy at law.

324.     Defendants' violations of the Unruh Act further entitle Plaintiffs to recover

1  statutory damages of up to three times the amount of actual damages in an amount to be proven at

2  trial, or a minimum of $4,000 per violation.

3  **FOURTH CAUSE OF ACTION**
**Unfair Competition In Violation Of**

4  **California Business And Professions Code §§ 17200, *et seq*.**
**(On Behalf Of Plaintiffs And The YouTube Community Class)**

5

6       325.    Plaintiffs re-allege and incorporate herein by reference, as though set forth in full,

7  each of the allegations set forth in paragraphs 1 through 324 above.

8       326.    Defendants have committed acts of unfair competition, as defined by California

9  Business and Professions Code §17200, by engaging in the practices described above.

10       327.    Defendants' policies and practices, and their application of the same to Plaintiffs,

11  constitute unlawful, unfair or fraudulent business acts or practices within the meaning of

12  California Business and Professions Code §17200.  Defendants' policies, as well as their

13  application, violate the policy and spirit of the Unruh Act, the Lanham Act, the California

14  Constitution, and prior court decisions.  In addition, Defendants compete with third-party content

15  providers like Plaintiffs, and Defendants' arbitrary and capricious restrictions on their competitors'

16  speech and content significantly threatens or harms competition.  Those actions are likely to

17  mislead the public, and do mislead the public, about YouTube, Defendants' videos, Plaintiffs, and

18  Plaintiffs' videos.  Content creators, advertisers, and viewers trust and rely on Defendants for an

19  open marketplace of ideas and expression, and further that when videos are restricted or

20  demonetized, that those videos are truly, and in good faith, deemed inappropriate for viewing by

21  minors or sensitive viewers.

22       328.    There is no utility to the public for Defendants' actions, where those restrictions

23  treat Plaintiffs and others similarly situated differently, simply because of their perceived politics

24  and the identity of their speaker.  To the extent that Defendants' arbitrarily and discriminatorily-

25  applied policies have any utility whatsoever, that utility is significantly outweighed by the harm

26  which they impose on consumers and the public.  Defendants have alternatives to this conduct that

27  would be less harmful to consumers, but do not adopt or apply them because of their bias against

28  Plaintiffs and others similarly situated.

329.     As a direct and proximate result of the aforementioned acts, Plaintiffs have suffered, and continue to suffer, immediate and irreparable injury in fact, including lost income, reduced viewership, and damage to brand, reputation, and goodwill, for which there exists no adequate remedy at law.

330.     Defendants' wrongful actions were taken with oppression, fraud and/or malice.

### FIFTH CAUSE OF ACTION
**Breach Of Implied Covenant Of Good Faith And Fair Dealing
(On Behalf Of Plaintiffs And The YouTube Community Class)**

331.     Plaintiffs re-allege and incorporate herein by reference, as though set forth in full, each of the allegations set forth in paragraphs 1 through 330 above.

332.     Under California law, every contract "imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement." *McClain v. Octagon Plaza, LLC,* 159 Cal.App.4th 784, 798 (2008) (quoting *Carma Developers (Cal.), Inc. v. Marathon Dev. Cal., Inc.*, 2 Cal.4th 342, 371–72 (1992)).

333.     The covenant "is based on general contract law and the long-standing rule that neither party will do anything which will injure the right of the other to receive the benefits of the agreement." *Waller v. Truck Ins. Exchange, Inc.*, 11 Cal.4th 1, 36 (1995). The covenant of good faith finds particular application in situations where one party is invested with a discretionary power affecting the rights of another. When a contract confers on one party a discretionary power affecting the rights of the other, a duty is imposed to exercise that discretion in good faith and in accordance with fair dealing" and such discretion "must be exercised in good faith." *Carma*, 2 Cal.4th at 372; *see also Perdue v. Crocker Nat'l Bank*, 38 Cal.3d 913, 923 (1985) ("where a contract confers on one party a discretionary power affecting the rights of the other, a duty is imposed to exercise that discretion in good faith and in accordance with fair dealing").

334.     Breach of the implied covenant occurs "[w]here the terms of a contract are literally complied with but one party to the contract deliberately countervenes the intention and spirit of the contract." *Hilton Hotels Corp. v. Butch Lewis Prod., Inc.*, 808 P.2d 919, 922–23 (Nev. 1991). "Establishing such a breach of the implied covenant depends upon the 'nature and purposes of the

1    underlying contract and the legitimate expectations of the parties arising from the contract."

2    *Integrated Storage Consulting Servs., Inc. v. NetApp, Inc.*, No. 5:12-CV-06209-EJD, 2013 WL

3    3974537, at *7 (N.D. Cal. July 31, 2013).

4         335.    Five factual elements are required to establish a breach of the covenant of good

5    faith and fair dealing: (1) the parties entered into a contract; (2) the plaintiff fulfilled his

6    obligations under the contract; (3) any conditions precedent to the defendant's performance

7    occurred; (4) the defendant unfairly interfered with the plaintiff's rights to receive the benefits of

8    the contract; and (5) the plaintiff was harmed by the defendant's conduct.  Judicial Council of

9    California Civil Jury Instruction 325.

10        336.    Plaintiffs and Defendants have entered into contracts, including the Terms of

11   Service, in connection with Plaintiffs' use and access to YouTube and the related services

12   Defendants offer under those contracts.

13        337.    Plaintiffs have fulfilled their obligations under the Terms of Service and other

14   agreement(s) and fulfilled or performed the conditions precedent, if any, under those agreement(s),

15   including complying with YouTube's viewpoint-neutral, content-based access rules and granting

16   Defendants an irrevocable and perpetual license to their video content and any personal

17   information and data derived from Plaintiffs' use or content on YouTube, and paying Defendants

18   other consideration for services and access.

19        338.    Defendants unfairly interfered with Plaintiffs' rights by profiling and using their

20   race, gender, sexual and/or personal identity or viewpoint to deny them equal access to YouTube

21   and its related services based on conduct that that is prohibited by and not permitted under

22   California or federal law.

23        339.    As a direct and proximate result of Defendants' breach, Plaintiffs have suffered

24   monetary damages and other financial harms and losses in excess of $500.00 per year, plus other

25   lost revenues, including the monetary value of unlawfully acquired property and license rights to

26   Plaintiffs' content and the personal data and information derived from Plaintiffs and their

27   subscribers and viewers, the total amount of which will be determined at trial.

28        340.    As a direct and proximate result of Defendants' breach, Plaintiffs have also

**THIRD AMENDED CLASS ACTION COMPLAINT**

1  suffered irreparable harm to their contractual based speech rights and expression provided for,

2  subject to only to viewpoint-neutral, content-based rules as set forth in the express and implied

3  provisions of the Terms of Service and other contract(s)..

4                                    **SIXTH CAUSE OF ACTION**
                       **Violation Of The Lanham Act — 15 U.S.C. §§ 1125 *et seq*.**
5                                    **(On Behalf Of Plaintiffs )**

6        341.    Plaintiffs re-allege and incorporate herein by reference, as though set forth in full,

7  each of the allegations set forth in paragraphs 1 through 340 above.

8        342.    Defendants are engaged in interstate commerce through hosting, creating,

9  advertising, and soliciting and receiving revenue for advertising, and video streaming services on

10  YouTube.

11        343.    In addition, Defendants compete directly with Plaintiffs in the marketing of online

12  video streaming by creating, hosting, and promoting their own video content, and the video

13  content of a hand-picked cadre of creators with whom they partner or sponsor.  Among other

14  things, Defendants' sponsored content competes directly with Plaintiffs for viewers, advertisers,

15  and monetization or other revenue sources on YouTube.

16        344.    As alleged more fully above, Defendants' intentional willful and malicious use in

17  commerce words, terms, names, symbols, devices, and combinations thereof, and false and

18  misleading representations of fact that are both likely to cause confusion, or cause mistake, or to

19  deceive as to the affiliation, connection, or association of Plaintiffs with other persons, as to the

20  origin, sponsorship or approval of goods or services by Plaintiffs, and in commercial advertising

21  and/or promotion, misrepresents the nature, characteristics and qualities of their, Plaintiffs, and

22  others' goods, services, or commercial activities.

23        345.    Defendants' false statements and implications that Plaintiffs' content contain

24  "nudity, vulgarity, violence, hate, shocking or sexually explicit material" in violation of

25  YouTube's viewpoint-neutral, content-based rules are sent directly to the same viewers and are

26  made available to THE same advertisers, for whom Defendants compete directly with Plaintiffs

27  and other class members.

28

346.    These false statements and implications to millions of viewers that Plaintiffs' videos are "Restricted" because they, according to Defendants, contain "nudity, vulgarity, violence, hate, shocking or sexually explicit material" and violate YouTube's Terms of Service and Community Guidelines, are inconsistent with YouTube's purportedly viewpoint-neutral, content-based rules.

347.    These false statements and implications have a tendency to deceive or confuse those viewers and advertisers to believe that Plaintiffs' videos contain "nudity, vulgarity, violence, hate, shocking or sexually explicit material" when Plaintiffs' videos contain no such material harms Plaintiffs' ability to compete for viewer reach, advertising, and other monetization opportunities on YouTube.

348.    Defendants' branding of Plaintiffs' videos as "Restricted" makes or implies a specific and falsifiable misrepresentation to Plaintiffs' consumers and the viewing public that the video that they have attempted to access contains content that is so inappropriate, shocking and outrageous for the viewer who has chosen to enable "Restricted Mode" that the viewer must be protected from that content and that the YouTuber who has created and posted that content is responsible for having created and uploaded such inappropriate, shocking and outrageous content.

349.    These specific and falsifiable factual representations, both on their face and as implied, are by no means limited to Defendants' foreboding red "Restricted Mode" stamp of disapproval.  Indeed, as shown below, viewers who attempt to ascertain why a particular video is subject to "Restricted Mode" are told by Defendants that videos are eliminated from "Restricted Mode" when they include specific pieces of content, including content (1) Talking about drug use or abuse, or drinking alcohol; (2) Overly detailed conversations about or depictions of sex or sexual activity; (3) Graphic descriptions of violence, violent acts, natural disasters and tragedies, or even violence in the news; (4) Videos that cover specific details about events related to terrorism, war, crime, and political conflicts that resulted in death or serious injury, even if no graphic imagery is shown; (5) Inappropriate language, including profanity; and (6) Video content that is gratuitously incendiary, inflammatory, or demeaning towards an individual or group.

350.    This improper conduct also includes, without limitation, Defendants' inclusion of

homophobic and hate speech on or in close proximity to content posted by Plaintiffs on YouTube, by way of video recommendations, playing anti-gay advertisements in connection with Plaintiffs' videos, and the improper inclusion of homophobic and hate speech comments on or in close proximity to content posted by Plaintiffs, which inclusion is part of Defendants' overall promotion of the YouTube service and significantly misleads consumers as to the affiliation, connection, or association of Plaintiffs to the persons, viewpoints and opinions expressed in such content.

351.   This improper conduct further includes, without limitation, Defendants' improper use of words, terms, names, symbols, devices, and combination thereof in connection with the promotion of their service as a neutral public forum.

352.   As alleged more fully above, when a network administrator or an individual viewer activates "Restricted Mode," each video subject to "Restricted Mode" appears with a Defendant-created stamp of disapproval, including a red face including a red square bearing a foreboding and disapproving facial expression that demeans and otherwise stigmatizes the content subject to "Restricted Mode," together with text showing "This video is unavailable with Restricted Mode enabled.  To view this video, you will need to disable Restricted Mode."

353.   As part of advertising and promoting YouTube to consumers that purportedly wish to protect themselves from specific forms of content and as part of promoting YouTube's own content, Defendants advertise "Restricted Mode" to consumers as a tool that will enable consumers to shield themselves from content (1) Talking about drug use or abuse, or drinking alcohol in videos; (2) Overly detailed conversations about or depictions of sex or sexual activity; (3) Graphic descriptions of violence, violent acts, natural disasters and tragedies, or even violence in the news; (4) Videos that cover specific details about events related to terrorism, war, crime, and political conflicts that resulted in death or serious injury, even if no graphic imagery is shown; (5) Inappropriate language, including profanity; and (6) Video content that is gratuitously incendiary, inflammatory, or demeaning towards an individual or group.

354.   Defendants have applied "Restricted Mode" to numerous videos created and uploaded to YouTube by Plaintiffs that do not contain any elements (1) Talking about drug use or abuse, or drinking alcohol in videos; (2) Overly detailed conversations about or depictions of sex

1   or sexual activity; (3) Graphic descriptions of violence, violent acts, natural disasters and

2   tragedies, or even violence in the news; (4) Videos that cover specific details about events related

3   to terrorism, war, crime, and political conflicts that resulted in death or serious injury, even if no

4   graphic imagery is shown; (5) Inappropriate language, including profanity; and (6) Video content

5   that is gratuitously incendiary, inflammatory, or demeaning towards an individual or group.  By

6   misapplying "Restricted Mode" to Plaintiffs' videos, Defendants falsely degrade and stigmatize

7   Plaintiffs' videos while simultaneously enhancing the image and goodwill of their own content,

8   and that of their partners and/or sponsored creators.  They accomplish this by labelling Plaintiffs'

9   content as "shocking," "inappropriate," "offensive," "sexually explicit,' "obscene," unfit for

10  minors, or the "gay thing" under the pretext of keeping the platform safe for users.

11          355.    These deceptive representations are particularly egregious in the context of

12  YouTube's repeated and false self-promotion, discussed above, as a viewpoint-neutral and

13  politically neutral place for free speech and "an open marketplace of ideas," where the public is

14  invited to engage in freedom of expression and speech.  In this context – where Defendants

15  represent to the public that the only content they restrict is content that is unprotected by principles

16  of free speech – Defendants repeated false representations and unfair competition both deceived,

17  and had a tendency to deceive, substantial segments of Plaintiffs' audiences, subscribers, viewers,

18  and advertisers, who are induced by Defendants to falsely believe that Plaintiffs are associated

19  with the hate speech that Defendants permit to be associated with their content and, further, falsely

20  believe that Plaintiffs' content contains elements that such subscribers, viewers, and advertisers

21  wish to avoid – including content (1) Talking about drug use or abuse, or drinking alcohol in

22  videos; (2) Overly detailed conversations about or depictions of sex or sexual activity; (3) Graphic

23  descriptions of violence, violent acts, natural disasters and tragedies, or even violence in the news;

24  (4) Videos that cover specific details about events related to terrorism, war, crime, and political

25  conflicts that resulted in death or serious injury, even if no graphic imagery is shown; (5)

26  Inappropriate language, including profanity; and (6) Video content that is gratuitously incendiary,

27  inflammatory, or demeaning towards an individual or group.

28          356.    As a direct and proximate result of Defendants' actions complained of herein,

1   Plaintiffs have suffered, and continue to suffer, immediate and irreparable injuries in fact,

2   including injuries in the form of fewer subscribers to their respective YouTube channels, diverted

3   viewership and additional unlawfully obtained viewers for YouTube's produced content, fewer

4   viewers of their videos(particularly by isolated and vulnerable  viewers who would benefit from

5   the video content), fewer notifications to subscribers regarding their posting of new video content,

6   fewer or no recommendations of their videos to viewers from Defendants, decreased ad revenue, a

7   reduction in advertisers willing to purchase advertisements shown on Plaintiffs' videos, and

8   damage to their respective brands, reputations and goodwill, which has collectively cost Plaintiffs

9   millions of dollars.

10          357.    Defendants' wrongful actions were taken with oppression, fraud and/or malice.

11   Plaintiffs have repeatedly attempted to remedy the situation, and Defendants have repeatedly

12   refused to un-restrict or re-monetize Plaintiffs' videos.  Defendants have attempted to justify their

13   differential treatment of Plaintiffs and their respective videos as necessary to protect sensitive

14   viewers throughout the world, or as a response to a report that video content was offensive

15   received from someone located somewhere in the world.  Defendants' treatment of  creator videos

16   like those of Plaintiffs is part of their normal course of business, effectuated through both the

17   Google/YouTube algorithms, as well as through their agents manually reviewing Plaintiffs' videos

18   and conducting appeals.

19                              **PRAYER FOR RELIEF**

20          1.      For a Declaratory Judgment that §230(c) does not provide immunity for, or

21   otherwise apply to claims and allegations that arise from or relate to Defendants

22   Google/YouTube's unlawful use of the user's sexual orientation, gender identity, race or ethnicity,

23   or political, religious, moral, or personal viewpoints to filter, restrict, or block content, or to

24   otherwise deny Plaintiffs' access or use of any services offered by Google/YouTube in connection

25   with Plaintiffs' use of YouTube under the plain language of §230 and the First and/or Fourteenth

26   Amendments of the U. S. Constitution.

27          2.      For an injunction requiring Defendants to:

28

**THIRD AMENDED CLASS ACTION COMPLAINT**

1           a.      Cease and desist from capriciously restricting, demonetizing, or otherwise censoring any content of videos uploaded to the YouTube site in violation of federal and California law; and

           b.      Cease and desist from censoring, restricting, restraining, or regulating speech based on the discretionary use or application of discriminatory, animus-based, arbitrary, capricious, vague, unspecified, or subjective criteria, rules, guidelines, and/or practices;

3.      For compensatory, special, and statutory damages in an amount to be proven at trial, including statutory damages of $1500.00 for each violation of the Unruh Act, and any other legal damages or monetary relief under Civil Code §§51, 51.5, 52, Civil Procedure Code §1021.5, 15 U.S.C. §1117;

4.      A civil penalty of $2,500 for each violation pursuant to Business and Professions Code §§17200, 17206, and 17536;

5.      For punitive damages and exemplary damages in an amount to be proven at trial;

6.      For restitution of financial losses or harm caused by Defendants' conduct and ill-gotten gains, and disgorgement of profit obtained from all unlawful conduct in an amount to be proven at trial;

7.      Attorney's fees and costs of suit;

8.      For prejudgment and post-judgment interest; and

9.      For any and all other relief that the Court deems just and proper.

## JURY DEMAND

Plaintiffs demand trial by jury on all issues of law so triable.

1    DATED:  January 20, 2021          Respectfully submitted,

2                                      BROWNE GEORGE ROSS
                                        O'BRIEN ANNAGUEY ELLIS LLP
3                                          Peter Obstler

4

5

6                                      By:  _____
                                                Peter Obstler
7                                      Attorneys for  Plaintiffs Divino LLC, Chris Knight,
8                                      Celso Dulay, Cameron Stiehl, BriaAndChrissy LLC,
                                        Bria Kam, Chrissy Chambers, Chase Ross, Brett
9                                      Somers, Lindsay Amer, Stephanie Frosch, Sal
                                        Cinquemani, Tamara Johnson, and Greg Scarnici
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28