UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

DIVINO GROUP LLC, et al.,

              Plaintiffs,

     v.

GOOGLE LLC, et al.,

              Defendants.

Case No.  19-cv-04749-VKD

**ORDER GRANTING DEFENDANTS' MOTION TO DISMISS THIRD AMENDED COMPLAINT WITH LIMITED LEAVE TO AMEND**

Re: Dkt. Nos. 77, 102

      Defendants Google LLC ("Google") and YouTube LLC ("YouTube") move to dismiss plaintiffs' third amended class action complaint.  Plaintiffs oppose the motion.  Upon consideration of the moving and responding papers, including the notices and memoranda submitted by the United States and the parties' responses thereto, as well as the oral arguments of counsel, the Court grants defendants' motion to dismiss, with leave to amend only as to plaintiffs' claim for breach of the implied covenant of good faith and fair dealing.[1]

## I.     BACKGROUND

      Plaintiffs Divino Group LLC, Chris Knight, Celso Dulay, Cameron Stiehl, BriaAndChrissy LLC d/b/a "BriaAndChrissy," Bria Kam, Chrissy Chambers, Chase Ross, Brett Somers, Lindsay Amer, Stephanie Frosch, Sal Cinquemani (also known as "SalBardo"), Tamara (Sheri) Johnson, and Greg Scarnici are Lesbian, Gay, Bisexual, Transgender, Transsexual or Queer ("LGBTQ+") content creators, viewers, users, and consumers who filed this putative class action against Google and

---

[1] All parties have expressly consented that all proceedings in this matter may be heard and finally adjudicated by a magistrate judge.  28 U.S.C. § 636(c); Fed. R. Civ. P. 73; Dkt. Nos. 5, 16, 17.

United States District Court
Northern District of California

YouTube.  Plaintiffs claim that despite YouTube's purported viewpoint neutrality, defendants have discriminated against them based on their sexual or gender orientation, identity, and/or viewpoints by censoring, demonetizing, or otherwise interfering with certain videos that plaintiffs uploaded to YouTube.  Dkt. No. 67 ¶ 1; *see also id*. ¶¶ 35-44.[2]

Plaintiffs filed their original complaint on August 13, 2019 (Dkt. No. 1) and an amended complaint on November 12, 2019 (Dkt. No. 7).

On January 6, 2020, the Court granted plaintiffs' unopposed motion for leave to file a second amended complaint ("SAC").  Dkt. No. 23.  The SAC asserted claims for (1) violation of plaintiffs' First Amendment rights under 42 U.S.C. § 1983; (2) violation of Article I, section 2 of the California Constitution; (3) violation of the Unruh Act, California Civil Code §§ 51, *et seq*.; (4) unfair competition under California Business and Professions Code §§ 17200, *et seq*.; (5) breach of the implied covenant of good faith and fair dealing; and (6) false advertising and false association in violation of the Lanham Act, 15 U.S.C. § 1125, *et seq*.  In addition, plaintiffs sought a declaration that Section 230 of the Communications Decency Act ("CDA"), 47 U.S.C. § 230(c), on which plaintiffs expected defendants to rely as an affirmative defense, is unconstitutional.  Plaintiffs also separately sought a declaration that defendants violated the rights and obligations pled as the bases for all of plaintiffs' other claims.  Dkt. No. 20.

Defendants moved to dismiss all of the claims in the SAC pursuant to Rule 12(b)(6) for failure to state a claim and as barred by Section 230 of the CDA.  Dkt. No. 25.  On January 6, 2021, the Court granted defendants' motion to dismiss, with limited leave to amend.  Dkt. No. 65.  The Court dismissed plaintiffs' First Amendment claim without leave to amend, concluding that defendants are not state actors, YouTube is not a public forum, and that the availability of protections under CDA Section 230 does not amount to government endorsement of defendants' alleged discrimination.  *Id*. at 7-12.  Plaintiffs' Lanham Act claim for alleged false advertising[3] was dismissed with leave to amend.

---

[2] The Court assumes the parties' familiarity with the general background facts as described in its prior order on defendants' motion to dismiss plaintiffs' second amended complaint (Dkt. No. 65 at 2-6) and does not repeat those facts in this order.

[3] Plaintiffs withdrew their Lanham Act claim to the extent it was based on false association.  They also appeared to abandon allegations that defendants violate the Lanham Act by describing

United States District Court
Northern District of California

United States District Court
Northern District of California

The Court concluded that plaintiffs' theory—i.e., that by making plaintiffs' videos inaccessible through application of Restricted Mode, defendants falsely implied that the videos contain shocking or inappropriate content—is squarely foreclosed by *Prager Univ. v. Google LLC* ("*Prager III*"), 951 F.3d 991 (9th Cir. 2020). *Id*. at 12-14. Having dismissed the only claims giving rise to federal jurisdiction, and noting that the SAC did not expressly invoke federal jurisdiction under the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d), the Court declined to exercise jurisdiction over plaintiffs' state law claims and dismissed those state claims without prejudice. *Id*. at 16. The Court dismissed plaintiffs' claim for declaratory relief regarding CDA Section 230 because declaratory relief is a remedy, not an independent cause of action; the claim was based on plaintiffs' First Amendment claim, which was dismissed; and because the Declaratory Judgment Act cannot be used to anticipate an affirmative defense. *Id*. at 17-18. Plaintiffs' omnibus claim for declaratory relief was dismissed as improper, and because plaintiffs failed to state any federal claim over which the Court could exercise jurisdiction, and because the Court declined to exercise supplemental jurisdiction over plaintiffs' state law claims. *Id*. at 18-19.

Plaintiffs were given leave to amend their Lanham Act false advertising claim, and to reassert their state law claims for relief. They were also given leave to attempt to plead CAFA jurisdiction. *Id*. at 16, 19.

Plaintiffs' operative third amended class action complaint ("TAC") asserts a Lanham Act claim (claim 6), as well as several state law claims for violation of Article I, section 2 of the California Constitution (claim 2); violation of the Unruh Act (claim 3); unfair competition under California Business and Professions Code § 17200, *et seq.* (claim 4); and breach of the implied covenant of good faith and fair dealing (claim 5). Additionally, plaintiffs again seek a declaration that CDA Section 230, which defendants have raised as a defense, is unconstitutional (claim 1). Plaintiffs assert that federal question jurisdiction exists by virtue of the Lanham Act claim. They also contend that their declaratory relief claim provides an additional independent basis for federal question jurisdiction under 28 U.S.C. § 1331. The TAC further asserts that federal jurisdiction also exists under CAFA, 28 U.S.C.

---

YouTube as a viewpoint-neutral community that values freedom of expression. *See* Dkt. No. 65 at 12-13; *see also* Dkt. No. 25 at 17-18; Dkt. No. 36 at 24-27; Dkt. No. 62 at 29:9-13.

United States District Court
Northern District of California

1   § 1332(d).  Plaintiffs assert that the Court has supplemental jurisdiction over their state law claims, 28

2   U.S.C. § 1367.  Dkt. No. 67 ¶¶ 61-62.

3          Defendants move pursuant to Rule 12(b)(6) to dismiss all claims in the TAC without

4   further leave to amend, arguing that plaintiffs still fail to assert facts supporting a cognizable claim

5   for false advertising under the Lanham Act.  Defendants further contend that the TAC fails to state

6   sufficient facts to support any of plaintiffs' state law claims for relief, and that all such claims are

7   barred by CDA Section 230.

8   **II.     LEGAL STANDARD**

9          "A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) for failure to state a

10   claim upon which relief can be granted 'tests the legal sufficiency of a claim.'"  *Conservation*

11   *Force v. Salazar*, 646 F.3d 1240, 1241-42 (9th Cir. 2011) (quoting *Navarro v. Block*, 250 F.3d

12   729, 732 (9th Cir. 2001)).  When determining whether a claim has been stated, the Court accepts

13   as true all well-pled factual allegations and construes them in the light most favorable to the

14   plaintiff.  *Reese v. BP Exploration (Alaska) Inc.*, 643 F.3d 681, 690 (9th Cir. 2011).  While a

15   complaint need not contain detailed factual allegations, it "must contain sufficient factual matter,

16   accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556

17   U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A claim is

18   facially plausible when it "pleads factual content that allows the court to draw the reasonable

19   inference that the defendant is liable for the misconduct alleged."  *Id.*

20          The Court is not required to "'assume the truth of legal conclusions merely because they

21   are cast in the form of factual allegations.'"  *Prager Univ. v. Google LLC* ("*Prager I*"), No. 17-

22   CV-06064-LHK, 2018 WL 1471939, at *3 (N.D. Cal. Mar. 26, 2018) (quoting *Fayer v. Vaughn*,

23   649 F.3d 1061, 1064 (9th Cir. 2011) (per curiam)).  Nor does the Court accept allegations that

24   contradict documents attached to the complaint or incorporated by reference, *Gonzalez v. Planned*

25   *Parenthood of L.A.*, 759 F.3d 1112, 1115 (9th Cir. 2014), or that rest on "allegations that are

26   merely conclusory, unwarranted deductions of fact, or unreasonable inferences," *In re Gilead Scis.*

27   *Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008).

28          A court generally may not consider any material beyond the pleadings when ruling on a

4

Rule 12(b)(6) motion.  If matters outside the pleadings are considered, "the motion must be treated as one for summary judgment under Rule 56."  Fed. R. Civ. P. 12(d).  However, documents appended to the complaint, incorporated by reference in the complaint, or which properly are the subject of judicial notice may be considered along with the complaint when deciding a Rule 12(b)(6) motion.  *Khoja v. Orexigen Therapeutics*, 899 F.3d 988, 998 (9th Cir. 2018); *see also Hal Roach Studios, Inc. v. Richard Feiner & Co., Inc.*, 896 F.2d 1542, 1555 n.19 (9th Cir. 1990).  Likewise, a court may consider matters that are "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned."  *Roca v. Wells Fargo Bank, N.A.*, No. 15-cv-02147-KAW, 2016 WL 368153, at *3 (N.D. Cal. Feb. 1, 2016) (quoting Fed. R. Evid. 201(b)).

## III.   DISCUSSION

### A.   Federal Jurisdiction

The Court first examines the claims plaintiffs assert in support of federal jurisdiction.  As discussed above, the TAC alleges federal question jurisdiction, 28 U.S.C. § 1331, based on plaintiffs' Lanham Act claim and on their claim for declaratory judgment.  The TAC also alleges CAFA jurisdiction under 28 U.S.C. § 1332(d).

#### 1.   Lanham Act Claim

The Court previously dismissed plaintiffs' Lanham Act false advertising claim[4] as foreclosed by *Prager III*, in which the Ninth Circuit held that statements about videos being unavailable in Restricted Mode are simply accurate explanations of the application of defendants' content review and monitoring procedures, and are not actionable as commercial advertising or promotion.  *See Prager III*, 951 F.3d at 999-1000; *see also* Dkt. No. 65 at 12-14.  This Court further noted that plaintiffs "do not explain how the purported competition between plaintiffs and defendants transforms defendants' explanatory statements into commercial advertising and

---

[4] Although the TAC appears to reassert allegations that defendants violate the Lanham Act through false association and defendants' alleged "promotion of their service as a neutral public forum" (*see, e.g.,* Dkt. No. 67 ¶¶ 344, 350, 351, 355), as discussed above, plaintiffs were given leave to amend their Lanham Act claim only to the extent it was based on false advertising.  *See* Dkt. No. 65 at 19.

United States District Court
Northern District of California

1    promotion or into specific representations of fact about particular videos." Dkt. No. 65 at 14.

2        In the TAC, plaintiffs' false advertising claim (asserted by plaintiffs only on their own behalf)

3    continues to rest on the theory that by making their videos inaccessible through the application of

4    Restricted Mode, YouTube falsely implies that the videos contain shocking or inappropriate content,

5    such as "nudity, vulgarity, violence, hate, shocking or sexually explicit material." *See* Dkt. No. 67

6    ¶¶ 91-106; 341-357.  Plaintiffs further allege that defendants "compete directly" with plaintiffs "in

7    the marketing of online video streaming" and misapply Restricted Mode to plaintiffs' videos in

8    order to "falsely degrade and stigmatize" plaintiffs' videos "while simultaneously enhancing the

9    image and goodwill of [defendants'] own content, and that of their partners and/or sponsored

10    creators." *Id*. ¶¶ 343, 354.  Plaintiffs claim that they have been injured in the form of fewer

11    subscribers and viewers, diverted viewership, fewer notifications to subscribers regarding new

12    video content, fewer or no recommendations of their videos by defendants to viewers, decreased

13    ad revenue, a reduction in advertisers willing to purchase advertisements shown on plaintiffs'

14    videos, and "damage to [plaintiffs'] respective brands, reputations and goodwill[.]" *Id*. ¶ 356.

15        Plaintiffs emphasize that the alleged false implications of Restricted Mode are communicated

16    not only to viewers, but also to advertisers, and are intended to sway viewers and advertisers to watch

17    defendants' videos, rather than plaintiff's videos. *See* Dkt. No. 85 at 5.  However, nothing in the TAC,

18    including in the particular paragraphs cited by plaintiffs (*see* Dkt. No. 67 ¶¶ 3-4, 7, 13, 17, 22-24,

19    26.b., 80, 82-89, 95.b., 96-112, 133, 138.c., 192-93, 197, 201, 211, 232, 234, 238-39, 243-44, 246,

20    257, 259, 262, 268, 341-357) changes the character of the challenged statements that videos are

21    "unavailable" or "restricted" in Restricted Mode, which the Ninth Circuit has held are not actionable

22    under the Lanham Act.  *Prager III*, 951 F.3d at 1000 ("The statements about Restricted Mode were

23    made to explain a user tool, not for a promotional purpose to 'penetrate the relevant market' of the

24    viewing public. . . . Furthermore, the fact that certain PragerU videos were tagged to be unavailable

25    under Restricted Mode does not imply any specific representation about those videos."); *see also*

26    *Newman v. Google*, No. 20-CV-04011-VC, 2022 WL 2556862, at *1 (N.D. Cal. July 8, 2022) ("The

27    plaintiffs have failed to add any allegations of consequence to the latest iteration of their complaint,

28    leaving the Court with no choice but to conclude that further amendment would be futile.  The First

United States District Court
Northern District of California

6

Amendment and Lanham Act claims fail for the same legal reasons articulated in Judge Koh's prior ruling."); *Newman v. Google*, No. 20-CV-04011-LHK, 2021 WL 2633423, at *10-12 (N.D. Cal. June 25, 2021) ("Specifically, Plaintiffs challenge the statement that appears when a Restricted Mode user attempts to access a video that is unavailable.  That statement provides only that 'This video is unavailable with Restricted Mode enabled.  To view this video, you will need to disable Restricted Mode.' . . .  This is the exact statement that the Ninth Circuit found not actionable under the Lanham Act in *Prager III*.").

As plaintiffs have had several opportunities to plead their Lanham Act false advertising claim, the Court concludes that further amendment would be futile.  Plaintiffs' Lanham Act false advertising claim is dismissed without leave to amend.

### 2.      Claim for Declaratory Judgment

Plaintiffs argue that their claim for a declaratory judgment provides an independent basis for federal jurisdiction under 28 U.S.C. § 1331.[5]  Citing *Gunn v. Minton*, 568 U.S. 251 (2013) and *Atlantic Richfield Co. v. Christian*, 140 S. Ct. 1335 (2020), plaintiffs contend that their constitutional challenge to CDA Section 230, which has been raised by defendants as a defense in their prior and present motions to dismiss, brings plaintiffs' claim for declaratory judgment within a "'special and exceptional' circumstance from which federal jurisdiction under § 1331 arises." Dkt. No. 67 ¶ 54; *see also id.* ¶¶ 283, 284.

Federal courts have original, or federal question, jurisdiction over civil actions "arising under the Constitution, laws, or treaties of the United States."  28 U.S.C. § 1331.  "'[A] case can 'arise under' federal law in two ways.'"  *Negrete v. City of Oakland*, 46 F.4th 811, 816 (9th Cir. 2022) (quoting *Gunn*, 568 U.S. at 257).  "First and '[m]ost directly, a case arises under federal law when federal law creates the cause of action asserted.'"  *Id.* at 816-17 (quoting *Gunn*, 568 U.S. at 257).  "Second, under the substantial federal question branch, 'even where a claim finds its origins in state rather than federal law,' the Supreme Court has 'identified a 'special and small category'

---

[5] Defendants move to strike the declaratory judgment claim on the ground that plaintiffs were not clearly given leave to reassert or amend that claim.  *See* Dkt. No. 77 at 1, 9 n.9.  To the extent that the Court's order on defendants' prior motion to dismiss may be ambiguous as to whether plaintiffs were permitted to reassert or amend this claim, defendants' motion to strike is denied.

United States District Court
Northern District of California

of cases in which arising under jurisdiction still lies.'" *Id.* at 817 (quoting *Gunn*, 568 U.S. at 258).

"Specifically, 'federal jurisdiction over a state law claim will lie if a federal issue is:

(1) necessarily raised, (2) actually disputed, (3) substantial, and (4) capable of resolution in federal

court without disrupting the federal-state balance approved by Congress.'" *Id.* (quoting *Gunn*, 568

U.S. at 258).

Plaintiffs do not contend that federal law creates their claim for declaratory relief.  Indeed,

although the TAC correctly anticipates defendants' CDA Section 230 defense, "[f]ederal

jurisdiction cannot be predicated on an actual or anticipated defense," and "[i]t is not enough that

the plaintiff alleges some anticipated defense to his cause of action and asserts that the defense is

invalidated by some provision of [federal law]." *Vaden v. Discover Bank*, 556 U.S. 49, 60 (2009)

(internal quotations and citation omitted); *see Atl. Richfield Co.*, 140 S. Ct. at 1350 n.4 (reiterating

that "'[f]ederal jurisdiction cannot be predicated on an actual or anticipated defense.'") (quoting

*Vaden*, 556 U.S. at 60); *Negrete*, 46 F.4th at 817 (stating that federal question jurisdiction cannot

be based on "a federal defense, including the defense of pre-emption, even if the defense is

anticipated in the plaintiff's complaint, and even if both parties concede that the federal defense is

the only question truly at issue.  And that remains true even if, as here, the state-law complaint

explicitly seeks declaratory relief with respect to the anticipated federal defense.") (internal

quotations and citations omitted).

Nor have plaintiffs demonstrated that their declaratory judgment claim satisfies the four

requirements for jurisdiction based on a substantial federal question.  Specifically, plaintiffs have

not shown that defendants' invocation of CDA Section 230 as a defense is "necessarily raised" in

the sense contemplated by *Gunn*.  In *Gunn*, an element of the plaintiff's state law claim for

malpractice necessarily required resolution of a federal patent law issue.  *See Gunn*, 568 U.S. at

259.  In the present case, defendants opted to assert CDA Section 230 as a defense, which cannot

be the basis for federal jurisdiction for the reasons discussed above.  Even assuming that the CDA

230 defense implicates issues of federal law, "a federal issue raised in anticipation of a defense is

not sufficient to establish federal question jurisdiction." *Negrete*, 46 F.4th at 819.  Moreover,

"[f]or federal question jurisdiction to extend to a declaratory judgment action, the 'claim itself

must present a federal question unaided by anything alleged in anticipation of avoidance of defenses which it is thought the defendant may interpose.'" *Id*. at 820 (quoting *Skelly Oil Co.*, 339 U.S. at 671)).  Plaintiffs have not, and cannot, make such a showing here.

Plaintiffs misplace their reliance on *United States v. Texas*, 566 F. Supp. 3d 605 (W.D. Tex. 2021), which concerned the *federal government's* authority under *In re Debs*, 158 U.S. 564 (1895) to pursue a lawsuit to enjoin a state law as unconstitutional.  *Texas* does not inform the Court's analysis of "arising under" jurisdiction in this action, which concerns the propriety of a claim for declaratory judgment by private citizens against private entities based on a federal defense.  As previously noted by the Court, "using the Declaratory Judgment Act to anticipate an affirmative defense is not ordinarily proper, and numerous courts have refused to grant declaratory relief to a party who has come to court only to assert an anticipatory defense." *Veoh Networks, Inc. v. UMG Recordings, Inc*., 522 F. Supp. 2d 1265, 1271 (S.D. Cal. 2007); *see also* Dkt. No. 65 at 18.

Plaintiffs have not established that their declaratory judgment claim regarding the constitutionality of CDA Section 230 provides an independent basis for the Court's federal question jurisdiction.  This claim is dismissed without leave to amend.

### 3.   CAFA Jurisdiction

The TAC's third and final asserted basis for federal jurisdiction is CAFA, 28 U.S.C. § 1332(d).  CAFA was designed to permit a defendant to remove certain class or mass actions to federal court.  It gives federal courts original jurisdiction over class actions where there are at least 100 class members, at least one plaintiff is diverse in citizenship from any defendant, and the amount in controversy exceeds $5,000,000, exclusive of interest and costs.  *Dart Cherokee Basin Operating Co., LLC v. Owens*, 574 U.S. 81, 84-85 (2014); *Yocupicio v. PAE Grp., LLC*, 795 F.3d 1057, 1059 (9th Cir. 2015); *Ibarra v. Manheim Invs., Inc*., 775 F.3d 1193, 1195 (9th Cir. 2015).  Plaintiffs' CAFA allegations appear in paragraphs 55-60 of the TAC.  Defendants do not contest the allegations regarding CAFA's jurisdictional requirements of minimum diversity and class numerosity.  They argue only that allegations regarding the amount in controversy are conclusory. *See* Dkt. No. 77 at 4 n.3; Dkt. No. 88 at 3 n.2.  With respect to the amount-in-controversy

United States District Court
Northern District of California

9

United States District Court
Northern District of California

1   requirement, the TAC alleges:  "The matter in controversy exceeds the sum or value of Five

2   Million Dollars ($5,000,000), exclusive of interest and costs; moreover, the claims for relief seek,

3   among other things statutory damages, compensatory damages, restitution, and other equitable

4   relief that substantially exceed One Billion Dollars ($1,000,000,000)."  Dkt. No. 67 ¶ 56.

5          "In determining the amount in controversy, courts first look to the complaint."  *Ibarra*, 775

6   F.3d at 1197.  Speculation and conjecture based on unreasonable assumptions are insufficient to

7   demonstrate that CAFA's jurisdictional threshold is satisfied.  *Id*.  While "a damages assessment

8   may require a chain of reasoning that includes assumptions," "those assumptions cannot be pulled

9   from thin air but need some reasonable ground underlying them."  *Id*. at 1199.  Nonetheless,

10  "Congress intended CAFA to be interpreted expansively."  *Id.* at 1197; *see also Jauregui v.*

11  *Roadrunner Transp. Servs., Inc*., 28 F.4th 989, 993 (9th Cir. 2022) ("The [Supreme] Court has

12  explained that 'CAFA's provisions should be read broadly, with a strong preference that interstate

13  class actions should be heard in a federal court if properly removed by any defendant.'") (quoting

14  *Dart Cherokee*, 574 U.S. at 89).  The amount in controversy is "simply 'the amount at stake in the

15  underlying litigation . . . .'"  *Jauregui*, 28 F.4th at 994 (quoting *Theis Rsch., Inc. v. Brown & Bain*,

16  400 F.3d 659, 662 (9th Cir. 2005)).  "Importantly, that '[a]mount at stake' does not mean likely or

17  probable liability; rather, it refers to *possible* liability.'"  *Id*. (quoting *Greene v. Harley-Davidson,*

18  *Inc*., 965 F.3d 767, 772 (9th Cir. 2020)).

19         Plaintiffs' allegations in paragraph 56 of the TAC regarding the amount-in-controversy are

20  conclusory.  Although the TAC generally asserts that plaintiffs have collectively lost "millions of

21  dollars" (Dkt. No. 67 ¶ 356), the named plaintiffs' estimated damages do not appear to meet, much

22  less exceed, the $5 million CAFA threshold.  *See, e.g.,* Dkt. No. 67 ¶¶ 178, 194, 195, 196, 211,

23  232, 233, 238, 255, 259, 262, 263.  Moreover, the TAC's allegations indicate that not all of

24  plaintiffs' videos were excluded from Restricted Mode or demonetized (*see id*. ¶¶ 191, 201, 203,

25  214, 232, 234; *see also* Dkt. No. 101 at 26:1-6, 28:12-16), and it is unclear precisely how often the

26  alleged improper restriction of video content occurs.

27         Nevertheless, plaintiffs maintain that defendants improperly censored or otherwise

28  interfered with many of their videos.  *See* Dkt. No. 67 ¶¶ 191, 201, 203, 214, 234; *see also* Dkt.

No. 101 at 26:1-6, 28:12-16.  And their allegations regarding the amount in controversy rest, in large part, on the sheer scale of defendants' alleged billion-dollar business, the potential millions of class members,[6] and the artificial intelligence algorithms and manual review policies that reportedly are used to filter video content based on unlawful criteria.  *See* Dkt. No. 67 ¶¶ 15, 57-58, 65, 70, 113-114, 119, 269-70.  Notably, defendants have not presented a factual challenge to the TAC's allegations regarding CAFA jurisdiction; they simply assert, without elaboration, that

---

[6] The YouTube Community Class is defined as:

> All persons or entities in the United States who are or were members, users and or consumers of YouTube who uploaded, posted, or viewed video content on YouTube subject to the choice-of-law and venue provisions set forth in Defendants' Terms of Service, Mission Statement, Community Guidelines, and/or any other content-based filtering, monetization, distribution, personal data use policies, advertising or regulation and practices any other regulations or practices that are related to the YouTube Platform on or after January 1, 2015 and continuing through to December 31, 2019 (the "Class Period").

Dkt. No. 67 ¶¶ 269.  The class excludes defendants, "their employees, affiliates, parents, subsidiaries, and co-conspirators, whether or not named in this Complaint, and the United States government." *Id*. ¶ 269.  Plaintiffs believe that there are over 200 million class members.  *Id*. ¶ 270.

The LGBTQ+ subclass is defined as:

> All persons or entities in the United States who (a) are or were members, users or consumers of YouTube who uploaded, posted, or viewed video content on YouTube subject to the choice-of-law and venue provisions set forth in Defendants' Terms of Service, Mission Statement, Community Guidelines, and/or any other content-based filtering, monetization, distribution, personal data use policies, advertising or regulation and practices any other regulations or practices that are related to the YouTube Platform and (b) are part of a protected class of persons under the California or Federal law because of sexual orientation, gender identity, or gender or (c) create, post, distribute, monetize, or advertise video content on the YouTube Platform that discusses or relates to topics, issues or viewpoints that advocate for, are of interest to, or are intended for audiences, on or after January 1, 2015 and continuing through to December 31, 2019 (the " Subclass Period").

*Id*.  The class excludes defendants, "their employees, affiliates, parents, subsidiaries, and co-conspirators, and any YouTube users who create, post, distribute, promote or engage in video or communications on the YouTube Platform that is directed against Plaintiffs or Community and is objectively violent, obscene, threatening, or homophobic as alleged in the Complaint." *Id*.  Plaintiffs believe that there are at least 9.33 million members of the subclass.  *Id*. ¶ 270.

United States District Court
Northern District of California

1    the TAC's allegations are conclusory.  *See* Dkt. No. 77 at 4 n.3; Dkt. No. 88 at 3 n.2.

2           Moreover, as discussed below, the Court finds that plaintiffs have sufficiently alleged

3    claims for violation of the Unruh Act and California's unfair competition law.  Even assuming that

4    the alleged improper restriction of users' videos occurred only once with respect to fewer than half

5    of the members of the putative YouTube Community Class, and further assuming minimal

6    damages of $1 per class member, the collective damages alleged in the TAC would exceed the $5

7    million CAFA threshold.  Accordingly, viewing the TAC's allegations as a whole, and in a light

8    most favorable to plaintiffs, the Court finds that plaintiffs have pled sufficient facts demonstrating

9    a plausible possibility that CAFA's amount-in-controversy requirement is satisfied.  However, as

10   discussed below, the Court also finds that even those claims that are sufficiently pled in the TAC

11   nonetheless are barred by CDA Section 230.

12          **B.      State Law Claims**

13                  **1.      California Constitution, Article I, Section 2**

14          Plaintiffs assert a claim, for themselves and on behalf of the YouTube Community Class,

15   for violation of their rights to liberty of speech and association under the California Constitution.

16   Dkt. No. 67 ¶¶ 305-317.  Contending that defendants operate and maintain YouTube as "a public

17   forum, or its functional equivalent," plaintiffs allege that defendants "expressly invite the public to

18   visit the YouTube platform to engage in freedom of expression," and "have restricted the speech

19   and expressive conduct of the Proposed Class" through censorship of their videos based on

20   subjective, vague, and overbroad criteria.  *See id*. ¶¶ 307, 308, 311.

21          Article I, section 2 of the California Constitution provides that "[e]very person may freely

22   speak, write, and publish his or her sentiments on all subjects . . .."  Although this provision of the

23   state constitution contains a state action limitation, *Golden Gateway Ctr. v. Golden Gateway*

24   *Tenants Assoc.*, 26 Cal. 4th 1013, 1023 (2001), it confers free speech rights that are broader than

25   those provided by the First Amendment and, in certain limited circumstances, applies to private

26   actors, *Robins v. Pruneyard Shopping Ctr.*, 23 Cal. 3d 899, 910 (1979), *aff'd* 447 U.S. 74 (1980).

27   In *Pruneyard*, the California Supreme Court held that the scope of state action applied to privately

28   owned shopping centers, emphasizing their functional equivalence to a public forum such as a

1    "downtown" or "central business district" *Id.* at 907 & 910 n.5.  Noting the "importance of the

2    public character of the property in determining the scope of California's free speech clause," the

3    California Supreme Court subsequently clarified that "the actions of a private property owner

4    constitute state action for purposes of California's free speech clause only if the property is freely

5    and openly accessible to the public." *Golden Gateway*, 26 Cal. 4th at 1033.

6         Plaintiffs contend that defendants' alleged conduct with respect to the regulation of content

7    posted on YouTube constitutes state action, arguing that YouTube is "the cyber-equivalent of a

8    town square where citizens exchange ideas on matters of public interest or concern."  Dkt. No. 67

9    ¶ 307.  However, no court has extended the *Pruneyard* line of cases, which concern physical

10   property, to the Internet.  This Court shares the concerns expressed by other courts about the

11   advisability of such a "dramatic expansion of [*Pruneyard*]."  *Prager Univ. v. Google LLC*, No.

12   19CV340667, 2019 WL 8640569, at *6 (Super. Ct. Nov. 19, 2019); *see also Newman*, 2022 WL

13   2556862 at *3 ("The Court has serious doubts that the California Supreme Court would endorse

14   such a dramatic expansion given the 'potentially sweeping consequences of such a holding' and

15   the 'host of potential 'slippery slope' problems that are likely to surface.'") (quoting *hiQ Labs,*

16   *Inc. v. LinkedIn Corp.*, 273 F. Supp. 3d 1099, 1116 (N.D. Cal. 2017)); *Domen v. Vimeo, Inc.*, 433

17   F. Supp. 3d 592, 607 (S.D.N.Y. 2020) ("Like the court in *hiQ Labs, Inc.*, this Court 'has doubts

18   about whether *Pruneyard* may be extended wholesale into the digital realm of the Internet,' given

19   the 'reach and potentially sweeping consequences of such a holding,' and in particular the

20   differences between the U.S. and California Constitutions regarding their treatment of private

21   actors in the free speech context.") (quoting *hiQ Labs, Inc.*, 273 F. Supp. 3d at 1116); *hiQ Labs,*

22   *Inc.*, 273 F. Supp. 3d at 1116, *aff'd on other grounds,* 938 F.3d 985 (9th Cir. 2019), *judgment*

23   *vacated on other grounds*, 141 S. Ct. 2752 (2021) ("The analogy between a shopping mall and the

24   Internet is imperfect, and there are a host of potential 'slippery slope' problems that are likely to

25   surface were *Pruneyard* to apply to the Internet.").

26         Plaintiffs have not demonstrated that there are additional facts that may be pled in support

27   of a plausible claim, and the Court finds that further amendment would be futile.  Plaintiffs' claim

28   under Article I, section 2 of the California Constitution therefore is dismissed without leave to

United States District Court
Northern District of California

13

1  amend.

2  ### 2. Unruh Act, California Civil Code §§ 51, *et seq.*

3  Plaintiffs assert a claim, for themselves and on behalf of the YouTube Community Class,

4  for violation of the Unruh Act. *See* Dkt. No. 67 ¶¶ 318-324. The TAC alleges that "[d]espite their

5  promises of neutrality and a diversity of viewpoints," defendants discriminate against plaintiffs

6  and censor their speech "based not upon the content of speech, but on their sexual orientation and

7  political identity and viewpoint." *Id*. ¶ 320. Defendants argue that this claim fails as a matter of

8  law because it is based on the alleged disparate impact of facially neutral policies that apply

9  equally to all content creators. Dkt. No. 77 at 13-16; Dkt. No. 88 at 7-10. Plaintiffs maintain that

10  the TAC's allegations demonstrate that defendants apply their policies in an intentionally

11  discriminatory manner to limit plaintiffs' and putative class members' access to services because

12  of their sexual orientation. Dkt. No. 85 at 17-19.

13  The Unruh Act prohibits the denial of access to "the full and equal accommodations,

14  advantages, facilities, privileges, or services in all business establishments of every kind

15  whatsoever" based on protected classifications, including "sex"[7] and "sexual orientation." Cal.

16  Civ. Code § 51(b). The parties do not dispute that the Unruh Act applies to a website that hosts

17  videos posted by members of the public. *See generally White v. Square, Inc.*, 7 Cal. 5th 1019

18  (2019) (stating that Unruh Act's prohibition against discrimination applies to online businesses);

19  *Cullen v. Netflix, Inc.*, 880 F. Supp. 2d 1017 (N.D. Cal. 2012) (stating that the Unruh Act

20  "appl[ies] to websites 'as a kind of business establishment and an accommodation, advantage,

21  facility, and privilege of a place of public accommodation . . . .") (quoting *Nat'l Fed'n of the Blind

22  v. Target Corp.*, 582 F. Supp. 2d 1185, 1196 (N.D. Cal. 2007)). "Whoever denies, aids or incites a

23  denial, or makes any discrimination or distinction contrary to [the Unruh Act] is liable for each

24  and every offense for the actual damages . . . up to a maximum of three times the amount of actual

25  damage but in no case less than four thousand dollars ($4,000)," as well as attorney's fees. Cal.

26

27  ---
[7] The Unruh Act defines the term "sex" to include "a person's gender." Cal. Civ. Code § 51(e)(5). "'Gender' means sex, and includes a person's gender identity and gender expression." *Id*.

28  "'Gender expression' means a person's gender-related appearance and behavior whether or not stereotypically associated with the person's assigned sex at birth." *Id*.

United States District Court
Northern District of California

Civ. Code § 52(a).

"By its terms, the Unruh Act 'does not extend to practices and policies that apply equally to all persons.'" *Greater Los Angeles Agency on Deafness, Inc. v. Cable News Network, Inc.* ("*GLAAD*"), 742 F.3d 414, 425 (9th Cir. 2014) (quoting *Turner v. Assoc. of Am. Med. Colls.*, 167 Cal. App. 4th 1401, 1408 (2008)). "[A] plaintiff seeking to establish a case under the Unruh Act must plead and prove intentional discrimination in public accommodations in violation of the terms of the Act. A disparate impact analysis or test does not apply to Unruh Act claims." *Harris v. Capital Growth Investors XIV*, 52 Cal. 3d 1142, 1175 (1991), *superseded by statute on other grounds as stated in Munson v. Del Taco, Inc.*, 46 Cal. 4th 661, 664-65 (2009); *see also GLAAD*, 742 F.3d at 425 ("The California Supreme Court has clarified that the Unruh Act contemplates 'willful, affirmative misconduct on the part of those who violate the Act' and that a plaintiff must therefore allege, and show, more than the disparate impact of a facially neutral policy.") (quoting *Koebke v. Bernardo Heights Country Club*, 36 Cal. 4th 824, 853 (2005)). Even so, evidence of disparate impact "may be probative of intentional discrimination in some cases," subject to a proper foundation and the general rules of evidence. *Harris*, 52 Cal. 3d at 1175; *see also GLAAD*, 742 F.3d at 426 n.4 (citing *Koebke*, 36 Cal. 4th at 854) (same).

Defendants argue that plaintiffs' Unruh Act claim simply is based on allegations about the disparate impact of neutral policies that apply equally to all content creators. "By its nature, an adverse impact claim challenges a standard that is applicable alike to all such [protected classifications] based on the premise that, notwithstanding its universal applicability, its actual impact demands scrutiny." *Turner*, 167 Cal. App. 4th at 1408. Here, defendants point out that the TAC alleges that defendants restricted and demonetized some plaintiffs' videos, while leaving allegedly similar non-LGBTQ+ content unrestricted and fully monetized. *See, e.g.* Dkt. No. 67 ¶¶ 191, 217; *see also id.* ¶ 235 (allegations concerning plaintiff Stephanie Frosch's complaint "about how Google/YouTube's recent changes to the algorithm had disproportionately affected the YouTube creators and viewers."). Defendants maintain that these are quintessential disparate impact allegations. Additionally, defendants contend that the TAC asserts, in conclusory fashion and based solely on plaintiffs' speculation, that YouTube's algorithms flagged plaintiffs' videos

because they contain LGBTQ+ content.  *See* Dkt. No. 77 at 14 (citing Dkt. No. 67 ¶¶ 7, 17, 26.c, 114, 119, 204).  Defendants further argue that plaintiffs' allegations concerning disparate impact are undermined by other allegations suggesting that many of plaintiffs' videos remain available on YouTube, as well as allegations that YouTube made LGBTQ+ outreach efforts and encouraged and sponsored LGBTQ+ programs from, for example, the BriaandChrissy channel.  *See id.* at 16; *see also* Dkt. No. 67 ¶¶ 35-44, 179, 180, 220, 259.

Plaintiffs contend that they have alleged more than mere disparate impact and have stated sufficient facts giving rise to a plausible inference of discriminatory intent.  However, plaintiffs are not aided by their reliance on the declaration of plaintiff Stephanie Frosch (Dkt. No. 40), purported evidence that is not incorporated in or appended to the operative complaint and which the Court has already determined cannot appropriately be considered in resolving a Rule 12(b)(6) motion to dismiss.  *See* Dkt. No. 42.

As for particular paragraphs of the TAC that plaintiffs do cite, most of them indicate that restrictions placed on users' content was an error that defendants took steps to rectify. Specifically, the TAC alleges that defendants acknowledged that Restricted Mode was not "working the way it should" and "will never be perfect," but stated that they were working on fixing Restricted Mode so that it "should not filter out content belonging to individuals or groups based on" a range of attributes "like gender, gender identity, political viewpoints, race, religion or sexual orientation."  The TAC further alleges that "[i]n response to complaints from the Community and other civil rights critics," defendants "removed all restricted filtering on videos posted or produced by members and groups, and changed their policy, filtering algorithm, and manual review policies purportedly to ensure that videos posted by vloggers were not being censored solely because of the identity of the speaker."  *See* Dkt. No. 67 ¶¶ 29, 106, 140, 142. These allegations, standing alone, do not raise a plausible inference that defendants *intentionally* discriminated against plaintiffs on the basis of their sexual orientation or viewpoints.  *See Newman*, 2021 WL 2633423 at *7 (finding that allegations regarding "an error caused by the YouTube algorithm used to filter content" did not support a plausible inference that defendants intentionally discriminated against content creators on the basis of race).

The remaining allegations on which plaintiffs rely concern a December 2017 phone call between plaintiff Chris Knight and a Google call center employee concerning a Divino Group advertisement that allegedly remained under review for six days without explanation. According to a purported transcript of that phone call,[8] the advertisement was for a Divino Group Christmas episode that launched on December 24; at the time of Mr. Knight's phone call, Christmas was over and the ad remained under review. When Mr. Knight inquired why the ad remained under review, a customer service representative initially stated that "the ad has been disapproved because of shocking content[.]" The call subsequently was transferred to a "floor manager." According to the transcript, when Mr. Knight asked what "shocking content" caused the ad to be flagged for review, the manager responded that "the video has the sexuality content about the gays and everything" and that "the major reason is about the gay thing." *See* Dkt. No. 20 at ECF 130-135; *see also* Dkt. No. 67 ¶¶ 20, 24, 26.e., 32, 143, 155, 167, 354. The TAC alleges that defendants later apologized "for what they contend was a misunderstanding" and "eventually agreed to run the ad" more than three weeks after the Christmas holiday passed. Dkt. No. 67 ¶ 144.

Defendants maintain that the call center episode is irrelevant to the extent it concerns plaintiffs' purchase of advertisements, rather than the restriction of plaintiffs' videos. They also argue that the TAC's allegations are misleading and inconsistent insofar as they suggest that the Divino Group ad was disapproved, when it in fact was allowed to run. As discussed above, however, the overall theory of plaintiffs' Unruh Act claim is that they are being unlawfully denied equal access to YouTube's services because of their sexual orientation and viewpoints. The TAC alleges that the Divino Group ad was not allowed to run initially because of the "gay thing," and it was allowed to run later (after the advertised event was over) only after Mr. Knight called to complain. Plaintiffs further allege that, far from being an isolated incident, the same thing happened to Divino Group at least five times before the December 2017 call center incident, and that defendants subsequently "declined at least four additional ad requests from the same channel

---

[8] Plaintiffs apparently intended to, but did not, append the transcript to the TAC. *See* Dkt. No. 67 ¶ 20 n.6. Nevertheless, both sides invite the Court to review the transcript appended to plaintiffs' prior pleadings, most recently submitted as Exhibit A to plaintiffs' SAC. *See* Dkt. No. 20 at ECF 130-135; Dkt. No. 85 at 18; Dkt. No. 88 at 7.

1    with little, or no, explanation." *See* Dkt. No. 20 at ECF 131, 132, 133 Dkt. No. 67 ¶ 144.

2         Plaintiffs' allegations that defendants intentionally discriminated against them because of

3    their sexual orientation in violation of the Unruh Act are very thin.  They are also seemingly

4    inconsistent with allegations indicating that not all of their videos are restricted or otherwise

5    affected and with allegations that content posted by a different "sexually ambiguous young man"

6    showing "bare buttocks" apparently is available on YouTube without restriction, suggesting that

7    something other than intentional discrimination may explain why YouTube restricted some videos

8    but not others.  *See* Dkt. No. 67 ¶¶ 191, 201, 203, 214, 220, 232, 234; *see also* Dkt. No. 101 at

9    28:12-16.  Nevertheless, viewing the TAC's allegations as a whole and in a light most favorable to

10   plaintiffs, the Court finds that the allegations concerning the call center episode and allegations

11   that plaintiffs' videos are restricted or demonetized when allegedly similar non-LGBTQ+ content

12   are not, together with allegations that some plaintiffs' videos are restricted even when the content

13   concerns innocuous subject matter like drinking tea (Dkt. No. 67 ¶ 204), are sufficient under Rule

14   12(b)(6) standards to state a plausible claim for relief for violation of the Unruh Act.  *See, e.g., Nia*

15   *v. Bank of America, N.A.*, — F. Supp. 3d —, No. 21-cv-01799-BAS-BGS, 2022 WL 157001, at

16   *5-8 (S.D. Cal. May 18, 2022) (concluding that plaintiff sufficiently pled intentional

17   discrimination in support of an Unruh Act claim based on his own alleged treatment by the

18   defendant bank, as well as multiple consumer complaints).

19              **3.    Unfair Competition**[9]

20         Plaintiffs assert a claim for violation of California's unfair competition law ("UCL") for

21   themselves and on behalf of the YouTube Community Class.  Dkt. No. 67 ¶¶ 325-330.  The claim

22   is based in part on alleged violations of the Unruh Act, the Lanham Act, and the California

23   Constitution.  *Id*. ¶ 327.  Plaintiffs further allege that defendants' "arbitrary and capricious

24   restrictions on their competitors' speech and content significantly threatens or harms competition"

25   and "are likely to mislead the public, and do mislead the public, about YouTube, Defendants'

26

27   _____

28   [9] Plaintiffs suggest that defendants' invocation of CDA Section 230 as a defense is also "unfair"
     conduct (*see* Dkt. No. 85 at 19 (citing Dkt. No. 65 ¶ 5).  The Court addresses the CDA Section 230
     defense below.

United States District Court
Northern District of California

18

1   videos, Plaintiffs, and Plaintiffs' videos." *Id.*

2          California's UCL broadly defines "unfair competition" to "include any unlawful, unfair or

3   fraudulent business act or practice . . .." Cal. Bus. & Prof. Code § 17200. "Its purpose is to

4   protect both consumers and competitors by promoting fair competition in commercial markets for

5   goods and services." *Kwikset v. Super. Ct.*, 51 Cal. 4th 310, 320 (2011) (internal quotations and

6   citation omitted). "Because Business and Professions Code section 17200 is written in the

7   disjunctive, it establishes three varieties of unfair competition—acts or practices which are

8   unlawful, or unfair, or fraudulent. In other words, a practice is prohibited as unfair or deceptive

9   even if not unlawful and vice versa." *Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*,

10  20 Cal. 4th 163, 180 (1999) (internal quotations and citations omitted). Plaintiffs allege that

11  defendants are liable under all three prongs of the UCL.

### a.      "Unlawful" Prong

13         With respect to the "unlawful" prong of the UCL, to the extent plaintiffs' claim is based on

14  the Lanham Act and California Constitution claims that have been dismissed, their UCL claim

15  also fails. However, insofar as the TAC states a plausible claim for violation of the Unruh Act,

16  plaintiffs also have a claim for unlawful business practices under the UCL. *See id.* ("By

17  proscribing any unlawful business practice, section 17200 borrows violations of other laws and

18  treats them as unlawful practices that the unfair competition law makes independently

19  actionable.") (internal quotations and citation omitted).

### b.      "Unfair" Prong

21         To the extent plaintiffs' claim is based on alleged "unfair" business-competitor practices,

22  they have not alleged sufficient facts to support a plausible claim for relief. For business-

23  competitor UCL claims, the alleged unfairness must "be tethered to some legislatively declared

24  policy or proof of some actual or threatened impact on competition." *Cel-Tech Commc'ns*, 20

25  Cal. 4th at 186-87. Additionally, conduct is "unfair" under the UCL if it "threatens an incipient

26  violation of an antitrust law, or violates the policy or spirit of one of those laws because its effects

27  are comparable to or the same as a violation of the law, or otherwise significantly threatens or

28  harms competition." *Id.* at 187; *see also Snapkeys, Ltd. v. Google LLC*, No. 19-cv-02658-LHK,

United States District Court
Northern District of California

2020 WL 6381354, at *3 (N.D. Cal. Oct. 30, 2020) (same).  "Injury to a competitor is not equivalent to injury to competition," *Cel-Tech Commc'ns*, 20 Cal. 4th at 186, and "[a] plaintiff must allege harm to the competitive market 'as a whole,' not just to a competitor," *Snapkeys*, 2020 WL 6381354 at *3 (quoting *March v. Anesthesia Servs. Med. Grp., Inc.*, 200 Cal. App. 4th 480, 502 (2011)).

Here, plaintiffs allege that defendants compete with them for viewers through defendants own YouTube channels and YouTube TV.  *See, e.g.,* Dkt. No. 67 ¶¶ 88-89.  Defendants note that the only plaintiff who is alleged to control a video hosting site remotely comparable to YouTube is Tamara Johnson, who does not allege that she experienced any harm or anticompetitive conduct with respect to that website.  *See* Dkt. No. 77 at 17 n.13; Dkt. No. 67 ¶ 261.  In any event, while plaintiffs allege that they themselves have been harmed by defendants' alleged unfair business practices, plaintiffs offer only conclusory allegations as to how defendants' alleged conduct significantly harms competition as a whole.  *See* Dkt. No. 67 ¶¶ 11, 99, 102, 192, 293.d., 327.  Such conclusory allegations are insufficient to support a claim for unfair business-competitor practices under the UCL.  *See Levitt v. Yelp!, Inc.*, 765 F.3d 1123, 1136-37 (9th Cir. 2014) (concluding that plaintiffs' general allegation that defendant "harms competition by favoring businesses that submit to Yelp's manipulative conduct and purchase advertising to the detriment of competing businesses that decline to purchase advertising," did "not satisfy *Cel–Tech's* requirement that the effect of Yelp's conduct amounts to a violation of antitrust laws 'or otherwise significantly threatens or harms competition.'") (quoting *Cel-Tech Commc'ns*, 20 Cal. 4th at 187).

To the extent plaintiffs bring their UCL claim as consumers, rather than competitors, California law is "in flux" as to what constitutes "unfair" conduct in the consumer action context. *Lozano v. AT&T Wireless Servs., Inc.*, 504 F.3d 718, 735-36 (9th Cir. 2007).  California courts generally apply two tests, which are not mutually exclusive:  a traditional balancing test or the *Cel-Tech* "tethering" test.  *See id.* at 736.  "Under the traditional balancing test, 'an act or practice is unfair if the consumer injury is substantial, is not outweighed by any countervailing benefits to consumers or to competition, and is not an injury the consumers themselves could reasonably have avoided.'" *Hadley v. Kellogg Sales Co.*, 243 F.Supp.3d 1074, 1104 (N.D. Cal. 2017) (quoting

*Berryman v. Merit Prop. Mgmt., Inc.*, 152 Cal. App. 4th 1544, 1555 (2007)).  Under the *Cel-Tech* test, a business practice is unfair if the defendant "violated a 'legislatively declared policy or proof of some actual or threatened impact on competition.'"  *Id.* (quoting *Cel-Tech Commc'ns*, 20 Cal. 4th at 186)).

Neither plaintiffs nor defendants clearly articulate which test should be applied, although plaintiffs seem to advocate either a balancing test or the *Cel-Tech* "tethering" test.  *See* Dkt. No. 67 ¶ 328; Dkt. No. 85 at 20:3-5.  Viewing the allegations of the TAC in the light most favorable to plaintiffs, the Court finds that those allegations meet the "tethering" test insofar as plaintiffs have a plausible Unruh Act claim and defendants' alleged discriminatory conduct violates the policy concerns underlying that Act.  *See, e.g., Nia*, — F. Supp. 3d —, 2022 WL 1570012, at *9 (concluding that plaintiff's allegations satisfied the "tethering" test where he alleged intentional discrimination that violated Unruh and federal statutes and is "contrary to the public policy concerns that pervade [those federal and state statutes]."); C*andelore v. Tinder, Inc.*, 19 Cal. App. 5th 1138, 1155 (2018) ("Further, in view of our conclusion that Tinder's alleged discriminatory pricing model violates the public policy embodied in the [Unruh] Act, the UCL's "unfair" prong provides an independent basis for relief on the facts alleged.").

### c.    "Fraudulent" Prong

"A business practice is fraudulent under the UCL if members of the public are likely to be deceived."  *Davis v. HSBC Bank Nevada, N.A.*, 691 F.3d 1152, 1169 (9th Cir. 2012).  "The challenged conduct is judged by the effect it would have on a reasonable consumer."  *Id.* (internal quotations and citation omitted).  This portion of plaintiffs' claim appears to be based on allegations that defendants mislead the public about YouTube as "an open marketplace of ideas and expression," as well as allegations about defendants' use of Restricted Mode that reportedly "mislead[s] the public[] about YouTube, Defendants' videos, Plaintiffs, and Plaintiffs' videos." Dkt. No. 67 ¶ 327.

Defendants contend that plaintiffs' claim under the fraudulent prong of the UCL fails on the grounds that (1) statements about free expression and about the unavailability of videos in Restricted Mode are not actionable and (2) plaintiffs fail to allege the loss of any money or

property as the result of any allegedly false statement.  Plaintiffs did not address these arguments in their written opposition or at oral argument.  *See* Dkt. Nos. 85, 101.  In any event, plaintiffs' claim under the fraudulent prong fails for the same reasons as their Lanham Act claim.  *See Prager III*, 951 F.3d at 1000; *see also Murphy v. Twitter, Inc.*, 60 Cal. App. 5th 12, 40-41 (2021) ("No reasonable person could rely on proclamations that '[w]e believe in free expression and think every voice has the power to impact the world,' that Twitter was the 'free speech wing of the free speech party,' or that Twitter's mission 'is to give everyone the power to create and share ideas and information instantly without barriers,' as a promise that Twitter would not take any action to self-regulate content on its platform."); *Prager*, 2019 WL 8640569 at *12 ("As to the UCL fraud claim, to the extent it is based on the 'four essential freedoms' set forth above and similar statements, these statements are non-actionable puffery.").  Moreover, the TAC does not allege that plaintiffs lost money or property as the result of any allegedly false statement (as opposed to alleged losses due to the restriction or demonetization of their videos).  *See* Dkt. No. 67 ¶¶ 152-56, 192-94, 211, 233, 238, 255, 258-262, 263-68; *see also Kwikset Corp.*, 51 Cal. 4th at 322 (stating that to establish statutory standing under the UCL, a party must "(1) establish a loss or deprivation of money or property sufficient to qualify as injury in fact, i.e., economic injury, and (2) show that that economic injury was the result of, i.e., caused by, the unfair business practice or false advertising that is the gravamen of the claim.").

### 4.  Breach of Implied Covenant of Good Faith and Fair Dealing

Plaintiffs assert, for themselves and on behalf of the YouTube Community Class, a claim for breach of the implied covenant of good faith and fair dealing.  Dkt. No. 67 ¶¶ 331-340.  The gravamen of their claim is that defendants' alleged "censorship . . . . violates the warranty of good faith and fair dealing implied in the Defendants' Terms of Service, and the video posting guidelines and policies to which Plaintiffs were required to agree, in order to use the YouTube Platform."  Dkt. No. 67 ¶ 173.  Defendants contend that plaintiffs' claim fails as a matter of law because it is based on conduct that is permitted by YouTube's Terms of Service.

"[E]very contract imposes upon each party a duty of good faith and fair dealing in the performance of the contract such that neither party shall do anything which will have the effect of

destroying or injuring the right of the other party to receive the fruits of the contract." *Storek & Storek, Inc. v. Citicorp Real Estate, Inc.*, 100 Cal. App. 4th 44, 55 (2002) (citing *Waller v. Truck Ins. Exchange, Inc.*, 11 Cal. 4th 1, 36 (1995)).  The implied covenant of good faith and fair dealing "is based on general contract law and the long-standing rule that neither party will do anything which will injure the right of the other to receive the benefits of the agreement." *Waller*, 11 Cal. 4th at 36 (internal quotations and citations omitted).  The covenant "is implied as a supplement to the express contractual covenants, to prevent a contracting party from engaging in conduct that frustrates the other party's rights to the benefits of the agreement." *Id.* (internal quotations and citation omitted).  The elements required to establish a claim for breach of the implied covenant are:  "(1) the parties entered into a contract; (2) the plaintiff fulfilled his obligations under the contract; (3) any conditions precedent to the defendant's performance occurred; (4) the defendant unfairly interfered with the plaintiff's rights to receive the benefits of the contract; and (5) the plaintiff was harmed by the defendant's conduct." *Rosenfeld v. JPMorgan Chase Bank, N.A.*, 732 F. Supp. 2d 952, 968 (N.D. Cal. 2010).

"It is universally recognized [that] the scope of conduct prohibited by the covenant of good faith is circumscribed by the purposes and express terms of the contract." *Carma Developers (Cal.), Inc. v. Marathon Dev. Cal, Inc.*, 2 Cal. 4th 342, 373 (1992).  "[T]he implied covenant of good faith is read into contracts in order to protect the express covenants or promises of the contract, not to protect some general public policy interest not directly tied to the contract's purpose." *Id.* (internal quotations and citation omitted).  "[A]s a general matter, implied terms should never be read to vary express terms." *Id.* at 374 (citation omitted).  "And if defendants were given the right to do what they did by the express provisions of the contract there can be no breach." *Id.* (citation omitted).

As to this claim, the TAC fails to state a plausible claim for relief.  Plaintiffs allegations are exceedingly vague and do not clearly identify the underlying agreement(s) or contract term(s) that apply to the parties' dispute.  Rather, the TAC generally alleges that defendants' purported "censorship" violates YouTube's "Terms of Service." *See, e.g.,* Dkt. No. 67 ¶¶ 21, 173.  Plaintiffs' implied covenant claim appears to be based on "Terms of Service," in addition to

unidentified "other agreement(s)" and "other contract(s)." *Id*. ¶¶ 336, 337, 340. As demonstrated by the parties' respective requests for the Court to consider materials outside the complaint, it appears that more than one version of the Terms of Service may apply, and plaintiffs do not clearly allege which, if any, of those documents actually are referenced in the TAC and form the basis of plaintiffs' claim.[10] The TAC also fails to identify what contractual terms might be at issue, except for repeated vague assertions that defendants allegedly "warrant[ed]" or "promise[d]" that their "identity and viewpoint-neutral, content-based rules" would "apply equally to all," without any connection between those alleged promises and any particular agreement or contract. *See, e.g.*, Dkt. No. 67 ¶¶ 1, 10, 13-16, 18, 26.a., 26.o., 72, 74, 79, 113, 132-133, 137, 220, 225, 232, 307. In sum, the Court cannot tell whether there is an implied covenant that is consistent with whatever contract(s) and term(s) are at issue.

Accordingly, defendants' motion to dismiss plaintiffs' claim based on the implied covenant of good faith and fair dealing is granted. As it is not clear that further amendment would be futile, the Court dismisses this claim with leave to amend. If plaintiffs choose to amend, they should clearly identify which Terms of Service and "other agreement(s)" and "other contract(s)" form the basis for their claim.

Having concluded that the TAC states at least some claims for relief, the Court now turns to defendants' asserted defense that all such claims are barred by CDA Section 230.[11]

---

[10] Accordingly, consideration of those materials under the incorporation-by-reference doctrine is inappropriate. *See Khoja*, 899 F.3d at 1005 (concluding that the incorporation-by-reference doctrine did not apply to a document not clearly referenced or quoted in the complaint). As explained by the Ninth Circuit, "[w]hen parties pile on volumes of exhibits to their motion to dismiss, hoping to squeeze some into the complaint, their submissions can become needlessly unwieldy. . . . [and] materials may be inserted into pleadings when they should not be there." *Id*. For much the same reasons, the Court does not find it appropriate to take judicial notice of the contents of the parties' submitted documents. *See id*. at 999 (stating that judicial notice is reserved for facts that are "'not subject to reasonable dispute,' are 'generally known,' or 'can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned.'") (quoting Fed. R. Evid. 201(b)(1)-(2)).

[11] While acknowledging the possibility that an implied covenant claim may fall within an exception to CDA Section 230 immunity, defendants maintain that not all contract-based claims necessarily survive CDA immunity. *See* Dkt. No. 88 at 16; *see also Murphy*, 60 Cal. App. 5th at 29-35 (concluding that CDA Section 230(c)(1) barred plaintiff's contract claim, which was based, not on the breach of a specific promise, but on defendant's enforcement of its own policies). The Court, however, is not persuaded that, as a matter of law, CDA Section 230 necessarily immunizes

### C.      Communications Decency Act, Section 230

Defendants contend that even if the TAC states claims for relief, all claims are barred by CDA Section 230.  Specifically, defendants argue that plaintiffs' claims are barred by Section 230(c)(1) because the claims seek to treat defendants as a publisher of plaintiffs' videos and to make them liable for acts undertaken with respect to that content.  Defendants further contend that plaintiffs' claims are independently barred by CDA Section 230(c)(2)(B) to the extent they are based on the application of Restricted Mode.

"Section 230 of the CDA 'immunizes providers of interactive computer services against liability arising from content created by third parties.'"  *Gonzalez v. Google LLC*, 2 F.4th 871, 886 (9th Cir. 2021) (quoting *Fair Hous. Council of San Fernando Valley v. Roommates.com, LLC*, 521 F.3d 1157, 1162 (9th Cir. 2008)).  "Congress designed § 230 'to promote the free exchange of information and ideas over the Internet and to encourage voluntary monitoring for offensive or obscene material.'"  *Id*. (quoting *Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1099-1100 (9th Cir. 2009)).  "And any activity that can be boiled down to deciding whether to exclude material that third parties seek to post online is perforce immune under section 230."  *Roommates*, 521 F.3d at 1170-71.  The Court properly may consider the application of CDA Section 230 on a motion to dismiss where the allegations in the complaint suffice to establish the defense.  *Gonzalez*, 2 F.4th at 890 n.8.  Plaintiffs do not argue that the TAC's allegations are insufficient to establish a defense under CDA Section 230.  Accordingly, the Court addresses the merits of that defense.

### 1.      Defendants did not "contract out" of CDA Section 230

Preliminarily, plaintiffs argue that the California choice-of-law provision in YouTube's Terms of Service is, in effect, a waiver of any defenses based on federal law, including CDA Section 230.  To the extent CDA Section 230 applies at all, plaintiffs maintain that that the Terms of Service invoke that statute only in directing users to pursue claims for defamation directly against the person who posted the content.  *See* Dkt. No. 85 at 25.  Defendants do not dispute that

---

a defendant from liability for contract claims.  In any event, because the TAC fails to state a plausible claim based on the implied covenant, the Court reserves judgment as to whether any such claim may be barred by CDA Section 230.

YouTube's Terms of Service contain a California choice-of-law provision, but they contend that it does not preclude them from asserting CDA Section 230 as a defense. The Court agrees with defendants.

Plaintiffs' argument misapprehends the meaning of the choice-of-law provision. "Through the Supremacy Clause, U.S. Const. Art. VI, cl. 2, the law of any state includes federal law, and federal law is as much the law of a state 'as laws passed by the state legislature.'" *Mudd-Lyman Sales & Serv. Corp. v. United Parcel Serv.*, 236 F. Supp. 2d 907, 910 (N.D. Ill. 2002) (quoting *Howlett v. Ross*, 496 U.S. 356, 367 (1990)). "To the extent that a contractual choice-of-law provision provides that the law of a specific state shall apply, this includes federal law as well as state law." *Id.*; *see also Volt Info. Scis., Inc. v. Bd. of Trustee of Leland Stanford Junior Univ.*, 489 U.S. 468, 488 (1989) (Brennan, J., dissenting) (stating that it is "beyond dispute that the normal purpose of such choice-of-law clauses is to determine that the law of one State rather than that of another State will be applicable; they simply do not speak to any interaction between state and federal law."). Plaintiffs have not persuasively demonstrated that defendants have contractually waived any federal defenses, including CDA Section 230.

### 2.    Section 230(c)(1)

CDA Section 230(c)(1) states: "No provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." 47 U.S.C. § 230(c)(1). The CDA further provides that "[n]o cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section." *Id.* § 230(e)(3). Thus, CDA Section 230(c)(1) "precludes liability for '(1) a provider or user of an interactive computer service (2) whom a plaintiff seeks to treat . . . as a publisher or speaker (3) of information provided by another information content provider.'" *Gonzalez*, 2 F.4th at 891 (quoting *Barnes*, 570 F.3d at 1100-01) (footnote omitted). Section 230 "immunity is not limited to cases in which plaintiffs assert state law claims." *Id.* at 891 n.9 (citing *Roommates*, 521 F.3d at 1164).

Plaintiffs argue that "[a]s a matter of law," Section 230(c)(1) does not apply to a broad swath of claims, including "claims for intentional discrimination in contract or business

transactions, unfair competition or false advertising, and free speech claims."  Dkt. No. 85 at 25.

In making that argument, however, plaintiffs appear to rely, in part, on language in a Ninth Circuit

decision that the Ninth Circuit subsequently withdrew on rehearing.  *See Enigma Software Grp.*

*USA, LLC v. Malwarebytes, Inc*., 938 F.3d 1026, 1033 (9th Cir. 2019) ("*Enigma I*"), *opinion*

*withdrawn and superseded on denial of rehearing by Enigma Software Grp. USA, LLC v.*

*Malwarebytes, Inc*., 946 F.3d 1040, 1047 (9th Cir. 2019) ("*Enigma II*").  They also cite to a

Second Circuit decision that subsequently was withdrawn.  *See Domen v. Vimeo, Inc.*, 6 F.4th 245,

253 (2d Cir. 2021), *opinion withdrawn by Domen v. Vimeo, Inc.*, No. 20-616-cv, 2021 WL

4399692 (2d Cir. Sept. 23, 2021).  Moreover, defendants correctly note that courts have

determined that Section 230(c)(1) applies to a variety of claims that seek to treat the defendant as a

"publisher or speaker of any information provided by another information content provider."  47

U.S.C. § 230(c)(1); *see, e.g., Lewis*, 461 F. Supp. 3d at 953-955 (concluding that Section 230(c)(1)

barred plaintiff's free speech, implied covenant, and false-advertising claims), *aff'd on other*

*grounds*, 851 F. App'x 723 (9th Cir. 2021); *Sikhs for Justice "SFJ", Inc. v. Facebook, Inc*., 144 F.

Supp. 3d 1088, 1092-96 (N.D. Cal. 2015) (concluding that Section 230(c)(1) barred plaintiff's

federal discrimination claim brought under the Civil Rights Act of 1964), *aff'd*, 697 F. App'x 526

(9th Cir. 2017); *Domen*, 433 F. Supp. 3d at 596-97, 605 (finding that Section 230(c)(1) barred

plaintiff's free speech and Unruh Act claims and stating that "State antidiscrimination laws . . . are

not exempted from the reach of the CDA"), *aff'd on other grounds*, 2021 WL 4352312 (2d Cir.

Sept. 24, 2021).

    For the reasons discussed below, the Court concludes that the present case satisfies the

three requirements for CDA immunity.

### a.      Interactive computer service

    There appears to be no dispute that defendants are providers of an "interactive computer

service" (s*ee, e.g.* Dkt. No. 65 ¶¶ 45, 46, 65, 66), which the CDA defines as "any information

service, system, or access software provider that provides or enables computer access by multiple

users to a computer server, including specifically a service or system that provides access to the

Internet and such systems operated or services offered by libraries or educational institutions."  47

1    U.S.C. § 230(f)(2); *Gonzalez* 2 F.4th at 891 ("As to the first element of § 230, the parties do not

2    dispute that Google is an 'interactive computer service' provider as defined in 47 U.S.C.

3    § 230(f)(2). We agree."); *Roommates*, 521 F.3d at 1162 n.6 ("[T]he most common interactive

4    computer services are websites."); *Lewis*, 461 F. Supp. 3d at 954 ("There does not appear to be

5    any dispute that YouTube and Google are providers of an interactive computer service.").

**b.     Treating defendants as publishers or speakers**

7         Each of plaintiffs' claims arises from defendants' activities that fall within a publisher's

8    traditional functions. What matters in this analysis "is not the name of the cause of action," but

9    "whether the cause of action inherently requires the court to treat the defendant as the 'publisher or

10   speaker' of content provided by another." *Barnes*, 570 F.3d at 1101-02. "To put it another way,

11   courts must ask whether the duty that the plaintiff alleges the defendant violated derives from the

12   defendant's status or conduct as a 'publisher or speaker.' If it does, section 230(c)(1) precludes

13   liability." *Id.* at 1102; *Roommates*, 521 F.3d at 1170-71 (stating that "any activity that can be

14   boiled down to deciding whether to exclude material that third parties seek to post online is

15   perforce immune under section 230.").

16        The remaining Unruh Act and UCL claims in the TAC are based on defendants' decisions

17   to remove, restrict, or demonetize plaintiffs' videos. For example, the Unruh Act claim seeks

18   damages based on defendants' demonetization of plaintiffs' content and placing their videos in

19   Restricted Mode. Dkt. No. 67 ¶ 320. Similarly, the UCL claim is premised on defendants'

20   alleged unlawful or unfair restriction and demonetization of videos. *See id.* ¶ 327. Such conduct

21   constitutes publishing functions under CDA Section 230. *See, e.g., Barnes*, 570 F.3d at 1102

22   ("We have indicated that publication involves reviewing, editing, and deciding whether to publish

23   or to withdraw from publication third-party content."); *Domen*, 433 F. Supp. 3d at 602 ("In this

24   case, Vimeo plainly was acting as a 'publisher' when it deleted (or, in other words, withdrew)

25   Plaintiffs' content on the Vimeo website."); *Fed. Agency of News LLC*, 432 F. Supp. 3d at 1120-

26   21 (N.D. Cal. 2020) (concluding that plaintiff's claims, including under the Unruh Act, were based

27   on defendant's decision not to publish plaintiff's content and therefore sought to treat defendant as

28   a publisher); *Lewis*, 461 F. Supp. 3d at 954-55 (concluding that claims, including federal

28

discrimination claim, concerned defendants' removal, restriction and demonetization of plaintiff's postings sought to treat defendants as publishers); *Sikhs for Justice*, 144 F. Supp. 3d at 1095 (concluding that plaintiff's federal discrimination claim sought to hold defendant liable as a publisher where "the act that Defendant allegedly conducted in a discriminatory manner is the removal of the [plaintiff's] Page in India.").

          **c.**      **Information provided by another information content provider**

Defendants contend this prong of the Section 230(c)(1) defense is satisfied because plaintiffs' claims concern content—i.e., plaintiff's videos—that is "provided by another information content provider." *See* 27 U.S.C. § 230(c)(1). An "information content provider" is defined as "any person or entity that is responsible, in whole or in part, for the creation or development of information provided through the Internet or any other interactive computer service." 47 U.S.C. § 230(f)(3). This prong "applies to any content that is created entirely by individuals or entities other than the interactive computer service provider." *Lewis*, 461 F. Supp. 3d at 955 (internal quotations and citation omitted).

Citing *Roommates* and paragraphs 95-97 of the TAC, plaintiffs argue that defendants themselves act as "information content providers" with respect to the content in question "by operating a filtering and restricting system that embeds metadata and other discriminatory information into the video content which they then use to restrict and deny access." Dkt. No. 85 at 26. In *Roommates*, the defendant was found ineligible for Section 230 immunity because it became a "developer, at least in part," of the information in question by creating a website, posting a questionnaire, providing a limited set of pre-populated answers, and requiring users to provide responses, which defendant then used to screen housing opportunities based on protected characteristics that defendant itself forced users to disclose. *Roommates*, 521 F.3d at 1165-67; *see also Kimzey v. Yelp! Inc.*, 836 F.3d 1263, 1269 (9th Cir. 2016) (stating that "a website may lose immunity under the CDA by making a material contribution to the creation or development of content.").

There are no such facts here. Nothing in the TAC alleges or supports a plausible inference that defendants create or develop any content by "embed[ing] metadata and other discriminatory

United States District Court
Northern District of California

1   information into the video content" (Dkt. No. 85 at 26) that is posted by others.  While the TAC

2   alleges that defendants use algorithms to "review and regulate video content" (*see* Dkt. No. 67

3   ¶ 113) they plead no facts demonstrating that those algorithms are themselves content or

4   materially contribute to content.  *See, e.g., Dyroff v. Ultimate Software Grp., Inc*., 934 F.3d 1093,

5   1098 (9th Cir. 2019) ("It is true that Ultimate Software used features and functions, including

6   algorithms, to analyze user posts on Experience Project and recommended other user groups. . . .

7   Plaintiff, however, cannot plead around Section 230 immunity by framing these website features

8   as content."); *see also Force v. Facebook, Inc*., 934 F.3d 53, 70 (2d Cir. 2019) (holding that using

9   algorithms that "[m]erely arrang[e] and display[] others' content to users of Facebook . . . is not

10   enough to hold Facebook responsible as the 'develop[er]' or 'creat[or]' of that content.") (citation

11   omitted).

12       Defendants have demonstrated that they satisfy all three requirements for Section 230(c)(1)

13   immunity and that plaintiffs' claims under the Unruh Act and the UCL are barred.

14                      **3.       Section 230(c)(2)(B)**

15       Defendants contend that to the extent plaintiffs' claims are based on defendants' decisions

16   regarding the application of Restricted Mode, those claims are independently barred by CDA

17   Section 230(c)(2)(B).  Section 230(c)(2)(B) immunizes providers and users of interactive

18   computer services for "any action taken to enable or make available to information content

19   providers or others the technical means to restrict access to material" that the providers or users

20   "consider[] to be obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise

21   objectionable, whether or not such material is constitutionally protected."  47 U.S.C.

22   § 230(c)(2)(A)-(B).  Plaintiffs argue that defendants may not invoke immunity under the CDA for

23   "bad faith censorship" or to block or filter content based on a user's sexual identity or viewpoints.

24   Dkt. No. 85 at 27.

25       Putting aside that plaintiffs' arguments again rely, in part, on language in *Enigma I* that

26   subsequently was withdrawn in *Enigma II* (*see* Dkt. No. 85 at 27), they are correct that the scope

27   of the immunity provided by the CDA is not unlimited.  For example, the Ninth Circuit has held

28   that Section 230(c)(2)(B) does not provide immunity for blocking a competitor's software

United States District Court
Northern District of California

program for anticompetitive reasons. *Enigma II*, 946 F.3d at 1052. Unlike *Enigma II*, however, and despite the TAC's allegations that defendants compete with plaintiffs for an audience and viewership, the parties in the present action are not direct competitors. *See* Dkt. No. 67 ¶¶ 35-46; *see e.g., Asurvio LP v. Malwarebytes, Inc.*, No. 5:18-cv-05409-EJD, 2020 WL 1478345, at *5 (N.D. Cal. Mar. 26, 2020) ("The Court finds that the limitation to section 230(c)(2) (B) immunity recognized in *Enigma* does not apply to this case. In *Enigma*, the parties were direct competitors who sold computer security software nationwide.") (internal quotations and citation omitted). Indeed, other courts have concluded that "defendants' creation of a 'Restricted Mode' to allow sensitive users to voluntarily choose a more limited experience of the YouTube service is exactly the type of self-regulation that Congress sought to encourage in enacting section 230, and fits within section 230(c)(2)(B)'s immunity for 'any action taken to enable or make available to . . . others,' namely, YouTube users, 'the technical means to restrict access to' material 'that the provider or user considers to be obscene, . . . excessively violent, . . . or otherwise objectionable." *Prager Univ.*, 2019 WL 8640569 at *10.

Defendants have demonstrated that Section 230(c)(2)(B) immunity applies to the Unruh Act and UCL claims, to the extent those claims are based on YouTube's application of Restricted Mode.

### D.    Plaintiffs' Challenge to Constitutionality of CDA Section 230

The Court is mindful of the doctrine of constitutional avoidance. *See Dep't of Com. v. U.S. House of Representatives*, 525 U.S. 316, 343 (1999) ("If there is one doctrine more deeply rooted than any other in the process of constitutional adjudication, it is that we ought not to pass on questions of constitutionality . . . unless such adjudication is unavoidable.") ((quoting *Spector Motor Serv. v. McLaughlin*, 323 U.S. 101, 105 (1944)). However, in view of the Court's conclusions that the TAC states some claims for relief, which nonetheless are barred by CDA Section 230(c), the Court finds it necessary to address plaintiffs' argument that CDA Section 230 is unconstitutional.

Plaintiffs argue that CDA Section 230(c) is unconstitutional because it violates their free speech rights under the First Amendment. Dkt. No. 85 at 27-30. Relying on *Denver Area Educ.*

United States District Court
Northern District of California

*Telecomm. Consortium, Inc. v. Fed. Commc'ns Comm'n*, 518 U.S. 727 (1996), plaintiffs argue that "the statute's application results in an unconstitutional permissive speech law that violates the First Amendment." *Id.* at 27.   Defendants respond that there is no valid basis for plaintiffs' constitutional attack on Section 230(c) because defendants are not state actors subject to the constraints of the First Amendment.  Dkt. No. 77 at 24-25; Dkt. No. 88 at 18-20.  The United States argues that Section 230(c) is not unconstitutional because YouTube is not a state actor and because Section 230(c) has not deprived plaintiffs of any valid underlying speech claim.  Dkt. Nos. 47, 89.

The Court agrees with defendants and the United States.  In this Court's prior order granting defendants' motion to dismiss the SAC, the Court concluded that plaintiffs failed to establish the presence of state action in support of their First Amendment claim because (1) YouTube's hosting of speech on a private platform is not a traditional and exclusive government function; (2) plaintiffs failed to support their assertion that defendants effectively declared themselves the equivalent of state actors; (3) the availability of the affirmative defense under Section 230(c) does not amount to government endorsement of defendants' alleged discrimination; and (4) nothing about Section 230 coerces private entities to take any particular action.  Nothing in the TAC or plaintiffs' arguments requires the Court to alter its prior analysis or conclusions.  *See* Dkt. No. 65 at 7-12; *see also Prager III*, 951 F.3d at 997-98; *Newman*, 2021 WL 2633423 at *9-10.

Plaintiffs nonetheless maintain that under *Denver Area*, Section 230(c) is unconstitutional because it "was expressly enacted as a permissive regulation of speech" that allows defendants to regulate, restrict and block content on YouTube.  Dkt. No. 85 at 27-28.  Plaintiffs' arguments fail to persuade.  As discussed in the Court's prior order dismissing plaintiffs' SAC:

> Unlike the cable systems operators in *Denver Area*, YouTube is not a government-regulated entity charged with providing public broadcasting services.  And unlike the statute at issue in *Denver Area*, which permitted cable system operators to ban specific content, Section 230 of the CDA does not single out particular types of speech as suitable for private censorship.  At most, Section 230 provides protection from civil liability for interactive computer service providers who elect to host information provided by another content provider, or who in good faith act to restrict materials that

> the provider or user considers "obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable," regardless of whether that material is constitutionally protected. [47] U.S.C. § 230(c); *see also Roberts*, 877 F.3d at 837 (concluding that a permissive federal statute giving a private entity the choice to arbitrate does not "encourage" arbitration such that the private entity's conduct is attributable to the government).

Dkt. No. 65 at 11-12; *see also Lewis*, 461 F. Supp. 3d at 952-53 (concluding that Section 230(c)(1) "does not ban or restrict any speech."); *Prager Univ.*, 2019 WL 8640569 at *12 (same); *see generally Janus v. Am. Fed. of State, Cty. & Mun. Emps., Council 31*, 138 S. Ct. 2448, 2479 n.24 (2018) (noting that, while the issue has not yet been decided by the Supreme Court, the proposition that a law "allowing, but not requiring, private parties" to take certain action is sufficient to establish governmental action "is even more questionable today.").[12]  Plaintiffs have not presented any argument that compels a contrary conclusion.  Although plaintiffs maintain that *United States v. Texas*, 566 F. Supp. 3d 605 (W.D. Tex. 2021) establishes that they need not establish state action to pursue a constitutional challenge to CDA Section 230, that argument fails for the reasons discussed above.

To the extent the TAC suggests that defendants' invocation of CDA Section 230(c) as a defense violates plaintiffs' First Amendment right to "petition[] the courts for relief," (*see* Dkt. No. 67 ¶ 304), plaintiffs have not been precluded from presenting their legal disputes to the courts, "express[ing] their ideas, hopes, and concerns to their government," or from "request[ing] action by the government to address those concerns."  *Borough of Duryea v. Guarnieri*, 564 U.S. 379, 388-89 (2011).  Here, the United States argues, persuasively, that the Petition Clause does not require that the government guarantee plaintiffs the ability to continue to litigating their claims to a particular outcome, or that defendants must be denied the opportunity to avail themselves of a defense under CDA Section 230.  *See* Dkt. No. 47 at 15-16; Dkt. No. 89.  For example, in

---

[12] The parties dispute whether defendants should be permitted to file a statement of recent decision concerning Judge Chen's order on a motion to dismiss in *Huber v. Biden*, No. 21-cv-06580-EMC, 2022 WL 827248 (N.D. Cal. Mar. 18, 2022).  *See* Dkt. Nos. 102, 103.  In briefing the matter, both sides present substantive arguments regarding their respective views on the relevance of *Huber*. As the parties have had an opportunity to brief the matter, the Court grants defendants' request for leave to file their statement of recent decision.  The Court otherwise finds it unnecessary to rely on *Huber*; as discussed above, plaintiffs have not persuasively argued that *Denver Area* requires either a finding of state action or a constitutional violation in the present matter.

1    interpreting the Due Process Clause of the Fourteenth Amendment, the Supreme Court has noted

2    that the government "remains free to create substantive defenses or immunities for use in

3    adjudication—or to eliminate its statutorily created causes of action altogether . . .." *Logan v.*

4    *Zimmerman Brush Co.*, 455 U.S. 422, 432 (1982); *see also Ileto v. Glock, Inc.*, 565 F.3d 1126,

5    1140-41 (9th Cir. 2009) (concluding that law limiting liability did not deprive the plaintiffs of a

6    vested property right because "although a cause of action is a species of property, a party's

7    property right in any cause of action does not vest until a final unreviewable judgment is

8    obtained.").

9       Plaintiffs have not established that the application of Section 230(c) as a defense is

10   unconstitutional.

11       **E.**     **Leave to Amend**

12       Under Rule 15(a) of the Federal Rules of Civil Procedure, leave to amend "shall be freely

13   given when justice so requires," because "the court must remain guided by the underlying purpose

14   of Rule 15 . . . to facilitate decisions on the merits, rather than on the pleadings or technicalities."

15   *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000) (en banc) (alterations and internal quotation

16   marks omitted). "The decision of whether to grant leave to amend nevertheless remains within the

17   discretion of the district court," which may deny leave to amend if allowing amendment would

18   unduly prejudice the opposing party, cause undue delay, or be futile, or if the party seeking

19   amendment has acted in bad faith. *Leadsinger, Inc. v. BMG Music Publ'g*, 512 F.3d 522, 532 (9th

20   Cir. 2008) (citing *Foman v. Davis*, 371 U.S. 178, 182 (1962)).

21       As discussed above, plaintiffs are given leave to amend their claim for breach of the

22   implied covenant of good faith and fair dealing. However, they will not be given leave to amend

23   any other claims. Plaintiffs have now had several opportunities to plead their claims. *See* Dkt.

24   Nos. 1, 7, 20, 67. They have not articulated any additional facts that could be alleged in an

25   amended pleading to support plausible claims for violation of the Lanham Act, the California

26   Constitution, or for declaratory relief regarding the constitutionality of CDA Section 230, much

27   less additional claims for breach of contract, rescission, replevin or for an accounting (*see* Dkt.

28   No. 67 at 1 n.1; Dkt. No. 85 at 30) that have not been asserted in any pleading. Nor have they

presented arguments establishing that defendants' CDA Section 230(c) defense does not apply or is unconstitutional as a matter of law.  Accordingly, the Court finds that further amendment would be futile.  Except for the claim for breach of the implied covenant of good faith and fair dealing, plaintiffs' request for further leave to amend is denied.

## IV.    CONCLUSION

Based on the foregoing, defendants' motion to dismiss the third amended complaint is granted, with leave to amend only as to the claim for breach of the implied covenant of good faith and fair dealing.  If they choose to amend, plaintiffs shall file their fourth amended complaint by **October 14, 2022**.

**IT IS SO ORDERED.**

Dated: September 30, 2022

VIRGINIA K. DEMARCHI
United States Magistrate Judge

United States District Court
Northern District of California