DAVID H. KRAMER, SBN 168452
LAUREN GALLO WHITE, SBN 309075
KELLY M. KNOLL, SBN 305579
WILSON SONSINI GOODRICH & ROSATI
Professional Corporation
650 Page Mill Road
Palo Alto, CA 94304-1050
Telephone: (650) 493-9300
Facsimile: (650) 565-5100
Email: dkramer@wsgr.com
Email: lwhite@wsgr.com
Email: kknoll@wsgr.com

BRIAN M. WILLEN (*Pro Hac Vice*)
WILSON SONSINI GOODRICH & ROSATI
Professional Corporation
1301 Avenue of the Americas, 40th Floor
New York, NY 10019-6022
Telephone: (212) 999-5800
Facsimile: (212) 999-5801
Email: bwillen@wsgr.com

Attorneys for Defendants
GOOGLE LLC and YOUTUBE, LLC

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| DIVINO GROUP LLC, a California limited liability company, CHRIS KNIGHT, an individual, CELSO DULAY, an individual, CAMERON STIEHL, an individual, BRIAAANDCHRISSY LLC, a Georgia limited liability company, BRIA KAM, an individual, CHRISSY CHAMBERS, an individual, CHASE ROSS, an individual, BRETT SOMERS, an individual, and LINDSAY AMER, an individual, STEPHANIE FROSCH, an individual, SAL CINEQUEMANI, an individual, TAMARA JOHNSON, an individual, and GREG SCARNICI, an individual,<br><br>Plaintiffs,<br><br>v.<br><br>GOOGLE LLC, a Delaware limited liability company, YOUTUBE, LLC, a Delaware limited liability company, and DOES 1-25,<br><br>Defendants. | CASE NO.: 5:19-cv-04749-VKD<br><br>**DEFENDANTS' MOTION TO STRIKE AND DISMISS PLAINTIFFS' [CORRECTED] FOURTH AMENDED CLASS ACTION COMPLAINT**<br><br>Date: March 21, 2023<br>Time: 10:00 a.m.<br>Place: Ctrm 2<br>Before: Hon. Virginia K. DeMarchi |

# TABLE OF CONTENTS

**Page**

NOTICE OF MOTION AND MOTION .................................................................................. 1

STATEMENT OF REQUESTED RELIEF AND ISSUES TO BE DECIDED ........................... 1

MEMORANDUM OF POINTS AND AUTHORITIES ............................................................. 1

FACTUAL BACKGROUND ................................................................................................. 2

    A.    YouTube and the Parties' Governing Agreements ............................................ 2

    B.    The Court's Dismissal of Plaintiffs' 3AC ........................................................ 3

    C.    Plaintiffs' 4AC .............................................................................................. 4

ARGUMENT ...................................................................................................................... 6

I.      PLAINTIFFS' COMPLAINT SHOULD BE STRICKEN UNDER RULE 12(f) .............. 6

II.     PLAINTIFFS' COMPLAINT SHOULD BE DISMISSED UNDER RULE 12(b)(6) ....... 9

    A.    Plaintiffs' Claim is Time-Barred Insofar as it Accrued Outside the One-
         Year Contractual Limitations Period ............................................................... 9

    B.    Plaintiffs' Damages Claim is Independently Barred by the Limitation of
         Liability in YouTube's Terms ....................................................................... 11

    C.    Plaintiffs Fail to State a Viable Claim for Breach of the Implied Covenant ........ 12

         1. As *Prager* Confirms, Plaintiffs' Claim Fails Based on YouTube's
            Express Reservation of the Right to Make Publishing Decisions ................... 13

         2. Plaintiffs Cannot State a Claim Based on Non-Contractual Statements or
            Prefatory Language in the Community Guidelines ........................................ 15

             a)    Plaintiffs Cannot Base Their Contract Claim on Isolated
                  Testimony or Lofty Statements in Scattered YouTube
                  Webpages ........................................................................... 15

             b)    Plaintiffs Cannot Base Their Contract Claim on the Prefatory
                  Language in YouTube's Community Guidelines .......................... 16

         3. Plaintiffs Cannot State a Claim Based on Allegations That YouTube
            Restricted or Demonetized Their Videos Based on Their Identities ............... 18

III.    PLAINTIFFS' CLAIM IS BARRED BY SECTION 230 ................................................ 23

CONCLUSION ................................................................................................................. 25

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Atkinson v. Facebook Inc.*,
  2020 U.S. Dist. LEXIS 263319 (N.D. Cal. Dec. 7, 2020) ...................................................23

*Barnes v. Yahoo!, Inc.*,
  570 F.3d 1096 (9th Cir. 2009)................................................................................23, 24, 25

*Bd. of Trs. v. Santa Cruz Underground & Paving, Inc.*,
  WL 2317433 (N.D. Cal. June 28, 2022) ...............................................................................10

*Block v. eBay, Inc.*,
  747 F.3d 1135 (9th Cir. 2014)........................................................................................16, 17

*Carma Developers (Cal.), Inc. v. Marathon Dev. Cal, Inc.*,
  2 Cal. 4th 342 (1992).............................................................................................................13

*Cook v. County of Los Angeles*,
  2021 WL 4353120 (C.D. Cal. July 28, 2021) .........................................................................9

*Cooksey v. Ocean*,
  2017 WL 11631497 (C.D. Cal. Apr. 26, 2017)........................................................................8

*Daniels v. Alphabet Inc.*,
  2021 WL 1222166 (N.D. Cal. Mar. 31, 2021) .......................................................14, 15, 25

*Daniels v. Alphabet Inc.*,
  2021 WL 2865147 (N.D. Cal. July 8, 2021) ...........................................................................9

*Darnaa, LLC v. Google, Inc.*,
  2015 WL 7753406 (N.D. Cal. Dec. 2, 2015) ...............................................................10, 11

*Darnaa, LLC v. Google Inc.*,
  756 F. App'x 674 (9th Cir. 2018)..........................................................................................12

*Domen v. Vimeo, Inc.*,
  433 F. Supp. 3d 592 (S.D.N.Y. 2020) ..................................................................................24

*Enhanced Athlete Inc. v. Google LLC*,
  479 F. Supp. 3d 824 (N.D. Cal. 2020) ..................................................................................15

*Fed. Agency of News LLC v. Facebook, Inc.*,
  432 F. Supp. 3d 1107 (N.D. Cal. 2020) ................................................................................23

*Hambrecht & Quist Venture Partners v. Am. Med. Int'l, Inc.*,
  38 Cal. App. 4th 1532 (1995).................................................................................................10

*Hillside Drilling Inc. v. Goldman Sachs Grp.*,
  2009 WL 2246215 (N.D. Cal. July 27, 2009) ................................................................7, 8

*Johnson v. Napa Valley Wine Train, Inc.*,
  2016 WL 493229 (N.D. Cal. Feb. 9, 2016) ......................................................................12

*Lewis v. Google LLC*,
  461 F. Supp. 3d 938 (N.D. Cal. 2020) .......................................................................14, 23

*Lewis v. YouTube, LLC*,
  244 Cal. App. 4th 118 (2015) .......................................................................................2, 12

*Moon v. County of Orange*,
  2020 WL 6145106 (C.D. Cal. Sept. 18, 2020) ...................................................................9

*Murphy v. Twitter, Inc.*,
  60 Cal. App. 5th 12 (2021) ...............................................................................15, 23, 24

*Newman v. Google LLC*,
  2021 WL 2633423 (N.D. Cal. June 25, 2021) ..................................................................22

*Newman v. Google LLC*,
  2022 WL 2556862 (N.D. Cal. July 8, 2022) ............................................................ *passim*

*Newman v. Google LLC*,
  No. 3:20-cv-04011-VC, slip op. (N.D. Cal. Nov. 28, 2022) .............................................16

*Oculus Innovative Scis., Inc. v. Nofil Corp.*,
  2007 WL 2600746 (N.D. Cal. Sept. 10, 2007) ...................................................................6

*Pasadena Live v. City of Pasadena*,
  114 Cal. App. 4th 1089 (2004) ........................................................................................13

*Prager Univ. v. Google LLC*,
  2019 Cal. Super. LEXIS 2034 (Cal. Sup. Ct. Nov. 19, 2019)...........................................25

*Prager Univ. v. Google LLC*,
  85 Cal. App. 5th 1022, 301 Cal. Rptr. 836 (2022) ................................................ *passim*

*Prager Univ. v. Google LLC*,
  951 F.3d 991 (9th Cir. 2020)............................................................................................16

*Soltani v. W. & S. Life Ins. Co.*,
  258 F.3d 1038 (9th Cir. 2001) .........................................................................................10

*Stiles v. Wal-Mart Stores, Inc.*,
  2018 WL 3093501 (E.D. Cal. June 20, 2018).....................................................................9

*Sweet v. Google Inc.*,
  2018 WL 11847771 (N.D. Cal. Mar. 7, 2018) ..................................................................14

*Zango, Inc. v. Kaspersky Lab, Inc.*,
    2007 WL 5189857 (W.D. Wash. Aug. 28, 2007) ................................................24

## STATUTES

15 U.S.C. § 1051 ................................................................................................4, 8

47 U.S.C. § 230(c)(1) ................................................................................... *passim*

47 U.S.C. § 230(c)(2) ...............................................................................24, 25

Cal. Civ. Code § 51 ...............................................................................4, 8, 25

## RULES

Fed. R. Civ. P. 8 ..............................................................................................9

Fed. R. Civ. P. 12(b)(6) ...............................................................................1, 9

Fed. R. Civ. P. 12(f) .....................................................................................1, 6

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**<u>NOTICE OF MOTION AND MOTION</u>**

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD: PLEASE TAKE

NOTICE that on March 21, 2023, at 10:00 a.m. before the Honorable Virginia K. DeMarchi,

Magistrate Judge of the United States District Court for the Northern District of California,

Defendants Google LLC ("Google") and YouTube, LLC ("YouTube") (collectively,

"Defendants") shall and hereby do move for an order striking allegations in Plaintiffs'

[Corrected] Fourth Amended Class Action Complaint (Dkt. No. 116, "4AC") and dismissing the

4AC with prejudice.

**<u>STATEMENT OF REQUESTED RELIEF AND ISSUES TO BE DECIDED</u>**

Pursuant to Rule 12(f) of the Federal Rules of Civil Procedure, Defendants seek to strike

the immaterial, impertinent, scandalous, and formerly dismissed allegations in Plaintiffs' 4AC.

In addition, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure and Section 230 of

the Communications Decency Act, 47 U.S.C. § 230(c) ("Section 230"), Defendants seek

dismissal of Plaintiffs' 4AC without further leave to amend.

**<u>MEMORANDUM OF POINTS AND AUTHORITIES</u>**

This Court's order dismissing Plaintiffs' Third Amended Complaint ("3AC") allowed

Plaintiffs leave to amend a single cause of action, for breach of the implied covenant of good

faith and fair dealing. Dkt. No. 107 ("Order"). The Court instructed Plaintiffs to "clearly

identify" the specific contracts and provisions that allegedly give rise to that claim. *Id.* at 24.

Despite this clear instruction, Plaintiffs' 4AC remains "exceedingly vague" (*id.* at 23)—jumbled,

impenetrable, and over 1,000 pages long with exhibits. The 4AC reiterates many of the same

indiscernible accusations that led to this Court's prior dismissals, while adding nothing that

creates a plausible implied covenant claim. Plaintiffs cannot overcome the express language of

the governing agreements, have no plausible allegations of breach, and cannot evade YouTube's

immunities under Section 230. Much of the 4AC should be stricken, and what remains should be

dismissed, this time with prejudice.

1

**FACTUAL BACKGROUND**

2

A.      **YouTube and the Parties' Governing Agreements**

3

*YouTube's Terms of Service and Community Guidelines*. YouTube's service is governed

4

by contractual terms and content policies. *See, e.g.*, 4AC ¶¶ 64, 73-76, 78-82. Plaintiffs agreed to

5

YouTube's Terms of Service ("Terms" or "TOS") and the incorporated rules laid out in

6

YouTube's Community Guidelines. *See, e.g.*, *id.* ¶¶ 73, 138.

7

The Terms expressly limit YouTube's liability for (among other things) errors,

8

omissions, or offensive third-party content, including decisions to remove such content—and

9

have done so since well before this case was filed. *See, e.g.*, *id.* ¶ 78(h-l), Ex. 2 at 111;[1] *accord*

10

*Lewis v. YouTube, LLC*, 244 Cal. App. 4th 118, 124-26 (2015). The Terms also include (and

11

have long included) a contractual limitations provision requiring that any cause of action related

12

to YouTube's service be brought within one year of accrual. *See, e.g.*, 4AC, Ex. 2 at 113.

13

The Community Guidelines prohibit certain kinds of content from appearing on

14

YouTube, including "nudity and sexual content," "vulgar language," and other "graphic

15

content." *Id.* ¶ 80; *id.* Ex. 8 at 257. YouTube reserves broad authority to remove such content

16

from its service although it does not make any affirmative promise to do so. The Terms

17

specifically provide that "YouTube reserves the right to decide whether Content violates these

18

Terms of Service for reasons other than copyright infringement, such as, but not limited to,

19

pornography, obscenity, or excessive length. YouTube may at any time, without prior notice and

20

in its sole discretion, remove such Content and/or terminate a user's account for submitting such

21

material in violation of these Terms of Service." *Id.* Ex. 2 at 107-108.[2]

22

*Restricted Mode*. To make YouTube more inclusive for sensitive viewers while still

23

allowing a wide range of content to appear on its general service, YouTube offers Restricted

24

25

[1] Defendants refer to the exhibits filed with the original version of the 4AC (Dkt Nos. 114-1 to 114-21), using the pagination Plaintiffs applied to those documents.

26

[2] Effective December 10, 2019, YouTube replaced this reservation with a functionally

27

identical one: "YouTube is under no obligation to host or serve Content." 4AC, Exs. 3-6; *see also id.* Exs. 3-5 ("If we reasonably believe that any Content is in breach of this Agreement or may cause harm to YouTube, our users, or third parties, we may remove or take down that

28

Content in our discretion.").

Mode—an optional, opt-in setting that some subset of users selects to screen out content flagged as age-restricted or "potentially adult." *Id.* ¶ 108; *id.* Ex. 9 at 622-623, 706-707. While the Community Guidelines govern what content is eligible to appear on YouTube at all, separate guidelines govern videos' eligibility to appear in Restricted Mode. Those Restricted Mode guidelines cover "potentially adult" content, which includes, but is not limited to, "[o]verly detailed conversations about or depictions of sex or sexual activity"; "[i]nappropriate language, including profanity"; and "[v]ideo content that is gratuitously incendiary, inflammatory, or demeaning toward an individual or group." *Id.* Ex. 9 at 706. As long as they comply with the Community Guidelines, videos excluded from Restricted Mode remain freely available on YouTube's general service, where they can be seen by the vast majority of users who have not turned on Restricted Mode. Creators who believe their content has been wrongly excluded from Restricted Mode may appeal to YouTube. *Id.* at 707.

*Monetization*. YouTube allows users whose channels meet certain requirements to earn revenue from (to "monetize") their videos by running advertisements with them as part of the YouTube Partner Program ("YPP"). *See, e.g.*, *id.* Ex. 13 at 984-85. To be eligible for monetization, users agree to additional written contracts, including the YPP Terms and the AdSense Online Terms of Service. *See, e.g.*, 4AC ¶¶ 75-76. Among other things, those Terms make clear that "YouTube is not obligated to display any advertisements alongside your videos." *Id.* Ex. 12 at 980. Users also agree to comply with YouTube's monetization policies, including the Advertiser-friendly content guidelines, which are designed to ensure that ads do not appear alongside videos that certain audiences might find objectionable. *See id.* ¶¶ 75-76; *id.* Exs. 12-15.

**B.      The Court's Dismissal of Plaintiffs' 3AC**

Plaintiffs are LGBTQ+ YouTube content creators who accepted YouTube's Terms and monetization agreements. In each version of their complaint, Plaintiffs have alleged that YouTube wrongly excluded some of their videos from Restricted Mode, disqualified some of their videos from advertising, and moderated their content in various other ways. *E.g.*, Dkt. No. 67. Plaintiffs assert that these decisions were made based on their sexual identities, or were otherwise wrongful or discriminatory.

This Court has dismissed two prior versions of Plaintiffs' complaint—most recently their 3AC. *See* Dkt. No. 65; Order. In its most recent order, the Court found that Plaintiffs failed to state claims under the Lanham Act, for a declaratory judgment, and for violation of the California Constitution. Order at 5-14. Despite Plaintiffs' "very thin" allegations of discrimination, the Court found that Plaintiffs had stated a plausible claim under the Unruh Act (and a related claim under UCL), but held that those claims were barred by Section 230. *Id.* at 14-22, 25-31. Dismissal of all these claims was with prejudice.

The Court also dismissed Plaintiffs' claim for breach of the implied covenant but allowed leave to amend that claim, explaining that Plaintiffs' allegations were "exceedingly vague and do not clearly identify the underlying agreement(s) or contract term(s) that apply to the parties' dispute." *Id.* at 23. Plaintiffs' general "alleg[ations] that defendants' purported 'censorship' violates YouTube's 'Terms of Service'" were insufficient, as were their "repeated vague assertions that defendants allegedly 'warrant[ed]' or 'promise[d]' that their 'identity and viewpoint-neutral, content-based rules' would 'apply equally to all,' without any connection between those alleged promises and any particular agreement or contract." *Id.* at 23-24. The Court was clear that, if Plaintiffs chose to amend their complaint, then they should "clearly identify" the specific agreements that form the basis for their implied covenant claim. *Id.* at 24.

## C.    Plaintiffs' 4AC

While the 4AC technically asserts a single cause of action for breach of the implied covenant (4AC ¶¶ 135-146), it regurgitates nearly all of Plaintiffs' prior pleading. Plaintiffs again allege that their YouTube videos have received over half a billion views and generated hundreds of thousands of dollars in ad revenue.[3] Plaintiffs continue to complain, however, that over time, their videos received fewer views, their channels acquired fewer subscribers, and they generated less revenue than they once did. *See, e.g.*, *id.* ¶¶ 171, 192, 230, 236, 253, 266. Again, they

---

[3] *See, e.g.*, 4AC ¶ 15 (ElloSteph channel: 36.5 million views); *id.* ¶ 16 (Sal Bardo channel: 24.1 million views); *id.* ¶ 175 (BriaAndChrissy channel: 380 million views; WonderWarriors: 60 million views); *id.* ¶ 214 (single age-restricted video: 1.3 million views); ¶ 175 ($3,500 per month); *id.* ¶ 192 ($8,000 for each sponsored video); *id.* ¶ 193 (CAD$10,800 annually in revenue); *id.* ¶ 208 ($5,751 in just one month); *id.* ¶ 231 ($23,000 in annual revenue).

---

1  attribute these changes to various updates to YouTube's service and advertising programs (which

2  they admit affected all users equally) and "technical difficulties" (*e.g.*, *id.* ¶¶ 153, 171, 180, 246,

3  263); to their own self-censorship and withdrawal from YouTube (*e.g.*, *id.* ¶¶ 183, 227, 234, 237,

4  256, 266(b,e)); and to YouTube allegedly moderating some fraction of their content differently

5  from others' based "at least in part" on Plaintiffs' identities (*e.g.*, *id.* ¶¶ 184, 189, 199, 214, 230,

6  255, 266, 268).[4] Plaintiffs also repeat variations of their claim that YouTube "denie[d] equal

7  application of [its] content based guidelines and rules to consumers" (*id.* ¶ 101; *see* Order at 23),

8  and repeat verbatim nearly all of their allegations concerning YouTube's removal, restriction, or

9  demonetization of Plaintiffs' content (*compare*, *e.g.*, 3AC ¶¶ 150-268, *with* 4AC ¶¶ 147-266).

10     *Plaintiffs' Allegedly Removed Content.* Like Plaintiffs' prior complaints, the 4AC

11  suggests that YouTube "wrongly remove[s] Plaintiffs' content" under the YouTube Terms of

12  Service (4AC ¶ 107) but largely fails to identify any content that was purportedly removed. *See,*

13  *e.g.*, *id.* ¶¶ 55(c), 55(k), 204, 215. Where Plaintiffs do identify content that they claim was

14  wrongfully removed, they generally admit that the content was reinstated on YouTube shortly

15  after appeal. *Id.* ¶¶ 204, 242 (content reinstated within one to two weeks). Plaintiffs describe a

16  single video about "homophobic" celebrities that YouTube supposedly "censored" in June 2015

17  (*id.* ¶ 189), but appear to acknowledge that this video too remains on YouTube's platform, albeit

18  with limited monetization (*id.* ¶ 188 (https://www.youtube.com/watch?v=O6wGBnY9gTA)). In

19  short, the 4AC fails to identify a single video from among the thousands Plaintiffs uploaded to

20  YouTube (*e.g.*, *id.* ¶¶ 11-18) that was removed and kept off the platform.

21     *Plaintiffs' Allegedly Restricted and Demonetized Content*. Plaintiffs' allegations instead

22  focus on Restricted Mode and monetization. As in the 3AC, Plaintiffs suggest that a handful of

23  their videos on YouTube were excluded from Restricted Mode, demonetized, or (more

24  frequently) permitted limited monetization. *See, e.g.*, *id.* ¶¶ 163, 184, 188, 204. Plaintiffs

25  

26     [4] Plaintiffs also reiterate vague references to other supposed harms, such as that some
    subscribers to Plaintiffs' channels have not received notifications regarding new videos (4AC
27  ¶ 180); that YouTube's filters have not blocked all of the undesirable comments that Plaintiffs do
    not wish to see (4AC ¶ 222); and that some of the custom "thumbnail" images displayed with
28  Plaintiffs' videos have been deleted or replaced with "generic" thumbnails (4AC ¶ 197).

1   acknowledge that many, if not most, of their videos were allowed to appear in Restricted Mode

2   and to earn advertising revenue. *See, e.g., id.* ¶¶ 188, 198, 200, 211, 230, 232 (not all Plaintiffs'

3   videos excluded from Restricted Mode or demonetized); *id.* ¶¶ 175, 191-193, 208, 231, 236, 253,

4   257 (ad revenues earned by Plaintiffs). And Plaintiffs further admit that YouTube often re-

5   monetized or removed restrictions from their videos in response to their appeals. *Id.* ¶¶ 204, 242,

6   246, 249, 252, 255(a). Plaintiffs' allegations of Restricted Mode exclusion and demonetization

7   are thus limited to a handful of videos—all of which remain accessible on YouTube. *See, e.g., id.*

8   ¶¶ 163, 184, 188, 204.

9         Beyond Plaintiffs' repurposed allegations from the 3AC, the few additions to the 4AC

10   offer little that is new and even less that is material. Plaintiffs attach hundreds of pages of

11   YouTube agreements and support webpages to the 4AC (*id.* ¶¶ 72-84; Exs. 1-19), but do not tie

12   YouTube's supposed wrongs to any contractual promises contained in those documents. In

13   addition, Plaintiffs add to the 4AC: a (distinctly incorrect) recounting of this Court's prior order

14   (*id.* ¶¶ 2-3, 5-6); inflammatory and unsupported allegations about ***Google's*** algorithms that have

15   no bearing on ***YouTube's*** content policies (much less the specific decisions about Plaintiffs'

16   specific content at issue here) (*id.* ¶¶ 39-44); and allegations about a September 2017 meeting

17   with YouTube creators and a January 2018 customer service phone call that Plaintiffs have

18   raised many times (*id* ¶¶ 47-53). They also propose new class definitions. *Id.* ¶¶ 115, 117.

19                                    **ARGUMENT**

20   **I.   PLAINTIFFS' COMPLAINT SHOULD BE STRICKEN UNDER RULE 12(f)**

21         Under Rule 12(f) of the Federal Rules of Civil Procedure, a court "may strike from a

22   pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous

23   matter." Courts routinely strike inflammatory rhetoric and allegations that do not bear on the

24   core legal issues raised in the complaint. *E.g.*, *Oculus Innovative Scis., Inc. v. Nofil Corp.*, 2007

25   WL 2600746, at *4 (N.D. Cal. Sept. 10, 2007). While Plaintiffs technically removed from their

26   4AC the five claims that were dismissed with prejudice, their amended pleading otherwise

27   reflects no effort to focus their allegations on the single implied covenant claim that this Court

28   dismissed without prejudice. The 4AC contains many allegations that are impertinent,

inflammatory, or otherwise immaterial. Particularly in light of the fact that this is now Plaintiffs'

fifth attempted pleading and the Court allowed Plaintiffs leave to amend for the express purpose

of clarifying the basis for their one remaining claim, this Court should strike those allegations.

**Immaterial, Impertinent, and Scandalous Allegations.** First, this Court should strike the

following immaterial, impertinent, and scandalous allegations in the 4AC:

- 4AC ¶¶ 39, 41, and 43 assert that a book entitled "Algorithms of Oppression" says that "'technological redlining' is pervasive at Google/YouTube." But the excerpts they rely on do not address YouTube or have anything to do with the claim that YouTube restricted Plaintiffs' videos based on their identities—which is why Judge Chhabria held that this same book could not support similar claims. *Newman v. Google LLC*, 2022 WL 2556862, at *1 (N.D. Cal. July 8, 2022). Plaintiffs' inflammatory rhetoric relating to this book (which misquotes the very source Plaintiffs invoke) should be stricken. *See Hillside Drilling Inc. v. Goldman Sachs Grp.*, 2009 WL 2246215, at *4 (N.D. Cal. July 27, 2009) (striking allegations discussing defendant's alleged role in global recession where that role was not plausibly related to the plaintiff's case).

- 4AC ¶ 4 n.3 makes the conclusory assertion that YouTube updated its Terms "in direct response to Plaintiffs['] allegations in prior pleadings in this case, and its companion case," but Plaintiffs identify no plausible basis for this claim. *See Hillside*, 2009 WL 2246215, at *4 & n.6 (striking inflammatory allegation that was not plausibly supported).

- 4AC ¶ 6 falsely asserts that "this Court previously stated" that YouTube had an "obligation to determine access to services on YouTube subject to specific content-based rules that are to be applied without reference or consideration of the user's identity or viewpoints." This Court did not say that; the allegation should be stricken.

- 4AC ¶ 55(e) discusses a call that Divino Group made to a call center regarding one of its ads. The summary in 4AC ¶ 55(e) falsely places quotation marks around statements that Plaintiffs *know are not in the transcript of that call*, such as the assertion that there was a "'company policy' of prohibiting 'gay' users from advertising their content on YouTube." *Compare id.*, *with* 1AC, Ex. 1 (Dkt. No. 7-3) (call transcript).

- 4AC ¶¶ 36-37, 55(g-h), 59, 165, 168 contain immaterial, impertinent, and inflammatory allegations. Without basis, Plaintiffs claim, for example, that Defendants "surreptitiously" use computer scripts "to send secret, separate messages to Defendants' servers," resulting in determinations about "who and what gets access to services on YouTube." *Id.* ¶ 36; *see also id.* ¶ 37 (alleging Defendants "use personal data . . . to classify Plaintiffs and other similarly situated YouTubers as LGBTQ+, the 'gay thing,' and other identity based categories" to make content-moderation and monetization decisions). Plaintiffs also accuse YouTube (which they claim has a "rotting corporate culture" (*id.* ¶ 165)) of promoting "online hate speech" (*id.* ¶ 55(g-h)) and of working to "maximiz[e] financial gain, political power, and consolidat[e] control over the public speech and content of its consumers and the

public" (*id.* ¶ 168). In addition, Plaintiffs falsely attribute to Defendants inflammatory statements that they have not actually made. *Id.* ¶ 59. This Court should strike each of these allegations. *See, e.g.*, *Cooksey v. Ocean*, 2017 WL 11631497, at *2 (C.D. Cal. Apr. 26, 2017) (dismissing as immaterial inflammatory allegations that did not bear on the sole claim at issue); *Hillside*, 2009 WL 2246215, at *4 & n.6.

- The 4AC adds several paragraphs (*id.* ¶¶ 107-108) that purport to detail Defendants' breaches of contract. These purported summaries (which appear to have been ported over from pleadings in a different case)[5] have nothing to do with Plaintiffs' actual allegations in this case. *See, e.g.*, *id.* ¶ 108 (claiming "Defendants automatically restricted Plaintiffs' content wherever the title, tags, or audio refer to **race** related subjects" (emphasis added)).

**Dismissed Claims.** Additionally, the 4AC is littered with references to claims that the Court dismissed without leave to amend. In particular:

- <u>First Amendment/California Constitution Liberty of Speech Clause</u>. The 4AC contains myriad assertions that YouTube is somehow infringing on the free speech rights of its users, which appear to be left over from their claims that YouTube violates the federal or California constitutions. *See* 4AC ¶ 165 (accusing Defendants of running a "scheme to suppress speech"); *id.* ¶ 166 (saying YouTube runs a "fraudulent scheme" that is "to the detriment of the users' free speech and consumer rights"); *see also, e.g.*, *id.* ¶¶ 120(a,h,l,m), 167-70.

- <u>Lanham Act</u>. The 4AC contains leftover allegations regarding Plaintiffs' Lanham Act claim. *See, e.g.*, *id.* ¶¶ 55(b) (accusing YouTube of "[f]alsely representing to the viewing public and potential advertisers that video content created and posted to YouTube by Plaintiffs contains discussions about drug use or abuse or drinking alcohol," among other things), 120(f).

- <u>UCL</u>. The 4AC also contains allegations regarding "unfair competition" and "consumer fraud" that appear to be left over from Plaintiffs' UCL claim and that the Court expressly rejected. *E.g.*, *id.* ¶¶ 120(a,f,j), 167, 170.

- <u>Unruh Act</u>. The 4AC repeatedly references supposed violations of antidiscrimination law that were dismissed with prejudice. *Id.* ¶¶ 120(a), 165, 167.

- <u>Unjust Enrichment</u>. 4AC ¶ 120(j) seemingly references an unjust enrichment claim, which has never been asserted in this case.

The Court should strike these allegations, which are necessarily immaterial to what

---

[5] Making things worse (and certainly more confusing), it appears that the citations in these paragraphs are directed to pleadings in the *Newman* case pending before Judge Chhabria, rather than this case. For example, Plaintiffs cite paragraphs 125-128 of the "FAC" for the proposition that Defendants "promise to allow fair use of copyrighted materials but remove Plaintiffs' materials." These citations apparently refer to paragraphs in the *Newman* complaint describing YouTube's copyright policy and supposedly wrongful removal of "content that constitutes fair use" (Dkt. No. 119).

remains of this case. *See, e.g.*, *Cook v. County of Los Angeles*, 2021 WL 4353120, at *5 (C.D. Cal. July 28, 2021) (striking allegations addressing a theory that the court previously ruled against); *Moon v. County of Orange*, 2020 WL 6145106, at *6 (C.D. Cal. Sept. 18, 2020) ("Plaintiffs have shown disregard for the Court's orders by including in the FAC and other iterations of the complaint claims that this Court's prior orders dismissed with prejudice."), *aff'd*, 2021 WL 4936945 (9th Cir. Oct. 22, 2021); *Stiles v. Wal-Mart Stores, Inc.*, 2018 WL 3093501, at *5 (E.D. Cal. June 20, 2018) (same); *cf. Daniels v. Alphabet Inc.*, 2021 WL 2865147, at *3-4 (N.D. Cal. July 8, 2021) (striking claims for relief that exceeded the scope of amendment allowed by the court). Indeed, the fact that Defendants have been forced to spend significant time wading through all these irrelevant and dismissed allegations—despite the Court's clear instruction to Plaintiffs in dismissing the prior complaint—underscores that dismissal of the 4AC under Rule 8 would also be appropriate. *See, e.g.*, *Moon*, 2020 WL 6145106, at *5 (dismissing complaint under Rule 8 because the court could not be expected to strike all the irrelevant material). At a minimum, however, these improper allegations should be stricken so that the parties and the Court can focus on the actual claim at issue.

## II.   PLAINTIFFS' COMPLAINT SHOULD BE DISMISSED UNDER RULE 12(b)(6)

In giving Plaintiffs limited leave to file a 4AC, this Court ordered them to "clearly identify" the relevant contractual terms on which their sole remaining claim is based. Order at 24. But Plaintiffs have not done that. Through their jumble of a complaint, it appears that Plaintiffs intend to proceed on a claim for breach of the covenant of good faith implied in ***all*** of the relevant contracts discussed above, and they do little to identify the specific promises that supposedly underlie that claim. That approach is perhaps not surprising, as attention to the actual terms of the relevant agreements confirms that Plaintiffs have no viable claim.

### A.   Plaintiffs' Claim is Time-Barred Insofar as it Accrued Outside the One-Year Contractual Limitations Period

Plaintiffs' contract claim faces a threshold problem. When they accepted the YouTube Terms, Plaintiffs agreed that "ANY CAUSE OF ACTION ARISING OUT OF OR RELATED TO THE SERVICES MUST COMMENCE WITHIN ONE (1) YEAR AFTER THE CAUSE OF

ACTION ACCRUES. OTHERWISE, SUCH CAUSE OF ACTION IS PERMANENTLY

BARRED." 4AC, Ex. 2 at 113. Such contractual limitations provisions are enforceable under

California law, and YouTube's has been expressly upheld and applied to claims like those here.

*See Darnaa, LLC v. Google, Inc.*, 2015 WL 7753406, at *3-4 (N.D. Cal. Dec. 2, 2015), *aff'd*,

756 F. App'x 674 (9th Cir. 2018); *accord Hambrecht & Quist Venture Partners v. Am. Med.*

*Int'l, Inc.*, 38 Cal. App. 4th 1532, 1547-48 (1995) ("California courts accord contracting parties

substantial freedom to modify the length of the statute of limitations" and have enforced

agreements shortening the limitations period for contract claims to as little as three months);

*Soltani v. W. & S. Life Ins. Co.*, 258 F.3d 1038, 1043-45 (9th Cir. 2001) (upholding six-month

contractual limitations period); *Bd. of Trs. v. Santa Cruz Underground & Paving, Inc.*, WL

2317433, at *8-11 (N.D. Cal. June 28, 2022) ("Under California law, courts routinely enforce

contractual limitation provisions for indemnity and breach of contract claims.").

This lawsuit was filed on August 13, 2019. Accordingly, any implied covenant claim that

accrued before August 13, 2018 is barred by the express terms of the underlying contract. And it

is clear from the 4AC that Plaintiffs are alleging numerous purported breaches that occurred

outside this limitations period. Among the centerpieces of Plaintiffs' complaint, for example, are

a set of allegations that at a September 14, 2017 meeting attended by Plaintiff Stephanie Frosch,

YouTube representatives "stated that . . . Defendants' algorithms and computerized filtering

tools discriminate and 'target' users like Plaintiffs." 4AC ¶¶ 47-49. Plaintiffs also repeatedly

invoke another set of allegations that YouTube wrongfully refused to run an advertisement for

Plaintiff Divino Group "[d]uring the week before the Christmas Holidays in 2017," that Plaintiff

contacted YouTube about the same "[o]n or about January 3, 2018," and that YouTube "admitted

that a 'mistake' had been made and purportedly ran the ad" in "late January, 2018" (*id.* ¶¶ 51-

52). *See also id.* ¶¶ 1, 5, 37, 42, 44, 50, 59, 83, 101, 104, 117, 144, 152, 164, 214, 268

(referencing call transcript). Setting aside the many other deficiencies with those allegations (*see*

*infra* at 21-22), any alleged breaches arising from the September 2017 YouTube creator meeting

or the December 2017 call center episode are untimely. Both incidents occurred roughly two

years (or more) before Plaintiffs filed suit.

1       The same is true of the vast majority of the other removal, restriction, or monetization

2   decisions that Plaintiffs allege. *See, e.g.*, 4AC ¶ 163 (claiming "[b]etween September 2015 and

3   March 2018, two GNews! episodes were subject to 'Restricted Mode'"); *id.* ¶ 176 (alleging

4   temporary demonetization of a video "[o]n or about June of 2013"); *id.* ¶ 189 (alleging

5   Defendants "censored a video on the BriaAndChrissy" in June 2015); *see also, e.g.*, *id.* ¶¶ 181-

6   182, 188, 238, 241-250, 266. While this timing problem may bar any claim here whatsoever, at a

7   minimum, Plaintiffs cannot pursue a claim based on these decisions—or any others that occurred

8   before August 2018—and cannot rely on such untimely allegations to support their implied

9   covenant claim. *See Darnaa, LLC*, 2015 WL 7753406, at *3-4 (applying YouTube's contractual

10   limitations period in holding that, "because plaintiff's own account of events establishes that its

11   claims accrued more than one year before the filing of the complaint in this case, plaintiff's

12   claims are dismissed as time-barred").

13       **B.    Plaintiffs' Damages Claim is Independently Barred by the Limitation of**

14           **Liability in YouTube's Terms**

15       YouTube's Terms of Service also have for years included a limitation of liability

16   provision: "In no event shall YouTube . . . be liable to you for any . . . damages whatsoever

17   resulting from ***any errors or omissions in any content or for any loss or damage of any kind***

18   ***incurred as a result of your use of any content posted, emailed, transmitted, or otherwise made***

19   ***available via the services***, whether based on warranty, ***contract***, tort, or any other legal theory."

20   4AC, Ex. 2 at 111 (emphases added); *see also id.* Exs. 3-6 (similar). This provision further

21   provides that "***YouTube shall not be liable for content or the defamatory, offensive, or illegal***

22   ***conduct of any third party.***" *Id.* Ex. 2 at 111 (emphasis added). The remedy Plaintiffs seek

23   here—compensatory and other damages allegedly resulting from YouTube's moderation of their

24   content (and that of third parties)—is independently barred by the limitation of liability

25   provision.[6]

26   ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯

27       [6] Plaintiffs purport to pursue a hodgepodge of ill-defined remedies (4AC at 90-92) in
addition to compensatory damages ("in excess of $1 billion"), but many are plainly not available.

28

Both the California Court of Appeal and the Ninth Circuit have applied YouTube's limitation of liability provision to dismiss similar claims. In *Lewis*, the Court of Appeal explained that the language concerning "omissions in any content" covered the plaintiff's contract claim seeking to hold YouTube liable for "deletion of her content without prior notice" and affirmed the dismissal of the claim. 244 Cal. App. 4th at 125-28 ("By claiming that YouTube wrongfully deleted her videos . . . Lewis is claiming that YouTube failed to do as it should by omitting content on its Web site."); *accord Darnaa, LLC v. Google Inc.*, 756 F. App'x 674 (9th Cir. 2018) (limitation of liability provision barred contract claim based on YouTube removing a video from its existing location and rejecting argument that the provision was unconscionable). The same result is warranted here: Plaintiffs' damages claims based on the "omission" of their content and "offensive" content posted by others are barred by the contract.

**C.    Plaintiffs Fail to State a Viable Claim for Breach of the Implied Covenant**

Even if Plaintiffs could escape these provisions, their implied covenant claim still would fail as a matter of law. The recent Court of Appeal decision in *Prager University v. Google LLC* ("*Prager*"), 85 Cal. App. 5th 1022, 301 Cal. Rptr. 836 (2022), which issued after this Court dismissed the 3AC, confirms that Plaintiffs cannot assert a contract-based claim for the kinds of content-moderation choices at issue here. *Prager* is an authoritative interpretation of California law applying YouTube's Terms of Service, Community Guidelines, and advertising agreements to reject a virtually identical claim brought against YouTube by the same plaintiffs' counsel.

As here, the plaintiff in *Prager* was a YouTube content creator who asserted that YouTube breached the parties' agreements by excluding from Restricted Mode and demonetizing certain of its videos. 301 Cal. Rptr. at 844. And as here, the *Prager* plaintiff asserted that YouTube was "imposing restraints on Prager because of its political identity or viewpoints, not the content of its videos." *Id.* The Court of Appeal affirmed the trial court's order dismissing that claim without leave to amend. *Id.* at 858. In particular, the court explained,

---

*E.g.*, *Johnson v. Napa Valley Wine Train, Inc.*, 2016 WL 493229, at *13 (N.D. Cal. Feb. 9, 2016) (damages for breach of implied covenant are limited to "contract . . . remedies"; punitive damages are not cognizable under California law).

Prager's implied covenant claim was contrary to YouTube's "express reservation of defendants' unfettered discretion in making publishing decisions." *Id.* at 852 (citations omitted). This precedential ruling dooms Plaintiffs' parallel claim here.

> 1.  As *Prager* Confirms, Plaintiffs' Claim Fails Based on YouTube's Express Reservation of the Right to Make Publishing Decisions

"The implied covenant cannot impose substantive duties on the contracting parties beyond those incorporated in the specific terms of their agreement. It will not be read into a contract to prohibit a party from doing that which is expressly permitted by the agreement itself." *Prager*, 301 Cal. Rptr. at 851 (cleaned up). Thus, as this Court recognized in dismissing the 3AC, where a defendant is "given the right to do what they did by the express provisions of the contract there can be no breach." Order at 23 (quoting *Carma Developers (Cal.), Inc. v. Marathon Dev. Cal, Inc.*, 2 Cal. 4th 342, 373 (1992)); *see also Pasadena Live v. City of Pasadena*, 114 Cal. App. 4th 1089, 1094 (2004).

This case is controlled by *Prager*, which makes clear that YouTube's Terms of Service and monetization agreements give YouTube unilateral discretion over the removal, restriction, and demonetization of content on its service. As even Plaintiffs acknowledge, the general Terms of Service expressly "reserve[] the rights to 'remove Content without prior notice' and 'to decide whether Content violates these Terms of Service for reasons other than copyright infringement' and 'without prior notice and in its sole discretion, [to] remove such Content and/or terminate a user's account for submitting such material in violation of these Terms of Service.'" 4AC ¶ 78(h) (quoting 4AC, Ex. 2 at 107-08); *see also id.* Exs. 3-6 (similar). The Terms also make clear that "YouTube is under no obligation to host or serve Content." *Id.* Exs. 3-6. As to monetization, the YPP Terms provide that "YouTube is not obligated to display any advertisements alongside your videos." *Id.* ¶¶ 75-76; *id.* Ex. 12 at 980. Google and YouTube's terms and policies regarding advertising also reserve "the right to refuse or limit your access to [AdSense] Services." *Id.* Ex. 15 at 1116; *see id.* ¶ 78(i).

The *Prager* court held that these same agreements "give defendants 'unfettered and unilateral discretion to remove, restrict, demonetize, or de-emphasize content as they see fit,'"

1   and that these rights bar any implied covenant claim based on Defendants' content-moderation

2   decisions. *Prager*, 301 Cal. Rptr. 3d at 852. *Prager* expressly rejected the argument (the

3   centerpiece of Plaintiffs' claim here) that "defendants are bound by a contractual promise to filter

4   content neutrally." *Id.* at 850 (rejecting claim that YouTube made "contractual promises to

5   provide Prager with identity neutral content moderation and access"). The Court of Appeal

6   explained that such a claim—which seeks to "constrain defendants' conduct as publishers" and

7   obligate YouTube "to make publishing decisions in a manner [plaintiff] alleges good faith

8   requires"—is not a claim for the "enforcement of any express promise, but for imposition of a

9   duty that would be at odds with the express reservation of defendants' unfettered discretion in

10  making publishing decisions." *Id.* at 852*.* This holding, by itself, defeats Plaintiffs' claim here.

11          *Prager* also precludes Plaintiffs' suggestion (*e.g.*, 4AC ¶¶ 107-109, 188, 232(b)) that

12  YouTube's enumeration of certain categories of material that are subject to removal,

13  demonetization, or exclusion from Restricted Mode—whether in YouTube's Community

14  Guidelines, advertising guidelines, or Restricted Mode guidelines, respectively—somehow limits

15  YouTube's "express reservation of rights" under its agreements. *Prager*, 301 Cal. Rptr. 3d at 851

16  ("[T]he Community Guidelines in no way purport to bind defendants to publish any given video,

17  or to remove a video only for violation of these guidelines."). As the Court of Appeal explained,

18  that argument "conflates user guidelines with provider duties." *Id.*; *accord Daniels v. Alphabet*

19  *Inc.*, 2021 WL 1222166, at *8 (N.D. Cal. Mar. 31, 2021) (the "express terms of the alleged

20  contract contradict Mr. Daniels's claim that the Terms of Service permit YouTube to remove

21  content only in the event that content violates the Community Guidelines").

22          While *Prager* is dispositive, it follows a long line of cases that have rejected similar

23  contract-based claims against YouTube and other online services premised on supposedly

24  improper, unfair, or discriminatory content-moderation decisions. *See, e.g.*, *Lewis v. Google*

25  *LLC*, 461 F. Supp. 3d 938, 962 (N.D. Cal. 2020) (YouTube did not breach the implied covenant

26  by removing videos with hateful content or comments), *aff'd*, 851 F. App'x 723 (9th Cir.), *cert.*

27  *denied*, 142 S. Ct. 434 (2021); *Sweet v. Google Inc.*, 2018 WL 11847771, at *9-10 (N.D. Cal.

28  Mar. 7, 2018) (YouTube's decision not to allow plaintiff to monetize videos did not violate

1   implied covenant); *Daniels*, 2021 WL 1222166, at *8-10 (YouTube's removal and

2   demonetization of plaintiffs' videos did not breach any contract or implied covenant); *Enhanced*

3   *Athlete Inc. v. Google LLC*, 479 F. Supp. 3d 824, 833 (N.D. Cal. 2020) (dismissing implied

4   covenant claim because YouTube's agreements gave it "sole discretion" over content removal);

5   *accord Murphy v. Twitter, Inc.*, 60 Cal. App. 5th 12, 35 (2021) (Twitter's suspension of

6   plaintiff's account did not breach the implied covenant). The Court need go no further to dismiss

7   Plaintiffs' claim.

8                    2.       Plaintiffs Cannot State a Claim Based on Non-Contractual Statements or

9                             Prefatory Language in the Community Guidelines

10          In an effort to evade the actual terms of the relevant agreements, Plaintiffs point to

11  various statements on YouTube webpages and elsewhere, none of which are enforceable

12  promises or capable of supporting an implied covenant claim.

13                   a)       *Plaintiffs Cannot Base Their Contract Claim on Isolated*

14                            *Testimony or Lofty Statements in Scattered YouTube Webpages*

15          Insofar as Plaintiffs try to premise their claim on extra-contractual public statements

16  (such as the 2018 congressional testimony of a YouTube executive and general statements on

17  YouTube's website, 4AC ¶¶ 77, 97-98, 100), their arguments doubly fail.

18          As an initial matter, Plaintiffs' attempt to shoehorn these statements into the parties'

19  agreements is baseless. Plaintiffs have no "basis for treating defendants' public-facing comments

20  as contractual." *Prager*, 301 Cal. Rptr. 3d at 852. The congressional testimony plainly was not

21  part of any agreement, nor were the "Our Mission" and "YouTube's Commitments" pages.

22  Plaintiffs suggest that these pages were somehow incorporated into the agreements because they

23  were linked to from navigation bars or webpage footers. *Id.* ¶ 96. But this ignores that "the

24  parties entered integrated contracts expressly providing that the written agreements, together

25  with the materials incorporated by reference, constitute the 'entire agreement' concerning each

26  relevant service." *Prager*, 301 Cal. Rptr. 3d at 852. YouTube's agreements clearly spell out for

27  users the specific policies and terms that are incorporated in those agreements. 4AC ¶¶ 73-76;

28  *see also, e.g., id.* Exs. 2-6. The "Our Mission" and "YouTube's Commitments" pages are not

1    identified as part of the contract, and the fact that they may have been accessible from the

2    webpage displaying YouTube's Terms of Service does not transform them into contractual

3    promises. In short, as in *Prager*, "defendants' generalized public statements regarding their

4    monitoring and filtering practices do not give rise to a state law contractual obligation to regulate

5    their publishing decisions." 301 Cal. Rptr. 3d at 852.

6          In any event, these statements do not create actionable promises. As a matter of law,

7    YouTube did not undertake any legally binding promise through such "[l]ofty but vague"

8    statements. *Prager Univ. v. Google LLC*, 951 F.3d 991, 999-1000 (9th Cir. 2020) (YouTube's

9    statements "about its commitment to free speech constitute[] opinions" and are "classic, non-

10   actionable opinions or puffery"); *see also id.* at 999 (rejecting plaintiff's argument that YouTube

11   could assume unprecedented legal obligations solely because of "a single statement made by its

12   executive before a congressional committee that she considers YouTube to be a 'neutral public

13   fora'"); *accord Block v. eBay, Inc.*, 747 F.3d 1135, 1138-39 (9th Cir. 2014) (explanatory

14   statements about a service do not create actionable promises); *Newman v. Google LLC*, No. 3:20-

15   cv-04011-VC, slip op. at 1 (Dkt. 138) (N.D. Cal. Nov. 28, 2022) (argument that YouTube's

16   Mission Statement, along with "statements made by YouTube at congressional hearings," were

17   "actionable promises" was a "non-starter").

18          **b)**      *Plaintiffs Cannot Base Their Contract Claim on the Prefatory*

19                     *Language in YouTube's Community Guidelines*

20          Plaintiffs also suggest that prefatory language found in the overview to YouTube's

21   Community Guidelines creates a binding promise by YouTube to treat users "equally." 4AC

22   ¶¶ 95-96. Plaintiffs point to the following sentence on YouTube's Community Guidelines

23   webpage: "We enforce these Community Guidelines using a combination of human reviewers

24   and machine learning, and apply them to everyone equally—regardless of the subject or the

25   creator's background, political viewpoint, position, or affiliation." *Id.* Ex. 8 at 249. For multiple

26   independent reasons, this sentence does not support an implied covenant claim.

27          *First*, as a matter of law, such descriptive prefatory language does not create a binding

28   contractual obligation. The Ninth Circuit's decision in *Block v. eBay, Inc.* is directly on point. In

*Block*, the plaintiff claimed that eBay, by using automatic bidding software that entered bids on behalf of the bidder, thereby breached a provision of its user agreement that stated, "We are not involved in the actual transaction between buyers and sellers." 747 F.3d at 1137. The Ninth Circuit held that the statement "is simply a general description of how eBay's auction system works"—not an enforceable promise. *Id*. at 1138. There was no "explicit promissory language," and the statement instead served an "explanatory function." *Id*. at 1138-39. The same is true here: the preface to YouTube's Community Guidelines describes how YouTube does enforcement; it does not contain "promissory language" but instead is written in an "informal, conversational style," indicating that it is "an introduction to [YouTube] for new users" and not "a set of legally enforceable promises." *Id.* at 1139. Like eBay's statement, YouTube's cannot give rise to a contract-based claim—especially not in light of YouTube's express reservation of rights.[7]

*Second*, Plaintiffs do not allege that this language even existed at the time they filed this action. Plaintiffs tellingly did not rely on any such prefatory language when they filed their original complaint in 2019—because it wasn't there at that time. *See* Dkt. Nos. 1, 7, 20, 67. The language was not added until late in 2021—years after this case was filed and well after YouTube engaged in the moderation decisions at issue. *Compare* Dkt. No. 82 at 43 (September 17, 2021 version of Community Guidelines including "to everyone equally" language), *with* Dkt. No. 77-3 at 2 (August 12, 2021 Community Guidelines including no such language). Defendants obviously cannot be held liable for breaching a purported promise that had not yet been made.

*Third*, even if this language did create a temporally relevant, enforceable promise, it still would not help Plaintiffs. The Community Guidelines cover only choices about YouTube's content **removals** (Restricted Mode and monetization are governed by different guidelines).

---

[7] This is confirmed by the rest of the introductory paragraph. For example, in the same sentence, YouTube says that it enforces the Guidelines "using a combination of human reviewers and machine learning." 4AC, Ex. 8 at 249. Under Plaintiffs' theory, a user could sue YouTube if a video was reviewed solely by human reviewers, rather than by "a combination of human reviewers and machine learning." As in *Block*, that absurd interpretation underscores that these statements are merely descriptive and do not create actionable promises. 747 F.3d at 1138-39.

4AC, Ex. 8 at 249 (Community Guidelines discuss "what type of content *isn't allowed* on YouTube" (emphasis added)). The preface to the Community Guidelines thus has nothing to do with YouTube's choices about what content belongs in Restricted Mode or is eligible to be paired with advertising. But while the 4AC suggests generally that YouTube "wrongly remove[s] Plaintiffs' content," Plaintiffs alleged virtually no instances in which their content was permanently *removed* from YouTube—and certainly no specifics about such removals that would support a plausible claim for breach of the Community Guidelines overview. 4AC ¶ 107; *see, e.g.*, *id.* ¶¶ 55(c), 55(k), 204, 215; *supra* at 5.

Unquestionably, the vast majority of the videos Plaintiffs uploaded were at all times allowed to remain on YouTube. *See, e.g.*, 4AC ¶ 230. There are only three videos in the entire 4AC that any of the Plaintiffs specifically allege were removed (*id.* ¶¶ 189, 204, 242), but the sparse allegations about those removals actually undermine any claim. Plaintiffs acknowledge that two of those videos were promptly reinstated by YouTube after an appeal. *Id.* ¶¶ 204, 242 (videos reinstated within one and two weeks). And in any event, since these removals and reinstatements occurred before August 2018, any claim based on them is time-barred. *See supra* at 10-11. The same is true as to the third video, which Plaintiffs allege was removed (or "censored") even earlier—in 2015 (*id.* ¶ 189)—yet appears to be available on YouTube to this day (*id.* ¶ 188). It is unsurprising then that Plaintiffs do not try to assert that YouTube removed any of these videos in breach of a supposed agreement to apply the Community Guidelines "equally." 4AC ¶¶ 189, 204, 242; *see also Newman*, slip op. at 1 (N.D. Cal. Nov. 28, 2022) (dismissing materially identical contract claim that did not "adequately allege that the plaintiffs have been treated differently based on those [identity] characteristics"). In short, Plaintiffs have no basis for an implied covenant claim based on the Community Guidelines overview.

### 3.   Plaintiffs Cannot State a Claim Based on Allegations That YouTube Restricted or Demonetized Their Videos Based on Their Identities

As for Plaintiffs' allegations relating to Restricted Mode and demonetization, the 4AC does not identify any contractual language that purports to limit YouTube's discretion in making such decisions—despite this Court's direction to identify such language "clearly" (Order at 24).

1   The language discussed above (*supra* at 15-16) is either obviously non-contractual, irrelevant, or

2   both. Plaintiffs nonetheless attempt to assert an implied covenant claim based on the theory that

3   YouTube treated them differently from other creators in making Restricted Mode or

4   monetization decisions based on Plaintiffs' sexual orientation or other identity characteristics.

5   But even if there were some basis in the parties' agreements for imposing such an implied

6   restriction (and there is not, as *Prager* confirms), the allegations in the 4AC do not plausibly

7   support a claim that YouTube breached it. Plaintiffs offer a great deal of rhetoric, but no concrete

8   allegations making plausible the conclusion that YouTube prevented specific videos from

9   appearing in Restricted Mode or being monetized because of Plaintiffs' identities.

10      To begin, there is no dispute that many of Plaintiffs' videos **did** appear in Restricted

11  Mode and **were** fully monetized at all times. That renders facially implausible any claim that

12  YouTube was making moderation decisions simply based on Plaintiffs' identity. But even as to

13  the selected videos that were excluded from Restricted Mode or monetization, the 4AC pleads no

14  facts plausibly suggesting that, if Plaintiffs were not part of the LGBTQ+ community, those

15  same videos would have been treated differently. Indeed, Plaintiffs' allegations are notably short

16  on specifics. Merely listing individual moderation decisions that Plaintiffs disagree with is

17  plainly not enough, and where Plaintiffs do point to individual videos, even a cursory review of

18  their contents reveals clear explanations for YouTube's decisions that dispel any serious claim of

19  identity-based determinations.

20      For example, Plaintiffs assert that YouTube limited their ability to monetize or prevented

21  from appearing in Restricted Mode the following content:

22  - A video concerning an individual's overdose on alcohol, which includes discussion of drug use, video of the individual experiencing the overdose, and photos of that
23    person's hospitalization (https://www.youtube.com/watch?v=05dvHnDhLz0);

24  - A video of a woman discussing being the victim of revenge porn, including being sexually assaulted while unconscious (https://www.youtube.com/watch?v=fokQral-
25    HTU);

26  - A video recounting homophobic comments, which includes profanity ("suck my dick, faggot," "put my foot up your fucking ass," "cocksucker") and mention of "shooting
27    up a gay wedding" (https://www.youtube.com/watch?v=O6wGBnY9gTA);

28  - A video in which individuals demonstrate a bondage tie

---

(https://www.youtube.com/watch?v=QZDGgaAghR4&t=10s); and

- Videos reviewing other "kinky" products (https://www.youtube.com/watch?v=Ppk9Ms1SflE&t=134s, https://www.youtube.com/watch?v=8c9oXDCDuYc&t=728s).

4AC ¶¶ 188, 214. On their face, these videos fall squarely within YouTube's guidelines for exclusion from Restricted Mode and/or monetization, and Plaintiffs cannot seriously contend that YouTube's decisions to restrict or demonetize them breached an implied covenant.

Plaintiffs fare no better in pointing to purportedly similar videos from third-party creators that allegedly appear on YouTube's platform without (or with fewer) restrictions. *Id.* ¶¶ 188, 214. For one thing, Plaintiffs' comparison charts ignore all of Plaintiffs' videos that were not restricted or demonetized—and similarly say nothing about other videos from the third-party creators that might have been restricted by YouTube. Plaintiffs also fail to allege whether the third-party creators identified in these charts share Plaintiffs' characteristics—a flaw that Judge Chhabria identified in recently dismissing a similar claim. *See Newman*, slip op. at 2 (N.D. Cal. Nov. 28, 2022) (finding Plaintiffs failed to allege that "similar videos posted by users with different characteristics have been treated any better" or that the creators of "preferred" videos did not "share the plaintiffs' characteristics," and explaining that, if those creators share plaintiffs' characteristics, "then the fact that their content is treated more favorably does not suggest differential treatment based on those characteristics").[8]

But even overlooking these deficiencies, Plaintiffs' cherry-picked comparisons still fail to support their claims. The 4AC supplies only the titles and URLs of nearly all the videos listed in the chart—Plaintiffs say nothing about their actual content. But even a glance at those videos

---

[8] Plaintiffs claim, for example, that Defendants restricted videos of both Mr. Ross and Mr. Somers "doing nothing more than drinking tea" and recommending "tea for self-care" (4AC ¶¶ 201, 212) "while leaving unrestricted countless videos posted by other YouTube creators doing the very same thing" (*id.* ¶ 212), but they do not allege whether those "other YouTube creators" are or are not part of the LGBTQ+ community. This is a pervasive issue throughout the 4AC. *See, e.g., id.* ¶ 202 (claiming videos by "other video creators" treated differently); *id.* ¶ 215 (complaining that Defendants did not restrict videos "when posted by others"); *see also* ¶ 214 (generally claiming that videos by "creators who Defendants do not classify as LGBTQ+" or by YouTube's "preferred creators" generate more revenue, but offering no allegation that any of the "comparable" videos Plaintiffs actually identify were posted by non-LGBTQ+ creators).

undermines Plaintiffs' premise that they differ only in the sexual orientation of their creators. In fact, many of the supposedly similar videos are obviously different:

- A video of a woman discussing being the victim of revenge porn after being sexually assaulted while unconscious (https://www.youtube.com/watch?v=fokQral-HTU), compared with a video by a therapist generally discussing post-traumatic stress disorder (https://www.youtube.com/watch?v=_qIAZcOryl4);

- A video performance of a song called "Stop birthing gays," which includes the lyric "boom went the baby as it hit to the ground" (https://www.youtube.com/watch?v=PvIAd0Rkiyk), compared with a video of an individual questioning protestors at a gay pride parade (https://www.youtube.com/watch?v=ehjWWgdrY_Q);

- Videos reviewing "kinky" products—including a "secure steel chastity device for men metal cock cage" (https://www.youtube.com/watch?v=Ppk9Ms1SflE&t=134s, https://www.youtube.com/watch?v=8c9oXDCDuYc&t=728s), compared with videos of individuals trying on "sexy" dresses and bathing suits (https://www.youtube.com/watch?v=S8kw9t7qf6c, https://www.youtube.com/watch?v=Xgw4qHFwffI, https://www.youtube.com/watch?v=S7Ro5MaIlFc); and

- A video demonstrating a bondage tie (https://www.youtube.com/watch?v=QZDGgaAghR4&t=10s), compared with a video of a person trying on swimsuits (https://www.youtube.com/watch?v=6l-JuZx0070).

4AC ¶¶ 188, 214. In short, as in *Newman*, even when given free rein to ignore all the examples that undercut their theory, Plaintiffs' charts still fail to support any claim that their videos were treated differently from other YouTube users in Restricted Mode or for monetization based on Plaintiffs' sexual orientation. *See Newman*, slip op. at 2 (N.D. Cal. Nov. 28, 2022).

Nor can Plaintiffs salvage their claim with unsupported rhetoric, including their recurring allegations about a September 2017 YouTube creator meeting attended by Stephanie Frosch. *E.g.*, 4AC ¶¶ 47-49. These allegations refer to a declaration that Ms. Frosch submitted in the parallel *Newman* case, but that Plaintiffs elected not to submit as part of their 4AC here. But while Ms. Frosch claimed to have been told that YouTube's algorithms used information about creators' identities, she never asserted that YouTube treats content from LGBTQ+ creators worse than content associated with other users—much less that Plaintiffs' sexual orientation is what caused their videos to be excluded from Restricted Mode or demonetized. *Id.* ¶ 48(b); *see* Dkt. No. 40 ¶¶ 16(c), 24(a). That distinction is significant: there is nothing in any of YouTube's agreements or guidelines that contractually prohibits YouTube from considering information

1    about users' identities as one input to its content-moderation algorithms. *See Newman*, slip op. at

2    2 n.1 (N.D. Cal. Nov. 28, 2022) (rejecting argument that YouTube's agreements contain any

3    "promise never to consider users' personal characteristics for any reason"). Moreover, as Judge

4    Koh explained in *Newman,* in rejecting plaintiffs' reliance on the same declaration, Ms. Frosch's

5    description "indicates that Defendants stated that any restrictions placed on users' content was an

6    error caused by the YouTube algorithm used to filter content, rather than an attempt by

7    Defendants to intentionally discriminate against content creators." *Newman v. Google LLC*, 2021

8    WL 2633423, at *7 (N.D. Cal. June 25, 2021). These "vague" allegations (*id.*) equally do not

9    support a contract-based claim of differential treatment based on sexual identity.

10       Equally misleading and unhelpful are Plaintiffs' allegations about statements from a

11   single Google call center support agent. 4AC ¶¶ 51-52, 164. Plaintiffs allege that Defendants

12   have a "'company policy' of banning content that related to the 'gay thing'" (*id.* ¶ 164), based on

13   the transcript of a phone call that one Plaintiff had with a Google call center in January 2018

14   about an ad that was at first disallowed, but later run (*e.g.*, *id.* ¶¶ 51-52). Setting aside Plaintiffs'

15   troubling mischaracterization of that call (*supra* at 7; 2AC, Ex. A) and the fact that a claim based

16   on these allegations is time-barred (*supra* at 10), neither the transcript of that call, nor any fact

17   actually pleaded in the 4AC, creates a plausible basis for concluding that YouTube has a policy

18   of denying services—and certainly not the Restricted Mode and video-monetization services at

19   issue here—to Mr. Knight (much less any other Plaintiff) because of his sexual orientation.

20   Indeed, the call center episode had nothing whatsoever to do with Restricted Mode or with Mr.

21   Knight's effort to pair his YouTube videos with third-party ads. *See Newman*, slip op. at 3 (N.D.

22   Cal. Nov. 28, 2022) (the call center allegations "cannot singlehandedly make plausible the broad

23   sweep of allegations of differential treatment as to removal, restrictions, and monetization").

24       For all of these reasons, Plaintiffs simply have no plausible claim that YouTube breached

25   any implied covenant in making publication decisions regarding any of Plaintiffs' content.

26   **III.   PLAINTIFFS' CLAIM IS BARRED BY SECTION 230**

27       On top of all its other flaws, Plaintiffs' implied covenant claim is barred by multiple

28   provisions of Section 230.

---

1   **Section 230(c)(1)**. As this Court has explained, "Section 230(c)(1) applies to a variety of

2   claims that seek to treat the defendant as a 'publisher or speaker of any information provided by

3   another information content provider.'" Order at 27. Because Plaintiffs' implied covenant claim

4   seeks to impose a duty that would restrict YouTube from exercising traditional editorial

5   functions, such as deciding whether to remove, restrict, or demonetize content, that claim is

6   barred by Section 230(c)(1).

7       The recent appellate rulings in *Murphy* and *Prager* are directly on point. As in *Prager*,

8   the alleged "injurious" conduct underlying Plaintiffs' claim "consists of defendants' decisions

9   regarding the audience to which videos would be published and whether publication of the

10  videos would include paid advertising"—core editorial functions protected by Section 230(c)(1).

11  301 Cal. Rptr. at 847; *accord Murphy*, 60 Cal. App. 5th at 34. Those rulings follow a series of

12  federal cases that have similarly applied Section 230 to bar implied covenant claims based on

13  alleged misapplication of general terms of use governing content-moderation. *See, e.g.*, *Atkinson*

14  *v. Facebook Inc.*, 2020 U.S. Dist. LEXIS 263319, at *13-16 (N.D. Cal. Dec. 7, 2020) (implied

15  covenant claim barred because plaintiff was "really accusing Facebook of utilizing its

16  community standards to make classic publishing decisions"), *aff'd*, 2021 WL 5447011 (9th Cir.

17  Nov. 22, 2021); *Lewis*, 461 F. Supp. 3d at 954 (implied covenant claim alleging wrongful

18  "demonetizing, censoring, restricting and removing" of content barred by Section 230(c)(1));

19  *Fed. Agency of News LLC v. Facebook, Inc.*, 432 F. Supp. 3d 1107, 1119 (N.D. Cal. 2020)

20  (implied covenant claim barred by Section 230(c)(1)).

21      As these cases make clear, applying Section 230(c)(1) to foreclose the implied covenant

22  claim here is entirely consistent with the Ninth Circuit's decision in *Barnes v. Yahoo!, Inc.,* 570

23  F.3d 1096, 1108 (9th Cir. 2009), *as amended* (Sept. 28, 2009). *Prager*, 301 Cal. Rptr. 3d at 849.

24  "*Barnes* never suggested . . . that all contract or promissory estoppel claims survive CDA

25  immunity." *Murphy*, 60 Cal. App. 5th at 29. Rather, *Barnes* recognized that an online service's

26  decision to establish "a general monitoring policy" for wrongful content does "not suffice for

27  contract liability" such that Section 230(c)(1) does not apply. *Barnes,* 570 F.3d at 1108; *Prager*,

28  301 Cal. Rptr. 3d at 849 (explaining that under *Barnes*, "a promise that 'is vague and hedged

1    about with conditions' does not suffice" to preclude Section 230(c)(1) immunity).

2          *Prager*, *Murphy*, and *Barnes* all recognize that Section 230(c)(1) applies to contract-

3    based claims that accuse "an online service of unfairly applying its general rules regarding what

4    content it will publish" and "attack" a service's "interpretation and enforcement of its own

5    general policies rather than breach of a specific promise." *Murphy*, 60 Cal. App. 5th at 29–30

6    (explaining that such claims attack "paradigmatic editorial decisions" protected by Section 230);

7    *accord Prager*, 301 Cal. Rptr. 3d at 849 (holding that *Barnes*' analysis does not apply when

8    plaintiffs do not identify a specific "enforceable promise"); *Barnes*, 570 F.3d at 1108. That is

9    exactly Plaintiffs' claim here. Plaintiffs certainly do not allege that "someone at [YouTube]

10   specifically promised [them] they would" make a certain decision regarding their content.

11   *Murphy*, 60 Cal. App. 5th at 29. As in *Prager*, therefore, Plaintiffs have "not identified a viable

12   contractual theory that falls outside the scope of the CDA." 301 Cal. Rptr. 3d at 845.

13         ***Section 230(c)(2)(A)***. Even if *Barnes* applied, however, that decision was plainly limited

14   to Section 230(c)(1) and has no bearing on Section 230(c)(2)(A), which provides an additional

15   protection for "any action voluntarily taken in good faith to restrict access to or availability of

16   material that the provider or user considers to be obscene, lewd, lascivious, filthy, excessively

17   violent, harassing, or otherwise objectionable, whether or not such material is constitutionally

18   protected." 47 U.S.C. § 230(c)(2)(A). This section "does not require that the material actually be

19   objectionable; rather, it affords protection for blocking material 'that the provider or user

20   ***considers to be***' objectionable." *Zango, Inc. v. Kaspersky Lab, Inc.*, 2007 WL 5189857, at *4

21   (W.D. Wash. Aug. 28, 2007) (emphasis added), *aff'd*, 568 F.3d 1169 (9th Cir. 2009).[9]

22         It is clear from the 4AC that this protection applies to much of the content restriction and

---

[9] While Plaintiffs contend that their videos were not objectionable (*e.g.*, 4AC ¶¶ 157, 175, 218), whether **they** considered them so is immaterial under the terms of the statute. *See Domen v. Vimeo, Inc.*, 433 F. Supp. 3d 592, 603 (S.D.N.Y. 2020) (explaining that "Section 230(c)(2) is focused upon the provider's subjective intent"). So too is Plaintiffs' allegation that YouTube considered Plaintiffs' "identities" before determining certain content was objectionable. *See, e.g.*, 4AC ¶ 1. That does not amount to bad faith, nor is it a basis for finding that YouTube did not consider the material at issue to be "objectionable" under Section 230. *Accord Domen*, 433 F. Supp. 3d at 603-04 (applying Section 230(c)(2)(A) to dismiss claims based on service provider's removal of plaintiffs' videos despite allegations of discrimination).

---

removal alleged here. YouTube allegedly restricted Plaintiffs' videos that contained, among other things, lewd and lascivious content. *See, e.g.*, 4AC ¶¶ 144, 188, 212, 218, 232. Plaintiffs themselves admit that "many videos on the[ir] channel[s] deal[] with sex and include graphic sexual images are not suitable for younger audiences." *E.g.*, 4AC ¶ 203, 213, 263. So too does the content of those videos speak for itself, such as the "Gross Tongue Challenge," where a wrong answer to a quiz required the guesser to hold their tongue on a chosen part of the questioner's body. 4AC ¶ 188 (referencing https://www.youtube.com/watch?v=Hsdz1Gy22bQ); *see also supra* at 5-6, 19-21. There is no dispute that YouTube considered some of Plaintiffs' content to be objectionable, which ends the inquiry under Section 230(c)(2)(A). *See, e.g., Daniels*, 2021 WL 1222166, at *13 (applying 230(c)(2)(A) to bar claims, including contract claims, based on YouTube's decision to restrict access to plaintiff's videos).

**Section 230(c)(2)(B)**. Finally, insofar as they rely on exclusion from Restricted Mode, Plaintiffs' claims fail independently under Section 230(c)(2)(B). This provision immunizes a provider of an "interactive computer service" as to "any action taken to enable or make available" to a user "the technical means to restrict access" to "material that the provider or user considers to be obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable." 47 U.S.C. § 230(c)(2)(A)-(B). This Court already recognized in dismissing Plaintiffs' Unruh Act and UCL claims that YouTube's "creation of a 'Restricted Mode' to allow sensitive users to voluntarily choose a more limited experience of the YouTube service is exactly the type of self-regulation that Congress sought to encourage in enacting section 230, and fits within section 230(c)(2)(B)'s immunity." Order at 30-31 (quoting *Prager*, 2019 Cal. Super. LEXIS 2034, at *25-26 (Cal. Sup. Ct. Nov. 19, 2019) (rejecting plaintiffs' argument that "defendants may not invoke immunity under the CDA for 'bad faith censorship' or to block or filter content based on a user's sexual identity or viewpoints")). That holding applies equally to the 4AC. As discussed, *Barnes* has nothing to do with immunity under Section 230(c)(2)(B), and nothing in that provision prevents its application to Plaintiffs' implied covenant claim.

## CONCLUSION

For all of these reasons, the 4AC should be dismissed with prejudice.

1

2   Dated:  January 4, 2023

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Respectfully submitted,

WILSON SONSINI GOODRICH & ROSATI
Professional Corporation


By: _____*/s/ Lauren Gallo White*_____
        Lauren Gallo White


Attorneys for Defendants
GOOGLE LLC and YOUTUBE, LLC