ELLIS GEORGE CIPOLLONE
O'BRIEN ANNAGUEY LLP
Peter Obstler (State Bar No. 171623)
  pobstler@egcfirm.com
Eric M. George (State Bar No. 166403)
  egeorge@egcfirm.com
Dennis S. Ellis (State Bar No. 178196)
  dellis@egcfirm.com
2121 Avenue of the Stars, 30th Floor
Los Angeles, California  90067
(310) 274-7100; Facsimile: (310) 275-5697

Attorneys for LGBTQ+ Plaintiffs

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION

| | |
|---|---|
| DIVINO GROUP LLC, a California limited liability company, CHRIS KNIGHT, an individual, CELSO DULAY, an individual, CAMERON STIEHL, an individual, BRIAANDCHRISSY LLC, a Georgia limited liability company, BRIA KAM, an individual, CHRISSY CHAMBERS, an individual, CHASE ROSS, an individual, BRETT SOMERS, an individual, LINDSAY AMER, an individual, STEPHANIE FROSCH, an individual, SAL CINQUEMANI, an individual, TAMARA JOHNSON, an individual, and GREG SCARNICI, an individual, | Case No. 5:19-cv-04749-VKD |
| | **PLAINTIFFS' OPPOSITION TO MOTION TO STRIKE AND MOTION TO DISMISS** |
| Plaintiffs, | |
| vs. | Date:   March 21, 2023<br>Time:   10:00 a.m.<br>Judge:   Hon. Virginia DeMarchi<br>Ctrm.:   2 |
| GOOGLE LLC, a Delaware limited liability company, YOUTUBE, LLC, a Delaware limited liability company, and DOES 1-25, | |
| Defendants. | Action Filed:   August 13, 2019<br>Trial Date:       None Set |

2170625.1

1

## <u>TABLE OF CONTENTS</u>

2

<u>Page</u>

3   I.      INTRODUCTION ....................................................................................................1

4   II.     THE 4AC ..............................................................................................................4

5          A.    The Licensing Provisions ........................................................................4

6          B.    Defendants Also Receive Monetary Consideration ................................5

7          C.    Defendants' Obligations To Plaintiffs.....................................................6

8          D.    Allegations Of Misconduct .....................................................................8

9   III.    DEFENDANTS' MOTION TO STRIKE ..............................................................8

10         A.    Defendants' Motion To Strike Is Improper "Tone Policing"...................10

11               1.    Allegations About Defendants Filtering Tools And Algorithms ................10

12               2.    Changes To The Contract ..............................................................12

13               3.    References To Other Dismissed Claims Are Proper .....................13

14  IV.     DEFENDANTS' MOTION TO DISMISS ............................................................13

15         A.    Plaintiffs Have An Enforceable Right To Equal Treatment Under
16               Defendants' Neutral, Content Based Rules Governing Distribution,
                 Monetization And Advertising Of Content. ............................................15

17         B.    Defendants' One-Year Contractual Statute Of Limitations Does Not Bar
18               Breaches That Continually Accrue ..........................................................19

19         C.    The Reservations Of Right Clauses Cannot Be Construed As A License To
                 Discriminate Against Plaintiffs Because They Are LGBTQ+ ................20

20               1.    Community Guidelines Reservation ..............................................21

21               2.    The 2019 General Reservation.......................................................22

22               3.    Restricted Mode And Demonetization............................................22

23               4.    Other Vague Reservations.............................................................23

24         D.    If Plaintiffs Have No Rights, Then Defendants Have No License Rights ..............23

25         E.    Section 230(c) Immunity Does Not Extend To Plaintiffs' Contractual
26               Claims......................................................................................................27

                 1.    230(c)(1) "Publishing Immunity" .................................................27

27               2.    230(c)(2) Immunity For Blocking And Filtering Content ............29

28

1

**TABLE OF CONTENTS**
(Continued)

2                                                                           Page

3    V.    CONCLUSION .................................................................................................30

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES

**Page**

**FEDERAL CASES**

*Ahl-E-Bait Media, Inc. v. Jadoo TV, Inc.*,
No. CV1205307 MMM, 2013 WL 11324312 (C.D. Cal. Apr. 16, 2013)..................4, 14, 24, 25

*Barnes v. Yahoo!, Inc.*,
570 F.3d 1096 (9th Cir. 2009) ...........................................................27, 28

*Brown v. Google LLC*,
525 F. Supp. 3d 1049 (N.D. Cal. 2021) ...........................................................11

*Cal. v. United States*,
512 F.Supp. 36 (N.D. Cal. 1981) ...........................................................10

*Carolina Cas. Ins. Co. v. Oahu Air Conditioning Serv., Inc.*,
994 F. Supp. 2d 1082 (E.D. Cal. 2014) ...........................................................10

*Colin ex rel. Colin v. Orange Unified School Dist.*,
83 F. Supp. 2d 1135 (C.D. Cal. 2000)...........................................................26

*Davis v. Capitol Recs., LLC*,
No. 12-CV-1602 YGR, 2013 WL 1701746 (N.D. Cal. Apr. 18, 2013) ...................................10

*Denver Area Educ. Telecomm. Consortium, Inc. v. F.C.C.*,
518 U.S. 727 (1996) ...........................................................27

*Doe v. GTE Corp.*,
347 F.3d 655 (7th Cir. 2003)...........................................................28

*Earl v. Nielsen Media Rsch., Inc.*,
658 F.3d 1108 (9th Cir. 2011) ...........................................................19

*Enigma Software Grp. USA, LLC v. Malwarebytes, Inc.*,
946 F.3d 1040 (9th Cir. 2019)...........................................................28, 29

*Hi-Tech Elec., Inc. of Del. v. T&B Constr. & Elec. Servs., Inc.*,
No. CV 15-3034, 2017 WL 660645 (E.D. La. Feb. 15, 2017)....................................10

*InfoStream Grp., Inc. v. PayPal, Inc.*,
SI, 2012 WL 3731517 (N.D. Cal. Aug. 28, 2012) ...........................................................25

*London Mkt. Insurers v. Musket Corp.*,
CV-16-05726-SVW-JPR, 2017 WL 8218282 (C.D. Cal. 2017)........................................21, 22

*Meridian Project Sys., Inc. v. Hardin Const. Co., LLC*,
426 F. Supp. 2d 1101 (E.D. Cal. 2006) ...........................................................13, 17

**TABLE OF AUTHORITIES**
(Continued)

**Page**

*Nat'l R.R. Passenger Corp. v. Morgan*,
  536 U.S. 101 (2002) ...................................................................................20

*Nelson v. Cnty, of Sacramento*,
  2:12-cv-02040-MCE-GGH, 2013 WL 3242266 (E.D. Cal. Jun. 20, 2013) .............................10

*Newman v. Google*,
  3:20-cv-04011-VC (N.D. Cal. Nov. 28, 2022) ................................................. *passim*

*Prager Uni. vs Google LLC, YouTube, LLC,*
  301 Cal. Rptr. 3d 836 (2022),........................................................................14

*Reyes v. Wells Fargo Bank, N.A.,*
  No. C-10-01667 JCS, 2011 WL 30759 (N.D. Cal. Jan. 3, 2011)................................21

*Sweet v. Google Inc.,*
  No. 17-CV-03953-EMC, 2018 WL 1184777 (N.D. Cal. Mar. 7, 2018)..................................26

*United States v. Google,*
  1:23-cv-00108 (E.D. Va. Jan. 24, 2023) ................................................................12

*Vanleeuwen v. Keyuan Petrochemicals, Inc.,*
  11-CV-9495, 2013 WL 2247394 .........................................................................3, 13

**STATE CASES**

*Aryeh v. Canon Bus. Sols., Inc.,*
  55 Cal. 4th 1185 (2013)..................................................................................20

*City of Atascadero v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,*
  68 Cal. App. 4th 445 (Cal. Ct. App. 1998) ..............................................................21

*Dryden v. Bd. of Pension Comm'rs of City of L. A.,*
  6 Cal. 2d 575 (1936)......................................................................................20

*Hogar Dulce Hogar v. Comty. Dev. Comm'n,*
  110 Cal. App. 4th 1288 (2003)............................................................................20

*Pease v. Brown,*
  186 Cal. App. 2d 425 (1960)........................................................................4, 18, 24

*Sonic-Calabasas A, Inc. v. Moreno,*
  247 P.3d 130 (2011)........................................................................................26

*Storek & Storek, Inc. v. Citicorp Real Est., Inc.,*
  100 Cal. App. 4th 44 (2002) ........................................................................ *passim*

1

**TABLE OF AUTHORITIES**
(Continued)

2

                                                                          **Page**

3    *Third Story Music, Inc. v. Waits*,
        41 Cal. App. 4th 798 (1995)..................................................................24, 25

4

     *WYDA Assocs. V. Merner*,
5        42 Cal.App.4th 1702 (1996).............................................................................2

6    **FEDERAL STATUTES**

7    47 U.S.C. § 230(c)..............................................................................1, 27, 28, 29

8    47 U.S.C. § 230(c)(1).................................................................................27, 28

9
     47 U.S.C. § 230(c)(2).........................................................................................29
10
     47 U.S.C. § 230(c)(2)(A)....................................................................................29
11
     47 U.S.C. § 230(e).............................................................................14, 27, 29
12

13   **STATE STATUTES**

14   Cal. Bus. & Prof. Code § 17200.....................................................................1, 13

15   Cal. Civ. Code, § 1643....................................................................................4, 22

16   Cal. Civ. Code §§ 1654, 1643...........................................................................21

17   **RULES**

18   Fed. R. Civ. P. Rule 12......................................................................................12

19   Fed. R. Civ. P. Rule 12(b)(6) ...................................................................... *passim*

20   Fed. R. Civ. P. Rule 12(f)....................................................................8, 10, 11, 12

21   Fed. R. Civ. P. Rule 56......................................................................................12

22   **OTHER AUTHORITIES**

23
     Safiya Umoja Noble, "Algorithms of Oppression," Apple Books,
24       https://books.apple.com/us/book/algorithms-of-oppression/id1327926683 ............11

25

26

27

28

1      Plaintiffs Divino Group, LLC, Chris Knight, Celso Dulay, Cameron Stiehl, BriaandChrissy

2   LLC, Bria Kam, Chrissy Chambers, Chase Ross, Brett Somers, Lindsay Amer, Stephanie Frosch,

3   Sal Cinquemani, Tamara Johnson, and Greg Scarnici (collectively the "Plaintiffs"), hereby

4   respectfully submit their opposition to Defendants' Motion to Strike and Motion to Dismiss

5   Plaintiffs' [Corrected] Fourth Amended Class Action Complaint (ECF #121) (the "Motions").

6   I.      **INTRODUCTION**

7          The issue before the Court is whether Plaintiffs have identified a contractual right to be

8   treated equally by Defendants under YouTube's Terms of Service and other agreements with

9   Plaintiffs (the "Service Contracts")?  Order Granting Plaintiffs' Motion to Dismiss, ECF No. 107

10  (Sept. 30, 2022) ("Order") at 24:12-16; 34:20-21.

11         That issue does not come before the Court on a blank slate.  On September 30, 2022, this

12  Court found that Plaintiffs have alleged sufficient facts to state a claim that Defendants

13  discriminate against them and treat them differently in violation of the Unruh Act and the

14  California Business and Professions Code §§ 17200, *et seq*. ("UCL").  Order at 18:9-18.  The

15  Court then found that Plaintiffs' Unruh Act and UCL discrimination claims were barred under 47

16  U.S.C. § 230(c) ("230(c)").  *Id*. at 26:2-34:10.  The Court granted Plaintiffs limited leave to amend

17  "whether there is an implied covenant that is consistent with whatever contract(s) and term(s) are

18  at issue." *Id*. at 24:10-16.

19         In the [Corrected] Fourth Amended Complaint (DKT # 116) ("4AC"), Plaintiffs identify

20  express and implied contractual rights to be treated equally and without regard to their LGBTQ+

21  identity, background, affiliation, or personal viewpoints.  In the Service Contracts, Defendants

22  promise that when determining whether a consumer's content is eligible for distribution,

23  advertising, or monetization services, ***"everyone plays by the same rules"*** and ***"succeed[s] on***

24  ***their own terms,"*** because ***"people - not gatekeepers – decide what is popular."***  4AC Ex. 19 at

25  1148, Ex. 17 at 1138.  This includes Defendants' "Community Guidelines," which Defendants

26  state form "a key part of [the] broader suite of policies" that make up the rules and "are regularly

27  updated in consultation with outside experts and YouTube creators to keep pace with emerging

28  challenges." *Id*. Ex. 8 at 249.  Defendants promise to ***"enforce these Community Guidelines***

1  *using a combination of human reviewers and machine learning and apply them to everyone*

2  *equally—regardless of the subject or the creator's background, political viewpoint, position, or*

3  *affiliation." Id.*

4         Furthermore, the Service Contracts provide more than 700 pages of specific content based

5  "Policies" and rules that govern who and what is eligible to use and access YouTube (collectively

6  the "Rules").  *See*, *e.g.*, *id.* Ex. 8, pp. 249–396, Ex. 9 at 403–861 ("Policy, Safety, and Copyright

7  Policies"), Ex. 10 at 917–946 ("Advertising on YouTube Policies").  Defendants state that "[t]hese

8  policies apply to all types of content on our platform, including videos, comments, links, and

9  thumbnails."  *Id.* Ex. 8 at 249.  All the Rules provide content based descriptions of the type of

10  content for which access to all or specific portions of YouTube ("Service") is prohibited.  *See*,

11  *e.g.*, *id.* Exs. 8, 9, and 10.  The Rules exist to "outline what type of content isn't allowed on

12  YouTube," and are intended "to make YouTube a safer community while still giving creators the

13  freedom to share a broad range of experiences and perspectives."  *Id.* Ex. 8 at 249.  Nowhere in

14  the Rules do Defendants disclose or imply that they also consider personal information about the

15  user, including their LGBTQ+ identity, or suggest that they can deny benefits to anyone under the

16  Rules because of who they are, rather than what they say or post.  *Cf.  id.* Ex. 7 at 222–230.

17         Finally, there can be no doubt or ambiguity about what Defendants mean when they

18  promise equal, content based access to the Service.  On January 17, 2018, Defendants told

19  Congress under oath that they operate YouTube as "a neutral public forum," the public's access to

20  which is determined in a "politically neutral way," subject to "our Community Guidelines, which

21  are spelled out and provided publicly to all."  4AC ¶¶ 95–100.  And, while those public facing

22  statements may not be independently actionable, they are sufficient evidence to support Plaintiffs'

23  core claim that they have a right to be treated equally when it comes to determining eligibility for

24  distribution, advertising, monetization, and other services offered on YouTube.  *See WYDA*

25  *Assocs. V. Merner*, 42 Cal.App.4th 1702, 1710 (1996).

26        At a bare minimum, therefore, Defendants are obligated to do two things: (1) apply and

27  enforce their specific content based rules and guidelines to each Plaintiff without regard to that

28  person's "background, political viewpoint, position, or affiliation," when they post content or seek

access to Services offered by YouTube; and (2) apply and enforce those specific neutral content based rules "to everyone equally." *See also* Order at 1–4, ECF No. 138, *Newman v. Google*, 3:20-cv-04011-VC ("*Newman*") (N.D. Cal. Nov. 28, 2022) ("*Newman* Order").

In their Motions, Defendants devote a substantial amount of energy re-litigating the Court's ruling that Plaintiffs have alleged LGBTQ+ discrimination and differential treatment. *Compare* Order, 15:17-18:18, *with* Motions 5:13-6:8; 18:4-22:25; 25:8–11 (allegations of disparate impact and differential treatment insufficient and not "plausible" and "there is no dispute that YouTube considered some of Plaintiffs' content to be objectionable, which ends the inquiry"). That is improper under the law of the case doctrine. *Vanleeuwen v. Keyuan Petrochemicals, Inc.*, 11-CV-9495, 2013 WL 2247394 PSG (JCGx), at *7–10 (C.D. Cal. 2013). It also violates Rule 12(b)(6) by asking the Court to construe and resolve factual allegations in their favor before any discovery has occurred.[1]

That leaves Defendants' legal arguments that Plaintiffs have no rights under the Service Contracts. This includes Defendants' arguments that (i) Plaintiffs have no enforceable right to be free from LGBTQ+ discrimination and be treated equally when it comes to Defendants' decisions about whether their content is eligible for the distribution, monetization, and the other promotional services that YouTube offers the public; and (2) even if they do, their claim to enforce those contractual rights is barred under 230(c). *See* Motions 9:22–15:7; 22:26-25:26. In the Motions, Defendants do not address the core allegations on which Plaintiffs' breach of the implied covenant claim is based: Defendants do not offer YouTube as a free service, but as consideration for license rights that permit Defendants to use and monetize Plaintiffs' content and their personal data and information, as well as the personal data of any other consumer who subscribes to Plaintiffs' channels or view their content. 4AC ¶¶ 78, 86–89, Ex. 5 at 171–172. Thus, if Defendants are correct that Plaintiffs have no rights under the Service Contracts, including the basic right not to

---

[1] To the extent the Court considers Defendants' factual counter narrative, the Court should also grant limited leave to amend and consider the addition allegations and charts that refute Defendants' factual assertions to the Complaint. *See* Motion for Limited Leave To File Additional Factual Allegations of Differential Treatment (filed concurrently herewith).

1  be discriminated under a consumer contract, then there is a material failure of consideration and

2  the Court must either imply the covenant of good faith and fair dealing to enforce those rights as

3  consideration, or Defendants' license rights to 95% of the third party video content in the world

4  are unenforceable and void.  *See Storek & Storek, Inc. v. Citicorp Real Est., Inc.*, 100 Cal. App.

5  4th 44, 61 (2002) ("imply[ing] a covenant of good faith and fair dealing to limit that discretion in

6  order to create a binding contract and avoid a finding that the promise is illusory"); *Pease v.*

7  *Brown*, 186 Cal. App. 2d 425, 431 (1960) (when party is "free to perform or to withdraw from the

8  agreement at his own unrestricted pleasure," the contract is "deemed illusory and it provides no

9  consideration"); *Ahl-E-Bait Media, Inc. v. Jadoo TV, Inc.,* No. CV1205307 MMM (PJWx), 2013

10  WL 11324312, at *8 (C.D. Cal. Apr. 16, 2013) (licensing agreement illusory despite internet

11  television company's temporary distribution of plaintiff's content); *see also* Cal. Civ. Code,

12  § 1643.

13  **II.   THE 4AC**

14       Defendants' Service Contracts with Plaintiffs are licensing agreements under which the

15  Defendants obtain the valuable rights to distribute and profit from Plaintiffs video content and the

16  personal consumer data generated by that video content.  4AC ¶¶ 78, 86–89; Ex. 5 at 171–172.

17  Without that licensing provision, Defendants cannot operate YouTube or profit by advertising,

18  monetizing, or selling a consumer's content or personal data.  In exchange for those valuable

19  licensing rights, Defendants promise Plaintiffs distribution, advertising, and monetization benefits

20  from the Service, subject only to compliance with specific, neutral, content based Rules.  Thus,

21  Defendants' argument that Plaintiffs have no rights to equal treatment and are entitled to no

22  benefits under the Contracts, begs the question of what consideration do user's get in exchange for

23  the largest consumer licensing agreement in the world?

24       **A.   The Licensing Provisions**

25       Under the Service Contracts, Defendants offer the general public distribution, advertising,

26  monetization, and other services and benefits in exchange for the license rights to the video

27  content and personal data of each person who uses the Service.  YouTube can only distribute, sell

28  advertising to, or profit from Service if consumers, like Plaintiffs, grant Defendants a worldwide,

non-exclusive," sublicensable and transferable" license to the video content and personal

consumer data generated by the video.  *See* 4AC Ex. 5 at 171–172.  The license also permits

Defendants to distribute, advertise, and monetize Plaintiffs' videos on the Service even where, as

here, Defendants prohibit Plaintiffs from doing the same.  *Id.*; 4AC ¶¶ 78. 86–89.

The license includes provisions that grant Defendants the right "to reproduce, distribute,

prepare derivative works, display, and perform it [] in connection with the Service," or "for the

purpose of promoting and redistributing part or all of the Service."  4AC Ex. 5 at 171–172.  It also

includes the right of Defendants to "monetize" the consumer's "Content on the Service "and such

monetization may include displaying ads on or within Content or charging users a fee for access."

*Id.*  And, as of November 18, 2020, "any payments [the consumer] may be entitled to receive from

YouTube under any other agreement between you and YouTube (including for example payments

under the YouTube Partner Program, Channel memberships or Super Chat) will be treated as

royalties."  *Id.*; *but cf.* 4AC Ex. 9 at 905 (requiring users who create a YouTube channel to license

the "copyright or other related rights [of the Content] directly to YouTube").  Furthermore, when

Plaintiffs open up a Google Ad Sense Account with Defendants to promote and expand audience

reach and engagement for their video and channels, the user grants Defendants the additional

"right to access, index and cache the Properties, or any portion thereof, including by automated

means."  *Id.* Ex. 15 at 1116.  Based on these licensing provisions, Defendants have acquired the

rights to distribute and profit from what is estimated to be more than 95% of the available third

party video content in the history of the world.  4AC ¶¶ 78, 86–89.

**B.**   **Defendants Also Receive Monetary Consideration**

In addition to licensing rights, Plaintiffs must also pay Defendants money for the ad

products that Defendants sell to "promote" and "boost" audience views and engagement with their

videos and channels.  It is estimated that Defendants' marketing of ad products to Plaintiffs and

swaths of other consumers generates hundreds of millions of dollars, and possibly billions, in

annual profits for Defendants.  Plaintiff Divino alone has paid Defendants more than $14,542.94.

4AC ¶ 149.  When Plaintiffs pay money to purchase these ads from Defendants, they must of

course rely on Defendants' promises that Defendants apply their restrictions and prohibitions on

PLAINTIFFS' OPPOSITION TO MOTION TO STRIKE AND MOTION TO DISMISS

content, use, and audience reach "regardless of the creator's background" where "everyone plays by the same rules" and "succeed[s] on their own terms," because "people - not gatekeepers - decide what is popular." *Id.* Ex. 8 at 249, Ex. 19 at 1148, Ex. 17 at 1138.  Without those promises, and the ability of the consumer to enforce them, the advertising products that Defendants sell to Plaintiffs and swaths of other consumers have little or no value.  4AC  ¶¶ 149, 154, 158–162.

### C.      Defendants' Obligations To Plaintiffs

In exchange for the core licensing rights, Defendants promise that access to the Service's distribution, promotion, advertising, and monetization benefits will be based on equally applied, content based rules, and other benefits of the Service.  All of the Rules, including the Community Guidelines, the "Policies," and other specific service Rules, are content based rules that prohibit eligibility for that portion of the service, if, and only if, the video contains prohibited content.

Nowhere in the Rules or anywhere else in the Service Contracts do Defendants state or imply that they consider Plaintiffs LGBTQ+ identity to treat them differently under the Rules. 4AC ¶¶ 72–84, Exs. 1–5, 8, 9, 12–15. The Rules impose a long and detailed list of overlapping and interrelated  content restrictions and prohibitions imposed on the consumer, including the YouTube Community Guidelines, YouTube's Privacy Policies, and YouTube's Privacy, Safety, and Copyright Policies. *Id.* Ex. 4 at 142, 144.  In addition, the Service Contracts list 10 other "restrictions" or Service use prohibitions. *Id.* at 145–47 (listing 10 "restrictions that apply to use of the Service").  And, if, as in the case of Plaintiffs, the consumer seeks to use the Service to advertise, promote, or monetize video content, the consumer must also comply with the content based requirements under YouTube's Advertising and Monetization "policies" and/or be allowed to join YouTube's "Partner Program." *See generally id.* Exs. 7–15 (the policies or Rules that govern the Service); 4AC, ¶ 50, 59–62 (listing the specific content based terms and different "policies" that comprise the Rules under the Service Contract).  Defendants promise to apply and enforce these content based Rules to make decisions about who may access or use any part of the Service, in a "neutral" manner, without regard to the creator's "background," or related viewpoints or affiliations, including Race. *See also* Motions 2:2-3:21 (setting forth content based rules.)

Whatever the ambiguity, overlap, redundancy, or confusion created by all of these Rules,

1   they all apply, govern, and enforce prohibitions based on the actual content in the video, not the

2   identity of the consumer posting or viewing the content.  This includes those portions of the

3   Service related to the content "distribution platform," paid consumer products, and services like

4   the "YouTube Partner Program and YouTube Paid Memberships and Purchases (where

5   available)."  And, compliance with the terms of the Service Contracts governing user access is

6   subject expressly to the application and enforcement of the neutral content based rules set forth in

7   Defendants' "Community Guidelines" and "Policies."  4AC Ex. 5 at 163–164.  These Rules and

8   policies explain what you [the user] can and cannot do" while using the Service and tell Plaintiffs

9   that "everyone plays by the same rules." *Id.* Ex. 19 at 1148.  They also incorporate by reference

10  the embedded "links or references provided in [the] terms," and, at least prior to November 18,

11  2020, expressly incorporate the terms in YouTube's "Mission Statement." *See id.* Exs. 1-6.  In

12  the 700 pages of Exhibits that make up the Service Contracts at issue in this case, none of them

13  grant Defendants a right to enforce these content based prohibitions because Plaintiffs are

14  LGBTQ+ or otherwise treat Plaintiffs differently because of their gender identity or sexual

15  orientation   *See*, *e.g.*, *id.* Exs. 5, 7, 8, and 15.

16          Defendants promise to apply and enforce the Rules, including the Community Guidelines,

17  to "everyone equally" without regard to the creator's background, personal characteristics,

18  identity, viewpoint or beliefs, could not be clearer: "***We [Defendants] enforce these Community***

19  ***Guidelines using a combination of human reviewers and machine learning, and apply them to***

20  ***everyone equally—regardless of the subject or the creator's background, political viewpoint,***

21  ***position, or affiliation"*** and "***everyone plays by the same rules" and "succeed[s] on their own***

22  ***terms," because "people - not gatekeepers – decide what is popular."*** *Id.* Ex. 8 at 249, Ex. 19 at

23  1148, Ex. 17 at 1138.

24          There can be no dispute about what Defendants mean by this.  Defendants admitted, under

25  oath, that they operate YouTube as "a neutral public forum," under "neutral" content based rules

26  that Defendants enforce "in a politically neutral way," and, then, based only on things that "are

27  prohibited by our Community Guidelines, which are spelled out and provided publicly to all."

28  4AC ¶ 100;  *see also* ¶¶ 95-99, Exs. 1-6 (expressly incorporating embedded "links or references

1    provided in [the] terms," including YouTube's "Mission Statement").

2        **D.    Allegations Of Misconduct**

3        Throughout their Motions, Defendants resort to re-litigating the Court's prior findings by

4    interjecting factual disputes about the status of Plaintiffs' content.  Regarding the latter,

5    Defendants spend 7 pages asserting that they are not doing what the Court found that Plaintiffs

6    sufficiently alleged they were and that, in any event they have corrected all but  a "handful" of the

7    improper restricted distribution, monetized, and/or removed videos have been corrected or

8    "reinstated."  *See* Motions 4:19-6:18; 10:13-11:12; 18:4-14; 19:20-22:23.

9        While that is not only improper under Rule 12(b)(6), it is also demonstrably false.  Unlike

10   the Third Amended Class Action Complaint ("TAC"), Plaintiffs have now alleged what the Court

11   declined to consider previously: detailed allegations that, on September 14, 2017, Defendants'

12   engineers and data analysts admitted to one their filtering tools "target" LGBTQ+ users.  4AC ¶¶

13   47-49.  And, that targeting continues to this day.  Defendants characterize the restricted and

14   demonetized videos as a mere "handful."  The Complaint, however, specifically identifies 37

15   videos, 34 of which (or more than 90%) remain restricted and/or demonetized, and one of which

16   was taken down entirely.  *See, e.g.*, 4AC ¶¶ 184, 188, 201, 209–211, 214, 217, 266–268; *see also*

17   Memorandum in Support of Motion for Limited Leave To Plead Additional Allegations Of

18   Differential Treatment at 4–6 (containing detailed charts showing that Defendants restrict and

19   demonetized 14 videos of the 21 videos posted by Plaintiff Divino and one videos) ("Motion for

20   Leave") (filed concurrently herewith).

21   **III.    DEFENDANTS' MOTION TO STRIKE**

22       Confronted with the Court's finding that Plaintiffs alleged facts sufficient to establish

23   differential treatment of Plaintiffs, Defendants seek to strike similar allegations in the 4AC.

24   Defendants' use of Rule 12(f) to re-litigate the Court's earlier findings regarding the sufficiency of

25   the discrimination allegations to bolster their counter factual narrative without discovery is

26   improper.  And even with respect to three allegations that Plaintiffs have agreed to correct, those

27   do not alter the factual sufficiency of Plaintiffs core allegations that Defendants treat them

28   differently when it comes to eligibility decisions about the distribution, advertising, and

monetization benefits available to them under their Service Contracts.[2]

To protect the accuracy of the record, therefore Plaintiffs have no opposition to revising the following allegations to correct any technical deficiencies in the 4AC:

**(1) Paragraph 6 should read:**
That is not only unlawful intentional LGBTQ+ discrimination under YouTube's form consumer contracts, but it also gives rise to actionable violations and breaches of the contractual terms, promises, and obligations in those contracts by Defendants.  This Court previously found that Plaintiffs have sufficiently alleged that Defendants discriminate and treat them differently because they are LGBTQ+.  Order at 9-18.  And Defendants continue to engage in that discrimination despite "public facing" statements that "describe the platform as being viewpoint neutral" and that Google has "an unwritten policy" that is "inconsistent with those public statements."  Tr. Zoom Proceeding, June 2, 2020, 9:23-10:7.

**(2) Paragraph 55(e) should read:**
Enforcing what Defendants stated was a company decision to prohibit gay users from advertising their content on YouTube because of the "gay thing" and using that unwritten policy to stigmatize Plaintiffs and their content as "shocking" and "sexually explicit" solely because they identify as gay.

**(3) Paragraphs 107 and 108 should read:**
107.    Defendants restrict content with "potentially mature" or "objectionable" material [Exhibit 9 at 622-623, 647], including discussions of drugs or alcohol; "overly detailed" sexual discussions; and "[i]nappropriate language;" and "content that is gratuitously incendiary, inflammatory, or demeaning."  [Exhibit 9 at 706.]  "Restricted Mode" uses "signals—such as video title, description, metadata, Community Guidelines reviews, and age restrictions—to identify and filter out potentially mature content."  [Exhibit 9 at 623.]

108.    Though Defendants promised not to filter out content belonging to individuals or groups based on their background, affiliation, or viewpoints, including their LGBTQ+ identity. Defendants make public facing statements that "[s]haring stories about facing discrimination...and confronting or overcoming discrimination is what makes YouTube great," and they would "make s ure those stories are included in Restricted Mode" [Exhibit 9 at 706.] But despite these "public facing statements," Defendants restricted Plaintiffs' content wherever the title, tags, or audio refer to LGBTQ+ subjects and restricted hundreds of Plaintiffs' videos on the pretext that they contain "mature" or "adult" content, when they do not, and despite allowing similar content posted by non LGBTQ+ creators to be fully monetized and distributed without any restrictions.

---

[2] On January 24, 2023, after reviewing Defendants' Motion to Strike, Plaintiffs sought to meet and confer with Defendants about filing an amended complaint to "correct" and "true up" the allegations with the companion case in *Newman v. Google*.  Defendants declined the offer.  *See* Motion for Leave.

A.      **Defendants' Motion To Strike Is Improper "Tone Policing"**

The rest of Defendants' Motion to Strike "tone policing" that courts view with disfavor and deny unless the "allegations in the pleading have no possible relation to the controversy, ***and*** may cause prejudice to one of the parties." *Carolina Cas. Ins. Co. v. Oahu Air Conditioning Serv., Inc.*, 994 F. Supp. 2d 1082, 1090 (E.D. Cal. 2014) (citation omitted) (emphasis added); *Hi-Tech Elec., Inc. of Del. v. T&B Constr. & Elec. Servs., Inc.*, No. CV 15-3034, 2017 WL 660645, at *2 (E.D. La. Feb. 15, 2017).  Minor misquotations are not "immaterial, impertinent, or scandalous" within the meaning of Rule 12(f) when they do not change the meaning of the underlying statement in a meaningful way.  *Davis v. Capitol Recs., LLC*, No. 12-CV-1602 YGR, 2013 WL 1701746, at *8 (N.D. Cal. Apr. 18, 2013).

When considering a motion to strike, the court "must treat as admitted all material factual allegations underlying the challenged defenses and all reasonable presumptions that can be drawn therefrom." *Cal. v. United States*, 512 F.Supp. 36, 39 (N.D. Cal. 1981).  "'If the court is in doubt as to whether the challenged matter may raise an issue of fact or law, the motion to strike should be denied, leaving an assessment of the sufficiency of the allegations for adjudication on the merits.'" *Carolina Cas. Ins. Co.*, 994 F. Supp. 2d at 1090–91; *see also Nelson v. Cnty, of Sacramento*, 2:12-cv-02040-MCE-GGH, 2013 WL 3242266, at *3 (E.D. Cal. Jun. 20, 2013).  Applying these rules, Defendants' Motion to Strike is petty, baseless and immaterial to the issue before the Court.

1.      **Allegations About Defendants Filtering Tools And Algorithms**

Defendants place particular emphasis on trying to strike allegations regarding the source code, architecture, and design of their filtering tools, algorithms, and content review practices. Defendants' sensitivity to this important factual dispute is not surprising.  As Plaintiffs allege, "a transparent inspection of that source code is essential to determining and confirming the extent to which Defendants have discriminated, and continue to discriminate, against Plaintiffs and other similarly situated YouTubers on the basis of the 'gay thing,' LGBTQ+, or other invidious or unlawful identity based classifications" under and in violation of their contracts.  4AC ¶ 44. "'[K]nowledge of the technical aspects of search and retrieval, in terms of critiquing the computer

1   programming code that underlies the systems, is absolutely necessary to have a profound impact

2   on these systems.'" *Id.* (quoting Safiya Umoja Noble, "Algorithms of Oppression," Apple Books;

3   https://books.apple.com/us/book/algorithms-of-oppression/id1327926683 (last visited Feb. 6,

4   2023)).  Thus, unlike many cases involving allegations of differential treatment that turn on

5   statistical inferences and "he said - she said" information, a discovery based inspection of

6   Defendants' filtering tools, algorithms, and practices will determine whether Defendants are

7   improperly using Plaintiffs' LGBTQ+ identities and other non-content based information to make

8   decisions about whether Plaintiffs' content is ineligible for distribution, advertising, and

9   monetization under the Service Contracts.  And even if the Court finds that Plaintiffs do not have

10  any contractual right to be treated equally, Defendants cannot use Rule 12(f) to re-litigate the

11  Court's finding that Plaintiffs have alleged facts that Defendants discriminate against LGBTQ+

12  consumers.

13         With respect to 4AC ¶¶ 36–37, 39, 41, and 43, Defendants complain that "Algorithms of

14  Oppression" does not say that "'technological redlining' is pervasive at Google/YouTube," or

15  otherwise have anything to do with whether YouTube restricted Plaintiffs' videos based on their

16  identities.  That is not true.  Professor Noble could not be clearer that she is talking about and

17  focused on Google.  And to the extent her research is focused on Defendants use of "sensitive

18  information" about the consumer's identity and personal data based on YouTube and Google

19  search engines, Plaintiffs have alleged (and the Court has found) that similar identity based

20  information is being used by Defendants to make content based eligibility decisions that results in

21  differential treatment of LGBTQ+ users.  4AC ¶¶ 86–88, 115.

22         The same is true for the allegations regarding the use of computer scripts "to send secret,

23  separate messages to Defendants' servers," resulting in determinations about how content gets

24  curated.  And the specific allegation that Defendants use and consider that sensitive personal

25  information is not unique to this case.  *See, e.g.*, *Brown v. Google LLC*, 525 F. Supp. 3d 1049,

26  1055–1060 (N.D. Cal. 2021). Whether Defendants' content curation and review tools and practices

27  are using the information results in or causes the differential treatment and discrimination that the

28  Court has found is sufficiently alleged is not subject to reconsideration under Rule 12(f).  *See*

1    Order, 18:9-18.

2         Finally, Defendants use of Rule 12 to "tone polic[e]" Plaintiffs' allegations about

3    Defendants' corporate culture and monopoly power is misdirected.  Defendants should take that

4    issue up with the New York Times, other mainstream news outlets, and the U.S. DOJ, all of whom

5    have reported in detail about Google's "toxic culture," racist and sexist employment practices, and

6    abuse of market dominance.  *See, e.g.*, "'You're the Problem': When They Spoke Up About

7    Misconduct, They Were Offered Mental Health Services," New York Times, July 28, 2021,

8    *https://www.nytimes.com/2021/07/28/us/google-workplace-complaints-counseling.html (last visited*

9    *Feb. 6, 2023)*; #SiliconValleySoWhite: Black Facebook and Google employees speak out on big

10   tech racism, USA Today, Feb. 10, 2020, *available at*

11   https://www.usatoday.com/story/tech/2020/02/10/racial-discrimination-persists-facebook-google-

12   employees-say/4307591002/ (Feb.10, 2020 8:00 a.m. ET)  Compl., ECF No. 1, *United States v.*

13   *Google*, 1:23-cv-00108 (E.D. Va. Jan. 24, 2023) (detailing Google's monopoly power and anti-

14   competitive acts in internet advertising).

15              **2.    Changes To The Contract**

16        There is nothing "[im]plausible" about "the assertion that YouTube updated its Terms in

17   direct response" the issues raised in this, and its "companion case."  Plaintiffs have alleged the

18   specific timing and dates of the changes, including the 2019 amendments that remove Defendants'

19   Mission Statements and other representations and terms that support Plaintiffs' claims from

20   Defendants Service Contracts.  4AC ¶ 4 n.3.  Defendants are certainly free to deny, explain, and/or

21   prove the reasons they purportedly made those changes during discovery and why they had

22   nothing to do with the discrimination claims of Plaintiffs and other consumers as part of a Rule 56

23   motion, but neither Plaintiffs, other aggrieved consumers, or the Court, are required to accept their

24   conclusory denial as matter of law under Rule 12(f).  That is especially true in this case where

25   Defendants rely on those changes to argue that Plaintiffs seek to rely on extra contractual, non-

26   actionable statements confirming that benefits under the Service Contracts are based on the neutral

27   application of the Rules.  *See, e.g.*, Motions at 15:15-18:23 (referring to "extra-contractual"

28   statements that were incorporated into earlier versions of Defendants' Terms of Service).  And

1   whether or not those statements create a separate enforceable right, they are material to the Court's

2   determination of contractual intent and whether decisions under the Service Contracts must be

3   based on content, not identity.  *See Meridian Project Sys., Inc. v. Hardin Const. Co., LLC*, 426 F.

4   Supp. 2d 1101, 1109 (E.D. Cal. 2006).

5   ### 3.   References To Other Dismissed Claims Are Proper

6   Plaintiffs have not reasserted any of the dismissed claims and have limited their Complaint

7   to the single, remaining breach of covenant claim.  *See generally* 4AC.  Plaintiffs' allegations that

8   Defendants "suppress speech" to "the detriment of the users' free speech and consumer rights,"

9   while "[f]alsely representing to the viewing public and potential advertisers that video content

10  created and posted to YouTube by Plaintiffs contains discussions about drug use or abuse or

11  drinking alcohol," are material to whether Defendants have breached their contractual obligations

12  to determine eligibility for benefits under the Service Contracts based on what they say and post,

13  not who they are.  *See* Mot. 8:8-22 (citation omitted).  The same holds true for Plaintiffs'

14  allegations referencing anti-discrimination laws, the UCL, and unjust enrichment.  *Id.; see also*

15  Order at 30:12-13; 31:15-17 (dismissing Unruh and UCL claims under 230(c)).

16  Finally, the unjust enrichment allegations are material to Defendants defense that Plaintiffs

17  have no enforceable rights under the Service Contracts because YouTube is a free service.  Any

18  ruling on the legal sufficiency of Plaintiffs' implied covenant claim must address whether

19  Defendants' conduct eviscerates what meaningful consideration Defendants offer in exchange for

20  the rights to Plaintiffs' content and personal data.

21  ## IV.   DEFENDANTS' MOTION TO DISMISS

22  For purposes of Rule 12(b)(6), there is, and can be, no dispute that Defendants discriminate

23  by treating Plaintiffs differently under their Service Contracts because they are LGBTQ+.  Order

24  at 18:9-18.  That is law of the case and bars any challenge to same allegations in an amended

25  complaint.  *Vanleeuwen*, 2013 WL 2247394, at *7–10.  Consequently, Defendants' core legal

26  argument is that Plaintiffs have no enforceable rights to be treated equally under the Service

27  Contracts.  According to Defendants, they reserve unfettered and unilateral discretion to

28  discriminate against Plaintiffs "as they see fit," by removing, restricting, and demonetizing their

1  content, not because of what Plaintiffs post, but because they are LGBTQ+.  *See, e.g.*, Motions

2  1:21-26; 6:11-13; 13:27-14:2 (quoting *Prager Uni. vs Google LLC, YouTube, LLC*, 301 Cal. Rptr.

3  3d 836, 852 (2022)); 15:10-18:25 ("*Prager*").

4          That is not what the Service Contracts say.  Eligibility for distribution, monetization, and

5  promotional advertising are based on a long list of specific content based rules that nowhere

6  disclose or reserve the right to deny a consumer benefits and services because of who they are

7  rather than what they post.  4AC Ex. 8 at 249 (distribution rules prohibiting "spam, deceptive

8  practices, and scams, [and] nudity and sexual content," among other topics), Ex. 9 at 706

9  (restriction rules governing topics such as "drugs and alcohol" "sexual situations," and

10  "violence"), Ex. 13 at 988–990 (monetization rules governing topics such as spam, repetitious and

11  re-used content), Ex. 14 at 999–1000 (additional monetization rules governing "inappropriate

12  language[,] violence[,] adult content[,] shocking content[,]" and related themes).  And nothing in

13  Defendants' general and vague reservation of rights and limitations clauses grants them the right

14  to deny Plaintiffs contractual benefits based on content for discriminatory, non-content based

15  reasons.  *See id.* Exs. 1–15.

16          But even if the Court were to adopt and endorse Defendants' contractual right to

17  discriminate against LGBTQ+ consumers, Defendants still must come to terms with the licensing

18  provisions in the Service Contracts.  If Defendants are correct that Plaintiffs have no enforceable

19  rights whatsoever under their Service Contracts, "and cannot evade YouTube's immunities under

20  Section 230," then Defendants provide no material consideration to enforce their reciprocal rights

21  to operate YouTube by using, advertising, monetizing, and profiting from the content of third

22  party consumers like Plaintiffs.  A contract based on inadequate consideration whereby

23  Defendants get to enforce their licensing rights but Plaintiffs have no rights to the benefits and

24  services that Defendants offer in exchange for the licensing rights is precisely the type of

25  "illusory" contract that triggers the implied covenant of good faith and fair dealing.  *See, e.g.*,

26  *Storek & Storek, Inc.*, 100 Cal. App. 4th at 61; *Ahl-E-Bait Media, Inc.*, 2013 WL 11324312, at *8

27  (licensing agreement illusory).

28

A.   <u>**Plaintiffs Have An Enforceable Right To Equal Treatment Under Defendants'
Neutral, Content Based Rules Governing Distribution, Monetization And
Advertising Of Content.**</u>

This Court asked Plaintiffs to "clearly identify" their contractual rights under the Service
Contracts.  Order 23:24-24:17.  Plaintiffs identify 21 overlapping and inter-related documents that
comprise the Service Contracts governing the relationship between Plaintiffs and Defendants.
4AC ¶¶ 1, 104–105, 107–109.  Under those Service Contracts, Plaintiffs have a right to (i) equal
access and eligibility for equal distribution of content (Community Guidelines and Restricted
Mode), (ii) Advertising (Partners and Advertiser Friendly Guidelines), and (iii) Monetization
(Monetization Policies).  *Id.* Ex. 8 at 249, Ex. 9 at 706, Ex. 13 at 988–990, Ex. 14 at 999–1000.
According to each of those provisions, Defendants may decline to distribute, monetize, or promote
or advertise a video, if the content in the video violates the specific content prohibition rules
governing the service or benefit.  *Id.* Ex. 8 at 249 (stating that Community Guidelines "outline
what type of content isn't allowed on YouTube" and listing guidelines), Ex. 9 at 706 (noting that
to be included in Restricted Mode, "your content must follow the guidelines above" and listing
guidelines), Ex. 13 at 991 (monetization rules stating "If you violate any of our policies, YouTube
may" restrict monetization, and listing policies).

Equal access to each is based on a specific set of rules or policies about video content that
Defendants must apply and enforce "equally to all," without regard to Plaintiffs' LGBTQ+
identity, background, affiliation, or viewpoint: ***We [Defendants] enforce these Community
Guidelines using a combination of human reviewers and machine learning, and apply them to
everyone equally—regardless of the subject or the creator's background, political viewpoint,
position, or affiliation;*** and "***everyone plays by the same rules" and "succeed[s] on their own
terms," because "people - not gatekeepers – decide what is popular."*** *Id.* Ex. 8 at 249, Ex. 19 at
1148, Ex. 17 at 1138; *see also Newman* Order at 1–4 (finding at a minimum that Plaintiffs have a
right to equal treatment under the Contracts.  And in 700 pages of specific content based
provisions governing what content is and is not eligible for distribution, monetization, and
advertising benefits on YouTube, nowhere do Defendants disclose that they use "sensitive

-15-
PLAINTIFFS' OPPOSITION TO MOTION TO STRIKE AND MOTION TO DISMISS

1    information", they collect Plaintiffs' race, sexuality, or any other legally protected identity

2    classification to deny them equal access to benefits, let alone a right to discriminate against

3    Plaintiffs by treating them differently because they are LGBTQ+.

4          The policies for Restricted Mode state that "If your content contains one or more of these

5    themes, we may age restrict," before listing themes like "harmful or dangerous activities" "nudity

6    or sexually suggestive content," "violent or graphic content," and "vulgar language."  4AC Ex. 9

7    at 719; *see also id.* at 707 (age-restricted videos are placed in Restricted Mode).  These provisions

8    condition Defendants' ability to restrict content on the content's violation of the listed themes.[3]

9    *Id.* at 706, 719 ("If your content….we may . . . .").  Defendants do not identify any reservation of

10   rights that would affect the application of these content based rules.

11         YouTube's Partner Program—or Monetization—Terms also contain an affirmative

12   promise that YouTube will pay participants "55% of net revenues recognized by YouTube from

13   ads displayed or streamed . . . on your Content."  *Id.* Ex. 12 at 980.  The Partner Program Terms of

14   Service incorporate the Partner Program Policies, *see id.*, which state "If you violate any of our

15   policies, YouTube may" restrict monetization.  *Id.* Ex. 13 at 991.  The Partner Program Policies

16   include: (1) the Community Guidelines' content based policies, *id.* Ex. 13 at 987–88; (2) the

17   Google AdSense policies, which prohibit things like repetitious and re-used content, *id.* at 988–90;

18   and (3) YouTube's Advertiser Friendly Content policies on "inappropriate language[,] violence[,]

19   adult content[,] shocking content[,]" and related themes."  *Id.* Ex. 14 at 999–1000.[4]

20         Furthermore, Defendants' argument that their promises not to discriminate "cover only

21

22   [3]  To the extent that Defendants claim a right to expand on the types of prohibited content
     specified in these provisions, Defendants' content based rules for restricted mode, identified
23   above, cannot be extended to allow Defendants to discriminate against Plaintiffs based on their
     identities.  Such a decision would be an objectively unreasonable application of the listed rules
24   and would necessarily violate the duty of good faith.  *See Storek & Storek, Inc.*, 100 Cal. App. 4th
     at 55, 58–59
25

26   [4]  To the extent that Defendants claim a right to expand on the types of prohibited content
     specified in these provisions, Defendants' content based rules for the monetization program,
27   identified above, cannot be extended to allow Defendants to discriminate against Plaintiffs based
     on their identities.  *See supra* n.3.
28

1  choices about YouTube's content *removals*" and that eligibility for benefits under Restricted Mode,

2  advertising, and monetization "are governed by different guidelines," fail on their face.  *See*

3  Motions 17:21–18:2.  Defendants expressly state that their Community Guidelines are part of the

4  rules governing other services.  4AC Ex. 13 at 984 (Partner Program Policies incorporate the

5  Community Guidelines), Ex. 12 at 980 (Partner Program Terms of Service incorporate the

6  YouTube Terms of Service, which incorporate the Community Guidelines), Ex. 5 at 164, Ex. 10 at

7  936 (incorporating Community Guidelines into policy governing advertisements).

8         Defendants are also incorrect in arguing that their public facing statements promising not

9  to discriminate and treat everyone equally are immaterial to contractual intent.  *See* Motions

10  14:14-18:23.  Defendants' statements about "politically neutral," content based application of the

11  Contractual "Rules" are relevant evidence and admissions as to just what Defendants' Rules mean

12  and how they are enforced, including that Defendants enforce their "policies in a politically

13  neutral way," and, in so doing, "certain things are prohibited by our Community Guidelines,

14  which are spelled out and provided publicly to all."  4AC ¶ 100.  Courts consider extra contractual

15  statements and evidence reflecting the parties' understanding of an ambiguous contract.  *Meridian*

16  *Project Sys., Inc. v. Hardin Const. Co., LLC*, 426 F. Supp. 2d 1101, 1109 (E.D. Cal. 2006).  This

17  includes Defendants' statements that appear in the Service Contracts: (i) Defendants "would

18  ensure that 'Restricted Mode' would not 'filter out content belonging to individuals or groups

19  based on' 'gender,' 'race, religion or sexual orientation,'" 4AC ¶ 100; and (ii) that YouTube is

20  "committed" to "[r]emove content that violates our policies;" and our "policies explain what you

21  can and cannot do while you're there, so everyone plays by the same rules," 4AC Ex. 19 at 1147–

22  1149.  Thus Defendants' "public facing statements" are evidence that Defendants' conduct is

23  "inconsistent" with their construction of the Service Contracts.  *See Newman* Order at 2

24  (Defendants' act "in ways that are inconsistent with the Terms of Service or other rules"); *Prager*,

25  301 Cal.Rptr.3d at 850–852 (Defendants public-facing representations are "consistent" with

26  plaintiff's claim that "Defendants filter the content on its platform using a discrete set of neutral

27  policies").

28         There are implied covenants at issue in this case.  First, when a contract allows one party to

1   determine whether it is satisfied by another party's performance as a condition precedent to the

2   party's performance, the courts require that the party comply with the covenant of good faith and

3   fair dealing in making that determination. *Storek & Storek, Inc.*, 100 Cal. App. 4th at 55, 58–59.

4   Second, when the contract leaves a party "free to perform or to withdraw from the agreement at

5   his own unrestricted pleasure." *Pease v. Brown*, 186 Cal.App.2d at 431. In addition, if the

6   contract lacks consideration, the court must "imply a covenant of good faith and fair dealing to

7   limit that discretion in order to create a binding contract and avoid a finding that the promise is

8   illusory." *See Storek & Storek, Inc.*, 100 Cal.App.4th at 61.

9          Under Rule 12(b)(6), Plaintiffs have sufficiently alleged that Defendants discriminate and

10   treat them differently because they are LGBTQ+. Order at 18:9-18. Defendants' lengthy factual

11   argument that Plaintiffs "<u>Cannot State a Claim Based on Allegations That YouTube Restricted or

12   Demonetized Their Videos Based on Their Identities</u>" has no place in this Rule 12(b)(6) motion.

13   Motions, 18:24-22:23. There is no dispute that Plaintiffs have sufficiently alleged discrimination

14   and differential treatment based on LGBTQ+ identity. And in *Newman*, the Court also found the

15   LGBTQ+ discrimination allegations, including the 2017 meeting, to be specific:

16          It doesn't seem conclusory. I mean it says that the defendants admitted that YouTube
          uses algorithms and automated filtering tools . . . to gather and analyze information
17          about creators and viewers based on the plaintiffs' identities . . . [a]nd that the
          defendants also use that same information to make decisions about viewing
18          restrictions and monetization that turn on who the users and viewers are rather than
          what is actually in the video content. I mean that doesn't sound conclusory to me.
19          That sounds reasonably specific.

20   Transcript of Hearing, October 27, 2022, at 28:21-29:7; *see also Newman* Order at 3 (recognizing

21   strength of LGBTQ+ discrimination allegations).

22          Defendants' insistence that they no longer discriminate against LGBTQ+ users and

23   Plaintiffs and that all that remains is a "handful" of "cherry picked video restrictions is also

24   demonstrably false. The 4AC identifies 37 videos, 34 of which remain selectively restricted and

25   demonetized, and one that was taken down entirely. 4AC ¶¶ 188, 201, 214; Motion for Leave 4-10.

26   Asking the Court to assess all of these videos, their context, and then to compare them to the

27   unrestricted videos that Plaintiffs allege as comparators is a fact-intensive inquiry unsuited to

28   disposal on a 12(b)(6) motion and must also await discovery on what only Defendants know: the

1  restriction and demonetization rates for users they do not identify as LGBTQ+.  *Earl v. Nielsen*

2  *Media Rsch., Inc.*, 658 F.3d 1108, 1114 (9th Cir. 2011) (noting that comparing plaintiff's situation

3  to alleged comparators in discrimination case was fact-intensive).  And, to the extent that the Court

4  is going to consider such attacks on Plaintiffs' factual allegations and engage in video by video fact

5  finding, Defendants must establish that the well pleaded allegations of treating Plaintiffs differently

6  because they consider information about their sexuality is not true.

7          Plaintiffs have done what the Court asked: identified specific contractual provisions and

8  other statements that are sufficient to state a claim for breach of the implied covenant in two

9  different ways: (i) Defendants treat Plaintiffs differently than others because they are LGBTQ+

10  when determining whether Plaintiffs have satisfied content based condition precedents to

11  distribution, monetization, and promotional advertising, *see, e.g.*, 4AC Ex. 8 at 249, Ex. 9 at 706 ,

12  Ex. 13 at 988–990, Ex. 14 at 872–873; and (ii) Defendants exercise their discretion when making

13  those determinations in a manner that renders Plaintiffs' right to equal treatment and access under

14  the services in exchange for licensing rights meaningless and illusory, *id.* Ex. 8 at 249.

15      **B.**    **Defendants' One-Year Contractual Statute Of Limitations Does Not Bar**

16          **Breaches That Continually Accrue**

17          For the first time, Defendants argue that the statute of limitations provision in the Service

18  Contracts prevents Plaintiffs from enforcing any rights they may otherwise have to be free from

19  LGBTQ+ discrimination because except for a "handful of videos," the alleged misconduct ended

20  before August 13, 2018.[5]  Defendants' factual assertion that the alleged discrimination ended in

21  May of 2018 is demonstrably false.

22          The 4AC alleges that at some point in or around 2016-2017, Defendants began to use

23  Plaintiffs' LGBTQ+ identity and treat them differently to make what were previously purely

24  content based decisions.  *See, e.g.*, 4AC ¶¶ 181–182, 232.  That discrimination increased to a point

---

25

26  [5]  If Defendants are permitted to raise that issue now and argue that the alleged discrimination
    ended before August 13, 2018, at the very least then, the Court should allow Plaintiffs to allege
27  additional facts about the extent and nature of the continuing to discrimination.  *See* Motion For
    Leave To Allege Additional Facts Of Continuing Discrimination.

28

1   that Defendants had no choice but to acknowledge and admit that they were targeting LGBTQ+

2   users because of who they were not what they posted. *Id.* ¶ 47–48.  By the time the lawsuit was

3   filed in 2019, Defendants' discrimination had eviscerated the distribution and related monetization

4   benefits by more than 75%.  *See, e.g.*, *id.* at ¶¶ 191–193, 208.  This discrimination continues.  *Id.*

5   ¶¶ 188, 201, 214; Memorandum in Support of Motion for Leave at 4-10.

6          Under the doctrine of continual accrual "[w]hen an obligation or liability arises on a

7   recurring basis, a cause of action accrues each time a wrongful act occurs, triggering a new

8   limitations period."  *Hogar Dulce Hogar v. Comty. Dev. Comm'n*, 110 Cal. App. 4th 1288, 1295

9   (2003).  "Because each new breach of such an obligation provides all the elements of a claim . . .

10  each may be treated as an independently actionable wrong with its own time limit for recovery.

11  *Aryeh v. Canon Bus. Sols., Inc.*, 55 Cal. 4th 1185, 1198 (2013).  The continuous accrual rule

12  allows a plaintiff to sue over withheld pension payments, even where the limitations period had

13  expired since the defendant initially denied the payment.  *See e.g., Aryeh* 55 Cal. 4th at 1199

14  (discussing *Dryden v. Bd. of Pension Comm'rs of City of L. A.*, 6 Cal. 2d 575, 577 (1936)).  Each

15  missed payment constitutes a new breach of contract, creating a new cause of action and a new

16  accrual date.  *Id.*  Defendants' continuing discrimination and differential treatment of Plaintiffs

17  because they are LGBTQ+ are no exception.

18         Finally, Defendants' related argument that Plaintiffs cannot rely on any conduct before

19  August 2018, including the September 2017 meeting with LGBTQ+ creators in which YouTube

20  admitted that their algorithms were currently discriminating against LGBTQ+ users, is incorrect.

21  Limitations periods bars claims, not evidence.  *Nat'l R.R. Passenger Corp.  v. Morgan*, 536 U.S.

22  101, 113 (2002).

23         **C.     The Reservations Of Right Clauses Cannot Be Construed As A License To**

24                 **Discriminate Against Plaintiffs Because They Are LGBTQ+**

25         Defendants argue that the specific, content based right to be treated equally is also

26  unenforceable under several vague general reservation clauses.  Motion at 13–15.  Defendants'

27  arguments that they can discriminate finds no support in those provisions.  And the use of general,

28  vague or catchall provisions to eviscerate specific provisions violates the law governing the

1   construction of contracts that: (i) Courts "interpret contractual language in a manner which gives

2   force and effect to every provision, and not in a way which renders some clauses nugatory,

3   inoperative or meaningless;"  *City of Atascadero v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,

4   68 Cal. App. 4th 445, 473 (Cal. Ct. App. 1998) and (ii) that specific provisions govern over

5   general ones when they conflict.  *See, e.g.*, *London Mkt. Insurers v. Musket Corp.*, CV-16-05726-

6   SVW-JPR, 2017 WL 8218282, *2 (C.D. Cal. 2017).  Furthermore, courts resolve any such conflict

7   in favor of the aggrieved party, especially, where, as here, specific content based provisions

8   limiting Defendants' ability to moderate content conflict with general reservations of rights.  Cal.

9   Civ. Code.§§ 1654, 1643 (contracts are construed in a manner that is "lawful, operative . . . and

10  capable of being carried into effect"); *accord Reyes v. Wells Fargo Bank, N.A.*, No. C-10-01667

11  JCS, 2011 WL 30759, at *12 (N.D. Cal. Jan. 3, 2011).  This case is no exception.

12              **1.      Community Guidelines Reservation**

13          The Community Guidelines "govern what content is eligible to appear on YouTube."

14  Motions at 3; *see also* 4AC Ex. 8 at 249 (stating that the Guidelines "outline what type of content

15  isn't allowed on YouTube"); 4AC ¶ 100.  Defendants promise that they will apply the Guidelines

16  "to everyone equally—regardless of the subject or the creator's background, political viewpoint,

17  position, or affiliation."  4AC Ex. 8 at 249.  The Community Guidelines list content based

18  categories of prohibitive content, including: "spam, deceptive practices, and scams, [and] nudity

19  and sexual content," among other topics.  *Id.*

20          Despite this language, Defendants argue that, beginning in 2018, they "reserved the right

21  to decide whether *Content* violates these Terms of Service" and they retain "sole discretion" to

22  remove such *Content* and/or terminate a user's account for submitting such *material* in violation

23  of these Terms of Service."  *Id.* Ex. 2 at 80–81.  Those additional provisions change nothing

24  because, consistent with Defendants representations, the reservation of discretion applies to

25  "content" and "material" that violates the specific Rules.  Like every other portion of the 700

26  pages of Service Contracts, Defendants do not reserve a right to discriminate against LGBTQ+

27  users when determining whether their "content" complies with the Rules.  To the extent that

28  Defendants claim that this provision allows them to discriminate against Plaintiffs when enforcing

1  content based Rules because Plaintiffs are LGBTQ+, they violate the express terms and the

2  implied covenant of good faith and fair dealing that requires that such determinations be

3  reasonable, non-pretextual, and non-discriminatory.

4                    **2.**        <u>The 2019 General Reservation</u>

5       In December 2019, Defendants added a general reservation of rights that "YouTube is

6  under no obligation to host or serve content."  4AC Ex. 5 at 166.  This general reservation must

7  yield to the more specific provisions of the Community Guidelines and other rules in the Service

8  Contracts and cannot be construed to wipe out all of those specific rights so as to render the rest of

9  the contract illusory.  *See, e.g.*, *London Market Insurers*, 2017 WL 8218282, *2 (specific governs

10  over general); Cal. Civ. Code, § 1643 (courts must strive to construe the contract in a manner that

11  is "lawful, operative . . . and capable of being carried into effect").  More importantly, it does not

12  apply to Plaintiffs' allegations and claims regarding the denial of benefits and access after

13  Defendants agreed to host and serve the videos identified in the 4AC.  Once Defendants decide to

14  "host and serve" Plaintiffs' content, and Defendants take the licensing rights to distribute,

15  monetize, and advertise it for their own personal profit and gain, the reservation, on its face, does

16  not apply.

17                    **3.**        <u>Restricted Mode And Demonetization</u>

18       Defendants' Motions cites two reservations of rights regarding their content based policy

19  of applying Restricted Mode to limit a user's rights to distribution and monetization.  Neither of

20  permit Defendants to discriminate against Plaintiffs because they are LGBTQ+.   In the first,

21  Defendants state that "YouTube is not obligated to display any advertisements alongside your

22  videos and may determine the type and format of ads available on the YouTube Service."

23  Motions at 13.  Granting Defendants an unfettered right to discriminate and treat Plaintiffs

24  differently because they are LGBTQ+ renders the specific content based rules governing the type

25  of content that is eligible for content meaningless and further destroys the bargained for

26  consideration that underlies the licensing provisions that allow Defendants to sell ads and

27  monetize Plaintiffs content in the first place.  *See, e.g.*, *London Market Insurers*, 2017 WL

28  8218282, *2 (specific governs over general); Cal. Civ. Code, § 1643 (courts must strive to

PLAINTIFFS' OPPOSITION TO MOTION TO STRIKE AND MOTION TO DISMISS

1    construe the contract in a manner that is "lawful, operative . . . and capable of being carried into

2    effect").

3                   **4.       Other Vague Reservations**

4            Defendants assert two other purported general reservations of rights to terminate Plaintiffs'

5    specific content based rights.  First, Defendants argue that Plaintiffs' claims are barred by

6    YouTube's Limitation of Liability clause, which states that YouTube will not be liable for

7    damages "resulting from any errors or omissions in any content."  Ex. 2 at 111.  However, the

8    Limitation of Liability, by its terms, does not bar Plaintiffs' claims for injunctive relief, 4AC

9    Prayer for Relief ¶ 3, nor does it bar Plaintiffs' claims that Defendants have demonetized their

10   non-omitted, still-hosted content, see, e.g., id. ¶ 109.  Next, Defendants cite a provision from

11   Google's AdSense Terms of Service that states that Google has "the right to refuse or limit your

12   access to the [AdSense] Services."  4AC Ex. 15 at 1116.  But that reservation does not apply to the

13   YouTube Partner Program at all, and the Monetization Policies do not incorporate the entire

14   AdSense agreement; the AdSense agreement mostly governs an unrelated program for individuals

15   who want to add Google services to their webpages.  *See* Ex. 15 at 988.

16           **D.      If Plaintiffs Have No Rights, Then Defendants Have No License Rights**

17           All of Defendants' arguments amount to the same thing:  Plaintiffs have no enforceable

18   rights under the Service Contracts whatsoever, including the basic right not to be discriminated

19   against under a consumer licensing contract because they are LGBTQ+.  If Defendants are correct

20   that Plaintiffs do not even have an enforceable right to be treated equally, the question becomes

21   what consideration do they give Plaintiffs in exchange for the licensing rights to distribute and

22   monetize their video content and personal data.

23           There is a difference of opinion among the state and federal courts on the issue of whether

24   YouTube's Service Contracts provide any rights to consumers when it comes to the benefits and

25   access offered by Defendants.  In *Newman*, Judge Chhabria found that, at a minimum, the

26   Contracts provide an enforceable promise not to discriminate against or treat users differently

27   because they are LGBTQ+.  *Newman* Order at 2.  Furthermore, while the Court found that the

28   contractual right does not necessarily include a "promise never to consider users' personal

characteristics for any reason," Defendants must have "legitimate reasons to do so," and may "take users' individual characteristics into account *to ensure and promote equal and non-discriminatory treatment*." *Id.* at 2 n.1 (emphasis added).  Thus, whatever discretion Defendants may have to take Plaintiffs' identity into account when making eligibility decisions about access, they cannot do so to discriminate against or treat them differently when applying and enforcing those provisions.

In *Prager University v. Google*, the case that Defendants urge this Court to follow, the Sixth District Court of Appeals found that consumers have absolutely no rights to be treated equally under the Service Contracts.  *Prager* held that all of Defendants' content based rules are merely explanatory guidelines and that Defendants retain unfettered and sole discretion to determine eligibility to benefits and access "as they see fit," even when it comes to discrimination. 301 Cal. Rptr. 3d 836, 851 (2022), *review filed* (Jan. 17, 2023).  One material omission in the *Prager* opinion, however, was its failure to address the fact that Defendants' Service Contracts function as a "non-exclusive ... license to use, reproduce, distribute, prepare derivative works of, display, and perform the Content in connection with the Service and [its] business." *Id.* at 853. The Court's holding that the Contracts, including the TOS, do not provide any rights to consumers renders those Contracts meaningless and illusory.  The absence or termination of any consideration to Plaintiffs, therefore, makes the license agreement unenforceable unless the Court implies a covenant of good faith and fair dealing under the Contracts.

If a contract leaves a party "free to perform or to withdraw from the agreement at his own unrestricted pleasure, the promise is deemed illusory and it provides no consideration." *Pease v. Brown*, 186 Cal. App. 2d 425, 431 (1960).  In such cases, courts "imply a covenant of good faith and fair dealing to limit that discretion in order to create a binding contract and avoid a finding that the promise is illusory." *See Storek & Storek, Inc.*, 100 Cal. App. 4th at 61.  Courts will imply such covenants even when doing so is "at odds with the express language of the contract." *Third Story Music, Inc. v. Waits*, 41 Cal. App. 4th 798, 805 (1995).  Temporary hosting, or part performance, does not make up for a lack of a binding obligation in the contract. *Ahl-E-Bait Media, Inc.,* 2013 WL 11324312, at *8 (C.D. Cal. Apr. 16, 2013) (finding licensing agreement

illusory despite internet television company's temporary distribution of plaintiff's content).

Courts impose a covenant of good faith and fair dealing to limit a party's unchecked discretion in a number of cases directly analogous to this one.  At least two of those cases have involved licensing contracts like the one at issue.  In *Ahl-E-Bait Media, Inc.,* the owner and operator of a television station entered into a license agreement granting an internet television company a license to distribute its content.  2013 WL 11324312, at *1.  The contract gave the television company absolute discretion to decide whether or not to actually distribute plaintiff's channel.  *Id.*  Because of that absolute discretion, the court found that the contract lacked consideration, was illusory, and it held that the television company's decision not to distribute was limited by the covenant  of good faith and fair dealing.  *Id.* at *8–9.  Similarly, in *Third Story Music, Inc. v. Waits*, the court held that the licensee's absolute discretion under a licensing agreement to decide whether to distribute plaintiff's music needed to be limited by the covenant of good faith and fair dealing unless the licensor received an upfront payment for the license.  41 Cal. App. 4th at 798–802, 808–809.  Although the court declined to enforce the covenant because there had been an upfront payment, no such payment was made in this case.  *Id.*; *see also Storek & Storek, Inc.*, 100 Cal.App.4th at 57 (discussing *Third Story Music*).

Finally, courts have applied the covenant of good faith and fair dealing to interactive service provider ("ISP") terms of service.  In *InfoStream Grp., Inc. v. PayPal, Inc.*, the court imposed the covenant to limit another large ISP's discretion under its terms of service.  No. C 12-748 SI, 2012 WL 3731517, at *8 (N.D Cal. Aug. 28, 2012).  After finding that PayPal's terms of service—which allowed PayPal to terminate accounts "for any reason at any time" and "at its sole discretion"—lacked consideration, the court applied the covenant to require PayPal to act in good faith in making termination decisions.  *Id*.

Defendants' construction of the Service Contracts that they retain unfettered discretion to discriminate against LGBTQ+ Plaintiffs when making decisions on whether to distribute, restrict, monetize, or promote Plaintiffs' content fails to identify ***any*** material consideration offered in exchange for the license rights to monetize and profit from Plaintiffs content.  If the Court does not "imply a covenant of good faith and fair dealing to limit that discretion in order to create a

1   binding contract and avoid a finding that the promise is illusory" then the license provisions by

2   which Defendants control and regulate the content and data of more than 250 million U.S.

3   consumers and more than 95% of the world's third party video content on YouTube is

4   unenforceable and void.  *See Storek & Storek, Inc.*, 100 Cal.App.4th at 57; 4AC ¶ 88.

5          To be clear, Plaintiffs are not arguing that Defendants are not entitled to broad discretion

6   when applying and enforcing their specific rules or, when applicable, their reservations of rights

7   *See, e.g., Sweet v. Google Inc.*, No. 17-CV-03953-EMC, 2018 WL 1184777, at *9 (N.D. Cal. Mar.

8   7, 2018) (declining to imply the covenant because the YouTube Partner Program "encompassed

9   more than just advertising revenues; content can be monetized in other ways such as subscription

10  revenues," that "are attributable to the monthly views or watchtime of your Content as a

11  percentage of the monthly views or watchtime of all or a subset of participating content in the

12  relevant subscription offering as determined by YouTube" along with the right to have content

13  posted and distributed was adequate consideration).  But whatever the parameters of that

14  discretion, it cannot be extended to permit unlawful discrimination or treating users differently

15  because they are LGBTQ+.  *See Sonic-Calabasas A, Inc. v. Moreno*, 247 P.3d 130, 145–46 (2011)

16  (contracts that violate public policy are void); *see also Colin ex rel. Colin v. Orange Unified*

17  *School Dist.*, 83 F. Supp. 2d 1135, 1150 (C.D. Cal. 2000) ("[I]t is state public policy to prevent

18  discrimination on the basis of sexual orientation.").  And to the extent that Defendants contend

19  that Plaintiffs have no rights to be treated equally because they are LGBTQ+ under the licensing

20  agreement when it comes to hosting, distributing, or monetizing content under specific content

21  based rules, the Court should imply the covenant of good faith and fair dealing to at least provide

22  consumers with a right not to be unlawfully discriminated against as the minimal consideration for

23  a global license agreement that affects 250 million consumers in the U.S. [6]

24  _____

25  [6] Plaintiffs have a difficult time believing that Judge Chen believed that "complete control over
    decisions regarding advertisements," includes the right to discriminate and treat consumers

26  differently based on a protected identity classification like race or sexuality.  *Cf. Sweet v. Google
    Inc.*, No. 17-CV-03953-EMC, 2018 WL 1184777, at *9 (N.D. Cal. Mar. 7, 2018).  Furthermore,

27  Judge Chen found that there were rights and that there was consideration precisely because
    Defendants agreed to host and serve content.  *See id.*

28

**E.      Section 230(c) Immunity Does Not Extend To Plaintiffs' Contractual Claims**

In its Order, the Court stated that it would reserve judgment as to whether contractual claims like Plaintiffs' implied covenant claim may be barred by CDA Section 230.  Order 24:17-18 & n. 11.  In making that determination, the Court must consider whether the application of section 230(c) results in terminating the consideration granted to Plaintiffs in exchange for the extensive licensing rights they grant to Defendants.  Thus, notwithstanding prior rulings that licensing provisions do not implicate the type of intellectual property rights that are exempted from immunity under section 47 U.S.C. § 230(e), allegations that Defendants took licensing rights and then refused to perform further complicates the already tricky application of 230(c) to well pleaded allegations of LGBTQ+ discrimination from which this case arises.[7]

**1.      230(c)(1) "Publishing Immunity"**

Breaching a licensing agreement is not a traditional, discretionary editorial function unique to publishers.  Can Defendants enter into a license agreement with the estate of the late James Baldwin to monetize and profit from his literary work in exchange for a promise to distribute, monetize, and promote the literary work, keep the revenues and profits obtained from a licensing agreement for themselves, and then refuse to distribute, monetize, or promote Mr. Baldwin's work because he is gay and/or black by claiming "publishing immunity" under 230(c)?  One would hope not.  *But see Prager*, 301 Cal. Rptr.3d at 854 (allegations in the complaint relate to a theory of liability that is foreclosed by the CDA); Order, 24:17-18 & n. 11.

Section 230(c)(1) does not apply to contractual breaches by an ISP.  *Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1108-1109 (9th Cir. 2009).  In *Barnes*, the Ninth Circuit held that an ISP who expressly or implicitly breaches an enforceable promise or contract is not entitled to immunity under section 230(c)(1).  "Liability for breach of promise is different from, and not merely a rephrasing of, liability for negligent undertaking [by a publisher.]"  *Id*. at 1106.  "Contract

---

[7] Furthermore, allowing Defendants to keep licensing rights without providing the consideration they exchanged for those rights makes Defendants' licensing rights unenforceable and creates the kind of statutory disruption of established contractual relationships that the Supreme Court warned about in *Denver Area Educ. Telecomm. Consortium, Inc. v. F.C.C.*, 518 U.S. 727, 766 (1996).

liability," therefore "would come not from [Defendants'] publishing conduct, but from [their] manifest intention to be legally obligated to do something." *See id.* That includes Defendants' obligation to provide Plaintiffs identity and viewpoint neutral access to YouTube. *See id.* at 1107.

Section 230(c)(1) only "precludes liability when the duty the plaintiff alleges the defendant violated derives from the defendant's status or conduct as a publisher or speaker;" here the duty that Defendants' breach is beyond the grant of immunity, because it "springs" from a contract and enforceable promise "not from any non-contractual conduct or capacity of the defendant." *Id.*, at 1107 (citing *Doe v. GTE Corp.*, 347 F.3d 655, 662 (7th Cir. 2003)) (emphasis added). Thus, while section 230(c)(1) "creates a baseline rule" of "no liability for publishing . . . the content of other information service providers, . . . [i]nsofar as [Defendants] made a promise with the constructive intent that it be enforceable, it has implicitly agreed to an alteration in such baseline" rule. *Barnes*, 570 F.3d at 1108–09.[8]

There is no dispute that Defendants entered into a licensing agreement in which they took the benefits without performing. Entering into a licensing agreement and then refusing to perform is certainly not unique to publishers. Furthermore, Defendants cannot style themselves as the *Masterpiece Cakeshop* "baker" or editors of the Miami Herald's op-ed section. Unlike those parties, who refused service ***before*** taking money or other valuable consideration to perform the service, Defendants failed to perform ***after*** receiving full payment from Plaintiffs under a license agreement. *Storek & Storek, Inc.*, 100 Cal.App.4th at 61 (contracts that do not require consideration are unenforceable unless court implies duty of good faith and fair dealing to limit

---

[8]   *Murphy v. Twitter, Inc.,* does not provide a reason to extend 230(c) beyond *Barnes* in this case. *See* 60 Cal. App. 5th 12 (2021). This is not a dispute over whether specifically identified online "material" or "content" violates YouTube's policies or rules. Respondents have never identified any specific material that violates a content based rule and continue to use licensing rights to monetize Plaintiffs' content and data. *See* 4AC 183, 227, 232, 255. By contrast, *Murphy* held only that the disputes as to whether specific material identified by the ISP in online content violated the platform's hate speech policy involved purely content based disputes protected from judicial review under §230(c). *Id.*, at 24-35. As the court stated, the mere fact that Twitter has a hate speech policy does not imply a specific promise that Twitter would not filter or block her content so as to remove that dispute from the ambit of §230(c). *See id.*, at 32, 38-39. *Compare* RB 13-14, 23-36, 40-41, 5254, 62-64, with *Murphy*, 60 Cal. App. 5th at 18-22.

1  ability to refuse to perform).

2          **2.**      <u>**230(c)(2) Immunity For Blocking And Filtering Content**</u>

3         Section 230(c)(2) also does not apply.  By definition, that provision is a content based

4  statute under which providers do not have unfettered discretion to declare online content

5  "objectionable."  *Enigma Software Grp. USA, LLC v. Malwarebytes, Inc.*, 946 F.3d 1040, 1047

6  (9th Cir. 2019).  On its face, section 230(c)(2) immunizes only the blocking and screening of

7  "offensive ***materials.***"  47 U.S.C. §230(c)(2) (emphasis added).  Section 230(c)(2) applies only to

8  the filtering and blocking of content, not the people: "[p]rotection for private blocking and

9  screening of offensive ***material***;" (ii) immunizing the blocking of "***material*** that the provider . . .

10  considers to be obscene . . . . or otherwise objectionable"), and (iii) extends immunity to the

11  "technical means to restrict access to ***material***").  230(c)(2)(A), (B) (emphasis added).  Section

12  230(c) does not mention blocking and screening of "***users,***" much less doing so based on a

13  person's sexual, gender, religious, political, or commercial identity or viewpoints.  *See* 47 U.S.C.

14  §230(c).

15         The Ninth Circuit has warned that "extending immunity beyond the facts of [a] case could

16  'pose serious problems,'" particularly "where a provider is charged with using § 230 immunity to

17  advance an anticompetitive agenda."  *Enigma*, 946 F.3d at 1049–1050.  And an "unbounded"

18  construction of the law "would allow a content provider to "block content for anticompetitive

19  purposes or merely at its malicious whim."  *Id.*  No federal court has ever interpreted section

20  230(c) to immunize an ISP from animus-based filtering, much less to immunize discriminatory

21  non-performance under a valid licensing agreement.  This court should not be the first.  The

22  criteria for blocking online material must be based on the characteristics of the online material,

23  *i.e.,* lewd, obscene, or objectionable ***content***, not because person posting the content is LGBTQ+.

24         Finally, Defendants' factual assertion that "there is no dispute that YouTube considered

25  some of Plaintiffs' content to be objectionable, which ends the inquiry under Section

26  230(c)(2)(A)" is improper under Rule 12(b)(6).  Motions 25:8–11.  Unless and until the Court

27  permits discovery, Defendants are not entitled to assert that they determined, without regard to

28  Plaintiffs' LGBTQ+ identity or other competitive animus, that the specific content in the videos

was "objectionable."  That is certainly true in this case, where the Court has found sufficient allegations to establish that Defendants treat Plaintiffs differently when making content moderation decisions because they are LGBTQ+.  Order 18:9-18; 4AC ¶¶ 47–49, 55d, 223; Ex. 1.

## V.    CONCLUSION

For the reasons outlined above, Defendants' Motion to Strike and Motion to Dismiss should be denied.

DATED:  February 7, 2023                    Respectfully submitted,

ELLIS GEORGE CIPOLLONE
O'BRIEN ANNAGUEY LLP
     Peter Obstler
     Eric M. George
     Dennis S. Ellis

By: _____
            Peter Obstler
Attorneys for LGBTQ+ Plaintiffs